# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **FIRST HORIZON BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. Civil Action No. 2:25-cv-02956** |
| | ) | |
| **INTELLECTUAL VENTURES** | ) | **JURY DEMAND** |
| **MANAGEMENT, LLC, INTELLECTUAL** | ) | |
| **VENTURES I LLC, INTELLECTUAL** | ) | |
| **VENTURES II LLC, CALLAHAN** | ) | |
| **CELLULAR L.L.C., OL SECURITY** | ) | |
| **LIMITED LIABILITY COMPANY,** | ) | |
| **INVENTION INVESTMENT FUND I,** | ) | |
| **L.P., and INVENTION INVESTMENT** | ) | |
| **FUND II, LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |

**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF**

COMES NOW Plaintiff First Horizon Bank ("First Horizon" or "Plaintiff") and for its

Amended Complaint against Defendants Intellectual Ventures Management, LLC ("Intellectual

Ventures Management"), Intellectual Ventures I LLC ("Intellectual Ventures I"), Intellectual

Ventures II LLC ("Intellectual Ventures II"), Callahan Cellular L.L.C. ("Callahan Cellular"), OL

Security Limited Liability Company ("OL Security"), Invention Investment Fund I, L.P. ("Fund

I"), and Invention Investment Fund II, LLC ("Fund 2") (collectively, "Defendants") states the

following:

**I. NATURE OF THE ACTION**

1.      This is an action for a declaratory judgment that First Horizon does not infringe

United States Patent Number 7,949,785; United States Patent Number 8,332,844; United States

Patent Number 8,407,722; United States Patent Number 10,567,391; United States Patent Number 7,464,862; United States Patent Number 8,352,584; United States Patent Number 9,678,967; and United States Patent Number RE48,894 (collectively, the "Patents-in-Suit") and that at least the asserted claims of the Patents-in-Suit are invalid.

## II. THE PARTIES

2. First Horizon is a banking corporation organized and existing under the laws of the State of Tennessee and having its principal place of business located at 165 Madison Ave, Memphis, Tennessee 38103. First Horizon provides banking and financial-related products and services to its customers, including products and services concerning secure payment processing and point-of-sale transactions. First Horizon Bank is the successor by conversion to First Tennessee Bank National Association, a national banking association.

3. Upon information and belief, Defendant Intellectual Ventures Management is a limited liability company formed under the laws of the State of Washington and having its principal place of business located at 14360 SE Eastgate Way, Bellevue, Washington 98007. The registered agent for service of process for Defendant Intellectual Ventures Management is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

4. Upon information and belief, Defendant Intellectual Ventures I is a limited liability company formed under the laws of the State of Delaware and having its principal place of business located at 14360 SE Eastgate Way, Bellevue, Washington 98007. The registered agent for service of process for Defendant Intellectual Ventures I is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

5.      Upon information and belief, Defendant Intellectual Ventures II is a limited liability company formed under the laws of the State of Delaware and having its principal place of business located at 14360 SE Eastgate Way, Bellevue, Washington 98007. The registered agent for service of process for Defendant Intellectual Ventures II is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

6.      Upon information and belief, Defendant Callahan Cellular is a limited liability company formed under the laws of the State of Delaware and having its principal place of business located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. The registered agent for service of process for Defendant Callahan Cellular is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

7.      Upon information and belief, Defendant OL Security is a limited liability company formed under the laws of the State of Delaware and having its principal place of business located at 160 Greentree Drive, Suite 101, Dover, Delaware 19904. The registered agent for service of process for Defendant OL Security is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

8.      Upon information and belief, Defendant Fund I is a limited partnership formed under the law of the State of Delaware and having its principal place of business located at 14360 SE Eastgate Way, Bellevue, Washington 98007. The registered agent for service of process for Defendant Fund I is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

9.      Upon information and belief, Defendant Fund II is a limited liability company formed under the law of the State of Delaware and having its principal place of business located at 14360 SE Eastgate Way, Bellevue, Washington 98007. The registered agent for service of

3

process for Defendant Fund II is The Corporation Trust Company having an address of Corporation Trust Center 1209 Orange St, Wilmington, Delaware 19801.

### III. THE PATENTS

#### A. U.S. Patent No. 7,949,785

10.     United States Patent Application No. 10/403,818, entitled SECURE VIRTUAL COMMUNITY NETWORK SYSTEM and naming Hasan S. Alkhatib, Fouad A. Tobagi, and Farid F. Elwailly as the inventors, was filed on March 31, 2003, and issued on May 24, 2011, as U.S. Patent No. 7,949,785. A true and correct copy of the '785 Patent is attached hereto as Exhibit 1.

11.     Upon information and belief, Defendant Intellectual Ventures I is the assignee of the '785 Patent and has the right to enforce the '785 Patent.

#### B. U.S. Patent No. 8,332,844

12.     United States Patent Application No. 11/709,477, entitled ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT and naming Pradip Kulkarni, Mukul Kumar, Adhir Potdar, Richard Au, and Tung Nguyen as inventors, was filed on February 21, 2007, and issued on December 11, 2012, as U.S. Patent No. 8,332,844. A true and correct copy of the '844 Patent is attached hereto as Exhibit 2.

13.     Upon information and belief, Defendant Intellectual Ventures II is the assignee of the '844 Patent and has the right to enforce the '844 Patent.

14.     On or about April 30, 2025, Unified Patents, LLC submitted a Request for *Ex Parte* Reexamination of claims 1-27 of the '844 Patent, and on or about July 22, 2025, the United States

4

Patent and Trademark Office granted the Request for *Ex Parte* Reexamination. As of the filing date of this Amended Complaint, that *Ex Parte* Reexamination proceeding is ongoing.

### C. U.S. Patent No. 8,407,722

15. United States Patent Application No. 11/396,251, entitled ASYNCHRONOUS MESSAGING USING A NODE SPECIALIZATION ARCHITECTURE IN THE DYNAMIC ROUTING NETWORK and naming Timothy Tuttle and Karl E. Rumelhart as the inventors was filed on March 30, 2006, and issued on March 26, 2013 as U.S. Patent No. 8,407,722. A true and correct copy of the '722 Patent is attached hereto as Exhibit 3.

16. Upon information and belief, Defendant Intellectual Ventures I is the assignee of the '722 Patent and has the right to enforce the '722 Patent.

### D. U.S. Patent No. 10,567,391

17. The '391 Patent, entitled GRADUATED AUTHENTICATION IN AN IDENTITY MANAGEMENT SYSTEM and naming Dick C. Hardt as the inventor was filed on May 20, 2019, and issued on February 18, 2020 as U.S. Patent No. 10,567,391. A true and correct copy of the '391 Patent is attached hereto as Exhibit 4.

18. Upon information and belief, Defendant Callahan Cellular is the assignee of the '391 Patent and has the right to enforce the '391 Patent.

### E. U.S. Patent No. 7,464,862

19. The '862 Patent, entitled APPARATUS & METHOD FOR POS PROCESSING and naming Steven V. Bacastow as the inventor was filed on June 1, 2005 and issued on December 16, 2008 as U.S. Patent No. 7,464,862. A true and correct copy of the '862 Patent is attached hereto as Exhibit 5.

20.    Upon information and belief, Defendant OL Security is the assignee of the '862 Patent and has the right to enforce the '862 Patent.

**F.  U.S. Patent No. 8,352,584**

21.    The '584 Patent, entitled SYSTEM FOR HOSTING CUSTOMIZED COMPUTING CLUSTERS and naming Jeffrey B. Franklin as the inventor was filed on September 30, 2010 and issued on January 8, 2013. A true and correct copy of the '584 Patent is attached hereto as Exhibit 6.

22.    Upon information and belief, Defendant Intellectual Ventures II is the assignee of the '584 Patent and has the right to enforce the '584 Patent.

**G.  U.S. Patent No. 9,678,967**

23.    The '967 Patent, entitled INFORMATION SOURCE AGENT SYSTEMS AND METHODS FOR DISTRIBUTED DATA STORAGE AND MANAGEMENT USING CONTENT SIGNATURES and naming Bruce Borden and Russell Brand as the inventors was filed on April 6, 2007 and issued on June 13, 2017. A true and correct copy of the '967 Patent is attached hereto as Exhibit 7.

24.    Upon information and belief, Defendant Callahan Cellular is the assignee of the '967 Patent and has the right to enforce the '967 Patent.

**H.  U.S. Patent No. RE48,894**

25.    The '894 Patent, entitled DISAGGREGATED RESOURCES AND ACCESS METHODS and naming Thomas Earl Ludwig and Mark Adams as the inventors was filed on May 24, 2019 and issued on January 11, 2022. A true and correct copy of the '894 Patent is attached hereto as Exhibit 8.

26.   Upon information and belief, Defendant Intellectual Ventures I is the assignee of the '894 Patent and has the right to enforce the '894 Patent.

27.   On or about January 7, 2022, Rateze Remote Mgmt. L.L.C. submitted a Reissue Application of the '894 Patent.  As of the filing date of this Amended Complaint, that reissue proceeding is ongoing.

### I.   The Patents-In-Suit

28.   Upon information and belief, Defendant Intellectual Ventures Management controls, manages, licenses and/or enforces one or more portfolios of patents that have been assigned to others, which includes the Patents-in-Suit, whose ownership and/or rights are assigned and/or licensed to Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and/or Fund II and/or which share a common nucleus (collectively "Intellectual Ventures Management's Patent Portfolio" or "Patent Portfolio").

29.   Upon information and belief, Intellectual Ventures Management is the agent and representative of the assignees and/or exclusive licensees of the patents in Intellectual Ventures Management's Patent Portfolio and has the right, by or on behalf of the assignees, to enter into agreements concerning matters relating to the patents in Intellectual Ventures Management's Patent Portfolio and concerning matters relating to the licensing and enforcement of the patents in its Patent Portfolio.

30.   Upon information and belief, Intellectual Ventures Management's Patent Portfolio includes patents that have been assigned and/or exclusively licensed to Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, including the Patents-in-Suit.  Intellectual Ventures Management has held itself out as having the right and, upon information and belief does have the right, by or on behalf of Intellectual Ventures I, Intellectual

7

Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, to enter into agreements concerning matters relating to the Patents-in-Suit and to license and/or enforce the Patents-in-Suit.

31.    Upon information and belief, Intellectual Ventures Management has held itself out as, and is, the agent and representative of Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II concerning at least the patents in Intellectual Ventures Management's Patent Portfolio, including the Patents-in-Suit.

32.    Upon information and belief, all rights, including enforcement, in the Patents-in-Suit are possessed by Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and/or Fund II.

33.    Upon information and belief, Intellectual Ventures Management has acted in its capacity as an agent and representative of Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II concerning the patents in Intellectual Ventures Management's Patent Portfolio in the State of Tennessee and the Western District of Tennessee, including by entering into agreements concerning the assignees' and licensees' patents in its Patent Portfolio, seeking to license those patents, and threatening to enforce those patents it alleges are infringed and not licensed, including in its actions as to First Horizon concerning the Patents-in-Suit alleged in this Complaint.

34.    Upon information and belief, Steve Joroff and Jonathan K. Waldrop are employees and/or agents and representatives of Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II and has acted in their capacities as an employee and/or an agent and representative of Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II with at least the right to enter into agreements concerning the Patents-in-Suit and to license and

8

enforce the Patents-in-Suit by or on behalf of Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, and has done so in the State of Tennessee and the Western District of Tennessee, including in his actions as to First Horizon concerning the Patents-in-Suit alleged in this Complaint.

35. Upon information and belief, Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II have conspired to monetize the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio by licensing those patents and by enforcing those patents through patent infringement litigation or otherwise, and have conspired to monetize the Patents-in-Suit in the State of Tennessee.

36. Upon information and belief, Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are owned and/or operated by a common entity or are otherwise under common control.

37. Upon information and belief, Intellectual Ventures Management is the agent and/or legal representative of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, such that Intellectual Ventures Management is authorized to act on behalf of the assignees and licensees of the patents in its Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, including as to licensing and/or enforcement of the Patent-in-Suit.

38. Upon information and belief, on its own behalf and by and on behalf of the assignees and licensees of the patents in its Patent Portfolio, Intellectual Ventures Management accuses entities of infringing the assignees' and licensees' patents in its Patent Portfolio, offers

9

licenses of those patents to those entities, purports to negotiate licenses of those patents with those entities, and threatens that the patents will be enforced through patent litigation if the entities refuse to pay the license fee demanded by Intellectual Ventures Management.

39.     Upon information and belief, under the direction and/or control of Intellectual Ventures Management, owners of patents within Intellectual Ventures Management's Patent Portfolio have assigned and/or exclusively licensed patents to other owners of patents also within Intellectual Ventures Management's Patent Portfolio.

40.     For example, upon information and belief, Callahan Cellular has assigned hundreds of patents in Intellectual Ventures Management's Patent Portfolio to other entities also within Intellectual Ventures Management's Patent Portfolio and/or to entities related to Intellectual Ventures Management, including Intellectual Ventures I, Intellectual Ventures II, and related entities. Upon information and belief, Callahan Cellular has assigned patents in the Patent Portfolio under the direction and/or control of Intellectual Ventures Management.

41.     Upon information and belief, Intellectual Ventures Management and Callahan Cellular, Intellectual Ventures I, and Intellectual Ventures II are each owned and/or operated by a common entity or are otherwise under common control or Callahan Cellular, Intellectual Ventures I, and Intellectual Ventures II are owned, managed, and/or controlled by Intellectual Ventures Management. Upon information and belief, Intellectual Ventures Management is also the agent and representative of Callahan Cellular, Intellectual Ventures I, and Intellectual Ventures II.

42.     Upon information and belief, many of the patents in Intellectual Ventures Management's Patent Portfolio that were assigned by Callahan Cellular to other assignees of patents in the Patent Portfolio and/or who are related to Intellectual Ventures Management have been subsequently asserted by those assignees, including Intellectual Ventures I, Intellectual

10

Ventures II, and/or related entities, in patent infringement litigation against entities who refused to pay the license fee demanded by Intellectual Ventures Management.

43.    By way of example, upon information and belief, Defendant Callahan Cellular assigned United States Patent Nos. 7,016,963, 9,092,546 and 9,686,378 to Defendant Intellectual Ventures II on September 18, 2018.

44.    Upon information and belief, as part of the assignment, the same individual (Tracy Lemke) signed on behalf of both Defendant Callahan Cellular (as an Authorized Person) and Defendant Intellectual Ventures II (as the Assistant Company Secretary).

45.    Upon information and belief, Defendant Intellectual Ventures II then sued VMware Inc. for infringement of each of those patents in the U.S. District Court for the Western District of Texas. *See Intellectual Ventures II LLC v. VMware Inc.*, No. 6:20-cv-00220-ADA (W.D. Tex. filed Mar. 25, 2020); *Intellectual Ventures II LLC v. VMware Inc.*, No. 1:20-cv-00457-ADA (W.D. Tex. filed Mar. 25, 2020).

46.    By way of another example, upon information and belief, Defendant Callahan Cellular assigned United States Patent No. RE42,153 to Defendant Intellectual Ventures II on May 6, 2016.

47.    Upon information and belief, as part of the assignment, Tracy Lemke signed on behalf of Defendant Callahan Cellular as an Authorized Person.

48.    Upon information and belief, as alleged above, Tracy Lemke was the Assistant Company Secretary of Defendant Intellectual Ventures II at the time of the assignment.

49.    Upon information and belief, Defendant Intellectual Ventures II then separately sued Arista Networks, Inc. and Hewlett Packard Enterprise Company for infringement of United States Patent No. RE 42,153 in the U.S. District Court for the Western District of Texas. *See*

11

*Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Arista Networks, Inc.*, No. 6:20-cv-00749-ADA (W.D. Tex. filed Aug. 18, 2020); *Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Hewlett Packard Enter. Co.*, No. 6:21-cv-00226-ADA (W.D. Tex. filed Mar. 9, 2021).

50.     As another example, upon information and belief, Defendant Callahan Cellular assigned United States Patent No. 7,199,715 to Defendant Intellectual Ventures II on August 4, 2016.

51.     Upon information and belief, as part of the assignment, the same individual (Tracy Lemke) signed on behalf of both Defendant Callahan Cellular and Defendant Intellectual Ventures II as an Authorized Person of both parties.

52.     Upon information and belief, Defendant Intellectual Ventures II then sued FedEx Corporation, *et al.*, for infringement of United States Patent No. 7,199,715 in the U.S. District Court for the Eastern District of Texas. *See Intellectual Ventures II LLC v. FedEx Co., et al*, No. 2:16-cv-00980-JRG (E.D. Tex. filed Aug. 31, 2016).

53.     As another example, upon information and belief, Defendant Callahan Cellular assigned United States Patent No. 6,782,370 to Defendant Intellectual Ventures II on Feb. 15, 2016.

54.     Upon information and belief, as part of the assignment, Tracy Lemke signed on behalf of Defendant Callahan Cellular as an Authorized Person.

55.     Upon information and belief, as alleged above, Tracy Lemke was the Assistant Company Secretary of Defendant Intellectual Ventures II at the time of the assignment.

56.     Upon information and belief, Defendant Intellectual Ventures II then separately sued FTD Companies, Inc. and J.Crew Group, Inc. for infringement of United States Patent No.

12

6,782,370 in the U.S. District Court for the Eastern District of Texas. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. FTD Cos., Inc.*, No. 6:16-cv-00195-JRG (E.D. Tex. filed on Mar. 8, 2016); *Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. J.Crew Grp., Inc.*, No. 6:16-cv-00196-JRG (E.D. Tex. filed Mar. 8, 2016).

57.     Upon information and belief, Defendant OL Security has also assigned multiple patents in Intellectual Ventures Management's Patent Portfolio to other entities also within Intellectual Ventures Management's Patent Portfolio and/or to entities related to Intellectual Ventures Management, including Intellectual Ventures Assets 132 LLC, Intellectual Ventures Assets 150, LLC, and related entities.  Upon information and belief, OL Security has assigned patents in the Patent Portfolio under the direction and/or control of Intellectual Ventures Management.

58.     Upon information and belief, Intellectual Ventures Management and OL Security, Intellectual Ventures Management and Intellectual Ventures Assets 132 LLC, and Intellectual Ventures Management and Intellectual Ventures Assets 150, LLC, are each owned and/or operated by a common entity or are otherwise under common control or OL Security, Intellectual Ventures Assets 132 LLC, and Intellectual Ventures Assets 150, LLC are owned, managed, and/or controlled by Intellectual Ventures Management. Upon information and belief, Intellectual Ventures Management is also the agent and representative of OL Security, Intellectual Ventures Assets 132 LLC, and Intellectual Ventures Assets 150, LLC.

59.     By way of example, upon information and belief, on October 29, 2019 Defendant OL Security assigned U.S. Patent Nos. 7,853,250, 9,042,914, 9,800,612, 10,320,840, 7,778,606, 7,603,710, 8,078,722, 8,122,506, 8,661,542, and Application No. 16/436,566 to Intellectual Ventures Assets 132 LLC.

60.    Upon information and belief, as part of the assignment of these patents within the patent portfolio, the same individual (Lawrence Froeber) signed on behalf of both OL Security (as the CFO) and Intellectual Ventures Assets 132 LLC (as the CFO).

61.    Upon information and belief, Lawrence Froeber was also the CFO of Defendant Intellectual Ventures Management at the time of the assignment. *See* https://www.intellectualventures.com/who-we-are/leadership/larry-froeber (last accessed Oct. 31, 2024).

62.    Upon information and belief, as part of the assignment, the correspondence data identified Defendant Intellectual Venture Management as the "Correspondent Name" and identified Intellectual Ventures Management's former principal place of business, 3150 139th Ave SE, BLDG 4, Bellevue, Washington 98005, as the "Address."

63.    By way of another example, upon information and belief, Intellectual Ventures Assets 150 LLC assigned United States Patent No. 6,970,843, among other patents, to Kioba Processing, LLC on November 15, 2019. Upon information and belief, as part of the assignment of these patents within the patent portfolio, Lawrence Froeber signed on behalf of Intellectual Ventures Assets 150 LLC as the CFO. Upon information and belief, Lawrence Froeber was also the CFO of Defendant Intellectual Ventures Management at the time of the assignment. *See* https://www.intellectualventures.com/who-we-are/leadership/larry-froeber (last accessed Oct. 31, 2024).

64.    Upon information and belief, one or more patents in Intellectual Ventures Management's Patent Portfolio that were assigned by OL Security to other assignees of patents in the Patent Portfolio and/or who are related to Intellectual Ventures Management have been

subsequently asserted by those assignees in patent infringement litigation against entities who refused to pay the license fee demanded by Intellectual Ventures Management.

65.     By way of another example, upon information and belief, Defendant OL Security assigned United States Patent No. 6,894,639 to Defendant Intellectual Ventures II on March 28, 2024.

66.     Upon information and belief, as part of the assignment, the same individual (Michelle Macartney) signed on behalf of both Defendant OL Security (as an Authorized Person) and Defendant Intellectual Ventures II (as the Assistant Company Secretary).

67.     Upon information and belief, as part of the assignment, the correspondence data identified Intellectual Ventures Management as the "Correspondent Name" and identified Intellectual Ventures Management's former principal place of business, 3150 139th Ave SE, BLDG 4, Bellevue, Washington 98005, as the "Address."

68.     Upon information and belief, Intellectual Ventures II then sued Tesla, Inc. for infringement of United States Patent No. 6,894,639 in the United States District Court for the Western District of Texas. *See Intellectual Ventures II LLC v. Tesla, Inc.*, No. 6:24-cv-00188-ADA (W.D. Tex. filed Apr. 12, 2024).

69.     Upon information and belief, Intellectual Ventures Management and Fund I and Fund II are each owned and/or operated by a common entity or are otherwise under common control and Fund I and Fund II are owned, managed, and/or controlled by Intellectual Ventures Management. Upon information and belief, Intellectual Ventures Management is also the agent and representative of Fund I and Fund II.

70.     For example, on September 23, 2024, Intellectual Ventures Management's Vice President of Licensing Steve Joroff, by and on behalf of Intellectual Ventures Management and

15

the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent a letter to First Horizon in relation to the licensing and enforcement of patents in Intellectual Ventures Management's Patent Portfolio. A copy of the letter is attached as Exhibit 9 (hereinafter "Plaintiff's Sept. 23, 2024 Letter"). In Plaintiff's Sept. 23, 2024 Letter, Mr. Joroff admits that Intellectual Ventures Management manages Fund I and Fund II.

71.    On or about October 16, 2025, Jonathan K. Waldrop of Kasowitz LLP, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent a letter by Federal Express to Plaintiff First Horizon's physical address located at 165 Madison Avenue, Memphis, TN 38103, further conducting business in relation to the licensing and enforcement of the in patents in Intellectual Ventures Management's Patent Portfolio. A copy of the letter is attached as Exhibit 10 (hereinafter "Plaintiff's Oct. 16, 2025 Letter"). In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop admits that Intellectual Ventures Management manages Fund I and Fund II.

72.    Further, on Intellectual Ventures' website at www.intellectualventures.com, Intellectual Ventures identifies "Invention Investment Fund", which is the name that Intellectual Ventures uses to refer to Fund I and Fund II (*see, e.g.,* Exhibit 10) as "What We Do" and "Our Work"[1]. A true and correct copy of the Intellectual Ventures website is attached hereto as Exhibit 11.

---

[1] *Invention Investment Fund*, INTELLECTUAL VENTURES, https://www.intellectualventures.com/what-we-do/invention-investment-fund (last visited Dec. 29, 2025).

16

73.    Accordingly, upon information and belief, and as shown above, Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are owned and/or operated by a common entity or are otherwise under common control or Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are owned, managed, and/or controlled by Intellectual Ventures Management, and Intellectual Ventures Management is the agent and representative of Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II.

## IV. JURISDICTION AND VENUE

74.    This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.,* and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

75.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1338(a), as it is a civil action arising under an Act of Congress relating to a patent; under 28 U.S.C. § 1331 as it involves a federal question; and under 28 U.S.C. § 2201 and § 2202, as the action seeks a declaratory judgment and further relief.

76.    This Court has personal jurisdiction over Intellectual Ventures Management because, among other things, Intellectual Ventures Management has conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

77.    This Court has personal jurisdiction over Intellectual Ventures I because, among other things, Intellectual Ventures I has conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

78.    This Court has personal jurisdiction over Intellectual Ventures II because, among other things, Intellectual Ventures II has conducted business relating to the licensing and

17

enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

79.     This Court has personal jurisdiction over Callahan Cellular because, among other things, Callahan Cellular has conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

80.     This Court has personal jurisdiction over OL Security because, among other things, OL Security conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

81.     This Court has personal jurisdiction over Fund I because, among other things, Fund I has conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

82.     This Court has personal jurisdiction over Fund II because, among other things, Fund II has conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

83.     Venue is proper in this District under 28 U.S.C. § 1391 because Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are subject to personal jurisdiction in this judicial district, and have directed their business, licensing, and enforcement activities at this judicial district, and a

18

substantial part of the events giving rise to the claims occurred in this judicial district, as discussed below.

84.    Intellectual Ventures Management, by and through its representatives, on its own behalf and as the agent and representative of the assignees of the patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II has conducted business relating to the licensing and enforcement of patents in its Patent Portfolio in the State of Tennessee, including by offering specific terms for First Horizon in the State of Tennessee to license the assignees' and licensees' patents in its Patent Portfolio and by sending threatening emails and letters into Tennessee asserting that First Horizon is required to license the assignees' and licensees' patents in its Patent Portfolio, that First Horizon infringes the assignees' and licensees' patents in its Patent Portfolio, and that litigation will be pursued against companies alleged to infringe who do not pay to license the assignees' and licensees' patents in its Patent Portfolio, including the Patents-in-Suit, all with full knowledge that First Horizon is an entity having its principal place of business located in the State of Tennessee.

1. **<u>At Least As Early As 2014, Defendants Were Conducting Their Business Of Licensing and Enforcement of the Assignees' and Licensees' Patents in Intellectual Ventures Management's Patent Portfolio in Tennessee.</u>**

85.    In early 2014, Intellectual Ventures Management, on its own behalf and by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including upon information and belief one or more Defendants, actively met, communicated and negotiated with First Horizon located in the State of Tennessee and in the Western District of Tennessee, in relation to licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

86.    In March of 2014, Intellectual Ventures Management's Senior Manager of Market Development, Luke Ekhoff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, met telephonically with counsel for First Horizon located within the State of Tennessee to discuss licensing all of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

87.    In March of 2014, Mr. Ekhoff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, sent an email to counsel for First Horizon, which is located within the State of Tennessee, to arrange a subsequent in-person meeting to discuss licensing all of the assignees' and licensees' patents in the Patent Portfolio.

88.    On April 24, 2014, representatives of Intellectual Ventures Management, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, communicated with counsel for First Horizon to discuss licensing the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

89.    Between the April 24, 2014 meeting and November of 2014, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in its Patent Portfolio, engaged in extensive negotiations with First Horizon in the State of Tennessee regarding licensing the assignees' and licensees' patents in the Patent Portfolio.

90.    Ultimately, on November 12, 2014, the negotiations in 2014 ended without a license of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

91.     Accordingly, upon information and belief, Intellectual Ventures Management, on its own behalf and by and on behalf of the assignees and licensees of the patents in its Patent Portfolio, including upon information and belief one or more Defendants, actively conducted business in the State of Tennessee from at least February to November of 2014 that included offers to and negotiations with First Horizon, which resides in the State of Tennessee and in the Western District of Tennessee, regarding the licensing of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio by First Horizon in the State of Tennessee.

**2.   <u>Multiple Contracts Have Been Negotiated And Executed As Part of Defendants' Business in Tennessee Of Licensing and Enforcement of the Assignees' and Licensees' Patents in Intellectual Ventures Management's Patent Portfolio.</u>**

92.     Beginning in as early as 2013, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, targeted First Horizon, residing in the State of Tennessee and the Western District of Tennessee, and sent threatening correspondence asserting, *inter alia*, that the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio are infringed and are required to be licensed by First Horizon.

93.     Upon information and belief, at least as early as February of 2014, Intellectual Ventures Management, by and through its representatives, on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, also conducted extensive business activities in the State of Tennessee related to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio within the State of Tennessee, including by engaging in extensive negotiations with First Horizon located in the State of Tennessee and in this judicial district in relation to licensing and enforcement of those patents.

94.     Upon information and belief, starting as early as February 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, entered into multiple confidentiality agreements and extensions with First Horizon, located in the State of Tennessee and in the Western District of Tennessee, in relation to Intellectual Ventures Management's efforts to license and enforce the assignees' and licensees' patents in its Patent Portfolio in Tennessee.

**a.  The Parties Executed a February 2014 Contract Whose Terms Survive Termination Or Expiration.**

95.     Upon information and belief, as early as February 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, negotiated with First Horizon, located in the State of Tennessee, in relation to licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

96.     Upon information and belief, on February 28, 2014, Defendant Intellectual Ventures Management on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, and First Horizon's predecessors-in-interest, First Horizon National Corporation and First Tennessee Bank National Association, located in the State of Tennessee, entered into and executed a contract entitled "Mutual Confidentiality Agreement" regarding the disclosure, use, and maintaining confidentiality of certain information and materials (1) of Defendant Intellectual Ventures Management, (2) of First Horizon located in the State of Tennessee, and (3) of "any 'individual, corporation, trust, partnership, joint venture, limited liability company, association,

22

unincorporated organization or other legal entity'" that either Defendant Intellectual Ventures Management or First Horizon, "directly or indirectly Controls, is Controlled by, or is under common Control with" (hereinafter "February 2014 Contract"). The February 2014 Contract further defined "Control" as follows:

"Control" (and its derivatives) means (a) ownership or control, directly or indirectly, of more than fifty percent (50%) of the voting stock or other ownership interest of an Entity, or (b) both (i) ownership or control, directly or indirectly, of fifty percent (50%) or less of the voting stock or other ownership interest of an Entity representing the maximum percentage of such voting stock or other ownership interest permitted by local law, and (ii) the power to direct or cause, directly or indirectly, the direction of the management and policies of such Entity.

97.    Although the February 2014 Contract states that its initial term was for a period of ninety (90) days, it specifically provides that the obligations "will survive the expiration or termination of the Term."

98.    Upon information and belief, the obligation to perform and/or not perform specific actions under the February 2014 Contract survived the termination or expiration of the February 2014 Contract and continues today.

99.    Upon information and belief, the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are each an "individual, corporation, trust, partnership, joint venture, limited liability company, association, unincorporated organization or other legal entity" that Defendant Intellectual Ventures Management "directly or indirectly Controls, is Controlled by, or is under common Control with" in accordance with the terms of the February 2014 Contract, including those terms that survive expiration or termination.

23

100. Upon information and belief, the February 2014 Contract, including those terms that survive expiration or termination, is a legally binding agreement that created obligations, whether then existing or subsequently arising, to perform and/or not perform specific actions.

101. Upon information and belief, the February 2014 Contract with First Horizon, located in the State of Tennessee, created obligations, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in its Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II to perform and/or not perform specific actions.

102. Upon information and belief, the obligations created by the February 2014 Contract, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, survived the termination or expiration of the February 2014 Contract and continue in force today.

103. Upon information and belief, since February 28, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of patents in the Intellectual Ventures Management Patent Portfolio, including, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and/or not perform the specific actions according to the terms which were negotiated, agreed to, and memorialized in the February 2014 Contract and which the parties agreed would survive its termination or expiration.

104. Upon information and belief, since February 28, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of the patents in

the Intellectual Ventures Management Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and satisfy their obligations, whether then existing or subsequently arising, under the February 2014 Contract to First Horizon and its successor-in-interest First Horizon, located in the State of Tennessee.

b. **The Parties Also Executed a May 2014 Contract Whose Terms Survive Termination Or Expiration.**

105.    In May 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, negotiated a second contract with First Horizon, located in the State of Tennessee, in relation to licensing and enforcement of all of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

106.    Upon information and belief, on May 25, 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, and First Horizon's predecessors-in-interest, First Horizon National Corporation and First Tennessee Bank National Association, located in the State of Tennessee, entered into and executed a contract entitled "Amendment to the Mutual Confidentiality Agreement" which changed the term of the February 2014 Contract to a period of one hundred eighty (180) days and replaced certain wording, but otherwise continued the February 2014 Contract (hereinafter the "May 2014 Contract").

107.    Upon information and belief, as agreed to in the February 2014 Contract and continued by the May 2014 Contract, the obligations owed to First Horizon and its successor-in-interest First Horizon, located in the State of Tennessee, survived the expiration or termination of the May 2014 Contract and continue today.

25

108. Upon information and belief, the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are each an "individual, corporation, trust, partnership, joint venture, limited liability company, association, unincorporated organization or other legal entity" that Defendant Intellectual Ventures Management "directly or indirectly Controls, is Controlled by, or is under common Control with" in accordance with the terms of the February 2014 Contract and continued by the May 2014 Contract, including those terms that survive expiration or termination.

109. Upon information and belief, the May 2014 Contract, including those terms that survive expiration or termination, is a legally binding agreement that created obligations, whether then existing or subsequently arising, to perform and/or not perform specific actions.

110. Upon information and belief, the May 2014 Contract with First Horizon, located in the State of Tennessee, created obligations, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in its Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II to perform and/or not perform specific actions.

111. Upon information and belief, the obligations created by the May 2014 Contract, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, survived the termination or expiration of the May 2014 Contract and continue in force today.

112. Upon information and belief, since May 25, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of patents in the Intellectual Ventures Management Patent Portfolio, including, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and/or not perform the specific actions according to the terms which were negotiated, agreed to, and memorialized in the May 2014 Contract and which the parties agreed would survive its termination or expiration.

113. Upon information and belief, since May 25, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of the patents in the Intellectual Ventures Management Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and satisfy their obligations, whether then existing or subsequently arising, under the May 2014 Contract to First Horizon and its successor-in-interest First Horizon, located in the State of Tennessee.

**c.   The Parties Also Executed an August 2014 Contract Whose Terms Survive Termination Or Expiration.**

114. In August 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, negotiated a third contract with First Horizon, located in the State of Tennessee, in relation to licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

115. Upon information and belief, on August 24, 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, and First

27

Horizon's predecessors-in-interest, First Horizon National Corporation and First Tennessee Bank National Association, located in the State of Tennessee, entered into and executed a contract entitled "Second Amendment to the Mutual Confidentiality Agreement" which changed the term of the February 2014 Contract to a period of two hundred twenty-five (225) days, but otherwise continued the February 2014 Contract (hereinafter "August 2014 Contract").

116. Upon information and belief, as agreed to in the February 2014 Contract and continued by the August 2014 Contract, the obligations owed to First Horizon and its successor-in-interest First Horizon, located in the State of Tennessee, survived the expiration or termination of the August 2014 Contract and continue today.

117. Upon information and belief, the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are each an "individual, corporation, trust, partnership, joint venture, limited liability company, association, unincorporated organization or other legal entity" that Defendant Intellectual Ventures Management "directly or indirectly Controls, is Controlled by, or is under common Control with" in accordance with the terms of the February 2014 Contract and continued by the August 2014 Contract, including those terms that survive expiration or termination.

118. Upon information and belief, the August 2014 Contract, including those terms that survive expiration or termination, is a legally binding agreement that created obligations, whether then existing or subsequently arising, to perform and/or not perform specific actions.

119. Upon information and belief, the August 2014 Contract with First Horizon, located in the State of Tennessee, created obligations, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in its Patent Portfolio,

28

including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II to perform and/or not perform specific actions.

120. Upon information and belief, the obligations created by the August 2014 Contract, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, survived the termination or expiration of the August 2014 Contract and continue in force today.

121. Upon information and belief, since August 24, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of patents in the Intellectual Ventures Management Patent Portfolio, including, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and/or not perform the specific actions according to the terms which were negotiated, agreed to, and memorialized in the August 2014 Contract and which the parties agreed would survive its termination or expiration.

122. Upon information and belief, since August 24, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of the patents in the Intellectual Ventures Management Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and satisfy their obligations, whether then existing or subsequently arising, under the August 2014 Contract to First Horizon and its successor-in-interest First Horizon, located in the State of Tennessee.

**3.  In 2023, Defendants Increased Their Licensing and Enforcement in Tennessee of the Assignees' and Licensees' Patents in Intellectual Ventures Management's Patent Portfolio.**

123.    Nine (9) years later, Intellectual Ventures Management, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, has targeted First Horizon in the State of Tennessee, sending threatening emails and letters asserting, *inter alia*, that the assignees' and licensees' Patents-in-Suit are infringed and are required to be licensed by First Horizon, which resides in the State of Tennessee and the Western District of Tennessee.

124.    On November 17, 2023, Intellectual Ventures Management's Vice President of Licensing Steve Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to First Horizon's Senior Vice President and Assistant General Counsel Desiree Franklin, who resides and is located in the State of Tennessee, in relation to licensing and enforcement of all of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit. A copy of the email is attached as Exhibit 12.

125.    Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, indicated an intent to "initiate a dialogue concerning intellectual property and licensing matters with First Horizon" residing in the State of Tennessee and to discuss "an overview of IV's expansive patent portfolio and its relevance to First Horizon's operations." Upon information and

30

belief, in this communication, Intellectual Ventures Management conducted business, by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including on behalf of Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, relating to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio with First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee.

126. Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, indicated that the assignees' and licensees' patents in Intellectual Ventures Management Patent Portfolio "align closely with the technologies integral to First Horizon's daily operations, including cloud computing, networking, security, storage, digital payments, and utilization of open-source software, among others."

127. On December 20, 2023, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business relating to the licensing and enforcement of all of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio and emphasizing "the criticality of discussing the potential licensing agreement between" Defendants and First Horizon. A copy of this email is attached as Exhibit 13.

128. Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including

31

Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that it was "imperative to underscore the significance of obtaining a license" and warned of "inadvertent risks."

129.    Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, further stated that "[w]ithout a formalized agreement in place, there might be inadvertent risks associated with utilizing technologies covered by IV's patents," and that it is "essential to protect both First Horizon's operations and IV's intellectual property rights through a comprehensive licensing arrangement." Upon information and belief, through this communication, Intellectual Ventures Management conducted business, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, relating to the licensing and enforcement of all of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio with First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee.

130.    On January 7, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of all of the assignees' and licensees' patents in Intellectual Ventures Management Patent Portfolio, and further to "stress the urgency of acquiring a license" to the

32

assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio under "fixed fee, non-negotiable financial terms." A copy of this email is attached as Exhibit 14.

131. Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, "raised concerns about potential inadvertent risks related to utilizing technologies encompassed by IV's patents" and that it was "critical to mitigate these risks and protect both First Horizon's operations and IV's intellectual property rights through a formalized licensing arrangement."

132. Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, further stated that First Horizon's "prompt acknowledgment or response" to the email sent on January 7, 2024, was "crucial." Upon information and belief, in this communication, Intellectual Ventures Management by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to all of the assignees' and licensee's patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent

33

infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

133.    On January 18, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management Patent Portfolio and stating that it was "crucial" to receive a response "to avoid any misunderstandings." A copy of this email is attached as Exhibit 15.

134.    Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio (which includes Defendants' Patents-in-Suit) "aligns strategically with technologies crucial to First Horizon's operations." Upon information and belief, in this communication, Intellectual Ventures Management, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse

entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

135.    On February 6, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio and further stating that it was "crucial that we at least schedule a 30-minute conversation to address this matter." A copy of this email is attached as Exhibit 16.

136.    Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that "[e]fficient infringement is not a viable strategy in this circumstance," and that "engaging in discussions is critical to avoiding misunderstandings or unnecessary escalation." Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license. Upon information and belief, in this communication, Intellectual Ventures Management, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the

35

State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

137.    On February 23, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio. A copy of this email is attached as Exhibit 17.

138.    Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I and Fund II, stated that the goal of the communication was to "engage in good-faith negotiations to explore a mutually beneficial license arrangement." Upon information and belief, in this communication, Intellectual Ventures Management conducted business, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, relating to the licensing and enforcement of the assignees' and licensees' patents in Intellectual

36

Ventures Management's Patent Portfolio with First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee.

139.    On March 15, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio and stating that they are "committed to ensuring that all organizations, including First Horizon, operate within the bounds of intellectual property law." A copy of this email is attached as Exhibit 18. Upon information and belief, in this communication, Intellectual Ventures Management, by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

140.    On August 26, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's

Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio and stating that "26 financial services companies have secured licenses" and his "role is to ensure that one way or another, First Horizon is also properly licensed." A copy of this email is attached as Exhibit 19. Upon information and belief, in this communication, Intellectual Ventures Management, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

141.    On September 23, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent a letter to First Horizon, addressed to Plaintiff First Horizon's physical address of 165 Madison Avenue, Memphis, TN 38103, and to Ms. Franklin in particular,

38

who resides and is located in the State of Tennessee, further conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio. A copy of the Plaintiff's Sept. 23, 2024 Letter is attached as Exhibit 9.

142. In Plaintiff's Sept. 23, 2024 Letter, Mr. Joroff, by and on behalf of Intellectual Ventures Management, as well as Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, who are each assignees and/or licensees of patents in Intellectual Ventures Management's Patent Portfolio, alleged that the '785 Patent, the '844 Patent, the '722 Patent, the '391 Patent, and the '862 Patent "cover technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import:

| US Patent No. | Title | Assignee | Example Claim | Example Product/Feature |
|---|---|---|---|---|
| US7949785 | Secure virtual community network system | Intellectual Ventures I LLC | 30 | Open-Source Software: First Horizon' use of Kubernetes https://recruiting.ultipro.com/FIR1007FTN/JobBoard/c005ef3e-175a-49c4-ba29-9f431f673944/OpportunityDetail?opportunityId=8c800876-90b0-4dfe-a198-722daa9494d9 |
| US8332844 | Root image caching and indexing for block-level distributed application management | Intellectual Ventures II LLC | 7 | Open-Source Software: First Horizon's use of Docker https://recruiting.ultipro.com/FIR1007FTN/JobBoard/c005ef3e-175a-49c4-ba29-9f431f673944/OpportunityDetail?opportunityId=8c800876-90b0-4dfe-a198-722daa9494d9 |
| US8407722 | Asynchronous messaging using a node specialization architecture in the dynamic routing network | Intellectual Ventures I LLC | 14 | Open-Source Software: First Horizon's use of Kafka https://recruiting.ultipro.com/FIR1007FTN/JobBoard/c005ef3e-175a-49c4-ba29-9f431f673944/OpportunityDetail?opportunityId=8c800876-90b0-4dfe-a198-722daa9494d9 |
| US10567391 | Graduated authentication in an identity management system | Callahan Cellular L.L.C. | 18 | First Horizon's use of Secure Payment Processing https://www.firsthorizon.com/Landing/Business/Merchant-Services https://docs.clover.com/docs/use-3ds |
| US7464862 | Apparatus & method for POS processing | OL Security LLC | 1 | First Horizon's use of Point-of-Sale Systems https://www.firsthorizon.com/Landing/Business/Merchant-Services https://www.clover.com/pos-systems |

143. In Plaintiff's Sept. 23, 2024 Letter, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures

39

Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, alleged that Plaintiff infringes at least claim 30 of the '785 Patent with "Kubernetes", Plaintiff infringes at least claim 7 of the '844 Patent with "Docker", Plaintiff infringes at least claim 14 of the '722 Patent with "Kafka", Plaintiff infringes at least claim 18 of the '391 Patent with "Secure Payment Processing", and Plaintiff infringes at least claim 1 of the '862 Patent with "Point-of-Sale Systems".  Plaintiff's Sept. 23, 2024 Letter alleged that "First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the "example infringing products" and thereby asserted both direct and indirect infringement of those patents by First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee.

144.    In Plaintiff's Sept. 23, 2024 Letter, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, further stated that "these patents are offered as an initial list of example patents and example infringing products and that IV's investigation of First Horizon products and services is ongoing."

145.    In Plaintiff's Sept. 23, 2024 Letter, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, further stated that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license."

146.    In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, repeated the following statement also in Plaintiff's September 23, 2024 Letter:

> IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license. IV is willing to offer a patent license and remains open to business discussions with First Horizon to negotiate such a license, either to the specifically referenced patents or to all or a subset of the IV patent rights.

147.    Upon information and belief, First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, has been offered a license by or on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, to patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in Intellectual Ventures Management's Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

148.    On October 8, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing

and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio and stating that First Horizon "is required to obtain a license for its operations." A copy of this email is attached as Exhibit 20.

149.   In this threatening correspondence, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered specific terms for First Horizon to license the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio including Defendants' Patents-in-Suit, namely a "one-time license fee for a worldwide license to the IV patent portfolio is $3.25 million."

150.   Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, also attached to his October 8, 2024 correspondence a document titled "Invention Investment Fund (IIF) Commercial Bank Licensing," which states the intent is "to enforce its patent rights, with patent litigations pending against JPMC, Liberty Mutual, and Comerica, with further actions planned." A copy of this document is included in Exhibit 21.

151.   The "Invention Investment Fund (IIF) Commercial Bank Licensing" of Exhibit 21 further states that Intellectual Ventures Management, upon information and belief on its own behalf and by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, "is offering licenses to all financial services and insurance companies with business operations in the United States" and that they "will also

42

consider offers to license (or purchase) selected patents from its portfolio." Upon information and belief, in this communication, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit, under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

152.    On December 11, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, further conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio, claiming to be "following up regarding the notice sent to First Horizon Corp. on September 23, 2024, and the pricing expectations shared on October 8, 2024." A copy of this email is attached as Exhibit 22.

43

153.    In this correspondence, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that the communication served "to document Intellectual Ventures' ongoing efforts to fulfill its legal obligations" and to "avoid claims of unreasonable delay (laches) or misleading conduct (equitable estoppel), which could limit available remedies." Upon information and belief, in this communication, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit, under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

154.    On February 6, 2025, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, further conducting business in relation to the

44

licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio. A copy of this email is attached as Exhibit 23.

155.   In this correspondence, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that "IV has recently settled its financial services litigations with Liberty Mutual and Comerica, further demonstrating the strength and enforceability of our patents." Further, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated a substantive response was required "[t]o avoid unnecessary escalation." Upon information and belief, in this communication, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit, under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

156.    On April 3, 2025, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, further conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio. A copy of this email is attached as Exhibit 24.

157.    In this correspondence, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that "IV filed two new patent litigations–against Nationwide Mutual Insurance and The Bank of New York Mellon–following their decision not to engage in licensing discussions," and further that they "anticipate additional enforcement actions in the coming months with institutions that continue to decline meaningful negotiations." Upon information and belief, in this communication, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit, under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and

46

licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

158.    On April 25, 2025, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, further conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio in an attempt to "underscore[] the strength and enforceability of the Intellectual Ventures (IV) patent portfolio." A copy of this email is attached as Exhibit 25.

159.    In this correspondence, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that "the Patent Trial and Appeal Board (PTAB) officially terminated three inter partes review (IPR) proceedings" for the '722 Patent, the '785 Patent, and the '844 Patent. Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that "these outcomes send a clear message: the IV portfolio not only survives challenge but continues to demonstrate its legal and commercial strength in both licensing and litigation contexts." Upon information and belief, in this communication, Intellectual Ventures

Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit, under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

160.    On or about October 16, 2025, Jonathan K. Waldrop of Kasowitz LLP, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent a letter by Federal Express to Plaintiff First Horizon's physical address located at 165 Madison Avenue, Memphis, TN 38103, and to Ms. Franklin in particular, who resides and is located in the State of Tennessee, further conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio. A copy of Plaintiff's Oct. 16, 2025 Letter is attached as Exhibit 10.

161.    On October 16, 2025, Mr. Waldrop of Kasowitz LLP, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures

II, Callahan Cellular, OL Security, Fund I, and Fund II, also emailed Plaintiff's Oct. 16, 2025 Letter to Plaintiff First Horizon addressed to Ms. Franklin, who resides and is located in the State of Tennessee.

162.    In Plaintiff's Oct. 16, 2005 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, continued to allege that Plaintiff's "products, platforms, features, and/or services" infringe the patents in Intellectual Ventures Management's Patent Portfolio.

163.    Plaintiff's Oct. 16, 2025 Letter states that it is "a follow up to the notice letter from Steve Joroff, sent to First Horizon in September 2024. . . . ".  Upon information and belief, "the notice letter from Steve Joroff, sent to First Horizon in September 2024" refers to Plaintiff's Sept. 23, 2024 Letter.

164.    Plaintiff's Oct. 16, 2025 Letter is an example of the broad and continuing infringement allegations spanning across Intellectual Ventures Management's Patent Portfolio that Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II have continued to assert against Plaintiff over the course of the parties' communications.

165.    In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, who are each assignees and/or licensees of patents in Intellectual Ventures Management's Patent Portfolio, alleged that the '584 Patent, the '967 Patent, and the

49

'894 Patent are an additional set of sample patents, which cover technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import:

| US Patent No. | Title | Assignee | Example Claim | Example Product/Feature |
|---|---|---|---|---|
| 8,352,584 | SYSTEM FOR HOSTING CUSTOMIZED COMPUTING CLUSTERS | INTELLECTUAL VENTURES II LLC | 1 | Open Source Software: First Horizon's use of Kubernetes *See Enclosures* |
| 9,678,967 | INFORMATION SOURCE AGENT SYSTEMS AND METHODS FOR DISTRIBUTED DATA STORAGE AND MANAGEMENT USING CONTENT SIGNATURES | CALLAHAN CELLULAR L.L.C. a wholly owned subsidiary of IIF2 | 1 | Open Source Software: First Horizon's use of Hadoop *See Enclosures* |
| RE48,894 | DISAGGREGATED RESOURCES AND ACCESS METHODS | INTELLECTUAL VENTURES I LLC | 15 | Open Source Software: First Horizon's use of Kafka *See Enclosures* |

166.    In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, alleged that Plaintiff infringes at least claim 1 of the '584 Patent with "Kubernetes", Plaintiff infringes at least claim 15 of the '894 Patent with "Kafka", and Plaintiff infringes at least claim 1 of the '967 Patent with "Hadoop".

167.    Plaintiff's Oct. 16, 2025 Letter alleged that "First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the "example infringing products" and thereby asserted both direct and indirect infringement of those patents by First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee.

168.    In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures

50

Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, further stated that "these patents are offered as a list of example patents and example infringing products and that IV's investigation of First Horizon products and services is ongoing."

169. In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, repeated the following statement also in Plaintiff's September 23, 2024 Letter:

> IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license. IV is willing to offer a patent license and remains open to business discussions with First Horizon to negotiate such a license, either to the specifically referenced patents or to all or a subset of the IV patent rights.

170. Upon information and belief, First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, has been offered a license by or on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, to patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in Intellectual Ventures Management's Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

51

171. According to its website at www.intellectualventures.com[2], Intellectual Ventures "manages one of the world's largest patent portfolios," "is a pioneer in patent licensing," and has "generated billions of dollars in licensing revenue." As previously mentioned, a true and correct copy of the Intellectual Ventures website is attached hereto as Exhibit 11.

172. Upon information and belief, the business model of Intellectual Ventures is to license its patents to others.

### V. <u>THE CONTROVERSY</u>

173. There is an actual controversy within the jurisdiction of this Court under 28 U.S.C. § 2201 and § 2202.

174. Intellectual Ventures Management, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have accused First Horizon of infringing the Patents-in-Suit and indicated the intention to take the steps necessary to protect their intellectual property rights, as set forth in the paragraphs above, including by stating on their behalf that it "seeks to enforce its patents" and identified three ongoing patent infringement lawsuits filed against JP Morgan Chase & Co. ("JP Morgan"), Comerica Inc. ("Comerica"), and Liberty Mutual Holding Company Inc., *et al*., ("Liberty Mutual *et al.*") filed in the name of one or more Defendants for their collective benefit as examples and evidence of how Defendants protect and enforce the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, while threatening First Horizon that there are additional "Industry-Related Litigations" planned against accused infringers

---

[2] *Invention Investment Fund*, INTELLECTUAL VENTURES, https://www.intellectualventures.com/what-we-do/invention-investment-fund (last visited Dec. 29, 2025).

who do not pay to license the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio. *See* Exhibit 21.

175.   As discussed below, First Horizon does not infringe and has not infringed the Patents-in-Suit.

176.   Defendants' actions have created an actual, justiciable, substantial, and immediate controversy between First Horizon and Defendants as to whether First Horizon infringes the Patents-in-Suit.

177.   Defendants' actions include the transmission of threatening emails and letters by representatives of Intellectual Ventures Management, by and on behalf of all Defendants, stating First Horizon is purportedly required to license the Patents-in-Suit, alleging that First Horizon infringes each of the Patents-in-Suit, and representing that litigation will be used to attack accused infringers who do not pay to license the patents in Intellectual Ventures Management's Patent Portfolio. *See* Exhibit 21.

178.   The assignees of the patents in Intellectual Ventures Management's Patent Portfolio have a history of aggressive litigation against other parties similarly situated to First Horizon when those other parties have refused to pay to license the patents in Intellectual Ventures Management's Patent Portfolio.

179.   For example, after Intellectual Ventures Management accused JP Morgan of practicing the patents in Intellectual Ventures Management's Patent Portfolio and JP Morgan refused to pay to license those patents, Defendants Intellectual Ventures I and Intellectual Ventures II filed suit against JP Morgan in the U.S. District Court for the Eastern District of Texas Marshall Division on November 15, 2023, and alleged that JP Morgan's use of Docker, Kafka, Trino and/or Presto, Apache Spark, a mobile banking application with the Zelle payment features, and

53

Kubernetes infringed six patents, including the '844 Patent, the '722 Patent, and the '785 Patent which Defendants also now accuse First Horizon of infringing. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, No. 2:23-cv-00523-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1.

180.    As another example, after Intellectual Ventures Management accused Comerica of practicing the patents in Intellectual Ventures Management's Patent Portfolio and Comerica refused to pay to license those patents, Defendants Intellectual Ventures I and Intellectual Ventures II filed suit in the U.S. District Court for the Eastern District of Texas Marshall Division on November 15, 2023, and alleged that Comerica's use of Docker, Kafka, Apache Spark, and Kubernetes infringed four patents, including the '844 Patent, the '722 Patent, and the '785 Patent which Defendants also now accuse First Horizon of infringing. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Comerica Inc.*, No. 2:23-cv-00524-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1.

181.    As another example, after Intellectual Ventures Management accused Liberty Mutual *et al.* of practicing the patents in Intellectual Ventures Management's Patent Portfolio and Liberty Mutual *et al.* refused to pay to license those patents, Defendants Intellectual Ventures I and Intellectual Ventures II filed suit in the U.S. District Court for the Eastern District of Texas Marshall Division on November 15, 2023, and alleged that Liberty Mutual *et al.*'s use of Docker, Kafka, Spark, and Kubernetes infringed four patents, including the '844 Patent, the '722 Patent, and the '785 Patent which Defendants also now accuse First Horizon of infringing. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Liberty Mut. Holding Co. Inc., et al.*, No. 2:23-cv-00525-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1.

182.    Defendants have established a pattern of practice wherein Intellectual Ventures Management, on its own behalf and by and on behalf of entities it manages and/or who are under common ownership and/or control and/or for which it is the agent and/or legal representative, including the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio such as Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, accuses an entity of practicing the assignees' and licensees' patents in its portfolio, Intellectual Ventures Management offers to license the assignees' and licensees' patents to the allegedly infringing party, and, if the allegedly infringing party does not pay the license fee demanded, then the assignees of those patents file suit for patent infringement against that party in the U.S. District Court in Texas for their collective benefit.

183.    For example, Intellectual Ventures Management, on its own behalf and by and on behalf of entities it manages and/or who are under common ownership and/or control and/or for which it is the agent and/or legal representative, including the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, sent the letter that is Exhibit 5 to their complaint the day before Intellectual Ventures I and Intellectual Ventures II filed suit for patent infringement against Comerica for their collective benefit. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Comerica Inc.*, No. 2:23-cv-00524-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1, Ex. 5. That letter, signed by their attorney, emphasized that the entities do "not authorize Comerica or Comerica's customers or partners to practice any of these patents without a license." *Id.* Further, the letter stated that the entities were "willing to offer a patent license to Comerica and remain[ed] open to business discussions with Comerica to negotiate such a license, either to the specifically referenced patents, or to all or a subset of the IV patent rights." *Id.*

55

184. Substantively identical letters signed by the same attorney were sent to JP Morgan and to Liberty Mutual *et al.* before Intellectual Ventures I and Intellectual Ventures II also filed complaints for patent infringement against each of them, and those letters were then also included as exhibits to their respective complaints. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, No. 2:23-cv-00523-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1, Ex. 7; *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Liberty Mut. Holding Co. Inc., et al.*, No. 2:23-cv-00525-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1, Ex. 5.

185. Upon information and belief, before each of those letters were received, JP Morgan, Comerica, and Liberty Mutual *et al.* each received similar correspondence from Intellectual Ventures Management, on its own behalf and by and on behalf of entities it manages and/or who are under common ownership and/or control and/or for which it is the agent and/or legal representative, including the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, attempting to license the patents in its Patent Portfolio under threat of litigation as First Horizon has also received.

186. Taken together, a pattern has been demonstrated wherein entities that Intellectual Ventures Management manages and/or who are under common ownership and/or control and/or for which it is the agent and/or legal representative, including the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, file suit for patent infringement against companies who refuse to pay to license the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio and a *modus operandi* in which Intellectual Ventures Management, by and on behalf of itself and those entities, sends substantially identical and successive correspondence preceding the filing of a complaint for patent infringement against

56

accused infringers who refuse to pay. Intellectual Ventures Management, on its own behalf and by and on behalf of entities it manages and/or who are under common ownership and/or control and/or for which it is the agent and/or legal representative, including the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, has sent First Horizon substantially identical and successive correspondence that it sent to other defendants before a complaint for patent infringement was filed against those defendants.

187. Therefore, there is an actual, justiciable, substantial, and immediate controversy as between First Horizon and Defendants regarding whether First Horizon infringes the Patents-in-Suit. This conclusion is further supported by Intellectual Ventures Management's actions, on behalf of Defendants, that include (1) alleging that there were certain risks related to utilizing technologies encompassed by the patents in the Intellectual Ventures Management Patent Portfolio and it was "critical to mitigate these risks and protect both First Horizon's operations and IV's intellectual property rights through a formalized licensing arrangement"; (2) identifying technology attributed to First Horizon that allegedly infringes patents assigned to Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, in the letter sent on September 23, 2024, by Mr. Joroff, on behalf of Defendants, to First Horizon; and (3) a historically aggressive litigation strategy, viewed in conjunction with the statements from Mr. Joroff where Intellectual Ventures Management, by and on behalf of the assignees and licensees of the patents in its Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have targeted First Horizon just as Liberty Mutual *et al.*, Comerica, and JP Morgan were first targeted and then sued.

188.    The facts show a substantial controversy between parties with adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaratory judgment. Accordingly, this Court has declaratory judgment jurisdiction to hear this case.

### VI. CAUSES OF ACTION

**COUNT I**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '785 PATENT**

189.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

190.    Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon. Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 18.

191.    Intellectual Ventures Management, by and on behalf all of Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license" of at least the Patents-In-Suit, including the '785 Patent. *See* Exhibit 20.

192.    Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See* Exhibit 9; Exhibit 10.

193.    Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license.

58

194.    Intellectual Ventures Management, on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio, including the '785 Patent, and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

195.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged that the '785 Patent "cover[s] technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" and identifies "Kubernetes," a third party branded software, as the "Example Product/Feature." *See* Exhibit 9.

196.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged infringement of at least claim 30 of the '785 Patent by "First Horizon' [sic] use of Kubernetes" (the "'785 Accused System"). *See* Exhibit 9.

197.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '785 Accused System), or import into the United States any product and/or system (including but not limited to the '785 Accused System) in a manner which infringes the '785 Patent.

198.    By way of an example, each independent claim of the '785 Patent requires, *inter alia*, that a device is registered in a virtual network. *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at Claim 1 ("the virtual network manager configured to register devices in a virtual network"); Claim 30 ("a memory and a processor to implement a register module configured to register

59

devices in a virtual network"); Claim 38 ("a first device that is registered as a member in the virtual network"); Claim 48 ("distributing a virtual network address to a device to register the device as a member of the virtual network"); Claim 62 ("distribute a virtual network address to a device to register the device as a member in the virtual network"); Claim 75 ("a user set of one or more devices that are registered in the virtual network").

199.    First Horizon does not infringe the '785 Patent (including, for example, the independent claims identified in the preceding paragraph) at least because the '785 Accused System does not register devices in a virtual network.

200.    The "kubernetes.io" website includes the following "overview" of the '785 Accused System. *See* https://kubernetes.io/docs/concepts/overview/#why-you-need-kubernetes-and-what-can-it-do (last accessed Oct. 4, 2024).

## Overview

Kubernetes is a portable, extensible, open source platform for managing containerized workloads and services, that facilitates both declarative configuration and automation. It has a large, rapidly growing ecosystem. Kubernetes services, support, and tools are widely available.

60

Let's take a look at why Kubernetes is so useful by going back in time.



**Traditional Deployment**     **Virtualized Deployment**     **Container Deployment**

### Traditional deployment era:

Early on, organizations ran applications on physical servers. There was no way to define resource boundaries for applications in a physical server, and this caused resource allocation issues. For example, if multiple applications run on a physical server, there can be instances where one application would take up most of the resources, and as a result, the other applications would underperform. A solution for this would be to run each application on a different physical server. But this did not scale as resources were underutilized, and it was expensive for organizations to maintain many physical servers.

### Virtualized deployment era:

As a solution, virtualization was introduced. It allows you to run multiple Virtual Machines (VMs) on a single physical server's CPU. Virtualization allows applications to be isolated between VMs and provides a level of security as the information of one application cannot be freely accessed by another application.

Virtualization allows better utilization of resources in a physical server and allows better scalability because an application can be added or updated easily, reduces hardware costs, and much more. With virtualization you can present a set of physical resources as a cluster of disposable virtual machines.

Each VM is a full machine running all the components, including its own operating system, on top of the virtualized hardware.

### Container deployment era:

Containers are similar to VMs, but they have relaxed isolation properties to share the Operating System (OS) among the applications. Therefore, containers are considered lightweight. Similar to a VM, a container has its own filesystem, share of CPU, memory, process space, and more. As they are decoupled from the underlying infrastructure, they are portable across clouds and OS distributions.

61

201. The "kubernetes.io" website provides that the '785 Accused System is an "open source platform for managing containerized workloads and services" wherein the containers are "decoupled from the underlying infrastructure" and "are portable across clouds and OS distributions." *See* https://kubernetes.io/docs/concepts/overview/#why-you-need-kubernetes-and-what-can-it-do (last accessed Oct. 4, 2024).

202. The "kubernetes.io" website provides the following description of Kubernetes "Cluster Architecture" which make up the '785 Accused System. *See* https://kubernetes.io/docs/concepts/architecture/ (last accessed Oct. 4, 2024).

> The architectural concepts behind Kubernetes.
>
> A Kubernetes cluster consists of a control plane plus a set of worker machines, called nodes, that run containerized applications. Every cluster needs at least one worker node in order to run Pods.
>
> The worker node(s) host the Pods that are the components of the application workload. The control plane manages the worker nodes and the Pods in the cluster. In production environments, the control plane usually runs across multiple computers and a cluster usually runs multiple nodes, providing fault-tolerance and high availability.

203. The "kubernetes.io" website provides the following description of "Pods" which, as provided above, make up the '785 Accused System. *See* https://kubernetes.io/docs/concepts/workloads/pods/ (last accessed Oct. 4, 2024).

## Pods

*Pods* are the smallest deployable units of computing that you can create and manage in Kubernetes.

A *Pod* (as in a pod of whales or pea pod) is a group of one or more containers, with shared storage and network resources, and a specification for how to run the containers. A Pod's contents are always co-located and co-scheduled, and run in a shared context. A Pod models an application-specific "logical host": it contains one or more application containers which are relatively tightly coupled. In non-cloud contexts, applications executed on the same physical or virtual machine are analogous to cloud applications executed on the same logical host.

As well as application containers, a Pod can contain init containers that run during Pod startup. You can also inject ephemeral containers for debugging a running Pod.

204.    The "kubernetes.io" website provides the following description of "DNS for Services and Pods" which, as provided above, make up  the '785 Accused System. *See* https://kubernetes.io/docs/concepts/services-networking/dns-pod-service/ (last accessed Oct. 4, 2024).

## DNS for Services and Pods

Your workload can discover Services within your cluster using DNS; this page explains how that works.

Kubernetes creates DNS records for Services and Pods. You can contact Services with consistent DNS names instead of IP addresses.

Kubernetes publishes information about Pods and Services which is used to program DNS. Kubelet configures Pods' DNS so that running containers can lookup Services by name rather than IP.

Services defined in the cluster are assigned DNS names. By default, a client Pod's DNS search list includes the Pod's own namespace and the cluster's default domain.

205.    The "kubernetes.io" website provides that, to the extent that the '785 Accused System is configured to register anything in a virtual network, it is configured to register Pods in a virtual network.

206.    Based at least in part on this representation, a Pod is not a "device" as claimed in each independent claim of the '785 Patent.

207.    Accordingly, First Horizon does not infringe the '785 Patent at least because the '785 Accused System does not register devices in a virtual network.

208.    Accordingly, First Horizon does not directly infringe the '785 Patent, either literally or under the doctrine of equivalents.

209.    Furthermore, at least because there is no direct infringement by Kubernetes, there is also no indirect infringement, and First Horizon does not induce infringement of the '785 Patent or otherwise contribute to infringement of the '785 Patent.

210.    Therefore, an actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '785 Patent.

211.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '785 Accused System) has not infringed and does not infringe the '785 Patent.

## COUNT II
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '785 PATENT

212.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

64

213.    Each claim of the '785 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. § 1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

214.    Upon information and belief, and subject to further discovery, claim 30 of the '785 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

215.    Upon information and belief, and subject to further discovery, claim 30 of the '785 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

**1.    <u>Claim 30 of the '785 Patent is Invalid Under 35 U.S.C. § 101.</u>**

216.    Claim 30 of the '785 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 30 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

217.    In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012) (citations omitted)). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

218. If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two. Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

### i. Claim 30 of the '785 Patent Fails *Alice* Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101

219. Claim 30 as a whole is directed to an abstract idea. Claim 30 as a whole is directed to: (1) registering devices in a virtual network; (2) receiving a request from a first device on the virtual network for information related to a second device on the same virtual network; and (3) distributing identifying information associated with the second device to the first device to facilitate communication between the first and second devices, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

220. Claim 30 as a whole is directed to steps for a purely internal process, relying upon generic computer equipment to route communications within a network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

221. Furthermore, the specification confirms that Claim 30 as a whole is not a claimed advance over the prior art, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over

66

the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 30 as a whole, including the use of a conventional computing device to register devices on a virtual network and distribute information about said registered devices upon request, were well understood at the time of the invention, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at col. 9, ll. 42–44 ("A hardware architecture for the machines, server or other devices used to implement the present invention should be well understood to one of average skill in the art."). Claim 30 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

222. Claim 30 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 30 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. For example, Claim 30's functional recitation of "register[ing] devices in a virtual network," "receiv[ing] a DNS request" and "return[ing] a network address[,] … a private network address[,] … and a virtual network address" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 30 as a whole is directed to a generic network architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements, and so

67

is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

223.    Claim 30 as a whole describes using standard hardware to execute basic communication routing tasks over a network without any improvement to the functionality of the network components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 30 is not directed to specific asserted improvements in computer capabilities.

224.    Claim 30 as a whole is directed to basic peer-to-peer communication protocols, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 30 is directed to assigning a virtual network address to a device registered on a virtual network and, in response to a request, providing said virtual network address among other identifying information to a requesting device such that communication may be made, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

225.    Claim 30 as a whole is directed to communication over a network, and specifically to communicating requests to a remote server and receiving communications from that server, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 892 (Fed. Cir. 2019) (quoting *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019)); *see also buySAFE, Inc. v. Google, Inc.*,

765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network … is not even arguably inventive.").

226. Claim 30 as a whole is directed merely to facilitating communication by devices registered on a common virtual network and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

227. For at least the foregoing reasons, Claim 30 fails *Alice* step one.

**ii. Claim 30 of the '785 Patent Also Fails *Alice* Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

228. Claim 30 merely recites a generic computer with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 30 simply uses a generic computer to perform generic computer functions, including "register[ing] devices in a virtual network," "distribut[ing] a virtual network address" to the registered devices, and, upon "receiv[ing] a DNS request from a first device in the virtual network," "return a network address associated with a route director [and] a private network address [and public network address] associated with a second device in the virtual network", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir. 2015) ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

229. Claim 30 recites architecture of a generic computing system, including a "virtual network," a "virtual network manager," a "network interface," a "memory," a "processor," a

plurality of "devices," and a "DNS server", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Implementation of an abstract idea by the '785 Patent's routine hardware fails to move the mere routing of communications within a network beyond an abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

230.    The specification of the '785 Patent further confirms the conventional nature of the architecture in claim 30, explaining that the "hardware architecture for the machines, server or other devices used to implement the present invention should be well understood to one of average skill in the art." *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at col. 9, ll. 42–44.

231.    Claim 30 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '785 Patent discloses that a "virtual network" is merely a "private dynamic network which acts as a private LAN for computing devices." *See* Alkhatib *et al.* at col. 9, ll. 1–2. The "choice of processor is not critical," the "memory can be any conventional computer memory," and the "network interface can include a network card for connecting to an Ethernet or other type of LAN." *See* Alkhatib *et al.* at col. 9, ll. 48–58. The "DNS server" is also well-known in the prior art and is included in the prior art system shown in Figure 3 of the '785 Patent. Claim 30 does not improve functionality of these devices; instead, it employs well-understood hardware to simply route communications within a network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network

70

components operating according to their ordinary functions."); *Bascom Global Internet Services,*

*Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that

transforms the abstract idea into a patent-eligible invention must be significantly more than the

abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on

a computer.").

232.    The elements of claim 30, both individually and as an ordered combination, do not

recite an inventive concept and fail to transform the claimed invention into patent-eligible subject

matter.

233.    For at least the foregoing reasons, Claim 30 fails *Alice* step two.

234.    Accordingly, claim 30 of the '785 Patent is directed to patent ineligible subject

matter and, thus, invalid pursuant to 35 U.S.C. § 101.

   **2.  Claim 30 of the '785 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.**

235.    Upon information and belief, and subject to further discovery, claim 30 of the '785

Patent is invalid under 35 U.S.C. §§ 102 and 103.

236.    The '785 Patent originated as U.S. Application No. 10/403,818, was filed on March

31, 2003, and does not claim priority to an earlier filing date.

237.    Claim 30 of the '785 Patent reads as follows:

30. A virtual network manager, comprising:
    a network interface configured for data communication via a virtual network
        that is defined by a domain name having an associated public network
        address;
    a memory and a processor to implement a register module configured to register
        devices in a virtual network, the register module further configured to:
        receive a registration request from an agent associated with a device;
        distribute a virtual network address to the device when the device is
            registered in the virtual network, the device being identified to other
            devices in the virtual network by the virtual network address; and
    a DNS server for the virtual network, the DNS server configured to receive a
        DNS request from a first device in the virtual network, and return a network

71

address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device.

238.   Claim 30 of the '785 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent Publication No. US2003/0028671 (hereinafter "Mehta") and, separately, is also rendered invalid under 35 U.S.C. § 103 by Mehta in combination with "Request for Comment 1383: An Experiment in DNS-Based IP Routing" by Christian Huitema (hereinafter "Comment 1383").

239.   Mehta was filed on June 10, 2002 and published on February 6, 2003.  It is entitled "Method and System for Two-way Initiated Data Communication with Wireless Devices," and lists Samir Narendra Mehta, Mazin Ramadan, Geoffrey S. Heller, Vineet R. Sharma, Markus L. Janse, Edward L. Gow, and Ngochan T. Nguyen as inventors. A true and correct copy of Mehta is attached hereto as Exhibit 26.

240.   Mehta is prior art to the '785 Patent.

241.   Comment 1383[3] was publicly available prior to March 31, 2003. A true and correct copy of Comment 1383 is attached hereto as Exhibit 27.

242.   Comment 1383 is prior art to the '785 Patent.

243.   As shown on the '785 Patent under the heading "References Cited," neither Mehta nor Comment 1383 were considered by the Examiner during examination of the application that issued as the '785 Patent.

---

[3] Huitema, C., Network Working Group Request for Comment (RFC): 1383, entitled An Experiment in DNS Based IP Routing ("RFC-1383").

244.    The '785 Patent issued without the United States Patent and Trademark Office considering that Mehta and/or Comment 1383 render the invention claimed in the '785 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

245.    On November 20, 2024, a Petition for *Inter Partes* Review of the '785 Patent was filed by Liberty Mutual Insurance Company, Liberty Mutual Technology Group, Inc., Liberty Mutual Holding Company Inc., Liberty Mutual Group Inc., Liberty Mutual Plano LLC, Camparion Insurance Agency, LLC, Ironshore Holdings (U.S.) Inc., and Comerica Incorporated and assigned AIA Review No. IPR2025-00201 (the "Liberty Mutual '785 Petition"). A true and correct copy of the Liberty Mutual '785 Petition and its exhibits are attached hereto as Exhibit 28 and incorporated into this Amended Complaint by reference.

246.    The Liberty Mutual '785 Petition explains that Mehta and Comment 1383 render claim 30 of the '785 Patent invalid.  The Liberty Mutual '785 Petition explains that when the application that issued as the '785 Patent was filed, the invention claimed in claim 30 of the '785 Patent would have been obvious to a person of skill in the art ("POSITA") in light of Mehta and RFC-1383. *See* Exhibit 28.

247.    Before the Patent Trial and Appeal Board ("PTAB") could consider that Mehta and Comment 1383 render claim 30 of the '785 Patent invalid, the parties to IPR2025-00201 reached a settlement and jointly requested that IPR2025-00201 be terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC*, IPR2025-00201, Paper 9 (P.T.A.B. Apr. 23, 2025). In response to the parties' joint request for termination based on the parties' settlement, IPR2025-00201 was terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC*, IPR2025-00201, Paper 10 (P.T.A.B. Apr. 23, 2025).

73

248.     IPR2025-00201 was terminated before any substantive review or decision by the PTAB as to the invalidity of claim 30 in light of Mehta and Comment 1383.

249.     For at least the reasons stated in the Liberty Mutual '785 Petition, which is adopted herein and set forth below, Mehta and Comment 1383 render claim 30 of the '785 Patent invalid.

250.     Claim 30 claims "[a] virtual network manager, comprising" specific limitations that are recited in claim 30. *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at Claim 30.

251.     Mehta discloses a virtual network manager comprising the limitations recited in claim 30 of the '785 Patent. *See* U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.*

252.     Comment 1383 discloses a virtual network manager comprising certain limitations recited in claim 30 of the '785 Patent. *See* Exhibit 27.

253.     Claim 30 of the '785 Patent claims its virtual network manager comprises "a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public network address" (hereinafter "the Network Interface Limitation"). *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at Claim 30.

254.     Mehta discloses the Network Interface Limitation. For example, Mehta discloses: an "Address Management Proxy System" (AMPS) that is configured to manage communications between "a device on a private network [initiated] from a device on a public network to achieve virtual end-to-end connectivity." *See* U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0002]; Exhibit 28 at 35–36. The AMPS is shown in Figure 2 of Mehta, provided below:



Fig. 2

255.    The AMPS "enables devices and systems connected to a public internet, such as the Internet, to initiate communication with and to send data to wireless devices connected to a private wireless network. . . ." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0024].

256.    As stated in the Liberty Mutual '785 Petition, "Mehta also discloses the AMPS virtual network community is defined by 'public network address[es]' … that have an associated public domain name, [for example,] because Mehta has a DNS or domain name server for the public domain name that returns public IP addresses for associated private devices." Exhibit 28 at 37 (quoting U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0012] ("the AMPS comprises one or more modified DNS'/API servers ... [that] receives a request from a device on a public network for a particular [private network] device, and returns an appropriate temporary public address, which is internally mapped to the private address of the [private network] device"); ¶ [0057] (request for the private network device corresponding to "'uniqueID.hostname.domain.tld,'

75

which specifies a typical hierarchy of person/service on a machine named 'hostname' on a domain such as a company's network on a top level domain such as 'org.' 'com,' 'edu,' etc.")).

257.    Claim 30 claims its virtual network manager also comprises "a memory and a processor to implement a register module configured to register devices in a virtual network, the register module further configured to: receive a registration request from an agent associated with a device; distribute a virtual network address to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by the virtual network address" (hereinafter "the Memory and Processor Limitation"). *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at Claim 30.

258.    Mehta discloses the Memory and Processor Limitation.  For example, Mehta discloses: "A computer-readable memory medium containing instructions for controlling a processor in a computer system to establish a bi-directional communication channel … between a first device connected to a computer network environment using a public network address and a second device connected to a wireless communications network and having a private address." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at Claim 67. "[A] general purpose computer system for practicing embodiments of the [AMPS] … comprises a computer memory…, a display 402, [and] a Central Processing Unit. . . ." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0036].

259.    The AMPS "dynamically allocates, using methods similar to a DHCP protocol, a private wireless network address when the wireless device registers itself with the carrier infrastructure upon being powered on." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0053]. "Thus, the unique ID table 610 may be sparsely filled or entries created dynamically and then deleted dynamically as devices register and unregister with the carrier infrastructure system."

76

U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0053]. "The AMPS DNS'/API server receives a request from a device on a public network for a particular wireless device…" U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0012].

260. Figure 3 of Mehta, provided below, depicts an "Address Management Data Server 303" and an "Address Management Data Repository 304" where registration information may be stored:



261. Mehta discloses that "a pool of public addresses, for example, public IP addresses, is maintained and allocated dynamically to wireless network devices as required." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0039]. The AMPS includes "one or more Address Proxy/Routers 305" that use "the Address Management Data Server 303 or equivalent to create and update a series of routing tables that are used to assign public addresses to wireless devices as needed and to update the various mappings between public addresses and the non-mutable (private) addresses of the wireless devices." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶

[0032]. Further, "[i]f a public network address has not already been assigned or is not valid, then the routine causes a new public network address to be allocated and that new public address is associated with the private wireless network address." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0057].

262.    Claim 30 claims its virtual network manager also comprises "a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device" (hereinafter "the DNS Server Limitation"). *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at Claim 30.

263.    Mehta discloses the DNS Server Limitation.  For example, Mehta discloses: "The [AMPS] achieves two way initiated bi-directional communication by implementing a **modified DNS server** and serving as a proxy/router for devices on the private wireless network as they interface to the public wired internetworking world." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030] (emphasis added). "In summary, a pool of public addresses is maintained and dynamically distributed among active wireless devices as needed by the AMPS…." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030]. "The term "bi-directional" as used herein means that data paths and communication can flow in either direction between two endpoint systems." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030]. "FIG. 2 shows wired devices 201, 202, and 203 connected to public network 210." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030]. "One skilled in the art will recognize that these devices could be connected to another private or public network, which is then connected by one or more wired devices to the public network 210, yet still achieve the functionality discussed here." U.S. Pat. Pub. No. 2003/0028671

to Mehta *et al.* at ¶ [0030]. "Any such variation provides equivalent functionality and is explicitly contemplated and presumed to be part of the present invention." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030]. "On the wireless side, the AMPS 220, acting in its capacity as a proxy (and router) for wireless devices, is shown both connected via wire to the public network 210 and via standard carrier infrastructure elements (not shown) to the wireless network 230." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030].

264.    "[T]he AMPS comprises one or more modified DNS/API servers, one or more Address Proxy/Routers, an Address Management Data Server, one or more Address Management Data Repositories, and optionally a load balancer." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0012]. "The AMPS DNS'/API server receives a request from a device on a public network for a particular wireless device, and returns an appropriate temporary public address, which is internally mapped to the private address of the wireless device." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0012]. "The router (or routing server/service) typically contains a routing table, which determines to which machine (and optionally to which port) to send a datagram, given a destination IP address." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0008] (emphasis added). The AMPS can "be used by one device on a first wireless network to communicate with another wireless device on a second network–each device ends up communicating with the Address Proxy/Router of the other network." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0033].

265.    As stated in the Liberty Mutual '785 Petition, "[i]n Mehta, each (wireless) device has a private IP address and a Unique ID assigned by a (e.g., network) carrier." Exhibit 28 at 48 (citing U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0053]). "Additionally, Mehta has a set of Address Proxy/Router 305 machines, each of which can have multiple public addresses

(facing the Internet) as well as multiple private address (facing the wireless network)." Exhibit 28 at 48 (citing U.S. Pat. Pub. No. US2003/0028671 to Mehta *et al.* at ¶ [0055]). "Mehta organizes this information into three tables … [that] list at least four pieces of information that can be associated with each host: a Unique ID 601, Private Network Address 602, Public Network Address 631, and Proxy/Router machine 621." Exhibit 28 at 48 (citing U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at Figure 6).

266.    "Once all of the tables have been updated in both the proxy/router and in the data repository, the DNS'/API server returns the determined public network address of the associated Address Proxy /Router machine." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0057].

267.    As stated in the Liberty Mutual '785 Petition, "the AMPS stores and assigns to destination devices in the network 'a private non-routable address by means of DHCP (or DHCP-like) server.'" Exhibit 28 at 49–50 (citing U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0026]). "This is the Private Network Address 602 in Tables 610 and 630 of Fig. 6." Exhibit 28 at 50. "As part of the steps of Fig. 7, the DNS'/API server has to query the Address Management Data Server 303 and it returns this private address from the Data Repository 304." Exhibit 28 at 50. "This address is then further returned (upstream) by AMDS 303 to DNS'/API Server 302." Exhibit 28 at 50.

268.    "FIG. 7 is an example flow diagram of an example routine provided by a DNS'/API server of the Address Management Proxy System to return a public address that corresponds to a designated unique identifier." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0057]. The "public address is, for example, an address associated with one of the Address Proxy/Routers, which are connected to the external public network and have access to the private addresses on the private wireless network." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0012].

80

269.    Comment 1383 also discloses the DNS Server Limitation.  For example, RFC-1383 discloses: "The 'MX records' are currently used by the mail routing application to introduce a level of decoupling between the 'domain names' used for user registration and the mailbox addresses." Exhibit 27 at 2. "They are particularly useful for sending mail to 'non connected' domains: in that case, the MX record points to one or several Internet hosts that accept to relay mail towards the target domain." Exhibit 27 at 2. "We propose to generalize this scheme for packet routing." Exhibit 27 at 2. "Suppose a routing domain D, containing several networks, subnetwork and hosts, and connected to the Internet through a couple of IP gateways." Exhibit 27 at 2. "These gateways are dual homed: they each have an address within the domain D -- say D1 and D2 -- and an address within the Internet -- say I1 and I2 --." Exhibit 27 at 2–3. "These gateways also have a particularity: they retain information, and don't try to announce to the Internet any reachibility [sic] information on the networks contained within 'D'." Exhibit 27 at 3. "These networks however have been properly registered; a name server accessible from the Internet contains the 'in-addr.arpa' records that enable reverse 'address to name' lookup, and also contains the network level equivalent of 'MX records', say 'RX records'." Exhibit 27 at 3. "Given any host address Dx within D, one can get 'RX records' pointing to the Internet addresses of the gateways, I1 and I2." Exhibit 27 at 3. "A standard Internet router Ix cannot in principle send a packet to the address Dx: it does not have any corresponding routing information." Exhibit 27 at 3. "However, if the said Internet router has been modified to exploit our scheme, it will query the DNS with the name build up from 'Dx' in the 'in-addr.arpa' domain, obtain the RX records, and forward the packet towards I1 (or I2), using some form of 'source routing'." Exhibit 27 at 3. "The gateway I1 (or I2) will receive the packet; its routing tables contain information on the domain D and it can relay the packet to the host Dx." Exhibit 27 at 3.

270.    The DNS record type "is designed for easy general purpose extensions in the DNS, and its content is a text string." Exhibit 27 at 11. "The RX record will contain three fields: A record identifier composed of the two characters 'RX' … to disambiguate from other experimental uses of the 'TXT' record[; a] cost indicator, encoded on up to 3 numerical digits … [; and a]n IP address, encoded as a text string following the 'dot' notation." Exhibit 27 at 11.

271.    "Upon reception of the ICMP message, the query manager updates the local routing table, so that any new packet bound to the requested destination becomes routed through the real time forwarder." Exhibit 27 at 12. "At the same time, the query manager will send a DNS request, in order to read the RX records corresponding to the destination." Exhibit 27 at 12. "After reception of the response, it will select a gateway, and pass the information to the real time forwarder." Exhibit 27 at 12.

272.    Mehta discloses the virtual network manager claimed in claim 30 of the '785 Patent. Mehta renders claim 30 of the '785 Patent invalid pursuant to 35 U.S.C. § 102.

273.    In light of the disclosure in Mehta, a POSITA would also consider claim 30 of the '785 Patent obvious pursuant to 35 U.S.C. § 103.

274.    In light of the combined disclosure in Mehta and RFC-1383, a POSITA would also consider claim 30 of the '785 Patent obvious pursuant to 35 U.S.C. § 103.

**COUNT III**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '844 PATENT**

275.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

276.    Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon.  Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that

"Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 16. Intellectual Ventures Management, by and on behalf of all Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license" of at least the Patents-In-Suit, including the '844 Patent. *See* Exhibit 20. Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See* Exhibit 9; Exhibit 10. Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license. Intellectual Ventures Management, by and on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio, including the '844 Patent, and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

277.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged that the '844 Patent "cover[s] technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" and identifies "Docker," a third party branded software, as the "Example Product/Feature." *See* Exhibit 9.

278.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged infringement of at least claim 7 of the '844 Patent by "First Horizon's use of Docker" (the "'844 Accused System"). *See* Exhibit 9.

279.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '844 Accused System), or import into the United States any product and/or system (including but not limited to the '844 Accused System) in a manner which infringes the '844 Patent.

280.    By way of an example, each independent claim of the '844 Patent requires, *inter alia*, that the claimed "leaf image" contain "only additional data blocks not previously contained in said root image and changes made … to the blocks of said root image." *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 1 ("a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image"); Claim 7 ("said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image"); Claim 14 ("a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image"); Claim 19 ("said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image"); Claim 23 ("said leaf image portion comprising only additional data blocks not previously contained in said root image portion and, changes made by said first compute

84

node to the blocks of said room image, wherein said leaf image portion does not include blocks of said root image that are unchanged by said first compute node").

281. First Horizon does not infringe the '844 Patent at least because the '844 Accused System does not include leaf images as claimed.

282. The "Docker" website provides that the '844 Accused System includes an architecture with (1) "images" which are "read-only template[s] with instructions for creating a Docker container" and (2) "containers" which are "runnable instance[s] of an image" where each container "is defined by its image." *See* https://docs.docker.com/get-started/docker-overview/ (last accessed Oct. 4, 2024).

## Images

An image is a read-only template with instructions for creating a Docker container. Often, an image is based on another image, with some additional customization. For example, you may build an image which is based on the `ubuntu` image, but installs the Apache web server and your application, as well as the configuration details needed to make your application run.

You might create your own images or you might only use those created by others and published in a registry. To build your own image, you create a Dockerfile with a simple syntax for defining the steps needed to create the image and run it. Each instruction in a Dockerfile creates a layer in the image. When you change the Dockerfile and rebuild the image, only those layers which have changed are rebuilt. This is part of what makes images so lightweight, small, and fast, when compared to other virtualization technologies.

## Containers

A container is a runnable instance of an image. You can create, start, stop, move, or delete a container using the Docker API or CLI. You can connect a container to one or more networks, attach storage to it, or even create a new image based on its current state.

By default, a container is relatively well isolated from other containers and its host machine. You can control how isolated a container's network, storage, or other underlying subsystems are from other containers or from the host machine.

A container is defined by its image as well as any configuration options you provide to it when you create or start it. When a container is removed, any changes to its state that aren't stored in persistent storage disappear.

283. The "Docker" website provides that "[t]he major difference between a container and an image is the top writable layer." *See* https://docs.docker.com/engine/storage/drivers/ (last accessed Oct. 4, 2024).

## Container and layers

The major difference between a container and an image is the top writable layer. All writes to the container that add new or modify existing data are stored in this writable layer. When the container is deleted, the writable layer is also deleted. The underlying image remains unchanged.

284. Upon information and belief, a "container" of the '844 Accused System includes both (1) image layers and (2) a container layer, as depicted below. *See* https://docs.docker.com/engine/storage/drivers/ (last accessed Oct. 4, 2024).



285. In light of this representation, and on information and belief, a container of the '844 Accused System does not include "only additional data blocks not previously contained in said root image and changes made … to the blocks of said root image" as recited by each independent claim of the '844 Patent.

286. The '844 Accused System does not include a "leaf image[s]" as claimed by the independent claims of the '844 Patent.

287.     Accordingly, First Horizon does not directly infringe the '844 Patent, either literally or under the doctrine of equivalents.

288.     Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '844 Patent or otherwise contribute to infringement of the '844 Patent.

289.     Therefore, an actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed, or is infringing, the '844 Patent.

290.     The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '844 Accused System) has not infringed and does not infringe any claim of the '844 Patent.

## COUNT IV
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '844 PATENT

291.     First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

292.     Claim 7 of the '844 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

293.     Upon information and belief, and subject to further discovery, claim 7 of the '844 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

87

294.    Upon information and belief, and subject to further discovery, claim 7 of the '844 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

1.    **Claim 7 of the '844 Patent is Invalid Under 35 U.S.C. §101.**

295.    Claim 7 of the '844 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 7 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

296.    In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

297.    If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two.  Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented

88

methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

### i.   Claim 7 of the '844 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.

298.   Claim 7 as a whole is directed to an abstract idea. Claim 7 as a whole is directed to: (1) storing root images on a first storage unit; (2) storing leaf images on a second storage unit; (3) caching blocks of the root images that have been accessed; and (4) indexing the root images, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

299.   Claim 7 as a whole is directed to steps for a purely internal process, relying upon generic computer equipment data storage and management, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

300.   Furthermore, the specification confirms that Claim 7 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 7 as a whole, including the use of a conventional computing device to store root images, store root images, cache blocks of the root images that have been accessed, and index the root images, were well understood at the time of the invention. *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at col. 4, ll. 27–34 (The system including "a general purpose computing system environment, such as compute node 100 [which] includes at least one processing unit 102 and memory 104."); col. 4, ll. 48–56 ("Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other

89

medium which can be used to store the desired information and which can be accessed by compute node 100. Any Such computer storage media may be part of compute node 100."); col. 5, ll. 19–22 (The compute nodes 220*a-n* coupled to first storage unit 240 and a corresponding second storage unit 250*a-n*. . . ."). Claim 7 as a whole claims nothing more than the abstract idea underlying the claims described in the specification. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

301.    Claim 7 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 7 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. For example, Claim 7's functional recitation of "storing blocks of a root image of … compute nodes," "storing leaf images for respective compute nodes," and "caching blocks of said root image" merely describes abstract outcomes without concrete technological solutions. Claim 7 as a whole is directed to a generic computing system architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

302.    Claim 7 as a whole describes using standard hardware to execute basic data storage and management without any improvement to the functionality of the system components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 7 is not directed to specific asserted improvements in computer capabilities.

303.    Claim 7 as a whole is directed to basic data storage and management techniques, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 7 is directed to "storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units," and "caching blocks of the root image that have been accessed by at least one compute node." *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at col. 4, ll. 15–22.

304.    The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc.*, 778 F. App'x at 892 (quoting *ChargePoint, Inc.*, 920 F.3d at 767); *see also buySAFE, Inc.*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network … is not even arguably inventive."). Further, the Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017) (organizing and accessing data held abstract); *Content Extraction and Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of data collection, recognition, and storage is undisputedly well-known.").

305.    Claim 7 as a whole is directed merely to data storage and management within a computing system and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

306.    For at least the foregoing reasons, Claim 7 fails *Alice* step one.

ii.    **Claim 7 of the '844 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

307.    Claim 7 merely recites a generic computer with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 7 simply uses a generic computer to perform generic computer functions, including "storing blocks of a root

91

image of … compute nodes," "storing leaf images for respective compute nodes," and "caching blocks of said root image", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101 *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

308. Claim 7 recites architecture of a generic computing system, including a "plurality of compute nodes," a "first storage unit," "second storage units," and a "cache memory", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 7. Implementation of an abstract idea by the '844 Patent's routine hardware fails to move the mere storage of data beyond an abstract idea.

309. Claim 7 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '844 Patent discloses that a "compute node" merely includes "at least one processing unit 102 and memory 104." U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at col. 4, ll. 29–31. The "memory 104 may be volatile (such as RAM), non-volatile (such as ROM, flash memory, etc.) or some combination of the two." U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at col. 4, ll. 32–34. Further, the "[c]omputer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can be accessed by compute node 100." U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at col. 4, ll. 48–56. Notably, the specification fails to note any unique

92

features of the "first storage unit" and "second storage units," thus confirming they are conventional. Claim 7 does not improve functionality of these devices; instead, it employs well-understood hardware to simply route communications within a network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

310. The elements of claim 7, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter.

311. For at least the foregoing reasons, Claim 7 fails *Alice* step two.

312. Accordingly, claim 7 of the '844 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

## 2. Claim 7 of the '844 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.

313. Upon information and belief, and subject to further discovery, claim 7 of the '844 Patent is invalid under 35 U.S.C. §§ 102 and 103.

314.    The '844 Patent originated as U.S. Application No. 11/709,477 and was filed on February 21, 2007.

315.    The '844 Patent, and specifically U.S. Application No. 11/709,477, claims to be a continuation-in-part of U.S. Application No. 11/395,816, which claims to be a continuation-in-part of U.S. Application No. 11/026,622. U.S. Application No. 11/395,816 was filed on March 30, 2006, and U.S. Application No. 11/026,622 was filed on December 20, 2004.

316.    Claim 7 of the '844 Patent reads as follows:

7.  A method for providing data to a plurality of compute nodes, comprising:
    storing blocks of a root image of said compute nodes on a first storage unit;
    storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and
    caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

317.    Claim 7 of the '844 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by "Optimizing the Migration of Virtual Computers" by Sapuntzakis, *et al.* (hereinafter "Sapuntzakis") and is rendered invalid under 35 U.S.C. § 103 by Sapuntzakis in combination with U.S. Patent Publication No. 2005/0283597 (hereinafter "Holzmann").

318.    Sapuntzakis's publication information is Sapuntzakis, *et al.* "Optimizing the Migration of Virtual Computers," Association for Computing Machinery, Special Interest Group on Operating Systems, Operating Systems Review, Proceedings of the 5th Symposium on Operating Systems Design and Implementation, Volume 36, Issue S1, published 12/31/2002. Sapuntzakis was publicly available prior to December 20, 2004. A true and correct copy of Sapuntzakis is attached hereto as Exhibit 29.

319.    Sapuntzakis is prior art to the '844 Patent.

320.    Holzmann was filed on June 22, 2004 and published on December 22, 2005. It is entitled "System and Method for Booting Multiple Servers Form a Single Operating System Image," and lists Richard Holzmann as the inventor. A true and correct copy of Holzmann is attached hereto as Exhibit 30.

321.    Holzmann is prior art to the '844 Patent.

322.    As shown on the '844 Patent under the heading "References Cited," neither Sapuntzakis nor Holzmann were considered by the Examiner during examination of the application that issued as the '844 Patent.

323.    The '844 Patent issued without the United States Patent and Trademark Office considering that Sapuntzakis and/or Holzmann render the invention claimed in the '844 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

324.    On November 20, 2024, a Petition for *Inter Partes* Review of the '844 Patent was filed by Liberty Mutual Insurance Company, Liberty Mutual Technology Group, Inc., Liberty Mutual Holding Company Inc., Liberty Mutual Group Inc., Liberty Mutual Plano LLC, Camparion Insurance Agency, LLC, Ironshore Holdings (U.S.) Inc., and Comerica Incorporated and assigned AIA Review No. IPR2025-00202 (the "Liberty Mutual '844 Petition"). A true and correct copy of the Liberty Mutual '844 Petition and its exhibits are attached hereto as Exhibit 31 and incorporated into this Amended Complaint by reference.

325.    The Liberty Mutual '844 Petition explains that Sapuntzakis and Holzmann render claim 7 of the '844 Patent invalid.  The Liberty Mutual '844 Petition explains that when the application that issued as the '844 Patent was filed, the invention claimed in claim 7 of the '844 Patent would have been obvious to a POSITA in light of Sapuntzakis and Holzmann. *See* Exhibit 31.

95

326.    Before the PTAB could consider that Sapuntzakis and Holzmann render claim 7 of the '844 Patent invalid, the parties to IPR2025-00202 reached a settlement and jointly requested that IPR2025-00202 be terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC*, IPR2025-00202, Paper 8 (P.T.A.B. Apr. 23, 2025). In response to the parties' joint request for termination based on the parties' settlement, IPR2025-00202 was terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC*, IPR2025-00202, Paper 9 (P.T.A.B. Apr. 23, 2025).

327.    IPR2025-00202 was terminated before any substantive review or decision by the PTAB as to the invalidity of claim 7 in light of Sapuntzakis and Holzmann.

328.    For at least the reasons stated in the Liberty Mutual '844 Petition, which is adopted herein and set forth below, Sapuntzakis and Holzmann render claim 7 of the '844 Patent invalid.

329.    Claim 7 claims "[a] method for providing data to a plurality of compute nodes, comprising" specific limitations that are recited in claim 7. *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 7.

330.    Sapuntzakis discloses a method for providing data to a plurality of compute nodes comprising the limitations recited in claim 7 of the '844 Patent. *See* Exhibit 29.

331.    Holzmann discloses a method for providing data to a plurality of compute nodes comprising certain limitations recited in claim 7 of the '844 Patent. *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann.

332.    Claim 7 of the '785 Patent claims its method for providing data to a plurality of compute nodes comprises "storing blocks of a root image of said compute nodes on a first storage unit" (hereinafter "the First Storage Limitation"). *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 7.

333.   Sapuntzakis discloses the First Storage Limitation. For example, Sapuntzakis discloses: "Computers and storage in the Collective system act as caches of capsules." Exhibit 29 at 2. "As users travel, the Collective can move their capsules to computers close to them, giving users a consistent environment." Exhibit 29 at 2. "Capsules could be moved with users as they commute between home and work." Exhibit 29 at 2. "Capsules can be duplicated, distributed to many different machines, and updated like any other data; this can form the basis for administering a group of computers." Exhibit 29 at 2.

334.   "At the root of the hierarchy is a root disk, which is a complete capsule disk." Exhibit 29 at 5. "Figure 1 shows an example of a capsule hierarchy illustrating how it may be used in a university." Exhibit 29 at 5. "The root capsule contains all the software available to all students." Exhibit 29 at 5. Figure 3 shows an "[i]mplementation of capsule disks and demand paging." Figure 1 and 3 of Sapuntzakis are provided below:



Figure 1: An example capsule hierarchy.



Figure 3: Implementation of capsule disks and demand paging.

335.    Claim 7 of the '785 Patent claims its method for providing data to a plurality of compute nodes comprises "storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes" (hereinafter "the Second Storage Limitation"). *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 7.

336.    Sapuntzakis discloses the Second Storage Limitation. For example, Sapuntzakis discloses: "We can store the disks in these capsules efficiently by creating a hierarchy, where each child capsule could be viewed as inheriting from the parent capsule with the differences in disk state between parent and child captured in a separate copy-on-write (COW) virtual disk." Exhibit 29 at 5.

98

337.    Sapuntzakis further discloses: "Writes to a capsule disk are performed by writing the data to the latest COW disk and updating its bitmap file." Exhibit 29 at 5. "Reads involve searching the latest COW disk and its ancestor disks in turn until the required block is found." Exhibit 29 at 5. "Since the root COW disk contains a copy of all the blocks, the search is guaranteed to terminate." Exhibit 29 at 5–6. "Since the latest COW disk is always local, all writes are local." Exhibit 29 at 6.

338.    Claim 7 of the '785 Patent claims its method for providing data to a plurality of compute nodes comprises "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory" (hereinafter "the Caching Limitation"). *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 7.

339.    Sapuntzakis discloses the Caching Limitation. For example, Sapuntzakis discloses: "Each COW disk can either be local or remote. Each remote COW disk has a corresponding local shadow COW disk which contains all the locally cached blocks of the remote COW disk." Exhibit 29 at 6. "Reads, on the other hand, could either be local or remote." Exhibit 29 at 6. "In the case of a remote read, the disk server requests the block from the shadow COW disk." Exhibit 29 at 6. "If the block is not cached locally, it is fetched remotely and added to the shadow COW." Exhibit 29 at 6. "First, the memory in most systems caches disk blocks." Exhibit 29 at 7.

340.    Holzmann discloses the Caching Limitation. For example, Holzmann discloses: "The invention is directed to a system and method for booting multiple servers or other network resources from a single operating system image." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at Abstract. "The operating system image is stored on a solid state disk." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at Abstract. "When a server is booted, cache space is allocated in the volatile memory portion of the solid state disk." *See* U.S. Pat. Pub. No.

2005/0283597 to Holzmann at Abstract. "This cache is used to store data necessary for booting

and operation of the operating system." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at

Abstract. "As additional servers or other network resources are booted, the cache is used to access

the necessary operating system data." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at

Abstract. "FIG. 1 is a block diagram illustrating the component parts of the invented system and

the functions of each component part." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶

[0017]. "The invented system comprises a solid state disk system 101 having a storage means 102,

a control module 103, a memory module 104, an interface module 105 that communicates with

external devices 106, and an internal power source 107." *See* U.S. Pat. Pub. No. 2005/0283597 to

Holzmann at ¶ [0017]. Figure 1 of Holzmann is provided below:



Fig. 1

100

341. "The memory module 104 comprises at least one direct-access memory module for holding data currently or recently used by external devices 106." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0020]. "The memory module 104 is more quickly accessible, and performs read and write processing functions more quickly, than non-volatile or disk memory, such as storage means 102." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0020]. "The memory module 104 preferably comprises at least one random-access memory (RAM) module." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0020].

342. "Upon receiving a boot request, the control module 103 loads the required portion of the operating system image (the portion loaded typically depends on the operating system and its boot process) into memory module 104. . . ." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0021]. "Portions of the cache may be assigned statically for each server or other external devices 106. Alternatively, and preferably, the portions of the cache attributed to each server may be assigned dynamically. . . ." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0021].

343. "The external device 106 requests operating system data through the interface module 105. . . ." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0024]. "[T]he control module 103 monitors the request for operating system data, and determines whether the particular operating system data block requested by the external devices 106 has previously been loaded into the operating system cache." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0024]. "If the data block has been loaded into the cache, and that data block has not been overwritten … the requested data block is provided from the cache. . . ." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0024].

344. "If a second server or other external device sends a boot request to control module 103, the module allocates additional space in the cache for a second cache 402. . . ." *See* U.S. Pat.

101

Pub. No. 2005/0283597 to Holzmann at ¶ [0033]. "If additional servers require boot operations, additional cache space 403 can [be] allocated for those servers." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0033]. "By allocating separate cache space for each server or other network resource, the inventive system prevents corruption of data, overwriting of data, and other harmful actions that would lead to resource malfunction." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0033].

345.    "If the requested data has not been loaded into the cache 501, the control module 103 copies the data from the operating system data stored in memory portion 400 to the cache 501." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0035].

346.    Sapuntzakis discloses the virtual network manager claimed in claim 7 of the '844 Patent. Sapuntzakis renders claim 7 of the '844 Patent invalid pursuant to 35 U.S.C. § 102.

347.    In light of the disclosure in Sapuntzakis, a POSITA would also consider claim 7 of the '844 Patent obvious pursuant to 35 U.S.C. § 103.

348.    In light of the combined disclosure in Sapuntzakis and Holzmann, a POSITA would also consider claim 7 of the '844 Patent obvious pursuant to 35 U.S.C. § 103.

**COUNT V**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '722 PATENT**

349.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

350.    Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon. Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 16.

Intellectual Ventures Management, by and on behalf of all Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license" of at least the Patents-In-Suit, including the '722 Patent. *See* Exhibit 20. Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See,* Exhibit 9; Exhibit 10. Intellectual Ventures Management, on behalf of Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license. Intellectual Ventures Management, by and on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio, including the '722 Patent, and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

351. In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged that the '722 Patent "cover[s] technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" and identifies "Kafka," a third party branded software, as the "Example Product/Feature." *See* Exhibit 9.

352.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged infringement of at least claim 14 of the '722 Patent by "First Horizon's use of Kafka" (the "'722 Accused System"). *See* Exhibit 9.

353.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '722 Accused System) or import into the United States any product and/or system (including but not limited to the '722 Accused System) in a manner which infringes the '722 Patent.

354.    By way of example, independent claim 14 of the '722 Patent requires, *inter alia*, that the claimed method provide "a data representation to a client device, … wherein the data representation includes at least one live object recognizable by the client device." *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

355.    The '722 Patent states that the "live objects" are "designated to be real-time dynamically-updateable objects." *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at col. 5, ll. 27–31.

356.    First Horizon does not infringe the '722 Patent at least because the '722 Accused System does not include a data representation to a client device that includes at least one live object recognizable by the client device.

357.    Upon information and belief, and based on the representations made on the "Kafka" website, the '722 Accused System sends data in the form of "events" or "records," not "real-time dynamically-updateable objects" as required by the '722 Patent. *See* https://kafka.apache.org/documentation/#majordesignelements (last accessed Oct. 4, 2024).

358.    Accordingly, First Horizon does not directly infringe the '722 Patent, either literally or under the doctrine of equivalents.

104

359.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '722 Patent or otherwise contribute to infringement of the '722 Patent.

360.    An actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '722 Patent.

361.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '722 Accused System) has not infringed and does not infringe the '722 Patent.

## COUNT VI
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '722 PATENT

362.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

363.    Claim 14 of the '722 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

364.    Upon information and belief, and subject to further discovery, claim 14 of the '722 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

365.    Upon information and belief, and subject to further discovery, claim 14 of the '722 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

1.  **Claim 14 of the '722 Patent is Invalid Under 35 U.S.C. § 101.**

105

356.     Claim 14 of the '722 Patent is invalid as being directed to patent ineligible subject

matter pursuant to 35 U.S.C. § 101. Claim 14 as a whole is directed to a non-patentable, abstract

idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208

(2014).

357.     In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach

for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the

scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are

directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena,

or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70).

Where the "focus of the claims is not on such an improvement in computers as tools, but on certain

independently abstract ideas that use computers as tools," they are directed toward an abstract idea

because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

358.     If from step one of *Alice* the claim as a whole is determined to be directed to

ineligible subject matter, then analysis proceeds to *Alice* step two.  Under the second step, the

Court examines "the elements of the claim to determine whether it contains an inventive concept

sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S.

at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible

application, "one must do more than simply state the [abstract idea] while adding the words 'apply

it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented

methods fail the second step when they are drawn to "merely selecting information, by content or

source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

   **i.   Claim 14 of the '722 Patent Fails Alice Step One and is Ineligible Subject Matter
          Under 35 U.S.C. § 101.**

359.    Claim 14 as a whole is directed to an abstract idea. Claim 14 as a whole is directed to: (1) providing a data representation to a device; (2) registering for updates related to the data representation; and (3) sending update messages to the device related to the data representation, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

360.    Claim 14 as a whole is directed to steps for a purely internal process, relying upon generic computer equipment to route content within a network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

361.    Furthermore, the specification confirms that Claim 14 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 14 as a whole, including the use of conventional computing components to route update messages containing updates to properties of live objects, were well understood at the time of the invention, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at col. 4, l. 66 – col. 5, l. 2 ("The server 112, client 114, information provider 108, dynamic content provider 116, and routing network 110 are preferably in communication via conventional communications links 117 such as those comprising the Internet."); col. 9, ll. 51–56 (explaining that the "information provider" and "dynamic content provider" are each merely a "conventional computer system"); col. 10, ll. 15–17 (explaining that the "client" is merely a "conventional personal computer used by a person to access information on the Internet"); col. 6, ll. 14–15 (explaining that the server is "a conventional computer system configured to act as a web server"); col. 5, ll. 34–36 (explaining that the routing network simply "maintains a registry

indicating which clients have registered for which object IDs," a task executable by known computer components.). Claim 14 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

362.    Claim 14 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 14 as a whole relies on functional language to claim high-level results without specific implementation details. For example, Claim 14's functional recitation of "providing … a data representation to a client device," "register[ing] for updates," and "sending … an update message to the routing network" merely describes abstract outcomes without concrete technological solutions. Claim 14 as a whole is directed to a generic network architecture performing routine tasks and lacks sufficient specificity regarding such things as data routing techniques and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

363.    Claim 14 as a whole describes using standard hardware to execute basic content routing tasks over a network without any improvement to the functionality of the network components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 14 is not directed to specific asserted improvements in computer capabilities.

364. Claim 14 as a whole is directed to basic content routing protocols, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 14 is directed to providing a data representation which includes at least one live object to a client device, causing the client device to respond by determining an object identifier of the live object and to register for updates of the live object with the routing network, and sending an update message to the routing network which updates a property of the live object, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

365. Claim 14 as a whole is directed to content routing over a network, and specifically to content routing based on a registry of interested devices, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc.*, 778 F. App'x at 892 (quoting *ChargePoint, Inc.*, 920 F.3d at 767); *see also buySAFE, Inc.*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network … is not even arguably inventive."). Further, the Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Erie Indem. Co.*, 850 F.3d at 1327 (organizing and accessing data held abstract); *Content Extraction and Transmission LLC*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

366. Claim 14 as a whole is directed merely to content routing based over a network based on a registry of interested devices and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

367. For at least the foregoing reasons, Claim 14 fails *Alice* step one.

**ii. Claim 14 of the '722 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

109

368.     Claim 14 merely recites a generic computer with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 14 simply uses a generic computer to perform generic computer functions, including "providing … a data representation to a client device," "register[ing] for updates," and "sending … an update message to the routing network", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101 *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

369.     Claim 14 recites architecture of a generic computing system, including a server, client, information provider, dynamic content provider, and a routing network wherein each component is "in communication via conventional communication links", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See* U.S. Pat. No. 8,407,722 to Tuttle at col. 4, l. 66 – col. 5, l. 2. Implementation of an abstract idea by the '722 Patent's routine hardware fails to move the mere routing of content within a network beyond an abstract idea.

370.     Claim 14 is directed to a method implemented via conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The specification of the '722 Patent further confirms the conventional nature of these computing elements. The '722 Patent discloses the "information provider" and "dynamic content provider" are each merely a "conventional computer system." U.S. Pat. No. 8,407,722 to Tuttle at col. 9, ll. 51–56. Similarly, the "client" is merely a "conventional personal computer used by a person to access information on the Internet." U.S. Pat. No. 8,407,722 to Tuttle at col. 10, ll. 15–17. The

110

server is "a conventional computer system configured to act as a web server." U.S. Pat. No. 8,407,722 to Tuttle at col. 6, ll. 14–15. The routing network simply "maintains a registry indicating which clients have registered for which object IDs," a task executable by known computer components. U.S. Pat. No. 8,407,722 to Tuttle at col. 5, ll. 34–36. Claim 14 does not improve functionality of these devices; instead, it employs well-understood hardware to simply route content within a network. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

371.   The elements of claim 14, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter.

372.   For at least the foregoing reasons, Claim 14 fails *Alice* step two.

366.   Accordingly, claim 14 of the '722 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

**2.   Claim 14 of the '722 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.**

111

367. Upon information and belief, and subject to further discovery, claim 14 of the '722 Patent is invalid under 35 U.S.C. §§ 102 and 103.

368. The '722 Patent originated as U.S. Application No. 11/396,251 and was filed on March 30, 2006.

369. The '722 Patent, and specifically U.S. Application No. 11/396,251, claims to be a continuation of U.S. Application No. 10/105,018, which was filed on March 21, 2002.

370. U.S. Application No. 10/105,018 claims to be a continuation-in-part of U.S. Application No. 10/017,182, which was filed on December 14, 2001.

371. U.S. Application No. 10/017,182 claims priority to the following Provisional Patent Applications: 60/278,303 filed on March 21, 2001; 60/280,627 filed on March 29, 2001; 60/279,608 filed on March 28, 2001; 60/276,847 filed on March 16, 2001; and 60/256,613 filed on December 18, 2000.

372. Claim 14 of the '722 Patent reads as follows:

> 14. A method comprising:
> providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network; and
> sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object,
> wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network,
> wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device processes the update message upon receipt to update the property of the live object at the client device.

373.    Claim 14 of the '722 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent No. 5,721,825 (hereinafter "Lawson") and U.S. Patent No. 6,480,883 (hereinafter "Tsutsumitake"), alone and in combination.

374.    Lawson was filed on October 3, 1996 and issued February 12, 1998. It is entitled "System and Method for Global Event Notification and Delivery in a Distributed Computing Environment," and lists Todd C. Lawson, Warren D. Cave, and Dean L. Schmidt as inventors. A true and correct copy of Lawson is attached hereto as Exhibit 32.

375.    Lawson is prior art to the '722 Patent.

376.    Tsutsumitake was filed June 29, 1999 and issued November 12, 2002. It is entitled "Real-Time Information Transmission System," and lists Hideyuki Tsutsumitake as the inventor. A true and correct copy of Tsutsumitake is attached hereto as Exhibit 33.

377.    Tsutsumitake is prior art to the '722 Patent.

378.    As shown on the '722 Patent under the heading "References Cited," neither Lawson nor Tsutsumitake were considered by the Examiner during examination of the application that issued as the '722 Patent.

379.    The '722 Patent issued without the United States Patent and Trademark Office considering that Lawson and/or Tsutsumitake render the invention claimed in the '722 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

380.    On November 20, 2024, a Petition for *Inter Partes* Review of the '722 Patent was filed by Liberty Mutual Insurance Company, Liberty Mutual Technology Group, Inc., Liberty Mutual Holding Company Inc., Liberty Mutual Group Inc., Liberty Mutual Plano LLC, Camparion Insurance Agency, LLC, Ironshore Holdings (U.S.) Inc., and Comerica Incorporated and assigned

113

AIA Review No. IPR2025-00200 (the "Liberty Mutual '722 Petition"). A true and correct copy of the Liberty Mutual '722 Petition and its exhibits are attached hereto as Exhibit 34 and incorporated into this Amended Complaint by reference.

381.    The Liberty Mutual '722 Petition explains that Lawson and Tsutsumitake render claim 14 of the '722 Patent invalid.  The Liberty Mutual '722 Petition explains that when the application that issued as the '722 Patent was filed, the invention claimed in claim 14 of the '722 Patent would have been obvious to a person of skill in the art ("POSITA") in light of Lawson and Tsutsumitake. *See* Exhibit 34.

382.    Before the PTAB could consider that Lawson and Tsutsumitake render claim 14 of the '722 Patent invalid, the parties to IPR2025-00200 reached a settlement and jointly requested that IPR2025-00200 be terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC,* IPR2025-00200, Paper 8 (P.T.A.B. Apr. 23, 2025). In response to the parties' joint request for termination based on the parties' settlement, IPR2025-00200 was terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC*, IPR2025-00200, Paper 9 (P.T.A.B. Apr. 23, 2025).

383.    IPR2025-00200 was terminated before any substantive review or decision by the PTAB as to the invalidity of claim 14 in light of Lawson and Tsutsumitake.

384.    For at least the reasons stated in the Liberty Mutual '722 Petition, which is adopted herein and set forth below, Lawson and Tsutsumitake render claim 14 of the '722 Patent invalid.

385.    Claim 14 claims "[a] method comprising" specific limitations that are received in claim 14. *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

386.    Lawson discloses a method comprising the limitations recited in claim 14 of the '722 Patent. *See* U.S. Pat. No. 8,721,825 to Lawson *et al.*

387.    Tsutsumitake discloses a method comprising the limitations recited in claim 14 of the '722 Patent. *See* U.S. Pat. No. 6,480,883 to Tsutsumitake.

388.    Claim 14 of the '722 Patent claims its method comprises "providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network" (hereinafter "the Providing Limitation"). *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

389.    Lawson discloses the Providing Limitation. For example, Lawson discloses: "A system in method for global event notification in a distributed computer environment is presented." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract. "The system and method of the present invention utilizes a local event registry to identify local event consumers that should be notified when an event occurs." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract. "The system and method also utilizes a global event registry which identifies other servers which need notification when an event occurs." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract. "These other servers will then, in turn, notify their local event consumers of the event." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract. "The system and method of the present invention incorporates multiple levels of filtering to allow event consumers to remove notification of events having little or no interest." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract. "The system

and method of the present invention also ensures that duplicate event notifications are not received for the same event." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract.

390.    Lawson further discloses: "In FIG. 1, event consumers are illustrated by the triangular regions 20 and are numbered 1-4." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 1–2. "Event producers are identified by rectangular regions 22 and are labeled 5-7." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 2–3. "Event producer and event consumer are meant to be generic terms that are interpreted broadly." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 4–5. "Event producer will be used to refer to a process, user, device, or other item that produces or generates an event." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 5–7. "An event consumer should be broadly interpreted to refer to any process, user, device, or other item that desires notification of an event." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 7–9. "As used throughout this application, event notification will refer to not only notification of an event but also distribution of information associated with that event." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 9–11.

391.    Lawson further discloses: "The presently preferred embodiment of a system for global event notification and distribution comprises a general purpose computer." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 17–19. "The present invention, however, can also be used with any special purpose computer or other hardware system and all should be included within its scope." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 19–21. "The preferred general purpose computer comprises traditional computer elements such as display means for displaying information to a user, a CPU means or other processing means for processing program code means, program storage means for storing program code means executed by the CPU or other processing means, and input means for receiving input from a user." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 22–28. "Additionally, computers having no local program storage means and that receive

116

program code means across a communication link should also be included within the scope of the present invention." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 28–31. "Embodiments within the scope of the present invention also include articles of manufacture comprising program storage means having encoded therein program code means for causing a CPU to perform certain actions." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 32–35. "Such program storage means can be any available media which can be accessed by the processing means of a general purpose or special purpose computer." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 35–39.

392.    Lawson "achieves global event notification by storing a global event registry comprising a list of events and a corresponding list of servers which need notification when the corresponding event occurs." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 45–48. "In addition to the global registry, each server stores a local event registry comprising a list of events and a corresponding list of local event consumers that need notification when an event occurs." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 48–52. "Each server has running thereon a local event globalization process that registers for events desired by local event consumers." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 54–56. "When an event consumer registers for an event, the event globalization process of the event consumer's local server places an entry into the local event registry for the local server." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 56–59. "An entry is also placed into the global event registry for the local server where the event consumer is located." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 59–61. "Thus, the global event registry is updated to contain an entry identifying the server where the event consumer is located and the desired event and the local event registry of that server is updated to identify the event consumer and the desired event." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 61–65. Figure 1 of Lawson is provided below:



FIG. 1

393.    In one example, Lawson states that "[i]t would be desirable to update the employee phone book database whenever a new employee was added to the system or whenever information about an existing employee was changed." U.S. Pat. No. 8,721,825 to Lawson at col. 21, ll. 16–19. "In such a situation, the employee phone book database could register for notification of 'a modified object' type event." U.S. Pat. No. 8,721,825 to Lawson at col. 21, ll. 19–21. "The employee database could then submit a filter that filtered out modifications to any objects except employee record type objects." U.S. Pat. No. 8,721,825 to Lawson at col. 21, ll. 21–23. "Then when an employee record was changed in the system, the database would receive notification that an employee record had been changed." U.S. Pat. No. 8,721,825 to Lawson at col. 21, ll. 24–26. In other examples, Lawson states that the "event consumer 4 is a company phone directory that has registered to receive an 'add user' event so that it can extract the phone number of the added user and place it in the company phone book." U.S. Pat. No. 8,721,825 to Lawson at col. 23, ll. 64–67. "Further, assume that event consumer 1 is a payroll database that has also registered for

118

the add user event so that information can be extracted to update the employee payroll database."
U.S. Pat. No. 8,721,825 to Lawson at col. 24, ll. 1–4.

394.    Lawson states: "When an event consumer receives notification that a certain event happened on an event producer, the event consumer can take appropriate action." U.S. Pat. No. 8,721,825 to Lawson at col. 1, ll. 61–64. Lawson further states: "Event consumers which desire to receive notification of certain events 'register' with the event producing system." U.S. Pat. No. 8,721,825 to Lawson at col. 2, ll. 6–8. "When an event occurs, notification is sent to all registered event consumers." U.S. Pat. No. 8,721,825 to Lawson at col. 2, ll. 8–9. "When an event consumer needs to register for a new event or create a new event, the event consumer can send a 'register for event' packet or a 'create event packet' to the event globalization process on the local server." U.S. Pat. No. 8,721,825 to Lawson at col. 15, ll. 41–45. "When an event is created, the event globalization process will create an entry in the global event registry, as for example global event registry 68 of FIG. 3." U.S. Pat. No. 8,721,825 to Lawson at col. 15, ll. 45–47. "This entry will include the event identifier of the new event." U.S. Pat. No. 8,721,825 to Lawson at col. 15, ll. 47–48. "When an event consumer registers for an event, the event globalization process will place an entry in the local event registry, as for example local event registry 72 of FIG.3, identifying the event and the event consumer wishing to receive notification of the event." U.S. Pat. No. 8,721,825 to Lawson at col. 15, ll. 48–53. "The event globalization process will also place an entry into the global event registry, as for example global event registry 68 of FIG. 3, identifying the local server needing to receive notification of the event when it occurs." U.S. Pat. No. 8,721,825 to Lawson at col. 15, ll. 53–56.

395.    Tsutsumitake discloses the Providing Limitation. For example, Tsutsumitake discloses: "A real-time information transmission system can immediately transmit information

119

updated on a server to a client, even if directly communication between the server and the client is not established." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract. "If the server receives a page request from the client, the server returns a requested page to the client." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract. "The same connection ID is added to the request from the client and to an associated response from the server." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract. "The client analyzes the page. If an event request is included in the analyzed page, the client adds another connection ID to the request and sends it to the server." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract. "Using the connection ID, the server sends an event to the client each time the event has occurred." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract. "The client processes the event and reflects the processed result on a screen of a display." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract.

396. "A page request receiving unit 102 receives a page request sent from the client 11 via the network interface 101, analyzes it, and informs a page transmission unit 103 of a page to be sent to the client 11." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 39–42. "Suppose that a format called URL (Uniform Resource Locator), which is generally used in the WWW, is applied to the page request." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 42–44. "The page transmission unit 103 transmits an HTML file 100 stored in the server 10 to the network 12 via the network interface 101." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 45–47. "Information to be transmitted is not limited to the HTML file (100), and may be freely chosen one such as image or voice." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 47–49.

397. "In this structure, the client, which received the requested page information from the server, can automatically issue the event request to the server according to the event request information set in the page information, and can activate the event notification." U.S. Pat. No.

120

6,480,883 to Tsutsumitake at col. 4, ll. 21–25. "Specifically, by associating the page information

with the event, the page information opened on the client side can be dynamically changed

according to the event notification sent from the server." U.S. Pat. No. 6,480,883 to Tsutsumitake

at col. 4, ll. 25–29.

398.    The system of Tsutsumitake is shown in Figure 1, provided below:



399.    "FIG.2 shows an example of the HTML file format. In this example, an event

request to the Server is included in the page." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 10,

ll. 20–22. "The event request is expressed by an attribute 'URL' in a tag 'EVENT' in a tag

'EMBED'." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 10, ll. 22–23. Figure 2 of Tsutsumitake

is provided below:

121

```
< HTML >
< HEAD >
< TITLE > SAMPLE PAGE < /TITLE >
< /HEAD >
< BODY >
< H1 > SAMPLE PAGE < /H1 >
THIS PAGE INCLUDES EVENT REQUEST
< EMBED >
  < EVENT URL=http://abc.def/hij.evt >
< /EMBED >
< /BODY >
< /HTML >
```

FIG. 2

400.    "The page receiving unit 112 receives a response from the server 10 to the page request, that is, the requested page, via the network interface 109." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 9, ll. 60–62. "The received page is displayed on the display of the input/output unit 110." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 9, ll. 62–63. "There is a case where the page received from the server 10 includes a description for issuing an event request to the server 10." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 9, ll. 63–65. "In such a case, the page receiving unit 112 informs an event request unit 113 of the URL of the event request." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 9, ll. 65–67.

401.    "The page receiving unit 112 analyzes the content of the page sent from the server 10 (step A6) to determine whether an event request is included in the page (step A7)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 10, ll. 56–59. "[I]f the event request is included, the page receiving unit 112 informs the event request unit 113 of the URL of the event and causes the event request unit 113 to send the event request to the server 10 (step A8)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 10, ll. 64–67. "The event request receiving unit 104 asks the connection management unit 105 whether or not an identifier (event ID) of the event requested by the event

122

request and an identifier (client ID) of the client 11 at the request originating point have already been registered (steps B8, B9)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 45–50. "If they are registered, the connection with the client 11 is cut off (step B10)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 50–51. "If they are not registered, a pair of the identifier (event ID) of the event requested by the event request and the identifier (client ID) of the client 11 at the request originating point are registered in the connection management unit 105 (step B11)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 51–55.

402.    Claim 14 of the '722 Patent claims its method comprises "sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object" (hereinafter "the Sending Limitation"). *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

403.    Lawson discloses the Sending Limitation. For example, Lawson discloses: "By its very nature, event notification is a local phenomenon." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 2, ll. 3–4. "In other words, an event producer notifies event consumers of events which happen locally to the event producer." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 2, ll. 4–6. "Event consumers which desire to receive notification of certain events 'register' with the event producing system." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 2, ll. 6–8. "When an event occurs, notification is sent to all registered event consumers." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 2, ll. 8–9. "As used throughout this application, event notification will refer to not only notification of an event but also distribution of information associated with that event." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 9–12. "[W]hether they be local events or remote events, are preferably packaged into an event packet." U.S. Pat. No. 8,721,825 to Lawson at col.

123

11, ll. 57–59. An event packet may comprise an Event Producer, Server, Type of Event, Time of Event, Size of Event Data, and Event Data. U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 7–11. "[T]he event producer field is an identifier that identifies the process, device. user, etc. which generated the event." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 12–14. "The server field identifies the server location where the event was produced." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 14–15. "The type of event field is an identifier describing the type of event which occurred." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 15–17. "This identifier preferably identifies an event in the global event registry and/or local event registry so that appropriate servers or event consumers can be identified to receive the event." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 17–20. "The time of event field is a time stamp indicating the time that the event occurred." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 20–21. "This time stamp is preferably a network time that can be referenced by each server in the network, although this is not strictly required." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 21–23. "The size of event data is a field indicating the size of the attached event data field." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 24–25. "The event data is the data associated with the event." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 25–26.

404.    Tsutsumitake discloses the Sending Limitation. For example, Tsutsumitake discloses: "If an event has occurred, the server 10 sends it to the client 11 with use of this connection ID." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 1–3. "Subsequently, as shown in FIG. 6, each time an event has occurred, it is sent repeatedly with use of the ID (Conn2)." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 3–5. "If an event has occurred in the event generation unit 107 or event generation monitoring unit 108, the event transmission unit 106 is instructed to send the event to the client 11 (step B15)." U.S. Pat. No. 6,480,883 to Tsutsumitake

at col. 12, ll. 10–13. "Thus, the event transmission unit 106 sends the generated event to the client 11 at the event request originating point via the network interface 101 (step B16)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 12, ll. 13–15. "The browser (client 11) processes a plurality of events (both the event indicating the present value of current and the event indicating the state of the device being transmitted in real time) sent from the server 10 in response to one event request issued in accordance with the displayed page, and reflects on the screen the event processing results on the current value display section 71 or device state display section 72." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 58–65.

405.    Claim 14 of the '722 Patent claims its method comprises "wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network" (hereinafter "the Gateway Limitation"). *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

406.    Lawson discloses the Gateway Limitation. For example, Lawson discloses: "[R]emote event processing block 66 monitors event queue 64 and when events are placed therein by incoming event processing block 60 that need to be transferred to other servers in the network, remote event processing block 66 will establish a connection to those servers and transfer the events to the other server." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 12–17. "Embodiments within the scope of the present invention may, therefore, comprise means for accessing a global event registry to identify which servers should receive which events." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 18–21. "Such means may be incorporated into remote event processing block 60." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 21–22. "In such a case, remote event processing block 66 identifies the servers that should receive

125

events queued in event queue 64 by checking global registry 68." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 22–24. "[W]hen an event is transferred from one server to another server, a connection must be established between the two servers." U.S. Pat. No. 8,721,825 to Lawson at col. 13, ll. 25–27. "Once the transfer is complete, then the connection is terminated." U.S. Pat. No. 8,721,825 to Lawson at col. 13, ll. 27–28. "Since it takes time to establish and terminate a connection, it is preferable that when a connection is established between two servers, all information that needs to be transferred between the two servers be accomplished while the connection is established." U.S. Pat. No. 8,721,825 to Lawson at col. 13, ll. 28–33. "Thus, there is a possibility of events being transferred both to and from the local server." U.S. Pat. No. 8,721,825 to Lawson at col. 13, ll. 33–34. "Remote event 58 represents a local event that is transferred to another server via network connection 52." U.S. Pat. No. 8,721,825 to Lawson at col. 11, ll. 51–53. "It should be pointed out that in FIG. 3 network connection 52 represents an example of the networking means for interconnect servers in the present invention." U.S. Pat. No. 8,721,825 to Lawson at col. 11, ll. 53–56.

407. "[E]mbodiments of the present invention may comprise means for filtering events so that an event is only transferred if the event meets designated filtering criteria." U.S. Pat. No. 8,721,825 to Lawson at col. 20, ll. 10–13. "Furthermore, filtering can be performed on any of the information available from a particular event." U.S. Pat. No. 8,721,825 to Lawson at col. 20, ll. 25–27. "The available information for an event includes not only the information available in the event data itself, but also in the event packet, such as the event packet previously described." U.S. Pat. No. 8,721,825 to Lawson at col. 20, ll. 27–30.

408. Tsutsumitake discloses the Gateway Limitation. For example, Tsutsumitake discloses: "An event request receiving unit 104 receives an event request sent from the client 11

126

via the network interface 101, analyzes it, and communicates with a connection management unit 105 to determine whether the event request should be processed." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 50–54. "The event request receiving unit 104 instructs an event transmission unit 106, where necessary, to transmit an event to the client 11." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 54–56. "The event request receiving unit 104 asks the connection management unit 105 whether or not an identifier (event ID) of the event requested by the event request and an identifier (client ID) of the client 11 at the request originating point have already been registered (steps B8, B9)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 45–50. "If they are registered, the connection with the client 11 is cut off (step B10)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 50–51. "If they are not registered, a pair of the identifier (event ID) of the event requested by the event request and the identifier (client ID) of the client 11 at the request originating point are registered in the connection management unit 105 (step B11)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 51–55.

409.    Claim 14 of the '722 Patent claims its method comprises "wherein the node is configured to identify the client device as a registered device and to route the update message to the client device" (hereinafter "the Node Limitation"). *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

410.    Lawson discloses the Node Limitation. For example, Lawson discloses: "[L]ocal event processing block 70 monitors event queue 64 for events that should be transferred to a local event consumer." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 43–45. "Embodiments of the present invention may, therefore, comprise means for accessing a local event registry to identify which local event consumers should receive which events." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 45–48. "Such means may be incorporated into local event processing

127

block 70." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 48–49. "In such a case, local event consumers that should receive events queued in event queue 64 are identified by checking local event registry 72 and any associated filtering criteria." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 49–52. "Embodiments within the scope of the present invention may comprise means for filtering events so that an event is only transferred when the event meets designated filtering criteria." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 53–56. "Such means, discussed in greater detail below, may be part of local event processing block 70." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 56–57. "The filtering criteria is illustrated in FIG.3 by filtering criteria block 74." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 57–58. "Although the details of filtering are presented below, filtering criteria may be stored as part of the local event registry or may be stored in any other manner as long as a local server can access the filtering criteria and identify the local event consumer and the event type that the filtering criteria applies to." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 58–64.

411.    Tsutsumitake discloses the Node Limitation. For example, Lawson discloses: "According to this invention, in the Situation in which each time an event has occurred in the Server the event notification has to be sent to the client at the event request originating point. . . ." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 4, ll. 36–39. "If an event has occurred, the server 10 sends it to the client 11 with use of this connection ID." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 1–3.

412.    Claim 14 of the '722 Patent claims its method comprises "wherein the client device processes the update message upon receipt to update the property of the live object at the client device" (hereinafter "the Client Device Limitation"). *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

128

413.    Lawson discloses the Client Device Limitation. For example, Lawson discloses: "[A]ssume that event consumer 4 is a company phone directory that has registered to receive an 'add user' event so that it can extract the phone number of the added user and place it in the company phone book." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 23, ll. 64–67. "As indicated by step 176, the event packet is received by the company phone directory and as indicated by the return arrow to step 174, processing could continue for the event notification process after transfer of the event packet." U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 24, ll. 64 – col. 25, l. 1. "The event packet could be transferred to event consumer 4 using any of the previously identified event transfer methods or with another appropriate event transfer method." U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 25, ll. 1–4. "After the event has been transferred, the company phone directory process creates a new record in the company phone book as indicated by step 178." U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 25, ll. 4–7.

414.    "In step 182, the event globalization process of server A transfers the event packet to the local event consumer which, in this case, is the payroll database process." U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 25, ll. 16–18. "The payroll database process receives the information as indicated by step 184 and proceeds to create a new entry in the employee payroll database as indicated by step 186." U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 25, ll. 18–21.

415.    Tsutsumitake discloses the Client Device Limitation. For example, Lawson discloses: "The current value in the specific device in the plant system 42 is monitored by the server 10 every second through the controller 40." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 46–48. "Specifically, the event generating unit 107 or event generation monitoring unit 108 generates the event of the present value of electric current at intervals of one second." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 48–51. "In addition, the state

129

(normal/abnormal) of the control device is monitored by the server 10 through the controller 40." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 51–53. "The event generating unit 107 or event generation monitoring unit 108 generates events of the state (normal/abnormal) of the control device non-periodically." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 53–55. "These generated events are transmitted in real time to the client 11." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 56–57. "The browser (client 11) processes a plurality of events (both the event indicating the present value of current and the event indicating the state of the device being transmitted in real time) sent from the server 10 in response to one event request issued in accordance with the displayed page, and reflects on the screen the event processing results on the current value display section 71 or device state display section 72." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 58–65.

416.    Lawson discloses the method claimed in claim 14 of the '722 Patent. Lawson renders claim 14 of the '722 Patent invalid pursuant to 35 U.S.C. § 102.

417.    Tsutsumitake discloses the method claimed in claim 14 of the '722 Patent. Tsutsumitake renders claim 14 of the '722 Patent invalid pursuant to 35 U.S.C. § 102.

418.    In light of the disclosure of Lawson, a POSITA would also consider claim 14 of the '722 Patent obvious pursuant to 35 U.S.C. § 103.

419.    In light of the disclosure of Tsutsumitake, a POSITA would also consider claim 14 of the '722 Patent obvious pursuant to 35 U.S.C. § 103.

420.    In light of the combined disclosure of Lawson and Tsutsumitake, a POSITA would also consider claim 14 of the '722 Patent obvious pursuant to 35 U.S.C. § 103.

## COUNT VII
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '391 PATENT

421. First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

422. Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon. Intellectual Ventures Management, by and on behalf of Defendants, have alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 16. Intellectual Ventures Management, by and on behalf of all Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license" of at least the Patents-In-Suit, including the '391 Patent. *See* Exhibit 20. Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See* Exhibit 9; Exhibit 10. Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license. Intellectual Ventures Management, by and on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio, including the '391 Patent, and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

131

423.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged that the '391 Patent "cover[s] technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" and identifies "Clover," a third party branded software, as the "Example Product/Feature."

424.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged infringement of at least claim 18 of the '391 Patent by "First Horizon's use of Secure Payment Processing," and specifically the use of third-party "Clover®" branded software allegedly using the 3-D Secure protocol (the "'391 Accused System"). *See* Exhibit 9.

425.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '391 Accused System) or import into the United States any product and/or system (including but not limited to the '391 Accused System) in a manner which infringes the '391 Patent.

426.    By way of example, each independent claim of the '391 Patent requires, *inter alia*, that the accused system or method receive information about "a first type of transaction" and "a second type of transaction" wherein "the second type of transaction is different from the first type of transaction." *See* U.S. Pat. No. 10,567,391 to Hardt at Claim 1, Claim 10, Claim 18.

427.    Upon information and belief, and based on the representations made about the 3-D Secure protocol on the "3dsecure2" website, the '391 Accused System (1) "allows issuers to approve a transaction without the need to interact with the cardholder" and (2) "will only require additional authentication if the risk is high." *See* https://3dsecure2.com/frictionless-flow/ (last accessed Oct. 4, 2024).

132

428. Upon information and belief, and based on the representations made on the "3dsecure2" website, the '391 Accused System provides for multiple authentication methods related to a single transaction, rather than for authentication of two different transactions. *See* https://3dsecure2.com/frictionless-flow/ (last accessed Oct. 4, 2024).

429. At least in light of this representation, and on information and belief, the '391 Accused System does not include information about "a first type of transaction" and "a second type of transaction" wherein "the second type of transaction is different from the first type of transaction" as recited by each independent claim of the '391 Patent.

430. Accordingly, First Horizon does not directly infringe the '391 Patent, either literally or under the doctrine of equivalents.

431. Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '391 Patent or otherwise contribute to infringement of the '391 Patent.

432. An actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '391 Patent.

433. The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '391 Accused System) has not infringed and does not infringe the '391 Patent.

## COUNT VIII
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '391 PATENT

434. First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

133

435.    Claim 18 of the '391 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

436.    Upon information and belief, and subject to further discovery, claim 18 of the '391 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

437.    Upon information and belief, and subject to further discovery, claim 18 of the '391 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

1.    **Claim 18 of the '391 Patent is Invalid Under 35 U.S.C. § 101.**

438.    Claim 18 of the '391 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 18 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

439.    In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

134

440.    If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two.  Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

### iii. Claim 18 of the '391 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.

441.    Claim 18 as a whole is directed to an abstract idea. Claim 18 as a whole is directed to: (1) receiving requests for user authentication as part of usage events; and (2) performing transactions associated with the requests at various transaction security levels by selecting a transaction security level based on the type of transaction, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

442.    Claim 18 as a whole is directed to steps for a purely internal process, relying upon generic computer equipment to offer a series of graduated security levels for transactions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

443.    Furthermore, the specification confirms that Claim 18 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 18 as a whole,

135

including the use of a conventional computing devices to offer a series of graduated security levels for transactions based on the type of transaction, were well understood at the time of the invention, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See* U.S. Pat. No. 10,567,391 to Hardt at col. 10, ll. 50–54 ("[T]he various systems of the present invention can be implemented using standard computing hardware controlled by software to receive information, analyze it, and provide a response. . . ."). Claim 18 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

444.    Claim 18 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 18 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. For example, Claim 18's functional recitation of "receiv[ing] a first request for user authentication," "receiv[ing] a second request for user authentication," "perform[ing] at least one transaction associated with the first request at a first transaction security level," and "perform[ing] at least one transaction associated with the second request at a second transaction security level" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 18 as a whole is directed to a generic system architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, authentication techniques, and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at

1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

445.    Claim 18 as a whole describes using standard hardware to perform a plurality of transactions at varying security levels based on the type of transaction without any improvement to the functionality of the system components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  It is not directed to specific asserted improvements in computer capabilities.

446.    Claim 18 as a whole is directed to basic authentication protocols, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  It is directed to receiving a request for user authentication and performing a transaction associated with the request at a specific transaction security level based on the type of transaction, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

447.    Claim 18 as a whole is simply involves communication over a network, and specifically to communicating requests to an interface and receiving communications from that interface to perform transactions via a processor, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc.*, 778 F. App'x at 892 (quoting *ChargePoint, Inc.*, 920 F.3d at 767); *see also buySAFE, Inc.*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network … is not even arguably inventive.").

448.    Claim 18 as a whole is directed merely to offering a series of graduated security levels in a conventional computing system and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

449.    For at least the foregoing reasons, Claim 18 fails *Alice* step one.

iv.    **Claim 18 of the '391 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

450.    Claim 18 merely recites a generic computer with a patent-ineligible abstract idea. Claim 18 simply uses a generic computer to perform generic computer functions, including "receiv[ing] a first request for user authentication," "receiv[ing] a second request for user authentication," "perform[ing] at least one transaction associated with the first request at a first transaction security level," and "perform[ing] at least one transaction associated with the second request at a second transaction security level", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

451.    Claim 18 recites architecture of a generic computing system, including a "at least one memory" and "at least one interface." Implementation of an abstract idea by the '391 Patent's routine hardware fails to move the mere offering of graduated security levels beyond an abstract idea.

452.    The specification of the '391 Patent further confirms the conventional nature of the architecture in claim 18, explaining that "the various systems of the present invention can be implemented using standard computing hardware controlled by software to receive information,

138

analyze it, and provide a response. . . ." *See* U.S. Pat. No. 10,567,391 to Hardt at col. 10, ll. 50–54.

453.    Claim 18 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '391 Patent discloses that the "at least one memory" is merely a conventional database. U.S. Pat. No. 10,567,391 to Hardt at col. 13, ll. 23–24; col. 14, ll. 44–47. The "at least one interface" is simply a conventional web browser providing a user access to homesites and membersites. U.S. Pat. No. 10,567,391 to Hardt at col. 5, ll. 10–15; col. 7, ll. 31–33; col. 14, ll. 3–5; col. 14, ll. 8–11. Claim 18 does not improve functionality of these devices; instead, it employs well-understood hardware to simply provide graduated security levels, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc.*, 827 F.3d at 1349 ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

454.    The elements of claim 18, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter.

455.    For at least the foregoing reasons, Claim 18 fails *Alice* step two.

139

456.    Accordingly, claim 18 of the '391 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

## 2. **Claim 18 of the '391 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.**

457.    Upon information and belief, and subject to further discovery, claim 18 of the '391 Patent is invalid under 35 U.S.C. §§ 102 and 103.

458.    The '391 Patent originated as U.S. Application No. 16/417,361 and was filed on May 20, 2019.

459.    The '391 Patent, and specifically U.S. Application No. 16/417,361, claims to be a continuation of U.S. Application No. 15/172,008. U.S. Application No. 15/172,008 was filed on June 2, 2016.

460.    U.S. Application No. 15/172,008 claims to be a continuation of U.S. Application No. 14/622,722. U.S. Application No. 14/622,722 was filed on February 13, 2015.

461.    U.S. Application No. 14/622,722 claims priority to U.S. Application No. 14/015,813. U.S. Application No. 14/015,813 was filed on August 30, 2004.

462.    U.S. Application No. 14/015,813 claims priority to U.S. Application No. 11/039,885. U.S. Application No. 11/039,885 was filed on January 24, 2005.

463.    U.S. Application No. 11/039,885 claims priority to U.S. Application No. 60/605,150. U.S. Application No. 60/605,150 was filed on August 30, 2004.

464.    U.S. Application No. 11/039,885 claims priority to U.S. Application No. 60/579,890. U.S. Application No. 60/579,890 was filed on June 16, 2004.

465.    Claim 18 of the '391 Patent reads as follows:

18. A system for implementing variable transaction security levels, the system comprising:
at least one memory;
at least one interface configured to:

140

receive a first request for user authentication as part of a first usage event,
wherein the first request for user authentication includes information about a first type of transaction to be performed by a user during the first usage event;
receive a second request for user authentication as part of a second usage event,
wherein the second request for user authentication includes information about a second type of transaction to be performed by the user during the second usage event, and wherein the second type of transaction is different from the first type of transaction; and
one or more processors configured to:
perform at least one transaction associated with the first request at a first transaction security level by selecting a first transaction mechanism having the first transaction security level, wherein the first transaction mechanism is selected based on the first type of transaction to be performed by the user during a first usage event; and
perform at least one transaction associated with the second request at a second transaction security level by selecting a second transaction mechanism having the second transaction security level,
wherein the second transaction mechanism is selected based on the second type of transaction to be performed by the user during the second usage event,
and wherein the first transaction security level is different from the second transaction security level.

466.    Claim 18 of the '391 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent Publication No. 2003/0056111 (hereinafter "Brizek"), JP2003091650 (hereinafter "Masahiro"), and JP2002304522 (hereinafter "Tomoharu"), alone or in combination.

467.    Brizek was filed on September 19, 2001 and published March 20, 2003. It is entitled "Dynamically Variable Security Protocol," and lists John P. Brizek as the inventor. A true and correct copy of Brizek is attached hereto as Exhibit 35.

468.    Brizek is prior art to the '391 Patent.

469.    Masahiro was filed on September 14, 2001 and published March 28, 2003. It is entitled "Online Buying System and Method," and lists Abe Masahiro as the inventor. A true and correct copy of Masahiro is attached hereto as Exhibit 36.

141

470.    A translation of Masahiro from the World Intellectual Property Organization's (hereinafter "WIPO") PATENTSCOPE system is attached hereto as Exhibit 37.

471.    WIPO is an agency of the United Nations that provides a global forum for intellectual property services, policy, information, and cooperation.

472.    WIPO is considered a reliable resource for information and disclosures regarding technology and intellectual property globally.

473.    The translation of Masahiro from WIPO, attached hereto as Exhibit 37, is an accurate translation of Masahiro from Japanese to English.

474.    Masahiro is prior art to the '391 Patent.

475.    Tomoharu was filed on April 5, 2001 and published October 18, 2002. It is entitled "Authentication Method, Transaction-Side System, Computer Program and Recording Medium Recorded with the Program," and lists Tomoharu Ogura as the inventor ("Ogura"). A true and correct copy of Ogura is attached hereto as Exhibit 38.

476.    A translation of Tomoharu from the World Intellectual Property Organization's (hereinafter "WIPO") PATENTSCOPE system is attached hereto as Exhibit 39.

477.    WIPO is an agency of the United Nations that provides a global forum for intellectual property services, policy, information, and cooperation.

478.    WIPO is considered a reliable resource for information and disclosures regarding technology and intellectual property globally.

479.    The translation of Tomoharu from WIPO, attached hereto as Exhibit 39, is an accurate translation of Ogura from Japanese to English.

480.    Tomoharu is prior art to the '391 Patent.

142

481.    As shown on the '391 Patent under the heading "References Cited," neither Brizek, Masahiro, nor Tomoharu were considered by the Examiner during examination of the application that issued as the '391 Patent.

482.    The '391 Patent issued without the United States Patent and Trademark Office considering that Brizek, Masahiro, and Tomoharu render the invention claimed in the '391 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

483.    Claim 18 claims "[a] system for implementing variable transaction security levels, the system comprising" specific limitations that are recited in claim 18. *See* U.S. Pat. No. 10,567,391 to Hardt *et al.* at Claim 18.

484.    Brizek discloses a system for implementing variable transaction security levels comprising the limitations recited in claim 18 of the '391 Patent. *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek.

485.    Masahiro discloses a system for implementing variable transaction security levels comprising the limitations recited in claim 18 of the '391 Patent. *See* Japanese Pat. Pub. No. 2003091650 to Masahiro.

486.    Tomoharu discloses a system for implementing variable transaction security levels comprising the limitations recited in claim 18 of the '391 Patent. *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu.

487.    Claim 18 of the '391 Patent claims its system for implementing variable transaction security levels comprises "at least one memory" (hereinafter "the Memory Limitation"). *See* U.S. Pat. No. 10,567,391 to Hardt *et al.* at Claim 18.

488.    Brizek discloses the Memory Limitation. For example, Brizek discloses: "The processor 26 may also be coupled to storage 38, which stores software 20 and 50." *See* U.S. Pat.

143

Pub. No. US2003/0056111 to Brizek at ¶ [0015]. "A system comprising: … a storage coupled to said processor, said storage storing instructions that enable the processor to receive information about the type of an electronic transaction and access that information to select a security level for the transaction." U.S. Pat. Pub. No. US2003/0056111 to Brizek at Claim 21.

489. Masahiro discloses the Memory Limitation. For example, Masahiro discloses: "[A] purchase center (a transmission/reception device including a server." *See* Japanese Pat. Pub. No. 2003091650 to Masahiro. "[T]he reception terminal 13 includes an authentication data management unit 139 that registers and manages authentication data and reads out and outputs the authentication data according to a request." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0018]. "As the authentication data, it is possible to use a parameter indicating an effective period or an effective amount (remaining power, etc.) in addition to a device-specific identifier such as an ID or a telephone number unique to the communication terminal." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0018]. "The registration of such a parameter can be rewritten from the outside or by a user operation as necessary." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0018]. "In addition, it is assumed that a function of registering secret information to be individually given, such as one time pad random number, is provided." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0018]. "The authentication data is previously registered in the purchase center 15 offline." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0018].

490. Tomoharu discloses the Memory Limitation. For example, Tomoharu discloses: "The customer terminal 20 has a wired or wireless network environment and is a terminal owned by a customer, and for example, a mobile phone, a telephone, a PC, a PDA, or the like can be used." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0017]. "In the present embodiment, since the customer terminal 20 is used as an authentication tool for performing

144

additional authentication to be described later, it is preferable that the customer terminal 20 has portability so as to be able to cope with a customer, especially when assuming a transaction by a delivery channel of a customer visit type." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0017]. "The bank-side system 30 includes a transaction system 31 and an authentication system 32 capable of transmitting information to each other, and each of the systems 31 and 32 is a general computer mainly composed of a CPU, a ROM, a RAM, a storage device, a communication device, and the like." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "The transaction system 31 is capable of transmitting information to and from the delivery channel 10 via a network, and is connected to, for example, a PC or the like that is a customer-at-home channel via the Internet via a dedicated line with an ATM that is a customer-visiting channel." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "In addition, a transaction ledger database is stored in a storage device 33 such as a magnetic disk device (HDD) accessible by the transaction system 31 in order to unitarily manage transactions with individual customers." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "The transaction ledger database may be implemented in a single database, but maybe implemented in a plurality of (linked) databases associated with each other." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "On the other hand, the authentication system 32 can transmit information to the customer terminal 20 via the network, and performs access processing to the customer terminal 20 when performing additional authentication." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018].

491.    Claim 18 of the '391 Patent claims its system for implementing variable transaction security levels comprises "at least one interface configured to: receive a first request for user authentication as part of a first usage event, wherein the first request for user authentication

145

includes information about a first type of transaction to be performed by a user during the first usage event; receive a second request for user authentication as part of a second usage event, wherein the second request for user authentication includes information about a second type of transaction to be performed by the user during the second usage event, and wherein the second type of transaction is different from the first type of transaction" (hereinafter "the Receive Limitation"). *See* U.S. Pat. No. 10,567,391 to Hardt *et al.* at Claim 18.

492. Brizek discloses the Receive Limitation. For example, Brizek discloses: "Ideally, the server 32 communicates with the client 42 to undertake a series of transactions." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "These transactions may include financial transactions, data transmissions and provision of services to mention a few examples." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "In each case, it is desirable to complete the transaction with the least amount of security overhead that is appropriate given the type and value of the transaction." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "Thus, a transaction involving a very large amount of money may need a relatively high security overhead while merely downloading a script may involve a relatively low security overhead." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "In accordance with embodiments of the present invention, the level of the security overhead may be adjustably or variably determined in a dynamic fashion." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0017]. "This may be determined based on code information provided by an initiator of the transaction, or it may be deduced dynamically during the course of the transaction." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0017]. "Referring to FIG. 2, the security software 20 stored in the storage 38 in FIG. 1, begins by receiving transaction type information as indicated in block 10 in accordance with one embodiment of the present invention." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018].

146

"The type information may indicate the nature of the transaction and may be provided by the initiator." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018]. "For example, the initiator of the transaction may enter information in a graphical user interface, which allows the type of the transaction to be determined." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018]. "Alternatively, in another embodiment, a variety of information may be obtained from the initiator." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018]. "As still another embodiment, the entity that receives the initiated transaction by the initiator may provide information." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018]. "The nature of the transaction may be indicated to a degree sufficient to enable the security overhead to be dynamically adjusted." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018]. Figure 2 of Brizek is provided below:



FIG. 2

147

493.    Masahiro discloses the Receive Limitation. For example, Masahiro discloses: "An online purchase system and a method thereof according to the present invention are characterized by: transmitting purchase introduction information for online purchasing a commodity or a service through a network by broadcasting or communication; receiving and presenting the purchase introduction information on the communication terminal side; call-connecting to the purchase center through the network on the basis of connection information to a purchase center included in the purchase introduction information when there is a purchase instruction input of the user; preparing a plurality of purchase means having different security levels for notification and authentication in advance when the purchase procedure is performed by notifying the purchase registration information including the purchase content and the personal information; and selectively executing the purchase means according to the user's request or the purchase content." *See* Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0007]. "Here, when there is online shopping information in the program data and the user makes a purchase application, the operation input unit 135 performs a predetermined operation to download the online shopping information to the download processing unit 136." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0016]. "The information indicates an operation procedure for the purchase application, is reproduced through the decoder unit 134, and the user inputs the purchase registration information while viewing the reproduction screen." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0016].

494.    Tomoharu discloses the Receive Limitation. For example, Tomoharu discloses: "In addition, the 'transaction condition' defines a condition of a transaction that needs to further perform additional authentication following normal authentication, in other words, an execution condition of additional authentication." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "The customer sets and registers a condition type such as a transaction amount and a

148

transaction type and a condition content according to the condition type in advance according to his or her own will." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "For example, if the upper limit of the transaction amount (payment amount) is set as in 'withdrawal of 100 million yen or more', the additional authentication is performed when payment of an amount of 100 million yen or more is applied." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "In addition, the type of the delivery channel 0 can also be set as the 'transaction condition'. *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "For example, a transaction condition of 'disbursement of 100 thousands or more by ATM' may be set." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "In this case, the additional authentication is performed when an account payment of an amount of 100 million yen or more is applied by the ATM, but the additional authentication is not performed in a case where a channel other than the ATM is used." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "Further, the upper limit related to the total amount of transaction (total payment amount) within a predetermined period (for example, one day) may be set as the 'transaction condition'." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "The 'transaction condition' can be set with respect to various transaction forms including account transfer or the like in addition to dispensing." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "What transaction form (offer) is the target of the additional authentication, or what kind of transaction condition is set for each transaction form (offer of the offer) is determined as a design matter on the bank side in consideration of the needs of the customer." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "The customer can arbitrarily set and specify his or her own transaction condition within a range allowed by the bank." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020].

149

495.    "In step 3, the transaction system 31 determines whether or not there is a transaction content that requires additional authentication with respect to the transaction that has been applied this time." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0026]. "This determination is performed by comparing the 'transaction condition' described in the target record with the transaction content applied this time." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0026]. "For example, in a case where the transaction condition of 'withdrawal of 100 million yen or more' is preset by the customer, if the current transaction content matches this condition, the process proceeds to step 4 in accordance with the determination of step 3, and additional authentication processing to be described later is performed." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0026]. "On the other hand, if the transaction content of this time does not match the transaction condition, the process proceeds to step 7." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0026]. "The case that proceeds from Step 3 to Step 7 corresponds to Case #1 in FIG. 5, and performs a transaction process that permits a transaction that has been applied this time, that is, a process such as an additional update of a transaction history, an instruction to an ATM, or the like (for example, a payment permission) (arrow B in FIG. 1)." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0026].

496.    "In addition, the security level of authentication (only normal authentication, or a combination of normal authentication and additional authentication) is changed in accordance with the content of the applied transaction." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0038].

497.    Claim 18 of the '391 Patent claims its system for implementing variable transaction security levels comprises "one or more processors configured to: perform at least one transaction associated with the first request at a first transaction security level by selecting a first transaction

150

mechanism having the first transaction security level, wherein the first transaction mechanism is selected based on the first type of transaction to be performed by the user during a first usage event; and perform at least one transaction associated with the second request at a second transaction security level by selecting a second transaction mechanism having the second transaction security level, wherein the second transaction mechanism is selected based on the second type of transaction to be performed by the user during the second usage event, and wherein the first transaction security level is different from the second transaction security level." (hereinafter "the Processor Limitation"). *See* U.S. Pat. No. 10,567,391 to Hardt *et al.* at Claim 18.

498.    Brizek discloses the Processor Limitation. For example, Brizek discloses: "The server 32 includes a processor 36 coupled to an input/output port 34, which may provide an interface to the link 48." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0015]. "The processor 36 may also be coupled to storage 38, which stores software 20 and 50." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0015]. "Ideally, the server 32 communicates with the client 42 to undertake a series of transactions." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "These transactions may include financial transactions, data transmissions and provision of services to mention a few examples." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "In each case, it is desirable to complete the transaction with the least amount of security overhead that is appropriate given the type and value of the transaction." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "Thus, a transaction involving a very large amount of money may need a relatively high security overhead while merely downloading a script may involve a relatively low security overhead." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "In accordance with embodiments of the present invention, the level of the security overhead may be adjustably or variably determined in a dynamic fashion." U.S. Pat. Pub. No.

151

US2003/0056111 to Brizek at ¶ [0017]. "This may be determined based on code information provided by an initiator of the transaction, or it may be deduced dynamically during the course of the transaction." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0017]. "Once the type information has been received as indicated in block 10, a check at diamond 12 determines whether or not the transaction is a low value transaction in one embodiment of the present invention." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0019]. "If so, a determination at diamond 14 determines whether hardware encryption is required." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0019]. "If not, the low value security assets may be utilized as indicated in block 16." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0019]. "This facilitates the execution of the transaction by reducing the security overhead. In some cases, the low value security assets may be essentially no security whatsoever and in other cases, the low value security assets may be as simple as a password." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0019]. "Still other security assets may be utilized in other cases." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0019]. "If a low value transaction is not involved, a check at diamond 18 determines whether a higher value or midvalue transaction is determinable based on the received type information." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0020]. "If so, a check at diamond 20 determines whether hardware is required." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0020]. "If not, a mid-value security asset may be applied as indicated in block 22." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0020]. "This may involve some authentication or less time consuming encryption as examples." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0020]. "A variety of other security assets may be applied depending on the context." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0020]. "Finally, a check at diamond 24 determines whether the transaction is determined to be a high value transaction." U.S. Pat. Pub. No. US2003/0056111 to

Brizek at ¶ [0022]. "If not, the transaction is not determinable and may not be permitted in one embodiment." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0022]. "If the transaction is determinable to be a high value transaction and high value assets are present as determined in diamond 26, the high value security assets may be applied as indicated in block 28." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0022]. "In such case, the security overhead or burden may be enhanced, but would be appropriate under such circumstances." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0022].

499.    Masahiro discloses the Processor Limitation. For example, Masahiro discloses: "[T]hree stages (low, medium, and high) having different security levels are exemplified as the purchase procedure." *See* Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0021]. "FIG. 2 is a flowchart illustrating a purchase procedure with a low level of security level." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0022]. "In FIG. 2, when the low-level security level purchase procedure is selected, identity verification (for example, a password, a fingerprint, or the like) is performed between the reception terminal 13 and the user (step S11)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0022]. "When it can be confirmed that the person is the person himself/herself, a call is made to the purchase center 15 through a network 14 such as a telephone, a cellular phone, and the Internet, and a line is connected, and a purchase application procedure is performed (step S12)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0022]. "Further, user confirmation (for example, name, card number, telephone number, etc.) and purchase content are confirmed from the purchase center 15 (step S13)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0022]. "FIG. 3 is a flowchart illustrating a purchase procedure having an intermediate level security level." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0024]. "In FIG. 3, when the middle level security level purchase procedure is selected, identity verification

153

(for example, password, fingerprint, etc.) is performed between the reception terminal 13 and the user as in the case of the low level (step S21)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0024]. "When it can be confirmed that the user is the person himself/herself, a call is made to the purchase center 15 through a network 14 such as a telephone, a cellular phone, and the Internet, and a line is connected, and a purchase application procedure is performed (step S22)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0024]. "When the procedure of the purchase application is completed, the line connection is once disconnected on the user side (step S23)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0024]. FIG. 4 is a flowchart illustrating a purchase procedure with a high level of security level. "In FIG. 4, when a high-level security level purchase procedure is selected, identity verification (for example, a password, a fingerprint, or the like) is performed between the reception terminal 13 and the user as in the middle level (step S31)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0026]. "When it can be confirmed that the user is the person himself/herself, a call is made to the purchase center 15 through a network 14 such as a telephone, a cellular phone, and the Internet, and a line is connected to perform a purchase application procedure (step S32)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0026]. "When the procedure of the purchase application is completed, the line connection is once disconnected on the user side (step S33)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0026].

500.    Tomoharu discloses the Processor Limitation. For example, Tomoharu discloses: "The customer terminal 20 has a wired or wireless network environment and is a terminal owned by a customer, and for example, a mobile phone, a telephone, a PC, a PDA, or the like can be used." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0017]. "In the present embodiment, since the customer terminal 20 is used as an authentication tool for performing

additional authentication to be described later, it is preferable that the customer terminal 20 has portability so as to be able to cope with a customer, especially when assuming a transaction by a delivery channel of a customer visit type." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0017]. "The bank-side system 30 includes a transaction system 31 and an authentication system 32 capable of transmitting information to each other, and each of the systems 31 and 32 is a general computer mainly composed of a CPU, a ROM, a RAM, a storage device, a communication device, and the like." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "The transaction system 31 is capable of transmitting information to and from the delivery channel 10 via a network, and is connected to, for example, a PC or the like that is a customer-at-home channel via the Internet via a dedicated line with an ATM that is a customer-visiting channel." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "In addition, a transaction ledger database is stored in a storage device 33 such as a magnetic disk device (HDD) accessible by the transaction system 31 in order to unitarily manage transactions with individual customers." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "The transaction ledger database may be implemented in a single database, but maybe implemented in a plurality of (linked) databases associated with each other." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "On the other hand, the authentication system 32 can transmit information to the customer terminal 20 via the network, and performs access processing to the customer terminal 20 when performing additional authentication." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018].

501.    "First, in the case of 'transaction approval', a transaction process that corresponds to the case # 2 of FIG. 5 and permits the transaction that has been applied this time is performed (Step 7)." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0034]. "In this case, the same

155

processing as the normal transaction processing is performed on the delivery channel 0 side, and the same display as the normal transaction is performed without displaying the fact of the additional authentication." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0034]. "On the side of the customer terminal 20, it is notified that the transaction approval has been accepted." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0034]. "The person who inputs the code from the customer terminal 20 can know that the transaction authentication has been appropriately received through the customer terminal 20." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0034].

502.    Brizek discloses the system for implementing variable transaction security levels claimed in claim 18 of the '391 Patent. Brizek renders claim 18 of the '391 Patent invalid pursuant to 35 U.S.C. § 102.

503.    Masahiro discloses the system for implementing variable transaction security levels claimed in claim 18 of the '391 Patent. Masahiro renders claim 18 of the '391 Patent invalid pursuant to 35 U.S.C. § 102.

504.    Tomoharu discloses the system for implementing variable transaction security levels claimed in claim 18 of the '391 Patent. Tomoharu renders claim 18 of the '391 Patent invalid pursuant to 35 U.S.C. § 102.

505.    In light of the disclosure in Brizek, a POSITA would also consider claim 18 of the '391 Patent obvious pursuant to 35 U.S.C. § 103.

506.    In light of the disclosure in Masahiro, a POSITA would also consider claim 18 of the '391 Patent obvious pursuant to 35 U.S.C. § 103.

507.    In light of the disclosure in Tomoharu, a POSITA would also consider claim 18 of the '391 Patent obvious pursuant to 35 U.S.C. § 103.

508.   In light of the disclosures in Brizek, Masahiro, and/or Tomoharu, in various combinations, a POSITA would also consider claim 18 of the '391 Patent obvious pursuant to 35 U.S.C. § 103.

## COUNT IX
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '862 PATENT

509.   First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

510.   Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon.  Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 16. Intellectual Ventures Management, by and on behalf of all Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license" of at least the Patents-In-Suit, including the '862 Patent.  *See* Exhibit 20.  Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license."  *See* Exhibit 9; Exhibit 10.  Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license.  Intellectual Ventures Management, by and on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management patent portfolio, including the '862 Patent, and identified patent litigation cases filed by entities

157

under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

511. In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged that the '862 Patent "cover[s] technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" and identifies "Clover," a third party branded software, as the "Example Product/Feature." *See* Exhibit 9.

512. In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged infringement of at least claim 1 of the '862 Patent by "First Horizon's use of Point-of-Sale Systems," and specifically the use of third-party "Clover®" branded software (the "'862 Accused System"). *See* Exhibit 9.

513. First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '862 Accused System), or import into the United States any product and/or system (including but not limited to the '862 Accused System) in a manner which infringes the '862 Patent.

514. By way of an example, independent claim 1 of the '862 Patent requires, *inter alia*, a portable housing that meets the claim limitations which include having "a software application in the non-volatile memory comprising a series of programs designed to perform specific functions" and "wherein the software application can function as a key which will serve to unlock the POS device [or PC] when connected and lock the device [or PC] when unconnected." *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

158

515.    Upon information and belief, the '862 Accused Device does not include at least a portable housing as claimed in each independent claim in the '862 Patent that has "a software application in the non-volatile memory comprising a series of programs designed to perform specific functions . . . wherein the software application can function as a key which will serve to unlock the POS device [or PC] when connected and lock the device [or PC] when unconnected." *See* https://www.clover.com/pos-systems (last accessed Oct. 4, 2024).

516.    Accordingly, First Horizon does not directly infringe the '862 Patent, either literally or under the doctrine of equivalents.

517.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '862 Patent or otherwise contribute to infringement of the '862 Patent.

518.    Therefore, an actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '862 Patent.

519.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '862 Accused System) has not infringed and does not infringe the '862 Patent.

**COUNT X**
**DECLARATORY JUDGMENT OF INVALIDITY OF THE '862 PATENT**

520.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

521.    Claim 1 of the '862 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the

Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

522. Upon information and belief, and subject to further discovery, claim 1 of the '862 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

523. Upon information and belief, and subject to further discovery, claim 1 of the '862 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

### 1. Claim 1 of the '862 Patent is Invalid Under 35 U.S.C. § 101.

524. Claim 1 of the '862 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 1 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

525. In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

526. If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two. Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept

sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

### i. Claim 1 of the '862 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.

527. Claim 1 as a whole is directed to an abstract idea. Claim 1 as a whole is directed to an apparatus having a portable housing, a non-volatile memory, an interface for communication between the non-volatile memory and a point-of-sale ("POS") device, a data repository in the non-volatile memory, and a software program in the non-volatile memory configured to function as a key to unlock the POS device when the apparatus is connected, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

528. Claim 1 as a whole is directed to an apparatus configured to perform steps for a purely internal process, relying upon generic computer equipment to lock and unlock a common POS device, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

529. Furthermore, the specification confirms that Claim 1 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 1 as a whole, including the use of a conventional computing components to lock and unlock a POS device, were well understood at the time of the invention. *See* U.S. Pat. No. 7,464,862 to Bacastow at Figure 1

161

(providing that the system merely includes a conventional processor, the Internet, a conventional file server, a conventional POS terminal, a conventional removable flash memory, and a conventional personal computer). Claim 1 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

530.    Claim 1 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. For example, Claim 1's functional recitation of "the software application [functioning] as a key which will serve to unlock the POS device when connected and lock the device when unconnected" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 as a whole is directed to a generic apparatus performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"— without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

531.    Claim 1 as a whole describes storing data relevant to a computing device on a removable flash memory, rather than on the computing device itself, without any improvement to

162

the functionality of the network components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 is not directed to specific asserted improvements in computer capabilities. The Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Erie Indem. Co.*, 850 F.3d at 1327 (organizing and accessing data held abstract); *Content Extraction and Transmission LLC*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

532.    Claim 1 as a whole is directed merely to storing data on a removable flash memory and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

533.    For at least the foregoing reasons, Claim 1 fails *Alice* step one.

### ii.    Claim 1 of the '862 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101

534.    Claim 1 merely recites generic computing elements with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 simply uses generic computing elements to perform generic computer functions, including functioning as a key to unlock a POS device when an apparatus is connected and lock the POS device when the same apparatus is connected, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

535.    Claim 1 recites architecture of a generic computing system, including a "portable housing," a "non-volatile memory," "an interface on the housing," "a software application in the

163

non-volatile memory," and "a data repositor in the non-volatile memory", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Implementation of an abstract idea by the '862 Patent's routine hardware fails to move the mere storage of data on a removable flash memory beyond an abstract idea.

536.    Claim 1 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '862 Patent discloses an "apparatus" including a "portable housing" that is configured to be connected to a computing device via an "interface." *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1. As shown in Figure 1, the portable memory apparatus is merely a "Removable Flash Memory" and the interface is conventional "USB." U.S. Pat. No. 7,464,862 to Bacastow at Figure 1. The "apparatus" includes a "non-volatile memory" having a "data repository" therein; something entirely conventional for portable flash memory devices. U.S. Pat. No. 7,464,862 to Bacastow at Claim 1. Claim 1 does not improve functionality of these devices; instead, it employs well-understood hardware to simply store data remote from the computing device, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc.*, 827 F.3d at 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be

significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

537.    The elements of claim 1, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

538.    For at least the foregoing reasons, Claim 1 fails *Alice* step two.

539.    Accordingly, claim 1 of the '862 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

   2.  **Claim 1 of the '862 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.**

540.    Upon information and belief, and subject to further discovery, claim 1 of the '862 Patent is invalid under 35 U.S.C. §§ 102 and 103.

541.    The '862 Patent originated as U.S. Application No. 11/141,837 and was filed on June 1, 2005.

542.    The '862 Patent, and specifically U.S. Application No. 11/141,837, claims priority to U.S. Application No. 60/579,997. U.S. Application No. 60/579,997 was filed on June 15, 2004.

543.    The '862 Patent, and specifically U.S. Application No. 11/141,837, claims priority to U.S. Application No. 60/631,300. U.S. Application No. 60/631,300 was filed on November 24, 2004.

544.    Claim 1 of the '862 Patent reads as follows:

1. An apparatus for extending the capability of a POS Device including:
   a. a portable housing;
   b. non-volatile memory withing the housing;
   c. an interface on the housing for communication between the non-volatile memory and the POS device; and
   d. a software application in the non-volatile memory comprising a series of programs designed to perform specific functions;

e. a data repository in the non-volatile memory to store required data to support software functions; wherein the software application can function as a key which will serve to unlock the POS device when connected and lock the device when unconnected.

545. Claim 1 of the '862 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent No. 5,854,891 (hereinafter "Postlewaite"), U.S. Patent No. 6,088,802 (hereinafter "Bialick"), and International Publication No. WO 03/001350 (hereinafter "Behar"), alone or in combination.

546. Postlewaite was filed on August 9, 1996 and issued December 29, 1998. It is entitled "Smart Card Reader Having Multiple Data Enabling Storage Compartments," and lists William M. Postlewaite, Kim J. Vogel, Jason Maynard, and Vincent Poole as inventors. A true and correct copy of Postlewaite is attached hereto as Exhibit 40.

547. Postlewaite is prior art to the '862 Patent.

548. Bialick was filed on June 4, 1997 and issued July 11, 2000. it is entitled "Peripheral Device with Integrated Security Functionality," and lists William P. Bialick, Mark J. Sutherland, Janet L. Dolphin-Peterson, Thomas K. Rowland, Kirk W. Skeba, and Russel D. Housley as inventors. A true and correct copy of Bialick is attached hereto as Exhibit 41.

549. Bialick is prior art to the '862 Patent.

550. Behar was filed on June 20, 2002 and published January 3, 2003. It is entitled "Security System and Software to Prevent Unauthorized Use of a Computing Device," and lists Yaacov Behar as the inventors. A true and correct copy of Behar is attached hereto as Exhibit 42.

551. Behar is prior art to the '862 Patent.

552. As shown in the '862 Patent under the heading "References Cited," neither Postlewaite, Bialick, nor Behar were considered by the Examiner during examination of the application that issued as the '862 Patent.

166

553.    The '862 Patent issued without the United States Patent and Trademark Office considering that Postlewaite, Bialick, and Behar render the invention claimed in the '862 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

554.    Claim 1 claims "[a]n apparatus for extending the capability of a POS Device including" specific limitations that are recited in claim 1. *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

555.    Postlewaite discloses an apparatus for extending the capability of a POS Device including the limitations recited in claim 1 of the '862 Patent. *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.*

556.    Bialick discloses an apparatus for extending the capability of a POS Device including the limitations recited in claim 1 of the '862 Patent. *See* U.S. Pat. No. 6,088,802 to Bialick *et al.*

557.    Behar discloses an apparatus for extending the capability of a POS Device including the limitations recited in claim 1 of the '862 Patent. *See* International Pub. No. WO 03/001350 to Behar.

558.    Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes "a portable housing" (hereinafter "the Housing Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

559.    Postlewaite discloses the Housing Limitation. For example, Postlewaite discloses: "As seen in FIG. 1 of the drawings, the present invention is an intermediate peripheral device for a computer 2 as an interface for utilizing one or more smart cards 4." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 4, ll. 27–30. "The invention comprises hardware components and associated software collectively comprising a security device generally designated 100." *See* U.S.

167

Pat. No. 5,854,891 to Postlewaite *et al.* at col. 4, ll. 30–32. "As an interface, security device 100 greatly expands the ability of a single smart card 4 to be connected to a variety of different type computers." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 4, ll. 50–52. "[A] smart card reader having means for communicating with a smart card having memory." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at Claim 1. "[S]ecurity device 100 comprises a card reader 102 having a receptacle 104 and contacts 106." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col 5, ll. 1–2. "Contacts 106 correspond to contacts 8 located on the face of smart card 4 (see FIG. 2)." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col 5, ll. 2–4. "When fully inserted into receptacle 104, contacts 8 align and establish electrical communication with contacts 106." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col 5, ll. 4–6. "Significantly, a single smart card reader of this invention reads and stores in different segments of its memory the data from a plurality of smart cards so that a customer having multiple smart cards for multiple applications need make but one insertion of each card into the novel smart card reader." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 34–39.

560.    Figures 1 and 2 of Postlewaite are shown below:

168



Fig. 1

Fig. 2

561.    Bialick discloses the Housing Limitation. For example, Bialick discloses: "The system 300 includes a host computing device 301 and a peripheral device 302 that communicate via a communications interface 303." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 50–52. "Herein, 'peripheral device' can refer to any device that operates outside of a host computing device and that is connected to the host computing device." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 52–55. "In FIG. 3B, the peripheral device 302 is embodied as a card 312 that can be inserted into a corresponding slot 313 formed in a portable computer 311 that, in FIG. 3B, embodies the host computing device 301." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 42–46. "Often a peripheral device according to the invention is a portable device, such as the card 312 shown in FIG. 3B." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 46–47. "Herein, 'portable device' can refer generally to any device that is capable of being easily carried by hand." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 48–49. Figures 3A and 3B are provided below:

169



FIG. 3A

FIG. 3B

562.    Behar discloses the Housing Limitation. For example, Behar discloses: "In order to secure one or more a personal or laptop computers 10, a key device 20 is issued for each device by a system manager or any other person within an organisation [sic] responsible for security of the IT environment." *See* International Pub. No. WO 03/001350 to Behar at 6. "The key device 20 consists of a little token which may readily be attached to other keys of the user, like home and car keys, likely to be carried along." *See* International Pub. No. WO 03/001350 to Behar at 6. Figure 1 of Behar is provided below:

170



FIG. I

563.    Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes a "non-volatile memory within the housing" (hereinafter "the Memory Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

564.    Postlewaite discloses the Memory Limitation. For example, Postlewaite discloses: "Significantly, a single smart card reader of this invention reads and stores in different segments of its memory the data from a plurality of smart cards so that a customer having multiple smart cards for multiple applications need make but one insertion of each card into the novel smart card reader." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 34–39. "The present invention provides apparatus for compiling virtual tokens (virtual smart cards) stored in non-volatile memory (NVM) associated with a card reader." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 56–58. "The NVM  device may either be contained within a card reader which is connectable to a computer, or alternatively, may be integral with a computer." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 58–62.

171

565.    Bialick discloses the Memory Limitation. For example, Bialick discloses: "Each embodiment of the communications interface 303 includes hardware present in each of the host computing device 301 and peripheral device 302 that operates in accordance with a communications protocol (which can be embodied, for example, by software stored in a memory device and/or firmware that is present in the host computing device 301 and/or peripheral device 302) appropriate for that type of communications interface, as known to those skilled in the art." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 10–18. "The peripheral device 602 includes security functionality 611, a memory device 612, an input/output (I/O) device 613 for enabling communication with the host 40 computing device 601 and target functionality 614." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 37–40. "The security functionality 611, memory device 612, I/O device 613 and target functionality 614 can each be implemented by conventional devices and can communicate with each other via a conventional computer bus 615, as is well known and s understood." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 40–45.

566.    Behar discloses the Memory Limitation. For example, Behar discloses: "The key device comprises programmable memory means capable of storing said key information." *See* International Pub. No. WO 03/001350 to Behar at 6. "In this embodiment flash EEPROM is used as storage medium in the key device but also other kinds of non-volatile, one-time or repeatedly programmable memory may be used or even volatile memory provided that the latter is accompanied by a suitable power source, like a battery or the like, in order to avoid data loss." *See* International Pub. No. WO 03/001350 to Behar at 6.

567.    Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes "an interface on the housing for communication between the non-volatile

172

memory and the POS device" (hereinafter "the Interface Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

568.    Postlewaite discloses the Interface Limitation. For example, Postlewaite discloses: "Enabling data is loaded into NVM through smart cards read by the card reader." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 65–66. "The NVM is segmented, each segment being dedicated to one virtual token bearing enabling data received from any one smart card." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, l. 66 – col. 3, l. 1. "Once enabling data is loaded, it is not alterable by the computer with which it is associated, nor by any computer not specifically equipped to modify the NVM." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 1–4. "The NVM is contained within a control module having plural interface apparatuses enabling communicating connection to the computer." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 4–7. "When utilized with computer 2 connected to security device 100, security device 100 enables the connected computer 2 to access protected programs or data directly or to perform other functions in connection with other remote computers (not shown)." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col 4, ll. 35–40. "To accomplish this, security device 100 comprises a card reader 102 having a receptacle 104 and contacts 106." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 1–2. "Contacts 106 correspond to contacts 8 located on the face of smart card 4 (see FIG. 2)." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 3–5. "When fully inserted into receptacle 104, contacts 8 align and establish electrical communication with contacts 106." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 4–6. "Card reader 102 communicates with a control module 108, as represented by communications conductor 110." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 7–8. "Security device 100 includes a plurality

173

of interface apparatuses for connection to computers generally." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col 5, ll. 63–65. Refer also to Figure 1, provided above.

569.    Bialick discloses the Interface Limitation. For example, Bialick discloses: "The system 300 includes a host computing device 301 and a peripheral device 302 that communicate via a communications interface 303." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 50–52. "Herein, 'peripheral device' can refer to any device that operates outside of a host computing device and that is connected to the host computing device." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 52–55. "Generally, the communications interface 303 can be any embodied by any of a variety of communication interfaces, such as a wireless communications interface, a PCMCIA interface, a smart card interface, a serial interface (such as an RS-232 interface), a parallel interface, a SCSI interface or an IDE interface." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 5–10. "Each embodiment of the communications interface 303 includes hardware present in each of the host computing device 301 and peripheral device 302 that operates in accordance with a communications protocol (which can be embodied, for example, by software stored in a memory device and/or firmware that is present in the host computing device 301 and/or peripheral device 302) appropriate for that type of communications interface, as known to those skilled in the art." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 10–18. "Each embodiment of the communications interface 303 also includes mechanisms to enable physical engagement, if any, between the host computing device 301 and peripheral device 302." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 18–21.

570.    Behar discloses the Interface Limitation. For example, Behar discloses: "The key device 20 comprises a standard infrared interface 21 which operates according to the Ultra Protocol as established by the Infrared Data Association (IrDA) in order to facilitate data communication

174

between a system manager's work station and the key device." *See* International Pub. No. WO 03/001350 to Behar at 7. Refer also to Figure 1, provided above.

571. Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes "a software application in the non-volatile memory comprising a series of programs designed to perform specific functions" (hereinafter "the Software Application Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

572. Postlewaite discloses the Software Application Limitation. For example, Postlewaite discloses: "Control module 108 includes processing means 112 for executing commands and monitoring for authorization, a segmented NVM 114 for providing virtual tokens, and an optional special purpose math coprocessor 116 for accelerating encryption and decryption of data." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 9–13. "Processing means 112 has an automatic recording means 118 to enter enabling data into the segmented NVM 114 from smart card 4 through card reader 102 without aid of computer 2." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 13–16. "Processing means 112 includes all signals, power, and protocol required for a connected computer to access a virtual token." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 17–19. "Processing means 112 enables execution commands to be operably communicated, if detected by recognition means 120, to selected protected programs contained in the memory of computer 2 connected to security device 100, or, of course, contained in a greater network as discussed prior." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 19–24. "Recognition means 120 detects and verifies appropriate enabling data entered into segmented NVM 114." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 24–25. "Processing means 112 includes a disabling inhibitor 122 for preventing execution commands originating at connected computer 2 to be recognized by processing means 112 if recognition

175

means 120 cannot detect and verify appropriate enabling data entered into segmented NVM 114."
*See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 26–30.

573. Bialick discloses the Software Application Limitation. For example, Bialick discloses: "The peripheral device 302 includes a security mechanism 302a that enables security operations (examples of which are described in more detail below) to be performed on data that is stored within the host computing device 301, data that is transmitted from the host 60 computing device 301 to the peripheral device 302, or data that is transmitted from the peripheral device to the host computing device 301." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 55–62. "As explained in more detail below, the peripheral device 302 also provides additional functionality (referred to herein as 'target functionality') to the system 300, such as, for example, the capability to store data in a solid-state disk storage device, the capability to enable communications from the host computing device 301 to another device, the capability to accept biometric input to enable user authentication to the host computing device 301, and the capability to receive and read a smart card inserted into the peripheral device 302." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, l. 62 – col. 5, l. 4. "Each embodiment of the communications interface 303 includes hardware present in each of the host computing device 301 and peripheral device 302 that operates in accordance with a communications protocol (which can be embodied, for example, by software stored in a memory device and/or firmware that is present in the host computing device 301 and/or peripheral device 302) appropriate for that type of communications interface, as known to those skilled in the art." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, 10–18. "The peripheral device 602 includes security functionality 611, a memory device 612, an input/output (I/O) device 613 for enabling communication with the host computing device 601 and target functionality 614." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 37–40. "The security

176

functionality 611, memory device 612, I/O device 613 and target functionality 614 can each be implemented by conventional devices and can communicate with each other via a conventional computer bus 615, as is well known and s understood." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 40–45.

574.    Behar discloses the Software Application Limitation. For example, Behar discloses: "Key information 25 is written into the key device by means of appropriate software, available to the system manager only, in order to activate the key device." *See* International Pub. No. WO 03/001350 to Behar at 6. "The key device comprises programmable memory means capable of storing said key information." *See* International Pub. No. WO 03/001350 to Behar at 6.

575.    Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes "a data repository in the non-volatile memory to store required data to support software functions" (hereinafter "the Data Repository Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

576.    Postlewaite discloses the Data Repository Limitation. For example, Postlewaite discloses: "Significantly, a single smart card reader of this invention reads and stores in different segments of its memory the data from a plurality of smart cards so that a customer having multiple smart cards for multiple applications need make but one insertion of each card into the novel smart card reader." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 34–39. "The present invention provides apparatus for compiling virtual tokens (virtual smart cards) stored in non-volatile memory (NVM) associated with a card reader." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, 57–59. "Enabling data is loaded into NVM through smart cards read by the card reader." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 65–66. "The NVM is segmented, each segment being dedicated to one virtual token bearing enabling data received from any one

177

smart card." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, l. 66 – col. 3, l. 1. "Once enabling data is loaded, it is not alterable by the computer with which it is associated, nor by any computer not specifically equipped to modify the NVM." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 1–4. "The NVM is contained within a control module having plural interface apparatuses enabling communicating connection to the computer." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 4–7. "In use in a computer, execution of protected software is dependent upon presence or detection and verification of encryption data or keys contained in the virtual token or installed smart card." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 8–11. "If a key is not present, the software will not operate." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 11–12. "Processing means 112 has an automatic recording means 118 to enter enabling data into the segmented NVM 114 from smart card 4 through card reader 102 without aid of computer 2." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 13–16.

577.    Bialick discloses the Data Repository Limitation. For example, Bialick discloses: "The peripheral device 302 includes a security mechanism 302a that enables security operations (examples of which are described in more detail below) to be performed on data that is stored within the host computing device 301, data that is transmitted from the host 60 computing device 301 to the peripheral device 302, or data that is transmitted from the peripheral device to the host computing device 301." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 55–62. "As explained in more detail below, the peripheral device 302 also provides additional functionality (referred to herein as 'target functionality') to the system 300, such as, for example, the capability to store data in a solid-state disk storage device, the capability to enable communications from the host computing device 301 to another device, the capability to accept biometric input to enable user authentication to the host computing device 301, and the capability to receive and read a smart

178

card inserted into the peripheral device 302." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, l. 62 – col. 5, l. 4. "Each embodiment of the communications interface 303 includes hardware present in each of the host computing device 301 and peripheral device 302 that operates in accordance with a communications protocol (which can be embodied, for example, by software stored in a memory device and/or firmware that is present in the host computing device 301 and/or peripheral device 302) appropriate for that type of communications interface, as known to those skilled in the art." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, 10–18. "The peripheral device 602 includes security functionality 611, a memory device 612, an input/output (I/O) device 613 for enabling communication with the host computing device 601 and target functionality 614." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 37–40. "The security functionality 611, memory device 612, I/O device 613 and target functionality 614 can each be implemented by conventional devices and can communicate with each other via a conventional computer bus 615, as is well known and s understood." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 40–45.

578. Behar discloses the Data Repository Limitation. For example, Behar discloses: "The key device comprises programmable memory means capable of storing said key information. In this embodiment flash EEPROM is used as storage medium in the key device but also other kinds of non-volatile, one-time or repeatedly programmable memory may be used or even volatile memory provided that the latter is accompanied by a suitable power source, like a battery or the like, in order to avoid data loss." *See* International Pub. No. WO 03/001350 to Behar at 6. "Key information 25 is written into the key device by means of appropriate software, available to the system manager only, in order to activate the key device." International Pub. No. WO 03/001350 to Behar at 6. "The key device comprises programmable memory means capable of storing said key information." International Pub. No. WO 03/001350 to Behar at 6.

179

579.    Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes "the software application can function as a key which will serve to unlock the POS device when connected and lock the device when unconnected" (hereinafter "the Key Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

580.    Postlewaite discloses the Key Limitation. For example, Postlewaite discloses: "One smart card may, for example, be required to access the computer, another to copy protect valuable software, another to access the Internet, and still another to purchase goods and services over the Internet with a credit card." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 25–29. "Each of these actions once required the user to insert a different smart card into his or her computer." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 29–30. "In use in a computer, execution of protected software is dependent upon presence or detection and verification of encryption data or keys contained in the virtual token or installed smart card." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 8–11. "If a key is not present, the software will not operate." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 11–12. "[T]he card reader can enable any of many computers, due to having a variety of interface apparatuses." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 16–18. "Control is retained by the possessor of the card reader." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, l. 19. "Firstly, the possessor can load selected data into an NVM segment, thereby creating a virtual token." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 19–20. "Secondly, the card reader can be a hardware key necessary for enabling a host computer to perform selected functions or transactions controlled by the virtual tokens." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 20–23. "The invention is a security device for enabling selected functions to be performed, such as, accessing operating software to run the computer, or to protect programs or data contained in memory in computers."

180

U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 4, ll. 32–34. "When utilized with computer 2 connected to security device 100, security device 100 enables the connected computer 2 to access protected programs or data directly or to perform other functions in connection with other remote computers (not shown)." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 4, ll. 32–40.

581. Bialick discloses the Key Limitation. For example, Bialick discloses: "In particular, the peripheral device can be adapted to enable, in a single integral peripheral device, performance of one or more security operations on data, and a defined interaction with a host computing device that has not previously been integrated with security operations in a single integral device." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 3, ll. 27–33. "The defined interactions can provide a variety of types of functionality (e.g., data storage, data communication, data input and output, user identification), as described further below." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 3, ll. 33–36.

582. Behar discloses the Key Limitation. For example, Behar discloses: "The present invention relates to a security system to prevent unauthorized use of a computing device, said system comprising a key device carrying an key identification; memory means installed in said computing device for storing a validation record; an interface to connect said key device with said computing device and to provide a pathway to exchange said key identification; a program to validate said key identification embedded in said key device using said validation record; and means for inhibiting use of said computing device if said key identification and said validation record do not match." *See* International Pub. No. WO 03/001350 to Behar at 1. "The key device provides a level of security which requires the possession of the device itself." International Pub. No. WO 03/001350 to Behar at 5. "Without a key device no access is possible to a computing device in the system." International Pub. No. WO 03/001350 to Behar at 5.

583.    Postlewaite discloses the apparatus for extending the capability of a POS Device claimed in claim 1 of the '862 Patent. Postlewaite renders claim 1 of the '862 Patent invalid pursuant to 35 U.S.C. § 102.

584.    Bialick discloses the apparatus for extending the capability of a POS Device claimed in claim 1 of the '862 Patent. Bialick renders claim 1 of the '862 Patent invalid pursuant to 35 U.S.C. § 102.

585.    Behar discloses the apparatus for extending the capability of a POS Device claimed in claim 1 of the '862 Patent. Behar renders claim 1 of the '862 Patent invalid pursuant to 35 U.S.C. § 102.

586.    In light of the disclosure in Postlewaite, a POSITA would also consider claim 1 of the '862 Patent obvious pursuant to 35 U.S.C. § 103.

587.    In light of the disclosure in Bialick, a POSITA would also consider claim 1 of the '862 Patent obvious pursuant to 35 U.S.C. § 103.

588.    In light of the disclosure in Behar, a POSITA would also consider claim 1 of the '862 Patent obvious pursuant to 35 U.S.C. § 103.

589.    In light of the disclosures in Postlewaite, Bialick, and/or Behar, in various combinations, a POSITA would also consider claim 1 of the '862 Patent obvious pursuant to 35 U.S.C. § 103.

## COUNT XI
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '584 PATENT

590.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

591.    Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First

Horizon. Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 18. Intellectual Ventures Management, by and on behalf all of Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license for its operations" of at least the Patents-In-Suit. *See* Exhibit 20. Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See* Exhibit 9; Exhibit 10. Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license. Intellectual Ventures Management, on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

592.    In Plaintiff's October 16, 2025 Letter, Kasowitz LLP, on behalf of Defendants, alleged that First Horizon's use of Kubernetes, a third party branded software, infringes at least claim 1 of the '584 Patent (the "'584 Accused System"). *See* Exhibit 10.

593.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '584 Accused System), or import into the

183

United States any product and/or system (including but not limited to the '584 Accused System) in a manner which infringes the '584 Patent.

594. By way of an example, each independent claim of the '584 Patent requires, *inter alia*, a first gateway communicatively linked between a first cluster and a private communications network, *and* a second gateway communicatively linked between a second cluster and the private communications network. *See* U.S. Pat. No. 8,352,584 to Franklin at Claim 1 ("a first gateway communicatively linked between the first cluster and the private communications network [and] … a second gateway communicatively linked between the second cluster and the private communications network"); Claim 10 ("a first gateway communicatively linked between the first HPC cluster and the private network [and] … a second gateway communicatively linked between the second HPC cluster and the private network").

595. First Horizon does not infringe the '584 Patent (including, for example, the independent claims identified in the preceding paragraph) at least because the '584 Accused System does not include a first gateway communicatively linked between a first cluster and a private communications network, *and* a second gateway communicatively linked between a second cluster and the private communications network.

596. The "kubernetes.io" website provides the following description of Kubernetes "Cluster Architecture" which make up the '584 Accused System. *See* https://kubernetes.io/docs/concepts/architecture/ (last accessed Oct. 4, 2024).

184

> The architectural concepts behind Kubernetes.
>
> A Kubernetes cluster consists of a control plane plus a set of worker machines, called nodes, that run containerized applications. Every cluster needs at least one worker node in order to run Pods.
>
> The worker node(s) host the Pods that are the components of the application workload. The control plane manages the worker nodes and the Pods in the cluster. In production environments, the control plane usually runs across multiple computers and a cluster usually runs multiple nodes, providing fault-tolerance and high availability.

597.    The "kubernetes.io" website provides the following diagram depicting the architecture of the '584 Accused System. *See* https://kubernetes.io/docs/concepts/architecture/ (last accessed Oct. 4, 2024).



598.    The "kubernetes.io" website provides that each "cluster" is connected to a "cloud provider api," and more specifically that each cluster is connected to the cluster via a "cloud control manager" which resides, or forms a portion of, the cluster. *See* https://kubernetes.io/docs/concepts/architecture/ (last accessed Oct. 4, 2024).

185

599.    Notably, there is no component, whether residing in software or hardware, disposed between the cluster, but more specifically the cloud control manager, and the cloud provider api. *See* https://kubernetes.io/docs/concepts/architecture/ (last accessed Oct. 4, 2024).

600.    The "kubernetes.io" website does provide that a "gateway API" is an optional add-on that may be applied to the '584 Accused System and may route and direct traffic between a plurality of clusters. *See* https://kubernetes.io/docs/concepts/services-networking/gateway/ (last accessed Nov. 11, 2025). One may equate this gateway API to the gateways as claimed in the '584 Patent.

601.    However, the '584 Accused System only employs a single gateway API, if at all, to route and direct traffic between the plurality of clusters. *See* https://kubernetes.io/docs/concepts/services-networking/gateway/ (last accessed Nov. 11, 2025).

602.    The '584 Accused System does not include a plurality of gateway APIs each dedicated to a specific cluster.

603.    Accordingly, First Horizon does not infringe the '584 Patent at least because the '584 Accused System does include a first gateway communicatively linked between a first cluster and a private communications network, *and* a second gateway communicatively linked between a second cluster and the private communications network.

604.    Accordingly, First Horizon does not directly infringe the '584 Patent, either literally or under the doctrine of equivalents.

605.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '584 Patent or otherwise contribute to infringement of the '584 Patent.

186

606.    Therefore, an actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '584 Patent.

607.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '584 Accused System) has not infringed and does not infringe the '584 Patent.

## COUNT XII
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '584 PATENT

608.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

609.    Claim 1 of the '584 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

610.    Upon information and belief, and subject to further discovery, claim 1 of the '584 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

611.    Upon information and belief, and subject to further discovery, claim 1 of the '584 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

**1.    Claim 1 of the '584 Patent is Invalid Under 35 U.S.C. § 101.**

612.    Claim 1 of the '584 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 1 as a whole is directed to a non-patentable, abstract

187

idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

613.    In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

614.    If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two.  Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

**i.      Claim 1 of the '584 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.**

615.    Claim 1 as a whole is directed to an abstract idea. Claim 1 as a whole is directed to: (1) providing a first computing environment via a first cluster of computing resources; (2) establishing communications between the first computing environment and a first gateway; (3)

188

providing a second computing environment via a second cluster of computing resources; (4) establishing communications between the second computing environment and a second gateway; and (5) monitoring operations of the first cluster and the second cluster for communications problems, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

616.    Claim 1 as a whole is directed to a computer system configured to perform steps for a purely *internal* process, relying upon generic computer equipment to route communications within a network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

617.    Furthermore, the specification confirms that Claim 1 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 1 as a whole, including the use of a conventional computing system to offload computing tasks to remote clusters and monitor these communications, were well understood at the time of the invention. *See* U.S. Pat. No. 8,352,584 to Franklin at Figure 2 (providing that the system merely includes a plurality of clusters and associated gateways connected to the Internet via a private company network and firewall). Claim 1 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

618.    Claim 1 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 as a whole relies on functional language

189

to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. For example, Claim 1's functional recitation of "monitor[ing] operations of the first cluster and the second cluster for communications problems," "provid[ing] a first computing environment," "provid[ing] a second computing environment," and "establish[ing] communications" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 as a whole is directed to a generic computer system architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

619. Claim 1 as a whole describes using standard hardware to execute basic cluster computing tasks without any improvement to the functionality of the system components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 is not directed to specific asserted improvements in computer capabilities.

620. Claim 1 as a whole is directed to basic cluster computing wherein communications may be routed over a network, and specifically routed between clusters of computing resources and computing elements, such as servers, connected to the Internet, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc.*, 778 F. App'x at 892

190

(quoting *ChargePoint, Inc.*, 920 F.3d at 767); *see also buySAFE, Inc.*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network … is not even arguably inventive."). Further, the Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Erie Indem. Co.*, 850 F.3d at 1327 (organizing and accessing data held abstract); *Content Extraction and Transmission LLC*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

621. Claim 1 as a whole is directed merely to a conventional computing system configured to offload computing tasks to remote clusters and monitor these communications, and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

622. For at least the foregoing reasons, Claim 1 fails *Alice* step one.

ii. **Claim 1 of the '584 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

623. Claim 1 merely recites a generic computer with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 simply uses a generic computer to perform generic computer functions, including "monitor[ing] operations of the first cluster and the second cluster for communications problems," "provid[ing] a first computing environment," "provid[ing] a second computing environment," and "establish[ing] communications", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

191

624.    Claim 1 recites architecture of a generic computing system, including "a private communications network," "a public communications network," "a first cluster comprising a set of computing resources," "a second cluster comprising a set of computing resources," "a monitoring system," "a first gateway," and "a second gateway", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Implementation of an abstract idea by the '584 Patent's routine hardware fails to move the mere offloading of computing tasks to remote clusters and monitoring these communications beyond an abstract idea.

625.    Claim 1 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '584 Patent discloses that the "private communications network" is merely a company's private network and the "public communications network" is merely the "Internet, a LAN, a WAN, or the like." *See* U.S. Pat. No. 8,352,584 to Franklin at Figure 2; col. 5, ll. 25–29. The "first cluster comprising a set of computing resources" and "second cluster comprising a set of computing resources" simply include two or more nodes each configured to "perform a computing task." U.S. Pat. No. 8,352,584 to Franklin at col. 10, ll. 29–31. Each node is merely "a group of circuitry and electronic components designed to perform one or more computing tasks" and "may include one or more processors (e.g. Intel Xeon™ or AMD Opteron™), memory, and interface circuitry." U.S. Pat. No. 8,352,584 to Franklin at col. 10, ll. 31–36. The "monitoring system" uses common hardware and/or software to "monitor[] the hardware and software components on each cluster node" and to "monitor[] the network connectivity of each node." U.S. Pat. No. 8,352,584 to Franklin at col. 7, ll. 53–62; col. 8, ll. 37–39. The "first gateway" and "second gateway" are merely routers "configured with software and hardware to apply a standard set of rules to only permit traffic destined for its corresponding cluster to pass through." U.S. Pat. No. 8,352,584 to Franklin at col. 5, ll. 32–34; col. 5, ll. 42–46. Claim 1

192

does not improve functionality of these devices; instead, it employs well-understood hardware to simply offload computing tasks to remote clusters, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

626. The elements of claim 1, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

627. For at least the foregoing reasons, Claim 1 fails *Alice* step two.

628. Accordingly, claim 1 of the '584 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

## 2. **Claim 1 of the '584 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.**

629. Upon information and belief, and subject to further discovery, claim 1 of the '584 Patent is invalid under 35 U.S.C. §§ 102 and 103.

630. The '584 Patent originated U.S. Application No. 12/894,664 and was filed on September 30, 2010.

631.    The '584 Patent, and specifically U.S. Application No. 12/894,664, claims to be a

continuation of U.S. Application No. 11/927,921. U.S. Application No. 11/927,921 was filed on

October 30, 2007.

632.    Claim 1 of the '584 Patent reads as follows:

1.  A computer system, comprising:
    a private communications network linked to a public communications network;
    a first cluster comprising a set of computing resources, including at least one
        hardware processor, in a first configuration, wherein the first cluster is
        communicatively linked to the private communications network;
    a second cluster comprising a set of computing resources, including at least one
        hardware processor, in a second configuration, wherein the second cluster
        is communicatively linked to the private communications network; and
    a monitoring system to monitor operations of the first cluster and the second
        cluster for communications problems;
    wherein the first configuration differs from the second configuration;
    wherein the first configuration provides a first computing environment to
        perform a first client task and the second configuration provides a second
        computing environment to perform a second client task; and
    wherein the computing resources comprise processing nodes, data storage
        shared by the processing nodes, and at least one communications network
        to link the processing nodes to each other and to the data storage;
    wherein the first cluster establishes communications between the set of
        computing resources of the first cluster and a first gateway
        communicatively linked between the first cluster and the private
        communications network;
    wherein the second cluster establishes communications among the set of
        computing resources of the second cluster and a second gateway
        communicatively linked between the second cluster and the private
        communications network;
    wherein communications between the first cluster and the second cluster are
        isolated;
    wherein the first cluster is a high performance cluster; and
    wherein the second cluster is a high performance cluster.

633.    Claim 1 of the '584 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by

U.S. Patent No. 6,952,737 (hereinafter "Coates") and U.S. Patent Publication No. 2006/0075199

(hereinafter "Kallahalla"), alone or in combination.

634.    Coates was filed on December 29, 2000 and issued October 4, 2005. It is entitled "Method and Apparatus for Accessing Remote Storage in a Distributed Storage Cluster Architecture," and lists Joshua L. Coates, Patrick E. Bozeman, and David A. Patterson as inventors. A true and correct copy of Coates is attached hereto as Exhibit 43.

635.    Coates is prior art to the '584 Patent.

636.    Kallahalla was filed on October 6, 2004 and published April 6, 2006. It is entitled "Method of Providing Storage to Virtual Computer Cluster Within Shared Computing Environment," and lists Mahesh Kallahalla, Mustafa Uysal, and Ram Swaminathan as inventors. A true and correct copy of Kallahalla is attached hereto as Exhibit 44.

637.    Kallahalla is prior art to the '584 Patent.

638.    As shown on the '584 Patent under the heading "References Cited," neither Coates nor Kallahalla were considered by the Examiner during examination of the application that issued as the '584 Patent.

639.    The '584 Patent issued without the United States Patent and Trademark Office considering that Coates and Kallahalla render the invention claimed in the '584 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

640.    Claim 1 claims "[a] computer system, comprising" specific limitations that are recited in claim 1. *See* U.S. Pat. No. 8,352,584 to Franklin *et al.* at Claim 1.

641.    Coates discloses a computer system comprising the limitations recited in claim 1 of the '584 Patent. *See* U.S. Pat. No. 6,952,737 to Coates *et al.*

642.    Kallahalla discloses a computer system comprising the limitations recited in claim 1 of the '584 Patent. *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.*

195

643.    Claim 1 of the '584 Patent claims its computer system comprises "a private communications network linked to a public communications network" (hereinafter "the Private Communications Network Limitation"). *See* U.S. Pat. No. 8,352,584 to Franklin *et al.* at Claim 1.

644.    Coates discloses the Private Communications Network Limitation. For example, Coates discloses: "A storage system, accessed over a network by a client, includes one or more storage centers." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 2, ll. 66–67. "The client, such as an end-user computer or a content server, issues requests over a network (e.g., Internet) to retrieve object files." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 4–6. "From any location on the Internet, clients see the exact same view of their private file system." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 19, ll. 2–4. "FIG. 27 is a block diagram illustrating one embodiment to interface a storage center to a client's private file directory system." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 4, ll. 54–56. Figure 27 of Coates is provided below:

196



**Figure 27**

645.    "FIG. 29 is a block diagram illustrating one embodiment for a storage port fail over configuration." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 14–15. "For purposes of explanation, FIG. 29 illustrates a fail over configuration with two storage ports." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 16–17. "However, the storage port fail over configuration may be extended to any '2N' fail over configuration." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 17–19. "For this embodiment, the fail over configuration includes an active storage port 3010 and a passive storage port 3020." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 19–

197

21. "Each storage port includes a plurality of network interface cards." U.S. Pat. No. 6,952,737 to

Coates *et al.* at col 29, ll. 21–22. "Both the active storage port 3010 and passive storage port 3020

communicate to storage center(s) over wide area network 3065, through network interface cards

3045 and 3025, respectively." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 22–25. "The

active storage port 3010 and passive storage port 3020 also communicate to the client site network

via network interface cards 3050 and 3035, respectively." U.S. Pat. No. 6,952,737 to Coates *et al.*

at col 29, ll. 25–27. "As shown in FIG. 29, the client accesses the active storage port 3010 over

client site network 3060 using IP Addr." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 27–

30. Figure 29 of Coates is provided below:



**Figure 29**

198

646.     Kallahalla discloses the Private Communications Network Limitation. For example, Kallahalla discloses: "The shared computing environment 200 comprises host computers 202, disk arrays 204, a SAN (storage area network) 206, and a LAN (local area network) 208." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The SAN 206 couples the host computers 202 to the disk arrays 204." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The LAN 208 couples the host computers 202 together. In an embodiment, the LAN 208 couples to a wide area network 210 (e.g., the Internet)." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The alternative shared computing environment 800 comprises a plurality of host computers 802 (e.g., desktop computers) coupled together by a LAN 808." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0047]. "Each host computer 802 comprises a processor 812, memory 814, a network interface 818, and storage 820." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0047]. "In an embodiment, the alternative shared computing environment 800 couples to a WAN 810." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0047]. Figure 8 of Kallahalla is provided below:



FIG. 8

647.    Claim 1 of the '584 Patent claims its computer system comprises "a first cluster comprising a set of computing resources, including at least one hardware processor, in a first configuration, wherein the first cluster is communicatively linked to the private communications network; a second cluster comprising a set of computing resources, including at least one hardware processor, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; … wherein the first configuration differs from the second configuration; wherein the first configuration provides a first computing environment to perform a first client task and the second configuration provides a second computing environment to perform a second client task; and wherein the computing resources comprise processing nodes, data storage shared by the processing nodes, and at least one communications network to link the processing nodes to each other and to the data storage; … wherein the first cluster is a high

performance cluster; and wherein the second cluster is a high performance cluster." (hereinafter

"the Cluster Limitation"). *See* U.S. Pat. No. 8,352,584 to Franklin *et al.* at Claim 1.

648.    Coates discloses the Cluster Limitation. For example, Coates discloses: "A storage

system, accessed over a network by a client, includes one or more storage centers." *See* U.S. Pat.

No. 6,952,737 to Coates *et al.* at col. 2, l. 66–67. "A storage center contains a control nodes (e.g.,

distributed object storage managers) and a plurality of intelligent storage nodes." *See* U.S. Pat. No.

6,952,737 to Coates *et al.* at col. 2, l. 67 – col. 3 l. 2. "The intelligent storage nodes store the object

files in one or more disk drives." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 2–4.

"The client, such as an end-user computer or a content server, issues requests over a network (e.g.,

Internet) to retrieve object files." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 4–6. "In

response to a client request, a control node is selected to manage the file retrieval process." *See*

U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 6–7. "In one embodiment, a load balancing

fabric, such as an L4 switch, receives the request from the network, and selects one of the control

nodes in manner so as to load balance client requests in the storage system." *See* U.S. Pat. No.

6,952,737 to Coates *et al.* at col. 3, ll. 8–11. "The control node determines the location of the object

file in one of the intelligent storage nodes ('destination storage node')." *See* U.S. Pat. No.

6,952,737 to Coates *et al.* at col. 3, ll. 11–13. "The control node receives the object file from the

destination storage node, and transfers the object file to the client." *See* U.S. Pat. No. 6,952,737 to

Coates *et al.* at col. 3, ll. 13–15. "In one embodiment, the control nodes include a data cache to

store object files previously retrieved from an intelligent storage node." *See* U.S. Pat. No.

6,952,737 to Coates *et al.* at col. 3, ll. 15–18. "For the embodiment of FIG. 1, the storage system

consists of a control path and a data path." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 5, ll. 35–

37. "The control path consists of a virtual file system ("VFS") 50 and the data path consists of a

201

distributed storage cluster 70….” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 5, ll. 37–39. “The distributed storage cluster 70 is used to store the object files for the system (i.e., all client data).” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 5, ll. 45–46. “As shown in FIG. 1, the VFS and the storage cluster 70 are coupled to communicate information so as to coordinate file system information with the physical storage of the object files.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 5, ll. 46–49. “The storage service 130 includes processing and networking facilities, such as a server 140, and data store 150.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 21–22. “The storage service 130 and content origin server 120 communicate to conduct file directory operations and object file operations.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 22–25. “The data store 150, part of the storage service 130, stores large data files, such as rich media data files, illustrated as multimedia files 160, 170 and 180 in FIG. 2.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 25–27. “In one embodiment, the data store 150 consists of a cluster of intelligent storage nodes.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 27–29.

649.     “In one embodiment, the storage cluster utilizes distributed systems technology that harnesses the throughput of hundreds of CPUs and the storage of thousands of disk drives.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 58–60. “FIG. 3 is a block diagram illustrating one embodiment for the storage cluster.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 61–62. “As shown in FIG. 3, the storage cluster consists of distributed object storage managers (‘DOSMs’) 320 and intelligent storage nodes 340.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 65–67.



*Figure 3*

650.    "The DOSMs 320 communicate with the intelligent storage nodes 340 via an interconnect fabric 330." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 30–31. "The interconnect fabric 330 consists of a high-speed, high bandwidth fabric to ensure that all the DOSMs 320 communicate with every intelligent storage node at all times." U.S. Pat. No.

6,952,737 to Coates *et al.* at col. 7, ll. 31–34. "In one embodiment, the DOSMs 320 communicate with the intelligent storage node over the interconnect fabric via a protocol, entitled the distributed object storage protocol ('DOSP')." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 34–37. "Effectively, the DOSP links hundreds of intelligent storage nodes into one large storage cluster." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 38–39. "As described more fully below, the DOSP consist of a multi-cast protocol as well as a point-to-point protocol." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 39–41. "In general, the intelligent storage nodes 340 provide the persistent store for the objects or files." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 42–43. "The intelligent storage nodes contain thousands of high-density disk drives." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 43–44.

651.    Kallahalla discloses the Cluster Limitation. For example, Kallahalla discloses: "The present invention comprises a method of providing storage to a virtual computer cluster within a shared computing environment." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "According to an embodiment, the method begins with a first step of combining storage resources within the shared computing environment into a virtual storage pool." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "The virtual storage pool comprises at least portions of storage devices in which at least one of the storage devices is not directly accessible by all computers which directly access any of the storage devices." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "The method continues with a second step of partitioning a virtual storage volume from the virtual storage pool." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "In a third step, the method assigns the virtual storage volume to the virtual computer cluster." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "The method concludes with a fourth step of making the virtual storage volume

204

accessible to computing platforms of the virtual computer cluster using software." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007].

652. "An embodiment of a shared computing environment (e.g., a utility data center) upon which the method 100 forms the virtual computer cluster is illustrated schematically in FIG. 2." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The shared computing environment 200 comprises host computers 202, disk arrays 204, a SAN (storage area network) 206, and a LAN (local area network) 208." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The SAN 206 couples the host computers 202 to the disk arrays 204." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The LAN 208 couples the host computers 202 together." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "In an embodiment, the LAN 208 couples to a wide area network 210 (e.g., the Internet)." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "Each host computer 202 comprises a processor 212, memory 214, an HBA (host bus adapter) 216, and a NIC (network interface card) 218." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The HBAs 216 couple the host computers 202 to the SAN 206." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The NICs 218 couple the host computers 202 to the LAN 208." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "A disk array 220 couples to a first host computer 202A." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The disk array 220 comprises direct attached storage for the first host computer 202A." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The direct attached storage comprises local storage for the first host computer 202A." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The host computers 202 may be clients which access the disk arrays 204." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "Or, the host computers 202 may be servers which access the disk arrays 204 for

205

clients (not shown)." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. Figure 2 of

Kallahalla is provided below:



FIG. 2

653.    "The third step 106 uses gatekeeper software located on host computers of the

virtual computer cluster including the first and second host computers, 202A and 202B, to perform

the isolation." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "The gatekeeper

software allows communication between the computing platforms of the virtual computer cluster

while precluding communication with other computing platforms within the shared computing

environment." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "The gatekeeper

software also controls input and output operations for the computer cluster." U.S. Pat. Pub. No.

2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "In an embodiment, the gatekeeper isolates the

virtual computer cluster from the remainder of the shared computing environment by keeping a

table of resources of the virtual computer cluster (e.g., computing platforms and virtual storage)

206

and allowing network and input/output traffic only within the resources identified in the table." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0030]. "The table may identify resource as network addresses, hardware identifiers, internally generated numbers unique identifiers (e.g., virtual server IDs), vendor specific unique identifiers (e.g., world-wide names), or other identifiers." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0030]. "Users of the virtual computer cluster may only access the resources in the table." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0030]. "Preferably, the users of the virtual computer cluster are also prevented from detecting resources in the shared computing environment which are not listed in the table." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0030].

654.    Claim 1 of the '584 Patent claims its computer system comprises "a monitoring system to monitor operations of the first cluster and the second cluster for communications problems" (hereinafter "the Monitoring System Limitation"). *See* U.S. Pat. No. 8,352,584 to Franklin *et al.* at Claim 1.

655.    Coates discloses the Monitoring System Limitation. For example, Coates discloses: "[I]f a failure occurs in an intelligent storage node, then the DOSM searches for the object file in a different storage center." See U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 55–57. "All components within the network storage system are replicated and redundant to provide complete recoverability in the event of a failure." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 19, ll. 51–53. "In one embodiment, each storage center attaches to multiple network back bone providers to ensure continuous network access." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 19, ll. 53–55. "All files and the control path directory structure are geographically replicated at the time of upload to prevent any possible loss of data." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 19, ll. 55–57. "As is described more fully below, the system maintains coherency among disparate storage

centers through use of the distributed object storage protocol ('DOSP')." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 19, ll. 57–60. "Thus, if a failure occurs in a distributed directory of storage center 1510, then the distributed directory manager in storage center 1510, using an IP address mapping, accesses the replicated distributed directory in storage center 1520." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 21, ll. 10–13. "Each operation has an associated operation code and a pair of structures: one for issuance of the request, and a second separate structure for return values." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 31, ll. 21–23. "Once the receiver has received and processed the request (sent data, deleted file, etc) it then sends a response consisting of the appropriate 'Out Structure' indicating the status of the request (SUCCESS, FAILURE, etc) and any required return values." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 31, ll. 23–28. "Currently, there are six service operations supported by the DOSP: null, store file, retrieve file, retrieve file range, delete file, and get contents." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 31, ll. 28–30.

656.    "The DOSM also maintains a state table 630." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 11, l. 36. "In general, the state table 630 provides the state of the system by storing information on the overall capacity and health of the intelligent storage nodes 340." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 11, ll. 36–39. "In one embodiment, the state tables are built using the multicast protocol to obtain, from the intelligent storage nodes, information about the corresponding intelligent storage node." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 11, ll. 39–42. "The state information indicates whether disks on the intelligent storage nodes are healthy, how much space is on the disks, etc." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 11, ll. 42–44. "In one embodiment, as shown in FIG. 6, state table 630 stores: read-write state of the storage nodes; health of the storage nodes (including an identification of failed nodes); and the current

208

load of the storage nodes, including available storage capacity and the number of input/output

("I/O") operations per second." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 11, ll. 44–49. Figure

6 of Coates is provided below:



**Figure 6**

657.    Kallahalla discloses the Monitoring System Limitation. For example, Kallahalla discloses: "In another gatekeeper enhancement embodiment, the module 1012 performs traffic monitoring for the computing platform 1006." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "In yet another gatekeeper enhancement embodiment, the module 1012 performs traffic control for the computing platform 1006." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "For example, the module 1012 may perform traffic admission control to the computing platform 1006." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "Or, the module 1012 may perform traffic throttling." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "The management station for the gatekeeper software may provide traffic control parameters to the module 1012." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "The management station may periodically update the traffic control parameters." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "In another gatekeeper enhancement embodiment, the module 1012 monitors an operating system in operation within the computing platform 1006." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0057]. "In yet another gatekeeper enhancement embodiment, the module 1012 monitors the computer hardware 1002." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0057].

658.    Claim 1 of the '584 Patent claims its computer system comprises "wherein the first cluster establishes communications between the set of computing resources of the first cluster and a first gateway communicatively linked between the first cluster and the private communications network; wherein the second cluster establishes communications among the set of computing resources of the second cluster and a second gateway communicatively linked between the second cluster and the private communications network; wherein communications between the first cluster

210

and the second cluster are isolated" (hereinafter "the Monitoring System Limitation"). *See* U.S. Pat. No. 8,352,584 to Franklin *et al.* at Claim 1.

659.    Coates discloses the Communications Limitation. For example, Coates discloses: "In one embodiment, a load balancing fabric, such as an L4 switch, receives the request from the network, and selects one of the control nodes in manner so as to load balance client requests in the storage system." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 8–11. "The control node determines the location of the object file in one of the intelligent storage nodes ('destination storage node')." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 11–13. "The control node receives the object file from the destination storage node, and transfers the object file to the client." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 13–15. "In one embodiment, the control node stores a reference (e.g., look-up table) that cross references object files to intelligent storage node locations." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 32–34. "In response to a client request, the control node determines whether the object file is identified on the reference." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 34–36. "If so, the control node, through an interconnect fabric, retrieves the object file from the identified intelligent storage node." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 36–38. "The DOSMs 320 communicate with the intelligent storage nodes 340 via an interconnect fabric 330." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 30–31. "The interconnect fabric 330 consists of a high-speed, high bandwidth fabric to ensure that all the DOSMs 320 communicate with every intelligent storage node at all times." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 31–34. "In one embodiment, the DOSMs 320 communicate with the intelligent storage node over the interconnect fabric via a protocol, entitled the distributed object storage protocol ("DOSP")." U.S. Pat. No. 6,952,737 to Coates *et al.* at col.

7, ll. 34–37. Effectively, the DOSP links hundreds of intelligent storage nodes into one large storage cluster." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 38–39.

660.    Kallahalla discloses the Communications Limitation. For example, Kallahalla discloses: "The method concludes with a fourth step of making the virtual storage volume accessible to computing platforms of the virtual computer cluster using software." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "The software allows access to the virtual storage volume by the computing platforms while precluding access to remaining storage within the shared computing environment by the computing platforms." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "The third step 106 uses gatekeeper software located on host computers of the virtual computer cluster including the first and second host computers, 202A and 202B, to perform the isolation." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "The gatekeeper software allows communication between the computing platforms of the virtual computer cluster while precluding communication with other computing platforms within the shared computing environment." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "The gatekeeper software also controls input and output operations for the computer cluster." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "[I]solating the virtual computer cluster from a remainder of the shared computing environment using the gatekeeper software such that the gatekeeper software allows communication between the computing platforms while precluding communication with other computing platforms of the shared computing environment and such that the gatekeeper software controls input and output operations for the virtual computer cluster." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at Claim 29.

661.    Coates discloses the computer system claimed in claim 1 of the '584 Patent. Coates renders claim 1 of the '584 Patent invalid pursuant to 35 U.S.C. § 102.

662.    Kallahalla discloses the computer system claimed in claim 1 of the '584 Patent. Kallahalla renders claim 1 of the '584 Patent invalid pursuant to 35 U.S.C. § 102.

663.    In light of the disclosure in Coates, a POSITA would also consider claim 1 of the '584 Patent obvious pursuant to 35 U.S.C. § 103.

664.    In light of the disclosure in Kallahalla, a POSITA would also consider claim 1 of the '584 Patent obvious pursuant to 35 U.S.C. § 103.

665.    In light of the combined disclosure in Coates and Kallahalla, a POSITA would also consider claim 1 of the '584 Patent obvious pursuant to 35 U.S.C. § 103.

## COUNT XIII
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '967 PATENT

666.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

667.    Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon. Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 18. Intellectual Ventures Management, by and on behalf all of Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license for its operations" of at least the Patents-In-Suit. *See* Exhibit 20. Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See*

213

Exhibit 9; Exhibit 10.  Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18.  Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license.  Intellectual Ventures Management, on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples.  *See* Exhibit 16.

668.    In Plaintiff's October 16, 2025 Letter, Kasowitz LLP, on behalf of Defendants, alleged that First Horizon's use of Hadoop, a third party branded software, infringes at least claim 1 of the '967 Patent (the "'967 Accused System").  *See* Exhibit 10.

669.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '967 Accused System), or import into the United States any product and/or system (including but not limited to the '967 Accused System) in a manner which infringes the '967 Patent.

670.    First Horizon does not make, use, offer for sell, or sell the Hadoop product, and further does not deploy Hadoop's framework in any First Horizon product or system.

671.    Defendants do not accuse any other technology used by First Horizon of infringing any claim of the '967 Patent.

672.    Accordingly, First Horizon does not infringe the '967 Patent.

673.    Accordingly, First Horizon does not directly infringe the '967 Patent, either literally or under the doctrine of equivalents.

674.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '967 Patent or otherwise contribute to infringement of the '967 Patent.

675.    Therefore, an actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '967 Patent.

676.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '967 Accused System) has not infringed and does not infringe the '967 Patent.

<div align="center">

**COUNT XIV**
**DECLARATORY JUDGMENT OF INVALIDITY OF THE '967 PATENT**

</div>

677.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

678.    Claim 1 of the '967 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

679.    Upon information and belief, and subject to further discovery, claim 1 of the '967 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

680.    Upon information and belief, and subject to further discovery, claim 1 of the '967 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

   1. **Claim 1 of the '967 Patent is Invalid Under 35 U.S.C. § 101.**

<div align="center">215</div>

681.     Claim 1 of the '967 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 1 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

682.     In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

683.     If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two.  Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

   **i.     Claim 1 of the '967 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.**

684.     Claim 1 as a whole is directed to an abstract idea. Claim 1 as a whole is directed to: (1) receiving a request for a file to be deleted; (2) generating a content signature for the requested file; (3) identifying a stored content signature that is identical to the content signature of the file to be deleted and locations of devices that contain files with that content signature; (4) transmitting a delete instruction; and (5) generating a deletion report, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

685.     Claim 1 as a whole is directed to steps for a purely *internal* process, relying upon generic computer equipment to delete common files across an organizational network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

686.     Furthermore, the specification confirms that Claim 1 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 1 as a whole, including the use of a conventional computing system to delete common files across an organizational network, were well understood at the time of the invention. *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 32, ll. 57–59. (explaining that the method is merely "implemented using well known computers"). Claim 1 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

687.    Claim 1 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. For example, Claim 1's functional recitation of "receiving a request for a file," "generating a content signature for the requested file," "identifying … a stored content signature that is identical to the content signature of the file to be deleted and locations of information source client computing devices … that contain files whose content signatures are identical to the stored content signature," "transmitting a delete instruction," and "generating a deletion report" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 as a whole is directed to a generic computer system architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

688.    Claim 1 as a whole describes using standard hardware to execute basic data storage and management tasks without any improvement to the functionality of the system components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 is not directed to specific asserted improvements in computer capabilities.

689.    Claim 1 as a whole is directed to basic data storage and management, and specifically to deleting common files across an organizational network, and so is directed to patent-

218

ineligible subject matter under 35 U.S.C. § 101. The Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Erie Indem. Co.*, 850 F.3d at 1327 (organizing and accessing data held abstract); *Content Extraction and Transmission LLC*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

690.    Claim 1 as a whole is directed merely to a conventional computing system configured to delete common files and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

691.    For at least the foregoing reasons, Claim 1 fails *Alice* step one.

**ii.    Claim 1 of the '967 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

692.    Claim 1 merely recites a generic computer system with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 simply uses a generic computer system to perform generic computer functions, including "receiving a request for a file," "generating a content signature for the requested file," "identifying … a stored content signature that is identical to the content signature of the file to be deleted and locations of information source client computing devices … that contain files whose content signatures are identical to the stored content signature," "transmitting a delete instruction," and "generating a deletion report", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

219

693. Claim 1 recites architecture of a generic computing system, including only an "organization," "a server," and "information source client computing devices", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Implementation of an abstract idea by the '967 Patent's routine hardware fails to move the mere deletion of common files across an organizational network beyond an abstract idea.

694. Claim 1 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '967 Patent discloses that the "organization" is merely a "local area network with twenty desktop computers." *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 1, ll. 35–39. The specification does not recite any novel aspects of the "server" and thus it is merely a conventional server. The "information source client computing devices" "can be any type of device capable of storing files[, including] desktop computers, laptop computers, server computers, personal digital assistants, CDROMs, and printer ROMs." U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 5, ll. 48–52. The "files" of claim 1 "include any named or namable collection of data located on an electronic device[, including] data files, application files, system files, and programmable ROM files." U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 6, ll. 16–20. The "content signature" of claim 1 is simply a "unique identifier for the file content," and more specifically a "hash function signature." U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 15, ll. 20–25. In fact, the specification concedes that the claimed methods are merely "implemented using well known computers." U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 32, ll. 57–59. Claim 1 does not improve functionality of these devices; instead, it employs well-understood hardware to simply delete common files across an organizational network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic

220

computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc.*, 827 F.3d at 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

695.    The elements of claim 1, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

696.    For at least the foregoing reasons, Claim 1 fails *Alice* step two.

697.    Accordingly, claim 1 of the '967 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

2.    **Claim 1 of the '967 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.**

698.    Upon information and belief, and subject to further discovery, claim 1 of the '967 Patent is invalid under 35 U.S.C. §§ 102 and 103.

699.    The '967 Patent originated as U.S. Application No. 11/783,271 and was filed on April 6, 2007.

700.    The '967 Patent, and specifically U.S. Application No. 11/783,271, claims to be a continuation-in-part of U.S. Application No. 10/443,006. U.S. Application No. 10/443,006 was filed on May 22, 2003.

701.    The '967 Patent, and specifically U.S. Application No. 11/783,271, claims priority from U.S. Application No. 60/857,188. U.S. Application No. 60/857,188 was filed on November 7, 2006.

702.    Claim 1 of the '967 Patent reads as follows:

1.  A method for deleting files on one or more identified information source client computing devices across an organization, comprising:
    receiving a request for a file located internal to the organization to be deleted;
    generating a content signature for the requested file to be deleted, wherein the content signature uniquely identifies content of the requested file to be deleted;
    identifying, at a server within the organization, a stored content signature that is identical to the content signature of the file to be deleted and locations of information source client computing devices within the organization that contain files whose content signatures are identical to the stored content signature, wherein the locations are identified based on stored metadata associated with the stored content signature, and wherein the stored content signature and the stored metadata are each stored on a server within the organization;
    transmitting a delete instruction to the identified locations of the information source client computing devices within the organization, wherein the delete instruction automatically deletes the matching files residing on each of the information source client computing devices; and
    generating a deletion report comprising the information source client computing devices on which the file to be deleted was found and deletion status of the file to be deleted on the information source client computing devices.

703.    Claim 1 of the '967 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent Publication No. 2006/0095479 (hereinafter "Cochran") and U.S. Patent Publication No. 2003/0037022 (hereinafter "Adya"), alone or in combination.

704.    Cochran was filed on November 4, 2004 and published May 4, 2006. It is entitled "Managing a File in a Network Environment," and lists Robert A. Cochran and John Wilkes as inventors. A true and correct copy of Cochran is attached hereto as Exhibit 45.

705.    Cochran is prior art to the '967 Patent.

222

706. Adya was filed on June 6, 2001 and published February 20, 2003. It is entitled "Locating Potentially Identical Objects Across Multiple Computers," and lists Atul Adya, William J. Bolosky, John R. Douceur, and Marvin M. Theimer as inventors. A true and correct copy of Adya is attached hereto as Exhibit 46.

707. Adya is prior art to the '967 Patent.

708. As shown on the '967 Patent under the heading "References Cited," neither Cochran nor Adya were considered by the Examiner during examination of the application that issued as the '967 Patent.

709. The '967 Patent issued without the United States Patent and Trademark Office considering that Cochran and Adya render the invention claimed in the '967 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

710. Claim 1 claims "[a] method for deleting files on one or more identified information source client computing devices across an organization, comprising" specific limitations that are cited in claim 1. *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

711. Cochran discloses a method for deleting files on one or more identified information source client computing devices across an organization comprising the limitations recited in claim 1 of the '967 Patent. *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.*

712. Adya discloses a method for deleting files on one or more identified information source client computing devices across an organization comprising the limitations recited in claim 1 of the '967 Patent. *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.*

713. Claim 1 of the '967 Patent claims its method for deleting files on one or more identified information source client computing devices across an organization comprises

223

"receiving a request for a file located internal to the organization to be deleted" (hereinafter "the Receiving Limitation"). *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

714.   Cochran discloses the Receiving Limitation. For example, Cochran discloses: "In response to requests from the monitoring service server 126, the monitoring agent 134 performs monitoring and other file management tasks with respect to files stored in the corresponding storage server system 104." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0022]. "The monitoring agent 134 is a software module that is executable on a CPU 136 in each storage server system 104." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0022]. "As an example, the monitoring service server 126 in the central server system 106 can send requests to the monitoring agent 134 to monitor the copy of file X 132 in the storage 130, to update a signature of the copy of file X 132, to retrieve other tracking information of the copy of file X 132, or to perform other management tasks." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0022]. "Based on the notification of the number of duplicate copies of the monitored file, the user can issue requests to delete one or more of the duplicate copies of the monitored file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0034]. "Upon receiving (at 218) the request to delete one or more duplicate copies of the monitored file, the monitoring service server 126 performs the requested deletion by sending requests to the appropriate storage server systems 104." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0034]. "[R]eceiving one or more requests from the client system, in response to the information pertaining to the plural copies of the file, to delete one or more of the copies of the file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at Claim 1. "[R]eceiving a request to delete the master copy of the file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at Claim 3.

715. Adya discloses the Receiving Limitation. For example, Adya discloses: "Additionally, it is not uncommon for files to be deleted from computing device 200." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "For example, the user may decide he or she no longer desires to run any programs that use a particular file (and uninstalls the program from the computing device), or the user no longer desires to keep a document file he or she created, etc." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "In these situations, a component of computing device 200 (e.g., distributed system file interface 210) forwards an indication to one or more other computing devices 200 that the file has been deleted from computing device 200." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "The other computing devices 200 that this indication is communicated to include the same computing devices that file information generation module 220 previously determined the file identifier should be sent to, thereby allowing those devices to remove the file information entry from their respective databases." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060].

716. Claim 1 of the '967 Patent claims its method for deleting files on one or more identified information source client computing devices across an organization comprises "generating a content signature for the requested file to be deleted, wherein the content signature uniquely identifies content of the requested file to be deleted" (hereinafter "the Content Signature Limitation"). *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

717. Cochran discloses the Content Signature Limitation. For example, Cochran discloses: "The central repository 108 includes plural sets of tracking information 112 for respective files stored in storage servers 104 of the network environment." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "In one example, the tracking information 112 includes a signature (e.g., a hash signature) of the file, a size of the file, a name of the file, an

225

identifier of the registered owner of the file, and a location of the file." *See* U.S. Pat. Pub. No.

2006/0095470 to Cochran *et al.* at ¶ [0011]. "A hash signature of a file is created by applying an

input associated with the file (such as the entire content of the file) through a hashing algorithm."

*See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "Various hashing algorithms

may be used, such as the MD5 (Message-Digest) algorithm." *See* U.S. Pat. Pub. No. 2006/0095470

to Cochran *et al.* at ¶ [0011]. "The MD5 algorithm creates a 128-bit message digest from a

predefined data input, where the message digest is unique to the specific data input." *See* U.S. Pat.

Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "As the content of the file changes, the hash

signature of the file can be recomputed to different values." *See* U.S. Pat. Pub. No. 2006/0095470

to Cochran *et al.* at ¶ [0011]. "In other embodiments, instead of using a hash signature, another

type of unique signature based on the content of the file can be used." *See* U.S. Pat. Pub. No.

2006/0095470 to Cochran *et al.* at ¶ [0011]. "Each file system 140 of a storage server system 104

includes one or more i-nodes 142." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0024].

"An i-node is a data structure that contains information about a particular file." U.S. Pat. Pub. No.

2006/0095470 to Cochran *et al.* at ¶ [0024]. "Each file typically is associated with an i-node and

is identified by an i-node number (i-number) in the file system 140." U.S. Pat. Pub. No.

2006/0095470 to Cochran *et al.* at ¶ [0024]. "[I]n accordance with some embodiments of the

invention, an i-node 142 can be maintained in the file system 140 of a storage server system 104

for a file that is not present in the storage server system 104." U.S. Pat. Pub. No. 2006/0095470 to

Cochran *et al.* at ¶ [0025]. "The i-node 142 according to some embodiments of the invention can

contain a locator identifier, such as a uniform resource locator (URL) or other similar locator

identifier, that identifies a location of the file associated with the i-node 142." U.S. Pat. Pub. No.

2006/0095470 to Cochran *et al.* at ¶ [0025]. "The location identifier in the i-node 142 can point,

for example, to the golden copy of the corresponding file in the central repository 108, or to another copy of a file on another storage server system 104." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0025].

718.   Adya discloses the Content Signature Limitation. For example, Adya discloses: "File information generation module 220 generates file information for one or more encrypted files 240." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "The file information for each file is a semi-unique value based on the data in the file itself (the data may be program instructions, program data, etc.) and/or other characteristics of the file." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "The value is a semi-unique value because it is based on the data in the file but is not completely representative of the file." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "For example, the file information may be a hash value that is based on the data in the file, but it is possible for two different files having different data to have the same hash value." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "Different characteristics of the file can also be incorporated into the file information, such as the file size, the file type, the file name, and so forth." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "The file information can be generated in any of a wide variety of manners, so long as each of the computing devices generates its file information in the same manner." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "In one implementation, the file information is a hash value generated based on the file." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at [0049]. "The hash value may be generated using a one-way hashing function (e.g., SHA, MD5, etc.), or any of a variety of other public or proprietary hashing functions." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at [0049]. "The hash value may be based on the entire file, or alternatively only a portion of the file (e.g., the beginning of the file, the end of the file, the middle

227

of the file, and so forth)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at [0049]. "In another implementation, the file information is referred to as a file signature, which is a combination of a hash value based on the file (the hash value represents 64 bits of the file signature) and the file size (which represents another 64 bits of the file signature)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at [0049]. "The file size is used because two files with differing file sizes cannot be identical." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at [0049].

719. Claim 1 of the '967 Patent claims its method for deleting files on one or more identified information source client computing devices across an organization comprises "identifying, at a server within the organization, a stored content signature that is identical to the content signature of the file to be deleted and locations of information source client computing devices within the organization that contain files whose content signatures are identical to the stored content signature, wherein the locations are identified based on stored metadata associated with the stored content signature, and wherein the stored content signature and the stored metadata are each stored on a server within the organization" (hereinafter "the Identifying Limitation"). *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

720. Cochran discloses the Identifying Limitation. For example, Cochran discloses: "The central repository 108 includes plural sets of tracking information 112 for respective files stored in storage servers 104 of the network environment." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "In one example, the tracking information 112 includes a signature (e.g., a hash signature) of the file, a size of the file, a name of the file, an identifier of the registered owner of the file, and a location of the file." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "A hash signature of a file is created by applying an input associated with the file (such as the entire content of the file) through a hashing algorithm." *See* U.S. Pat. Pub. No.

228

2006/0095470 to Cochran *et al.* at ¶ [0011]. "Various hashing algorithms may be used, such as the MD5 (Message-Digest) algorithm." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "The MD5 algorithm creates a 128-bit message digest from a predefined data input, where the message digest is unique to the specific data input." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "As the content of the file changes, the hash signature of the file can be recomputed to different values. In other embodiments, instead of using a hash signature, another type of unique signature based on the content of the file can be used." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "In accordance with some embodiments of the invention, the signature of the file is used to detect duplicate copies of a file, as well as to detect for unauthorized modification of a file by a hacker." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0012]. "The monitoring service server 126 may monitor the unique signatures of monitored files in the network environment to determine how many duplicate copies of each monitored file exist in the network environment." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0020]. "A duplicate copy of a file is one where the signatures of the files match identically." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0020]. "Each file system 140 of a storage server system 104 includes one or more i-nodes 142." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0024]. "An i-node is a data structure that contains information about a particular file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0024]. "Each file typically is associated with an i-node and is identified by an i-node number (i-number) in the file system 140." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0024]. "[I]n accordance with some embodiments of the invention, an i-node 142 can be maintained in the file system 140 of a storage server system 104 for a file that is not present in the storage server system 104." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0025]. "The i-node 142 according to some

229

embodiments of the invention can contain a locator identifier, such as a uniform resource locator (URL) or other similar locator identifier, that identifies a location of the file associated with the i-node 142." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0025]. "The location identifier in the i-node 142 can point, for example, to the golden copy of the corresponding file in the central repository 108, or to another copy of a file on another storage server system 104." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0025].

721.   Adya discloses the Identifying Limitation. For example, Adya discloses: "In these situations, a component of computing device 200 (e.g., distributed system file interface 210) forwards an indication to one or more other computing devices 200 that the file has been deleted from computing device 200." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "The other computing devices 200 that this indication is communicated to include the same computing devices that file information generation module 220 previously determined the file identifier should be sent to, thereby allowing those devices to remove the file information entry from their respective databases." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "The file information generated by a computing device is communicated to one or more computing devices referred to herein as database servers." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "Each database server maintains a database of file information that it receives and compares the received file information to identify any file information for two files that is the same (and thus indicative of potentially identical files)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "The database servers may be dedicated database servers (e.g., storing only file information), or alternatively may be other computing devices 200 in the network, storing both received file information as well as other files 240 in the distributed system portion(s) of their storage devices 208." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "In a database

server, file identification comparison module 242 receives file information and a corresponding file identifier (e.g., filename) from one or more other computing devices 200." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Module 242 manages a database 244 (e.g., stored on device 208) of the file information it receives." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Database 244 maintains a mapping of the file information to the file identifier." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062].

722.    Claim 1 of the '967 Patent claims its method for deleting files on one or more identified information source client computing devices across an organization comprises "transmitting a delete instruction to the identified locations of the information source client computing devices within the organization, wherein the delete instruction automatically deletes the matching files residing on each of the information source client computing devices" (hereinafter "the Transmitting Limitation"). *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

723.    Cochran discloses the Transmitting Limitation. For example, Cochran discloses: "Upon receiving (at 218) the request to delete one or more duplicate copies of the monitored file, the monitoring service server 126 performs the requested deletion by sending requests to the appropriate storage server systems 104." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0034].

724.    Adya discloses the Transmitting Limitation. For example, Adya discloses: "In these situations, a component of computing device 200 (e.g., distributed system file interface 210) forwards an indication to one or more other computing devices 200 that the file has been deleted from computing device 200." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "The other computing devices 200 that this indication is communicated to include the same

computing devices that file information generation module 220 previously determined the file identifier should be sent to, thereby allowing those devices to remove the file information entry from their respective databases." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "The file information generated by a computing device is communicated to one or more computing devices referred to herein as database servers." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "Each database server maintains a database of file information that it receives and compares the received file information to identify any file information for two files that is the same (and thus indicative of potentially identical files)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "The database servers may be dedicated database servers (e.g., storing only file information), or alternatively may be other computing devices 200 in the network, storing both received file information as well as other files 240 in the distributed system portion(s) of their storage devices 208." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "In a database server, file identification comparison module 242 receives file information and a corresponding file identifier (e.g., filename) from one or more other computing devices 200." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Module 242 manages a database 244 (e.g., stored on device 208) of the file information it receives." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Database 244 maintains a mapping of the file information to the file identifier." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062].

725.    Claim 1 of the '967 Patent claims its method for deleting files on one or more identified information source client computing devices across an organization comprises "generating a deletion report comprising the information source client computing devices on which the file to be deleted was found and deletion status of the file to be deleted on the information

source client computing devices" (hereinafter "the Generating Limitation"). *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

726.    Cochran discloses the Generating Limitation. For example, Cochran discloses: "The central repository service (and associated monitoring service) can be subscribed to by a user (or users)." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0015]. "Each subscriber can then register files that the user wishes to track and monitor." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0015]. "Additionally, system operators or other administrators, such as system managers, user-group representatives, owners, and so forth, can register files on behalf of users, or apply default or mandated policies that set the files to be monitored or not monitored." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0015]. "These sets can have rules applied to allow them to be composed." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0015]. "The user interface 116 can display information regarding files to be monitored (referred to as 'monitored files') in the network environment." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0016]. "For example, the user interface 116 can display notifications regarding how many duplicate copies of a monitored file are present in the network environment." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0016]. "Also, the user interface 116 can display alarms associated with monitored files of the network environment." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0017]. "These alarms can indicate that a particular file has been corrupted or modified without authorization, or that multiple copies of the particular file exist, or that a new copy has been created." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0017]. "Through the user interface 116, a user can select which duplicate copies of the file are to be deleted." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0017]. "If alteration or deletion of such a static monitored file is detected, then the

233

monitoring service server 126 may initiate an automatic restoration of the altered or deleted monitored file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0030]. "Alternatively, the monitoring service server 126 can communicate with the monitoring service client 120 in the user terminal 102 to provide a user with the option of restoring the altered or deleted static monitored file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0030]. "As yet another alternative, the monitoring service server 126 may simply notify the user, or just log the event for later analysis." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0030].

727.   Adya discloses the Generating Limitation. For example, Adya discloses: "For example, in the distributed file system environment illustrated in FIG. 1, a computing device may create or update a file for storage in distributed file system 150, and then communicate the file to another device(s) in distributed file system 150 acting as a directory server." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0047]. "The directory server then stores the file on an appropriate computing device (based on the rules followed by distributed file system 150) and maintains a record of where the file is stored." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0047]. "In this example, the computing device creating or updating the file generates the file information (via its file information generation module 220), while the computing device acting as the directory server (and thus which knows what other computing device the file is stored at) determines the location where the generated file information is to be communicated (via its forwarding location determination module 222)." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0047]. "In these situations, a component of computing device 200 (e.g., distributed system file interface 210) forwards an indication to one or more other computing devices 200 that the file has been deleted from computing device 200." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "Module 242 manages a database 244 (e.g., stored on device 208) of the file

234

information it receives." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Database 244 maintains a mapping of the file information to the file identifier." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Database 244 may also maintain an indication of the computing device on which the file corresponding to the received file information is stored (or alternatively this may be inherent in the file identifier, which may include a filename as well as directory path to locate the file)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Alternatively, the file identifier may not be stored (so long as the computer at which the file corresponding to the file information is stored is maintained in the database or otherwise known, the file information can be returned to that computer as an identification of the file)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062].

728.    Cochran discloses the computer system claimed in claim 1 of the '967 Patent. Cochran renders claim 1 of the '967 Patent invalid pursuant to 35 U.S.C. § 102.

729.    Adya discloses the computer system claimed in claim 1 of the '967 Patent. Adya renders claim 1 of the '967 Patent invalid pursuant to 35 U.S.C. § 102.

730.    In light of the disclosure in Cochran, a POSITA would also consider claim 1 of the '967 Patent obvious pursuant to 35 U.S.C. § 103.

731.    In light of the disclosure in Adya, a POSITA would also consider claim 1 of the '967 Patent obvious pursuant to 35 U.S.C. § 103.

732.    In light of the combined disclosure in Cochran and Adya, a POSITA would also consider claim 1 of the '967 Patent obvious pursuant to 35 U.S.C. § 103.

## COUNT XV
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '894 PATENT

733.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

235

734. Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon. Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 18. Intellectual Ventures Management, by and on behalf all of Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license for its operations" of at least the Patents-In-Suit. *See* Exhibit 20. Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See* Exhibit 9; Exhibit 10. Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license. Intellectual Ventures Management, on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

735. In Plaintiff's October 16, 2025 Letter, Kasowitz LLP, on behalf of Defendants, alleged that First Horizon's use of Kafka, a third party branded software, infringes at least claim 15 of the '894 Patent (the "'894 Accused System"). *See* Exhibit 10.

236

736.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '894 Accused System) or import into the United States any product and/or system (including but not limited to the '894 Accused System) in a manner which infringes the '894 Patent.

737.    By way of example, claim 15 of the '894 Patent, which depends from independent claim 8, requires, *inter alia*, that the claimed method determine "an organizational structure of the plurality of resource nodes based on the received node names." *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 15.

738.    The '894 Patent provides that "[t]hrough structured naming, resource consumers determine the overall structure of a disaggregated resource…." U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 14, ll. 62–64.

739.    First Horizon does not infringe the '894 Patent at least because the '894 Accused System does not determine an organizational structure of a plurality of resource nodes based on re.

740.    Accordingly, First Horizon does not directly infringe the '894 Patent, either literally or under the doctrine of equivalents.

741.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '894 Patent or otherwise contribute to infringement of the '894 Patent.

742.    An actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '894 Patent.

237

743.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '894 Accused System) has not infringed and does not infringe the '894 Patent.

<div align="center">

**COUNT XVI**
**DECLARATORY JUDGMENT OF INVALIDITY OF THE '894 PATENT**

</div>

744.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

745.    Claim 15 of the '894 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. § 1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

746.    Upon information and belief, and subject to further discovery, claim 15 of the '894 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

747.    Upon information and belief, and subject to further discovery, claim 15 of the '894 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

1.    **Claim 15 of the '894 Patent is Invalid Under 35 U.S.C. § 101.**

748.    Claim 15 of the '894 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 15 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

749.    In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the

<div align="center">238</div>

scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

750.    If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two.  Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

i.      **Claim 15 of the '894 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.**

751.    Claim 15 as a whole is directed to an abstract idea. Claim 15 as a whole is directed to: (1) receiving node names corresponding to a plurality of resource nodes; (2) determining an organizational structure of the plurality of resource nodes; (3) generating a resource map based on the organizational structure; and (4) messaging resource nodes based on the resource map, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

752.   Claim 15 as a whole is directed to steps for a purely *internal* process, relying upon generic computer equipment to route data requests based on a determined organizational structure, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

753.   Furthermore, the specification confirms that Claim 15 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 15 as a whole, including the use of a conventional computing system to route data requests based on a determined organizational structure, were well understood at the time of the invention. *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 8, ll. 46–47 (explaining that the resource nodes are merely conventional computing devices, such as "modules comprising a combination of hardware, software, or firmware" that include a "processing unit 210 and memory 220); col. 8, ll. 11–26 (explaining that the resource consumers are simply "electrical device[s] running a driver on a processing unit," for example "computers, operating systems, file systems, [and] management software"). Claim 15 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

754.   Claim 15 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 15 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-

240

ineligible subject matter under 35 U.S.C. § 101. For example, Claim 15's functional recitation of "receiving … node names corresponding to each of a plurality of resource nodes," "determining … an organizational structure of the plurality of resource nodes based on the received node names," "generating … a resource map based at least in part on the organizational structure," and "messaging … one or more resource nodes … based at least in part on the resource map" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 15 as a whole is directed to a generic computer system architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

755.    Claim 15 as a whole describes using standard hardware to execute basic data storage and retrieval tasks without any improvement to the functionality of the system components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 15 is not directed to specific asserted improvements in computer capabilities.

756.    Claim 15 as a whole is directed to the storage and retrieval of data, and specifically to routing data request based on a determined organizational structure, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc.*, 778 F. App'x at 892 (quoting *ChargePoint, Inc.*, 920 F.3d at 767); *see also buySAFE, Inc.*, 765 F.3d at 1355 ("That a

241

computer receives and sends the information over a network … is not even arguably inventive."). Further, the Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Erie Indem. Co.*, 850 F.3d at 1327 (organizing and accessing data held abstract); *Content Extraction and Transmission LLC*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

757.    Claim 15 as a whole is directed merely to a conventional computing system configured to route data requests based on a determined organizational structure and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

758.    For at least the foregoing reasons, Claim 15 fails *Alice* step one.

### ii.    Claim 15 of the '894 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101

759.    Claim 15 merely recites a generic computer system with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 15 simply uses a generic computer system to perform generic computer functions, including "receiving … node names corresponding to each of a plurality of resource nodes," "determining … an organizational structure of the plurality of resource nodes based on the received node names," "generating … a resource map based at least in part on the organizational structure," and "messaging … one or more resource nodes … based at least in part on the resource map", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no

242

more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

760.    Claim 15 recites architecture of a generic computing system, including only "a resource consumer device" and "a plurality of resource nodes", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Implementation of an abstract idea by the '894 Patent's routine hardware fails to move the mere routing of data requests based on a determined organizational structure beyond an abstract idea.

761.    Claim 15 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '894 Patent refers to the computing devices as "resource nodes," but they are merely conventional computing devices, such as "modules comprising a combination of hardware, software, or firmware," that include a "processing unit 210 and memory 220." *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 8, ll. 46–47. Each computing device is assigned a "resource node name" which merely provides "one or more pieces of information to remote consumers including identification or group membership information, logical position information within a disaggregated resource, partial role information, or other information that a resource consumer might need to access a disaggregated resource. U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 13, ll. 18–23. The resource nodes may "combine together to form groups of different types" wherein "[e]ach type of group represents a desired functionality, capability, or service." U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 12, ll. 9–11. The "group type" of claim 15 "provides resource consumers partial information regarding the role a group plays in the disaggregated resource." U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 12, ll. 11–13. The "resource map" of claim 15 merely provides information related to the physical address of the "resource nodes." U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 18, ll. 1–10.

243

Finally, the "resource consumers" that interact with the "resource nodes" are simply "electrical device[s] running a driver on a processing unit," for example "computers, operating systems, file systems, [and] management software…." U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 8, ll. 11–26. Claim 15 does not improve functionality of these devices; instead, it employs well-understood hardware to simply route data requests, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

762.    The elements of claim 15, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

763.    For at least the foregoing reasons, Claim 15 fails *Alice* step two.

764.    Accordingly, claim 15 of the '894 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

**2.    Claim 15 of the '894 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.**

765. Upon information and belief, and subject to further discovery, claim 15 of the '894 Patent is invalid under 35 U.S.C. §§ 102 and 103.

766. The '894 Patent originated as U.S. Application No. 16/422,873 and was filed on May 24, 2019.

767. The '894 Patent claims to be a reissue of U.S. 8,819,092 bearing U.S. Application No. 11/205,895. U.S. Application No. 11/205,895 was filed on August 16, 2005.

768. The '894 Patent, and specifically U.S. Application No. 16/422,873, claims to be a continuation of U.S. RE47,411 bearing U.S. Application No. 15/247,779. U.S. Application No. 15/247,779 was filed on August 25, 2016.

769. U.S. RE47,411 also claims to be a reissue of U.S. 8,819,092 bearing U.S. Application No. 11/205,895.

770. Claim 15 of the '894 Patent is a dependent claim that depends from independent claim 8.

771. Claim 8 of the '894 Patent reads as follows:

8. A method, comprising:
   receiving, at a resource consumer device, node names corresponding to each of a plurality of resource nodes;
   determining, using the resource consumer device, an organizational structure of the plurality of resource nodes based on the received node names, the organizational structure being a parallel structure that enables access to a data set through at least two of the plurality of resource nodes or a serial structure that enables access to a first data block of the data set through a first resource node and to a second data block consecutive to the first data block of the data set through a second resource node; and
   generating, using the resource consumer device, a resource map based at least in part on the organizational structure; and
   messaging, by the resource consumer device, one or more resource nodes of the plurality of resource nodes about the data set based at least in part on the resource map.

772. Claim 15 of the '894 Patent reads as follows:

245

15. The method of claim 8, wherein the received node names are configured to indicate a group type associated with the plurality of resource nodes.

773. Claim 15 of the '894 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent 8,886,705 (hereinafter "Tewari"), U.S. Patent No. 7,644,136 (hereinafter "Rose"), and U.S. Patent No. 5,701,462 (hereinafter "Whitney"), alone or in combination.

774. Tewari is entitled "Goal-Oriented Storage Management for a Distributed Data Storage Network," and lists Ruchir Tewari, Xiaohui Dawn Chen, Gregory L. Slaughter, and Thomas E. Saulpaugh as inventors. A true and correct copy of Tewari is attached hereto as Exhibit 47.

775. Tewari is prior art to the '894 Patent.

776. Rose is entitled "Virtual File System," and lists Steven W. Rose, Neil A. Rhoads, and Corinna G. Abdul as inventors. A true and correct copy of Rose is attached hereto as Exhibit 48.

777. Rose is prior art to the '894 Patent.

778. Whitney is entitled "Distributed File System Providing a Unified Name Space with Efficient Name Resolution," and lists Alan Whitney, Yuval Neeman, Sudheer Koneru, Milan Shah, Peter J. Cook, and Arnold S. Miller as inventors. A true and correct copy of Whitney is attached hereto as Exhibit 49.

779. Whitney is prior art to the '894 Patent.

780. As shown on the '894 Patent under the heading "References Cited," neither Tewari, Rose, nor Whitney were considered by the Examiner during examination of the application that issued as the '894 Patent.

246

781.    The '894 Patent issued without the United States Patent and Trademark Office considering that Tewari, Rose, and Whitney render the invention claimed in the '894 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

782.    Claim 15 claims "[t]he method of claim 8" comprising specific limitations that are cited in claim 8 and claim 15. *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 15.

783.    Tewari discloses a method comprising the limitations recited in claim 8 and claim 15 of the '894 Patent. *See* U.S. Pat. No. 8,886,705 to Tewari *et al.*

784.    Rose discloses a method comprising the limitations recited in claim 8 and claim 15 of the '894 Patent. *See* U.S. Pat. No. 7,644,136 to Rose *et al.*

785.    Whitney discloses a method comprising the limitations recited in claim 8 and claim 15 of the '894 Patent. *See* U.S. Pat. No. 5,701,462 to Whitney *et al.*

786.    Claim 8 of the '894 Patent claims its method comprises "receiving, at a resource consumer device, node names corresponding to each of a plurality of resource nodes" (hereinafter "the Receiving Limitation"), and Claim 15, which depends from Claim 8, incorporates this limitation from Claim 8. *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 8, Claim 15.

787.    Tewari discloses the Receiving Limitation. For example, Tewari discloses: "The distributed data storage network 100 includes computing nodes (e.g., computer systems) 110A-110E … [which] may be coupled through a network 102." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 23–32. "Most communication protocols require some addressing scheme to name a destination endpoint (such as a node) as the target of a message." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 5, ll. 61–63. "[M]essage addressing in the distributed data storage network 100 may be based on the concept of a 'role.'" U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 5, ll. 65–67. "As used herein, a role may refer to a location-independent address for a computer network."

247

U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 5, l. 61 – col. 6, l. 1. "Each tree may have one or more nodes that may be addressed by a 'role.'" U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 1–2. "Each message may be addressed to a particular role on a particular tree." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 2–3. "[E]ach role may be identified using a string, e.g., the name of the role." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 8–9. "The message address may include information identifying a tree and a role of the tree." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 10–12. "The node may also maintain routing information that allows messages to be routed from node to remote roles, i.e., roles instances associated with other nodes." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 45–48. Each node may receive "information indicative of states of other nodes [comprising] receiving information regarding the plurality of groups." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 8, ll. 16–18. "In one embodiment, the information may also identify which nodes are members of each group." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 8, ll. 18–21. "Resource Roles may reflect the state of availability or utilization of node resources such as storage, computing power, network bandwidth, etc." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 8, ll. 42–44. "Thus, membership in a resource role may be based on any of various attributes of a node, such as storage or operating characteristics." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 8, ll. 44–47.

788.     Rose discloses the Receiving Limitation. For example, Rose discloses: "The [Interactive Content Engine] (ICE) 100 includes an appropriate multiple-port … switch 101 … coupled to a number of Storage Processor Nodes (SPNs) 103." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 3, ll. 22–25. "Each title map or 'directory entry' contains a list indicating where the chunks of its title are stored, and more specifically, where each subchunk of each chunk is located." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 29–31. "[E]ach item in the list

248

representing a subchunk contains an SPNID identifying a specific user SPN 103, a disk drive number (DD#) identifying a specific disk drive 111 of the identified user SPN 103, and a subchunk pointer." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 32–36. "When a [user process] executing on an SPN requests a directory entry, the entire entry is sent and stored locally for the corresponding user." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 40–42. "In the [virtual file system] 209, each SPN 103 is assigned a logical ID that ... corresponds to the SPN's physical location." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 10, l. 66 – col. 11, l. 1.

789.    Whitney discloses the Receiving Limitation. For example, Whitney discloses: "A distributed file system uses objects to model the behavior of components of the distributed file system." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at Abstract. "Each object has an associated logical path name and physical address." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at Abstract. "An aggregation of all the logical path names comprises a distributed name space which can be logically partitioned into domains." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at Abstract. "Each domain includes a domain folder object which maps logical path names of objects in the domain containing the domain folder object, into addresses in the distributed system where the objects are stored." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at Abstract. "The addresses of the objects are used to access the objects in order to retrieve information from the distributed system." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at Abstract. "A preferred embodiment of the present invention provides a distributed file system." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 3, ll. 36–37. "The distributed file system of the preferred embodiment of the present invention is implemented by components distributed across a distributed system." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 3, ll. 37–40. "Initially a request to access an object is received (step 402)." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 63–64. "For purposes of

249

illustration, suppose that the request originates from workstation 500 shown in FIG. 5." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 63–66. "The workstation 500 includes an input/output (1/0) unit 502, a central processing unit (CPU) 504, and a memory 506." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, l. 66 – col. 7, l. 1. "In addition, the workstation 500 is connected to a keyboard 508 and a mouse 510." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 1–2. "The workstation memory 506 holds a copy of a workstation operating system 512, and at least one application program 514." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 2–5. "The operating system 512 includes the access object routine 516; and a local file system driver 526 that is responsible for managing the local file system." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 5–7. "The memory 500 also holds four other routines 518, 522, 524 and 526 which will be described in more detail below." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 7–9. "The request to access the object is forwarded to the CPU 504 of workstation 500." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 10–11. "The CPU 504 executes the access object routine 516 and begins processing to fulfill the request." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 11–13. "The request may originate from the application program 514 or from the operating system 512." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 13–14. "For example, suppose that a query request is entered on keyboard 508 or on mouse 510." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 14–16. "The query request to query an object is received by the input/output unit 302, which transfers the query request to the CPU 504." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 16–18.

790.    Claim 8 of the '894 Patent claims its method comprises "determining, using the resource consumer device, an organizational structure of the plurality of resource nodes based on the received node names, the organizational structure being a parallel structure that enables access

250

to a data set through at least two of the plurality of resource nodes or a serial structure that enables access to a first data block of the data set through a first resource node and to a second data block consecutive to the first data block of the data set through a second resource node" (hereinafter "the Determining Limitation"). *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 8.  Claim 15, which depends from Claim 8, incorporates this limitation from Claim 8.

791.    Tewari discloses the Determining Limitation. For example, Tewari discloses: "[E]ach role may be identified using a string, e.g., the name of the role." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 8–9. "The message address may include information identifying a tree and a role of the tree." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 10–12. "[T]he network software 132 may also include software operable to create and manage topology and routing information for the data storage network 100 and software operable to utilize the topology and routing information to route messages to other nodes 110." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 4, ll. 45–49. "Each node may maintain a list of role instances which are associated with that node for each tree." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 44–45. "The node may also maintain routing information that allows messages to be routed from the node to remote nodes, i.e., role instances associated with other nodes." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 45–48. "The resources may be identified and accessed using the respective resource node names." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 9, ll. 40–41.

792.    Rose discloses the Determining Limitation. For example, Rose discloses: "Each title map or 'directory entry' contains a list indicating where the chunks of its title are stored, and more specifically, where each subchunk of each chunk is located." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 29–31. "[E]ach item in the list representing a subchunk contains an SPNID identifying a specific user SPN 103, a disk drive number (DD#) identifying a specific disk drive

251

111 of the identified user SPN 103, and a subchunk pointer." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 32–36. "When a [user process] executing on an SPN requests a directory entry, the entire entry is sent and stored locally for the corresponding user." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 40–42. "[T]he disk drives 111 on the user SPNs 103 primarily store the subchunks of the titles." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 8, ll. 40–42. "The VFS 209 includes identifiers for the location of each subchunk via SPNID, DD#, and the LBA." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 8, ll. 42–43. "In the [virtual file system] 209, each SPN 103 is assigned a logical ID that ... corresponds to the SPN's physical location." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 10, l. 66 – col. 11, l. 1.

793.    Whitney discloses the Determining Limitation. For example, Whitney discloses: "A distributed file system (DFS) manager 208 is provided in the domain to manage knowledge about the distributed file system and the volumes (described in more detail below) contained within the domain." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 56–60. "The logical path name identifies an object, volume or other component within the distributed name space 300." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 5–6. "The distributed system of the preferred embodiment of the present invention provides a vehicle for resolving the logical path name to a physical address." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 6–9. "The functional components within each domain controller 200 include directory service (DS) entries 202, which provide directory service information." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 43–46. "Each domain controller also includes a directory service (DS) server 204." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 46–47. "The DS server 204 is responsible for mediating access to the DS entries 202." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 47–48. "The names of objects in the distributed system are organized into a distributed name space." U.S. Pat.

252

No. 5,701,462 to Whitney *et al.* at col. 5, ll. 29–30. "FIG. 3 shows a simplified example of such a distributed name space 300 for a distributed system." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 5, ll. 30–32. "The distributed file system makes the distributed name space visible." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 5, ll. 32–33. "The distributed name space 300 is a single logical tree structure that graphically represents the named objects of the distributed system." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 5, ll. 33–35. "The single tree structure provides a place for centralizing knowledge about the system and facilitates access to the entire name space." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 5, ll. 35–38.

794. Claim 8 of the '894 Patent claims its method comprises "generating, using the resource consumer device, a resource map based at least in part on the organizational structure" (hereinafter "the Generating Limitation"). *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 8. Claim 15, which depends from Claim 8, incorporates this limitation from Claim 8.

795. Tewari discloses the Generating Limitation. For example, Tewari discloses: "[T]he network software 132 may also include software operable to create and manage topology and routing information for the data storage network 100 and software operable to utilize the topology and routing information to route messages to other nodes 110." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 4, ll. 45–49. "Each node may maintain a list of role instances which are associated with that node for each tree." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 44–45. "The node may also maintain routing information that allows messages to be routed from the node to remote nodes, i.e., role instances associated with other nodes." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 45–48.

796. Rose discloses the Generating Limitation. For example, Rose discloses: "The ICE 100 maintains a database of all titles available to a user." *See* U.S. Pat. No. 7,644,136 to Rose *et*

*al.* at col. 5, ll. 45–46. "The list includes the local optical disk library, real time network programming, and titles at remote locations where license and transport arrangements have been made." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 46–48. "The database contains all the metadata for each title..." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 48–49. "The VFS 209 returns a directory entry (DE) to the UP 207, which locally stores the DE." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 6, ll. 55–57. "The DE 211 includes a list locating each subchunk of the title..., each entry including the SPNID identifying a specific user SPN 103, the disk drive number (DD#) identifying a specific disk drive 111 of the identified SPN 103, and an address or LBA providing the specific location of the subchunk on the identified disk drive." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 6, ll. 57–63. "The VFS 209 on the MGMT SPN 205 manages the list of titles and their locations in the ICE 100." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 8, ll. 33–34.

797.    Whitney discloses the Generating Limitation. For example, Whitney discloses: "The distributed file system performs the distributed name resolution required by step 406." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 7, ll. 31–32. "FIG. 6 is a flow chart of a retrieve storage location routine 518 which performs the mapping of the logical path name of an object to a physical address for the object in the distributed system 100 (i.e., step 406 of FIG. 4)." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 7, ll. 32–36. "Copies of the retrieve storage location routine 518 are preferably stored in all of the workstations 101 (FIG. 1) and domain controllers 106 of the distributed system 100." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 7, ll. 36–39.

798.    Claim 8 of the '894 Patent claims its method comprises "messaging, by the resource consumer device, one or more resource nodes of the plurality of resource nodes about the data set based at least in part on the resource map" (hereinafter "the Messaging Limitation"). *See* U.S. Pat.

254

No. RE48,894 to Ludwig *et al.* at Claim 8.  Claim 15, which depends from Claim 8, incorporates this limitation from Claim 8.

799.    Tewari discloses the Messaging Limitation. For example, Tewari discloses: "In one embodiment, the distributed data storage network 100 may be implemented as a peer-to-peer network." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 53–54. "The peer-to-peer network may comprise a decentralized network of nodes 110 where each node has similar capabilities and/or responsibilities." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 54–57. "Each node 110 may communicate directly with at least a subset of the other nodes 110." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 57–58. "Messages may be propagated through the distributed data storage network 100 in a decentralized manner." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 58–60. "For example, in one embodiment each node 110 in the network 100 may effectively act as a message router." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 60–62.

800.    Rose discloses the Messaging Limitation. For example, Rose discloses: "When a user requests a title, a full set of directory information (ID's/addresses) is made available to the UP executing on the user SPN 103 that accepted the user's request." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 8, ll. 46–49. "From there, the task is to transfer subchunks off of disk drives to memory (buffers), moving them via the switch 101 to the requesting user SPN 103, which assembles a full chunk in a buffer, delivers it to the user, and repeats until done." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 8, ll. 49–52.

801.    Whitney discloses the Messaging Limitation. For example, Whitney discloses: "If all the logical path names of the distributed name space 300 for the distributed system 100 were stored in the workstation prefix table 520, then the mapping of the logical path name for the object

255

would only entail a simple lookup of the logical path name and a retrieval of the corresponding address." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 24–29. "However, as the distributed system 100 expands into a system with thousands or even tens of thousands of hardware and software components modeled as corresponding named objects, the distributed name space 300 expands correspondingly." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 29–33. "Management of a single prefix table for such an extensive distributed system becomes impractical due to the sheer size of such a prefix table." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 33–35. "In step 606, the retrieve storage location routine 518 searches the workstation prefix table 520 for the longest logical path name which is a prefix of the logical path name from the request." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 36–39. "In other words, the workstation 500 first wants to discover whether it already possesses the requisite knowledge to complete name resolution for the logical name." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 39–42. "The notion of a prefix for a logical path name is perhaps best explained by example." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 42–43. "For example, '\a\b' is a prefix of logical path name '\a\b\c'." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 43–44. "The longest matching prefix found in step 606 may be equivalent to the entire logical path name or may match only a leading portion of the logical path name." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 44–47. "In step 608, the retrieve storage location routine 520 determines if there was a match between the logical path name from the request and a logical path name in the workstation prefix table 520 (i.e., was there a prefix that matched a leading portion of the logical name)." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 47–51. "If there was a match, it is determined whether the matched entry in the workstation prefix table 520 has its local volume flag set in column 812 (step 610)." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll.

51–54. "In other words, it is determined whether the object having the logical path name is within a local volume for the workstation." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 54–56. "If the local volume flag is set, the local address is retrieved from column 810 of the prefix table and the logical path name from the request is translated by substituting the retrieved local address for the matched portion of the logical path name (step 612)." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 56–60. "Control is then returned to the access object routine 516 (see FIG. 4)." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 60–61.

802.    Claim 15 of the '894 Patent claims the method of claim 8 "wherein the received node names are configured to indicate a group type associated with the plurality of resource nodes" (hereinafter "the Node Name Limitation"). *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 15.

803.    Tewari discloses the Node Name Limitation. For example, Tewari discloses: "[E]ach role may be identified using a string, e.g., the name of the role." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 8–9. "The message address may include information identifying a tree and a role of the tree." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 9–12.

804.    Rose discloses the Node Name Limitation. For example, Rose discloses: "Accesses to subchunks on each disk is managed in groups. Each group is sorted in physical order according to 'elevator seek' operation…." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 7, ll. 47–50. "[E]ach chunk of title content is stored on a different group, and content is spread across all groups in round-robin fashion." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 11, ll. 13–15. "[E]ach directory entry (DE) of the VFS 209 consists of various metadata about the title, and an array of chunk locators." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 12, ll. 4–6. "The chunk locator data

257

structure consists of 8 bytes: two bytes for identifying the group, two bytes for identifying the disk, and four bytes for identifying the disk allocation block...." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 12, ll. 6–9.

805.    Whitney discloses the Node Name Limitation. For example, Whitney discloses: "The distributed file system partitions the distributed system into administrative domains (which will be described in more detail below) which may each implement separate administrative." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 3, ll. 46–50. "The components included in the distributed system 100 are logically partitioned into domains 108A, 108B and 108C, wherein each domain includes a subset of the hardware and software components of the distributed system 100." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 10–14. "Each domain may include one or more networks running network operating systems." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 14–15. "A domain ... is a self-contained and self-sufficient unit for purposes of administration and security." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 15–19. "'Logical roots' are programming invariants that refer to a point in the distributed name space 300." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 34–35. "Logical roots are used to gain access to files and objects through the distributed name space 300." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 35–37. "Logical roots are context-sensitive in that a same logical root may resolve to different addresses on different machines." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 37–39. "Logical roots typically identify the root of a domain, the root of a machine's name space, or the root of all domains." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 39–41. "Logical roots are shortcuts for directly accessing an object in the tree that forms the distributed name space 300 without having to traverse the direct lineal ancestor objects." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 41–44.

806.    Tewari discloses the method claimed in claim 15 of the '894 Patent. Tewari renders claim 15 of the '894 Patent invalid pursuant to 35 U.S.C. § 102.

807.    Rose discloses the method claimed in claim 15 of the '894 Patent. Rose renders claim 15 of the '894 Patent invalid pursuant to 35 U.S.C. § 102.

808.    Whitney discloses the method claimed in claim 15 of the '894 Patent. Whitney renders claim 15 of the '894 Patent invalid pursuant to 35 U.S.C. § 102.

809.    In light of the disclosure in Tewari, a POSITA would also consider claim 15 of the '894 Patent obvious pursuant to 35 U.S.C. § 103.

810.    In light of the disclosure in Rose, a POSITA would also consider claim 15 of the '894 Patent obvious pursuant to 35 U.S.C. § 103.

811.    In light of the disclosure in Whitney, a POSITA would also consider claim 15 of the '894 Patent obvious pursuant to 35 U.S.C. § 103.

812.    In light of the disclosures in Tewari, Rose, and/or Whitney, in various combinations, a POSITA would also consider claim 15 of the '894 Patent obvious pursuant to 35 U.S.C. § 103.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff requests that this Court grant the following relief:

1.    A declaratory judgment that First Horizon has not infringed the '785 Patent;

2.    A declaratory judgment that claim 30 of the '785 Patent is invalid;

3.    A declaratory judgment that First Horizon has not infringed the '844 Patent;

4.    A declaratory judgment that claim 7 of the '844 Patent is invalid;

5.    A declaratory judgment that First Horizon has not infringed the '722 Patent;

6.    A declaratory judgment that claim 14 of the '722 Patent is invalid;

7.    A declaratory judgment that First Horizon has not infringed the '391 Patent;

259

8.      A declaratory judgment that claim 18 of the '391 Patent is invalid;

9.      A declaratory judgment that First Horizon has not infringed the '862 Patent;

10.     A declaratory judgment that claim 1 of the '862 Patent is invalid;

11.     A declaratory judgment that First Horizon has not infringed the '584 Patent;

12.     A declaratory judgment that claim 1 of the '584 Patent is invalid;

13.     A declaratory judgment that First Horizon has not infringed the '967 Patent;

14.     A declaratory judgment that claim 1 of the '697 Patent is invalid;

15.     A declaratory judgment that First Horizon has not infringed the '894 Patent;

16.     A declaratory judgment that claim 15 of the '894 Patent is invalid;

17.     A declaration that Intellectual Ventures Management, LLC, is the agent and representative of Intellectual Ventures I LLC, Intellectual Ventures II LLC, Callahan Cellular L.L.C., OL Security Limited Liability Company, Invention Investment Fund I, L.P., and Invention Investment Fund II, LLC, and has acted in that capacity regarding the Patents-in-Suit;

18.     A declaration that this case is exceptional within the meaning of 35 U.S.C. § 285, thereby entitling First Horizon to recovery of its costs including reasonable attorneys' fees under 35 U.S.C. § 285 and all other applicable statutes, rules, and common law, including this Court's inherent authority;

19.     Declaring that judgment be entered in favor of First Horizon, and against Defendants on First Horizon's claims;

20.     An order enjoining Defendants and those in privity with Defendants from asserting the '785, '844, '722, '391, '862, '584, '967, and '894 Patents against First Horizon and First Horizon's representatives, agents, affiliates, subsidiaries, vendors and customers; and

260

21.     Such other equitable and/or legal relief as this Court may deem proper and just under the circumstances.

## VII. DEMAND FOR JURY TRIAL

In accordance with Local Rule 7.1(c), First Horizon hereby demands a trial by jury of no less than twelve (12) members.

Dated:  January __, 2026

Respectfully submitted,

Adam S. Baldridge (BPR No. 23488)
Lea Speed (BPR No. 19410)
abaldridge@bakerdonelson.com
lspeed@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Tele: (901) 577-2102 / Fax:  (901) 577-2303

Edward D. Lanquist, Jr. (TN Bar No. 13303)
Dominic A. Rota (TN Bar No. 37622)
elanquist@bakerdonelson.com
drota@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Tele: (615) 726-5581 / Fax:  (615) 726-0464

*Attorneys for First Horizon Bank*

261

# EXHIBIT 1

US007949785B2

# (12) United States Patent
## Alkhatib et al.

(10) Patent No.: **US 7,949,785 B2**
(45) **Date of Patent:** **May 24, 2011**

(54) **SECURE VIRTUAL COMMUNITY NETWORK SYSTEM**

(75) Inventors: **Hasan S. Alkhatib**, Saratoga, CA (US); **Fouad A. Tobagi**, Los Altos, CA (US); **Farid F. Elwailly**, San Jose, CA (US)

(73) Assignee: **Inpro Network Facility, LLC,** Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 685 days.

(21) Appl. No.: **10/403,818**

(22) Filed: **Mar. 31, 2003**

(65) **Prior Publication Data**

US 2004/0249911 A1    Dec. 9, 2004

(51) **Int. Cl.**
*G06F 15/16* (2006.01)

(52) **U.S. Cl.** .......................................... **709/245**; 726/15

(58) **Field of Classification Search** .................. 709/245; 726/15
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,159,592 A | 10/1992 | Perkins |
| 5,361,256 A | 11/1994 | Doeringer |
| 5,563,878 A | 10/1996 | Blakeley |
| 5,623,605 A | 4/1997 | Keshav |
| 5,701,427 A | 12/1997 | Lathrop |
| 5,717,686 A | 2/1998 | Schiavoni |
| 5,717,687 A | 2/1998 | Minot |
| 5,734,651 A | 3/1998 | Blakeley |
| 5,751,961 A | 5/1998 | Smyk |
| 5,754,938 A | * | 5/1998 | Herz et al. .................... 725/116 |
| 5,764,906 A | 6/1998 | Edelstein |
| 5,777,989 A | 7/1998 | McGarvey |
| 5,781,550 A | 7/1998 | Templin |
| 5,790,548 A | 8/1998 | Sistanizadeh |
| 5,793,763 A | 8/1998 | Mayes |
| 5,805,818 A | 9/1998 | Perlman |
| 5,805,820 A | 9/1998 | Bellovin |
| 5,815,664 A | 9/1998 | Asano |
| 5,826,014 A | 10/1998 | Coley |
| 5,856,974 A | 1/1999 | Gervais |
| 5,864,666 A | 1/1999 | Shrader |
| 5,867,667 A | 2/1999 | Butman |
| 5,884,038 A | 3/1999 | Kapoor |

(Continued)

### FOREIGN PATENT DOCUMENTS

EP    0 817 444 A2    1/1998

### OTHER PUBLICATIONS

Venters, Demystifying Protocols: A comparison of Protocols Suitable for IP Telephony, Sonus Networks, pp. 1-11, 2000.

(Continued)

*Primary Examiner* — Douglas B Blair
(74) *Attorney, Agent, or Firm* — McAndrews, Held & Malloy, Ltd.

(57) **ABSTRACT**

A private virtual dynamic network is provided for computing devices coupled to public networks or private networks. This enables computing devices anywhere in the world to join into private enterprise intranets and communicate with each other. In one embodiment, the present invention provides a separate private virtual address realm, seen to each user as a private network, while seamlessly crossing public and private network boundaries. One implementation of the present invention uses an agent to enable an entity to participate in the network without requiring the member to add new hardware or software.

**90 Claims, 21 Drawing Sheets**



**US 7,949,785 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,884,246 A | 3/1999 | Boucher | |
| 5,889,953 A | 3/1999 | Thebaut | |
| 5,897,662 A | 4/1999 | Corrigan | |
| 5,898,830 A | 4/1999 | Wesinger, Jr. | |
| 5,913,210 A | 6/1999 | Call | |
| 5,937,162 A | 8/1999 | Funk | |
| 5,937,163 A | 8/1999 | Lee | |
| 6,003,084 A | 12/1999 | Green | |
| 6,006,272 A | 12/1999 | Aravamudan | |
| 6,032,196 A | 2/2000 | Monier | |
| 6,047,325 A | 4/2000 | Jain | |
| 6,055,236 A | 4/2000 | Nessett | |
| 6,055,575 A | 4/2000 | Paulsen | |
| 6,058,431 A | 5/2000 | Srisuresh | |
| 6,061,349 A | 5/2000 | Coile | |
| 6,061,738 A | 5/2000 | Osaku | |
| 6,101,543 A | 8/2000 | Alden | |
| 6,119,171 A | 9/2000 | Alkhatib | |
| 6,122,276 A | 9/2000 | Boe | |
| 6,128,664 A | 10/2000 | Yanagidate | |
| 6,137,791 A | 10/2000 | Frid | |
| 6,154,777 A | 11/2000 | Ebrahim | |
| 6,154,839 A | 11/2000 | Arrow | |
| 6,173,399 B1 | 1/2001 | Gilbrech | |
| 6,219,715 B1 | 4/2001 | Ohno | |
| 6,226,751 B1 * | 5/2001 | Arrow et al. | 726/15 |
| 6,243,749 B1 | 6/2001 | Sitaraman | |
| 6,249,801 B1 | 6/2001 | Zisapel | |
| 6,266,707 B1 | 7/2001 | Boden et al. | |
| 6,304,906 B1 | 10/2001 | Bhatti | |
| 6,353,614 B1 | 3/2002 | Borella | |
| 6,353,886 B1 | 3/2002 | Howard | |
| 6,381,638 B1 | 4/2002 | Mahler | |
| 6,421,732 B1 | 7/2002 | Alkhatib | |
| 6,430,622 B1 | 8/2002 | Aiken, Jr. | |
| 6,430,623 B1 | 8/2002 | Alkhatib | |
| 6,438,597 B1 | 8/2002 | Mosberger | |
| 6,438,612 B1 | 8/2002 | Ylonen | |
| 6,452,925 B1 | 9/2002 | Sistanizadeh | |
| 6,457,061 B1 | 9/2002 | Bal | |
| 6,477,565 B1 | 11/2002 | Daswani et al. | |
| 6,480,508 B1 | 11/2002 | Mwikalo | |
| 6,490,289 B1 | 12/2002 | Zhang et al. | |
| 6,496,867 B1 | 12/2002 | Beser | |
| 6,507,873 B1 | 1/2003 | Suzuki | |
| 6,510,154 B1 | 1/2003 | Mayers | |
| 6,523,068 B1 | 2/2003 | Beser | |
| 6,556,584 B1 | 4/2003 | Horsley | |
| 6,557,037 B1 | 4/2003 | Provino | |
| 6,557,306 B1 | 5/2003 | Sekiya | |
| 6,591,306 B1 | 7/2003 | Redlich | |
| 6,594,704 B1 * | 7/2003 | Birenback et al. | 709/238 |
| 6,618,757 B1 | 9/2003 | Babbitt | |
| 6,629,137 B1 | 9/2003 | Wynn | |
| 6,631,416 B2 * | 10/2003 | Bendinelli et al. | 709/227 |
| 6,651,101 B1 | 11/2003 | Gai | |
| 6,657,991 B1 | 12/2003 | Akgun | |
| 6,662,223 B1 | 12/2003 | Zhang | |
| 6,697,377 B1 | 2/2004 | Ju | |
| 6,701,437 B1 * | 3/2004 | Hoke et al. | 726/15 |
| 6,708,219 B1 | 3/2004 | Borella et al. | |
| 6,722,210 B2 | 4/2004 | Armstrong | |
| 6,731,642 B1 | 5/2004 | Borella | |
| 6,742,045 B1 | 5/2004 | Jordan | |
| 6,747,979 B1 | 6/2004 | Banks | |
| 6,754,706 B1 | 6/2004 | Swildens | |
| 6,772,210 B1 | 8/2004 | Edholm | |
| 6,778,528 B1 | 8/2004 | Blair | |
| 6,779,035 B1 | 8/2004 | Gbadegesin | |
| 6,781,982 B1 | 8/2004 | Borella | |
| 6,832,322 B1 * | 12/2004 | Boden et al. | 726/15 |
| 6,948,003 B1 | 9/2005 | Newman | |
| 6,961,783 B1 * | 11/2005 | Cook et al. | 709/245 |
| 6,970,941 B1 * | 11/2005 | Caronni et al. | 709/238 |
| 6,973,485 B2 | 12/2005 | Ebata | |
| 6,981,020 B2 | 12/2005 | Miloslavsky | |
| 6,982,953 B1 | 1/2006 | Swales | |
| 6,983,319 B1 | 1/2006 | Lu | |
| 6,993,012 B2 | 1/2006 | Liu | |
| 6,993,595 B1 | 1/2006 | Luptowski | |
| 6,996,628 B2 | 2/2006 | Keane | |
| 6,996,631 B1 | 2/2006 | Aiken | |
| 7,003,481 B2 | 2/2006 | Banka | |
| 7,010,702 B1 * | 3/2006 | Bots et al. | 726/13 |
| 7,028,333 B2 | 4/2006 | Tuomenoksa et al. | |
| 7,028,334 B2 | 4/2006 | Tuomenoksa et al. | |
| 7,032,242 B1 | 4/2006 | Grabelsky | |
| 7,054,322 B2 | 5/2006 | D'Annunzio | |
| 7,058,052 B2 | 6/2006 | Westphal | |
| 7,068,655 B2 | 6/2006 | March et al. | |
| 7,072,337 B1 | 7/2006 | Arutyunov et al. | |
| 7,072,935 B2 | 7/2006 | Kehoe et al. | |
| 7,085,854 B2 | 8/2006 | Keane et al. | |
| 7,092,390 B2 * | 8/2006 | Wan | 370/392 |
| 7,107,464 B2 * | 9/2006 | Shapira et al. | 709/200 |
| 7,107,614 B1 * | 9/2006 | Boden et al. | 726/15 |
| 7,110,375 B2 | 9/2006 | Khalil et al. | |
| 7,120,676 B2 | 10/2006 | Nelson et al. | |
| 7,133,368 B2 | 11/2006 | Zhang et al. | |
| 7,139,828 B2 | 11/2006 | Alkhatib | |
| 7,181,542 B2 * | 2/2007 | Tuomenoksa et al. | 709/250 |
| 7,194,553 B2 * | 3/2007 | Lucco et al. | 709/245 |
| 7,227,864 B2 | 6/2007 | Collins et al. | |
| 7,263,719 B2 * | 8/2007 | Jemes et al. | 726/12 |
| 7,327,721 B2 * | 2/2008 | Balasaygun et al. | 370/352 |
| 7,424,737 B2 * | 9/2008 | Wesinger et al. | 726/11 |
| 7,490,151 B2 * | 2/2009 | Munger et al. | 709/225 |
| 7,653,747 B2 * | 1/2010 | Lucco et al. | 709/245 |
| 7,787,428 B2 * | 8/2010 | Furukawa et al. | 370/338 |
| 7,814,228 B2 * | 10/2010 | Caronni et al. | 709/245 |
| 7,827,304 B2 * | 11/2010 | Park et al. | 709/238 |
| 7,844,718 B2 * | 11/2010 | Polcha et al. | 709/229 |
| 7,853,714 B1 * | 12/2010 | Moberg et al. | 709/238 |
| 2001/0027474 A1 | 10/2001 | Nachman et al. | |
| 2001/0050914 A1 * | 12/2001 | Akahane et al. | 370/382 |
| 2002/0013848 A1 * | 1/2002 | Rene Salle | 709/226 |
| 2002/0026525 A1 | 2/2002 | Armitage | |
| 2002/0053031 A1 * | 5/2002 | Bendinelli et al. | 713/201 |
| 2002/0056008 A1 * | 5/2002 | Keane et al. | 709/245 |
| 2002/0078198 A1 | 6/2002 | Buchbinder et al. | |
| 2002/0091859 A1 * | 7/2002 | Tuomenoksa et al. | 709/245 |
| 2002/0099937 A1 * | 7/2002 | Tuomenoksa | 713/153 |
| 2002/0103931 A1 * | 8/2002 | Mott | 709/245 |
| 2002/0133534 A1 * | 9/2002 | Forslow | 709/200 |
| 2003/0018912 A1 | 1/2003 | Boyle et al. | |
| 2003/0041091 A1 * | 2/2003 | Cheline et al. | 709/200 |
| 2003/0041136 A1 * | 2/2003 | Cheline et al. | 709/223 |
| 2003/0055978 A1 | 3/2003 | Collins | |
| 2003/0065785 A1 | 4/2003 | Jain | |
| 2003/0074472 A1 * | 4/2003 | Lucco et al. | 709/245 |
| 2003/0084162 A1 | 5/2003 | Johnson et al. | |
| 2003/0123421 A1 | 7/2003 | Feige | |
| 2003/0131131 A1 * | 7/2003 | Yamada et al. | 709/238 |
| 2003/0152068 A1 * | 8/2003 | Balasaygun et al. | 370/356 |
| 2003/0208554 A1 | 11/2003 | Holder | |
| 2003/0212795 A1 | 11/2003 | Harris et al. | |
| 2003/0219000 A1 | 11/2003 | Magret | |
| 2004/0006708 A1 * | 1/2004 | Mukherjee et al. | 713/201 |
| 2004/0088542 A1 * | 5/2004 | Daude et al. | 713/156 |
| 2004/0111612 A1 * | 6/2004 | Choi et al. | 713/163 |
| 2004/0148439 A1 * | 7/2004 | Harvey et al. | 709/249 |
| 2006/0190607 A1 * | 8/2006 | Lowery et al. | 709/226 |
| 2006/0195524 A1 * | 8/2006 | Nichols et al. | 709/204 |
| 2006/0195539 A1 * | 8/2006 | Nichols et al. | 709/206 |
| 2006/0212545 A1 * | 9/2006 | Nichols et al. | 709/219 |
| 2006/0212599 A1 * | 9/2006 | Lucco et al. | 709/245 |
| 2007/0286189 A1 * | 12/2007 | Kreiner et al. | 370/389 |
| 2008/0232295 A1 * | 9/2008 | Kreiner et al. | 370/313 |
| 2009/0116487 A1 * | 5/2009 | Read | 370/392 |

## OTHER PUBLICATIONS

Tsuchiya, et al., Extending the IP Internet Through Address Reuse, ACM SIGCOMM Computer Communication Review, pp. 16-33, Jan. 1993.

Francis, et al., IPNL: A NAT-Extended Internet Architecture, SIGCOMM'01, Aug. 27-31, 2001, pp. 69-79.

**US 7,949,785 B2**

Page 3

Yalagandula, et al., Transparent Mobility with Minimal Infrastructure, University of Texas at Austin, pp. 1-14, Jul. 2001.

Teraoka, et al., VIP: A Protocol Providing Host Mobility, Communications of the ACM, Aug. 1994/vol. 37, No. 8, pp. 67-75, 113.

Egevang, et al., The IP Network Address Translator (NAT), Network Working Group, RFC 1631, May 1994, pp. 1-10.

Chatel, Classical Versus Transparent IP Proxies, Network Working Group, RFC 1919, Mar. 1996, pp. 1-35.

Finseth, An Access Control Protocol, Sometimes Called TACACS, Network Working Group, Jul. 1993, pp. 1-18.

Computer Nelowrks, Third Edition, by Andrew S. Tanenbaum, 1996, pp. 643-670, 685-691.

Perkins, Mobile IP, IEEE Communications Magazine, May 1997, pp. 84-99.

"Non-Final Office Action", U.S. Appl. No. 10/233,288, (Dec. 21, 2009), 13 pages.

"Final Office Action", U.S. Appl. No. 10/403,518, (Feb. 2, 2010), 26 pages.

"Final Office Action", U.S. Appl. No. 10/403,829, (Feb. 23, 2010), 15 pages.

"Advisory Action", U.S. Appl. No. 10/403,829, (May 14, 2010), 2 pages.

"Non Final Office Action", U.S. Appl. No. 10/161,573, (May 26, 2009),39 pages.

"Non Final Office Action", U.S. Appl. No. 10/403,829, (Jun. 22, 2009),26 pages.

Francis, Gummadi "IPNL: A NAT-Extended Internet Architecture", SIGCOMM '01, (Aug. 2001),69-79.

"Final Office Action", U.S. Appl. No. 10/161,573, (Jul. 23, 2010), 21 pages.

"Final Office Action", U.S. Appl. No. 10/233,288, (Aug. 3, 2010), 15 pages.

"Non Final Office Action", U.S. Appl. No. 10/403,518, (Aug. 3, 2010), 30 pages.

"Advisory Action", U.S. Appl. No. 10/233,288, (Oct. 15, 2010), 3 pages.

Tanenbaum, Andrew S., "Computer Networks", Third Edition,(1996),1-37.

Chatel, M "Classical versus Transparent IP Proxies", Network Working Group Request for Comments, (Mar. 1996),1-35.

Finseth, C "An Access Control Protocol , Sometimes Called TACACS", Network Working Group Request for Comments, (Jul. 1993),1-18.

Francis, Paul et al., "IPNL: A NAT-Extended Internet Architecture", SIGCOMM'01, (Aug. 1, 2008),69-79.

Perkins, Charles E., "Mobile IP", IEEE Communications Magazine, Sun Microsystems,(May 1997),84-99.

Teraoka, Fumio et al., "VIP: A Protocol Providing Host Mobility", Communications of the ACM, vol. 37, No. 8,(Aug. 1994),67-75, 113.

Tsuchiya, Paul F., et al., "Extending the IP Internet Through Address Reuse", ACM SIGCOMM Computer Communication Review, (January 1993),16-33.

Venters, Tracy "Demystifying Protocols: A Comparison of Protocols Suitable for IP Telephony", Sonus Networks, (2000),1-11.

Yalagandula, Praveen et al., "Transparent Mobility with Minimal Infrastucture", University of Texas at Austin, (Jul. 2001),1-14.

Kessler, Gary C., "Mobile IP: Harbiner of Untethered Computing," http://www.garykessler,net/librarymobileip.htm, Jan. 20, 2004.

Rekhter, "Cisco Systems' Tag Switching Architecture overview," Network Working Group, Feb. 1997.

Kent, "Security Architecture for the Internet Protocol," Network Working Group, Nov. 1998.

Computer Dictionary; Microsoft Press; 3rd Edition; 1997; p. 264.

K. Egevang and P. Francis, RFC 1631, The IP Network Address Translator (NAT), May 1994.

"Non Final Office Action", U.S. Appl. No. 10/403,829, (Nov. 19, 2010),19 pages.

* cited by examiner

**U.S. Patent**          May 24, 2011          Sheet 1 of 21          US 7,949,785 B2

## Fig. 1



Prior Art

## Fig. 2A



Prior Art

## Fig. 2B



Prior Art



Fig. 3

Prior Art



Fig. 4

# Fig. 5a





Fig. 5b

# Fig. 6A    600



| IP Header (20) | UDP Header (8) | System Shim (20) | Virtual IP Packet |

602    604    606    608

# Fig. 6B    606

| Field Name | Description |
|---|---|
| Protocol Version | Version information |
| Data Type | Type of data following Shim |
| Header Option Flags | Option Flag Information |
| Source RD Public IP | Source Route Director gIP |
| Dest RD Public IP | Destination Route Director gIP |
| Source Member pIP | Source Member Private IP |
| Dest Member pIP | Destination Member Private IP |



Fig. 7

# Fig. 8



# Fig. 9

Set Up Virtual Community (Fig 10) — 902

↓

Notify Users — 904

↓

Register Users (Fig 12) — 906

↓

Management: Join, Leave, DNS, Group Agents, Policies, Routing (Figs. 13-15, 19-21) — 908

# Fig. 10

Set Virtual Domain Name — 1002

↓

Set Users — 1004

↓

Set User Password — 1006

↓

Set Policies — 1008

↓

Done

# Fig. 11

<HTTP Header><XML Header><P-Length>



# Fig. 12A

# Fig. 12B

| Field Name | Type | Description |
|---|---|---|
| Manager Seed | Array (32) | From Init Ack |
| Init Ack Time | Uint (8) | From Init Ack |
| Join Flags | Uint (2) | Indicates if rejoin and/or Group |
| Member Local IP | Uint (4) | The machine's local IP address |
| RD Local IP | Uint (4) | The Route Director local IP address |
| RD Global IP | Uint (4) | The Route Director Global IP |
| <Unused> | Uint (4) | |
| Member AH SPI | Uint (4) | For IPsec |
| Member ESP SPI | Uint (4) | For IPsec |
| Member Listen Port | Uint (2) | For Heartbeat Protocol |
| Token Timestamp | Uint (8) | The UTC time Token Key was created |
| Member Run ID | Array (16) | GUID Identifying current client run |
| Member Netbios Name | Array (16) | Microsoft NetBios support |
| SP Version | Uint (4) | Security Policy version |
| HA Version | Uint (4) | High availability version |
| Password Hash | Uint (20) | SHA1 of the user password string |
| Padding | Uint (.) | End on a multiple of 16 octets |

# Fig. 13





Fig. 14



Fig. 20

# Fig. 15



# Fig. 16A



# Fig. 16B



# Fig. 17



| IP Header (20) | UDP Header (8) | IPDTP Shim (20) | Virtual IKE Phase 1 UDP/IP packet |

1710  1720  1730  1740

# Fig. 18

IKE Ticket Payload in first IKE packet    1740

| Field Name | Field Type (Octets) | Description |
|---|---|---|
| Next Payload | Uint (1) | Type of payload following ours[1] |
| Reserved | Uint (1) | = 0, Part of ISAKMP |
| Payload Length (x) | Uint (2) | In octets |
| Payload Data | Array (x) | Payload in Network Byte Order |

IKE Ticket Payload Data    1750

| Field Name | Field Type (Octets) | Description |
|---|---|---|
| Total Size | Uint (2) | Size of Payload |
| Number of Payload Items (x) | Uint (2) | Number of Items in the Item List |
| Item List | Array (.) * x | List of items in payload |

IKE Ticket Item (one of Item List in Payload Data)

| Field Name | Field Type (Octets) | Description |
|---|---|---|
| Item Type | Uint (2) | One of the types shown below |
| Item Size (x) | Uint (2) | Size of this item in octets |
| Item | Array (x) | Item in packed network byte order |

1760

IKE Ticket Payload Item Types

| Item Name | Description |
|---|---|
| My FQDN | The Initiator's FQDN |
| My Ticket | A Ticket created by Initiator for Target |
| Peer FQDN | The Target's FQDN |
| Peer Ticket | A Ticket created by Manager for Target |

1770

# Fig. 19



| Field Name | Description |
|---|---|
| Protocol Version | Version |
| Data Type | = 1 for Information Ping to RD |
| Header Option Flags | None |
| Source RD Public IP | Source Route Director gIP = 0 |
| Dest RD Public IP | Destination RD gIP = 0 |
| Source member pIP | Source member private IP = 0 |
| Dest member pIP | Destination member private IP = 0 |

| Field Name | Description |
|---|---|
| Type | IPDTP Ping Type |
| Sequence | Arbitrary Sequence Number |

# Fig. 21



# Fig. 22

# Fig. 23



# Fig. 24





Fig. 25

- packet created using private addresses — 2502
- packet sent to Group Agent — 2504
- Group Agent replaces private addresses with virtual addresses — 2506
- Group Agent applies IPsec — 2508
- Group Agent encapsulates packet — 2510
- Group Agent sends packet — 2512

Fig. 26

- application sends DNS request — 2602
- Group Agent receives DNS Request — 2604
- Group Agent sends DNS Request to VCN Manager — 2606
- Group Agent receives response form VCN Manager — 2608
- Group Agent maps virtual IP address for target to private address in local LAN — 2610
- Group Agent returns private address to application — 2612
- application sends commmunication — 2614

US 7,949,785 B2

# SECURE VIRTUAL COMMUNITY NETWORK SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This Application is related to the following Applications: U.S. Pat. No. 7,139,828 issued Nov. 21, 2006; U.S. patent application Ser. No. 10/161,573, "Creating A Public Identity For An Entity On A Network," filed on Jun. 3, 2002; U.S. patent application Ser. No. 10/233,288, "Communicating With An Entity Inside A Private Network Using An Existing Connection To Initiate Communication," filed on Aug. 30, 2002; U.S. patent application Ser. No. 10/403,829 "Secure Virtual Address Realm," filed on Mar. 31, 2003; and U.S. patent application Ser. No. 10/403,518 "Group Agent," filed on Mar. 31, 2003. All of these related applications are incorporated herein by reference in their entirety.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention is directed to a network services system.

2. Description of the Related Art

Networked data devices provide users with efficient means for communication and collaboration. In recent years, the Internet has played a central role in allowing different types of networked devices to connect and share information across a myriad of networks. As technology advances and more organizations and people rely on the Internet, new challenges are presented for enhancing the ability to communicate. One such challenge is to enable the rapid creation of a secure means that allows local and remote specified entities to communicate and collaborate from any location via a standard Internet connection. For any solution to be widely accepted, it must take into account the realities and limitations currently existing.

For communication on the Internet, the Internet Protocol (IP) has become the default protocol used by most hosts and to which communication applications are now written. To transmit data from a source to a destination, the Internet Protocol uses an IP address. An IP address is four bytes long and consists of a network number and a host number. When written out, IP version 4 addresses are specified as four numbers separated by dots (e.g. 198.68.70.1). Users and software applications do not always refer to hosts or other resources by their numerical IP address. Instead of using numbers, they use ASCII strings called domain names. The Internet uses a Domain Name System (DNS) to convert a domain name to an IP address.

The Internet Protocol has been in use for over two decades. It has worked extremely well, as demonstrated by the exponential growth of the Internet. Unfortunately, the Internet is rapidly becoming a victim of its own popularity, it is running out of addresses.

One popular solution to the depleting address problem is Network Address Translation (NAT). This concept includes predefining a number of network addresses to be private addresses and public addresses. Public addresses are unique addresses that should only be used by one entity having access to the Internet. That is, no two entities on the Internet should have the same public address. Private addresses are not unique and are typically used for entities not having direct access to the Internet. Private addresses are used in private networks. Private addresses can be used by more than one organization or network. NAT assumes that all of the machines on a network will not need to access the Internet at all times. Therefore, there is no need for each machine to have a public address. A local network can function with a small number of one or more public addresses assigned to a NAT device. The remainder of the machines on the network will be assigned private addresses. Since entities on the network have private addresses, the network is considered to be a private network.

When a particular machine having a private address on the private network attempts to initiate a communication to a machine outside of the private network (e.g. via the Internet), the NAT device will intercept the communication, change the source machine's private address to a public address and set up a table for translation between public addresses and private addresses. The table can contain the destination address, port numbers, sequencing information, byte counts and internal flags for each connection associated with a host address. Inbound packets are compared against entries in the table and permitted through the NAT device only if an appropriate connection exists to validate their passage. One problem with a many NAT implementations is that it only works for communication initiated by a host within the private network to a host on the Internet that has a public IP address. Many NAT implementations will not work if the communication is initiated by a host outside of the private network and is directed to a host with a private address in the private network.

For most organizations, the security of devices coupled to the Internet is a concern. As a result, not all devices are directly connected to or accessible via the Internet. Rather, many devices are placed in private networks for security concerns (in addition to the address usage issue described above). Many private networks are secured by placing a firewall device between the private network and the Internet.

Another problem with many current communication schemes is that mobile computing devices can be moved to new and different networks, including private networks. These mobile computing devices may need to be reachable so that a host outside of the private network can initiate communication with the mobile computing device. However, in this case the problem is two-fold. First, there is no means for allowing the host outside of the private network to initiate communication with the mobile computing device. Second, the host outside the private network does not know the address for the mobile computing device or the network that the mobile computing device is currently connected to.

Thus, there is a need for a system that provides for local and remote entities to communicate and collaborate using the Internet, can work with existing NAT devices and firewalls, and allows for devices to move to different physical networks. To increase the ability of such a system to be accepted by the Internet community, it is desirable for such a system to not require changes to existing applications, allow peer-to-peer applications to communicate directly across the Internet and to not require changes to existing protocols. Each of these issues will be discussed below.

Large amounts of resources have been used to purchase and deploy existing applications currently running on the millions of computing devices. Organizations and individuals are not likely to want to adopt new communications solutions that require them to absorb the additional cost of replacing all of their applications.

To provide efficient and secure communication, it is desirable for devices to have the ability to allow their IP based applications to communicate directly with each other. By allowing peer-to-peer applications to communicate directly across the Internet, security is enhanced since the recipient is specifically identified and communication is passed directly between the applications on two or more respective machines.

US 7,949,785 B2

**3**

Most machines on the Internet use the TCP/IP (Transmission Control Protocol/Internet Protocol) reference model to send data to other machines on the Internet. The TCP/IP reference model includes four layers: the physical and data link layer, the network layer, the transport layer, and the application layer. The physical layer portion of the physical and data link layer is concerned with transmitting raw bits over a communication channel. The data link portion of the Physical and Data Link layer takes the raw transmission facility and transforms it into a line that appears to be relatively free of transmission errors. It accomplishes this task by having the sender break the input data up into frames, transmit the frames and process the acknowledgment frames sent back by the receiver.

The network layer permits a host to inject packets into a network and have them travel independently to the destination. On the Internet, the protocol used for the network layer is the Internet Protocol (IP).

The transport layer is designed to allow peer entities on the source and destination to carry on a "conversation." On the Internet, two protocols are used. The first one, the Transmission Control Protocol (TCP), is a reliable connection-oriented protocol that allows a byte stream originating on one machine to be delivered without error to another machine on the Internet. It fragments the incoming byte stream into discrete segments and passes each one to the network layer. At the destination, the receiving TCP process reassembles the received segments into the output stream. TCP also handles flow control to make sure a fast sender cannot swamp a slow receiver with more segments than it can handle. The second protocol used in the transport layer on the Internet is the User Datagram Protocol (UDP), which does not provide the TCP sequencing or flow control. UDP is typically used for one-shot, client server type requests-reply queries for applications in which prompt delivery is more important than accurate delivery.

The transport layer is typically thought of as being above the network layer to indicate that the network layer provides a service to the transport layer. Similarly, the transport layer is typically thought of as being below the application layer to indicate that the transport layer provides a service to the application layer.

The application layer contains the high level protocols, for example, Telnet, File Transfer Protocol (FTP), Electronic Mail-Simple Mail Transfer Protocol (SMTP), and Hypertext Transfer Protocol (HTTP).

FIG. 1 depicts the basic structure of an IP version 4 packet 10 used at the Network Layer. IP packet 10 consists of header 12 and payload 14. Payload 14 stores the data received from the Transport Layer in the TCP/IP model. FIG. 2A depicts the format of a header of an IP packet. The header is depicted to include six rows. The first five rows are 32 bits wide. The first five rows of the header comprise a 20 byte fixed portion of the header. The last row of the header provides a variable sized options field 22. Version field 24 keeps track of which version of the protocol the packet belongs to. The current version used on the Internet is version 4. IHL field 26 describes the length of the header in 32 bit words. Type field 28 indicates the type of service requested. Various combinations of reliability and speed are possible. Length field 30 contains the size of the packet, including both the header and the data. Identification field 32 is needed to allow the destination host to determine which packet the received fragment belongs to. All fragments of a packet contain the same identification value. Next comes three flags, which include an unused bit 33 and then two 1 bit fields 34 and 36. DF field 34 stands for don=t fragment. It is an order to the routers not to fragment the packet because the

**4**

destination is incapable of putting the pieces back together again. MF field 36 stands for more fragments. All fragments except for the last one have this bit set. Fragment offset field 38 indicates where in the current segment this fragment belongs. Time to Live field 40 is used to limit packet lifetime. It is supposed to count time in seconds, allowing a maximum life time of 255 seconds. In practice, it may count hops (or hops and seconds). The time is decremented on each hop by a router. When the time to live hits 0, the packet is discarded and a warning is sent back to the source using an Internet Control Messaging Protocol (ICMP) packet. This feature prevents packets from wandering around forever. Protocol Field 42 indicates which transport layer type is to receive the segment. TCP is one possibility, UDP is another. Checksum field 44 verifies the header. One method for implementing a checksum is to add up all 16 bit half words constituting the header and take the ones compliment of the result. Note that the checksum must be recomputed at each hop because the Time to Live field 40 changes or the content of the options field changes. Source field 46 indicates the IP address for the source of the packet and destination field 48 indicates the IP address for the destination of the packet. Options field 22 is a variable length field designed to hold other information. Currently, options used on the Internet indicate security, suggested routing path, previous routing path and time.

UDP is an alternative to TCP. FIG. 2B depicts the structure of a packet that uses UDP. Like the TCP, UDP uses the Internet Protocol to actually send a data unit from one computer to another. Unlike TCP, however, UDP does not provide the service of dividing a message into packets (datagrams) and reassembling it at the other end. Specifically, UDP does not provide sequencing of the packets that the data arrives in. Hence, application programs using UDP must ensure that the entire message has arrived and is in the right order. As shown in FIG. 2B, the packet includes an IP header 12$a$ and IP payload 14$a$. The payload 14$a$ comprises the UDP header 50 and UDP data 60. UDP header 50 consists of a 16 bit source port identifier, a 16 bit destination port identifier, a length field and checksum field. In FIG. 2B, the Destination Port has a meaning within the context of a particular Internet destination address, and the Length field is the length in octets of this user datagram, including its header and the data. The checksum is the 16-bit one's complement of the sum of consecutive two octaves of a pseudo header of information from the IP header, the UDP header, and the data (padded with zero octets at the end, if necessary, to make a multiple of two octets).

In addition to using the existing Internet infrastructure, another issue in allowing public-to-private, or private-to-private, communications lies in the addressing of the devices. Where a system is coupled to the public Internet with an IP address, communication packets can be routed directly to the machine. However, many devices couple to the Internet via service providers which provide them with a dynamic IP address. Thus, those wishing to communicate with this type of user must know the constantly changing address of the user in order to communicate with them. Still other hosts may be coupled to networks that use technologies other than IP.

One solution currently in use that provides for local and remote specified entities to communicate and collaborate using the Internet is the Virtual Private Network ("VPN"). The VPN uses additional network software layers to increase security between users in the public realm and those in private realms. For example, some VPNs encrypt packets using IPsec (or other protocols). The encrypted packets are then encapsulated within a standard packet and transmitted across the Internet to the destination. At the destination, the encrypted packet is decrypted. While the existing VPN provides remote

US 7,949,785 B2

**5**

users with secure access to a network, via the Internet, many existing VPNs have various shortcomings that prevent them from satisfying the needs of many users. For example, many VPNs do not provide for peer-to-peer communication with IPsec (or other security measures), do not work though NAT devices in all cases, are difficult to set up and maintain, do not provide for full mobility of entities communicating on the VPN, and do not always provide for communication with entities in the various private network configurations discussed herein.

One method of overcoming the mobility problem includes the use of Dynamic DNS. More information about Dynamic DNS can be found in RFC 2136 incorporated herein by reference.

Dynamic DNS is illustrated in FIG. 3. FIG. 3 shows a first computer or device B having a host name of B.COb.com having a dynamic or static private IP address IPb and a second computer or device A having a host name of A.COa.com and having a dynamic or static private IP address IPa. Devices B and A are coupled to the Internet 506 via firewall devices 302, 304 incorporating NAT. The addresses of B and A, as seen by devices on the Internet, are public IP addresses GIPb and GIPa, respectively. Also shown is device D, having a publicly address IPd and a host name of d.COd.com.

Also shown is a Dynamic DNS server, DDNS, residing on the Internet. In essence, the DDNS server is a DNS server supporting the dynamic DNS protocol of RFC 2136, and in this example is an authoritative name server containing records for B, A and D. The DDNS server will update it's records of B, A and D in real time, so that if or when D's address IPd changes, any query by other devices (B, A, for example) based on D's host name, will result in the response being the correct IP-IPd. Any DNS records for devices B and A will always reflect the public IP addresses (GIPa and GIPb) of the firewall/NAT devices.

Unfortunately, DDNS technology is complex and difficult to implement securely—two factors that have dramatically slowed the rate of deployment of Dynamic DNS. As a result, VPNs have not been able to adopt DDNS to solve all of the problems discussed herein.

Hence, a system is desired that allows local and remote entities to communicate and collaborate from any location via a standard Internet connection and which solves the problems discussed above.

## SUMMARY OF THE INVENTION

A system is disclosed that allows local and remote entities to communicate and collaborate from various locations. In one embodiment, the system makes use of a virtual subnet with a virtual address realm. The virtual address realm allows two or more users to communicate securely via at least one public network, whether the users are both coupled directly to the public network, both coupled directly to separate private networks or whether one is in a public network and one is in a private network. The virtual address realm uses virtual addresses to identify the devices on the virtual subnet. Although the devices are in different physical subnets, from the point of view of the applications the devices of the virtual subnet appear to be in one local subnet.

In one embodiment, the virtual address realm comprises a virtual address realm definition including at least a set of users. Each user accessing the virtual address realm may have at least one virtual address in the virtual address realm and at least one physical address.

Another embodiment of the present invention comprises a virtual community network for transmitting communications

**6**

via at least one physical network. The virtual community network comprises a virtual address realm including a logical name assignment, a set of users capable of communicating in the virtual address realm, and a secure communication channel. In a further aspect, the virtual community network logical name is a domain name, and the domain name may be a fully qualified domain name or a virtual domain name. In another aspect, the set of users includes at least a first user coupled to a first private physical network and a second user coupled to a second private physical network, and the first private physical network and the second private physical network may have at least one common private physical subnet address. The physical addresses may be dynamic or static.

Yet another embodiment of the invention is a method comprising the steps of: defining a virtual address realm overlying a public address realm, the virtual address realm including at least a user set and a logical name for said user set; and routing communications between users in the user set by means of virtual address realm addresses. In a further aspect, this method includes the step of registering users in the user set as members of the virtual address realm. Further, the method may include the step of assigning each registered user a unique virtual address in the virtual address realm. The method may further include the steps of encrypting communications between devices in the realm, and/or applying at least one address realm group policy.

A further embodiment of the invention is a method for providing secure communications between two devices. The method comprises the steps of: providing a virtual realm identifier; defining a set of users for the virtual realm; registering users in the realm; assigning virtual addresses; and routing information between users in said virtual address realm.

A still further embodiment of the invention comprises one or more processor readable storage devices having processor readable code embodied on said processor readable storage devices. In this embodiment, said processor readable code is for programming one or more processors to perform a method comprising the steps of: providing a virtual address realm configuration including a user set and a domain name for said user set; and routing communications between users in said virtual address realm.

Another embodiment of the invention comprises a method for providing a secure virtual network. The method may include the steps of: providing a virtual network manager coupled to a public network; defining a member set of users entitled to communicate in the virtual network; registering members with the manager; assigning members a virtual address; and routing network traffic between the members in the virtual community.

An additional further embodiment of the invention may comprise one or more processor readable storage devices having processor readable code embodied on said processor readable storage devices. The processor readable code may be for programming one or more processors to perform a method comprising the steps of: managing a virtual community network realm; defining a member set of users entitled to communicate in the virtual community; registering users with the virtual community; assigning each user a virtual address; and routing network traffic between the users in the virtual community.

Another embodiment of the invention is a virtual community network system. The system includes a virtual network manager including at least one virtual community definition comprising at least a domain name and a user set; and at least one route director capable of communicating with users in the user set.

US 7,949,785 B2

7

In a further aspect, the virtual community network includes a communication agent installed on a device. The agent may comprise a virtual network adapter interfacing with the device and applications on the device to route traffic to members of the virtual community via their virtual address.

For some devices, additional software or hardware cannot be installed on a member device or it is not desirable to install such additional software or hardware on the device. For such devices, a Group Agent can be used. The Group Agent acts as a proxy for one or more members of a virtual community without requiring installation of member agent software on the client devices.

One embodiment of a system that uses a Group Agent includes communicating with a first client and acting as an intermediary between the first client and members in a first virtual address realm so that the first client can communicate in the first virtual address realm. Note that in this embodiment the first client is not configured to communicate in the first virtual address realm. For example, no software is installed on the client to add drivers, layers or interfaces specific to the first virtual address realm.

Another embodiment of a system using a Group Agent includes communicating messages with a first client and communicating the messages with members in a virtual address realm on behalf of the first client. While communicating with the first client, the messages do not use virtual addresses. During the communication process, the messages are transformed so that the messages include virtual addresses when communicating with members in the virtual address realm and the messages do not include virtual addresses when communicating with the first client.

In one implementation, the first entity resides in a first physical address realm and the second entity resides in a second physical address realm, where the first physical address realm overlaps with the second physical address realm. For example, consider the situation where the first physical address realm is a first private network using a first set of private addresses and the second physical address realm is a second private network using a second set of private addresses, where there are private addresses that exist in both the first set of private addresses and the second set of private addresses.

The present invention can be accomplished using hardware, software, or a combination of both hardware and software. The software used for the present invention is stored on one or more processor readable storage media including hard disk drives, CD-ROMs, DVDs, optical disks, floppy disks, tape drives, RAM, ROM or other suitable storage devices. In alternative embodiments, some or all of the software can be replaced by dedicated hardware including custom integrated circuits, gate arrays, FPGAs, PLDs, and special purpose computers. In one embodiment, software implementing the present invention is used to program one or more processors. The processors can be in communication with one or more storage devices, peripherals and/or one or more communication interfaces.

These and other objects and advantages of the present invention will appear more clearly from the following description in which the preferred embodiment of the invention has been set forth in conjunction with the drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described with respect to the particular embodiments thereof. Other objects, features, and advantages of the invention will become apparent with reference to the specification and drawings in which:

8

FIG. 1 depicts an IP packet.

FIG. 2A depicts the format of a header of an IP packet.

FIG. 2B depicts the format of a UDP packet.

FIG. 3 depicts a print-out implementation of a dynamic routing system.

FIG. 4 depicts a block diagram of an implementation of the system of the present invention.

FIG. 5A is a structural network block diagram illustrating elements used in the system of the present invention.

FIG. 5B is a logical block diagram depicting communication types in an implementation of the system of the present invention

FIG. 6A depicts a packet structure for a communication packet in accordance with the present invention.

FIG. 6B is a table depicting the shim configuration of the packet in FIG. 6A.

FIG. 7 is a flow chart describing the overall process for communicating.

FIG. 8 is a block diagram illustrating the structure of the Member Agent application in the system of the present invention.

FIG. 9 is a flowchart illustrating the steps which occur in the creation of a virtual community.

FIG. 10 is a flowchart illustrating the process of configuring a virtual community.

FIG. 11 depicts an HTTP wrapper structure.

FIG. 12A is a flow diagram depicting a user registration process of the present invention.

FIG. 12B is a table illustrating the structure of the registration file information structure.

FIG. 13 is a flowchart depicting a member join process in accordance with the present invention.

FIG. 14 is a flowchart depicting a member leave request in accordance with the present invention.

FIG. 15 is a flow diagram depicting DNS request for a member in the virtual community in accordance with the present invention.

FIG. 16A depicts the commonly used IKE phase one aggressive mode exchange.

FIG. 16B depicts the IKE phase one aggressive mode exchange used in accordance with the present invention.

FIG. 17 depicts a packet structure of the virtual IKE phase 1 packet.

FIG. 18 depicts the IKE ticket payload data structure.

FIG. 19 is a representation of a system ping sequence in accordance with the present invention.

FIG. 20 is a flow diagram depicting a query request in the system of the present invention.

FIG. 21 depicts a flow structure for addressing and routing conducted by a Route director.

FIG. 22 is a block diagram depicting one embodiment of various components of the present invention utilizing a Group Agent.

FIG. 23 is a flow chart describing one embodiment of the process for Group Agent initialization.

FIG. 24 is a flow chart describing one embodiment of a process for initiating communication with a member that is using a Group Agent.

FIG. 25 is a flow chart describing one embodiment of a process for communicating using a Group Agent.

FIG. 26 is a flow chart describing one embodiment of a process for initiating communication by a member that is using a Group Agent.

DETAILED DESCRIPTION

One embodiment of the present invention provides for a secure Virtual Community Network or "VCN." In essence, a

US 7,949,785 B2

9

VCN is a private dynamic network which acts as a private LAN for computing devices coupled to public networks or private networks. This enables computing devices anywhere in the world to join into private enterprise intranets and communicate with each other. Thus, the invention provides a separate private virtual address realm, seen to each user as a private network while seamlessly crossing public and private network boundaries.

A basic overview of the system is shown in FIG. 4. FIG. 4 shows a computer or device B (host name—b.COb.com) in a first private domain and computer or device A (host name—a.COa.com) in a second private domain, both of which are coupled to the Internet by firewall devices 402, 404. The firewall devices are configured to implement Network Address Translation (NAT). A and B have dynamic or static private IP addresses. Computer or device X is coupled directly to the public Internet and has a public IP address.

In the present invention, a virtual community network (VCN) X.VCN is formed. Machines A, B and X can join the VCN, leave the VCN, or allow other machines in the VCN to communicate with them. More than simply a virtual private network (VPN), all members of the VCN are accessible as if they were part of a physical local network. The application running on the members of the VCN can accomplish what they would be able to accomplish if they were on the same physical routed network (e.g. all in the same private network). Membership in the VCN is controlled by an administrator via an administrative interface. In general, the administrator defines certain aspects of the VCN and then invites members into the VCN by specifying the domain name for each member. Members then register themselves with a VCN Manager, and notify the Manager via join and leave requests when they are available to participate in the community. Once registered and joined, members can communicate with other members as though connected via a local LAN.

As shown in FIG. 4, A, B and X may all make direct connections to each other through communications within the virtual domain. In FIG. 4, dashed lines represent direct communication paths seen to applications running on A, B and X, all "seeing" the virtual addresses of each other and communicating with each other using the application's IP interface.

A hardware architecture for the machines, server or other devices used to implement the present invention should be well understood to one of average skill in the art. Suitable hardware includes one or more processors, a memory, a mass storage device, a portable storage device, a first network interface, a second network interface and I/O devices, in communication with each other. The choice of processor is not critical as long as a suitable processor with sufficient speed is chosen. The memory can be any conventional computer memory. The mass storage device can include a hard drive, CD-ROM or any other mass storage device. The portable storage can include a floppy disk drive or other portable storage device. If the computer is acting as a router, it includes two or more network interfaces. In other embodiments, the computer may include only one network interface. The network interface can include a network card for connecting to an Ethernet or other type of LAN. In addition, one or more of the network interfaces can include or be connected to a firewall. For a gateway, one of the network interfaces will typically be connected to the Internet and the other network interface will typically be connected to a LAN. However, a gateway can exist physically inside a network. I/O devices can include one or more of the following: keyboard, mouse, monitor, display, printer etc. Software used to perform the methods of the present invention are likely to be stored in mass storage (or any form of non-volatile memory), a por-

10

table storage media (e.g. floppy disk or tape) and/or, at some point, in memory. The above described hardware architecture is just one suitable example depicted in a generalized and simplified form. The present invention could include dedicated hardware, a dedicated router with software to implement the invention or other software and/or hardware architectures that are suitable.

A more detailed overview of one embodiment of the present invention is depicted in FIGS. 5A and 5B. FIG. 5A illustrates various embodiments of devices coupled to public and private networks in a manner which allows use of the present invention, and is a representation of a physical connection of such devices. FIG. 5B illustrates a logical representation of elements used to create a VCN and of the various formats of communication traffic between those elements shown in FIG. 5A.

Specifically, FIGS. 5A and 5B illustrate various user machines $M_n$ coupled to the Internet 506, as well as other devices, described below, which implement a virtual community in accordance with the present invention. Devices $M_n$ can be personal computers, servers or other computing devices (mobile or non-mobile). Each machine may have different communication connectivity with the Internet.

In general, an exemplary system for implementing a VCN in accordance with the invention comprises a VCN Manager 510, a Network Route Director 520 and/or Private Route Director 530, and a number of Member Agents 565. Communication between systems in various protocols is illustrated by dashed lines (UDP) and solid lines (TCP). The VCN manager and Network Route Director are shown in FIG. 5A as being coupled directly to Internet 506.

User devices $M_A$ and $M_E$ are connected to the Internet and have public IP addresses. These addresses may be dynamic or static. If static, $M_A$ and $M_E$ can easily communicate with each other in a manner well known in the art by simply addressing IP packets directly to each other. If the addresses are dynamic, then $M_A$ and $M_E$ require some means of knowing when the IP address of the other changes in order to communicate. As described below, the VCN system provides such a means.

Device $M_B$ is in a private domain (e.g. private network) 540 and connected to a NAT Device 515 to access the Internet 506 by a private network path 540a. Device $M_B$ may use have a dynamic or static IP address specific to the private domain 540. Generally, such addresses are part of the private received IP classes which are not routable via the Internet. For example, 10.0.0.0-10.255.255.255, 172.16.0.0-172.31.255.255, 192.168.0.0-192.168.255.255 are network addresses classified for private networks. Firewall/NAT device 515 translates Machine $M_B$'s private IP address to a routable public IP address. NAT device 515 may include other security functions as well. $M_B$ communicates with other non-VCN devices on the Internet via the NAT device 515, and with other members of the VCN via Private Route Director (PRD) 530, which is coupled to the private network path 540a and is a member of the private network 540. Device $M_X$ is also shown as connected to and a member of the private domain 540 but has a static, routable public IP addresses. As such it may communicate with devices coupled to Internet 506 in a different manner, as illustrated in FIG. 5B.

Devices $M_C$ and $M_D$ are part of a second private domain (e.g. private network) 550 coupled to a second private network path 550a. Again, these machines have static or dynamic private IP addresses and are coupled to the Internet via a firewall/NAT device 517, which is itself coupled to network path 550a.

The VCN Manager 510 is a central server or server cluster providing management services, connection services and

US 7,949,785 B2

**11**

security services for the VCN. Each Member Agent **565** includes client agent software (or, in some embodiments, hardware) that runs on end machines and provides virtual network services. It enables the machine to be reached from public and private networks, and implements the security aspects of the system. In FIG. 5B, machines $M_A$, $M_B$, $M_C$, $M_D$, $M_E$ and $M_X$ all include Member Agents and, therefore, can be members of a particular VCN.

The Network Route Director (NRD) **520** is a stand-alone unit that runs on the public side of the Internet enabling Member Agents and Group Agents (discussed below) to be reached inside one or more private networks from the public network. Private Route Director ("PRD") **530** is an element that runs inside a private network enabling access to machines inside the private network from machines outside the private network. It can run as a service on a platform offering other services such as a Windows Server.

Generally, VCNs are defined and managed by the VCN Manager **510**. Clients utilize Member Agents or Group Agents to access other client machines ($M_n$), in private or public realms. The NRD or PRD routes communications to Member Agents.

As described herein, three forms of communication are used in creating and implementing the VCN. TCP is used in the registration and joining processes; encapsulated UDP packets are used between elements in establishing communication between joined devices and for management traffic, and Encrypted UDP packets are used for agent-to-agent communications.

FIG. 5B shows exemplary traffic between elements of the VCN. A first type of traffic is TCP traffic. TCP traffic is used between member agents to establish membership in the VCN (the registration process), and make the VCN manager aware they are available to communicate with other members of the VCN (the join process). In FIG. 5B, this is represented by solid lines **513***b*, **511***b*, **523***b* and **543***b*. TCP is also used: by the PRD **530** to establish communications with the VCN (lines **527***b*, **527***d*); and by the member agent of device $M_B$ to communicate with the PRD **530** (line **533***b*). TCP may also be used by devices $M_C$ and $M_D$ on private network **550** to communicate with each other.

Encapsulated UDP traffic is used by elements of the VCN once membership has been established and the elements are joined in the VCN for management and administrative communications. This is represented in FIG. 5B by lines **511***a*, **513***a*, **523***a*, **527***a*, **527***c*, **523***c*, **527***e*, **521**, **543***a*, **541**, and **519**. Encrypted UDP communications are used between devices, shown in FIG. 5B between device $M_X$ and $M_A$ at **525** and device $M_B$ and $M_C$ at **537**.

In one embodiment, secure connections are built dynamically using IPsec tunnels based on a virtual IP space that can traverse from private networks, across the Internet and into other private networks. Strong authentication and the establishment of IPsec policies at the time members join the community offers privacy and security to the members of the virtual community. This facilitates the introduction of a variety of policy-based network services with centralized management such as Virtual Private Networks for intranets and extranets, IP-telephony domains, and IP-based PDA communities.

Communication Protocol

In the present invention, an encapsulation routing protocol allows packets to traverse addressing boundaries and identifies routing endpoints by unique DNS domain names. It employs an address virtualization scheme that accomplishes backwards compatibility with IPv4 applications. With certain

**12**

optional exceptions, UDP encapsulation is used between elements of the Virtual Community.

One example of an encapsulated packet **600** is depicted in FIG. 6A. It includes a 20 octet IP header **602**, an 8 octet UDP header **604**, a 20 octet system shim **606**, and a variable size virtual IP packet **608**. A virtual IP packet has the same format as a standard IP packet.

Members of a VCN communicate to other members of that VCN by means of virtual IP Packets **608**. Virtual IP addressing is used to establish unique connection identities for community connected devices. IPsec can (optionally) be applied to the Virtual IP Packet for end-to-end security. Virtual IP addresses are used to identify members in the community in the virtual packet and are not directly routable. Rather, they are unique identifiers of a given connection to the upper layer application. In one embodiment, virtual IP addresses are in IPV4 format.

In general, the UDP header is set for a default port. System shim **606** carries enough addressing information to allow the Route Directors to forward the tunneled packet through the various address realms on its way to the destination. Such a routing methodology is often referred to as source routing.

In order to route packets to a peer in a different addressing realm, the protocol stack knows the address of the appropriate Route Director that serves the peer's realm, the private address of the peer or a NAT address. The Member Agent obtains the information by using the VCN Manager as a DNS authority for DNS lookup operations as described below (FIGS. 13 and 21). The DNS response from the VCN Manager will include the above-identified information in an optional text field of the response to the Member Agent.

TCP/IP connections require IP addresses to be used as connection identifiers at the user level. If an application wishes to make a connection to "m3.abcdef.com" and another to "m4.abcdef.com", it resolves both DNS identifiers into IPv4 addresses. The system cannot assign the private IP addresses of the members to be unique connection identifiers, because two members might have the same private address in different private address realms.

Assigning a virtual address to each peer designated by a DNS string solves the problem of ambiguous endpoints. These virtual addresses may be any legal IPv4 addresses, but conflicts will occur if the same addresses are used to directly designate a peer in an IPv4 network application. For instance, if 10.0.0.10 is used as a virtual address, and is also used on a member's network as the mail server, packets that are ordinarily destined to the mail server may be redirected to a random peer. In general, when choosing virtual addresses it is best to choose addresses that will not be routable to the member. Hence, each member is assigned a virtual IP address unique in the context of the virtual community and that will not conflict with any local addresses on its LAN or any public IP addresses on the Internet.

By having each member of a VCN use a virtual address, a virtual address realm is created. The virtual address realm is the set of addresses that can be used to identify and send communications to other members of the VCN. The virtual address realm is different from a physical address realm because the physical address realm is actually used to route on a physical network. The members of a VCN will all be in the virtual address ream of that VCN, but may be in different physical address realms. For example, looking at FIGS. 5A and 5B, $M_B$ and $M_C$ are in different physical address realms (e.g. **540** and **550**); however, they are both in the virtual address realm of the VCN. Another example can be seen with FIG. 4, where A and B are in different physical address realms (Cob.com and Coa.com); however, they are both in the same

US 7,949,785 B2

**13**

virtual address realm. Applications on members of a VCN will see the VCN as the local subnet; therefore, the VCN can be thought of as a virtual subnet. Each member of the VCN will appear to the application as an entity connected to the local subnet.

Route Directors **530** and **520** facilitate routing UDP encapsulated traffic to private address domains **540, 550**. In general, Route Directors either have public IP addresses or addresses that are statically remapped to a public IP address. The static translation of a Route Director's IP must leave the port in the UDP header unchanged to allow the UDP encapsulated destination port number to be directly used by public members, by other Route Directors, and by private members. Route Directors **520, 530** and VCN Manager **510** may be configured to use a non-default UDP encapsulation port. In one embodiment, all outgoing messages are sent to this port on the next destination node and all incoming messages are read from this port. As discussed below, information in a "join" packet tells Member Agents the UDP encapsulation port to use in communications to Route Directors, network managers, and other members of the community.

System Shim **606** (see FIG. 6A) has a format given by way of example in FIG. 6B. Protocol Version information, data type, header option flags, and Router Information are potentially stored in the Shim. (The abbreviation "gIP" stands for "global" or public IP address, indicating an Internet routable IP address). The Data Type field indicates the meaning of the optional data that may follow the Shim. This may include a Virtual IP Packet **608**, a ping to a Route Director, a request for a Network Route Director virtual address, a Route Director response with a virtual address, a member leaving and releasing a virtual address, and a member-to-Route Director packet. The shim also includes the public IP address for the source machine's Route Director, the public IP address for the destination machine's Route Director, the private IP address for the source machine and the private IP address for the destination machine. In the case where the source or destination use a public IP address, then the shim will not need to include the private addresses of the source/destination or a route director.

The system can optionally use TCP encapsulation between a member and a Route Director. If the VCN Manager determines that a Member Agent (e.g., Agent software on a member machine) and a Route Director are both able to support a TCP connection, then it may instruct the member to initiate a TCP connection with the Route Director. TCP port **80** may be used as the destination port for all TCP encapsulated messages to the Route Director, and TCP port **20202** may be used as the source port for all TCP encapsulated messages from a private member to the Route Director.

As noted above, Network Route Directors (NRDs) **520** facilitate routing traffic into and out of private address domains without requiring reconfiguration of a firewall **517** protecting the domain **550**. As in UDP encapsulation, a special field in the system join packet (explained below) tells the Member Agent which TCP encapsulation port to use as the source port. The NRD will then re-encapsulate virtual-traffic in UDP-encapsulation before passing it on to other elements of the virtual network.

Note that more than one user can use the same device, with each such user having different virtual addresses in the same or different address realms. Additionally, regardless of the number of users, one device can be in multiple virtual address realms. In some embodiments, a user can have multiple identities, each in a different address realm.

FIG. 7 is a flow chart describing the overall process for communicating between members of a VCN. Any member of

**14**

a VCN can communicate with any other member of a VCN regardless of whether either of the members are behind a firewall, behind a NAT device, directly accessible via the public Internet, in a private network, etc. From the point of view of an application on a member device, all the other members appear to be on the same LAN. Thus all applications running on a member's device will think that all other members of the VCN are on the same LAN and in the same address realm (e.g. the virtual address realm of the VCN).

In step **650** of FIG. 7, the Agent for the potential member joins the VCN and receives a virtual IP address. In order to establish or participate in communication within the VCN, a device must register with and join the VCN, thereby becoming a member of the VCN. The Agent will send a message to VCN Manager **510** and receive a virtual IP address back. The virtual IP address received is used to identify the member in the VCN. More details of step **650** as well as other portions of FIG. 7 will be discussed below. Note that there is a dotted line between step **650** and step **652**. This dotted line signifies that a lot of time can pass between step **650** and step **652**. Additionally, after step **650** is performed, it does not need to be repeated.

In step **652** of FIG. 7, an application on the source machine (the member initiating communication) intends to send a message to an application on the destination machine (another member of the VCN). Examples of applications that can communicate on the VCN include instant messaging, email, FTP, browsers, data transfer programs, and other applications that can communicate. Consider an example when application on device $M_A$ intends to initiate communication with an application on device $M_B$. Thus, $M_A$ is the source device and $M_B$ is the destination device. In step **654**, the application on $M_A$ will initiate a DNS request using the domain name for $M_B$. This DNS request is sent to VCN Manager **510**. In step **656**, VCN Manager **510** returns the public address of the Route Director for the destination, the private address for the destination device and a virtual IP address for the destination device. In the example described above, step **656** includes returning the public IP address for private Route Director **530**, the private address for $M_B$ and a virtual IP address for $M_B$. If the destination machine has a public IP address (and, thus, does not use a routing director) then step **656** will only include returning the public IP address for the destination. If the destination machine is in a private network that uses a Network Route Director (e.g., NRD **520**), then step **656** will return the public IP address for the Network Route Director.

In step **658**, the Agent for the source device, which received the information in step **656**, will store that received information. This information can be stored in a table, or any other data structure. In step **660**, the Agent for the source device will return the virtual IP address of the destination device to the application on the source device. In step **662**, the application on the source device will initiate the sending of a message/data using the virtual IP address for the destination device. In step **664**, a virtual IP packet will be created. The source IP address for the virtual IP packet will be the virtual IP address for the source device. The destination IP address for the virtual packet will be the virtual IP address for the destination device. The virtual IP packet will be in the same format as a standard IP packet. In step **664**, the newly created virtual IP packet will be subjected to IPsec (or another security means). In some embodiments, IPsec is not used. In step **670**, the virtual IP packet is encapsulated. For example, in one embodiment, the virtual IP packet is encapsulated as described above with respect to FIGS. 6A and 6B. This encapsulation will include shim **630**. As described above, shim **630** will include the public IP addresses for the Route Directors

US 7,949,785 B2

15

for the source and destination, and the private IP addresses for the source and destination devices. If either the source or destination do not have a Route Director, the shim will not need to include that information. For example, when the source machine is $M_A$, there is no Route Director for the source. If the source machine was $M_C$, then the shim, would include the public IP address for Network Route Director **520**. If the source is $M_B$, the shim would include the public IP address for Private Route Director **530**.

At this point, the path of the packet will depend on whether the destination is using a Private Route Director **530**, Network Route Director **520** or has a public IP address. If the destination has a public IP address, the process moves to step **678** where the encapsulated packet is forwarded to the destination agent.

If the destination is in a private network that has a PRD, then in step **672** the encapsulated packet is sent to the NAT device for the destination. For example, the encapsulated packet is sent from $M_A$ to NAT **515**. In step **674**, the encapsulated packet is sent from the NAT device for the LAN that includes the destination to the Route Director for the destination. For example, the encapsulated packet is sent from NAT **515** to private Route Director **530**. In step **676**, the Route Director which received the encapsulated packet will remove the virtual IP packet and the shim from the encapsulation. The Route Director will read the shim to learn the local IP address to send the packet to. The shim and virtual IP address will then be re-encapsulated into a new packet with the original virtual packet. The new outer packet includes a destination IP address equal to the private IP address of the destination device. The encapsulated packet received in step **674** will include a source IP address equal to the public IP address for $M_A$ (or the source's Route Director) and a destination IP address equal to the public IP address for the Route Director of the destination (e.g., PRD **530**). In step **678**, the new encapsulated packet will be sent from the Route Director to the Agent for the destination device.

If the destination agent is in a private network and is using a Network Route Director, then following encapsulation the encapsulated packet is sent to the Network Route Director for the destination agent in step **673**. At step **675**, the NRD will remove the virtual IP Packet and shim and re-encapsulate them in a UDP packet for transmission through a NAT device to the destination via a persistent UDP connection between the NRD and the destination. At step **677**, the encapsulated packet is forwarded to the NAT device (via the persistent UDP connection) behind which the destination Agent resides, which will perform its own routing of the encapsulated packet to the destination Agent in step **678**.

In step **680**, the Agent will remove the shim and the virtual IP packet from the encapsulation. The virtual IP packet will be removed from IPsec (e.g. decrypted). In step **682**, the information from the shim will be stored by the Agent. In step **684**, the contents of the virtual packet will be presented to the application on the destination device. That is, the application on the destination device will receive the contents of the data payload, or at least a portion of the data payload

When the destination wishes to respond to the source or the source wishes to send additional information, the process of FIG. **7** can be repeated. However, when repeating the process of FIG. **7** between two machines where communication is already established, the steps of performing the DNS request do not need to be performed again. That is, when the destination wishes to respond, the destination will perform the steps in FIG. **7** starting at step **662**. The Agent for the destination device will already know all the information to put in the shim. Additionally, when the source device wishes to send

16

additional information to the destination device, the source device can start FIG. **7** at step **662**. In some embodiments, however, the steps of performing the DNS request will be performed again.

Member Agent

As noted above, devices in the VCN utilize a member agent installed on the device to communicate. One unique aspect of the system of the present invention is the integration of the agent software in a typical device.

FIG. **8** illustrates the functional flow diagram of an installed agent on a device such as a computer, server or other device. Region **810** illustrates the "user space," and region **820** represents the kernel area of the components interacting with the host device.

Applications **830** interact directly with an IP stack **835** which is built on a deterministic network extender or DNE **850**. The deterministic network extender is provided by Deterministic Networks, Inc. The network extender allows one to implement any driver level functions such as IPsec, browsers, traffic redirectors, and the like, through a series of plug-ins. As shown in FIG. **8**, a number of plug-ins, including a DNS plug-in **852**, an IPsec plug-in **854**, a virtual adapter manager **856** and a domain name router **858** (see U.S. Pat. No. 6,119,171, incorporated herein by reference) interact with the deterministic network extender **850**. The DNS plug-in processes DNS queries by applications via the stack. The virtual adapter manager allows for additional adapters to co-exist in the same device.

The DNE is an NDIS compliant module (in Windows environments) which appears as a network device spire to the protocol stack **835**. The DNE supports the TCP/IP and UDP protocols and various adaptor types. In essence, this forms a virtual network adaptor in device installations. This means that various configurations for each virtual community can be provided for each DNE. This provides the advantage that a number of members or users can utilize the same device, with the device installing a different virtual adaptor using plug-ins for the deterministic network enhancer and each user does not need to reconfigure the network settings of the machine to join each community. Each plug-in is constructed in accordance with standards promulgated by the DNE provider.

As shown in FIG. **8**, user applications interact directly with the IP stack of the virtual adapter. Each adapter provides its own stack to the device's applications. To the applications, each stack appears separate, and no separate routing of the application is required. For example, the IKE user application **825** can interact with the domain name plug-in, the IPsec plug-in, the virtual area management communicator **856**, and the security policy manager **860**. The Adapter Manager **856** allows parallel stacks for each VCN to be implemented and used on each machine. This means a user and device can belong to several VCNs without needing to re-configure IP settings to access each VCN.

VCN Definition

FIG. **9** shows the steps which occur at the VCN Manager to define and establish a virtual community. At step **902**, an administrator sets up a virtual community by providing information to the VCN Manager via a user interface (not shown). It will be understood that the user interface and the method of providing information to the VCN Manager is not critical to the system of the present invention. One particularly advantageous interface is implemented in a World Wide Web browser. The interface may be implemented using HTML, XML, Java Applets, Java Server, Active Server Pager or any of a number of well-known Web technologies. The particular information required to set up the community network is illustrated in FIG. **10**. Next, at step **904**, users who are desig-

US 7,949,785 B2

17

nated by the administrator as being allowed access to the virtual community defined in step **902** are notified by any number of appropriate means. In one implementation, the users are notified by e-mail, although other forms of notification, such as verbal or personal notification, may be used. The e-mail may contain an invitation to join the community, community authentication information, a link to a location to download the Member Agent, and/or a link to the Group Agent. Next, at step **906**, using information contained in the e-mail, users register with the VCN Manager. Registration in this context means registering a machine using a Member Agent or a Group Agent with the VCN Manager. Users may be required to install the Member Agent software. The link in the notification e-mail may provide the user with a location for downloading the Member Agent software as well as instructions for installing the software. Other information, such as system password information, is provided in the e-mail. Finally, at step **908**, management of the community is handled by the VCN Manager. This includes monitoring which registered users have joined and left the system, answering DNS requests, and applying security policies, as described herein. This may include notifying new users and registering those users as the definition of the VCN changes.

FIG. **10** is a flowchart illustrating the process of setting up a virtual community which is performed by an Administrator. Initially, the Administrator sets up a virtual domain name and address domain at step **1002**. This information is used by the VCN Manager and Route Directors to allow members to communicate. Next, users are defined at step **1004**. In one embodiment, the users are defined by providing the domain names of each of the users who will be invited to participate in the VCN. At step **1006**, default passwords are set. This is the password a user first uses to access the system. The user may be forced to change the password for security reasons at a later date. Finally, at step **1008**, polices may be defined at the domain level, the user level, or for individual machines in the domain. Policies are used to allow or deny access to individual machines, services, or other users.

Member Registration

The registration process is the first step that a user and machine go through with the VCN Manager before becoming a member of a virtual community. There are two phases to member registration: a registration request and a registration file request. Registration happens outside of the IPsec tunnels because at registration time no IPsec tunnel exists for the user registering.

In one implementation, all traffic between Member Agents and the VCN Manager (with the exception of Registration and Join function traffic is encapsulated using UDP encapsulation, represented by lines **511***a*, **513***a*, **523***a*, **519**, **521**, **527***a*, **527***c*, **537**, **523***c*, **527***e*, **541**, **543***a*, **533***a* of FIG. **5B**). This encapsulated traffic will carry management traffic between the members and the VCN Manager. A service port is reserved at the VCN Manager in the virtual network for the establishment of a TCP connection between a member and the VCN Manager. A member that joins a VCN is informed of the service port as part of the join protocol. A DNS port is also open on the virtual side of the VCN Manager. In one embodiment, the VCN Manager virtual ports are TCP Port **9001** and DNS UDP Port **53**. The packets used for the initial Registration and the subsequent Join operations use TCP port **80** outside the virtual network. This is represented in FIG. **5** by the solid lines **513***b*, **511***b*, **523***b* and **543***b*.

VCN system protocol packets that are sent outside the system tunneling are HTTP wrapped and sent to the VCN Manager on TCP port **80** to facilitate NAT traversal. More information about NAT traversal will be provided below.

18

Each packet includes a header and payload. For compatibility with firewalls, the HTTP wrapper makes the packet a SOAP-compatible XML document. Including a binary data portion after XML is consistent with Direct Internet Message Encapsulation (DIME), a proposed lightweight, binary message format that can be used to encapsulate one or more application-defined payloads of arbitrary type and size into a single message construct.

The format of the HTTP wrapper from the Member Agent to the VCN Manager is shown in FIG. **11**. The wrapper includes an HTTP HEADER, XML HEADER and P-LENGTH fields. The HTTP header includes a POST HTTP field, an Identity field, a Content Type field, and a Content Length field. The XML header includes version information and packet type information. The Header includes error codes and explanations, as well as the content type and length.

The Registration exchange between the member agent and the VCN Manager is shown in FIG. **12A**. When a Member Agent **565** attempts to register at step **1200**, Member Agent **565** will send a registration request packet **1202** to the VCN Manager **510** to start registration. The packet is included in an HTTP wrapper as illustrated at **1204**. The registration packet will carry the client Fully Qualified Domain Name (FQDN) and a Diffe-Hellman Key Exchange request to the VCN Manager. The packet further includes packet version information, type and length information, a user authenticator, the length of FQDN in octets, a VCN name offset, the member's FQDN in DNS format, the length of Diffe-Hellman value in octets, and the member's initial Diffe-Hellman value.

An Initial Password is passed to the user through an outside channel, such as e-mail (or other channel). In a setting where security is a concern, an alternative method such as personal communication or encrypted e-mail may be used.

The registration authenticator is computed using the first sixteen bytes of the HMAC-SHA-1 applied to the packet data with the password hash as the key. (Normally, the HMAC-SHA-1 algorithm generates a 20-byte result; in one embodiment of the system only the first (leftmost) 16 octets are used in the MAC.) The formulas are as follows:

$$HMAC\text{-}Key\text{-}Field = SHA\text{-}1(Initial\ Password)$$

$$Authenticator = HMAC\text{-}SHA\text{-}1_{16}(HMAC\text{-}Key\text{-}Field, Data)$$

The VCN Manager will respond in one of three ways **1206**, **1208**, **1212**, to the registration packet **1202**. VCN Manager **510** will acknowledge (ACK) the packet at step **1212** with the Registration Acknowledge (ACK) packet **1214** if the member belongs to a community but its status is "not registered." The VCN Manager also sends a phase-2 confirmation code to the member's e-mail address and changes the member status to "registering." The packet will transfer a "Time To Live" value to the member which is a timeout period in seconds for hearing back from the member with the confirmation code. Phase two of registration must be completed in this time period.

If the packet is abnormal (in size, FQDN length, bad type, etc.), the authenticator check fails, the member does not exist in the database, or the VCN server is not running, the VCN Manager drops the packet in step **1206**. The packet will be not-acknowledged (NACK) **1210** if the member is already in the "registered" state, the send e-mail operation fails, the process of updating the member to the "registering" state fails, or the random generator fails in attempting to generate a confirmation code in step **208**.

Upon receiving the Registration ACK **1214**, the user will send Registration File Request Packet **1220** to the VCN Man-

US 7,949,785 B2

19

ager **510** to start registration. This packet will transfer the following information to the VCN Manager: a registration file User Authenticator, the length of FQDN in octets, a VCN name Offset, and the member's FQDN in DNS format.

The registration file user Authenticator contained in the File Request packet **1220** is slightly different from the Registration Request Authenticator in packet **1202**, in that the Initial Password, passed to the user through an outside channel (e-mail for example), and the Confirmation Code, a temporary code sent in the second e-mail with a timeout to the user, are used:

$$HMAC\text{-}Key\text{-}Field=SHA\text{-}1(Initial\ Password)$$

$$User\ Authenticator=HMAC\text{-}SHA\text{-}116(HMAC\text{-}Key\text{-}Field,SHA\text{-}1(Confirmation\ Code)+Data)$$

The VCN Manager will send a Registration File acknowledge Packet **1230** to the member **565** in response to the Registration File Request packet **1220** in step **1228** if it is determined that the member belongs to a community. The Acknowledge Packet **1230** will transfer the following information to the member:

Crypto Type—a code indicating how the rest of the packet is encrypted. This is provided in a crypto type field preceding the registration file.

Registration File—a structure with a number of fields containing the information required by the member to successfully perform a join. It is sent encrypted using the key generated via the Diffie-Hellman key exchange.

A table representing the Registration File structure is shown in FIG. **12B**. As shown therein, the Registration File contains an Authentication Type, a File Type, a File Length definition, a Token Key, a Key Timestamp, a Key Type, a Key Length, a High Availability (HA) Version, a HA Number, Server Information and Padding. The Token key is the shared secret with the server. The Token Key is identified by the Key Type, which is normally a Diffie-Hellman type in one embodiment. The VCN Manager also changes the member status to "registered."

If at step **1224**, the member agent status is not set at "registering," or the timeout for phase 2 has expired, a NACK packet **1226** is sent. If the packet is abnormal (in size, FQDN length, bad type, etc.), the authenticator check fails, or the user does not exist in the database, or the VCN server is not running, the packet is dropped in step **1222**. While current encrypting method for the file is to generate a key/IV pair from the combined Diffie-Hellman value using a Key Derivation Function, any number of suitable substitutes may be used.

In addition to the registration authentication described above, the system uses a packet authenticator to verify communications between the VCN Manager and Agents. The Authenticator is a cryptographically strong hash of the packet keyed by a shared secret between the source and destination. The authenticator is calculated over the entire packet using the HMAC-SHA-1 algorithm. The inputs to this Authenticator are not available until after Registration. As illustrated above, during registration an Authenticator based on the user password is used. The fields used in the calculation are a Diffie-Hellman Key comprising a multi-octet random string that is the result of the Diffie-Hellman key exchange protocol, and the entire packet data, with the Authentication field zeroed out.

The Authorization Key, AuthKey, described above, is derived from Diffie-Hellman using the KDF2 function, and used for general packet Authentication. AuthKey=KDF2 (Diffie-Hellman Key)MAC=HMAC-SHA-116(AuthKey,

20

Data). The AuthKey need be calculated only once per registration from the KDF2 of the DH key and then stored for later use. It is known as the Authentication key and is 20 octets long.

Member Join/Leave

Once a user is registered, the user can join the VCN. Once joined, the user is a member of the VCN. Joining allows the user to let the VCN Manager and other members know that the user/member is on-line and available to communicate. The Join protocol runs between a Member Agent and the VCN Manager to establish a session key with the Manager, authenticate to the Manager, and make use of connections via the Route Directors in the community.

The Member Join process is illustrated in FIG. **13**. There are two phases to the Join operation: phase one is an Initialize Request and phase two is the actual Join. At join time, the IPSec tunnel for secure communication is not established, so the first few join packets are sent outside the IPSec tunnel.

Initially, at **1302**, the Member Agent **565** will send an Init Request Packet **1304** to the VCN Manager **510** to start authentication. The packet will carry the following information to the VCN Manager:

Version Variant Mask—used to indicate optional variations of the protocol from the member to the VCN;

Token Timestamp—identifying when a Token Key was created (in seconds);

Member seed—a random number to thwart so called "man-in-the-middle" attacks;

Member Local IP—the member's Local LAN IP address; and

Client FQDN—the client's fully qualified domain name.

Again, three responses **1306**, **1308**, **1312** are possible. At step **1306**, if the packet is abnormal, it will be dropped. Similarly, if the member fails authentication, at step **1308** a NACK packet **1310** will be sent.

If the member passes authentication at **1312**, the Manager will send an acknowledgement packet **1314** to Member **565**. An AuthKey is also transmitted as part of the INIT Request Packet, and the Manager authenticates the packet by checking this against a secure key digest. The acknowledgement packet **1314** packet will transfer the following information to the member:

Version Variant Mask—version information;

Member Seed—from the Init Request to protect against playback attacks;

Manager Seed—a unique seed used to thwart man in the middle attacks;

Session AH Key—used in IPsec;

Session ESP Key—used in IPsec;

Ink ACK Time—a time stamp used to tie this packet to the following Join Request. There is a timeout if the Join is delayed too long;

Authentication Method—the method used for authentication;

Route Director Private IP—if member is in a private network, this is the private IP address of the Private Route Director. The value is zero if no Route Director is used;

Route Public Public IP—if member is in a private network, this is the public IP address of the Private Route Director. The value is zero if no Route Director is used;

Tunneling Port—used for UDP encapsulation Route Director Flags. Only Bits **0** and **1** currently used to direct the agent to a Private Route Director, Network Route Director with UDP, or a Network Route Director with TCP.

At step **1312** of the join process, the VCN Manager will also determine whether the Member Agent attempting to join

US 7,949,785 B2

21

is behind a NAT device. The method by which this occurs is discussed below with respect to FIG. **21** and the results of this determination may force the Agent to negotiate a session with a Network Route Director which will provide a pseudo address value used as the Agent's local IP value in the Join request, discussed below. This process is discussed in depth with respect to FIG. **21**.

Following receipt of the acknowledgement packet, at step **1316**, the member will send Join Request Packet **1318**. The packet's payload includes a manager seed, the initial ACK time, join flags, the member machine's local IP address (or pseudo address), the Route Director's private IP address, the Route Director's public IP, the member AH SPI and ESP SPI, the member listen port, a token timestamp, a GUID identifying the current client run, NetBIOS name support, a password hash, version information for high availability and security policy information.

In step **1320**, the VCN Manager will drop this packet if it is abnormal. In step **1322**, the VCN Manager will send a NACK packet **1324** if the member is not in the registered state, the timeout for Join from INIT ACK has expired, or updating the member to the Joined state fails.

If the join action succeeds, then in step **1326** the VCN Manager will send an acknowledge packet **1328**. The acknowledge packet payload includes the RMI Port at the VCN Manager, the Tunneling Port, VCN Manager Authentication Header (AH), Security Parameters Index (SPI) for IPsec, VCN Manager Encapsulating Security Payload (ESP) SPI for IPsec, the UTC Time (in seconds) when the member joined, VCN Manager Heartbeat interval (in seconds), the Member Heartbeat interval (in seconds), the VCN Manager's Virtual IP address, the Manager Subnet Prefix Length, the VCN Member Subnet Prefix Length, the Route Director's private IP address, the Route Director's public IP address, an indication of the updates that follow, an update of the Token Key, an update of the Security Policies, an update of High Availability indication, and padding. The member has now joined the community at **1330**. Once the member has joined, all communications can be encrypted using IPsec.

The system of the present invention also includes RADIUS authentication support. Generally, if a member attempts to authenticate using a RADIUS server, the VCN Manager will perform the same steps as when it receives the Join Request packet except for having a RADIUS server authenticate the member. The payload for this packet is similar to the Join Request packet except that it has an additional field for RADIUS password that is used by the RADIUS server to authenticate the member.

FIG. **14** shows the sequence for leaving a VCN. Initially, at step **1410** when a Member Agent is prepared to leave the community, a Leave Request Packet **1412** will be sent to the VCN Manager **510** to start the leave process. The Leave Request Packet will carry a Leave Flag, the FQDN Length, FQDN VCN Offset and Member FQDN. Unless dropped at step **1414** or a problem exists at **1416** which would generate a NACK packet **1418**, the VCN Manager will send the Leave ACK Packet **1430** to the member in step **1420**. This packet has no payload. At step **1440**, the member has successfully left the community.

DNS/Lookups

For one member to communicate with another member, the initiating member's agent will perform a query or DNS lookup (step **654** in FIG. **7**) to determine the address of the other member, and then establish a secure communication channel between them.

The Member Agent utilizes the VCN Manager to perform lookups of other virtual members in the virtual community

22

using DNS. The DNS operation is conducted using the DNS protocol with the VCN Manager. The member software sends a DNS query to the VCN Manager, and the manager returns information about the target member. Besides the target member's virtual IP address, the DNS response also contains additional information about the target member. While the VCN Manager accepts all DNS requests, it will only acknowledge the DNS requests of type A, which are targeted to virtual domain names in the secure virtual communities of the VCN Manager. The VCN Manager is the authoritative name server for those virtual domain names; other requests will simply be responded to with a "Server Failure."

The DNS query and response sequence is illustrated in FIG. **15**. At step **1510**, a member will request a DNS lookup by sending a DNS request **1520** to port 53 of the VCN Manager. The DNS request **1520** will result in a normal DNS response **1575** unless any of a number of failure conditions are met, shown at steps **1522**, **1540**, **1550**, and **1560**.

If the Manager receives a query on port 53 that is not a DNS query, then at step **1522**, it is dropped. If, at step **1524**, the query is not a standard query, such as a DNS STATUS (a status lookup) or IQUERY (inverse DNS), or the class of the DNS query indicates an Internet (IN) query, or if the TYPE value of the request is a pointer (PTR) or host address (A), then, a "Not implemented" DNS response **1530** is sent over the virtual link to the Member Agent **565**.

At step **1540**, the VCN checks to see if the source IP address is for a member of the VCN. If the source IP address is not for a member of the VCN, the virtual IP look up fails or the type PTR query does not match, a "server failed" response **1545** is returned. At step **1550**, if there is no DNS Question section or there is another type of format error with the packet, a "format error" response **1555** is sent. The VCN determines whether the member has joined the VCN, at step **1560**. If not, a name error response is sent at **1565**.

If the name is a successful lookup (step **1570**), then the VCN Manager will send a DNS Response Packet **1575** to the member **565**. The response includes the following information: the target member FQDN; the target member virtual IP address; a source Route Director flag, the source member virtual IP address; the target member join time; the target member agent version; the target member private IP address; the target Route Director public IP address; the target member NetBIOS name; the shared key, shared by the two members; a target Ticket length; a target member Ticket encrypted for target member only and containing a Ticket issue time, Ticket expiration time, and shared key; the target member virtual IP address, the source member virtual IP address, the source member private IP address; the source Route Director public IP address, the source member FQDN; and padding (to obtain a multiple of 16 octets). The Ticket provided by the DNS request is detailed further in the description of FIG. **16B**.

The target member's virtual IP address will be presented using an A-type resource record in the answer section of the normal DNS response packet. All the remaining information will be transferred using a TXT-type resource record in an additional section of the DNS Response.

Encapsulation

Traffic between Member Agents in the VCN is encapsulated using UDP encapsulation. Encapsulated traffic between members can carry any IP traffic from any standard IPv4 compliant application. However, one port is set aside in the virtual network at the application layer to establish a connection between two members in the community. In one embodiment, this is UDP port **500**, which is set aside for Internet Key Exchange (IKE), allowing negotiation of an IPsec tunnel between the two members.

US 7,949,785 B2

23

When an application on a member device wishes to open a connection to a peer on a target member device, a protocol is followed for the establishment of the IPsec session between the two. Member Agents are configured to listen on the UDP tunneling port (which defaults to port 20202) for virtual traffic. As an accepted procedure non-IPsec traffic on the virtual IKE port 500 is accepted and passed to an IKE and Security Policy Module to allow for the possibility of initiating, an IKE exchange and the establishment of an IPsec session between the two members.

IKE is fully described in RFC-2409. IKE provides a key exchange with a peer and creates a security association (SA) for the IPsec module. IKE access between peers occurs in two phases: phase 1 establishes a secure, authenticated, channel with which to communicate, and phase 2, which negotiates a Security Association on behalf of IPsec. Phase 1 is generally referred to as the ISAKMP Security Association (SA) and includes a "Main Mode" and "Aggressive Mode." In one implementation, Aggressive Mode is used for phase 1. One of the allowed phase 2 exchanges is "Quick Mode" and in one implementation, Quick Mode is used in the system for phase 2.

FIG. 16B shows the aggressive mode IKE phase one exchange utilized in the present invention. FIG. 16A shows the standard aggressive mode IKE phase one exchange for comparison. In these figures, in accordance with standard IKE parlance, one device is considered an exchange "initiator" and the other a "responder".

In general, in phase one of the IKE exchange, peers are authenticated, an IKE Security Association (SA) policy between peers is established, a Diffie-Hellman exchange is performed to produce matching shared secret keys and a secure tunnel to negotiate IKE phase two parameters is established.

In FIG. 16A, an initiator exchanges a header (HDR), SA negotiation payload, Key Exchange (KE), nonce payload (Ni, where "i" indicates an "initiator" payload) and identity of the party (IDii). The key exchange payload contains the public information exchanged in a Diffie-Hellman exchange. The responder returns the HDR, SA, KE, a responder nonce payload (Nr), its identity (IDir) and the HASH responder (HASH_R) payload, which is generally a hash of the ID payload and is used to authenticate the exchange. The initiator returns the HDR and HASH initiator (HASH_I) payload, and the initial secure tunnel is established.

In accordance with the present invention, FIG. 16B illustrates the use of an extension to aggressive mode exchange. This is performed by adding a ticket payload (TKT*) to distribute a shared-key to remote peers.

The Ticket is the means by which one Agent can identify whether another Agent is a trusted member of the virtual community. Essentially, the Ticket includes information identifying the initiating member to the receiving member.

The ticket is issued by the VCN Manager and encrypted for the receiving member with a member-server shared secret; only the receiving member can open it. The ticket contains a time-stamp, a sequence number and a shared-secret used for IPSEC between the two members. To communicate with the receiving member, the initiating member obtains the ticket from the VCN Manager (through, for example, the DNS sequence, described above) and passes it to the receiving member in a payload that can ride on an IKE packet. The receiving member receives the Ticket, decrypts the Ticket using the member-server shared secret, and uses the information in the Ticket to establish secure communication with the initiating member.

24

This payload, TKT, is formatted as shown in FIG. 17. The packet 1700 contains an IP header 1710, UDP header 1720, System shim 1730, and Virtual IKE Phase 1 UDP/IP packet 1740. FIG. 18 illustrates the structure and data of an exemplary first packet 1740. The IKE Ticket Payload in the first IKE packet contains information on the payload and the payload data, including the type of payload following next and the ticket payload data 1756. The payload data 1750 includes the size, number and item list 1766. The item list 1760 includes type, size and item information. The IKE ticket payload data 1740 contains the item types

The item types 1770 are shown in the last table of FIG. 18: "My FQDN"—a null terminated FQDN in label dot format. (For example, a human readable FQDN "bob.system.com" is encoded as "bob.system.com\0x00.") My Ticket data which includes a Manager Current Time (UTC of Manager as known by initiator); and an Initiator Virtual IP (Obtained at Join time) Target Virtual IP (Obtained from Manager) and Padding. The Peer FQDN Format is a null terminated FQDN in label dot format. For example, a human readable FQDN "bob.system.com" is encoded as "bob.system.com\0x00". Finally, the Peer Ticket data includes: a Ticket Issue Time (UTC (seconds) on VCN Manager); a Ticket Expiration (UTC (seconds) for ticket expiration); a Shared Key used by the two Members for IKE; a Target Virtual IP Address; the Initiator NAT Port; the Initiator Subnet; the Initiator Virtual IP Address; Initiator Private IP Address, the Initiator Public IP Address, the Initiator FQDN and padding.

The Diffie-Hellman key exchange protocol is utilized in the Internet Key Exchange (IKE) protocol that precedes IPsec. The prime and generator value are taken from a well-known Internet Draft entitled, "More Diffie-Hellman groups for IKE," Kivinen et al., IP Security Protocol Working Group (IPSE) Internal Draft, Dec. 13, 2001, for proposed use within the Internet Key Exchange (IKE) protocol.

Administrative Functions

The system can simulate pings to any of the Route Directors (NRD or PRD). This ping is sent inside a packet generated from an application used to trouble-shoot the virtual network by touching the Route Directors and insuring that they are alive.

An exemplary ping process is illustrated in FIG. 19. As shown therein a pinging application 1902 at step 1904 sends a ping request packet 1906 to the Route Director 560. The Route Director receives the ping at 1910 and generates a response at step 1912. The ping response packet 1914 is returned to the application 902 at step 1916.

The ping request packet is sent and returned on the default tunneling UDP port (which in FIG. 5B is UDP Port 20202). The Ping Request 1906 packet is formatted as shown in FIG. 19, with the content of the shim and the ping packets exploded in further detail. In the shim 1930, the source and destination Route Director public IP addresses (gIP) and private IP addresses (pIP) are all set to 0. In the system ping field 1960, the ping type field may be a ping request or a ping response. The Sequence field in the response is set to the same value as the Sequence field in the request packet.

Another function which may be performed is an Agent Query. FIG. 20 illustrates a query request from a Member Agent requiring system/status information of another member. The first Member Agent 565 at step 1802 will send a Query Request Packet 1810 to the VCN Manager 510. The Packet contains definitions for the Maximum Number of Records to return, a status Mask indicating whether the members are registered and/or joined, a platform Mask, indicating the platform (desktop, server, laptop, mail server, etc) of the member, the FQDN Length, FQDN VCN Offset, Search

US 7,949,785 B2

**25**

String Length, Member FQDN and a Search String for pattern matching. This packet is sent over the IPsec tunnel between the VCN Manager and the Member Agent.

If the packet is abnormal it is dropped at step **2012** if there is an error in the query authentication file or the member is not joined, NACK **2016** is sent in step **2014**. If the packet is not abnormal, no error is present, the member passes authentication and was joined, then the VCN Manager sends a query acknowledgement Packet **2030** to the member. The packet payload includes a number of records with the following fields: the status of the member, the platform type of the member, and the member's FQDN String. Note that the FQDN is null-terminated and consistent with the FQDN in DNS format definitions. Here, a human readable FQDN "www.abcdefg.com" is encoded as "www.abcdefg.com\0x00".

Each joined member will periodically send a heartbeat packet to the VCN Manager so that the VCN Manager can determine if the member is alive. In addition, the member's heartbeat packet is used to determine how long the member is actually joined. This information can be used to allow a provider of the infrastructure for the system to generate revenue from users on a per-use time basis. Conversely, the VCN Manager periodically sends its heartbeat packet to joined members so that the joined members can know if the Manager is alive. This can be used by the member to determine if it should switch to a backup VCN Manager. Heartbeat packets are sent inside the system tunnel on the default tunneling port (UDP port **20202**) and are IPsec protected.

Route Directors

Route directors allow communication to a member that is in a private network. The PRD resides within a private network, behind the NAT device. The NRD resides on the public side of the NAT device. The NAT device can be a Network Address Port Translation (NAPT) NAT device or a basic NAT where only addresses are translated.

Note that devices with public addresses do not require Route Directors (RDs). In the context of FIG. 5B, devices $M_A$ and $M_E$ do not require either a PRD or NRD, since they reside in the public address space. Likewise, $M_X$ does not require the PRD for its domain **540**, since it has a public address (or is statically mapped to a public address at the NAT device **515**).

The NRD implements a NAT traversal architecture which allows System packets to enter and exit a private network. The NRD maintains persistent connections/sessions with members that are behind NAT devices. Member Agents initiate a TCP or UDP persistent connection/session with the NRD and use keep-alive messages to ensure that the NAT device does not drop the member's connection/session. The use of TCP or UDP is based on a bit set by the VCN Manager in the INIT ACK packet of the Join Protocol. Communication to a member uses NRD tunnels between the NRD and the Member Agent through the persistent connection/session. More information about a suitable NAT traversal architecture is found in U.S. Pat. No. 7,139,828 and U.S. patent application Ser. No. 10/233,288, "Communicating With An Entity Inside a Private Network Using an Existing Connection to Initiate Communication," both of which are incorporated herein by reference.

When a member behind NAT attempts to join a virtual network by contacting the VCN Manager as discussed above, the VCN Manager will detect the presence of the NAT device, direct the member to a specific NRD and indicate the use of TCP or UDP. The presence of the NAT device must be detected during the initialize Init message portion of the join sequence so the VCN Manager can inform the member that it needs to setup a session with the assigned NRD prior to the Join message sequence.

**26**

In one embodiment, the NRD uses a pseudo address. The pseudo address is different than the virtual address and is used solely for NRD routing. The pseudo address assigned by the NRD will allow the NRD to map a packet to the member's post-NAT IP address and UDP port.

The process for establishing a session with a NRD and obtaining an address therefrom is shown in FIG. **21**. Initially (as described in FIG. **13**), a member behind a firewall will send an init request **1304** to VCN Manager **510**. In addition to the functions performed with respect to step **1306**, **1308**, and **1311** (of FIG. **13**), the VCN Manager will detect that the member is behind a NAT device and whether it is served by a PRD in step **2120**.

The detection of a NAT device is accomplished using a field with the member's local IP address in the Init packet sent to the VCN Manager. The VCN Manager detects the fact that Agent **565** is behind a NAT device by comparing the member's private IP address in the INIT message payload with the source address in the TCP/IP headers. If the addresses differ, then a NAT device is present. At step **2120**, the VCN Manager must next check if the member's NAT device is associated with a known PRD (Premises Route Director). If no PRD is found, then the VCN Manager will check if the member can use a known NRD. If an NRD is found then the INIT ACK **1314'** will indicate that the member must establish a session with the NRD prior to joining the VCN. If the NRD can support TCP tunneling, the INIT ACK will also indicate to the member to start a TCP connection rather than a UDP connection. If neither a PRD nor an NRD is found for the private member, an Init NACK will be returned. The VCN Manager will find an available NRD and send an INIT ACK **1314'** with the NRD info data contained therein. The contents of an INIT ACK packet **1314** are discussed above with respect to FIG. **13**.

At step **2132**, the member will seek to establish a session with the NRD and will send address request **2130** to the NRD. The member sends the Address Request Packet **2130** to the NRD. The packet includes an IP Header, UDP Header or TCP header, and Shim. In this case, the shim includes the NRD's public address. At step **2135**, the NRD assigns the member a pseudo address. This is used as the member's private address in the Shim when external members send packets to the NRD for forwarding to the private member. The NRD will store the association of the pseudo address with the Member's NAT device public address and port number. When other members of the VCN perform a DNS request on the member behind the NRD, as part of the DNS response, they will receive the public address of the NRD and they will receive the pseudo address as the private address for the member behind the NRD. When sending a communication to the member behind the NRD, the outer packet will be addressed to the public address of the NRD. The NRD will access the shim to identify the pseudo address. The NRD uses the pseudo address as a handle to the persistent connection/session when sending packets through a NAT to the member. Once identifying the appropriate persistent connection/session, the shim and virtual packet are encapsulated and sent to the destination, via the NAT device, using the identified persistent connection/session. When the NAT device receives the message, it will do the address and port translation, and forward the message to the member agent's real local address and port on the private network.

In one aspect, the pseudo address comprises portions of the public IP address space in IP version 4 that had been reserved for special purposes. This ensures that no machine within a private realm will have the same pseudo IP address as the private address of a machine in any separate and distinct

US 7,949,785 B2

27                                      28

private realm. In order to prevent this from happening, the system of the present invention uses addresses that are otherwise not used or reserved. Examples include the 0.0.0.0, the 10.0.0.0, 14.0.0.0, 127.0.0.0, 169.2454.0.0, 172.16.0.0 and the like.

The NRD provides the pseudo address to the Agent 565 in a NAT Traversal Address Response Packet 2140. The packet includes a shim having an indicator that the response is a pseudo address response, as well as the source Route Director public IP address and Destination Route Director public IP address, (which is set equal to the NRD address), the Source member private IP address (0) and the Destination member private IP address, which is the Virtual IP. Hence all communications for the Member Agent will be routed to the NRD 520. After acquiring the pseudo address from the NRD, the member designates that pseudo address to the VCN Manager as its local address in Join packet 1318.

Note that there is an extra packet exchange 2145, 2150 when establishing a TCP connection that is not required when establishing a UDP connection with the NRD. This packet is the NRD Init Request Packet 2145. The previous TCP session for the Address Request and Address Response must be closed and a new TCP session opened which will remain open for the duration of the tunnel session. The member sends the Init Request message to the NRD as the first message in this TCP session. This message only has a TCP header and System Shim preamble, and has no data following the Shim.

After receiving the pseudo address, the join process completes with the join request packet 1318, and join ack packets 1328. After the join processing is complete, TCP/UDP encapsulated traffic flows between the member and the NRD through the NAT. The member is now ready to establish connections with other members.

When outbound System traffic from a member behind a NAT device to the NRD is not frequent enough to keep the NAT device's mappings active, the member may to send keep alive messages to the NRD's TCP port 80 or UDP encapsulation port to ensure that the NAT device does not drop the TCP/UDP encapsulation session. The member sends this message to the NRD to ensure that the NAT device does not drop the TCP/UDP port mapping. The keep-alive messages do not need to be sent when other messages were sent out during the keep-alive interval.

The member sends this NAT Traversal Leave Packet message to the NRD to release the session and pseudo address when the member is leaving the VCN. The NAT traversal switch will verify that the receive-from socket address this message came from matches the lookup table entry before deleting the member's address.

Group Agent

For some devices, member client software cannot be installed on the device or it is not desirable to install member client software on the device. For example, a printer or other networked devices may not be able to load software. For various reasons, some entities may not desire to add network software onto their machines. Additionally, some devices may use operating systems that do not support running the member agent software. For those devices that cannot or choose not to use member agent software, a Group Agent can be used. The Group Agent acts as a proxy for one or more members of a VCN without requiring installation of member agent software on the client devices. Thus, a device can become a member of a VCN without changing any of the software on the device by using the Group Agent.

FIG. 22 is a block diagram depicting various components of the present invention utilizing a Group Agent. Note that some of the members of a VCN can use a Group Agent while other members do not use a Group Agent. FIG. 22 shows ten devices $M_1$-$M_{10}$. Devices $M_1$, $M_2$, $M_3$, $M_4$ and $M_{10}$ are devices that are participating in the VCN without using member agent software. Rather, they will use a Group Agent. Devices $M_5$, $M_6$, $M_7$, $M_8$ and $M_9$ are devices which include member agent software and, therefore, do not need to use a Group Agent. FIG. 22 shows some of the many varieties of permutations of using Group Agents, Network Route Directors and Private Route Directors. Other permutations can also be used with the present invention. Also note that FIG. 22 is more of a structural view of additional components of the present invention, as compared to FIG. 5B which is more of a symbolic/logical view.

FIG. 22 includes a first private network which connects to the Internet (or other network) via NAT device 2202. In addition to NAT 2202, the private network includes device $M_1$, device $M_2$ and Group Agent 2204. In one embodiment, the Group Agent runs on the same machine as a Private Route Director. Devices $M_1$ and $M_2$ do not include agent software. Rather, they participate in the VCN using Group Agent 2204.

A second private network allows devices to communicate to the Internet (or other network) via NAT device 2210. That private network also includes Group Agent 2212, device $M_3$ and device $M_4$. Note that Group Agent 2212 does not include a Private Route Director. Thus, for devices $M_3$ and $M_4$ to be reached by other members of the VCN, communication is performed via Network Route Director 520. In one embodiment, each of the private networks are different physical address realms. That is each uses a different set of private IP addresses. The present invention will also work if the private networks have overlapping addresses. That is, one or more private IP addresses are used by more than one private network involved in a VCN.

A third private network, which includes devices $M_5$ and $M_6$, provides for communication on the Internet via NAT device 2220. A fourth private network, which includes devices $M_7$ and $M_8$, allows its components to communicate on the Internet (or other network) via NAT device 2230. This fourth private network includes Private Route Director 2232. Because devices $M_7$ and $M_8$ include member agent software, there is no need for a Group Agent on this network. Device $M_9$ has a public IP address and includes member agent software; therefore, it communicates and participates in the VCN as described above. Device $M_{10}$ has a public IP address; however, device $M_{10}$ does not include member agent software. For device $M_{10}$ to participate in the VCN, it must make use of Group Agent 2234, which has a public IP address.

In one embodiment, a Group Agent includes software running on a computing device, including (but not limited to) a server, router, personal computer, minicomputer, mainframe, mobile computing device, or other suitable computing device. In other embodiments, the Group Agent, or any other of the software components described above, can be performed by its special purpose computing device.

A Group Agent acts as a proxy for one or more members which do not have member agent software. For example, Group Agent 2204 is a proxy for devices $M_1$ and $M_2$; and Group Agent 2212 is a proxy for devices $M_3$ and $M_4$. Group Agent 2234 is a proxy for device $M_{10}$. Although FIG. 22 shows the Group Agents being proxies for one or two members, a Group Agent can be a proxy for more than two members.

Communication between two members of a VCN can pass through two NAT devices, one NAT device for each member. For example, communication between device $M_1$ and device $M_4$ will pass through NAT device 2202 and NAT device 2210. Additionally, communication between device $M_1$ and another

US 7,949,785 B2

29

entity in a private network configured like the private network of device $M_1$ will require communication to pass through two NAT devices.

Note that a single Group Agent can participate in more than one VCN. For example, Group Agent **2204** can be used to allow device $M_1$ participate in a first VCN and concurrently (for all or part of the time) allow device $M_2$ to participate in a second VCN. Because there can be multiple virtual community networks, the VCN Manager is able to create and maintain, the multiple virtual community networks. As described herein, the VCN Manager identifies which entities can communicate on each VCN by maintaining a list of domain names for each VCN. For example, one list may include the domain names for devices $M_1$-$M_{10}$.

The Group Agent requires initialization so it may know which members it is a proxy for. Group Agent initialization cannot occur until after the Group Agent has joined the VCN Manager as a member. The join prior to Group Agent initialization is for a pseudo-member so the proxy initialization messages can use virtual IP addresses and the tunneling protocols described above to travel on an IPsec tunnel between VCN Manager **510** and the particular Group Agent. Separate member specific tunnels will be created when the Group Agent later joins for the proxied members. The Group Agent join will require the Group Agent to be registered with the VCN Manager. In one embodiment, this registration will be done during the installation of the Group Agent.

FIG. **23** provides a flowchart describing one embodiment of the process for Group Agent initialization. In step **2302**, the Group Agent joins as a pseudo-member. This process of step **2302** is performed as described above. In step **2304**, the Group Agent will send an initialization request to the VCN Manager. The initialization request is a packet that includes the fully qualified domain name for the Group Agent, a packet version indication, a packet type indicating that it is an initialization request, a packet length, and an authentication code. If the received initialization request is abnormal (step **2306**), then the initialization request is dropped in step **2308**. If the packet was normal but authentication failed (step **2312**), then the VCN Manager sends a NACK to the Group Agent in step **2314**. If authentication was successful and the initialization request was normal, then the VCN Manager sends an acknowledgement to the Group Agent in step **2320**.

After completion of step **2320**, the Group Agent is initialized and now must join each of the members it is proxying. To do so, the Group Agent will perform a loop where each iteration will include joining for one of the members that is being proxied. In step **2322**, it is determined whether there are any more members being proxied that have to be joined. If there are more members to join, then the Group Agent will join for one member being proxied in step **2324** and the method will loop back to step **2322**. When there are no more proxied members to be joined, the process of FIG. **23** is complete (step **2330**). The process of joining for a proxy member is the same as the process of joining described above; however, the process is performed for the member by the Group Agent rather than by the member agent. The virtual IP address received by the Group Agent is for the member being proxied. The Group Agent stores that virtual IP address in a data structure for the member. In one embodiment, there is a separate data structure for each member being proxied. In another embodiment, there is one data structure which has separate records for each member being proxied. This data stored will include the member's virtual IP address and private address in the local LAN, as well as other information that will be described below.

30

The acknowledgement sent from the VCN Manager to the Group Agent in step **2320** contains all of the member information required so the Group Agent can send the appropriate join requests for each member being proxied. The following information is in the acknowledgement sent from the VCN Manager to the Group Agent: packet version indicating the version of the header, packet type indicating that it is a acknowledgement, packet length, authentication code, subnet IP address, subnet prefix, public IP address of the Private Route Director (when the Group Agent also includes a Private Route Director), Private Route Director ping flag (1 if PRD responds to pings), the number of members being proxied, the number of permanent connections from proxied members to other members that the proxy must make, the member record list and the connect record list. The member record list is a set of records for each member being proxied. The following information is stored in each record: member password (password SHA1 digest), member's local private IP address, the length of the member's fully qualified domain name, the member's fully qualified domain name, offset to the VCN name, authentication type (0=preshared 1=certificate), time stamp indicating when the token key was created, token length in bytes, token key (member shared secret with VCN Manager), HA version number, number of HA records, HA record list and authentication key (generated by server for the proxy). Each HA record in the HA record list includes a VCN Manager IP address for the next VCN Manager, a join port for the next VCN Manager and a service port for the next VCN Manager in case the current VCN Manager goes down. The connect record list includes the following three fields: proxy member index (zero based index into member list), DNS request length and a DNS request.

Once the Group Agent joins for all of its members, then any of its members can receive communication from other members of the VCN or can initiate communication to other members in the VCN. Members that are being proxied by a Group Agent can communicate with other members being proxied by the Group Agent, with other members proxied by a different Group Agent (regardless of whether they are in a private network or available on the public Internet), and members that do not use a Group Agent (regardless of whether those other members are in a private network or available on the Internet with a public IP address), as long as they are all members of the same VCN. From the point of view of an application on a member being proxied by the Group Agent, the VCN appears as a local subnet (or LAN) and all of the members of the VCN appear to be on the local subnet (or LAN). However, the VCN is not a local subnet (or LAN); rather it is a virtual subnet (or LAN). Each of the members of the VCN will have a Virtual IP Address on the virtual subnet.

Because members of a VCN register with the VCN Manager, the VCN Manager will know how to find the members (e.g. it will know its public and private addresses). Thus, a Group Agent acting as a proxy for a first member will be able to act as an intermediary for that first member when talking to a second member of a VCN even if the second member moves to a different or new private network and/or changes its IP address. That is, when the second member makes the move or change, the second member will so inform the VCN Manager. The VCN Manager will inform the Group Agent of the change so that the Group Agent can continue to act as an intermediary between the first member and the group member. More information about communicating with mobile entities can be found in U.S. Pat. No. 7,139,828; U.S. patent application Ser. No. 10/161,573, "Creating A Public Identity For An Entity On A Network," filed on Jun. 3, 2002; and U.S. patent application Ser. No. 10/233,288, "Communicating With An Entity

US 7,949,785 B2

**31**

Inside A Private Network Using An Existing Connection To Initiate Communication," filed on Aug. 30, 2002, all three applications are incorporated herein by reference in their entirety.

FIG. 24 is a flowchart describing one embodiment of a process for initiating communication with a member that is being proxied by a Group Agent. In FIG. 24, the communication is being initiated by a member that is not being proxied by a Group Agent. That is, the member initiating communication is a member that has agent software loaded on it. That member is initiating communication with a member that does not have agent software. Prior to the process of FIG. 24 being performed, the Group Agent has joined the member into the VCN and the member initiating communication has already joined the VCN. For example purposes, looking at FIG. 22, the process of FIG. 24 can be performed by $M_5$, $M_6$, $M_7$, $M_8$ or $M_9$ initiating communication with any of devices $M_1$, $M_2$, $M_3$, $M_4$ or $M_{10}$. Assume, for example purposes, that device $M_9$ is initiating communication with device $M_1$. The destination device is also assumed to be served by a Private Route Director.

In step 2402, an application on the source device (e.g., device $M_9$) is intending to send a message to an application on the destination device (e.g., device $M_1$). In step 2404, the application on the source device sends a DNS request to the VCN Manager using the domain name of the destination. For example, the application on $M_9$ will send a DNS request using the domain name for $M_1$. In step 2406, the VCN Manager returns a response to the DNS request. This response includes the public IP address for private Route Director 2204, the private IP address for member $M_1$ and the virtual IP address for member $M_1$. In some embodiments, the DNS response also includes a token key (as described above). The Agent on the source device (e.g., $M_9$) stores the information it received from the VCN Manager. In step 2410, the Agent on the source device returns the virtual IP address for the destination to the application which initiated the DNS request. In step 2412, the application on the source device initiates the sending of a message to $M_1$ using the virtual IP address. That is, a virtual IP packet is created where the source address is the virtual IP address for the source machine ($M_9$) and the destination address in the virtual IP packet is the virtual IP address for the destination device (device $M_1$). The virtual IP packet is created in step 2414 and subject to IPsec (or other security means). In step 2416, the virtual IP packet is encapsulated. Encapsulation includes adding a shim, a UDP header and an IP header, all as described above. The shim includes the public IP address for the Private Route Director associated with the destination member (e.g., PRD 2204) and the private IP address for destination (e.g. member $M_1$). If the source, the member initiating communication was in a private network, then the shim would also include the public IP address for the Route Director associated with the source and the private IP address for the source. In step 2418, the encapsulated packet is sent to the NAT for the destination's private network. That is, in the example above, the newly created packet is sent to NAT 2202 via the Internet (or other network). In step 2420, the encapsulated packet is sent from the NAT (e.g., NAT 2202) to the Route Director for the destination (e.g., PRD 2204).

In step 2422 of FIG. 24, the Route Director removes the virtual IP packet and the shim from the encapsulation and presents both the virtual IP address and the shim to the Group Agent (e.g., Group Agent 2204). The Group Agent stores the information from the shim, as described above with respect to the member agent software. In one embodiment, the Group Agent includes the necessary logic to received the communi-

**32**

cation so that no route director is necessary. In step 2426, the Group Agent extracts the virtual IP packet from IPsec. In step 2428, the Group Agent chooses a private IP address for the source entity. In the above example, the source entity is device $M_9$. Group Agent 2204 will pick a private IP address that is routable in the private network associated with device $M_1$ and NAT 2202. This private address will be used by device $M_1$ to identify $M_9$. In step 2430, the Group Agent will change the source address in the virtual packet. That is, the virtual packet originally had a source address equal to the virtual IP address for the source device (e.g., $M_9$) and a destination address equal to the virtual IP address for the destination device (e.g., $M_1$). In step 2430, the source address in the virtual IP packet is changed to be equal to the private IP address chosen by the Group Agent for $M_9$ in step 2428. In step 2432, the Group Agent changes the destination address in the virtual IP packet to be equal to the private IP address in the local LAN for $M_1$. In step 2434, the packet is sent by the Group Agent to the destination machine (e.g., sent to $M_1$).

The above discussion of FIG. 24 was made with respect to the example that the communication has been initiated by device $M_9$ which is a member having a public IP address and member agent software. The process of FIG. 24 can also be performed by a member which does not have a public IP address, including members using a Private Route Director and/or a Network Route Director. When the process of FIG. 24 is being performed by members using Route Directors, the shim that is added to the encapsulated packet in step 2416 includes the private IP address for the member and the public IP address for the Route Director. The example used in discussing FIG. 24 also assumes that the destination was a device in a private network where the private network included a Group Agent and a Private Route Director. The process of FIG. 24 can also be adapted to work with a member using a Group Agent where the member has a public IP address and/or a member in a private network that uses a Network Route Director.

When sending communication to an entity with a public IP address that uses a Group Agent, the shim will include the public IP address for the Group Agent and the public IP address for the member in step 2416. The packet will not be sent to a NAT or to a Route Director. Rather, the packet will be sent directly to the Group Agent. The Group Agent will access the virtual IP packet in step 2426. Rather than choosing a private IP address to identify the source, the Group Agent will choose a public IP address for the destination to use to refer to the source. The virtual IP packet will be changed so that the source address is equal to the public IP address chosen by the Group Agent to represent the source and the destination address will become the public IP address for the destination. The virtual IP packet (which is no longer virtual) will be sent to the destination.

If the destination member participates in a VCN using a Network Route Director (e.g., device $M_3$ using NRD 520), then the encapsulated packet is sent to the Network Route Director in step 2418. The Network Route Director will communicate the shim and virtual IP packet to the Group Agent (e.g., Group Agent 2212) via a persistent connection as described above in FIG. 7, steps 673-675, 677, except that the packet is forwarded to the Group Agent rather than the NAT device. The Group Agent will then perform steps 2424-2434, as described above.

FIG. 25 is a flowchart describing one embodiment of a process for the destination device responding to the initiation of communication from the source device. In the example discussed above, this process would include device $M_1$ responding to device $M_9$. In step 2502, the application on

US 7,949,785 B2

33                                                                                          34

device $M_1$ attempts to send a communication. A packet is then created using the private addresses. The packet would include a source address equal to the private IP address in the LAN for device $M_1$. The destination address would be equal to the private IP address in the LAN that is used to identify device $M_9$. That packet is sent to the Group Agent in step **2504**. In step **2506**, the Group Agent changes the packet by replacing the private addresses with virtual addresses. The source address is replaced with the virtual IP address in the VCN used to identify device $M_1$. The destination address in the packet is replaced with the virtual IP address in the VCN used to identify device $M_9$. In step **2508**, this packet is subject to IPsec, and encapsulated as described above.

In step **2512** of FIG. **25**, the Group Agent sends the packet. In the example above, the Group Agent would send the encapsulated packet to device $M_9$ using the public IP address for device $M_9$. If the Group Agent is sending the packet to a member that is in a private network, then the encapsulated packet would be sent to the Group Agent/Private Route Director for the member or to the Network Route Director for that member. If the responding device (e.g. $M_1$) is using a Network Route Director, then the Group Agent can still send the reply packet directly to the original source without going through the Network Route Director. If the replying device (e.g. $M_1$) has a public IP address, then the packet sent to the Group Agent would include the public IP addresses for the responding device and the public IP address that the Group Agent told the replying device to use to identify the original source device. In one embodiment, when the member using the Group Agent has a public IP address, an IPsec tunnel can be created between the Group Agent and the member device.

FIG. **24** contemplates communication being initiated by a device that has member software loaded on it. FIG. **26**, on the other hand, describes a process that is performed when communication is initiated by a device that does not have member software and, therefore, uses Group Agent software. In step **2602**, the application on the initiating member will send a DNS request. This DNS request will be sent to the Group Agent. The Group Agent receives the DNS request in step **2604**. In step **2606**, the Group Agent sends its own DNS request for the same domain name to the VCN Manager. In step **2608**, the Group Agent receives a response from the VCN Manager. This response will include the virtual IP address for the target, the public IP address of the Route Director for the target (if any) and the private IP address for the target (if any). If the target has a public IP address, then the public IP address will be returned. In step **2610**, the Group Agent will choose a private IP address in the local LAN to be used to identify the target. The virtual IP address returned from the DNS request will be mapped to this private IP address in the local LAN. In step **2612**, the Group Agent will return that chosen private IP address to the application as a response to the application's DNS response. In step **2614**, the application will initiate the communication. In one embodiment, the process of **2614** includes performing the steps of FIG. **25**. Note that if the member who is initiating the communication in the process of FIG. **26** has a public IP address, rather than being in a private network, then in step **2610** the Group Agent will map the virtual IP address to a public IP address that the Group Agent and member will use to identify the target. It is this mapped public IP address that is returned to the application in response to the DNS request. The mapped public IP address is routable to the Group Agent.

Although the Group Agent is described above with respect to use with a VCN, the technology of the Group Agent is broader than a VCN. Thus, the Group Agent can be used to

allow entities to participate in other types of networks, communities, groups, organizations, communications, etc.

Note that in one embodiment, the member being serviced by the Group Agent must be in the same physical address realm as the Group Agent. In this manner, the Group Agent is used to bridge that physical address realm with the virtual space. The Group Agent contains the functionality to allow the member to participate in the virtual community; however, all the protocols of the virtual community terminate at the Group Agent. This way, the member receives a normal IP packet. From the point of view of the member, the Group Agent works like a router which connects the member to the subnet of virtual nodes.

The foregoing detailed description of the invention has been presented for purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching. For example, any number of VCN Managers may be used. Any combination of NRDs and PRDs may be used to improve network efficiency. Any combination of Member Agents and Group Agents may be used, and the Virtual Community may be of any size. Additionally, while the above description provided an example using the protocols and addressing currently used on the Internet, the present invention can be used with other protocols and addressing schemes. The described embodiments were chosen in order to best explain the principles of the invention and its practical application to thereby enable others skilled in the art to best utilize the invention in various embodiments and with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention be defined by the claims appended hereto.

We claim:

1. A virtual network system, comprising:

a virtual network manager implemented with a first device memory and a first device processor of a first computing device, the virtual network manager configured to register devices in a virtual network that is defined by a domain name, each device in the virtual network being identified to the other devices by a virtual network address that is unique for each device and not directly routable via a public network, the virtual network manager further configured to distribute a virtual network address to a device when the device is registered in the virtual network;

a route director implemented with a second device memory and a second device processor of a second computing device, the route director configured to communicate data between the devices that are registered in the virtual network, the data being communicated as encapsulated packets from a source device to a destination device, an encapsulated packet including a first virtual network address that corresponds to the source device and a second virtual network address that corresponds to the destination device; and

the virtual network manager further configured to receive a DNS request from the source device, and return a public network address of the route director, a private network address for the destination device, and the second virtual network address that corresponds to the destination device.

2. The system of claim **1** wherein each of the devices communicate with the virtual network manager and the other devices in the virtual network via an associated agent.

3. The system of claim **2** wherein the associated agent is installed on a proxy device which is a proxy agent for one or

US 7,949,785 B2

35

more of the devices in the virtual network with respect to the virtual network manager and the route director.

4. The system of claim 2 wherein the virtual network manager is further configured to:

receive a request from the agent associated with a device in a private network to register the device in the virtual network; and

detect a presence of a NAT device via which the request is routed from the agent to the virtual network manager.

5. The system of claim 4 wherein the virtual network manager is further configured to receive the request from the agent as a message, and detect the presence of the NAT device by comparing a field in a payload of the message with a source address in a header of the message.

6. The system of claim 1 wherein each of the devices include an agent configured to communicate with the virtual network manager and agents of the other devices in the virtual network.

7. The system of claim 1 wherein the virtual network manager is coupled to the public network and has an associated public network address.

8. The system of claim 1 wherein the route director is further configured to receive the encapsulated packets when routed to a public network address corresponding to the route director.

9. The system of claim 1 wherein each of the devices in the virtual network are further identified by at least one physical network address.

10. The system of claim 9 wherein the physical network addresses that are associated with the devices in the virtual network are dynamic.

11. The system of claim 9 wherein the physical network addresses that are associated with the devices in the virtual network are static.

12. The system of claim 9 wherein the physical network addresses that are associated with the devices in the virtual network are private network addresses, and wherein the virtual network addresses are unique in the virtual network so as not to conflict with the private network addresses.

13. The system of claim 9 wherein the source device is coupled to a first private network and accesses a public network via a first NAT device configured to transmit the encapsulated packets, an encapsulated packet further including the physical network address of the source device as a private network address in the first private network.

14. The system of claim 13 wherein the physical network address of the source device is dynamic.

15. The system of claim 13 wherein the physical network address of the source device is static.

16. The system of claim 13 wherein the destination device is coupled to a second private network and accesses the public network via a second NAT device, the encapsulated packet further including the physical network address of the destination device as a private network address in the second private network.

17. The system of claim 16 wherein the physical network address of the destination device is dynamic.

18. The system of claim 16 wherein the physical network address of the destination device is static.

19. The system of claim 16 wherein said first private network and said second private network share at least one network address.

20. The system of claim 1 wherein the route director is further configured to:

provide a device-specific pseudo address assignment for the device in the virtual network when the device communicates with the route director via a NAT device; and

36

store an association of the device-specific pseudo address with a public network address of the NAT device and a port number of the NAT device.

21. The system of claim 1 wherein the route director includes a translator for virtual network address information for a device in the virtual network that is implemented in a private network.

22. The system of claim 1 wherein the virtual network manager is coupled to the public network and includes a public network address.

23. The system of claim 22 wherein the route director is coupled to the public network and includes a different public network address than the public network address of the virtual network manager.

24. The system of claim 22 wherein the route director is coupled to a private network and includes a private network address.

25. The system of claim 1 wherein the encapsulated packets further include virtual IP packets configured for communication of the data, the virtual IP packets being encrypted prior to being encapsulated.

26. The system of claim 25 wherein the virtual IP packets are encrypted using IPSEC.

27. The system of claim 25 wherein the virtual IP packets are encrypted using DES or triple DES.

28. The system of claim 1 wherein the virtual network manager includes a virtual community definition that is defined by the domain name, and includes one or more of the devices that are registered in the virtual network.

29. The system of claim 1 wherein the route director is a public route director in the public network, the system further comprising a private route director in a private network configured to enable access to devices of the private network that are also in the virtual network from devices of the public network that are also in the virtual network.

30. A virtual network manager, comprising:

a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public network address;

a memory and a processor to implement a register module configured to register devices in a virtual network, the register module further configured to:

receive a registration request from an agent associated with a device;

distribute a virtual network address to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by the virtual network address; and

a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device.

31. The virtual network manager of claim 30 further comprising an additional network interface configured for data communication via a public network.

32. The virtual network manager of claim 31 wherein the network interface is a UDP port configured for data communication via the virtual network, and wherein the additional network interface is a TCP port configured for registration communications via the public network.

33. The virtual network manager of claim 30 wherein the network interface is a UDP port configured for data communication via the virtual network.

US 7,949,785 B2

37

34. The virtual network manager of claim 30 wherein the register module is further configured to receive the registration request from the agent that is installed on the device for data communication via the virtual network.

35. The virtual network manager of claim 30 further comprising a join module configured to receive a join request from the agent associated with the device to indicate that the device is connected for data communication within the virtual network, the join module further configured to receive a leave request from the agent associated with the device to indicate that the device will be disconnected from data communication within the virtual network.

36. The virtual network manager of claim 35 wherein the join module is further configured to provide virtual network addresses to the devices that are registered in the virtual network.

37. The virtual network manager of claim 35 wherein the join module is further configured to maintain data to associate a virtual network address with a device in the virtual network.

38. A virtual network system, comprising:

a computing device that includes at least a memory and a processor configured to implement a network manager of a virtual network that is defined by a public domain name, the network manager configured to distribute virtual network addresses to devices that register as members in the virtual network, each device in the virtual network being identified to the other devices by a virtual network address associated with the device;

a first virtual network agent associated with a first device that is registered as a member in the virtual network;

at least a second virtual network agent associated with at least a second device that is registered as a member in the virtual network;

a route director configured to route communications between the first device and the at least second device in the virtual network via the respective first and second virtual network agents, the communications configured for routing as encapsulated packets that include a first virtual network address that is not directly routable corresponding to the first device and a second virtual network address that is not directly routable corresponding to the at least second device; and

the network manager includes a DNS server configured to provide authoritative responses for DNS queries in the virtual network, the DNS server further configured to receive a DNS query from the first device and return a network address of the route director, a network address of the second device, and the virtual network address of the second device.

39. The system of claim 38 wherein the route director is a public network route director that includes a public network interface and the network address is a public network address by which the first and second virtual network agents communicate with the public network route director.

40. The system of claim 38 wherein the route director is a private route director that includes a private physical network interface and the network address is a private physical network address.

41. The system of claim 38 wherein the first virtual network agent is installed on the first device for data communication via the virtual network.

42. The system of claim 41 wherein the first device is in a private physical network, has an associated private network address, and has the associated virtual network address that is not directly routable by which the first device can be identified by the at least second virtual network agent from outside of the private physical network.

38

43. The system of claim 41 wherein the first device is coupled to a public physical network, has an associated public network address, and has the associated virtual network address by which the first device can be identified by the at least second virtual network agent.

44. The system of claim 38 wherein the first virtual network agent is a proxy agent for the first device with respect to the network manager and the route director.

45. The system of claim 38 wherein the first and second devices are configured to access the virtual network from separate private address physical realms.

46. The system of claim 38 wherein the network manager includes at least a first community definition and a second community definition, the first community definition being defined by the public domain name and includes one or more of the devices that are registered in the virtual network, and the second community definition being defined by a different public domain name and includes one or more different devices that are registered in the virtual network.

47. The system of claim 38 wherein the network manager includes a member authenticator configured to authenticate the devices that request to register with the network manager.

48. A computer-implemented method, comprising:

receiving registration requests from devices that request to be registered as members of a virtual network that is defined by a domain name having an associated public network address in a public network, each of the devices having an associated private network address;

distributing a virtual network address to a device to register the device as a member in the virtual network, each device in the virtual network being identified to the other devices by the virtual network address that is associated with the device;

routing communications between the devices that are registered in the virtual network, the communications being routed as encapsulated packets from a source device to a destination device, an encapsulated packet including a first virtual network address that corresponds to the source device and a second virtual network address that corresponds to the destination device; and

transmitting a response to a DNS request received from one of the devices that are the members in the virtual network, the response to the DNS request including a public network address of a route director that registers the devices, a public network address of the destination device, and the second virtual network address that corresponds to the destination device.

49. The method of claim 48 further comprising providing the devices in the virtual network with a communication agent.

50. The method of claim 49 wherein said providing the devices in the virtual network with a communication agent includes providing a proxy agent.

51. The method of claim 48 further comprising authenticating the devices as the members in the virtual network.

52. The method of claim 48 further comprising defining a member set of the virtual network that includes one or more of the devices, and assigning the domain name that defines the virtual network.

53. The method of claim 48 further comprising defining at least two member sets of the virtual network that each include one or more of the devices, the at least two member sets having at least one different device.

54. The method of claim 48 further comprising assigning the virtual network address to the device as an IPV4 compliant address.

US 7,949,785 B2

39

**55**. The method of claim **54** wherein the IPV4 compliant address is non-routable.

**56**. The method of claim **48** further comprising routing network traffic via the public network from a first device having a public network address to a second device having a different public network address, the network traffic being routed as data packets having a source address which is the virtual network address of the first device and a destination address which is the virtual network address of the second device, the data packets being encapsulated to include a second source address which is a public network address of the first device and a second destination address which is the different public network address of the second device.

**57**. The method of claim **48** further comprising routing network traffic from a first device in a private physical network having a private network address to a second device having a public network address, the network traffic being routed as data packets having a source address which is the virtual network address of the first device, a destination address which is the virtual network address of the second device, and a shim which includes the private network address, the data packets being encapsulated to include a second destination address which is the public network address of the second device.

**58**. The method of claim **48** further comprising routing network traffic from a first device in a private physical network having a first private network address to a second device in a different private physical network having a second private network address, the network traffic being routed as encapsulated packets having a source address which is the virtual network address of the first device, a destination address which is the virtual network address of the second device, and a shim which includes the first and second private network addresses.

**59**. The method of claim **58** wherein the first private network address and the second private network address are identical.

**60**. The method of claim **48** further comprising:

receiving a join status request from a first device in the virtual network as a query to determine the status of a second device in the virtual network; and

responding to the join status request to indicate whether or not the second device is joined to the virtual network for data communication.

**61**. The method of claim **48** further comprising applying a group policy to the devices that are registered as the members of the virtual network.

**62**. One or more processor readable storage media devices comprising processor readable code that, if executed by a computer device, implements a virtual network manager to:

receive registration requests from devices that request to be registered as members of a virtual network that is defined by a domain name having an associated public network address in a public network, each of the devices having an associated private network address;

distribute a virtual network address to a device to register the device as a member in the virtual network, each device in the virtual network being identified to the other devices by the virtual network address that is associated with the device;

manage communications routed between the devices that are registered in the virtual network, the communications routed as encapsulated packets from a source device to a destination device, an encapsulated packet including a first virtual network address that corresponds to the source device and a second virtual network address that corresponds to the destination device; and

40

transmit a response to a DNS request received from one of the devices that are the members in the virtual network, the response to the DNS request including a public network address of the virtual network manager, a public network address of the destination device, and the second virtual network address that corresponds to the destination device.

**63**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to provide the devices in the virtual network with a communication agent.

**64**. One or more processor readable storage media devices as recited in claim **63** wherein the virtual network manager provides the as a proxy agent.

**65**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to define a member set of the virtual network that includes one or more of the devices, and the domain name that defines the virtual network.

**66**. One or more processor readable storage media devices as recited in claim **62** wherein the virtual network address includes a non-routable IPV4 compliant address.

**67**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to route network traffic via the public network from a first device having a public network address to a second device having a different public network address.

**68**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to route network traffic from a first device in a private physical network having a private network address to a second device having a public network address.

**69**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to route network traffic from a first device in a private physical network having a first private network address to a second device in a different private physical network having a second private network address.

**70**. One or more processor readable storage media devices as recited in claim **69** wherein the network traffic is routed to the first or second device via a NAT device.

**71**. One or more processor readable storage media devices as recited in claim **69** wherein the first private network address and the second private network address are identical.

**72**. One or more processor readable storage media devices as recited in claim **67** wherein the network traffic is routed as encapsulated data packets.

**73**. One or more processor readable storage media devices as recited in claim **67** wherein the network traffic is routed as encrypted data traffic.

**74**. One or more processor readable storage media devices as recited in claim **62** further comprising processor readable code that, if executed, implements the virtual network manager to apply a group policy to the devices that are registered as the members of the virtual network.

**75**. A virtual network system, comprising:

a computing device that includes at least a memory and a processor configured to implement a virtual network manager having a network interface coupled to a virtual network, the virtual network manager including at least one virtual community definition that is defined by a domain name having an associated public network

US 7,949,785 B2

41

address and a user set of one or more devices that are registered in the virtual network, each device in the virtual network being identified to the other devices by a virtual network address that is associated with the device, the virtual network manager configured to exchange virtual network information with the one or more devices of the user set, the virtual network being accessible by devices in the user set and devices outside of the user set, and the virtual network manager further configured to receive a DNS request from a source device, and return a public network address of a route director, a private network address for a destination device, and a virtual network address that corresponds to the destination device.

76. The system of claim 75 wherein the virtual network manager includes a member register module.

77. The system of claim 75 wherein the virtual network manager includes a member join module.

78. The system of claim 77 wherein the member join module provides a virtual network address to a device that is registered as a member of the network.

79. The system of claim 75 wherein the virtual network manager is further configured to maintain data on an association between at least one virtual network address with at least one device that is registered as a member of the network.

80. The system of claim 75 wherein the virtual network manager includes a DNS server for the virtual community network.

81. The system of claim 75 wherein the virtual network manager includes a NAT device detector for devices connecting with the virtual network manager behind a NAT device.

42

82. The system of claim 75 wherein the virtual network manager includes at least a second virtual community definition.

83. The system of claim 75 wherein the virtual network manager includes a member authenticator.

84. The system of claim 75 wherein the virtual network manager includes a DNS server configured to provide authoritative responses for DNS queries from devices in the virtual community.

85. The system of claim 75 further comprising at least one route director configured to communicate with the one or more devices in the user set.

86. The system of claim 75 wherein each device registered in the network is configured to communicate with the virtual network manager and other devices in the user set via at least one agent.

87. The system of claim 75 wherein the user set includes at least a first device and a second device, and wherein at least one of said first device and said second device is coupled to a first private network and accesses a public network via a NAT device.

88. The system of claim 87 wherein said first device is coupled to said first private network, and said second device is coupled to a second private network and accesses the public network via a second NAT device.

89. The system of claim 75 wherein communications between the one or more devices in the user set are encrypted.

90. The system of claim 89 wherein the virtual network manager is configured to provide a shared message to the one or more devices in the user set to establish encrypted communications.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,949,785 B2                                    Page 1 of 1
APPLICATION NO.   : 10/403818
DATED             : May 24, 2011
INVENTOR(S)       : Alkhatib et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page 3, item (56), under "Other Publications", in Column 1, Line 11, delete "Nelowrks." and insert -- Networks. --.

Title Page 3, item (56), under "Other Publications", in Column 2, Line 22, delete "Infrastucture" and insert -- Infrastructure --.

Column 40, line 15, in Claim 64, delete "the" and insert -- the communication agent --.

Signed and Sealed this
First Day of November, 2011

David J. Kappos
Director of the United States Patent and Trademark Office

# EXHIBIT 2

US008332844B1

## (12) United States Patent
### Kulkarni et al.

(10) Patent No.: **US 8,332,844 B1**
(45) Date of Patent: **Dec. 11, 2012**

(54) **ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT**

(75) Inventors: **Pradip Kulkarni**, Pune (IN); **Mukul Kumar**, Pune (IN); **Adhir Potdar**, Pune (IN); **Richard Au**, Woodside, CA (US); **Tung Nguyen**, Cupertino, CA (US)

(73) Assignee: **Emendable Assets Limited Liability Company**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1193 days.

(21) Appl. No.: **11/709,477**

(22) Filed: **Feb. 21, 2007**

### Related U.S. Application Data

(63) Continuation-in-part of application No. 11/395,816, filed on Mar. 30, 2006, now Pat. No. 7,721,282, which is a continuation-in-part of application No. 11/026,622, filed on Dec. 30, 2004, now abandoned.

(51) **Int. Cl.**
**G06F 9/445** (2006.01)

(52) **U.S. Cl.** ...................................................... **717/176**

(58) **Field of Classification Search** .................. 345/557; 717/176
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,113,523 A | | 5/1992 | Colley |
| 5,127,104 A | | 6/1992 | Dennis |
| 5,175,852 A | | 12/1992 | Johnson et al. |
| 5,764,902 A | | 6/1998 | Rothrock |
| 5,974,547 A | | 10/1999 | Klimenko |
| 5,999,734 A | | 12/1999 | Willis |
| 6,018,747 A | | 1/2000 | Burns |

| | | | | |
|---|---|---|---|---|
| 6,101,576 A | * | 8/2000 | Kobayashi et al. | ........... 711/122 |
| 6,195,680 B1 | | 2/2001 | Goldszmidt | |
| 6,292,941 B1 | | 9/2001 | Jollands | |
| 6,421,777 B1 | * | 7/2002 | Pierre-Louis et al. | ........... 713/2 |
| 6,442,605 B1 | | 8/2002 | Rodriguez | |
| 6,502,238 B1 | | 12/2002 | Pavan et al. | |
| 6,597,956 B1 | | 7/2003 | Aziz | |
| 6,606,744 B1 | | 8/2003 | Mikurak | |
| 6,745,192 B1 | | 6/2004 | Libenzi | |
| 6,751,658 B1 | * | 6/2004 | Haun et al. | ................... 709/222 |
| 6,779,177 B1 | | 8/2004 | Bahrs | |
| 6,871,219 B2 | | 3/2005 | Noordergraaf | |
| 6,938,057 B2 | | 8/2005 | Gusler | |
| 6,986,005 B2 | | 1/2006 | Vo | |
| 6,990,513 B2 | | 1/2006 | Belfiore | |

(Continued)

### OTHER PUBLICATIONS

Calzarossa, M., and M. Kubát, "Processor Allocation in Parallel Systems," Proceedings of the IEEE International Conference on Computer Systems and Software Engineering (COMPEURO '91), Bologna, Italy, May 13-16, 1991, pp. 133-137.

(Continued)

*Primary Examiner* — Edward Martello
(74) *Attorney, Agent, or Firm* — Christensen O'Connor Johnson Kindness PLLC

(57) **ABSTRACT**

Described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

**27 Claims, 6 Drawing Sheets**



**US 8,332,844 B1**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,990,573 | B2 | 1/2006 | Cherian |
| 7,127,712 | B1 | 10/2006 | Noble |
| 7,150,015 | B2 | 12/2006 | Pace |
| 7,155,714 | B2 | 12/2006 | Makris |
| 7,200,715 | B2 | 4/2007 | Kleiman |
| 7,246,221 | B1 | 7/2007 | Soltis |
| 7,246,351 | B2 | 7/2007 | Bloch |
| 7,263,551 | B2 | 8/2007 | Belfiore |
| 7,269,664 | B2 | 9/2007 | Hutsch et al. |
| 7,290,258 | B2 | 10/2007 | Steeb |
| 7,331,047 | B2 | 2/2008 | Chu |
| 7,334,157 | B1 | 2/2008 | Graf |
| 7,430,610 | B2 | 9/2008 | Pace |
| 7,454,462 | B2 | 11/2008 | Belfiore |
| 7,467,293 | B2 | 12/2008 | Zhang |
| 7,475,274 | B2 | 1/2009 | Davidson |
| 7,496,739 | B1 | 2/2009 | Raghavan |
| 7,499,988 | B2 | 3/2009 | Keohane |
| 7,536,686 | B2 | 5/2009 | Tan |
| 7,549,055 | B2 | 6/2009 | Zimmer |
| 7,590,653 | B2 | 9/2009 | Sparks |
| 7,668,938 | B1 | 2/2010 | Phillips |
| 7,685,148 | B2 | 3/2010 | Engquist |
| 7,870,106 | B1 * | 1/2011 | Nguyen et al. ............... 707/694 |
| 2002/0016891 | A1 | 2/2002 | Noel |
| 2002/0083120 | A1 | 6/2002 | Soltis |
| 2002/0087813 | A1 | 7/2002 | Harris |
| 2002/0087846 | A1 | 7/2002 | Nickolls |
| 2003/0046511 | A1 | 3/2003 | Buch |
| 2003/0126242 | A1 * | 7/2003 | Chang ........................... 709/222 |
| 2003/0130832 | A1 | 7/2003 | Schulter |
| 2003/0233648 | A1 | 12/2003 | Earl |
| 2004/0015899 | A1 | 1/2004 | May |
| 2004/0078779 | A1 | 4/2004 | Dutt |
| 2004/0088473 | A1 | 5/2004 | Ogle |
| 2004/0199919 | A1 | 10/2004 | Tovinkere |
| 2005/0128319 | A1 | 6/2005 | Morino |
| 2005/0131962 | A1 | 6/2005 | Deshpande |
| 2006/0173993 | A1 | 8/2006 | Henseler |
| 2008/0229040 | A1 | 9/2008 | Honma |

## OTHER PUBLICATIONS

Chen, D., et al., "Exploiting High-Level Coherence Information to Optimize Distributed Shared State," Proceedings of the 9th ACM Symposium on Principles and Practice of Parallel Programming, San Diego, Jun. 11-13, 2003, pp. 131-142.

Cohen, A., and M. Woodring, "Win32 Multithreaded Programming," O'Reilly Online Catalog, Chapter 1, <http://www.oreilly.com/catalog/multithread/excerpt/ch01.html> [retrieved Nov. 21, 2006], pp. 1-8.

Couturier, R., et al., "A Compiler for Parallel Unity Programs Using OpenMp," Proceedings of the International Conference on Parallel and Distributed Processing Techniques and Applications, Las Vegas, Nevada, Jun. 28-Jul. 1, 1999, pp. 1992-1998.

Ismail, I.M., and J.A. Davis, "Program-Based Static Allocation Policies for Highly Parallel Computers," Proceedings of the 1995 IEEE Fourteenth Annual International Phoenix Conference on Computers and Communications, Scottsdale, Arizona, Mar. 28-31,1995, pp. 61-68.

Kandemir, M., et al., "Minimizing Data and Synchronization Costs in One-Way Communication," IEEE Transactions on Parallel and Distributed Systems 11(12):1232-1251, Dec. 2000.

Li, K.-C., et al., "Design Issue of a Novel Toolkit for Parallel Application Performance Monitoring and Analysis in Cluster and Grid Environments," Proceedings of the 8th International Symposium on Parallel Architectures, Algorithms and Networks (ISPAN'05), Las Vegas, Nev., Dec. 7-9, 2005, 6 pages.

Nguyen, T.M., et al., "Branching Store File System," U.S. Appl. No. 11/026,622, filed Dec. 30, 2004.

Ohta, K., et al., "Improving Parallel Write by Node Level Request Scheduling," Proceedings of the 9th IEEE/ACM International Symposium on Cluster Computing and the Grid, Shanghai, May 18-21, 2009, pp. 196-203.

OpenMP Fortran Application Program Interface (Version 2.0), Nov. 2000, <http://www.openmp.org/drupal/mp-documents/fspec20.pdf>, pp. 1-3 and 34-36.

OpenMP Fortran Application Program Interface (Version 2.0), Nov. 2000, <http://www.openmp.org/drupal/mp-documents/fspec20.pdf>, pp. 1-3, 18-19, 25-27, 34-37, and 67.

"Sequent's NUMA-Q SMP™ Architecture," Sequent Computer Systems, Inc., 1997, <http://parallel.ru/ftp/computers/sequent/NUMA_SMP_REV.pdf>, pp. 1-18.

Sivathanu, G., et al., "Ensuring Data Integrity in Storage: Techniques and Applications," Proceedings of the 2005 ACM Workshop on Storage Security and Survivability (StorageSS '05), Alexandria, Va., Nov. 7-10, 2005, pp. 26-36.

Zhu, T., et al., "Scheduling Divisible Loads in the Dynamic Heterogeneous Grid Environment," Proceedings of the First International Conference on Scalable Information Systems, Hong Kong, May 29-Jun. 1, 2006, 10 pages.

* cited by examiner

**U.S. Patent**     Dec. 11, 2012     Sheet 1 of 6     US 8,332,844 B1



**FIG. 1**



**FIG. 2**



**FIG. 3A**

**300**



350 — Modify the leaf image in response to the compute node's access to its instance of the application environment.

352 — Receive indexing results pertaining to the root image from a compute node.

354 — Store the indexing results on a shared storage unit.

356 — Provide the indexing results to other compute nodes.

360 — Optionally, reconcile the root image and the leaf image to form a new root image.

**FIG. 3B**

<u>345</u>



**FIG. 4**

U.S. Patent          Dec. 11, 2012          Sheet 6 of 6          US 8,332,844 B1

500



**FIG. 5**

US 8,332,844 B1

**1**

# ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT

## CLAIM OF PRIORITY UNDER 35 U.S.C. §120

The present application for patent is a continuation-in-part of application Ser. No. 11/395,816, entitled "BLOCK-LEVEL I/O SUBSYSTEM FOR DISTRIBUTED APPLICATION ENVIRONMENT MANAGEMENT," filed Mar. 30, 2006, now U.S. Pat. No. 7,721,282, assigned to the assignee hereof and hereby expressly incorporated by reference herein.

## REFERENCE TO CO-PENDING APPLICATIONS FOR PATENT

The present application for patent is related to the following U.S. patent application:

"VIRUS SCANNING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT," by Kulkarni et al., filed Feb. 28, 2007, now U.S. Pat. No. 8,065,737, assigned to the assignee hereof and expressly incorporated by reference herein.

## BACKGROUND

### Background

Over the years, as the internet has expanded and computers have multiplied, the need for clustered computing such as High Performance Computing (HPC) has increased. Clustered computing involves multiple compute nodes, usually a server grid, that work together to achieve a common task. For example, several (typically hundreds of) compute nodes may be clustered together to share the load of serving a high-traffic website. In large-scale systems such as this, a trend in software deployment is to centralize data management on a globally accessible file system with stateless computing nodes. A common example of this is Operating System (OS) software image management, where the compute nodes are activated with the distributed application environment by either diskless booting protocols or remote software installation to local storage. Under this architecture, a boot image is required for each compute node in the cluster. The boot image necessarily contains the kernel; it may additionally contain the application software that is intended to be run on the compute node.

The primary concern in clustered computing is low cluster bring-up time. The software that provides the boot images for the cluster typically stores a master boot image. It may then either pre-create clones of this master image for each such server, or it may create them "on the fly."

Creating a boot image on the fly involves copying the entire contents of the master image, which are typically in the range of 5-15 GB. Even with a significant amount of bandwidth by today's standards, this method will result in a large bring-up time.

Pre-creating a boot image for each server is advantageous from the point of view of cluster bring-up time. However, since one often does not know in advance how many servers will ever be booted, this scheme may result in wasted disk space.

Regardless of which of the preceding methods is used, both suffer from the same major problem—updating the boot image(s) for the cluster is cumbersome, as it means updating a number of copies of the boot image.

**2**

Additionally, once some compute nodes have booted, they will often engage in redundant activities with respect to each other. For example, assume that a cluster involves 20 compute nodes each running the same operating system and using substantially similar hardware. The 20 compute nodes will generally need to access much of the same data (e.g., drivers, library files, etc.). Moreover, when each of the 20 compute nodes index their file systems, the index results will only vary slightly to the extent that each compute node has developed its own "personality." Thus, to the extent that there is redundancy in the operations of the compute nodes, CPU resources, disk space, and data bus bandwidth are wasted.

In a branching store file system, a read-only base image (or "root" image) of the application environment is created. The root image is accessible by all compute nodes in the cluster. Changes made by a compute node to the root image are stored in a "leaf" image unique to that compute node. A filter operates between the compute nodes and the file system(s), which merges the changes recorded on the leaf images with the root image and delivers the result to the appropriate compute node. From the point of view of the compute node, it is running its own unique and cohesive instance of the application environment. While this system allows for creation of boot images on the fly without severely diminishing bring-up time, a separate version of the system must be created for each unique operating system because data is stored at the file system level (i.e., on a "per file basis"). Thus, migrating a computing cluster from one operating system to another is much more complicated than simply installing a new root image containing the new OS.

## SUMMARY

Described herein is technology for, among other things, root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

Thus, embodiments of the present disclosure provide an operating system-independent system and method for distributing an application environment to a compute node. By utilizing a root-leaf system of application environment storage, embodiments of the present disclosure allow creation of boot images on the fly without significantly diminishing bring-up time. This is due to the fact that creating a new boot image does not require copying the contents of the root image. Rather it involves registering a new UBD with the system, which occurs very quickly. Bring up time, and access time in general, can be further improved by caching commonly accessed the portions of the root image. Moreover, updating the boot image for the entire cluster simply involves updating the root image. Additionally, because of the commonality of the root image and the fact that its contents are not directly changed, certain operations performed on the root image (e.g., indexing) only need to be performed once by one compute node. Thereafter, the results of that operation can be

US 8,332,844 B1

3

shared with the other compute nodes in the cluster, thus saving the other compute nodes valuable time and resources.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagram of a suitable system on which embodiments may be implemented.

FIG. 2 is a diagram of a system, for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure.

FIGS. 3A-3B are flowcharts illustrating a process for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure.

FIG. 4 illustrates a flowchart for a process for updating the cache based on a read request, in accordance with an embodiment of the present disclosure.

FIG. 5 illustrates a flowchart for a process for indexing a root image, in accordance with various embodiments of the present disclosure.

## DETAILED DESCRIPTION

Reference will now be made in detail to various embodiments of the disclosure, examples of which are illustrated in the accompanying drawings. While the disclosure will be described in conjunction with the various embodiments, it will be understood that they are not intended to limit the scope of the claims to these embodiments. On the contrary, the disclosure is intended to cover alternatives, modifications and equivalents, which may be included within the spirit and scope of the disclosure as defined by the claims. Furthermore, in the detailed description of the present disclosure, numerous specific details are set forth in order to provide a thorough understanding of the present disclosure. However, it will be obvious to one of ordinary skill in the art that the present disclosure may be practiced without these specific details. In other instances, well-known methods, procedures, components, and circuits have not been described in detail so as not to unnecessarily obscure aspects of the present disclosure.

Some portions of the detailed descriptions that follow are presented in terms of procedures, logic blocks, processing, and other symbolic representations of operations on data bits within a computer or digital system memory. These descriptions and representations are the means used by those skilled in the data processing arts to most effectively convey the substance of their work to others skilled in the art. A procedure, logic block, process, etc., is herein, and generally, conceived to be a self-consistent sequence of steps or instructions leading to a desired result. The steps are those requiring physical manipulations of physical quantities. Usually, though not necessarily, these physical manipulations take the form of electrical or Magnetic signals capable of being stored, transferred, combined, compared, and otherwise manipulated in a computer system or similar electronic computing device. For reasons of convenience, and with reference to common usage, these signals are referred to as bits, values, elements, symbols, characters, terms, numbers, or the like with reference to the present disclosure.

It should be borne in mind, however, that all of these terms are to be interpreted as referencing physical manipulations and quantities and are merely convenient labels and are to be interpreted further in view of terms commonly used in the art. Unless specifically stated otherwise as apparent from the discussion herein, it is understood that throughout discussions of the present embodiment, discussions utilizing terms

4

such as "determining" or "outputting" or "transmitting" or "recording" or "locating" or "storing" or "displaying" or "receiving" or "recognizing" or "utilizing" or "generating" or "providing" or "accessing" or "checking" or "notifying" or "delivering" or the like, refer to the action and processes of a computer system, or similar electronic computing device, that manipulates and transforms data. The data is represented as physical (electronic) quantities within the computer system's registers and memories and is transformed into other data similarly represented as physical quantities within the computer system memories or registers or other such information storage, transmission, or display devices.

Briefly stated, described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

Example Compute Node Operating Environment

With reference to FIG. 1, an example system for implementing embodiments includes a general purpose computing system environment, such as compute node 100. In its most basic configuration, compute node 100 typically includes at least one processing unit 102 and memory 104. Depending on the exact configuration and type of compute node, memory 104 may be volatile (such as RAM), non-volatile (such as ROM, flash memory, etc.) or some combination of the two. This most basic configuration is illustrated in FIG. 1 by dashed line 106. Additionally, compute node 100 may also have additional features/functionality. For example, compute node 100 may also include additional storage (removable and/or non-removable) including, but not limited to, magnetic or optical disks or tape. Such additional storage is illustrated in FIG. 1 by removable storage 108 and non-removable storage 110. Computer storage media includes volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules or other data. Memory 104, removable storage 108 and nonremovable storage 110 are all examples of computer storage media. Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can be accessed by compute node 100. Any such computer storage media may be part of compute node 100.

Compute node 100 may also contain communications connection(s) 112 that allow it to communicate with other devices. Communications connection(s) 112 is an example of communication media. Communication media typically embodies computer readable instructions, data structures, program modules or other data in a modulated data signal such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" means a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal. By way of example, and not limi-

US 8,332,844 B1

5

tation, communication media includes wired media such as a wired network or direct-wired connection, and wireless media such as acoustic, RF, infrared and other wireless media. The term computer readable media as used herein includes both storage media and communication media. Compute node 100 may also have input device(s) 114 such as a keyboard, mouse, pen, voice input device, touch input device, etc. Output device(s) 116 such as a display, speakers, printer, etc. may also be included. All these devices are well known in the art and need not be discussed at length here.

Example Systems

FIG. 2 is a diagram of a system 200 for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure. In one embodiment, system 200 is implemented in a multi-computer system, such as an HPC cluster. In one embodiment, the application environment includes an operating system. In other embodiments, the application environment may contain other applications. System 200 has a number of compute nodes 220a-n coupled to first storage unit 240 and a corresponding second storage unit 250a-n though a corresponding union block device (UBD) 230a-n. To the compute nodes 220a-n, it appears that they have access to their own version of a distributed application environment. However, a separate and complete boot image is not created and stored for each compute node 220a-n.

System 200 has a first storage unit 240 for storing blocks of a root image of an application environment. The root image contains data initially common to the compute nodes 220a-n. The root image is not changed by compute nodes 220a-n. For example, in one embodiment, compute nodes 220a-n have read-only access to the first storage unit 240.

Moreover, each compute node 220a-n has a corresponding second storage unit 250a-n for storing a leaf image. The first storage unit 240 and second storage units 250a-n may each be contained on separate physical storage devices, on separate logical spaces on the same storage device, or any combination thereof. Regardless, the first storage unit 240 and the second storage units 250a-n may be contained within a single storage appliance. The leaf image may contain blocks of new data, blocks of changed data, or other blocks of data unique to the individual compute node. The leaf image may also contain a block modification log. In other words, a leaf image will describe the changes made by the respective compute node 220a-n to its instance of the application environment. Thus, when a compute node (e.g., node 220a) makes changes involving the root image, modifications are made to that compute node's leaf image (e.g., leaf image stored on second storage device 250a). With respect to changes to the root image, only the specific blocks that are changed are stored in the leaf image. For example, a particular file on the root image may comprise twenty blocks of data (e.g., blocks 1-20). One compute node (e.g., compute node 220a) desires to make a change to this file which involves a modification of only a few specific blocks of the file (e.g., blocks 4-9). In this example, only the modified blocks (e.g., blocks 4-9) will be stored in the compute node's leaf image (e.g., leaf image stored on second storage device 250a) plus some small overhead.

A compute node 220a-n mounts its instantiation of the application environment via its respective UBD 230a-n. In one embodiment, UBDs 230a-n are effectively low-level drivers that operate as an interface between the first and second storage devices and the file system of each compute node 220a-n. The file system may reside on the server side of the system 200. The file system may also reside on each of the compute nodes 220a-n. Because UBDs 230a-n operate below the file system, they are concerned merely with the blocks of

6

data themselves, rather than files they form. As a result, system 200 is completely file system, and thus operating system, independent.

UBDs 230a-n determine what leaf image (from the appropriate second storage unit 250) is needed for portions of the application environment that their respective compute nodes 220a-n have changed. UBDs 230a-n also locate the portions of the application environment that are not changed by their respective compute nodes 220a-n. These portions may reside in the root image. There may also be intermediate images (not depicted in FIG. 2) comprising versions of the root image from which a compute node's instance of the application environment is derived. Further, UBDs 230a-n create a new leaf image on a respective second storage unit 250a-n when their respective compute nodes 220a-n make changes to their instantiations of the application environment. In one embodiment, the UBDs 230a-n obtain the information necessary to create the application environment from a block modification log located in its respective leaf image.

UBDs 230a-n may also modify the leaf image in response to their respective compute node's access to its instance of the application environment. For example, upon receiving a write request from their respective compute nodes for a sector X, the UBDs 230a-n will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units 250a-n, where sector X can then be modified. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be mapped and copied from the root image before modification.

By providing an application environment to multiple compute nodes via a branching store system, embodiments allow for a more streamlined update/patch procedure. In one embodiment, first storage device 240 may be refreshed with a new operating system patch, thereby automatically refreshing the image for all dependent compute nodes.

Caching

An embodiment of the present disclosure provides for caching of portions of the root image. Because several compute nodes in a cluster may often access the same data (e.g., same drivers, same library files, etc.) on the root image, tremendous speed improvements can be realized by caching such data in cache 260. For example, by current standards, it is common for a storage disk to achieve a data transfer rate around 76 MB/s, whereas cache memory can achieve speeds up to and greater than 800 MB/s. In one embodiment, the cache may be contained within a single storage appliance, along with the first storage unit 240 and the second storage units 250a-n.

The value of such caching becomes even more apparent in the context of initial boot sequences. For example, a cluster of 20 compute nodes may be booted for the first time. Since it is a first boot, the cache is empty. The first compute node to boot (e.g., compute node 220a) will therefore load its data directly from the pertinent disks (e.g., first storage unit 240 and second storage unit 250a). While the first compute node is loading its data, its reads are intercepted and cached on a per-block basis in cache 260. Thereafter, when a second compute node (e.g., compute node 220b) goes to boot, any data required by the second compute node that was previously accessed by the first compute node can be served out of the cache 260 rather than the first storage unit. It is appreciated that to the extent that the configurations of the first and second compute nodes are substantially the same, the relationship between the data requested by the second compute node and the data stored in the cache 260 approaches a 1:1 ratio (i.e., a greater than ten-fold improvement in root image access time is realized).

US 8,332,844 B1

7

It is further appreciated that the entire contents of the root image may not necessarily be accessed to achieve a boot (e.g., unused drives and the like). Therefore, the data capacity of cache 260 can be much less than that of the first storage unit 240.

As new data is accessed on the root image that is not currently stored in the cache 260, the cache 260 may thereafter be updated with the new data. Moreover, as the amount of data in the cache 260 approaches or exceeds a threshold value, certain data will need to be removed from the cache 260 to make way for the new data. The data to be removed, deleted, overwritten, etc., may be selected the basis of, for example, how recently the data was accessed, how frequently the data has been accessed, or a combination of both. It should be appreciated that other cache arbitration algorithms known in the art may similarly be used.

Indexing

An embodiment of the present disclosure provides for indexing the root image. From the standpoint of seek time, it is beneficial for each compute node to have access to an index of its file system. In a traditional clustered computing situation, each compute node would independently index its file system. To the extent that each compute node in a cluster has similar operating environments to the others, indexing performed on common data is therefore redundant.

As an added benefit of the architecture 200 depicted in FIG. 2, because the data stored in the root image is by definition common to all the compute nodes 220a-n, one compute node (e.g., compute node 220a) can index the contents of the root image and then provide the indexing results to the other compute nodes (e.g., compute nodes 220b-n). Thereafter, the compute nodes 220a-n need only be concerned with indexing their respective leaf image, which are relatively small compared to the root image. Moreover, in embodiments where the first storage unit 240 is read-only, the root image will not have to be re-indexed because the contents of the root image do not change. It is appreciated that the indexing results can be provided to the other compute nodes in a number of ways. For example, the results may be stored on a shared storage unit (such as, but not limited to, cache 260), the results may provided directly to the other compute nodes, etc. Moreover, the initial indexing of the root image does not have to be performed by a compute node. For example, the indexing may be performed by a dedicated indexing host.

Example Methods

FIGS. 3A-3B are flowcharts illustrating a process 300 for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure. Although specific operations are disclosed in process 300, such operations are exemplary. Process 300 may not include all of the operations illustrated by FIGS. 3A-3B. Also, process 300 may include various other operations and/or variations of the operations shown by FIGS. 3A-3B. Likewise, the sequence of the operations of process 300 can be modified. Steps of process 306 may be stored as instructions on a computer readable medium and executed on a computer processor.

Step 310 involves storing blocks of a root image of the compute node on a first storage unit. By storing data at the block level, embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent.

Step 320 involves storing a leaf image on a second storage unit. The leaf image includes, but is not limited to, new data blocks for the compute node and blocks of the root image that the compute node has changed. The leaf image includes a block modification log in one embodiment.

8

Step 322 involves caching blocks of the root image that have been accessed by a compute node. In doing so, embodiments improve the access time for subsequent compute nodes requesting to access the same blocks of data.

Step 324 involves receiving a read request from a compute node. At step 326, a determination is made as to whether the data requested by the compute node is currently stored in the cache. If a portion of the data is currently stored in the cache, that portion is then served from the cache (step 328), thus improving the access time with respect to that portion of data as compared to otherwise retrieving it from a storage unit such as a hard disk.

Step 330 involves merging the blocks of the root image, the blocks of the leaf image, and the relevant blocks of the cache, if any, to create the application environment. In other words, the merging occurs at an operational level between the file system of a compute node and the first storage unit, the corresponding second storage unit, and the cache. Once the application environment has been created, it will appear to the compute node as one cohesive image rather than a base image plus its additions, deletions, and modifications. To the compute node, it appears that it has access to its own unique version of an application environment. However, a separate and complete boot image is not actually stored for the compute node.

Step 340 involves delivering the application environment to the compute node. Step 340 may comprise a low-level driver determining which data blocks are needed for the compute node's instance of the application environment and delivering the application environment to the compute via the compute node's file system.

Step 345 involves updating the cache based on the read request. For instance, to the extent that a compute node has accessed root image data not currently stored in the cache, the cache should be updated to include that cache. In some cases, the amount of data in the cache may approach a capacity limit, either due to the physical capacity of the cache itself or due to threshold limit set in software.

FIG. 4 illustrates a flowchart for a process 345 for updating the cache based on a read request, in accordance with an embodiment of the present disclosure. It should be appreciated that the steps illustrated in FIG. 4 are exemplary and the updating performed in block 345 of process 300 may be achieved in many other ways as well. Process 345 may not include all of the operations illustrated by FIG. 4. Also, process 345 may include various other operations and/or variations of the operations shown by FIG. 4. Likewise, the sequence of the operations of process 345 can be modified. Steps of process 345 may be stored as instructions on a computer, readable medium and executed on a computer processor.

At step 410, a determination is made as to whether the amount of data currently in the cache plus new data to be added exceeds a threshold value (physical or software-imposed). If the threshold value will be exceeded, the least recently accessed data is removed from the cache (step 420). This sequence repeats until there is adequate headroom in the cache to accommodate the new data. Once it is determined that the amount of data currently in the cache plus the new data to be added will not exceed the threshold value, FIG. 4 proceeds to step 430. Step 430 involves caching the portion of the requested data that is not currently stored in the cache (i.e., the "new data").

With reference again to FIG. 3B, step 350 involves modifying the leaf image in response to the compute node's access to its instance of the application environment. The modifying of the leaf image may include copying one or more data

US 8,332,844 B1

9 10

blocks from the root image to the leaf image, and modifying the data block in the leaf image. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be copied from the root image before modification.

Step **352** involves receiving indexing results pertaining to the root image from a compute node. Step **356** involves providing the indexing results to other compute nodes. It is appreciated that this may be done in a number of ways. For example, the indexing results may be provided directly to the compute nodes. Alternatively, the indexing results may be stored on a shared storage unit (step **354**) and then provided to the compute nodes via the shared storage unit. By receiving the indexing result of the root image from one compute node and providing it to the rest of the compute nodes, valuable time, resources, and bandwidth are saved for the other compute nodes. Since the root image is common to all the compute nodes, any re-indexing of the root image would be redundant and a waste of resources.

Step **360** involves reconciling the root image and the leaf image to form a new root image. This may be desirable if, for example, the leaf image has grown to exceed a particular disk quota. Furthermore, if there are multiple compute nodes that access the root image, each having their own respective leaf image, and there is substantial commonality between the leaf images, it may also be beneficial to reconcile the leaf images with the root image.

FIG. 5 illustrates a flowchart for a process **500** for indexing a root image, in accordance with various embodiments of the present disclosure. Although specific operations are disclosed in process **500**, such operations are exemplary. Process **500** may not include all of the operations illustrated by FIG. **5**. Also, process **500** may include various other operations and/or variations of the operations shown by FIG. **5**. Likewise, the sequence of the operations of process **500** can be modified. Steps of process **500** may be stored as instructions on a computer readable medium and executed on a computer processor.

Step **510** involves receiving data blocks of a file system at a compute node. The data blocks include a root image portion in the leaf image portion. As described above, the leaf image portion includes additional data blocks not previously contained in the root image portion and also changes made by the compute node to the blocks of the root image. Thus, the file system actually seen by the compute node is a product of merging the root image portion in the leaf image portion together at the block level.

Step **520** involves the compute node indexing the root image portion of its file system. In such a case, the compute node is to some extent agnostic to the fact that its file system is divided between a root image portion and a leaf image portion. At step **540**, the compute node provides the indexing results of the root image portion to another compute node. It is appreciated that this may be achieved a number of ways. For example, the first compute node may simply provide the indexing results to the second compute node directly. Alternatively, the first compute node may store the indexing results on a shared storage unit that is accessible by the second compute node (step **530**).

Thereafter, the compute node may complete its indexing of its file system by indexing the leaf image portion of the file system (step **550**). Further down the road, the benefits of indexing the root image separately from the leaf image are realized when the compute node requires that its file system be re-indexed. At step **560**, the compute node re-indexes its file system by re-indexing its corresponding leaf image portion with the previous indexing results of the root portion.

Thus, by operating at the block level, embodiments of the present disclosure provide file system and operating system independent systems and methods for distributing an application environment to a compute node. By utilizing a branching store system of application environment distribution, embodiments of the present disclosure allow creation of boot images on the fly without significantly diminishing bring-up time. This is due to the fact that creating a new boot image does not require copying the contents of the root image, but rather it involves registering a new UBD with the system, which occurs very quickly. Bring up time, and access time in general, can be further improved by caching commonly accessed the portions of the root image. Moreover, updating the boot image for the entire cluster simply involves updating the root image.

Embodiments of the present disclosure also allow for scalability and redundancy. For example, a server containing the root image may only have the resources to supply the root image to 100 compute nodes. Thus; in order to implement a 200-compute node system, two servers, each containing a copy of the root image, are used. This scalability provided by embodiments also lends itself to dynamic scaling. In other words, the number of root images required for a specific configuration can change based on the I/O workload, and new root images can be created on the fly accordingly. Moreover, additional servers containing the root image may be added into the system to provide redundancy and increase reliability. For example, and with reference to FIG. **2**, cache **261**, first storage unit **241**, and second storage units **251***a-n* provide failover/redundancy security for system **200**. As an added security measure, some of the root nodes may be located remotely from each other (e.g., half located in a main office and half in a satellite office). In addition, it is possible to copy the contents of one or more leaf nodes into a non-UBD (regular block device) copy (e.g., for use as an isolated backup).

Moreover, because of the commonality of the root image and the fact that its contents are not directly changed, certain operations performed on the root image (e.g., indexing) only need to be performed once by one compute node. Thereafter, the results of that operation can be shared with the other compute nodes in the cluster, thus saving the other compute nodes valuable time and resources.

The previous description of the disclosed embodiments is provided to enable any person skilled in the art to make or use the present disclosure. Various modifications to these embodiments will be readily apparent to those skilled in the art, and the generic principles defined herein may be applied to other embodiments without departing from the spirit or scope of the disclosure. Thus, the present disclosure is not intended to be limited to the embodiments shown herein but is to be accorded the widest scope consistent with the principles and novel features disclosed herein.

What is claimed is:

1. A system for providing data to a plurality of compute nodes, the system comprising:
   a first storage unit configured to store blocks of a root image of said compute nodes;
   a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

US 8,332,844 B1

11

a cache configured to cache blocks of said root image previously accessed by at least one of said compute nodes.

2. The system as recited in claim 1 wherein said cache is configured to store X most recently accessed blocks of said root image, and wherein X represents a cache threshold value.

3. The system as recited in claim 1 wherein said first storage unit, said second storage units, and said cache are contained within a single storage appliance.

4. The system as recited in claim 1 further comprising:
a plurality of union block devices configured to interface between respective compute nodes and said first storage unit, respective second storage units, and said cache to distribute application environments to the compute nodes, wherein said union block devices are configured to create said application environments by merging the blocks of said root image with the blocks of respective leaf images.

5. The system as recited in claim 4 wherein said union block devices comprise low-level drivers for interfacing between the file systems of respective compute nodes and said first storage unit, respective second storage units, and said cache.

6. The system as recited in claim 1 wherein said first storage unit is read-only.

7. A method for providing data to a plurality of compute nodes, comprising:
storing blocks of a root image of said compute nodes on a first storage unit;
storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and
caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

8. The method as recited in claim 7 further comprising:
receiving a read request from at least one of said compute nodes, wherein a first portion of the data requested is currently stored in said cache memory; and
providing said first portion of said data to said at least one of said compute nodes from said cache memory.

9. The method as recited in claim 8 further comprising:
updating said cache memory based on said read request.

10. The method as recited in claim 9 wherein a second portion of the data requested is not currently stored in said cache memory and said updating comprises:
caching said second portion in said cache memory; and
removing the least recently accessed data from said cache memory if the amount of data in said cache memory is above a threshold value.

11. The method as recited in claim 7 further comprising:
merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments.

12. The method as recited in claim 11 wherein said merging occurs at an operational level between file systems of the respective compute nodes and said first storage unit, respective second storage units, and said cache memory.

13. The method as recited in claim 7 wherein said first storage unit is read-only.

14. A system for indexing file systems for a plurality of compute nodes, the system comprising:

12

a first storage unit configured to store blocks of a root image of said compute nodes;
a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and
a plurality of union block devices corresponding to said compute nodes, said union block devices configured to interface between said compute nodes and said first and second storage units to distribute said file systems to said compute nodes, wherein said union block devices are configured to create said file systems by merging the blocks of said root image stored on the first storage unit with the blocks of respective leaf images stored on respective second storage units, and wherein further at least one of said compute nodes is configured to index said root image and provide the indexing results to another of said compute nodes.

15. The system as recited in claim 14 wherein said first storage unit and said second storage units are contained within a single storage appliance.

16. The system as recited in claim 14 further comprising:
a plurality of union block devices configured to interface between respective compute nodes and said first storage unit and respective second storage units, said union block devices configured to distribute application environments to the compute nodes, wherein said union block devices are configured to create said application environments by merging the blocks of said root image with the blocks of respective leaf images.

17. The system as recited in claim 16 wherein said union block devices comprise low-level drivers for interfacing between the file systems of respective compute nodes and said first storage unit, respective second storage units, and said cache.

18. The system as recited in claim 14 wherein said first storage unit is read-only.

19. A method for indexing file systems for a plurality of compute nodes, comprising:
storing blocks of a root image of said compute nodes on a first storage unit;
storing leaf images for respective compute nodes on respective second storage units, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images for respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes;
merging the blocks of said root image with the blocks of respective leaf images stored on respective second storage units to create respective file systems for respective compute nodes;
receiving indexing results pertaining to said root image from one of said compute nodes; and
providing said indexing results to the others of said compute nodes.

20. The method as recited in claim 19 further comprising:
storing said indexing results on a shared storage unit.

21. The method as recited in claim 19 wherein said merging occurs at an operational level between respective file systems of the compute nodes and said first storage unit and respective second storage units.

US 8,332,844 B1

13

14

**22**. The method as recited in claim **19** wherein said first storage unit is read-only.

**23**. A computer-readable storage medium having instructions stored thereon that, in response to execution by at least one computing device, cause the at least one computing device to:

receive data blocks of a file system, said data blocks comprising a root image portion and leaf image portion, said leaf image portion comprising only additional data blocks not previously contained in said root image portion and, changes made by said first compute node to the blocks of said root image, wherein said leaf image portion does not include blocks of said root image that are unchanged by said first compute node, wherein said file system is the result of merging said root image portion and said leaf image portion together at the block-level;

index said root image portion; and

provide the results of said indexing to a second compute node, wherein said logic encoded in the one or more tangible media comprise computer executable instructions executed by the first compute node.

**24**. The computer-readable storage medium of claim **23**, wherein the instructions further cause the at least one computing device to store said results of said indexing on a shared storage unit accessible by said second compute node.

**25**. The computer-readable storage medium of claim **23**, wherein the instructions further cause the at least one computing device to index said leaf image portion.

**26**. The computer-readable storage medium of claim **25**, wherein the instructions further cause the at least one computing device to re-index said file system by re-indexing said leaf image portion and merging the results of said re-indexing of said leaf image portion with said results of said indexing of said root image portion.

**27**. The computer-readable storage medium of claim **23** wherein said root image portion is read-only.

*    *    *    *    *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 8,332,844 B1                                 Page 1 of 1
APPLICATION NO.   : 11/709477
DATED             : December 11, 2012
INVENTOR(S)       : Kulkarni et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On Title Page 2, item (56), under "OTHER PUBLICATIONS", in Column 2, Lines 28-30, delete "OpenMP Fortan..............34-36.".

In the Specifications:

In Column 3, Line 8, delete "system," and insert -- system --, therefor.

In Column 3, Line 54, delete "Magnetic" and insert -- magnetic --, therefor.

In Column 7, Line 55, delete "306" and insert -- 300 --, therefor.

In Column 8, Line 50, delete "computer, readable" and insert -- computer readable --, therefor.

In the Claims:

In Column 13, Line 11, in Claim 23, delete "and," and insert -- and --, therefor.

Signed and Sealed this
Eleventh Day of June, 2013

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

# EXHIBIT 3

US008407722B2

## (12) United States Patent
### Tuttle et al.

(10) **Patent No.:**    **US 8,407,722 B2**
(45) **Date of Patent:**    **Mar. 26, 2013**

(54) **ASYNCHRONOUS MESSAGING USING A NODE SPECIALIZATION ARCHITECTURE IN THE DYNAMIC ROUTING NETWORK**

(75) Inventors: **Timothy Tuttle**, San Francisco, CA (US); **Karl E. Rumelhart**, Palo Alto, CA (US)

(73) Assignee: **Shaw Parsing L.L.C.**, Las Vegas, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1127 days.

(21) Appl. No.: **11/396,251**

(22) Filed: **Mar. 30, 2006**

(65) **Prior Publication Data**

US 2007/0239822 A1    Oct. 11, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 10/105,018, filed on Mar. 21, 2002, now Pat. No. 7,051,070, which is a continuation-in-part of application No. 10/017,182, filed on Dec. 14, 2001, now Pat. No. 7,043,525.

(Continued)

(51) **Int. Cl.**
   *G06F 3/00*    (2006.01)
   *G06F 15/16*    (2006.01)
(52) **U.S. Cl.** ....................................... 719/316; 709/206
(58) **Field of Classification Search** .................. 709/203, 709/219; 719/309
   See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,230,048 A * | 7/1993 | Moy | ................................. 707/1 |
| 5,535,335 A | 7/1996 | Cox et al. | |
| 5,692,193 A | 11/1997 | Jagannathan et al. | |
| 5,699,523 A | 12/1997 | Li et al. | |
| 5,706,516 A | 1/1998 | Chang et al. | |
| 5,732,219 A | 3/1998 | Blumer et al. | |
| 5,754,939 A | 5/1998 | Herz et al. | |

(Continued)

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 733 983 A2 | 9/1996 |
| EP | 0 749 081 A1 | 12/1996 |

(Continued)

#### OTHER PUBLICATIONS

Franklin et al., "Dissemination-Based Information Systems," IEEE Data Engineering Bulletin, vol. 19, No. 3, Sep. 1996, 9 pages.

(Continued)

*Primary Examiner* — Andy Ho
*Assistant Examiner* — Tuan Dao
(74) *Attorney, Agent, or Firm* — Sterne, Kessler, Goldstein & Fox P.L.L.C.

(57)    **ABSTRACT**

A network routes update messages containing updates to properties of live objects from input sources to clients having the objects. When the clients receive live objects, the clients identify the object IDs associated with the objects and register the object IDs with the routing network. The routing network is adapted to selectively send update messages to nodes in the network and the nodes forward the messages to the clients. One implementation uses a hierarchy of registries to indicate which nodes and clients receive which update messages. Another implementation assigns update messages to one or more of N categories and nodes to one or more of M types, and the gateways maintain mapping between categories and types. To ensure that clients receive all of the update messages for which they register, the clients connect to client proxies that in turn connect to at least one node of each type.

**37 Claims, 12 Drawing Sheets**



US 8,407,722 B2

Page 2

## Related U.S. Application Data

(60) Provisional application No. 60/256,613, filed on Dec. 18, 2000, provisional application No. 60/276,847, filed on Mar. 16, 2001, provisional application No. 60/278,303, filed on Mar. 21, 2001, provisional application No. 60/279,608, filed on Mar. 28, 2001, provisional application No. 60/280,627, filed on Mar. 29, 2001.

(56)                **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,822,543 | A | 10/1998 | Dunn et al. |
| 5,845,324 | A | 12/1998 | White et al. |
| 5,878,420 | A | 3/1999 | de la Salle |
| 5,886,643 | A | 3/1999 | Diebboll et al. |
| 5,919,247 | A | 7/1999 | Van Hoff et al. |
| 5,933,429 | A | 8/1999 | Bubenik et al. |
| 5,938,733 | A | 8/1999 | Heimsoth et al. |
| 5,964,839 | A | 10/1999 | Johnson et al. |
| 5,974,457 | A | 10/1999 | Waclawsky et al. |
| 6,018,619 | A | 1/2000 | Allard et al. |
| 6,029,175 | A | 2/2000 | Chow et al. |
| 6,052,447 | A | 4/2000 | Golden et al. |
| 6,055,493 | A | 4/2000 | Ries et al. |
| 6,091,724 | A * | 7/2000 | Chandra et al. ............... 370/390 |
| 6,094,681 | A | 7/2000 | Shaffer et al. |
| 6,112,240 | A | 8/2000 | Pogue et al. |
| 6,138,158 | A | 10/2000 | Boyle et al. |
| 6,173,406 | B1 | 1/2001 | Wang et al. |
| 6,233,600 | B1 | 5/2001 | Salas et al. |
| 6,240,451 | B1 | 5/2001 | Campbell et al. |
| 6,253,167 | B1 | 6/2001 | Matsuda et al. |
| 6,256,747 | B1 | 7/2001 | Inohara et al. |
| 6,292,835 | B1 | 9/2001 | Huang et al. |
| 6,308,209 | B1 | 10/2001 | Lecheler |
| 6,314,459 | B1 * | 11/2001 | Freeman ........................ 709/220 |
| 6,324,587 | B1 * | 11/2001 | Trenbeath et al. ............ 719/310 |
| 6,363,421 | B2 | 3/2002 | Barker et al. |
| 6,366,926 | B1 * | 4/2002 | Pohlmann et al. ......... 707/104.1 |
| 6,405,245 | B1 | 6/2002 | Burson et al. |
| 6,408,282 | B1 | 6/2002 | Buist |
| 6,418,448 | B1 | 7/2002 | Sarkar |
| 6,418,467 | B1 | 7/2002 | Schweitzer et al. |
| 6,446,257 | B1 | 9/2002 | Pradhan et al. |
| 6,449,638 | B1 | 9/2002 | Wecker et al. |
| 6,460,036 | B1 | 10/2002 | Herz |
| 6,484,143 | B1 | 11/2002 | Swildens et al. |
| 6,502,131 | B1 | 12/2002 | Vaid et al. |
| 6,510,323 | B1 * | 1/2003 | Stocker et al. ................ 455/466 |
| 6,539,427 | B1 | 3/2003 | Natarajan et al. |
| 6,553,413 | B1 | 4/2003 | Leighton et al. |
| 6,560,611 | B1 | 5/2003 | Nine et al. |
| 6,567,411 | B2 | 5/2003 | Dahlen |
| 6,577,328 | B2 | 6/2003 | Matsuda et al. |
| 6,606,596 | B1 | 8/2003 | Zirngibl et al. |
| 6,606,643 | B1 | 8/2003 | Emens et al. |
| 6,609,138 | B1 | 8/2003 | Merriam |
| 6,654,804 | B1 | 11/2003 | Fleming |
| 6,658,652 | B1 | 12/2003 | Alexander et al. |
| 6,687,729 | B1 | 2/2004 | Sievert et al. |
| 6,691,165 | B1 | 2/2004 | Bruck et al. |
| 6,725,446 | B1 | 4/2004 | Hahn et al. |
| 6,728,747 | B1 | 4/2004 | Jenkins et al. |
| 6,751,663 | B1 | 6/2004 | Farrell et al. |
| 6,760,324 | B1 | 7/2004 | Scott et al. |
| 6,769,009 | B1 | 7/2004 | Reisman |
| 6,789,115 | B1 | 9/2004 | Singer et al. |
| 6,792,458 | B1 | 9/2004 | Muret et al. |
| 6,829,642 | B1 | 12/2004 | Giroir et al. |
| 6,832,222 | B1 | 12/2004 | Zimowski |
| 6,836,886 | B2 | 12/2004 | Tuerke et al. |
| 6,871,346 | B1 | 3/2005 | Kumbalimutt et al. |
| 6,918,084 | B1 | 7/2005 | Slaughter et al. |
| 6,970,924 | B1 | 11/2005 | Chu et al. |
| 7,020,082 | B2 | 3/2006 | Bhagavath et al. |
| 7,043,525 | B2 | 5/2006 | Tuttle et al. |
| 7,051,070 | B2 | 5/2006 | Tuttle et al. |
| 7,107,326 | B1 | 9/2006 | Fijolek et al. |
| 7,127,720 | B2 | 10/2006 | Cano et al. |
| 7,139,844 | B2 | 11/2006 | Smith et al. |
| 7,159,034 | B1 | 1/2007 | Rai |
| 7,207,043 | B2 | 4/2007 | Blythe et al. |
| 7,209,959 | B1 * | 4/2007 | Campbell et al. ............. 709/219 |
| 7,249,197 | B1 | 7/2007 | Roestenburg et al. |
| 7,263,547 | B2 | 8/2007 | Kloba et al. |
| 7,277,917 | B2 | 10/2007 | Tuttle et al. |
| 7,293,074 | B1 * | 11/2007 | Jellinek et al. ................. 709/218 |
| 7,350,213 | B2 | 3/2008 | Deutesfeld et al. |
| 7,412,518 | B1 | 8/2008 | Duigou et al. |
| 7,426,721 | B1 | 9/2008 | Saulpaugh et al. |
| 7,430,610 | B2 | 9/2008 | Pace et al. |
| 7,516,177 | B2 | 4/2009 | Knapp et al. |
| 7,565,359 | B2 | 7/2009 | Nazem et al. |
| 2001/0012299 | A1 | 8/2001 | Dahlen |
| 2001/0047426 | A1 | 11/2001 | Hunter |
| 2002/0010757 | A1 | 1/2002 | Granik et al. |
| 2002/0013852 | A1 | 1/2002 | Janik |
| 2002/0024536 | A1 | 2/2002 | Kahan et al. |
| 2002/0056004 | A1 | 5/2002 | Smith et al. |
| 2002/0073165 | A1 | 6/2002 | McNulty et al. |
| 2002/0078251 | A1 | 6/2002 | Lewis |
| 2002/0087630 | A1 * | 7/2002 | Wu ............................... 709/203 |
| 2002/0095399 | A1 | 7/2002 | Devine et al. |
| 2002/0120717 | A1 * | 8/2002 | Giotta ........................... 709/219 |
| 2002/0165977 | A1 * | 11/2002 | Novaes ......................... 709/238 |
| 2003/0026254 | A1 | 2/2003 | Sim |
| 2003/0041110 | A1 | 2/2003 | Wenocur et al. |
| 2003/0120817 | A1 | 6/2003 | Ott et al. |
| 2003/0140111 | A1 | 7/2003 | Pace et al. |
| 2004/0139433 | A1 | 7/2004 | Blythe et al. |
| 2004/0148606 | A1 | 7/2004 | Hosoe |
| 2004/0199926 | A1 | 10/2004 | Gilgen et al. |
| 2004/0215493 | A1 | 10/2004 | Koppes et al. |
| 2005/0027815 | A1 | 2/2005 | Christodoulou et al. |
| 2005/0033841 | A1 | 2/2005 | McCarthy et al. |
| 2005/0125557 | A1 | 6/2005 | Vasudevan et al. |
| 2005/0278726 | A1 | 12/2005 | Cano et al. |
| 2006/0031282 | A1 | 2/2006 | Tuttle et al. |
| 2006/0031283 | A1 | 2/2006 | Tuttle et al. |
| 2006/0041681 | A1 | 2/2006 | Rumelhart |
| 2006/0075279 | A1 | 4/2006 | Cameros et al. |
| 2006/0117318 | A1 | 6/2006 | Rumelhart et al. |
| 2006/0265488 | A1 | 11/2006 | Tuttle et al. |
| 2007/0033293 | A1 | 2/2007 | Rumelhart |
| 2007/0050519 | A1 | 3/2007 | Cano et al. |
| 2007/0061811 | A1 | 3/2007 | Rumelhart et al. |
| 2009/0077173 | A1 | 3/2009 | Lowery et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 889 421 A1 | 1/1999 |
| WO | WO 97/16796 A1 | 5/1997 |
| WO | WO 01/63837 A2 | 8/2001 |
| WO | WO 2005/046184 A1 | 5/2005 |

### OTHER PUBLICATIONS

Nagami et al., "Toshiba's Flow Attribute Notification Protocol (FANP) Specification," Apr. 1997, RFC 2129, Internet RFC/STD/FYI/BCP Archives [online], [retrieved on May 16, 2002]. Retrived from the Internet: <landfield.com/rfcs/rfc2129.html>, 16 pages.

Strom et al., "Gryphon: An Information Flow Based Approach to Message Brokering," International Symposium on Software Reliability Engineering '98, 1998, 2 pages.

Sturman et al., "Reflection in the Gryphon Message Brokering System," Reflection Workshop of the 13.sup.th ACM Conference on Object Oriented Program Systems, Languages and Applications (OOPSLA '98), 1998, 5 pages.

International DOI Foundation, "Introduction to the Digital Object Identifier," [online]. Apr. 1998 [retrieved on May 16, 2002]. Retrieved from the Internet: <doi.org/introduction.html>, 4 pages.

Aksoy et al., "Research in Data Broadcast and Dissemination", Proc. 1st Int'l Conf. on Advanced Multimedia Content Processing, Osaka University, Osaka, Japan, Nov. 1998.

## US 8,407,722 B2

Page 3

Banavar et al., "An Efficient Multicast Protocol for Content-Based Publish-Subscribe Systems," Proc. of the 19th International Conference on Distributed Computing Systems, 1999, 9 pages.

Banavar et al., "Information Flow Based Event Distribution Middleware," Proceedings of the 1999 ICDCS Workshop on Electronic Commerce and Web-Based Applications, 1999, 8 pages.

Aguilera et al., "Matching Events in a Content-based Subscription System," Eighteenth ACM Symposium on Principles of Distributed Computing (PODC '99), Atlanta, GA, May 4-6, 1999, 9 pages.

Banavar et al., "A Case for Message Oriented Middleware," Distributed Computing, 13.sup.th International Symposium, Bratislava, Slavak Republic, Sep. 27-29, 1999, 18 pages.

Aguilera et al., "Efficient Atomic Broadcast Using Deterministic Merge," Symposium on Principles of Distributed Computing, 2000, 10 pages.

Opyrchal et al., "Exploiting IP Multicast in Content-Based Publish-Subscribe Systems," Proceedings of the IFIP/ACM International Conference on Distributed Systems Platforms (Middleware 2000), Apr. 2000, 23 pages.

Caplin Systems Ltd., White Paper "Real Time Text Protocol (RTTP)," Version 1.1, Sep. 2000, 11 pages.

Reuters, "Reuters Market Data Systems and the Trading Solutions Architecture," Version 1.0, Jan. 12, 2001, 51 pages.

Ramamrithan et al., "Dissemination of Dynamic Data on the Internet," [online]. Powerpoint Presentation, Spring 2001, [retrieved on Feb. 6, 2002], 5 pages. Retrieved from the Internet <.cs.umbc.edu/courses/graduate/CMSC691T/spring.sub.—2001/rlist/amit.ppt>.

ComputerLetter, vol. 17, No. 23, Jul. 16, 2001, pp. 1-8.

ComputerLetter, vol. 17, No. 31, Sep. 24, 2001, pp. 1-6.

ComputerLetter, vol. 17, No. 35, Nov. 5, 2001, pp. 1-6.

Tuttle et al., "Upstream Delivery of Information in a Digital Network", U.S. Appl. No. 09/901,582, filed Jul. 9, 2001.

"Repackaging the Net", ComputerLetter, vol. 17, No. 35, Nov. 5, 2001, pp. 1-5.

"Reckoning with IP", ComputerLetter, vol. 17, No. 37, Nov. 19, 2001, pp. 1-6.

"Persistence Counts", ComputerLetter, vol. 17, No. 23, Jul. 16, 2001, pp. 1, 5-7.

Zhao et al.; "A Workflow-centric Study of Organizational Knowledge Distribution;" Proceedings of the 33rd Hawaii International Conference on System Sciences; 2000; pp. 1-10; IEEE.

Gribble, et al.; "The Ninja Architecture for Robust Internet-scale Systems and Services;" Computer Networks; 2001; pp. 473-497; vol. 35; Elsevier Science B.V.

Carmona, David; "Programming the Thread Pool in the .NET Framework"; 'Online' Jun. 2002, pp. 1-17, XP002357234; retrieved on Dec. 1, 2005 from the Internet: URL:http://msdn.microsoft.com/library/default.asp?url=/library/en-us/dndotnet/hmtl/progthrepool.asp>, pp. 1-17.

Welsh, Matthew D.; "An Architecture for Highly Concurrent, Well-Conditioned Internet Services"; URL: http://www.eecs.harvard.edu/{mdw/papers/mdw-phdthesis/pdf>, 2005, pp. 48-54, 101, and 113-114.

Written Opinion of the International Searching Authority for International Application No. PCT/US2005/029162, recorded Jan. 17, 2006, 7 pages.

Written Opinion of the International Searching Authority for International Application No. PCT/US2005/029021, recorded Dec. 14, 2005, 10 pages.

Written Opinion of the International Searching Authority for International Application No. PCT/US2005/029158, recorded Jan. 25, 2006, 7 pages.

Non-Final Office Action dated Oct. 26, 2009, U.S. Appl. No. 11/205,263, Rumelhart et al., filed Aug. 15, 2005.

Final Office Action dated Nov. 24, 2009, U.S. Appl. No. 11/205,237, Rumelhart et al., filed Aug. 15, 2005.

Non-Final Office Action dated May 3, 2005, 8 pages in U.S. Appl. No. 10/017,182, Tuttle et al., filed Dec. 14, 2001.

Notice of Allowance dated Jan. 3, 2006, U.S. Appl. No. 10/105,018, Tuttle et al., filed Mar. 21, 2002.

Notice of Allowance dated Jul. 5, 2006, U.S. Appl. No. 10/105,018, Tuttle et al., filed Mar. 21, 2002.

Non-Final Office Action dated Aug. 9, 2005, U.S. Appl. No. 10/213,269, Cano et al., filed Aug. 5, 2002.

Final Office Action dated Jan. 26, 2006, U.S. Appl. No. 10/213,269, Cano et al., filed Aug. 5, 2002.

Notice of Allowance dated Jun. 6, 2006, U.S. Appl. No. 10/213,269, Cano et al., filed Aug. 5, 2002.

Non-Final Office Action dated Feb. 3, 2009, U.S. Appl. No. 11/205,233, Rumelhart et al., filed Aug. 15, 2005.

Non-Final Office Action dated Aug. 6, 2009, U.S. Appl. No. 11/205,233, Rumelhart et al., filed Aug. 15, 2005.

Non-Final Office Action dated Apr. 22, 2008, U.S. Appl. No. 11/205,237, Cameros et al., filed Aug. 15, 2005.

Non-Final Office Action dated Apr. 29, 2009, U.S. Appl. No. 11/205,237, Cameros et al., filed Aug. 15, 2005.

Final Office Action dated Nov. 25, 2008, U.S. Appl. No. 11/205,237, Cameros et al., filed Aug. 15, 2005.

Notice of Allowance dated May 22, 2007, U.S. Appl. No. 11/347,802, Tuttle et al., filed Feb. 3, 2006.

Non-Final Office Action dated Jan. 26, 2007, U.S. Appl. No. 11/347,802, Tuttle et al., filed Feb. 3, 2006.

Non-Final Office Action dated Mar. 6, 2009, U.S. Appl. No. 11/515,233, Rumelhart et al., filed Aug. 31, 2006.

Final Office Action dated Oct. 7, 2009, U.S. Appl. No. 11/515,233, Rumelhart et al., filed Aug. 31, 2006.

Non-Final Office Action dated Jan. 7, 2010, U.S. Appl. No. 11/205,233, Rumelhart et al., filed Aug. 15, 2005.

Non-Final Office Action dated Feb. 22, 2010, U.S. Appl. No. 11/515,233, Rumelhart et al., filed Aug. 31, 2006.

Final Office Action dated Mar. 23, 2010, U.S. Appl. No. 11/205,263, Rumelhart et al., filed Aug. 15, 2005.

U.S. Appl. No. 13/617,168, Tuttle et al., "Asynchronous Messaging Using A Node Specialization Architecture in the Dynamic Routing Network," filed Sep. 14, 2012.

Non-Final Rejection mailed Aug. 9, 2005 for U.S. Appl. No. 10/213,269, filed Aug. 5, 2002; 11 pages.

Final Rejection mailed Jan. 26, 2006 for U.S. Appl. No. 10/213,269, filed Aug. 5, 2002; 8 pages.

Notice of Allowance mailed Jun. 6, 2006 for U.S. Appl. No. 10/213,269, filed Aug. 5, 2002; 4 pages.

Non-Final Rejection mailed Aug. 26, 2010 for U.S. Appl. No. 11/515,366, filed Aug. 31, 2006; 16 pages.

Final Rejection mailed Feb. 17, 2011 for U.S. Appl. No. 11/515,366, filed Aug. 31, 2006; 30 pages.

Notice of Allowance mailed Nov. 10, 2005 for U.S. Appl. No. 10/017,182, filed Dec. 14, 2001; 6 pages.

* cited by examiner

Case 2:25-cv-02956-BCL-tmp    Document 13-2    Filed 02/10/26    Page 331 of 404
PageID 711



Fig. 1



Fig. 2



Fig. 3





Fig. 4

U.S. Patent        Mar. 26, 2013        Sheet 5 of 12        US 8,407,722 B2



Fig. 5



Fig. 6

**U.S. Patent**        Mar. 26, 2013        Sheet 7 of 12        US 8,407,722 B2



Fig. 7

Case 2:25-cv-02956-BCL-tmp    Document 13-2    Filed 02/10/26    Page 338 of 404
PageID 718



Fig. 8

**U.S. Patent**     Mar. 26, 2013     Sheet 9 of 12     **US 8,407,722 B2**



Fig. 9



Fig. 10

**U.S. Patent**        Mar. 26, 2013        Sheet 11 of 12        US 8,407,722 B2



Fig. 11



Fig. 12

US 8,407,722 B2

**1**

## ASYNCHRONOUS MESSAGING USING A NODE SPECIALIZATION ARCHITECTURE IN THE DYNAMIC ROUTING NETWORK

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 10/105,018 filed Mar. 21, 2002 (now U.S. Pat. No. 7,051, 070), which is a continuation-in-part of U.S. application Ser. No. 10/017,182 filed Dec. 14, 2001 now U.S. Pat. No. 7,043, 525, which claims the benefit of U.S. Provisional Application No. 60/256,613, filed Dec. 18, 2000, U.S. Provisional Application No. 60/276,847, filed Mar. 16, 2001, U.S. Provisional Application No. 60/278,303, filed Mar. 21, 2001, U.S. Provisional Application No. 60/279,608, filed Mar. 28, 2001, and U.S. Provisional Application No. 60/280,627, filed Mar. 29, 2001, all of which are hereby incorporated by reference herein.

### BACKGROUND

#### 1. Field of the Invention

This invention pertains in general to transferring information through digital networks and in particular to transferring information for remotely updating content at client devices through the digital networks.

#### 2. Background Art

The Internet is a digital network of computers. An individual computer on the Internet is typically identified by an internet protocol (IP) address. A computer on the Internet sends a packet of information to another computer by routing the packet to a logical port at the destination computer's IP address. The destination computer interprets the packet according to one of several possible protocols determined by the port to which the packet was sent.

The World Wide Web (the "Web") is a collection of technology and content available on the Internet that allows the content to be routed from server computers to particular destination computers. The Web includes a large number of web pages residing on many different servers. Web pages contain one or more files, or references to one or more files, specifying instructions for presenting the web page and content, such as text, images, applets, video, and/or audio.

Web pages use a variety of definitional and programming languages to control how information is presented. The most fundamental of these is the Hypertext Markup Language (HTML). HTML uses a system of "tags" to specify how content should be displayed. Recent advances in HTML introduce "style sheets" which help separate content information from display information. HTML has also been modified and extended to provide new capabilities. For example, Extensible Markup Language (XML) adds semantic content to web pages. In addition, Dynamic HTML (DHTML) adds some dynamic content to web pages.

A web page may also include one or more programs for controlling how the web page is displayed. For example, JAVA® applets and JAVASCRIPT® scripts may be used to control the display of a web page. In addition, DHTML uses scripts to control the dynamic content. Thus, a web page designer can use applets and scripts to produce animation effects or modify the display based on user interaction. For example, the designer can write a script that changes the color of a piece of text when a user clicks on a button.

Devices that display/execute web pages are often called "client devices" or simply "clients." Client devices include personal computers, web-enabled set-top boxes and televi-

**2**

sions, cellular telephones, personal digital assistants and other handheld devices, and special-purpose web-browsing appliances. Client devices typically employ a program called a "web browser" for interpreting the HTML or other display instructions in the web page and displaying the content accordingly. Most web browsers include special functionality, such as a Java Virtual Machine, for executing JAVA® applets and/or other applets or scripts embedded in the web pages.

A client device specifies a web page or other document on the web using a Uniform Resource Locator (URL). A URL has the form "service://server/path/file." Here "service" refers to the protocol to be used, such as the file transfer protocol (FTP) or the hypertext transport protocol (HTTP). "Server" is the IP address of the server containing the page, and "path/file" specifies the particular web page on the server.

The Web suffers from a substantial limitation with respect to dynamically updating content in a web page at a client device. The Web's only mode of operation is for a client device to first request a page from a server and then for the server to send the requested page to the client device. Once the server delivers the page to the client, it typically terminates its connection to the client, and does not retain any information about the client or the page that was sent. For this reason, servers are typically "stateless." As a result, client devices drive and control the flow of information around the Web. While client-side control is appropriate in some situations, it does not permit efficient updating of data at the client devices. For example, if a web page contains information that may change, such as the score of a baseball game or a stock quote, the server has no way to inform the client devices that are viewing the page of the change. Instead, the client devices must ask the server for the updated information. However, the client devices do not know when the information on the web page has changed, and thus do not know to ask for the update.

There are some simple web programming techniques that attempt to update content on client device-side web pages. One approach that web designers use is to rely on the client devices to periodically re-request web pages. This updating can be performed as the result of user action (such as pressing the "refresh" button) or can be automated to occur on a particular schedule (such as by using the HTML Meta Refresh tag to cause the client device to request the page every 'X' seconds). Although this technique provides client devices with more up-to-date information, it is very wasteful of resources. In particular, the web server must resend the page even if nothing has changed, and, even when something has changed, it must resend the entire web page rather than just the updated information, which may be only a very small part of the page. Further, attempting to reduce unnecessary requests by decreasing the request rate results in decreasing the currency of the data. This is an unalterable trade off in a client-driven approach.

The performance of automatic refreshing can be improved somewhat by putting information that may change in a separate frame from information that is less likely to change, and only refreshing the separate frame. A few web designers even write custom JAVA applets to limit refreshing to individual components on a page, such as the score of a soccer game. A willingness to go to such effort illustrates the serious drain of resources caused by frequent refreshing. Nevertheless, even custom JAVA applets are not a meaningful attack on this problem. Custom applets require a large separate development effort for each item on each page that might need to be updated. More importantly, most custom applets still update content based upon client-driven requests, although it is possible to design an applet that accepts "pushed" messages. This

US 8,407,722 B2

**3**

solution is not scalable to provide updated information for large numbers of client devices and for large numbers of web pages.

Therefore, there is a need in the art for an efficient way to provide dynamic content to a web page at a client device.

## DISCLOSURE OF THE INVENTION

The above need is met by a dynamic content routing network that routes messages containing data for updating properties of live objects to clients displaying web pages or other representations of data containing the live objects. The web server that initially provides the web pages to the clients does not need to track which clients are currently displaying the live objects. Instead, the information provider or a dynamic content provider (generically referred to as an "input source") that provided the live object simply sends an update message to the routing network. This routing utilizes bandwidth efficiently because the update messages are provided to the clients only when the live objects change.

The routing network is adapted to selectively send messages to the nodes in the network. In one embodiment, a hierarchy of registrations is used. Each gateway in the routing network maintains the mappings between the live: objects and the nodes that have registered for the live objects. Each node in the routing network, in turn, maintains the mappings between the live objects and the clients that display them. An input source provides a message to a gateway in each cluster in the routing network. Each gateway forwards to each node only messages that reference the objects for which it has registered. Each node forwards to each client only messages that reference the objects for which it has registered. Adding node functionality to the gateway and client functionality to the node advantageously allows the routing network to decide which nodes should receive an update message. As a result, messages are sent to only nodes that have registered for the messages. Furthermore, each node receives all the messages that the clients connected to that node are interested in.

In another embodiment, all messages from an input source are assigned to one or more of N categories. Also, the nodes are assigned to one or more of M types, and mappings are created between message categories and node types. Each gateway keeps track of these mappings. When a gateway receives messages from input sources, the gateway identifies the categories of the messages and routes the messages to the nodes of the types to which the categories are mapped. To ensure that clients have access to the messages they need, clients are allowed to communicate with nodes of several types using client proxies connected between the clients and the nodes. There are at least two ways to implement the client proxy embodiment. The implementations differ primarily in where the client registration information is stored. In the first implementation, client registration information is stored at the nodes, and the client proxy merely passes messages among the clients and nodes. When a node directs a message to the client, the node passes the message to the client proxy along with a pointer to the client socket. When the client proxy receives the message, it simply pushes it to the client socket.

In the second implementation of the client proxy embodiment, the client proxy stores client registration information. In this embodiment, each node stores the object IDs registered by client proxies connected to the node. The client proxy registers with the nodes for all objects for which it needs to receive updates. The nodes receive the messages from the input sources, determine which client proxies have registered for the messages, and send the messages to the appropriate

**4**

client proxies. The client proxies, in turn, transmit the messages to the clients that have registered for the messages.

The features and advantages described in this summary and the following detailed description are not all-inclusive, and particularly, many additional features and advantages will be apparent to one of ordinary skill in the art in view of the drawings, specification, and claims hereof.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a high-level block diagram illustrating an environment containing a dynamic content routing network;

FIG. **2** is an interaction diagram illustrating interactions among a server, information provider, dynamic content provider, client, and routing network to update a property of a live object on a web page;

FIG. **3** is a high-level diagram graphically indicating the many-to-many mapping performed by the routing network;

FIG. **4** illustrates two different web pages containing sports scores;

FIG. **5** is a block diagram illustrating an input source and the tools available to it for generating the update messages;

FIG. **6** is a flow chart illustrating the steps performed by an embodiment of an activation module;

FIG. **7** is a block diagram illustrating a lower-level view of the routing network according to an embodiment of the present invention;

FIG. **8** is a flow chart illustrating steps performed by a gateway and a node in a cluster to perform object-based routing of a message received from an input source in an embodiment using a hierarchy of registries;

FIG. **9** is a block diagram illustrating a high-level view of the routing network in an embodiment adapted to use message categories, node types, and client proxies;

FIG. **10** is a flow chart illustrating steps performed by a gateway, a node that stores client registration information, and a pass-through client proxy to perform object-based routing of a message received from an input source;

FIG. **11** is a block diagram illustrating a high-level view of the routing network for an embodiment in which the client proxy stores the client registration information; and

FIG. **12** is a block diagram illustrating a high-level view of the routing network for an embodiment in which the nodes adopt client proxy functionality.

The figures depict an embodiment of the present invention for purposes of illustration only. One skilled in the art will readily recognize from the following description that alternative embodiments of the structures and methods illustrated herein may be employed without departing from the principles of the invention described herein.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. **1** is a high-level block diagram illustrating an environment **100** containing a dynamic content routing network **110** (hereafter referred to as the "routing network"). The environment **100** also contains a server **112** in communication with a client **114**, an information provider **108**, and a dynamic content provider **116**. Although a typical environment **100** will have hundreds of servers **112** and information providers **108**, thousands (or even millions) of clients **114**, and multiple dynamic content providers **116**, FIG. **1** illustrates only one of each of these entities in order to enhance the clarity of this description.

The server **112**, client **114**, information provider **108**, dynamic content provider **116**, and routing network **110** are

US 8,407,722 B2

| 5 | 6 |

preferably in communication via conventional communications links **117** such as those comprising the Internet. The communications links **117** include known wired communications media, such as dedicated or shared data, cable television or telephone lines, and/or known wireless communications media, such as communications over the cellular telephone network using protocols such as the global system for mobile communications (GSM), code division multiple access (CDMA), time division multiple access (TDMA), etc.

In one embodiment, the entities may each be in communication with one or more Internet Service Providers (ISPs) (not shown) that provide each entity with access to other computers on the Internet. In addition, the server **112**, client **114**, information provider **108**, dynamic content provider **116**, and routing network **110** are preferably each identified by at least one Internet Protocol (IP) address such as "66.35.209.224." The IP address may also have one or more domain names associated with it, such as "bangnetworks.com." Alternative embodiments of the present invention may use alternative addressing schemes and/or naming conventions instead of, or in addition to, those described herein. For example, embodiments wherein one or more of the clients are cellular telephones or other portable devices may rely on different addressing schemes.

Preferably, the information provider **108** provides web pages or other representations of data to the server **112**. The web pages contain one or more "live objects," which are designated to be real-time dynamically-updateable objects. Each live object is identified by an object identifier, or object ID. Preferably, the server **112** provides the web pages **118** to multiple clients **114**. The clients **114** contact the routing network **110** and register for update messages for the object IDs on the web page. The routing network **110**, in turn, preferably maintains a registry indicating which clients have registered for which object IDs.

The information provider **108** and/or dynamic content provider **116** send update messages to the routing network **110**. These messages can be sent any time the information provider **108** or dynamic content provider **116** wants to update a property of a live object. Each update message preferably identifies a live object and contains data for updating a property of the identified live object. The routing network **110** accesses the registry and determines which clients have registered for the identified object. Then, the routing network **110** routes the update message to the appropriate clients. Upon receipt of an update message, the clients **114** update the specified property of the live object.

The routing network **110** provides an efficient one-to-many mapping of objects to clients (and by inference of information, a many-to-many mapping of information providers **108**/ dynamic content providers **116** to clients) through object-based routing. Messages provided by the information provider **108** and/or dynamic content provider **116** to the routing network **110** are not routed to the clients **114** based entirely on a specified destination; more specifically, they are not routed based on the IP address of the client, as in conventional IP routing schemes. Instead, the messages are routed based on the live objects referenced by the message.

The mapping and object-based routing provided by the routing network **110** allow the information provider **108** and dynamic content provider **116** to update properties of live objects at a dynamically changing cross-section of clients in real-time, without requiring the information provider or dynamic content provider to track the clients or web pages being viewed by the clients. The clients **114**, in turn, do not need to have any a priori knowledge of object IDs—they

"discover" which IDs they should register when they receives the web pages **118** from the server **112**.

Object-based routing also allows information providers **108** to dynamically update content on web pages without requiring the clients **114** to re-request the content, and without requiring the information providers **108** or servers **112** to maintain connections with the clients. In this manner, significantly more clients can receive updated content from a given information provider **108** than would be possible utilizing conventional client-side request-driven transmission control protocol/Internet Protocol (TCP/IP) connections between the clients and the server **112**.

Turning now to the individual entities illustrated in FIG. 1, the server **112** is preferably a conventional computer system configured to act as a web server and serves web pages **118** and other data representations to clients **114**. The web pages **118** provided by the server **112** are associated with one or more information providers **108**.

An information provider **108** is an entity providing one or more web pages **118**, information contained in web pages, and/or other representations of data served by the server **112**. The information provider **108** preferably has a conventional computer system coupled to the Internet. In one embodiment, the server **112** is directly controlled by the information provider **108** (e.g., the server is physically located at the information provider and/or is dedicated to serving only the information provider's web pages). In this embodiment, the server **112** and information provider **108** can be treated as the same entity. In an alternative embodiment, the server **112** serves web pages from multiple information providers.

As is known in the art, the web pages **118** and other content on the server **112** are specified by uniform resource locators (URLs) having the form "service://server/path/web page." Typically, web pages **118** are obtained via the hypertext transport protocol (HTTP) and thus an exemplary URL for retrieving the web page "b1.html" from the web server having the domain name "www.bangnetworks.com" is "http://www-.bangnetworks.com/news/b1.html."

As used herein, a "web page" is a block of data available from the server **112**. In the simplest case, a web page is a file written in the hypertext markup language (HTML). The web page may also contain or refer to one or more other blocks of data, such as other files, text, images, applets, video, and/or audio. In addition, the web page may contain instructions for presenting the web page and its content, such as HTML tags and style sheets. The instructions may also be in the Extensible Markup Language (XML), which is related to HTML and adds semantic content to web pages or the Dynamic HTML (DHTML), which adds some dynamic content to web pages. Additionally, the instructions may take the form of one or more programs such as JAVA® applets and JAVAS-CRIPT® and/or DHTML scripts.

As used herein, the phrase "web page" also refers to other representations of data served by the server **112** regardless of whether these data representations include characteristics of conventional web pages. These data representations include, for example, application programs and data intended for the web browser **120** or other application programs residing at the clients **114** or elsewhere, such as spreadsheet or textual (e.g., word processing) data, etc.

In a preferred embodiment, objects at the client, such as web pages and elements of web pages, can be designated as "live" by the information provider **108**. Properties of a live object can be dynamically updated in real-time at the client **114** by the information provider **108** or another entity acting on behalf of the information provider. As used herein, an "object" is any datum or data at the client **114** that can be

US 8,407,722 B2

7

individually identified or accessed. Examples of objects include elements of web pages such as text characters and strings, images, frames, tables, audio, video, applets, scripts, HTML, XML, and other code forming the web page, variables and other information used by applets, scripts and/or code, URLs embedded in the web page, etc. Application and operating system constructs are also objects. For example, cells of spreadsheets, text in word processor documents, and title bars and messages displayed by the operating system or applications are objects. Preferably, multiple objects can be grouped together into a single, logical object. Thus, an object can be defined at any desired or useful level of granularity.

Since content on a web page is conceptualized and organized by "object," the present invention essentially abstracts web pages and web page content, and other modules and/or functionality at the client 114, away from the HTML code or other conventional representation. This abstraction allows the information provider 108 to update a property of an object without concern for the location, display format, or other specifics of how the data is being represented at the client 114.

Live objects have associated "properties" which include any modifiable data related to the object or referenced with respect to the object. The information provider 108 typically, but not necessarily, provides initial settings for the properties of live objects provided to the client 114. The properties may or may not affect the visual representation of the object in the web page or other data representation. A property may affect an internal aspect of the object and, thus, a change to the property may not have any direct effect on a web page containing the object. For example, the property may affect whether particular aspects of the object are modifiable, how the object responds to user input or other stimuli, etc. Additionally, a property may also have a direct effect on how the object is displayed at the client 114. For example, the property may affect the content, color, typeface, size, formatting, or other attribute of text, images, or other data displayed by the object. Other properties may occupy parts of the spectrum between having no effect on the visible representation of the object and having a direct effect on the visible representation of the object. For example, a web page showing scores of football games may include a list of games and the current scores of the games as of the time the server 112 serves the web page. The list of games, subset of games to be displayed, and the scores of the games can be designated as live objects (or properties of a single live object) and updated as necessary or desired.

A property can also preferably include instantiating an instance of the object or invoking functionality of the object. For example, a property of a browser window object may include functionality for instantiating another browser window. This function can be invoked as a logical change to a property of the object. The second browser window can be referenced through the original browser window (i.e., object) or designated as a new live object.

An information provider 108 or other entity preferably updates a live object at a client 114 via an update message. In general, an update message identifies the live object and, if necessary, the property of the live object, and contains data for updating the property. In one embodiment, the data may be the actual value for the property or executable code for causing the object's property to be updated. For example, the data may be a simple numerical or textual value, e.g., "4," to which the property should be set, and/or the data may be JAVASCRIPT® code or a call to a JAVASCRIPT® function at the client that effects the desired change to the property of the object.

8

The update message preferably implicitly or explicitly identifies a handler at the client 114 for use in updating the live object's property. In one embodiment, the client 114 utilizes a default handler when the message implicitly specifies the handler (e.g. when the message does not identify a specific handler). In one embodiment, if the update message specifies the actual value for the property, a default handler generates JAVASCRIPT® code for changing the property to the specified value. If the data in the update message are JAVASCRIPT® code, the default handler does not perform any processing of the code. In either case, the default handlers preferably use LiveConnect to execute the JAVASCRIPT® code in a Java Virtual Machine (JVM) 122 at the client 114 and thereby update the property of the live object.

For certain objects and/or data types, the default handlers are not appropriate. In these cases, the message preferably explicitly identifies a handler for performing the update. For example, the message may explicitly specify a function to call on the data or the message may explicitly identify the environment in which the data should be executed. For example, the data in the update message may include code for execution by a software "plug-in" such as MACROMEDIA FLASH® and the message may explicitly identify FLASH as the handler.

The information provider 108 preferably designates an object as "live" by including a unique identifier for the object, the object ID, in the web page or other data representation provided to the client 114. In one embodiment, the information provider 108 encodes the object ID in an object's corresponding HTML "ID" attribute using the following HTML expression:

ID="elementIdentifier,"

where "elementIdentifier" is the object ID and is preferably a string. The string can encode any information desired by the information provider 108 or other entity establishing the object ID and in one embodiment is a simple textual and/or numeric identifier. In one embodiment, the information provider 108 begins the object ID with a predefined token, such as "Bang$," in order to distinguish live objects from other objects that happen to have defined ID attributes. For example, an object can have the object ID "Bang$elementIdentifier."

In the preferred embodiment, each information provider 108 optionally encodes a unique information provider ID in its object IDs in order to prevent naming collisions between the object IDs of different information providers. In one embodiment, the information provider ID is a textual and/or numeric identifier. The information provider 108 may specify the information provider ID and the object ID as part of a hierarchical namespace. For example, in one embodiment objects are named as follows: "$namespace1$ [namespace2$ . . . $namespaceN$]objectId," where "$namespace1" is the information provider ID and the "$" operates as the name separator and defines additional optional levels of a namespace hierarchy. One embodiment of the system 100 supports typical directory services functionality. For example, two dollar sign characters appearing together, "$$," refers to the top level of the namespace hierarchy.

Thus, the object ID for a live object is preferably formed from a combination of the predefined token, the information provider ID namespace, and a value assigned by the information provider 108. For example, the object ID for a live object representing the real time price of a stock having the symbol "BANG" might be: "Bang$$informationProviderID-$equities$realtime$bang." In this example, "Bang$" is the predefined token that signifies a live object, "$information-ProviderID" is the ID identifying the information provider,

US 8,407,722 B2

| 9 | 10 |

"$equities$realtime$" defines levels of a namespace hierarchy, and "bang" identifies the specific object.

In some embodiments and situations, the object ID utilizes relative names. For example, an information provider 108 referring to its own object IDs is implicitly in its own namespace. Accordingly, the information provider 108 does not need to include the information Provider ID in the object IDs it utilizes internally. In one embodiment, the information provider ID is not explicitly encoded into the object ID. Instead, the information provider ID is encoded elsewhere in the web page in order to provide scope to the page's object IDs.

In one embodiment, the object ID identifies a point (i.e., a node in a tree) in a Document Object Model (DOM) representation of a web page or other document at the client 114. The DOM is a platform- and language-neutral interface that represents a document as a hierarchy of objects. The DOM also provides an interface that allows programs and scripts to dynamically access and update properties of the objects. Object properties can be inherited by descendent objects.

In this embodiment, the client 114 preferably executes an update message in the context of the specified point in the DOM representation. The update may specify a change to a property of the object at the identified point. The update also may specify a change to a parent or descendent of the object at the identified point. In each case, the update is executed relative to the specified point in the DOM representation. In one embodiment, points in the DOM representation specify how to update properties of live objects located at those points. Thus, the same update may be interpreted differently depending upon the identified live object's location in the DOM representation.

For example, assume there is an object in the DOM representation identified as "window.document.frame[3].ObjectID." Also assume that the object has an "innerText" property located at "window.document.frame[3].ObjectID.innerText" that specifies the text displayed by the object. An update message can change the text displayed by the object by specifying "ObjectID" and the new value for the innerText property.

An advantage of utilizing object IDs to specify objects is that the information provider 108 or other entity providing the update message can access and change properties of objects without knowing the object's actual location in the DOM representation. Indeed, the object may be in different locations in different DOM representations and/or in multiple locations in the same DOM representation. In any of these cases, the update message will change the specified properties of all of the objects having the given object ID.

Depending upon the particular embodiment of the environment 100, the information provider 108 and/or the dynamic content provider 116 provides update messages to the routing network 110. The dynamic content provider 116 is preferably a conventional computer system operated by an entity that provides real-time information, such as stock prices and/or sports scores. In one embodiment, the information provider 108 receives updated properties for the live objects from the dynamic content provider 116 or another source (or generates the updated properties internally). Then, the information provider 108 sends an update message specifying the object ID and the change to the object property to the routing network 110. In this embodiment, the dynamic content provider 116 may be absent from the environment 100.

In another embodiment, the dynamic content provider 116 provides the object IDs for live objects to one or more information providers 108 and the information providers 108 distribute the live objects to the clients 114. Then, the dynamic content provider 116 sends messages specifying the changes to the properties of the live objects to the routing network 110. For example, the dynamic content provider 116 distributes an object ID associated with the score of a particular baseball game to the information providers 108. Then, the dynamic content provider 116 sends a message specifying the object ID and an update to a property of the object that controls the displayed score of the particular baseball game to the routing network 110. These two embodiments are not mutually exclusive and, therefore, some updates may be provided to the routing network 110 by the information provider 108 while others are provided by the dynamic content provider 116.

The client 114 is a device that retrieves web pages 118 and/or other information from the server 112. In one embodiment, the client 114 is a conventional personal computer used by a person to access information on the Internet. In alternative embodiments, the client 114 is a different consumer electronic device having Internet connectivity, such as an Internet-enabled television, a cellular telephone, a personal digital assistant (PDA), a web browsing appliance, etc. The client 114 preferably, but not necessarily, has an associated display device.

The client 114 preferably executes a web browser 120, such as MICROSOFT INTERNET EXPLORER®, for retrieving web pages and displaying them on the display device. In embodiments where the client receives data representations from the server 112 other than conventional web pages, the web browser 120 does not necessarily share similarities with conventional web browsers. Preferably, the web browser 120 contains a JVM 122 for executing JAVA® applets and/or scripts. The web browser 120 also preferably contains Dynamic HTML capabilities, such as support for JAVASCRIPT® (or another scripting language, such as VBScript) and the Document Object Model (DOM), and enables communications between JAVA® and the scripting languages. In one embodiment, the web browser 120 supports the LiveConnect standard for enabling communication between JAVA® applets and scripts written in the supported scripting languages. The web browser 120 can also be extended through software plug-ins such as MACROMEDIA FLASH®, REAL NETWORKS REALPLAYER®, and/or APPLE QUICKTIME®. In alternative embodiments, the functionality of the JVM 122 and/or other aspects of the web browser 120 are provided by one or more other functional units within the client 114. The term "module" is used herein to refer to software computer program code and/or any hardware or circuitry utilized to provide the functionality attributed to the module. The web browser 120 and JVM 122 are examples of modules in the client 114.

In some embodiments, the client 114 does not necessarily have a display device, web browser 120 and/or other components associated with a typical consumer device. The client 114, for example, may be a dedicated purpose device having certain aspects of web connectivity such as an embedded HTTP client in a web-enabled appliance or in a controller for an automobile, audio-visual equipment, or some other device.

A web page 118 provided from the server 112 to the client 114 preferably includes instructions for enabling the live objects on the web page. The instructions cause the client 114 to automatically and transparently (i.e., without user interaction) contact the routing network 110 and download an activation module 124 for activating the live objects. In one embodiment, the instructions comprise a URL specifying the location of the activation module 124 at the routing network 110. In an alternative embodiment, the client 114 obtains the activation module 124 from the server 112 or another source.

US 8,407,722 B2

11

The activation module **124** preferably contains JAVA® instructions for execution by the JVM **122**. However, alternative embodiments of the module **124** may encode the instructions in the web page **118** and/or the activation module **124** using different languages and/or techniques. For example, the instructions and/or activation module **124** can be embedded in the web browser **120** or operating system, either as native code or as plug-ins. In these alternative embodiments, the web browser **120** does not have to download the activation module **124** from an external source.

The activation module **124** preferably registers object IDs from the web page **118** downloaded by the client **114** with the routing network **110** and updates the live objects in response to update messages received from the network. The routing network **110** records the registrations in the registry **125**. The client's registrations preferably remain in effect as long as the client is displaying the associated web page **118**, although other embodiments of the system **100** may use different criteria for determining when to terminate the client's registrations.

FIG. **2** is an interaction diagram illustrating interactions among the server **112**, information provider **108**/dynamic content provider **116** (generically referred to as an "input source **210**"), client **114**, and the routing network **110** to update a property of a live object. Initially, the client **114** sends **212** a web page request to the server **112**. In response, the server **112** provides **214** to the client **114** the web page containing or otherwise identifying the one or more live objects. Instructions encoded in the web page preferably cause the client **114** to transparently request **216** the activation module **124** from the routing network **110**. In response, the routing network **110** sends **218** the activation module **124**. The client **114** executes **220** the activation module **124**, which identifies the object IDs of the live objects at the client and registers **222** the object IDs with the routing network **110**. The routing network **110** updates **223** its registry to identify the object IDs for which the client **114** has registered.

At some point, the input source **210** sends **224** an update message to the routing network **110** in order to change a property of a live object at the client **114**. In one embodiment, the message from the input source **210** to the routing network **110** contains only a single object ID and an update to a property of the identified object. In another embodiment, the message contains multiple object IDs and the corresponding property updates. In this latter embodiment, the message may have an associated "Batch ID" that identifies the message as having multiple object IDs and updates. Preferably, the information provider **108** can include a batch ID in a web page **118** in the same manner as including an object ID. Likewise, the client **114** can preferably register for a batch ID with the routing network **110** in the same manner as an object ID. In fact, the batch ID can be the same as the object ID so that the client **114** registers for both batch and non-batch messages by registering one ID. Alternatively, separate procedures can be established for registering batch messages. The client **114** preferably processes the component messages of a batch as if each message were delivered separately.

The routing network **110**, in turn, routes **226** the message to each client **114** that has registered for the specified object ID, preferably by utilizing standard Internet communications protocols, such as IP addresses, etc. The activation module **124** at the client **114** processes the message and updates **228** the property of the identified live object. If live objects having the same object ID appear in multiple locations at the client **114** (e.g., at multiple locations on a web page being displayed at the client), the activation module **124** preferably updates each of the live objects having the specified ID. As a result, the

12

routing network **110** allows live objects at the client **114** to be dynamically updated. Preferably, this routing and updating happens quickly enough to be considered "real-time" for the purposes of the input source **210**.

This update process, indicated within the dashed box **230** in FIG. **2**, can repeat an indefinite number of times and is fully asynchronous as to the information provider **210** and client **114**. For example, the input source **210** may send regular update messages to the routing network **110** as the score of a sporting event changes or a stock price fluctuates, but may stop sending update messages once the sporting event ends or stock market closes. When the client **114** ends the display of a web page containing the live object, or otherwise no longer desires to receive update messages, the client preferably closes **232** the connection with the routing network **110**. The routing network **110**, in turn, updates **234** the registry **125** to remove the client's object registrations. In another embodiment, the client **114** sends messages to the routing network **110** that selectively register and/or de-register the client from one or more objects yet leaves the connection open in order to receive update messages pertaining to other objects.

FIG. **3** is a high-level diagram graphically indicating the many-to-many mapping performed by the routing network **110**. Multiple input sources (labeled **210A-C**) send update messages to the routing network **110**. Each update message preferably specifies at least one object ID and an update to a property of the identified object. The routing network **110**, in turn, selectively routes the update messages to the clients **114** that have registered for the given object ID from the given input source **210**. In FIG. **3**, assume for example that clients **312A** and **312B** have registered for a given object ID while the other clients have not registered for the object ID. Accordingly, the routing network **110** routes the update message to clients **3 12A** and **312B**, but does not route the message to clients **312C-312H**.

FIG. **4** illustrates an example of the capabilities of the dynamic content routing network **110**. FIG. **4** illustrates two different web pages **410**, **412** containing sports scores. Although the web pages are formatted differently, each page contains the same scores for two professional football games and two professional baseball games. Web page **410** contains all four games under the heading "Local Sports Scores" while web page **412** contains the baseball games under the heading "Baseball Scores" and the football games under the heading "Football Scores."

There are various ways to internally represent the games and scores in the web pages using live objects. In one embodiment, a "game" object is defined having properties for the two teams involved in the game and the score associated with each team. The game object is placed at a selected position in the web page and the properties of the object cause the information about the game to be displayed on the page. In another embodiment, "team" and "score" objects are defined, with the team object having a property defining the name of a team and the score object having a property defining a score. In this second embodiment, the team and score objects are placed at selected locations on the page so that the proper teams and scores are aligned when the page is rendered. In yet another embodiment, an object is defined having properties for the name of one team and a score associated with that team. Then, pairs of the objects are placed in the page in the proper alignment to indicate the games and scores. In another embodiment, an object is defined having properties specifying names of two teams and a separate object is defined having properties specifying two scores. In this last embodiment, the two objects are placed in the page so that the names

US 8,407,722 B2

13

of the teams align with the associated scores. Obviously, additional variations of these representations are possible.

Assume for the example of FIG. 4 that the names of teams in a game are specified by a "names" object having properties for the two team names and the scores in the game are specified by a "scores" object having properties for two scores. In web page 410, a names object 414 having properties set to identify the "SF 49ers" and the "STL Rams" is located directly under the "Local Sports Scores" heading. A scores object 416 having a property set to identify the score of the game as "42" to "7" is directly to the right of the names object 414. In web page 412, the properties of the second names object 418 identify the same game using slightly different terminology: "SF" and "STL." However, this names object 418 is aligned with the same scores object 416 as is utilized in web page 410.

Thus, the same scores object 416 is utilized in different positions in each web page 410, 412. In order to update the score of the San Francisco 49ers vs. St. Louis Rams football game on both web pages, the input source 210 simply sends an update message to the routing network 110 specifying the object ID for the scores object 416 and the update to the score property. The routing network 110 routes the update message to the appropriate clients 114, and the clients update the appropriate score regardless of the particular page layout.

The input source 210, i.e., the information provider 108 and/or dynamic content provider 116 can use a variety of tools to generate the update messages. FIG. 5 is a block diagram illustrating an input source 210 and the tools available to it for generating the update messages. Other tools can be utilized in addition to or instead of the ones described herein.

Preferably, the tools allow the input source 210 to access an application programming interface (API) provided by the routing network 110 for accepting messages. In one embodiment, the messages sent by the input source 210 are in the same format as utilized by the activation module 124 at the client 114. In an alternative embodiment, the messages provided to the routing network 110 are in a different format and the routing network translates the messages into the format utilized by the activation module 124.

In one embodiment, the input source 210 utilizes a data pump module 510 to access the API. The data pump module 510 reads an extensible markup language (XML) file containing one or more object IDs and the new values for the identified objects at regular intervals and automatically generates API calls that send messages representing changes to object properties to the routing network 110. In another embodiment, the data pump module 510 is event-driven and reads the XML file in response to a change in the file or some other occurrence.

In another embodiment, the input source 210 utilizes a director console module 512 to access the API. Preferably, the director console module 512 presents an administrator with a graphical interface displaying the contents of the web page 118. For example, the administrator may use the director console 512 to edit textual data, images, and/or any objects or properties of objects on the web page. After editing, the administrator uses a "send update" button or similar technique to cause the director console module 512 to send messages for the changed objects and properties to the routing network 110 via the API.

In another embodiment, the information provider 108 and dynamic content provider 116 work together as the input source 210 by using a content management system module 514 to access the API. Preferably, the content management system module 514 resides at the information provider 108

14

and receives object property updates from the dynamic content provider 116. The content management system module 514 preferably updates the properties of the live objects in the web page 118 stored at the server 112 and also sends messages for the changed properties to the routing network 110. In this manner, the web page 118 at the server 112 and the web page displayed at the client 114 are updated almost simultaneously. In one embodiment, the dynamic content provider 116 sends the update messages to the routing network 110 instead of to the information provider 108. Embodiments of the system 100 can also utilize any combination of the content management techniques described herein.

For example, the tools described above can generate a message having the following code for updating the text displayed by a score object to "2":

    LiveObject  score=new  LiveObject("Bang$homeScor-
        eID");
    score.setProperty("innerText", "2").

This code sets the innerText property of the object having object ID "Bang$homeScoreID" to "2." The tools use the API to pass this message to the routing network 110.

Turning now to the actions performed at the client 114, FIG. 6 is a flow chart illustrating the steps performed by an embodiment of the activation module 124. Those of skill in the art will recognize that different embodiments may perform the steps of FIG. 6 in different orders. The activation module 124 generally performs three functions: register object IDs with the routing network 110, handle messages received by the client 114 from the network in order to update the properties of live objects, and control communications between the client and the network.

In order to register object IDs, the activation module 124 preferably parses 610 the web page 118 received from the server 112 and identifies the object IDs of the live objects. In an alternative embodiment, the activation module 124 identifies only a subset of the object IDs, such as the IDs of only live objects that are currently being displayed by the web browser 120. Alternatively, a list of object IDs may be pre-encoded in the web page in addition to the objects themselves, thereby enabling easy identification by the activation module 124. In yet another embodiment, a user of the client 114 selects the object IDs to register.

The activation module 124 preferably opens 612 a connection between the client 114 and the routing network 110. The activation module 124 can open 612 this connection before or after the activation module receives and/or parses the web page 118. In some cases, the client 114 is located behind a firewall that puts a restriction on the types of connection requests the client can make. A firewall might, for example, block all non-HTTP traffic. For this reason, the activation module 124 preferably wraps the connection request in an HTTP header in order to get the request to the routing network 110 through the firewall.

The activation module 124 uses the connection between the client 114 and routing network 110 to register 614 the object IDs by communicating to the routing network 116 a vector (e.g., a list or array) containing the identified object IDs. In order to accomplish this task through the firewall, the activation module 124 preferably puts the vector into a string, referred to as "object data," and then preferably creates an HTTP message to communicate the object data to the routing network 110. A schematic example is as follows:

    POST/HTTP/1.\r\n
    Content-Length: <length of object data>\r\n
    \r\n
    <object data>

US 8,407,722 B2

15                                                                16

where <object data> is the object ID list. When the routing network 110 receives such an HTTP request, it extracts the object data and updates the registry 125 to indicate that the client 114 has registered for the identified objects.

If the web browser 120 loads 616 a new page, or otherwise terminates display of the objects on the initial page, the activation module 124 associated with the initial web page preferably terminates 618 the client's connection with the routing network 110. Those of skill in the art will recognize that this termination 618 can occur asynchronously with the other steps illustrated in FIG. 6. Thus, the location of steps 616 and 618 represents only one possible place in the sequence of steps where the termination may occur.

If the connection is not terminated, the activation module 124 preferably waits until it receives 618 a message from the routing network 110 specifying an object ID and an update to a property of the identified object. In one embodiment, this message is received as HTTP data. Upon receipt of the message, the activation module 124 preferably extracts 620 the object ID and update from the HTTP data. Then, the activation module 124 updates 622 the property of the identified object, or causes the object to be updated, as specified by the message.

The sequence of receiving messages 618, extracting data 620, and updating objects 622 is preferably repeated until a new page is loaded 616 or the connection with the routing network 110 is otherwise terminated. Although not shown in FIG. 6, in certain circumstances, such as when a user action with respect to the web page 118 activates a new live object, the activation module 124 may register new object IDs with the routing network 110 without first downloading and parsing a new page. In one embodiment, if the newly-loaded page contains live objects, then the process of downloading the activation module 124 and updating the objects as described by FIG. 6 is repeated. In an alternative embodiment, the activation module 124 remains active at the client 114 and, therefore, the client does not re-download the activation module from the routing network 110. Instead, the already-present activation module 124 performs the live-enabling process on the new page.

FIG. 7 is a block diagram illustrating a lower-level view of the routing network 110 according to one embodiment of the present invention. FIG. 7 illustrates multiple input sources (labeled 710A-D) representative of sources providing messages to the routing network 110, such as an information provider 710A and a dynamic content provider 710B. FIG. 7 also illustrates multiple clients (labeled 712A-F) representative of the many clients in communication with the routing network 110 at any given instant.

Internally, the routing network 110 is preferably divided into one or more clusters 714. In FIG. 7, the routing network 110 has three clusters 714A, 714B, 714C, although the number of clusters can vary depending upon the processing needs of the network. An input-side global load balancer 716 preferably routes messages from the input sources 710 to the clusters 714. Similarly, a client-side global load balancer 718 preferably routes connection requests from the clients 712 to the clusters 714. The load balancers 716, 718 are designed to ensure that load is distributed among the clusters 714 according to a predetermined heuristic. For example, the load may be distributed evenly among the clusters 714 or a more powerful cluster may be distributed a majority of the load. In one embodiment, one load balancer performs the functions of the input-side 716 and client-side 718 load balancers and utilizes conventional Domain Name System-(DNS-) based load balancing.

Each cluster 714, of which cluster 714A is representative, preferably contains an input-side cluster load balancer 720A and a client-side cluster load balancer 722A. The cluster load balancers 720A, 722A function similarly to the corresponding global load balancers 716, 718 in that the input-side cluster load balancer 720A balances and routes incoming messages among one or more gateways 724A and the client-side cluster load balancer 722A balances and routes incoming connection requests among one or more nodes 726A and application servers 728A. The gateways 724A are connected to the nodes 726A. In one embodiment every gateway 724A is connected to every node 726A and in another embodiment certain gateways are connected to only certain nodes.

Preferably, the routing network 110 utilizes conventional single-processor computer systems executing the Linux operating system (OS). Preferably, each component of the routing network 110 is implemented by a separate, dedicated computer system in order to enable the separate optimization of the components. The input/output (I/O) functionality of the OS is preferably enhanced through the use of a non-blocking OS package such as NBIO available from the University of California, Berkeley, Calif. Based on the assumption that connections with the nodes 728 are long-lived, the OS is preferably configured to not allocate resources toward monitoring idle connections. Instead, the well-known/dev/poll patch is preferably applied to the OS in order to provide advanced socket polling capabilities.

Those skilled in the art will recognize that there are many ways to use the functionality of the routing network 110 to route update messages to clients 710. For example, in one embodiment, every message is distributed to every node 726. In another embodiment, the routing network 110 selectively sends messages to the nodes 726 in the routing network 110. Selectively sending messages to the nodes in the routing network presents at least the two difficulties. First, for a given message, a decision needs to be made as to which nodes should receive it. Second, a client must receive all messages in which it is interested. There are at least two approaches meeting these difficulties. The first approach uses a hierarchy of registries at the gateways and nodes to respectively keep track which messages to send to the nodes and clients. The second approach assigns messages to one or more categories, assigns nodes to one or more types, and maintains mappings between categories and types. This latter approach also uses client proxies to allow clients 712 to communicate with multiple nodes of different types.

FIG. 7 illustrates the embodiment using the hierarchy of registries. A node 726 registers with each gateway 724 in all of the clusters and indicates which messages it needs and the clients do the same with the nodes. Each gateway 724 preferably maintains a registry 734 containing the object IDs registered by the nodes 726 connected to the gateway 724. In one embodiment, the gateway registry 734 associates each object ID with a linked list containing one entry for each node 726 that has registered for that object ID. In another embodiment, the gateway registry 734 is a hash table containing the object ID registered by the nodes 726 connected to the gateway 724. A node 726 preferably maintains a node registry 732 containing the object IDs registered by clients 712 connected to the node. The gateways 724 in each cluster 714 receive the messages from the input sources 710 and direct the messages to the appropriate node or nodes 726. The nodes 726 preferably transmit messages received from the gateways 724 to the clients 712 that have registered in the object IDs identified by the messages.

In one embodiment, the node registry 732 associates each object ID with a linked list containing one entry for each

US 8,407,722 B2

17                                                              18

client **712** that has registered for that object ID. In another embodiment, the node registry **732** is a hash table containing the object ID registered by the clients **712** connected to the nodes **726**. Each entry in the linked list or hash table preferably contains a pointer to a socket representing the connection to the corresponding client **712**. As is known in the art, the pointer to the socket, typically called a "file descriptor," represents an address to which the node can write in order to send the message to the corresponding client. Gateways **724** can also use file descriptors in this manner to store node addresses. Alternative embodiments of the present invention utilize other data structures in addition to, or instead of, the hash table and linked list, and/or may utilize different data within the data structures.

Preferably, the node **726** adds an entry to its registry **732** every time a client **712** registers an interest in an object and deletes the corresponding entry from the registry when the client **712** disconnects from the node or otherwise indicates that it is no longer interested in a particular object. If the node **726** determines that the client **712** registered for an object ID that was not previously registered on that node, the node preferably registers that object ID with the gateways **724** to which it is connected. Similarly, if the node **726** determines that the client **712** deregistered an object ID for which it was the last interested client, the node **726** deregisters that object ID with the gateways **724** to which it is connected. The gateways **724** update their registries **734** in response to the communication from the node **726**.

In alternative embodiments of the present invention, when the client **712** disconnects from the node **726** or otherwise indicates that it is no longer interested in a particular object, the node **726** waits for a period of time or until some event occurs before deregistering the object ID with the gateway **724**. For example, the node **726** could wait until it receives a message associated with that object ID to do the deregistration. Alternatively, the wait time can be fixed, random, or based on the frequency of registrations for that object ID, or registrations for the same input source **710** as the object being deregistered. This latter approach keeps the object IDs from more frequently used input sources **710** registered for a longer period of time. This waiting advantageously reduces the number of registration changes required between nodes and gateways in cases where it is likely that another client will soon register for the same object ID.

Since a gateway **724** does not control the rate at which it receives messages from input sources **710**, it is possible for the gateway to receive messages faster than it can process them (i.e., send the messages to the nodes). Therefore, each gateway **724** preferably maintains a queue **730** of messages that have been received but not yet processed in order to avoid losing messages. In one embodiment, the gateway **724** drops messages if the queue **730** becomes too long. In another embodiment, the gateway **724** utilizes priorities assigned to certain messages or input sources to determine which messages to drop.

The application server **728** within each node **714** preferably serves the activation module **124** to the clients **712** in response to client requests. In addition, the application server **728** serves any other modules that may be required or desired to support the environment **100**. In an alternative embodiment of the routing network, a single application server **728** fulfills all of the client requests. This application server **728** may be within a certain cluster **714** or independent of the clusters. However, this single-application-server embodiment is less desirable because it lacks redundancy.

FIG. **8** is a flow chart illustrating steps performed by a gateway **724** and a node **726** in a cluster **714** to perform object-based routing of a message received from an input source **710** in the embodiment using a hierarchy of registries. Initially, the gateway **724** receives **810** the message from the input source **710**. The gateway **724** extracts **820** the object ID from the message. The gateway **724** examines its registry **734** to determine the nodes **726** that have registered in the object ID. The gateway **724** transmits **840** the message to each of the registered nodes **726**. Each node **726** that receives the message uses its registry **732** to determine **850** which clients **712** have registered for the message. Each node **726** then forwards **860** the message to the registered clients **712**.

Adding node functionality to the gateway and client functionality to the node advantageously allows the routing network **110** to solve the difficulties identified above. For example, it allows the routing network **110** to decide which nodes should receive an updated message. As a result, messages are sent to only nodes that have registered for the message. Further, no matter which node a client connects to, that node will receive all messages that the client wants. One skilled in the art would understand that while the present invention allows registration at both a gateway level and node level, registration could be extended to any number of levels.

In the second approach for meeting the difficulties described above, all messages in the routing network **110** are assigned to one or more of N categories, and all of the nodes are assigned to one or more of M types. Mappings are created that specify which categories of messages are forwarded to which types of nodes. The mappings allow control over the amount of traffic processed by the nodes.

FIG. **9** is a block diagram illustrating a high-level view of the routing network **110** of FIG. **7** in an embodiment adapted to use the approach having message categories and node types. Although FIG. **9** illustrates only two node types—nodes of type 1 **726** and nodes of type 2 **726**—for purposes of simplicity, this embodiment of the network **110** can have any number of node types. FIG. **9** also illustrates a client proxy **740** for reasons described below. However, an embodiment of the present invention using message categories and node types does not necessarily utilize a client proxy **740**.

There are many different possible mappings between message categories and node types. In the simple case, there is one-to-one mapping between message categories and node types. For example, if the message is of category 1, it is forwarded to the nodes of type 1. In more complicated mappings, messages of one category are mapped to nodes of multiple types. For example, messages of category 1 are mapped to nodes of types 1, 2, and 3, whereas messages of category 2 are mapped to nodes of types 2, 3 and 4. In short, any possible mapping of message categories to node types is possible and the number of message categories, N, does not have to be the same as the number of node types, M.

There are multiple ways to assign the messages into categories. One way is to assign all messages from a given input source **710** into a certain category. Another way is to explicitly specify the category in the object ID for the message. Yet another way is to utilize a hashing function or lookup table to partition messages into categories based on object IDs or other values. For example, in one embodiment a hash function is applied to the object ID to generate an integer between 1 and N, and this integer is the message category.

Nodes are preferably assigned to types based on information stored in the gateways **724**. In one embodiment, each gateway **724** holds a lookup table or other data structure that specifies the types to which each node is assigned. The lookup table also preferably stores the mappings between message categories and node types. When a gateway **724** receives a message from an input source, the gateway preferably deter-

US 8,407,722 B2

**19**

mines the category of the message using one of the techniques described above. Then, the gateway **724** determines the node type (or types) to which the message category maps, and determines which nodes are of the given type. The gateway **724** routes the message to the appropriate nodes.

In one embodiment, the gateway **724** uses a combination of multiple techniques to determine the message categories, node types, and/or mappings. For example, a lookup table can be used to encode a priori knowledge about categories, types, and/or mappings and a hash table can be used to route messages for which there is no a priori knowledge. Continuing this example, assume that certain messages are assigned to a given category based on a table lookup, while other messages are assigned to categories based on a hashing function. In this example, the gateway **724** looks up the object ID (or other information, such as an input source ID) of an arriving message in a lookup table to determine if it has a specified category. If the object ID is stored in the lookup table, the gateway **724** determines the mappings for the category and routes the messages to the nodes of the appropriate types. If the object ID is not stored in the lookup table, the gateway **724** utilizes a hash function on the object ID (or other information) to determine the message category.

Message categorization advantageously allows the routing network **110** to decide which nodes get which messages. However, message categorization does not ensure that clients **712** have access to the messages they need. Assume a client **712** connects to a node of type **1** and the client **712** wants to receive messages of category **3**. If there is a simple one-to-one mapping of message categories to node types, nodes of type **1** will never receive messages of category **3**, and neither will the client **712**. To ensure that clients have access to the messages they need, the embodiment shown in FIG. **9** uses client proxies to allow clients **712** to communicate with multiple nodes of different types. As shown in FIG. **9**, the clients **712** connect to a client proxy **740** instead of the nodes **726**. Each client proxy **740** is connected to at least one node of each type. For example, as shown in FIG. **9**, the client proxy **740** connects to a node of type **1 726** and a node of type **2 726**.

There are at least two ways to implement the embodiment that uses client proxies to ensure that clients connect to multiple nodes of different types. The implementations vary primarily in where the client registration information is stored. In the first variation, client registration information is stored at the nodes, and the client proxy is adapted to simply pass update messages and registration information among the clients and nodes. In the second variation, the client proxy **740** is responsible for keeping track of client registrations.

FIG. **9** illustrates the variation where the nodes store the client registration information, and the client proxy **740** is adapted to pass messages and registration information among the clients and nodes. When a client sends registration information to the client proxy **740**, the client proxy passes it to the appropriate node or nodes. In one embodiment, the client proxy **740** sends client registration information to at least one node of every type, and the nodes ignore irrelevant registration information (e.g., registrations for messages of categories not handled by the node). In another embodiment, the client proxy **740** itself analyzes the registrations, and passes only registrations relevant for a given node type to a node of that type. In a third embodiment, the client contains functionality for determining which node types handle which registration requests, and the client tells the proxy **740** to which node types to pass the registration information.

The client proxy **740** preferably stores an identifier of its connection to each client **712**, such as a pointer to the socket for the client connection, and sends this identifier to the nodes

**20**

along with the registration information. Each node **726**, in turn, maintains a registry **732** storing the relevant registration information it receives from the client proxy **740**. Preferably, at most one node of each type will contain registration information for a given client for messages of a category mapped to the node type. In addition, a node preferably does not store registration information for messages of categories not mapped to its node type.

The registry **732** for each node **726** preferably indicates the object IDs registered by the clients, the client proxy **740** to which the client is connected (e.g., a pointer to the socket at the node to which the client proxy is connected), and the identifier indicating the client's connection to the client proxy (e.g., the pointer to the socket at the client proxy to which the client is connected). When the node **726** receives an update message, it uses the registry to identify the clients to which it should forward the message, the client proxies to which the clients are connected, and the specific connections between the client proxies and the clients. The node routes the update message to the identified client proxies and includes the identifier (e.g., the pointer to the client socket) telling the client proxy where to send the update message. When the client proxy **740** receives the update message, it uses the identifier to send the message to the client or clients.

In one embodiment, the node registry **732** contains, for each object ID, a list with one entry for each client registered for that ID. Each entry contains a (name of client proxy, name of client) pair where each "name" is a socket identifier or some other information for identifying how to route the message to the named entity. In another embodiment, the registry **732** is adapted to more efficiently handle the case where multiple clients at a given client proxy are registered for the same object ID by placing a list of clients registered for the object ID in each entry. Thus, each entry in the list for a given object ID contains a (name of client proxy, list of names of clients on that proxy) pair. When a message having a particular object ID arrives at the node, the node walks down the corresponding entries in the registry for that ID, pushing one copy of the message to each listed client proxy. Along with the message, the node includes the list of clients on that proxy (e.g., a list of pointers to sockets for the clients) who have registered for the object ID. When the client proxy receives the message and the list, it simply pushes a copy of the message to each client.

The approach using the pass-through client proxy **740** described above is advantageous because it reduces memory loads because the client proxy stores only minimal state, and each node has a restricted list of object IDs for which it is responsible. It also expedites message routing because the client proxy does very little processing to forward a message. Plus, this approach separates different potential stress points in the network into different components, allowing the network to be tuned to provide good performance. In particular, the nodes handle a large amount of data and store a large amount of state, but do not have to hold open a large number of connections. The client proxies do not store a large amount of data or state, but hold open a large number of connections to the clients. In different embodiments, the ratios of nodes to client proxies can be varied to match the network to its requirements.

In the second variation of client proxies, the client proxy **740** stores client registration information. FIG. **11** illustrates a high-level diagram of the routing network **110** in which the client proxy **740** stores the client registration information. In this embodiment, the node registry **732** stores the object IDs registered by client proxies **740** connected to the node. Each client proxy **740** preferably maintains a client proxy registry

US 8,407,722 B2

21

736 containing the object IDs registered by clients **712** connected to the client proxy **740**. The client proxy **740** registers with the nodes for all objects for which it needs to receive updates. Thus, this variation is similar to the hierarchical registry embodiment described above.

An alternative to maintaining a separate client proxy as described above is to have the nodes themselves provide the client proxy functionality. In this alternative, clients connect to a node of a first type. When a client registers for messages of a category not handled by the node, the node passes the registration to a node of the appropriate type along with an identifier of the client connection. In this case, the node connected to the client adopts the functionality of the pass-through client proxy. The node can also adopt the functionality of the client proxy that stores client registration information, thereby creating a hierarchy of registrations among the nodes themselves.

FIG. **12** is a high-level block diagram of the routing network **110** of the embodiment in which the nodes themselves adopt client proxy functionality. There are at least two ways to implement this embodiment. In one implementation there is a preferred node type, such as node of type 3, that always serves as a client proxy. This node type may be designated to handle the most common categories of messages. As a result, the client proxy functionality would be utilized very rarely. As shown in FIG. **12**, client 1 **712** and client 2 **712** are connected to the node of type 3 **726**, which in turn is connected to a node of type 1 **726** and a node of type 2 **726**.

In another implementation, instead of having one preferred node type that always serves as a client proxy, each node type can serve as a node and as a client proxy. For example, when a client **712** connects to a node **726**, it passes the node all of the object IDs the client wishes to register. For object IDs of message categories handled by that node, the node stores the registrations in its registry. For object IDs of messages in other categories, the node acts as a client proxy and passes the registration requests to nodes of the appropriate types. This implementation can be made more efficient by providing functionality in the activation module for identifying the most common categories of messages sought by the client, and causing the client to connect to a node of a type that receives those categories of messages.

An alternative to connecting clients **712** to nodes **726** using a client proxy **740** is having a client **712** maintain multiple connections to the routing network **110**. This can be accomplished, for example, by attaching message-categorization functionality to the activation module **124**. The activation module **124** preferably determines which categories of messages it needs and to which nodes types it should connect. The activation module **124** then makes a connection to one node of each relevant type and registers the appropriate object IDs with the appropriate nodes.

An alternative to using client proxies is to allow clients to register for only categories of messages handled by one type of node. For example, if each node type handles messages from only one input source, each client **712** can be required to register for messages from only one input source. This can be done, for example, by configuring the load balancer **718** to ensure that clients registering for messages from one input source connect to a node of the type that receives messages from that input source.

FIG. **10** is a flow chart illustrating steps performed by a gateway **724**, a node **726** that stores client registration information, and a pass-through client proxy **740** to perform object-based routing of a message received from an input source **710**. Initially, the gateway **724** receives **1010** the message from an input source **710**. The gateway **724** determines

22

**1020** to which category the message belongs using one or more of the techniques described above. After the gateway **724** has determined to which category the message belongs, the gateway **724** identifies **1030** node types to which the message category is mapped and routes **1040** the message to the nodes of those types. Each node **726** that receives the message extracts **1050** the object ID from the message. Each node **726** examines its registry **732** to determine which clients have registered for the message, the client proxies to which the clients are connected, and the connections between the client proxies and the clients. Each node **726** then forwards **1060** the message to the identified client proxies **740** along with the identifiers for the client connections (e.g., the client socket or a list of client sockets). When a client proxy **740** receives the message from a node **726**, it pushes **1070** the message to the identified client socket or sockets.

The above description is included to illustrate the operation of the preferred embodiments and is not meant to limit the scope of the invention. The scope of the invention is to be limited only by the following claims. From the above discussion, many variations will be apparent to one skilled in the relevant art that would yet be encompassed by the spirit and scope of the invention. For example, the invention may be implemented using a tangible computer-readable medium having stored thereon computer-executable instructions.

The invention claimed is:

1. A method comprising:

receiving, using a processing device, an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object;

identifying a category of the update message based on the input source;

determining a node having a node type to which the update message is to be routed based on a mapping of categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network;

routing, using the processing device, the update message to the node having the determined node type;

causing the node, through the update message, to determine a client, different from the input source, that has registered for updates of the live object;

causing the node to route the update message from the node to the client; and

causing the client to process the update message and to update the property of the lire object.

2. The method of claim **1**, further comprising:

causing the node to extract an object identifier (ID) from the update message, to establish a connection with the client, and to determine if the client has registered for updates of the live object based on the object ID.

3. The method of claim **2**, further comprising:

causing the node to determine at least one client proxy with which the client communicates;

causing the node to route the update message to the client proxy; and

causing the client proxy to route the update message to the client to determine the connection.

4. The method of claim **3**, further comprising causing the node to maintain client registration information concerning the client connection.

5. The method of claim **3**, further comprising causing the node to maintain client registration information concerning the client connection at the client proxy.

6. The method of claim **1**, wherein the property of the live object has a direct effect on a visual representation of the live

US 8,407,722 B2

23

object in a data representation, has an effect on an internal aspect of the live object and has no effect on the visual representation of the live object in the data representation, or has a direct effect on one aspect of the visual representation of the live object in the data representation and has no effect on other aspect of the visual representation of the live object in the data representation.

7. A routing network comprising:

a gateway device configured to:

receive an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object,

identify a category of the update message based on the input source;

determine a node having a node type to which the update message is to be routed based on a mapping of a categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network; and route the update message; and

the node configured to:

receive the update message from the gateway device, wherein the node is configured to be mapped to the node type,

determine a client, different from the input source, that has registered for updates of the live object, and

route the update message from the node to the client, wherein the client is adapted to process the update message and to update the property of the live object.

8. The routing network of claim 7, wherein the node is configured to extract an object identifier (ID) from the update message and to determine a connection to the client to route the data to the client.

9. The routing network of claim 8, wherein the node is configured to determine the connection by determining at least one client proxy with which the client communicates and to route the update message to the client proxy.

10. The routing network of claim 9, wherein client registration information concerning the client connection is configured to be maintained at the node.

11. The routing network of claim 9, wherein client registration information concerning the client connection is configured to be maintained at the client proxy.

12. The routing network of claim 7, wherein:

the gateway device is configured to route the update message to the node adapted to receive messages of more than one message category, and

the node is configured to determine a connection with at least one client proxy with which the client communicates and to route the data to the client proxy.

13. The routing network of claim 7, wherein the node type is configured to identify the node that receives the update message from the gateway device.

14. A method comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the

24

update message identifies the live object and contains update data that updates a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device processes the update message upon receipt to update the property of the live object at the client device.

15. The method of claim 14, wherein providing the data representation to the client device includes providing the live object that causes the client device to register with a client proxy of the routing network.

16. The method of claim 14, wherein providing the data representation to the client device includes providing the live object that causes the client device to register with the node of the routing network.

17. The method of claim 14, wherein providing the data representation to the client device includes providing an activation module that is executed by the client device and that registers the live object with the routing network.

18. The method of claim 17, wherein providing the activation module includes providing the activation module that is configured to determine a node type that handles registration and that causes the client device to register with the node corresponding to the node type.

19. The method of claim 17, wherein providing the activation module includes providing the activation module that is configured to determine a message category of the data representation and that causes the client device to register with a node having a node type corresponding to the message category.

20. An apparatus comprising:

an input source device configured to provide a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object that is recognizable by the client device, and that causes the client device to determine an object identifier (ID) of the live object to register for updates of the bye object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network,

wherein the input source device is configured to route an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and route the update message containing the update data to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the bye object at the client device.

21. The apparatus of claim 20, wherein the live object of the data representation is configured to cause the client device to register with a client proxy of the routing network.

US 8,407,722 B2

25

22. The apparatus of claim **20**, wherein the live object of the data representation is configured to cause the client device to register with the node of the routing network.

23. The apparatus of claim **20**, wherein the received data representation includes an activation module that is configured to be executed by the client device and adapted to register the live object with the routing network.

24. The apparatus of claim **23**, wherein the activation module is configured to determine a node type for handling registration and to cause the client device to register with the node of the node type.

25. The apparatus of claim **23**, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having a node type corresponding to the message category.

26. An article of manufacture including a computer-readable storage medium having instructions stored thereon, execution of which by a computing device causes the computing device to perform operations comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object that is recognizable by the client device, and that causes the client device to respond to the live object by determining an object identifier (ID) of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

27. The article of manufacture of claim **26**, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

28. The article of manufacture of claim **26**, wherein the live object of the data representation causes the client device to register with the node of the routing network.

29. The article of manufacture of claim **26**, wherein the received data representation includes an activation module executed by the client device and adapted to register the live object with the routing network.

30. The article of manufacture of claim **29**, wherein the activation module determines a node type that handles registration and causes the client device to register with the node of the node type.

26

31. The article of manufacture of claim **29**, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having a node type corresponding to the message category.

32. A non-transitory computer readable storage medium having instructions stored thereon, the instructions comprising:

instructions for providing a data representation to a client device coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and wherein the client device is configured to respond to the live object of the data representation by determining an object identifier (ID) of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

instructions for providing, using a processing device of an input source, different from the client device, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message containing the update data to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

33. The non-transitory computer readable storage medium of claim **32**, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

34. The non-transitory computer readable storage medium of claim **32**, wherein the live object of the data representation causes the client device to register with the node of the routing network.

35. The non-transitory computer readable storage medium of claim **32**, wherein the data representation includes an activation module that is executed by the client device and that is adapted to register the live object with the routing network.

36. The non-transitory computer readable storage medium of claim **35**, wherein the activation module determines a node type for handling registration and causes the client device to register with the node of the node type.

37. The non-transitory computer readable storage medium of claim **35**, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having the node type corresponding to the message category.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,407,722 B2                                          Page 1 of 1
APPLICATION NO.     : 11/396251
DATED               : March 26, 2013
INVENTOR(S)         : Tuttle et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On Title Page 2, Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 3,
delete "Retrived" and insert -- Retrieved --, therefor.

On Title Page 3, Item (56), under "OTHER PUBLICATIONS", in Column 1, Line 12,
delete "Slavak Republic," and insert -- Slovak Republic, --, therefor.

On Title Page 3, Item (56), under "OTHER PUBLICATIONS", in Column 1, Line 48,
delete "library/default.asp?url=/library/en-us/dndotnet/hmtl/progthrepool." and
insert -- library/default.asp?url=/library/en-us/dndotnet/html/progthrepool. --, therefor.

In the Specifications

In Column 3, Line 24, delete "live: objects" and insert -- live objects --, therefor.

In Column 12, Line 7, delete "provider 210" and insert -- provider 108 --, therefor.

In Column 14, Line 57, delete "network 116" and insert -- network 110--, therefor.

In the Claims

In Column 22, Line 47, in Claim 1, delete "of the lire" and insert -- of the live --, therefor.

In Column 24, Line 45, in Claim 20, delete "of the bye" and insert -- of the live --, therefor.

In Column 24, Line 64, in Claim 20, delete "bye object" and insert -- live object --, therefor.

In Column 26, Line 17, in Claim 32, delete "routing, network" and insert -- routing network --,
therefor.

Signed and Sealed this
Thirteenth Day of May, 2014

*Michelle K. Lee*

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

# EXHIBIT 4

US010567391B2

## (12) United States Patent
### Hardt

(10) **Patent No.:** **US 10,567,391 B2**
(45) **Date of Patent:** *Feb. 18, 2020

(54) **GRADUATED AUTHENTICATION IN AN IDENTITY MANAGEMENT SYSTEM**

(71) Applicant: **Callahan Cellular L.L.C.**, Wilmington, DE (US)

(72) Inventor: **Dick C. Hardt**, Vancouver (CA)

(73) Assignee: **Callahan Cellular L.L.C.**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/417,361**

(22) Filed: **May 20, 2019**

(65) **Prior Publication Data**

US 2019/0273747 A1 Sep. 5, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/172,008, filed on Jun. 2, 2016, now Pat. No. 10,298,594, which is a
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *H04L 29/06* | (2006.01) |
| *G06F 17/30* | (2006.01) |
| *G06F 15/16* | (2006.01) |
| *G06F 7/04* | (2006.01) |
| *G06F 21/60* | (2013.01) |

(52) **U.S. Cl.**
CPC ......... *H04L 63/105* (2013.01); *G06F 21/606* (2013.01); *H04L 63/08* (2013.01); *H04L 63/1416* (2013.01); *H04L 63/1466* (2013.01); *H04L 63/0428* (2013.01); *H04L 63/0815* (2013.01)

(58) **Field of Classification Search**
CPC ... H04L 63/105; H04L 63/08; H04L 63/1416; H04L 63/1466; H04L 63/0428; H04L 63/0815; G06F 21/606
USPC .............................................. 726/4
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,837,501 | A | 9/1974 | Pielkenrood |
| 4,067,813 | A | 1/1978 | Pielkenrood |
| | | (Continued) | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| AU | 2003240323 | A1 | 12/2003 |
| CA | 2222480 | A1 | 7/1998 |
| | | (Continued) | |

OTHER PUBLICATIONS

"724 Solutions—Products—Financial Services," www.724.com, Sep. 25, 2001, 1 page.
(Continued)

*Primary Examiner* — Monjur Rahim
(74) *Attorney, Agent, or Firm* — Perkins Coie LLP

(57) **ABSTRACT**

A method and system for graduated security in an identity management system utilize differing levels of time sensitivity, channel security and authentication security to provide a multi-dimensional approach to providing the right fit for differing identity requests. The differing levels of security can be selected by user preference, membersite request or homesite policy.

**20 Claims, 8 Drawing Sheets**



## US 10,567,391 B2

Page 2

### Related U.S. Application Data

continuation of application No. 14/622,722, filed on Feb. 13, 2015, now Pat. No. 9,398,020, which is a continuation of application No. 14/015,813, filed on Aug. 30, 2013, now Pat. No. 8,959,652, which is a continuation of application No. 11/039,885, filed on Jan. 24, 2005, now Pat. No. 8,527,752.

(60) Provisional application No. 60/605,150, filed on Aug. 30, 2004, provisional application No. 60/579,890, filed on Jun. 16, 2004.

### (56) References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,437,988 A | 3/1984 | James | |
| 4,713,753 A | 12/1987 | Boebert et al. | |
| 4,759,063 A | 7/1988 | Chaum | |
| 4,759,064 A | 7/1988 | Chaum | |
| 4,780,821 A | 10/1988 | Crossley | |
| 4,799,156 A | 1/1989 | Shavit et al. | |
| 4,914,698 A | 4/1990 | Chaum | |
| 4,949,380 A | 8/1990 | Chaum | |
| 4,991,210 A | 2/1991 | Chaum | |
| 5,487,826 A | 1/1996 | Back et al. | |
| 5,644,723 A | 7/1997 | Deaton et al. | |
| 5,677,955 A | 10/1997 | Doggett et al. | |
| 5,737,701 A | 4/1998 | Rosenthal et al. | |
| 5,774,551 A | 6/1998 | Wu et al. | |
| 5,781,629 A | 7/1998 | Haber et al. | |
| 5,794,207 A | 8/1998 | Walker et al. | |
| 5,794,259 A | 8/1998 | Kikinis | |
| 5,815,665 A | 9/1998 | Teper et al. | |
| 5,855,007 A | 12/1998 | Jovicic et al. | |
| 5,872,850 A | 2/1999 | Klein et al. | |
| 5,875,296 A | 2/1999 | Shi et al. | |
| 5,903,721 A | 5/1999 | Sixtus | |
| 5,911,141 A | 6/1999 | Kelley et al. | |
| 5,930,479 A | 7/1999 | Hall | |
| 5,953,710 A | 9/1999 | Fleming | |
| 5,983,208 A | 11/1999 | Haller et al. | |
| 5,995,965 A | 11/1999 | Experton | |
| 6,005,939 A | 12/1999 | Fortenberry et al. | |
| 6,009,410 A | 12/1999 | LeMole et al. | |
| 6,012,044 A | 1/2000 | Maggioncalda et al. | |
| 6,026,166 A | 2/2000 | LeBourgeois | |
| 6,029,141 A | 2/2000 | Bezos et al. | |
| 6,052,710 A | 4/2000 | Saliba et al. | |
| 6,061,790 A | 5/2000 | Bodnar | |
| 6,073,106 A | 6/2000 | Rozen et al. | |
| 6,073,241 A | 6/2000 | Rosenberg et al. | |
| 6,092,196 A | 7/2000 | Reiche | |
| 6,125,352 A | 9/2000 | Franklin et al. | |
| 6,131,096 A | 10/2000 | Ng et al. | |
| 6,154,768 A | 11/2000 | Chen et al. | |
| 6,192,380 B1 | 2/2001 | Light et al. | |
| 6,199,079 B1 | 3/2001 | Gupta et al. | |
| 6,208,659 B1 | 3/2001 | Govindarajan et al. | |
| 6,233,608 B1 | 5/2001 | Laursen et al. | |
| 6,243,688 B1 | 6/2001 | Kalina | |
| 6,247,029 B1 | 6/2001 | Kelley et al. | |
| 6,253,203 B1 | 6/2001 | O'Flaherty et al. | |
| 6,266,692 B1 | 7/2001 | Greenstein | |
| 6,285,983 B1 | 9/2001 | Jenkins | |
| 6,289,333 B1 | 9/2001 | Jawahar et al. | |
| 6,298,347 B1 | 10/2001 | Wesley | |
| 6,308,203 B1 | 10/2001 | Itabashi et al. | |
| 6,321,339 B1 | 11/2001 | French et al. | |
| 6,327,578 B1 | 12/2001 | Linehan | |
| 6,353,852 B1 | 3/2002 | Nestoriak, III et al. | |
| 6,356,905 B1 | 3/2002 | Gershman et al. | |
| 6,381,597 B1 | 4/2002 | Lin | |
| 6,385,596 B1 | 5/2002 | Wiser et al. | |
| 6,401,085 B1 | 6/2002 | Gershman et al. | |
| 6,421,768 B1 | 7/2002 | Purpura | |
| 6,442,696 B1 * | 8/2002 | Wray | G06F 21/31 |
| | | | 713/176 |
| 6,491,217 B2 | 12/2002 | Catan | |
| 6,496,855 B1 | 12/2002 | Hunt et al. | |
| 6,571,279 B1 | 5/2003 | Herz et al. | |
| 6,571,285 B1 | 5/2003 | Groath et al. | |
| 6,584,448 B1 | 6/2003 | Laor | |
| 6,605,224 B2 | 8/2003 | Aymong | |
| 6,606,643 B1 | 8/2003 | Emens et al. | |
| 6,609,198 B1 | 8/2003 | Wood et al. | |
| 6,629,081 B1 | 9/2003 | Cornelius et al. | |
| 6,651,090 B1 | 11/2003 | Itabashi et al. | |
| 6,665,704 B1 | 12/2003 | Singh | |
| 6,668,322 B1 | 12/2003 | Wood et al. | |
| 6,708,205 B2 | 3/2004 | Sheldon et al. | |
| 6,714,916 B1 | 3/2004 | Robertson et al. | |
| 6,725,050 B1 | 4/2004 | Cook | |
| 6,751,735 B1 | 6/2004 | Schell et al. | |
| 6,845,370 B2 | 1/2005 | Burkey et al. | |
| 6,865,426 B1 | 3/2005 | Schneck et al. | |
| 6,879,965 B2 | 4/2005 | Fung et al. | |
| 6,907,401 B1 | 6/2005 | Vittal et al. | |
| 6,944,677 B1 | 9/2005 | Zhao | |
| 6,957,334 B1 | 10/2005 | Goldstein et al. | |
| 7,016,875 B1 | 3/2006 | Steele et al. | |
| 7,016,877 B1 | 3/2006 | Steele et al. | |
| 7,054,906 B2 | 5/2006 | Levosky | |
| 7,076,558 B1 | 7/2006 | Dunn | |
| 7,089,208 B1 | 8/2006 | Levchin et al. | |
| 7,100,195 B1 | 8/2006 | Underwood | |
| 7,133,846 B1 | 11/2006 | Ginter et al. | |
| 7,197,539 B1 | 3/2007 | Cooley | |
| 7,216,292 B1 | 5/2007 | Snapper et al. | |
| 7,257,581 B1 | 8/2007 | Steele et al. | |
| 7,257,843 B2 * | 8/2007 | Fujita | G06F 21/52 |
| | | | 707/999.009 |
| 7,260,724 B1 * | 8/2007 | Dickinson | H04L 63/08 |
| | | | 713/182 |
| 7,277,546 B2 * | 10/2007 | Dhawan | H04K 1/04 |
| | | | 375/E7.04 |
| 7,289,971 B1 | 10/2007 | O'Neil et al. | |
| 7,333,942 B1 | 2/2008 | Cowles | |
| 7,343,351 B1 | 3/2008 | Bishop et al. | |
| 7,380,271 B2 | 5/2008 | Moran et al. | |
| 7,391,865 B2 * | 6/2008 | Orsini | G06F 21/31 |
| | | | 380/201 |
| 7,454,623 B2 | 11/2008 | Hardt | |
| 7,467,141 B1 | 12/2008 | Steele | |
| 7,487,130 B2 | 2/2009 | Steele | |
| 7,496,751 B2 | 2/2009 | de Jong et al. | |
| 7,546,349 B1 | 6/2009 | Cooley | |
| 7,610,391 B2 | 10/2009 | Dunn | |
| 7,694,335 B1 * | 4/2010 | Turner | H04L 63/1441 |
| | | | 708/250 |
| 7,783,741 B2 | 8/2010 | Hardt | |
| 7,793,095 B2 | 9/2010 | Hardt | |
| 7,827,115 B2 | 11/2010 | Weller | |
| 7,836,490 B2 * | 11/2010 | Smith | H04L 63/083 |
| | | | 726/13 |
| 7,941,669 B2 * | 5/2011 | Foley | H04L 63/083 |
| | | | 713/182 |
| 8,117,649 B2 | 2/2012 | Hardt | |
| 8,260,806 B2 | 9/2012 | Steele | |
| 8,296,825 B2 * | 10/2012 | Leone | H04L 63/0272 |
| | | | 726/4 |
| 8,504,704 B2 | 8/2013 | Hardt | |
| 8,527,752 B2 | 9/2013 | Hardt | |
| 8,566,248 B1 | 10/2013 | Steele | |
| 8,782,405 B2 * | 7/2014 | Okunseinde | G06Q 20/382 |
| | | | 709/229 |
| 8,959,652 B2 | 2/2015 | Hardt | |
| 9,245,266 B2 | 1/2016 | Hardt | |
| 9,398,020 B2 | 7/2016 | Hardt | |
| 10,298,594 B2 | 5/2019 | Hardt | |
| 2001/0011250 A1 | 8/2001 | Paltenghe et al. | |
| 2001/0018660 A1 | 8/2001 | Sehr | |
| 2001/0018675 A1 | 8/2001 | Blaze et al. | |
| 2001/0039586 A1 | 11/2001 | Primak et al. | |

**US 10,567,391 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2001/0047276 A1 | 11/2001 | Eisenhart |
| 2002/0002684 A1 | 1/2002 | Fox et al. |
| 2002/0016721 A1 | 2/2002 | Mason et al. |
| 2002/0029201 A1 | 3/2002 | Barzilai et al. |
| 2002/0049912 A1 | 4/2002 | Honjo et al. |
| 2002/0062262 A1 | 5/2002 | Vasconi et al. |
| 2002/0078233 A1 | 6/2002 | Biliris et al. |
| 2002/0087641 A1 | 7/2002 | Levosky |
| 2002/0091745 A1 | 7/2002 | Ramamurthy et al. |
| 2002/0091798 A1 | 7/2002 | Joshi et al. |
| 2002/0099671 A1 | 7/2002 | Mastin Crosbie |
| 2002/0107807 A1 | 8/2002 | Ketonen et al. |
| 2002/0107972 A1 | 8/2002 | Keane |
| 2002/0112083 A1 | 8/2002 | Joshi et al. |
| 2002/0112155 A1 | 8/2002 | Martherus et al. |
| 2002/0112185 A1 | 8/2002 | Hodges |
| 2002/0116642 A1 | 8/2002 | Joshi et al. |
| 2002/0120599 A1 | 8/2002 | Knouse et al. |
| 2002/0138581 A1 | 9/2002 | MacIntosh et al. |
| 2002/0152179 A1 | 10/2002 | Racov |
| 2002/0154157 A1 | 10/2002 | Sherr et al. |
| 2002/0165960 A1 | 11/2002 | Chan |
| 2002/0174369 A1 | 11/2002 | Miyazaki et al. |
| 2002/0178365 A1 | 11/2002 | Yamaguchi |
| 2002/0194138 A1 | 12/2002 | Dominguez et al. |
| 2002/0198818 A1 | 12/2002 | Scott et al. |
| 2002/0199095 A1 | 12/2002 | Bandini et al. |
| 2003/0018587 A1 | 1/2003 | Althoff et al. |
| 2003/0033528 A1 | 2/2003 | Ozog et al. |
| 2003/0074580 A1 | 4/2003 | Knouse et al. |
| 2003/0079123 A1 | 4/2003 | Mas Ribes |
| 2003/0110397 A1 | 6/2003 | Supramaniam et al. |
| 2003/0130960 A1 | 7/2003 | Fraser et al. |
| 2003/0131232 A1 | 7/2003 | Fraser et al. |
| 2003/0135732 A1 | 7/2003 | Vaha-Sipila |
| 2003/0149781 A1* | 8/2003 | Yared ...................... G06F 21/41 709/229 |
| 2003/0154306 A1 | 8/2003 | Perry |
| 2003/0158960 A1 | 8/2003 | Engberg |
| 2003/0163733 A1 | 8/2003 | Barriga-Caceres |
| 2003/0204725 A1 | 10/2003 | Itoi et al. |
| 2003/0208684 A1 | 11/2003 | Camacho et al. |
| 2003/0225841 A1 | 12/2003 | Song et al. |
| 2003/0229783 A1 | 12/2003 | Hardt |
| 2004/0008666 A1 | 1/2004 | Hardjono |
| 2004/0010697 A1 | 1/2004 | White |
| 2004/0049677 A1 | 3/2004 | Lee et al. |
| 2004/0103324 A1 | 5/2004 | Band |
| 2004/0128558 A1 | 7/2004 | Barrett |
| 2004/0143750 A1 | 7/2004 | Kulack et al. |
| 2004/0162786 A1 | 8/2004 | Cross et al. |
| 2004/0177110 A1 | 9/2004 | Rounthwaite et al. |
| 2004/0181665 A1 | 9/2004 | Houser |
| 2004/0205243 A1 | 10/2004 | Hurvig et al. |
| 2004/0225883 A1 | 11/2004 | Weller et al. |
| 2004/0243823 A1 | 12/2004 | Moyer et al. |
| 2004/0255117 A1 | 12/2004 | Paater et al. |
| 2005/0005110 A1 | 1/2005 | Kim et al. |
| 2005/0010653 A1 | 1/2005 | McCanne |
| 2005/0015340 A1 | 1/2005 | Maes |
| 2005/0114453 A1 | 5/2005 | Hardt |
| 2005/0171811 A1 | 8/2005 | Campbell |
| 2005/0210107 A1 | 9/2005 | Mora |
| 2005/0210244 A1 | 9/2005 | Stevens et al. |
| 2005/0283443 A1 | 12/2005 | Hardt |
| 2005/0283614 A1 | 12/2005 | Hardt |
| 2006/0005019 A1 | 1/2006 | Chao |
| 2006/0005020 A1 | 1/2006 | Hardt |
| 2006/0005263 A1 | 1/2006 | Hardt |
| 2006/0031489 A1 | 2/2006 | Marcjan |
| 2006/0106734 A1 | 5/2006 | Hoffman et al. |
| 2006/0179003 A1 | 8/2006 | Steele et al. |
| 2006/0200425 A1 | 9/2006 | Steele et al. |
| 2006/0229944 A1 | 10/2006 | Walker et al. |
| 2007/0130460 A1 | 6/2007 | Pfitzmann et al. |
| 2007/0143860 A1 | 6/2007 | Hardt |
| 2007/0277034 A1 | 11/2007 | LiVecchi |
| 2007/0282733 A1 | 12/2007 | May |
| 2008/0010298 A1 | 1/2008 | Steele et al. |
| 2009/0125429 A1 | 5/2009 | Takayama |
| 2009/0157531 A1 | 6/2009 | Bui |
| 2009/0210293 A1 | 8/2009 | Steele et al. |
| 2010/0306830 A1 | 12/2010 | Hardt |
| 2015/0180879 A1 | 6/2015 | Hardt |
| 2016/0140582 A1 | 5/2016 | Steele et al. |
| 2017/0006042 A1 | 1/2017 | Hardt |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2245293 A1 | 9/1999 |
| CA | 2431311 A1 | 9/2003 |
| CA | 2458257 A1 | 9/2003 |
| CA | 2447121 A1 | 1/2004 |
| CA | 2468351 A1 | 8/2004 |
| CA | 2468585 A1 | 8/2004 |
| CA | 2493897 A1 | 4/2005 |
| CA | 2494225 A1 | 4/2005 |
| CN | 1289974 A | 4/2001 |
| EP | 1089516 A2 | 4/2001 |
| EP | 1089518 A2 | 4/2001 |
| EP | 1223527 A2 | 7/2002 |
| EP | 1316016 A2 | 6/2003 |
| EP | 1316028 A1 | 6/2003 |
| EP | 1316041 A1 | 6/2003 |
| EP | 1388986 A1 | 2/2004 |
| EP | 1520217 A2 | 4/2005 |
| EP | 1766840 A1 | 3/2007 |
| EP | 1766852 A1 | 3/2007 |
| EP | 1766853 A1 | 3/2007 |
| EP | 1766863 A1 | 3/2007 |
| FR | 1098155 A | 7/1955 |
| JP | 11282804 A | 10/1999 |
| JP | 2001186122 A | 7/2001 |
| JP | 2003071960 A | 3/2003 |
| JP | 2003323408 A | 11/2003 |
| JP | 2005529392 T | 9/2005 |
| WO | 0067415 | 11/2000 |
| WO | 0146783 A2 | 6/2001 |
| WO | 0167364 A1 | 9/2001 |
| WO | 0205092 A2 | 1/2002 |
| WO | 0205103 A1 | 1/2002 |
| WO | 0205139 A1 | 1/2002 |
| WO | 0205185 A1 | 1/2002 |
| WO | 0205487 A1 | 1/2002 |
| WO | 2002001462 | 1/2002 |
| WO | 03046748 | 6/2003 |
| WO | 03098898 | 11/2003 |
| WO | 03104947 | 12/2003 |
| WO | 2005048544 | 5/2005 |
| WO | 2005125077 | 12/2005 |
| WO | 2005125086 | 12/2005 |
| WO | 2005125087 | 12/2005 |
| WO | 2005125096 | 12/2005 |
| ZM | 200500060 | 3/2006 |

OTHER PUBLICATIONS

"724 Solutions—Products—m-Commerce," www.724.com, Sep. 25, 2001, pp. 1-4.

"724 Solutions—Products—Wireless Internet Platform," www.724.com, Sep. 25, 2001, pp. 1-3.

Affiliate Application,"How do Gator, Price Helper and Offer Companion Work?", www.gator.com, Sep. 6, 2001, 1 page.

"Choicepoint Unveils New Web-based Pre-Employment Screening Service," Business Wire pp. 1287, May 17, 1999.

"Co-Brand Partner Opportunities," www.yodlee.com, Sep. 6, 2001, pp. 1-2.

"Content Partner Opportunities," www.yodlee.com, Sep. 6, 2001, 1 page.

"Create Relationships," www.digitalme.com, Sep. 6, 2001, pp. 1-2.

"Digitaline™ Fact Sheet (www.digitalme.com)" www.digitalme.com, Sep. 6, 2001, pp. 1-3.

**US 10,567,391 B2**

Page 4

(56) **References Cited**

OTHER PUBLICATIONS

"Ezlogin.Com Introduces Liveclips, Enabling Net Users to Clip Content From Anywhere on the Web and Paste It on a Custom Page," Java Industry Connection, Mar. 8, 2000, pp. 1-2.

"FAQ", www.digitalme.com, Sep. 6, 2001, pp. 1-2.

"Free Password Manager—Store passwords—Desktop or Online," www.passwordsafe.com, Oct. 10, 2001, 1 page.

"Implementing Mobile Passport," Copyright 1999-2001 Microsoft Corporation, Oct. 26, 2001, pp. 1-5.

"Learn More," www.digitalme.com, Sep. 6, 2001, pp. 1-2.

"Liberty Architecture Overview," Version 1.1, Internet Citation, Jan. 15, 2003, pp. 1-44.

"LinkUall.com—About Us—LinkUall Technology" www.linkuall. com, Copyright 1999-2000 Sinpag Inc., 1 page.

"LinkUall.com—Products—Calendars and Address books," www. linkuall.com, Oct. 10, 2001, pp. 1-2.

"Make it Convenient," www.digitalme.com, Sep. 6, 2001, pp. 1-3.

"Microsoft Passport Member Services. What is Passport," www. passport.com, Aug. 3, 2001, pp. 1-12.

"Microsoft Passport: A single name, password and Wallet for the web," WWW.passport.com, Aug. 3, 2001, pp. 1-2.

"Microsoft Passport: Streamlining Commerce and Communication on the Web," www.passport.com, Oct. 11, 1999, pp. 1-3.

"Online Businesses Use Microsoft Passport Single Sign-In and Wallet Services to Provide Customers with Secure and Convenient Shopping," www.microsoft.com, May 17, 2000, pp. 1-2.

"Security Overview," www.yodlee.com, Sep. 6, 2001, pp. 1-2.

"Spamgourmet: FAQ," by Spamgourmet.com, Web Archive dated Aug. 29, 2003, 3 pages.

"Spam-me-not Documentations," Web Archive Dated Oct. 11, 2003, 5 pages.

"Spoofed/Forged Email," 2002 Carnegie Mellon University, pp. 1-7.

"Sweet Enonymity," www.enonymous.com, Sep. 6, 2001, pp. 1-2.

"Take Control," www.digitalme.com, Sep. 6, 2001, pp. 1-2.

"Vision for an Enonymous Infomediary," www.enonymous.com, Sep. 6, 2001, pp. 1-3.

"Yodlee2Go: Web-enabled Phones", www.yodlee.com, Sep. 6, 2001, I page.

"Yodlee for Mobile: Simplify Your Life on the Road with Yodlee2Go," www.yodlee.com, Sep. 6, 2001, I page.

"Yodlee for Web: One-Click Access to All Personal Accounts," www.yodlee.com, Sep. 6, 2001, I page.

"Yodlee: e-Personalization Applications," www.yodlee.com, Sep. 6, 2001, 1 page.

"Yodlee: e-Personalization Platform," www.yodlee.com, Sep. 6, 2001, 1 page.

"Yodlee: e-Personalization Solutions," www.yodlee.com, Sep. 6, 2001, 1 page.

"Yodlee2Go: Palm OS Wireless," www.yodlee.com, Sep. 6, 2001, I page.

"Zkey—Corporate," www.zkey.com, Oct. 10, 2001, 1 page.

United States Patent and Trademark Office, Advisory Action before the Filing of an Appeal Brief for U.S. Appl. No. 09/988,811, dated Apr. 20, 2009, 3 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 09/933,567, dated Jul. 21, 2006, 3 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 10/455,438, dated Feb. 19, 2010, 3 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 10/867,768, dated Sep. 17, 2009, 3 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 11/039,885, dated Feb. 24, 2010, 4 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 11/039,886, dated Sep. 17, 2010, 3 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 11/327,176, dated Mar. 25, 2011, 2 pages.

United States Patent and Trademark Office, Advisory Action for U.S. Appl. No. 11/824,358, dated Aug. 24, 2010, 3 pages.

Alan Cohen and Walaika Haskins, "Grab and-Go Web," *PC Magazine*, Oct. 19, 2000, pp. 1-5.

Asaravala, A. "A Question of Identity Passport, Liberty and the Single Sign-On Race," www.newarchitectmag.com, Jan. 31, 2003, pp. 22-24, XP009022582.

Bennett, "NGWS—Microsoft's Dot Net Strategy," PC_Buyers_Guide.com, Jun. 22, 2000, pp. 1-5.

Chu et al., "Web-Based Single Sign-On Solutions: An SSO Product Matrix," *Computer Security Journal*, CSI Computer Security Institute, XX, vol. 16, No. 1, 2000, pp. 39-49, XP008021056.

Coulouris, "Secure Communication in Non-Uniform Trust Environment," ECOOP Workshop on Distributed Object Security, Jul. 1998, 5 pages.

Erdos et al., "Shibboleth—Architecture DRAFT v05 Online!", May 2, 2002, pp. 5-9, XP002264221.

European Patent Office, Examination Report, European Patent Application 05757655.5, dated Apr. 13, 2012, 6 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 09/933,567, dated Nov. 1, 2007, 13 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 09/933,567, dated May 11, 2006, 9 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 09/988,811, dated Jan. 27, 2010, 8 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 09/988,811, dated Dec. 30, 2010, 10 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 09/988,811, dated Feb. 2, 2009, 9 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/455,438, dated Oct. 30, 2008, 14 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/455,438, dated Dec. 2, 2009, 8 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/455,438, dated Jun. 26, 2007, 10 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/713,100, dated Oct. 28, 2008, 9 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/713,100, dated Oct. 30, 2009, 11 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/713,100, dated Jun. 14, 2007, 14 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/867,768, dated May 28, 2009, 7 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/867,768, dated Jun. 1, 2006, 8 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/867,768, dated Jun. 25, 2010, 8 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/867,768, dated Jul. 28, 2005, 7 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 10/867,768, dated Jul. 5, 2007, 10 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,885, dated Nov. 29, 2010, 19 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,885, dated Dec. 16, 2009, 14 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,885, dated Mar. 18, 2009, 12 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,885, dated Sep. 10, 2009, 14 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,886, dated Mar. 5, 2009, 16 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,886, dated Jul. 9, 2010, 20 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,886; dated Nov. 8, 2011, 56 pgs.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/327,160, dated Feb. 23, 2007, 10 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/327,160, dated Mar. 25, 2008, 11 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/327,176, dated Dec. 22, 2010, 11 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/327,176, dated Dec. 9, 2009, 11 pages.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/824,358, dated Jun. 29, 2010, 15 pages.

## US 10,567,391 B2

Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/824,358; dated Nov. 15, 2011, 35 pgs.

United States Patent and Trademark Office, Final Office Action for U.S. Appl. No. 11/039,886, dated Nov. 8, 2011, 29 pages.

Gabber et al., "Curbing June E-Mail via Secure Classification," FC-98: Proceedings of the Second International Conference on Financial Cryptography, 1998, pp. 198-213.

Gator Press Release "Gator Helps Consumers at More Than 25,000 E-Commerce and Registration Sites in First Month of Usage: Software an invaluable companion for more than 80,000 online consumers," Aug. 3, 1999, pp. 1-2.

Gator Press Release "Gator.Com Delivers on the Promise of the Electronic Commerce Modeling Language (ECML) Standard Today: Gator offers one click shopping at over 5,000 e-commerce sites today," Jun. 14, 1999, pp. 1-2.

Gator Press Release "Internet Start-up Gator.com Introduces Gator, the Web's First Smart Online Companion: New Internet product offers one-click login and express registration and checkout across the web," Jun. 14, 1999, pp. 1-3.

Gburzynski, "A Comprehensive Approach to Eliminating Spam," Proceedings of Euromedia, Plymouth, UK, Apr. 2003, 5 pages.

Gunnerson, "EZ Login," PC Magazine, Mar. 14, 2000, pp. 1-2.

Hall, "How to Avoid Unwanted Email," Communications of the Association for Computing Machinery, vol. 41, No. 3, Mar. 1, 1998, pp. 88-95.

Hallam-Baker, "Security Assertions Markup Language. Core Assertion Architecture—Examples and Explanations," Internet Citation, http://www.oasis-open.org/committees/security/docs/draft-sstc-core-phill-07.pdf, May 14, 2001, 24 pages.

International Search Report for PCT/CA2003/000857; Applicant: Hardt, Dick, C., Filed on Jun. 6, 2003, dated Dec. 12, 2003, 7 pages.

International Search Report for PCT/CA2003/01774, Applicant: Sxip Networks Srl, Filed on Nov. 17, 2003, dated Jul. 13, 2004, 3 pages.

International Search Report for PCT/CA2005/000934; Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Sep. 28, 2005, 4 pages.

International Search Report for PCT/CA2005/000935, Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Oct. 4, 2005, 3 pages.

International Search Report for PCT/CA2005/000936, Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Oct. 6, 2005, 3 pages.

International Search Report for PCT/CA2005/000937; Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Sep. 20, 2005, 3 pages.

Kormann et al., "Risks of the Passport single sign on protocol," *Computer Networks*, Elsevier Science Publishers S. V., vol. 33, No. 1-6, Jun. 2000, pp. 51-58, XP004304758.

Lopez et al., "Ubiquitous Internet access control: the PAPI system," Proc. of the 13th International Workshop on Database and Expert Systems Applications (DEXA'02), Sep. 2, 2002, pp. 368-372, XP010612047.

Marchiori, "Platform for Privacy Preference (P3P) Syntex Specification," Internet Citation, http://classic-web.archive.org/web/20031207022324/www.w3.org/tr/1999/wd-p3p-19990826/syntax, Aug. 26, 1999, pp. 1-25.

Menezes et al., "Handbook of Applied Cryptography," Chapter 12, Section 12.5.2, pp. 509-512, 1997.

Microsoft Press Release. "Microsoft Passport Offers Streamlined Purchasing Across Leading Web Sites," Oct. 11, 1999, pp. 1-4.

Microsoft PressPass, Microsoft.NET: "A Platform for the Next Generation Internet," Jun. 22, 2000, pp. 1-7.

"Microsoft.NET Passport Technical Overview," Sep. 2001, 29 pages.

Microsoft.NET Passport, "What's New," Sep. 2001, 14 pages.

United States Patent and Trademark Office, Non-Final Office Action and Interview Summary for U.S. Appl. No. 09/933,567, dated Feb. 20, 2007, 16 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/923,285, dated Jul. 12, 2004, 11 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/933,567, dated Sep. 29, 2005, 9 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/974,766, dated Feb. 4, 2005, 14 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811, dated Jan. 23, 2006, 12 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811, dated Dec. 5, 2007, 7 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811, dated Jul. 11, 2005, 5 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811, dated Jul. 14, 2009, 9 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811, dated Aug. 18, 2010, 8 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/455,438, dated Jan. 10, 2007, 12 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/455,438, dated Feb. 5, 2008, 11 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/713,100, dated Dec. 5, 2006, 15 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/713,100, dated Feb. 27, 2009, 8 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/713,100, dated Mar. 26, 2008, 8 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,635, dated Nov. 21, 2007, 5 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Oct. 31, 2008, 7 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Dec. 15, 2006, 7 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Dec. 19, 2005, 8 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Dec. 30, 2009, 8 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Mar. 24, 2008, 6 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 10/867,768, dated Mar. 30, 2005, 8 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,885, dated Jun. 17, 2008, 11 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,885, dated Jun. 3, 2010, 17 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,886, dated Feb. 9, 2009, 20 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,886, dated Jun. 24, 2008, 14 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,886, dated Jun. 8, 2011, 33 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/327,160, dated Oct. 4, 2007, 9 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/327,160, dated Jul. 12, 2006, 12 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/327,176, dated May 28, 2009, 12 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/327,176, dated Jun. 9, 2010, 12 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/824,358, dated Jan. 29, 2010, 13 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/824,358, dated Oct. 8, 2010, 12 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/824,358, dated Mar. 18, 2011, 8 pages.

United States Patent and Trademark Office, Non-Final Office Action U.S. Appl. No. 10/007,785, dated Mar. 2, 2005, 26 pages.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 09/988,811; dated Oct. 13, 2011, 34 pgs.

United States Patent and Trademark Office, Non-Final Office Action for U.S. Appl. No. 11/039,885, dated Aug. 26, 2011, 36 pgs.

United States Patent and Trademark Office, Notice of Allowance and Interview Summary for U.S. Appl. No. 09/974,766, dated Nov. 22, 2005, 10 pages.

## US 10,567,391 B2

Page 6

(56)           **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office, Notice of Allowance and Interview Summary for U.S. Appl. No. 10/713,100, dated Apr. 16, 2010, 12 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 09/923,285, dated Apr. 12, 2007, 13 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 09/933,567, dated Aug. 11, 2008, 9 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 10/007,785, dated Nov. 22, 2005, 10 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 10/007,785, dated Feb. 10, 2006, 3 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 10/455,438, dated Apr. 30, 2010, 10 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 10/867,635, dated Jun. 20, 2008, 4 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 11/327,160, dated Sep. 10, 2008, 12 pages.

United States Patent and Trademark Office, Notice of Allowance for U.S. Appl. No. 12/851,464, dated Oct. 5, 2011, 41 pgs.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 09/988,811, dated Aug. 11, 2006, 4 pages.

United States Patent and Trademark Office, Office Action for U.S. Appl. No. 10/455,438, dated Mar. 25, 2009, 11 pages.

Papadimitratos, P. et al., "Secure Routing for Mobile Ad hoc Networks," In Proceedings of the SCS Communication Networks and Distributed Systems Modeling and Simulation Conference, San Antonio, TX, Jan. 2002, pp. 1-13.

Rauschenberger, Secure Your Web Site With Passport, "Simplify Your Web Site Visitors' Experience by Authenticating Them," *Visual Studio Magazine*, Apr. 4, 2002, pp. 1-3.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 09/933,567, dated Jun. 17, 2005, 5 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 09/988,811, dated Mar. 7, 2007, 4 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 11/039,886, dated Sep. 14, 2009, 4 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 11/327,176, dated Feb. 17, 2009, 6 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 11/327,176, dated Mar. 20, 2008, 6 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 11/327,176, dated Jul. 9, 2008, 7 pages.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 12/434,803; dated Nov. 14, 2011, 7 pgs.

United States Patent and Trademark Office, Restriction Requirement for U.S. Appl. No. 11/824,358, dated Aug. 3, 2009, 7 pages.

Secure Your Web Site With Passport, "Implement Passport," *Visual Studio Magazine*, Apr. 4, 2002, pp. 1-3.

Secure Your Web Site With Passport, "Passport Key to HailStrom's Success," *Visual Studio Magazine*, Apr. 4, 2002, pp. 1-2.

Secure Your Web Site With Passport, "Sign in, Please," *Visual Studio Magazine*, Apr. 4, 2002, pp. 1-3.

United States Patent and Trademark Office, Supplemental Advisory Action for U.S. Appl. No. 11/039,885, dated Apr. 1, 2010, 3 pages.

Supplementary European Search Report for PCT/CA2005/000934, Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated May 27, 2011, 3 pages.

Supplementary European Search Report for PCT/CA2005/000935, Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005; dated Apr. 4, 2011, 3 pages.

Supplementary European Search Report for PCT/CA2005/000936, Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Jul. 19, 2010, 3 pages.

Supplementary European Search Report for PCT/CA2005/000937, Applicant: Sxip Networks Srl, Filed on Jun. 16, 2005, dated Jul. 19, 2010, 4 pages.

Tenebaum et al. "Commercenet Consortium," AFRL-ML-WP-TR-1999-4147, Air Force Materiel Command, Wright-Patterson AFB, Jul. 1999, 79 pages.

United States Patent and Trademark Office, Advisory Action, U.S. Appl. No. 10/867,768, dated Aug. 14, 2014, 3 pages.

United States Patent and Trademark Office, Advisory Action, U.S. Appl. No. 12/434,803, dated Nov. 29, 2013, 3 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 10/867,768, dated Jun. 6, 2014, 9 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 11/327,176, dated Oct. 27, 2014, 15 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 10/867,768, dated Oct. 7, 2013, 10 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 11/327,176, dated Mar. 21, 2014, 16 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 12/434,803, dated Mar. 18, 2014, 17 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 14/015,813, dated Apr. 21, 2014, 15 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 14/015,813, dated Sep. 26, 2014, 8 pages.

United States Patent and Trademark Office, Advisory Action, U.S. Appl. No. 10/867,768, dated Nov. 9, 2012, 2 pages.

United States Patent and Trademark Office, Advisory Action, U.S. Appl. No. 12/434,803, dated Oct. 23, 2012, 3 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 09/988,811, dated May 14, 2012, 16 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 10/867,768, dated Aug. 30, 2012, 13 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 11/039,885, dated Aug. 15, 2012, 16 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 11/039,886, dated Jan. 14, 2013, 31 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 12/434,803, dated Aug. 14, 2012, 11 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 12/434,803, dated Aug. 28, 2013, 12 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 10/867,768, dated Feb. 6, 2012, 40 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 11/039,885, dated Nov. 9, 2012, 17 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 11/039,886, dated Aug. 21, 2012, 27 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 12/434,803, dated Dec. 7, 2012, 15 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 12/434,803, dated Mar. 1, 2012, 12 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 09/988,811, dated May 24, 2013, 19 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 11/039,885, dated Apr. 29, 2013, 15 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 11/039,886, dated Apr. 5, 2013, 8 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 11/824,358, dated May 1, 2012, 9 pages.

United States Patent and Trademark Office, Supplemental Notice of Allowability, U.S. Appl. No. 11/824,358, dated Jun. 18, 2012, 6 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 12/434,803, dated Aug. 14, 2015, 13 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 10/867,768, dated Sep. 17, 2015, 16 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 14/622,722, dated Feb. 29, 2016, 35 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 11/327,176, dated Sep. 2, 2016, 15 pages.

United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 11/327,176, dated Apr. 6, 2017, 12 pages.

United States Patent and Trademark Office, Advisory Action, U.S. Appl. No. 11/327,176, dated Jul. 12, 2017, 3 pages.

United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 11/327,176, dated Nov. 16, 2017, 9 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 14/941,528, dated Jan. 26, 2018, 10 pages.

United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 15/172,008, dated Jul. 14, 2017, 15 pages.

## US 10,567,391 B2

Page 7

---

(56)    **References Cited**

OTHER PUBLICATIONS

Erdos, Marlena et al. "Shibboleth-Architecture Draft v05", MACE, May 2, 2002, pp. 1-44.
United States Patent and Trademark Office, Final Office Action, U.S. Appl. No. 15/172,008, dated Jan. 24, 2018, 13 pages.
United States Patent and Trademark Office, Non-Final Office Action, U.S. Appl. No. 15/172,008, dated Aug. 28, 2018, 4 pages.
United States Patent and Trademark Office, Notice of Allowance, U.S. Appl. No. 15/172,008, dated Jan. 3, 2019, 8 pages.

* cited by examiner

U.S. Patent     Feb. 18, 2020     Sheet 1 of 8     US 10,567,391 B2



Figure 1

Figure 2

Case 2:25-cv-02956-BCL-tmp    Document 13-2    Filed 02/10/26    Page 366 of 404
PageID 746



Figure 3

Figure 4



Figure 5

Figure 6



Figure 7



Figure 8

U.S. Patent          Feb. 18, 2020          Sheet 5 of 8          US 10,567,391 B2



Figure 9



Figure 10

Figure 11



Figure 12



Figure 13

Figure 14

US 10,567,391 B2

**1**

## GRADUATED AUTHENTICATION IN AN IDENTITY MANAGEMENT SYSTEM

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 15/172,008, filed Jun. 2, 2016 (U.S. Pat. No. 10,298, 594), which is a continuation of U.S. application Ser. No. 14/622,722, filed Feb. 13, 2015 (U.S. Pat. No. 9,398,020), which is a continuation of U.S. application Ser. No. 14/015, 813 filed Aug. 30, 2013 (U.S. Pat. No. 8,959,652), which is a continuation of U.S. application Ser. No. 11/039,885, filed Jan. 24, 2005 (U.S. Pat. No. 8,527,752), which claims the benefit of U.S. Provisional Application No. 60/579,890, filed Jun. 16, 2004 and U.S. Provisional Application No. 60/605, 150, filed Aug. 30, 2004, which are all incorporated herein by reference in their entireties.

### FIELD OF THE INVENTION

The present invention relates generally to electronic identity management systems. More particularly, the present invention relates to authentication and security for data exchange in a distributed hierarchical identity management system.

### BACKGROUND OF THE INVENTION

In the field of identity management, there are a number of known systems for providing user identity services on the Internet. Microsoft's Passport™, and the Liberty Alliance identity management system are two such known examples, as are the identity management systems taught in Canadian Patent No. 2,431,311, and Canadian Patent Application Nos. 2,458,257, 2,468,351, and 2,468,585.

Many known identity management systems offer secure logins, allowing a user to visit a site in the network (membersite) and obtain a secure login to that site using an identity store to authenticate the user identity over a secure channel. The use of a secure channel allows an identity store to provide the membersite with user login information and/or confidential user information.

However, the reliance on secure channels increases the barrier to entry for membersites. Under a secure setup, lightweight, or simple, login is encumbered by the overhead of a secure channel.

In an identity management system that relies upon homesites to act as an identity store which stores user identity information, it may be advantageous to provide a form of graduated security to allow a membersite to obtain identity information, including authentication, using a number of different channels, each with different security features.

There is a further need for a mechanism through which a webservice provider can obtain user authentication and authorization for a third party to receive information. At present, if a third party wishes to aggregate information from a number of webservice providers for the user, or if a third party requires information from a webservice provider to further process before providing the results to a user, the third party and the webservice must be heavily linked. Typically, the third party must become associated with the webservice, and have its services bundled by the webservice provider. Thus a financial institution can use an aggregation service to perform analysis on a client's holdings, but a client cannot easily obtain an aggregation across a number of financial institutions. There is therefore a need for a

**2**

mechanism for third parties to provide authentication of a user authorization for release of information provided by a webservice.

There are at present a number of contact management services that allow a user to provide a list of known contacts. If the contacts provided a user subscribe to the same service, when one of the users updates a segment of a profile, the change is automatically reflected in the other users contact list. However, at present, these services are highly centralized. There is no automated mechanism to obtain information about users that have not subscribed. There is a plurality of these services, and at present there is no convenient mechanism for data exchange between them. This results in users forming small collective islands of contact sharing. There is a need for a distributed contact management system that allows users to share information with people in a vast identity management system that allows for automated updating of contact information.

It is, therefore, desirable to provide an identity management system that can provide at least one of improved gradations in the security levels, support for third party webservices and support for distributed contact management.

### SUMMARY OF THE INVENTION

It is an object of the present invention to obviate or mitigate at least one disadvantage of previous identity management systems.

In a first aspect of the present invention, there is provided a method of selecting a security level for transmitting identity information from a homesite in an identity management network to a membersite in the identity management network. The method comprises the steps of receiving a request from a membersite; determining, in accordance with a security level associated with the received request, the security level for transmitting the response to the request and transmitting the response to the received request over a channel selected in accordance with the determined security level.

In an embodiment of the first aspect of the present invention, the received request is a request for identity information, a request for authentication of a user identity, or a combination of the two. In another embodiment, the security level associated with the received request is selected from a list including an authentication security level, a channel security level and a time sensitivity security level. In other embodiment, s the step of determining includes selecting a security level at least as secure as a level associated with the received request. In other embodiments, the step of determining includes one of selecting a security level specified in the received request, selecting a security level in accordance with information specified in the received request and selecting a security level in accordance with user preferences, that predefined and are associated with the information requested in the received request. The security level can also be selected in accordance with homesite policies.

In another aspect of the present invention, there is provided a homesite, in an identity management system, for receiving information requests from a membersite in the identity management system, and for determining a security level for transmitting a response to received information requests. The homesite comprises an input, an authentication engine, and a response engine. The input receives an information request from a membersite. The authentication engine authenticates a user associated with the information

US 10,567,391 B2

3

request. The response engine assembles information associated with the user in accordance with the received authentication request, and transmits the assembled information to the membersite over a channel selected in accordance with a security level determined in accordance with the received information request.

In an embodiment of the second aspect of the present invention, the response engine includes a security level determining engine for selecting one of an authentication security level, a channel security level and a time sensitivity security level. IN another embodiment, the response engine includes a security level determining engine for selecting a security level at least as secure as a level associated with the received request, for selecting a security level specified in the request or for selecting a security level in accordance with information specified in the received request. In another embodiment, the security level determining engine determines the security level in accordance with user preferences or a homesite policy.

Other aspects and features of the present invention will become apparent to those ordinarily skilled in the art upon review of the following description of specific embodiments of the invention in conjunction with the accompanying figures.

BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention will now be described, by way of example only, with reference to the attached Figures, wherein:

FIG. 1 is a flowchart illustrating a method of the present invention;

FIG. 2 is a flowchart illustrating a method of the present invention;

FIG. 3 is a block diagram illustrating a lightweight login in a system of the present invention;

FIG. 4 is a block diagram illustrating an increased security login in a system of the present invention;

FIG. 5 is a block diagram illustrating a further increased security login in a system of the present invention;

FIG. 6 is a block diagram illustrating a secure login in a system of the present invention;

FIG. 7 is a flowchart illustrating a method of the present invention;

FIG. 8 is a flowchart illustrating a method of the present invention;

FIG. 9 is a block diagram illustrating the dataflow for providing authorization and authentication to a webservice provider;

FIG. 10 is a block diagram illustrating an additional dataflow for authorization of a webservice provider;

FIG. 11 is a block diagram illustrating a rich client interfacing with a homesite and a webservice provider;

FIG. 12 is a block diagram illustrating a distributed contact management system of the present invention;

FIG. 13 is a block diagram illustrating an automated user information distribution system of the present invention; and

FIG. 14 is a block diagram illustrating a further embodiment of the automated user information distribution system illustrated in FIG. 13.

DETAILED DESCRIPTION

Generally, the present invention provides a method and system for identity management supporting graduated security levels, third party web services and contact management.

4

In the following discussion, a hierarchical distributed identity management system is assumed, though one skilled in the art will appreciate that a number of these techniques can be utilized in other identity management networks or other environments where transactional security is of importance.

In view of the need for a graduated security mechanism, the system of the present invention can provide a series of different levels of security. As noted with regard to the prior art, a mechanism for providing a series of graduated security levels provides membersites with the ability to determine the degree of security that they require. For sites that relied upon identification by the presence of a cookie, as many news based website do, or sites that relied upon simple username password combinations transmitted in cleartext prior to joining the identity management network, there is little need for requiring a very secure user identification channel. For such sites, requiring a secure login with signature verification for exchanged data serves as a barrier for entry. On the other side of the equation, financial service websites or websites providing medical histories are best served by very secure logins, with a mechanism that reduces the ability of malicious parties to perform man-in-the-middle type attacks. To provide such a varied login, the system of the present invention allows for a graduated security login. The graduated security login can use both differentiated levels of user authentication and differentiated levels of channel security.

In prior art identity management systems, users are authenticated by providing a user identifier, such as a username, and a shared secret, such as a password. In other systems, typically reserved for specialty uses, other information was used in place of a shared secret, including fingerprint or biometric data. If the provided information was sufficiently unique, as it is with fingerprint and biometric data, the provision of this information was sufficient, and a user identifier was not required. Thus, depending on the level of security required for the authentication, different information has been required. However, in the prior art, login information has been globally set, so that regardless of what a user may want to do the same authentication test was applied. In the context of a membersite requesting user authentication, this is particularly cumbersome. A user, who is being authenticated by a news site so that a particular presentation layout can be selected based on user preference, does not need to be bothered with a request to authenticate using a user name and password, especially if the user has been recently authenticated. Additionally, the news site does not necessarily want the user to be authenticated by a username and password combination, or an even stronger authentication mechanism, as it makes the process too cumbersome for the user and diminishes the likelihood that the user will visit the site. Conversely, a financial institution may want the user to be authenticated by a homesite regardless of when the user was last authenticated, and may demand that that authentication. Similarly, a medical database may want to force the user to authenticate with the homesite and use a particularly robust authentication mechanism, such as a biometric scan, so that there is confidence that the user has been properly authenticated.

To service the varied needs of different membersites, the homesite can support a series of different authentication levels. By supporting the plurality of different authentication mechanisms, the homesite can receive requests from a membersite to authenticate at a certain level of security. Additionally, a user can set a preference that when certain information, such as a credit card number, is requested, the homesite will only release it if authentication at a predefined

US 10,567,391 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

level has been obtained. Thus, when a homesite receives a request for user information or user authentication, it can determine from both the request, and the requested information, the level of user authentication that is required. If the request for authentication and the requested information specify different levels of security, the homesite can use the higher of the two for the maximum security.

One skilled in the art will appreciate that different dimensions of security can be applied independently of each other. Differing levels of user authentication security can be applied, so that users can be required to provide different complexities of authentication information, as can differing levels of security in the communication channel formed between the membersite and homesite through the user's browser. As a further dimension to the security level, a time sensitivity factor can be required of the user authentication, so that differing levels of user authentication security can be combined with a staleness factor that allows authentication of a user within a fixed period of time to be varied.

FIG. 1 illustrates an exemplary embodiment of a method for executing the above-described graduated authentication system. In step 100 a homesite receives a user identity request from a membersite. A user identity request typically includes a request for one or both of user authentication and information about the user. In step 100 the homesite determines a required security level in accordance with the request. This determination can take the form of examining the request to determine a membersite's explicit request for a security level, examining user preferences which indicate that a user wishes to authenticate with nothing less than a specified authentication security level, examining a user specified minimum authentication security level associated with requested identity information, and optionally a set of homesite policies regarding the authentication of users at minimum security levels can also be used in the determination of the required authentication security level. The determined security level is preferably a combination of both authentication security and a time limit. The time limit defines an acceptable level of staleness in the authentication, allowing the combined security level either to force the user to authenticate, or to allow a previous authentication. In step 104, the user is authenticated using an authentication mechanism having combination of a security level and time factor at least equal to the determined combined security level. For example, the determined combined security level could be that the user has been previously authenticated using a username and password, has been authenticated within a predetermined time limit previously, the user must authenticate for this transaction using a user name and password pair, a username and password pair in conjunction with another shared secret, or with biometric authentication. The previous list is intended to be exemplary, and in no way should it be considered exhaustive of either of the two dimensions of security or of their combination. Upon successful user authentication, the homesite provides the membersite with a user identity response in step 106. This response preferably contains the requested user information, and a statement from the homesite detailing the security level at which the user was authenticated. One skilled in the art will appreciate that the membersite can include in the user identity request a list of acceptable authentication mechanisms, and the homesite would them determine the required security level by selecting one from the provided list, optionally doing so in accordance with user preferences and homesite policies.

Thus, a homesite can use any of a number of authentication methods, and preferably uses the one specified by the membersite. To allow for authentication methods to be properly specified, each authentication method can be assigned a security level, allowing the membersite to request authentication at a desired level. The homesite can then use any authentication method at, or above, that level to authenticate the user.

From the perspective of a membersite, when a user visits, the membersite can determine that the user has a homesite, through any number of known mechanisms, including looking for a cookie in a shadow domain. The user can be redirected to the homesite with a request for authentication, possibly including an information request. This request includes an indication of the security level, preferably for both the authentication and the time sensitivity, required. When a response from the homesite is received, the response can include a statement, preferably signed by the homesite, that authentication was performed at a given level either at or in excess of the one specified by the membersite.

FIG. 2 is a flowchart illustrating an exemplary embodiment of a method to implement the above-described graduated authentication method from the perspective of the membersite. In step 108, the membersite issues a user identity request containing a defined authentication security level. In step 110, the membersite receives the homesite's user identity response. In step 112, the membersite examines the user identity response to determine the security level at which the user was authenticated. The determined security level can then be compared to the security level defined in step 108. If the level does not meet the requirements, the membersite can handle the error in any number of ways. As an example, if a membersite is a financial institution that in a login procedure obtains the user login information from a homesite, and the membersite specifies that the user must authenticate using a user name and password combination, and receives an identity response that was authenticated on the basis of a previous authentication, the membersite can refuse the user login. The membersite can then present the user with a notice that the homesite did not use the required authentication and then query the user for account information for an out-of-identity-management-network login.

As an example of the above described authentication security levels, consider the scenario of a news server that provides users with specified layout and content filtering based on saved user profiles. When a user visits the news server, the server sends the user to the homesite for authentication, and specifies that the lowest form of authentication is required, which in this scenario is that the user possesses a cookie from the homesite indicating that an authentication has occurred in the last 30 days. The homesite receives the user authentication request, determines that the user identifier, such as a globally unique persona identifier or a pairwise unique identifier, can be released without obtaining further user authentication as the user has previously authenticated. The user's identifier, along with a statement that authentication has been performed at or above the desired level, is then provided to the news server in a response signed by the homesite. The news server can then cross reference the user identifier with a set of preferences to display the news content in the desired format. Upon reading a story, the user clicks on a link to purchase a photo associated with one of the news stories. The purchase will be done on a credit card, whose information is stored by the homesite. The news server sends a request for user information to the homesite and requests the user's credit card number and a shipping address. The news server requests that the homesite authenticate the user using at least a username and password combination. The homesite receives

US 10,567,391 B2

7

the request for user information, and checks the user preferences related to the release of information. These preferences indicate that though the user will release a shipping address from a username and password challenge, a stronger challenge, such as a username and a response to two personal identification questions selected from a pool of questions, must be used to release a credit card number. The homesite then randomly selects two questions from a pool of questions, including information such as birthdate, place of birth, mother's maiden name, a favorite color, and a pet's name. These questions are provided to the user as a challenge. Upon successful completion of the challenge, the information is released to the news server in a signed response that includes an indication that a challenge at least as rigorous as the username password was obtained. Other levels of security can include a biometric or fingerprint scan, an out of band challenge such as a telephone call placed to a designated phone number, an out of band challenge including a password request in the out of band connection, automated token generation systems, and other known authentication mechanisms. One skilled in the art will appreciate that the above list is intended to be exemplary and not limiting in any manner.

As a companion to the above authentication security levels, the present invention can optionally provide a series of different channel configurations so that the channel between the membersite and homesite can have different levels of security itself. These two systems can be implemented independently of each other, though in combination they provide a large number of security options.

FIG. 3 illustrates the data flow between the browser B 114 of a user, whose identity information is stored by homesite HS 116, when attempting a login to membersite MS 118. B 114 connects to MS 118 over a data connection 120. The degree of security required for the authentication operation can be determined by the needs of the membersite. In transactions that do not require high degrees of security, such as authentications that would otherwise be username and password pairs exchanged in the clear, encryption is not required at either end. As a result, after browser 114 connects to MS 118 over datapath 120, MS 118 requests authentication of the user by sending an authentication request to HS 116. This request is sent to HS 116 by sending an authentication request to B 114 over datapath 112. The request sent to B 114 contains a redirect command that redirects B 114 to HS 116 and sends the authentication request over datapath 126. Thus, the authentication request is sent over a virtual channel created by datapaths 122 and 126 connected by the user redirection shown as 124. HS 116 authenticates the user, using any of a number of techniques as described above, or in the prior art references, and then provides the requested information to MS 118 by sending it, via browser 114, on over the channel created by datapaths 128, 130 and 132. If MS 118 would have otherwise used a simple username and password pair transmitted in the clear, the authentication of the user at HS 116 may be done over a secure channel, but the data provided to MS 118 can be send in the clear over unsecured data path 132. This allows sites that do not require secure connections to belong to the identity management network without supporting secure connections. In a presently preferred embodiment, HS 116 will send a response to MS 118 using the same data connection type that MS 118 sends the authentication request using, unless otherwise specified. Thus, upon receiving the authentication request over unsecured channel 124, HS 116 provides the requested authentication to MS 118 over unsecured channel 130.

8

FIG. 4 illustrates the dataflow for a scenario where MS 118 requests data over an insecure channel, and HS 116 is required to send the data over a secure data channel. When making the authentication request, MS 118 may consider that though the confirmation of the user identity is confidential, the request for the information is not. As such, MS 118 may choose to not use a secure channel to request the authentication. MS 118 then transmits an authentication request to HS 116 over the unsecure virtual channel created by datapaths 122, 124 and 126. The request specifies that the response should be transmitted over a secure channel. This allows MS 118 to not cause a redirect to its own secure server at the time of making the request, and instead simply sends the user to HS 116. After authenticating the user of browser 114, and optionally obtaining user authorization, HS 118 redirects the user to MS 118 over secure channel 136. Security for the channel can be provided in any of a number of ways including the use of Secure Sockets Layer (SSL) connections, or the secure hypertext transfer protocol (https). If MS 118 requests more than authentication, and includes a request for user information, such as biographic or financial data, the secure return path 136 provides security for the transmitted data. One skilled in the art will appreciate that if a user specifies that certain data is only to be released over secure channels, HS 116 can, in response to a request, redirect browser 114 to MS 118 to provide the message that the response can only be provided over a secure link. Thus, the user can be guaranteed that confidential information is only provided in secure sessions.

In certain attacks on secure servers a "man in the middle" is used, so that requests for information are intercepted, modified, and then passed along. If a man in the middle type attack of this sort is attempted on the system of FIG. 4, HS 116 will receive a request for additional information, but will only send it over a secure channel. Nonetheless, it may be beneficial for MS 118 to be able to easily identify such attacks. To allow for this, a further gradient of security can be introduced. Such a further security gradient is illustrated in the dataflows of FIG. 5. After B 114 connects to MS 118 over connection 120, MS 118 makes an authentication or information request from HS 116, by redirecting B 114 to HS 116 over the virtual channel created by datapaths 122, 124 and 126. After authenticating the user of B 114, and optionally obtaining user approval for the release of information, HS 116 sends the requested information or authentication to MS 118 via B 114, by redirecting B 114 over the virtual channel created by datapaths 140 142 and 144. However, in addition to using a secure channel, HS 116 includes in the response the parameters of the request. MS 118, upon receipt of the response, can then easily identify if the parameters have been modified. This alerts MS 118 to the start of a man in the middle attack.

FIG. 6 illustrates a further security level for use in the present invention. The user of browser 114 visits MS 118, and, upon indicating a membership in the identity management network, is redirected to HS 116 along the virtual channel created by datapaths 146, 148 and 150. After authenticating the user, HS 116 transmits the response to the information and/or authentication request to MS 118 over secure the virtual channel created by datapaths 140 142 and 144 along with the request parameters. To provide enhanced data protection, MS 118 uses secure paths 146 and 150 to transmit the request to HS 116 and also signs the request. HS 116 can then verify that the request was signed by MS 118, and has not been tampered with during transmission. If a request has been tampered with, HS 116 can redirect B 114 to MS 118 without the requested information to provide a

US 10,567,391 B2

9

message that the request was modified prior to receipt. If HS 116 and MS 118 have no other connection to each other, other than belonging to the same identity management network, MS 116 can provide its public key to HS 116 along with the request. To ensure that the signature is not modified, or replaced, during an attack, the signature can be signed by a common trusted party, such as a network root or a trusted certificate authority.

To offer the different gradients of channel security, the present invention provides for both membersites and homesites to communicate to each other, preferably through browser 114, using a channel selected from a channel listing. The following listing is meant to be exemplary and is not necessarily exhaustive. The list is not strictly ordered to show increasing security, as certain features of some channels offer security in a different manner than others. At a first level an open channel, with no encryption, can be used between the MS and the HS. To increase the security, and open channel can be used with HS signing the response to show that the content has not been modified in transit. A secure channel can be used, so that transit between the HS and B, and B and MS is secure. A secure channel with a signed response allows HS to have a secure connection to B, and then have a secure channel from B to MS, and allows MS to see that the response has not been modified in transit. An open channel can be used, with both the request and the response signed. This allows HS to know that the request for information has not been tampered with, and allows the MS to know that the response has not been tampered with. If HS passes the signed request back to MS along with the signed response, MS can also verify that the request was not tampered with. The same signed request and response can also be transmitted over a secure channel.

By offering a series of these security levels the identity management system of the present invention allows membersites to use the most appropriate security for their needs, and does not force a one size fits all solution upon membersites. Homesites include input ports to receive requests for information and authentication. Prior to release of the information or authentication, a homesite can examine the information to be released and compare it to specified user conditions for the release of that information. Thus, a user can specify a channel security level at which information can be released, similar to the authentication security level settings on information described above. This allows a membersite to make a low security request, and a user preference or homesite policy to override it, and inform the membersite that the requested information can only be released using secure channels. The use of redirect commands allows the HS and MS to pass these messages to each other transparently to the user. Thus, the homesite input ports receive membersite requests, while an authentication engine obtains user authentication, and optionally obtains user authorization for the release of requested information. A homesite response engine then prepares the response to the received request and transmits it to the membersite over either the requested channel, or over a channel required by user preferences or homesite policies.

MS 118 is always guaranteed that the message from HS 116 has not been modified when a signed response is sent. The signature can be verified against a signature signed by a trusted third party, such as a network root as described in other references, or by a certificate authority.

FIG. 7 illustrates an exemplary method for a homesite to select a channel as described above. In step 152, a homesite receives a user identity request. In step 154, the homesite determines a required channel security level in accordance

10

with the request. As described above the channel can be selected from a list defined a priori. In step 156, the homesite provides a user identity response over a channel having the appropriate security level. As one skilled in the art will appreciate, the determination of a required channel can be done in accordance with both the request and user or homesite defined preferences. As described above, if a membersite requests information over a channel deemed unacceptably low by either homesite or user defined preferences, the homesite can attempt to force the membersite to use a higher security channel by redirecting the user to the membersite with a response that indicates that a more secure channel is required. This response can either simply indicate that a more secure channel is required or it can indicate the minimum channel required.

FIG. 8 illustrates an exemplary method for a membersite to specify a channel as described above. The membersite, in step 158, issues a user identity request, which includes a defined channel security level. As described above the channel security level can be selected from a list defined a priori. In response to the user identity request, the membersite receives, in step 160, a user identity response. In step 162, the membersite can examine both the response and the channel, over which the response was received, to determine that the channel has the defined security level. If the membersite requested that the response include a signed set of the request parameters over an unencrypted http channel, an inspection of both the channel and the response will indicate whether or not the response meets the requirements. If the response does not meet the requirements, the user can be informed that the homesite did not respond as expected and that an attack may be in progress on the user's identity. In the alternate the membersite could determine that it is under attack from a malicious third party, and determine that the safest course of action is to terminate the connection and log the IP address of the response sender, which, if the browser was used to redirect the response, should correspond to the user.

One skilled in the art will appreciate that the above described channel and authentication security levels can be provided either separately from each other or in tandem. They both rely upon a membersite issuing a user identity request with a defined security level, and the membersite receiving a response that is checked to ensure that it meets the defined security level. From the perspective of the homesite, both methods involve receiving user identity requests, determining a security level in accordance with the received request and sending a response that meets the specified security levels.

One skilled in the art will appreciate that the various systems of the present invention can be implemented using standard computing hardware controlled by software to receive information, analyze it and provide a response appropriate to the method of the present invention. Applicant notes that the homesite of the present invention preferably includes an input, and authentication engine and a response engine. The input receives membersite request, preferably via the user, the authentication engine determines the requested authentication and authenticates the user, while the response engine sends an appropriate reply to the membersite. A membersite of the present invention can include an input for receiving a user, an authentication request engine, for transmitting a user authentication request with specified a security level, and a response analyzer for analyzing the response to the authentication request to ensure that the security level of the response either matches or exceeds the specified security level.

US 10,567,391 B2

11

FIG. 9 illustrates the application of the security system described above to allow a membersite to connect to a webservice on behalf of a user to obtain information or to have service performed. In FIG. 9, HS 116, MS 118 and webservice WS 166 all belong to the identity management network operated by root 164. In belonging to the network, each node has trust in root 164, and can identify other nodes in the network by requesting a signature, associated with the other nodes, that is signed by the root. By offering another node in the network a public signature block that is signed by the root, a node can establish both that it is part of the network, and that any transmission that it makes has not been tampered with.

When the user of browser 114 establishes a session with MS 118, over connection 168, an authentication with HS 116 takes place (not shown as part of the data flow). After authentication, the user may request a feature provided by MS 118 that requires access to a webservice, such as WS 166. As an illustrative example, not intended to limit the scope of the invention, MS 118 may offer a financial portal service to the user of browser 114, whereby MS 118 collects financial information from a number of other servers and presents it to the user in a consolidated format. WS 166 can match a globally unique persona identifier (GUPI) with the user of browser 114 and the services to which the user is subscribed. MS 118 provides a request to WS 166 over datapath 170. WS 166 sends a request 172 to MS 118. This request typically includes a request for user authentication and a set of information to allow WS 166 to identify the user. The request from WS 166 can also include requests for assertions from third parties that are held by the homesite 116. Such assertions can include verifiable statements that a user is a member of an organization, such as a reward program, and even that the user has obtained a status level in the organization. Other assertions may be issued by governmental organizations indicating that a user has a geographical location. Those skilled in the art will appreciate that any number of third party assertions can be provided to WS 166. This request is preferably accompanied with a nonce or other form of session identifier so that MS 118, or another system, is prevented from using the user authentication as part of a replay attack. MS 118 forwards the request for authentication to HS 116 by redirecting the user along logical datapath 174, one skilled in the art will appreciate that datapath 174 can include multiple channels established between different nodes on a point-to-point basis. The request from MS 118 to HS 116 may simply be the WS 166 request, or it may include a series of requests, including an aggregation of requests from the number of other web services (not shown). Furthermore, the request sent along datapath 174 may include other information needed by MS 118. The request relayed to HS 116 preferably contains a request for a set of information about the user, user authentication, and an explanation of what information is being provided and why it is being requested. In a presently preferred embodiment, the explanation is provided both as plaintext so that HS 116 can easily display it to the user, and as a programmatic explanation, so that HS 116 can obtain one-time authorization for the release of the information to WS 166. The programmatic explanation, if provided, allows HS 116 to simply perform a compare operation on existing authorizations, reducing the number of times that the user must interact with HS 116, increasing the appearance of a seamless experience.

Upon obtaining user authorization and authentication, HS 116 prepares a response, signs the response and includes its public signature, signed by root 164. If the request from MS

12

118 is an aggregation of requests from multiple webservices, HS 116 can sign each corresponding response separately so that each webservice is provided with only the information that it requested. In an alternate embodiment, to reduce the computational overhead on HS 116 imposed by signing multiple data blocks, the entire response is signed, and each web service is provided the whole response. The response is sent to MS 118 via browser 114 over datapath 176. MS 118 preferably breaks the response into the separately signed segments and forwards each segment to the respective WS. WS 166 then receives its request on datapath 178. WS 166 can then authenticate that the data has not been modified in transit by examining the homesite signature and knowing the root signature. The use of a nonce, as described above, provides WS 166 the ability to track when the request was issued if a timeout value is to be applied. WS 166 can match information in the response from HS 116 to information held, such as bank account information, to determine which information to release to MS 118. Upon validating the authorization and gathering the information to release to MS 118, WS 166 sends the information to MS 118 over datapath 180. Upon receipt of the information from WS 166, MS 118 can act on the information as required. Depending on the content of the response, WS 166 may select the elements of the signed response that it needs and then examine the authorization it has received. If authorization has been received WS 166 will either provide a token to MS 118 that permits multiple access without further authentication, or will provide the requested information to MS 118 without a token to provide one-time access only. For the purposes of an example, not intended to limit the scope of the present invention, the following scenario is presented. A user directs browser 114 to MS 118, where a session has already been established. MS 118 provides the ability to aggregate information, such as travel information, for a user. MS 118 has knowledge of the user's upcoming travel itinerary, and proceeds to connect to an airline travel webservice, WS 166. WS 166 upon receiving the initial contact from MS 118 provides a request for authentication of the user, using datapath 172, and requests the user's full name, address and frequent flier information. This request is forwarded to HS 116, possibly along with other information requests, following datapath 174 through MS 118, and browser 114. Upon receipt of the request, HS 116 requests that the user re-authenticate. The request from WS 166 is accompanied by both a text explanation outlining the information that is going to be released and a programmatic explanation; so that at a later date the user does not need to interact with HS 116, and HS 116 can simply send the response. After authentication and acceptance of the release of the information, the user authorizes HS 116 to release the information to WS 166. HS 116 then prepares a response including a user identifier, such as a GUPI, the requested information, and a nonce provided with request. The response is signed by HS 116, and a root-signed copy of HS 116's public signature is appended to the signed response. This response is forwarded to MS 118 via browser 114 by redirecting the browser, along the continuation of datapath 176, using any of a number of known techniques. MS 118 then forwards the segment of the signed response corresponding to the request from WS 166 to WS 166 over datapath 178. After verifying the nonce and the requested information, WS 166 obtains the flight information for the user, provides it to MS 118, and allows any of a number of functions to be provided including seat selection and advance check-in with electronic boarding pass provisions. One skilled in the art will appreciate both that other services can be provided, and that MS 118 can

US 10,567,391 B2

13

connect to a plurality of webservices to aggregate data from each of them. In one embodiment of the present invention, MS **118** requests sessions with a plurality of webservice providers, and aggregates their information requests. The aggregated requests are then provided en masse to HS **116**, and user authorization for all requests is obtained at once. This allows HS **116** to provide a series of responses to MS **118**, at which time MS **118** then separates the responses and sends each of the individual responses to the respective webserivce providers. The severing of the concatenated responses from HS **116** can easily be managed using the session identifiers issued by each webservice provider as a key. In alternate embodiments, HS **116** obtains user approval for the release of the information to each of the webservice providers, and then sends the responses one at a time to MS **118**, which after receiving a response simply redirects browser **114** to HS **116** to obtain the next response until all responses are obtained and forwarded to the webservice providers. One skilled in the art will appreciate that the actual mechanism used for the supporting of multiple webservice providers can vary without affecting the scope of the present invention.

Webservice providers, such as WS **166**, can relate the information that they requested to their database, and at the same time be assured that they are allowed to release the information, as HS **116** can be proven to be authoritative for the user's identifier by following a signature key chain through any number of delegations until a trusted source is used to show that HS **116** is authoritative for the information released.

Some of the information housed by HS **116** may be provided to it by an outside authoritative source as described in detail in related applications, such as Canadian Application Numbers 2,468,351, and 2,468,585, which are hereby incorporated by reference. In cases where the information, such as a frequent flier number, is housed by an external authoritative site, HS **116** can provide the externally signed assertion to WS **166**, allowing WS **166** to determine both that the information provided is authentic, and that HS **116** is authoritative for the user associated with the information.

One skilled in the art will appreciate that MS **118** may always connect to WS **166**. As a result, MS **118** can, upon receiving an indication that the user is part of the identity management system, initiate the connection to WS **166** to request a session over datapath **170**. When MS **118** requests information required by WS **166**, it can include its own user authentication request. Thus, authentication of the user at HS **116** can be done at the same time that the user authorizes the release of information to WS **166**.

As illustrated in FIG. **10**, HS **116** is authoritative for the user of browser **114**. As such, HS **116** can be used as an agent of the user and permitted to directly interact with WS **166**. In such a scenario HS **116** directly connects to WS **166**, and requests information using connection **182**. WS **166** uses a standard interface, and as a result does not notice a difference between HS **116** and MS **118**. Because HS **116** is already authoritative for the user, the authentication and data passing through MS **118** can be bypassed. WS **166** can issue an authentication request **184**, which HS **116**, acting as an agent for the user, can directly respond to over connection **186**. WS **166** can then either issue a token or one-time-information **188**. The user's trust of HS **116** allows for this scenario to be permitted, as without user approval HS **116** will not interact with WS **166**.

A rich client can be provided that interacts with WS **166** on the user's behalf without having to interact with MS **118**, as illustrated in FIG. **11**. As an example, if WS **166** provides

14

financial information to users for a bank, the bank can provide users with a rich client (RC) **190** that will interact with WS **120**. The client is preferably a non-browser based application that can make calls to WS **166**. Due to its standardized interface, WS **166** is agnostic as to who interacts with it. RC **190** appears as another MS to WS **166**. When RC **190** issues a request **192** to WS **166**, it receives a request for authentication and information **194**. RC then launches a browser **114** from the local computer, and uses the browser **114** to transmit WS **166**'s request to HS **116** over datapath **196**. The user interacts with HS **116** in the normal manner, and approves the release of the information. The response **198** is sent from HS **116** to the browser **114**, which provides the information to RC **190**. RC **190** can then close the browser window, and forward the requested information to WS **166** over datapath **200**. RC **190** can obtain the requested information from the browser **114** prior to closing the window, by having the browser **114** redirected to the localhost address at a predetermined port. As long as RC **190** has control over that port and is listening on it, the information can be received and then sent along to WS **166**. WS **166** can then send the requested information, or a token, to RC **190** over datapath **202**.

To facilitate the interaction of RC with the rest of the network, RC can use a public API to interact with network nodes such as HS **116** and WS **166**. As new standards for connection are defined, or new node types arise, the API can be changed by a public administrator, and then provided to the users of RC. By replacing the API, the ability to connect either to new node types or to existing nodes in a new manner can be provided without requiring the rewriting of the code base for RC.

As described above, the network root administers admission to the network, and provides signed assertions that a homesite is authoritative for a user. Each user is uniquely identified by both a GUPI and an email address. By leveraging the trust model of this network, a distributed contact management network is provided. At present contact management networks require a single database of contacts that are maintained by a sole provider. The distributed nature of the network of the present invention bypasses the drawbacks to that model. A distributed contact management system in the network of the present invention is illustrated in FIG. **12**.

Root **164** maintains a database **204** mapping email addresses to associated GUPI's and homesite identifiers used to identify the homesite that is authoritative for the GUPI. HS **116** is authoritative for a GUPI associated with the user of browser **114**. The user of browser **114** provides to HS **116** a listing of known contacts over datapath **206**. HS **116** extracts the email addresses from the contact listing and provides the email addresses to root **164** over datapath **208**. Root **164** then identifies the GUPI and homesite associated with each submitted email address, and provides this information to the HS **116** over return datapath **210**. HS **116** can then contact HS2 **212**, which is authoritative for a GUPI associated with one of the submitted email addresses over connection **214**. When HS **116** contacts HS2 **212** over datapath **214**, it can request additional contact information stored by HS2 **212**. HS2 **212** can release this information, if authorized by the relevant user, or can ask the relevant user for authorization at the next login. When providing the information, HS2 **212** can provide a URI to HS **116** allowing HS **116** to obtain updated information at other times, so that the contact information can be updated periodically. Conversely, HS **116** can provide HS2 **212** with a URI so that when the requested information changes, or at fixed intervals, HS **116** will receive updated information over datapath

US 10,567,391 B2

15

214. After receiving the user information over datapath 214, HS 116 can forward the information to browser 114 over datapath 216. One skilled in the art will appreciate that a number of other software applications, other than a standard internet web browser, can be used by the user to communicate with HS 116 including email and contact management clients. In the above scenario the contact information can be transmitted in any of a number of formats including the virtual card (vcard) standard.

The above-described scenario allows homesites to communicate to each other using URI's to update information. A similar network service is illustrated in FIG. 13, where HS 116 is provided with an update URI by MS 118, through browser 114 during a request for information over datapath 218. The requested information is provided to MS 118 over datapath 220. Both channels 218 and 220 make use of the redirection of browser 114. However, when the supplied information changes, and if the user has approved the updating of information, HS 116 can create a back channel connection 222 to MS 118 to supply the updated information. One skilled in the art will appreciate that in addition to the request interface described above, a homesite would preferably have an update interface or engine, to allow monitoring of information for a user, so that when a user modifies a profile, the relevant information can be updated by backchannel, without requiring user interaction with the membersite.

FIG. 14 illustrates the use of the update URI for a user who is changing from HS 116 to HS2 212 as a principal identity store. As in the example of FIG. 13, HS 116 has obtained an update URI associated with MS 118 over datapath 218, and has provided contact information to MS 118 over data path 220. The user, through browser 114 over datapath 224, informs HS 116 that the GUPI, and all associated information, is to be transferred to HS2 212. This can be a permanent transfer of information, or it can be using one homesite to serve as a backup to another. HS 116 connects to HS2 212, either directly over a back channel, or through redirection of the browser 114, and an exchange of data is made. This datapath is shown as datapath 226, which is an example of a back channel connection, but one skilled in the art will appreciate that it can be performed using browser redirection. Along with the user information associated with the GUPI, HS 116 transfers the update URI from MS 118 to HS2 212. Thus, when HS2 212 receives updated information from browser 114 the information can still be updated with MS 118 seamlessly over datapath 228.

GUPI's are typically assigned by root 164 to a homesite, such as HS 116. Thus far in identity management systems, each identifier is linked to an email address. This removes the ability of a user to be anonymous, as the identifier can be associated with an email address that is easily traceable to a user. To satisfy the need for anonymous personas, root 164 can assign a series of GUPIs to HS 116 as an anonymous pool. This allows HS 116 to provide a user with a pool of anonymous GUPIs, so that if a user wishes to remain anonymous, HS 116 is the only site that can identify the user. Once again, this model is predicated upon the user of browser 114 having trust in HS 116, without which, HS 116 would never be able to server as a homesite that stores the user's identity information. With a sufficiently large pool of anonymous GUPIs, HS 116 can assign a different GUPI to each site that a user visits. Though this prevents the building of attributes that can establish a virtual reputation, the purpose of anonymous personas is to prevent the building of any reputation. Because no two sites will be given the same GUPI, the result is much the same as a pairwise unique

16

identifier, however, HS 116 can, in one embodiment, economize on GUPI's in the unique pool by allowing the same GUPI to be used by two different users at two different sites. Because the GUPI has no attributes associated with it, and no user can build a reputation with it, if treated communally it further anonymizes the behaviour of the user. In non-shared embodiments, HS 116 must track the pairings of the membersite identifier and the user to determine the GUPI to be used. If the GUPI is not shared, it is still globally unique, and can be ported to another homesite. When transferring persona information to another homesite, the user can obtain a GUPI list from the homesite and can have the authoritativeness of that GUPI transferred to another homesite. For the embodiment where GUPIs are communally shared, the new homesite can be made authoritative for the GUPI, maintaining the same membersite identifier and user pairing to associate to the GUPI, without revoking the authoritativeness of the original homesite, as other people at other sites may use the GUPI.

One of the issues that arise from using multiple GUPI to allow a user to keep persona separate, is that when assertions are made, they are typically made for a single persona. Thus, for a user with home and office persona, an assertion may be made for the office persona regarding membership in an organization. If the user's home persona needs to make use of the membership assertion attached to the office persona there are two mechanisms provided by the present invention for this. Using a first mechanism, a user can direct HS 116 to contact AS which issued the assertion for the work persona. HS 116 then provides AS with multiple GUPIs, and the assertions for any of the provided GUPIs issued by AS and indicates that it is authoritative for all the submitted GUPIs, and all the submitted GUPIs are the same individual. AS, upon being informed that all the GUPIs are issued to the same individual, can then provide any GUPIs that do not have an assertion, with the assertion provided by HS 116. In an example, AS is a frequent flier program, and has provided an assertion indicating that the office persona of a user has obtained elite status. HS 116 provides the GUPIs for the user's office and home persona to AS along with the assertion that the office persona has obtained elite status. AS then verifies that HS 116 is authoritative for both GUPIs, and confirms that the office persona is certified as having elite status. AS then provides an assertion for the GUPI associated with the home persona indicating elite status. This allows for assertions to be shared between persona, but comes at the cost of having AS know that two GUPI are related to each other.

If a user wishes to avoid having two GUPI linked together by an AS, but one GUPI has an assertion needed by the other GUPI, the following method can be employed. When MS 118 requests an assertion about a first GUPI that is only held by a second GUPI, HS 116 can include in its signed response, both GUPIs, and the assertion held for the second GUPI. MS 118 can then determine from the response, that HS 116 is authoritative for both GUPIs, and sees that HS 116 states that both GUPIs are issued to the same person. MS 118 can then verify that the second persona has the required assertion, and apply the assertion to the first persona. As an example, a user with office and home persona has an assertion for the office persona that indicates elite status in a frequent flier program from AS. The user wants to use this assertion with the home persona when visiting MS 118. In response to MS 118's request for the assertion, HS 116 sends both office and home GUPI, and the assertion for the office persona GUPI. MS 116 can then verify that the GUPIs are related, and can transitively apply the assertion to the home

US 10,567,391 B2

17

persona. In contrast to the first embodiment, AS does not know that the persona are linked, but MS **118** knows. Because the operation, by default, includes moving attributes from one persona to another, HS **116** must reveal the link between 2 GUPIs to at least one of the two. By offering both mechanisms, the user is provided the opportunity to choose which node in the network is shown the link.

The above described method and system for sharing credentials between GUPIs can also be used in relation to anonymous GUPI, though it should be noted that this reduces the anonymity of a GUPI, so should preferably not be done with a GUPI shared among users. For a MS **118** that has only ever been presented with an anonymous GUPI, the above-described method provides a method of transferring history to an identifiable GUPI. If HS **116** provides MS **118** with both an anonymous GUPI and an identifiable, or non-anonymous, GUPI, MS **118** can transfer any history associated with the anonymous GUPI to the identifiable GUPI. This allows a user to interact with MS **118** in an anonymous fashion, and then, having reached a comfort level with MS **118**, the user can present another GUPI and have any history and reputation transferred to the non-anonymous GUPI.

To increase the availability of homesite management capabilities, a homesite can be built-in to a browser. Such a homesite can be offered either as an integral part of a web browser, or can be offered using a plug-in architecture. Such a plug in, or integrated browser, can be used to simplify the communication with nodes in the network and reduce the redirection of previous embodiments.

At a first level, a browser can indicate that it understands extensions to HTML specific to the identity management network. When browsers make requests from web servers using the hypertext transfer protocol (http), they provide an indication of capabilities, including an HTML version. By indicating that the browser understands the identity management network extensions to HTML (or identity management HTML tags), MS **118** does not need to redirect the browser to the shadow domain to find out the homesite of the user. Instead, MS can simply send an HTML instruction to the browser to obtain user authentication. If the browser indicates that it is both identity management aware, and that a homesite has been configured, MS **118** need only provide authentication and information requests to the browser, and the browser will then handle any redirection needed. This allows MS **118** to avoid using redirections to shadow domains to find out what the user's homesite is, and avoids having to issue redirection requests to the browser. From the perspective of the user, fewer redirection requests are issued, and MS **118** never obtains the location of the users' homesite. If MS **118** simply instructs the enhanced browser to obtain authentication in an HTML tagged message, it does not need to tell the browser where to redirect to, and avoids using Javascript™ redirects and close window commands to make the user experience seamless. The MS only determines the user's HS, when a response is issued, which increases user privacy.

As an enhancement, an enhanced browser can also be provided with the ability to function as a homesite. As disclosed in the above-cited references, a homesite can be provided as a local application. By integrating the homesite within the web browser, redirection can be avoided. When the HS-enabled browser visits MS **118**, it indicates that it supports identity management HTML tags. MS **118** then instructs the browser to obtain user authentication and return user information. HS-enabled browser no longer needs to redirect to an external site, and instead can provide user

18

authentication using a locally controlled authentication tab or window. If the user his specified that use of the browser is a sufficient indication of authentication, HS-enabled browser can immediately return the requested information, having signed the response. This eliminates the user having to interact with an external homesite, and reduces the data transmission, which is especially important on low-bandwidth connections. The HS-enabled browser preferably does not have a homesite cookie, so that MS **118** will not know that the user is using a local homesite.

One skilled in the art will appreciate that when an identity management aware browser sends identity management information through http headers, it allows MS **118** to refrain from bouncing the browser to the shadow domain. This allows MS **118** to simplify its interaction with the browser, as the browser has indicated that it knows a homesite for the user. Instead of the MS being sent the HS identifying information, MS uses an http command to request authentication in a POST command. The browser will handle redirection if needed and will replace the request authentication command with the appropriate HTML if an external HS is used. If an external HS is used, it can identify that it does not need to use a redirect command to send the information to MS, and instead simply sends the response to the browser and tells the browser to send the information to the MS.

The above-described enhancement to a browser can either be integrated into the browser code, or can be provided as a plug in. One skilled in the art will appreciate that either embodiment can communicate with a root node to obtain updated schema, or can obtain the updated schema from a central service used to ensure that the browser has been updated to the most recent patches and bug-fixes.

The above-described embodiments of the present invention are intended to be examples only. Alterations, modifications and variations may be effected to the particular embodiments by those of skill in the art without departing from the scope of the invention, which is defined solely by the claims appended hereto.

What is claimed is:

1. A computer-implemented method for implementing variable transaction security levels, the method comprising:

receiving a first request for user authentication as part of a first usage event, wherein the first request for user authentication includes information about a first type of transaction to be performed by a user during the first usage event;

receiving a second request for user authentication as part of a second usage event,

wherein the second request for user authentication includes information about a second type of transaction to be performed by the user during the second usage event, and wherein the second type of transaction is different from the first type of transaction;

performing, using one or more hardware processors, at least one transaction associated with the first request at a first transaction security level by selecting a first transaction mechanism having the first transaction security level, wherein the first transaction mechanism is selected based on the first type of transaction to be performed by the user during a first usage event; and

performing, using the one or more hardware processors, at least one transaction associated with the second request at a second transaction security level by selecting a second transaction mechanism having the second transaction security level,

US 10,567,391 B2

19

wherein the second transaction mechanism is selected based on the second type of transaction to be performed by the user during the second usage event,

and wherein the first transaction security level is different from the second transaction security level.

2. The method of claim 1, wherein the first transaction security level, the second transaction security level, or both comprise at least one of: a transaction authentication security level, a transaction channel security level, or a transaction time sensitivity security level.

3. The method of claim 2, wherein the performance of transaction comprises:

selecting, using the one or more hardware processors, a channel with a channel security level to perform the transaction, the channel selected based on a correspondence between the transaction channel security level for the transaction and the channel security level of the selected channel, or

selecting, using the one or more hardware processors, an authentication mechanism with an authentication security level to perform the transaction, the authentication mechanism selected based on a correspondence between the transaction authentication security level for the transaction and the authentication security level of the selected authentication mechanism, or

performing, using the one or more hardware processors, at least a part of the transaction within a specified time limit corresponding to the transaction time sensitivity security level for the transaction.

4. The method of claim 3, wherein one or more of the selected channel, the selected authentication mechanism, or the specified time limit used for performing the transaction is based on one or more policies specifying a minimum security level required for a response.

5. The method of claim 1, wherein the first request for user authentication is sent via a first data path and the second request for user authentication is sent via a second data path different from the first data path.

6. The method of claim 1 further comprising:

selecting a first channel having a first channel security level to perform the at least one transaction associated with the first request, the first channel selected based on a correspondence between the first transaction security level and the first channel security level; and

transmitting first data to perform the at least one transaction associated with the first request over the selected first channel.

7. The method of claim 1 further comprising:

selecting a second channel having a second channel security level to perform the at least one transaction associated with the second request, the second channel selected based on a correspondence between the second transaction security level and the second channel security level; and

transmitting second data to perform the at least one transaction associated with the second request over the selected second channel.

8. The method of claim 1 further comprising:

determining that the first transaction security level, the second transaction security level, or both are below a minimum threshold;

providing an indication that a more secure transaction security procedure is required or an indication of a minimum security level; and

redirecting the first request, the second request, or both to a computing system that requires a higher security level.

20

9. The method of claim 1, wherein the first transaction mechanism, the second transaction mechanism, or both are selected based on user preferences, wherein the user preferences are associated with information requested in the first request, the second request, or both.

10. A computer-readable storage device storing instructions that, when executed by a computing system, cause the computing system to perform acts for implementing variable transaction security levels, the acts comprising:

receiving a first request for user authentication as part of a first usage event, wherein the first request for user authentication includes information about a first type of transaction to be performed by a user during the first usage event;

receiving a second request for user authentication as part of a second usage event,

wherein the second request for user authentication includes information about a second type of transaction to be performed by the user during the second usage event, and wherein the second type of transaction is different from the first type of transaction;

performing, using one or more hardware processors, at least one transaction associated with the first request at a first transaction security level by selecting a first transaction mechanism having the first transaction security level, wherein the first transaction mechanism is selected based on the first type of transaction to be performed by the user during a first usage event; and

performing, using the one or more hardware processors, at least one transaction associated with the second request at a second transaction security level by selecting a second transaction mechanism having the second transaction security level,

wherein the second transaction mechanism is selected based on the second type of transaction to be performed by the user during the second usage event,

and wherein the first transaction security level is different from the second transaction security level.

11. The computer-readable storage device of claim 10, wherein the first transaction security level, the second transaction security level, or both comprise at least one of: a transaction authentication security level, a transaction channel security level, or a transaction time sensitivity security level, and

wherein the performance of transaction comprises:

selecting, using the one or more hardware processors, a channel with a channel security level to perform the transaction, the channel selected based on a correspondence between the transaction channel security level for the transaction and the channel security level of the selected channel, or

selecting, using the one or more hardware processors, an authentication mechanism with an authentication security level to perform the transaction, the authentication mechanism selected based on a correspondence between the transaction authentication security level for the transaction and the authentication security level of the selected authentication mechanism, or

performing, using the one or more hardware processors, at least a part of the transaction within a specified time limit corresponding to the transaction time sensitivity security level for the transaction.

12. The computer-readable storage device of claim 11, wherein one or more of the selected channel, the selected authentication mechanism, or the specified time limit used

US 10,567,391 B2

21

for performing the transaction is based on one or more policies specifying a minimum security level required for a response.

13. The computer-readable storage device of claim 10, wherein the first request for user authentication is sent via a first data path and the second request for user authentication is sent via a second data path different from the first data path.

14. The computer-readable storage device of claim 10, wherein the acts further comprise:

selecting a first channel having a first channel security level to perform the at least one transaction associated with the first request, the first channel selected based on a correspondence between the first transaction security level and the first channel security level; and

transmitting first data to perform the at least one transaction associated with the first request over the selected first channel.

15. The computer-readable storage device of claim 10, wherein the acts further comprise:

selecting a second channel having a second channel security level to perform the at least one transaction associated with the second request, the second channel selected based on a correspondence between the second transaction security level and the second channel security level; and

transmitting second data to perform the at least one transaction associated with the second request over the selected second channel.

16. The computer-readable storage device of claim 10, wherein the acts further comprise:

determining that the first transaction security level, the second transaction security level, or both are below a minimum threshold;

providing an indication that a more secure transaction security procedure is required or an indication of a minimum security level; and

redirecting the first request, the second request, or both to a computing system that requires a higher security level.

17. The computer-readable storage device of claim 10, wherein the first transaction mechanism, the second transaction mechanism, or both are selected based on user preferences, wherein the user preferences are associated with information requested in the first request, the second request, or both.

18. A system for implementing variable transaction security levels, the system comprising:

at least one memory;

at least one interface configured to:

receive a first request for user authentication as part of a first usage event, wherein the first request for user authentication includes information about a first type of transaction to be performed by a user during the first usage event;

22

receive a second request for user authentication as part of a second usage event,

wherein the second request for user authentication includes information about a second type of transaction to be performed by the user during the second usage event,

and wherein the second type of transaction is different from the first type of transaction; and

one or more processors configured to:

perform at least one transaction associated with the first request at a first transaction security level by selecting a first transaction mechanism having the first transaction security level, wherein the first transaction mechanism is selected based on the first type of transaction to be performed by the user during a first usage event; and

perform at least one transaction associated with the second request at a second transaction security level by selecting a second transaction mechanism having the second transaction security level,

wherein the second transaction mechanism is selected based on the second type of transaction to be performed by the user during the second usage event,

and wherein the first transaction security level is different from the second transaction security level.

19. The system of claim 18, wherein the first transaction security level, the second transaction security level, or both comprise at least one of: a transaction authentication security level, a transaction channel security level, or a transaction time sensitivity security level, and wherein the performance of transaction comprises:

selecting, using the one or more hardware processors, a channel with a channel security level to perform the transaction, the channel selected based on a correspondence between the transaction channel security level for the transaction and the channel security level of the selected channel, or

selecting, using the one or more hardware processors, an authentication mechanism with an authentication security level to perform the transaction, the authentication mechanism selected based on a correspondence between the transaction authentication security level for the transaction and the authentication security level of the selected authentication mechanism, or

performing, using the one or more hardware processors, at least a part of the transaction within a specified time limit corresponding to the transaction time sensitivity security level for the transaction.

20. The system of claim 18, wherein one or more of the selected channel, the selected authentication mechanism, or the specified time limit used for performing the transaction is based on one or more policies specifying a minimum security level required for a response.

*   *   *   *   *

# EXHIBIT 5

US007464862B2

## (12) United States Patent

**Bacastow**

(10) **Patent No.:** **US 7,464,862 B2**

(45) **Date of Patent:** **Dec. 16, 2008**

(54) **APPARATUS & METHOD FOR POS PROCESSING**

(75) Inventor: **Steven V. Bacastow**, Cumming, GA (US)

(73) Assignee: **QuickVault, Inc.**, Cumming, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 609 days.

(21) Appl. No.: **11/141,837**

(22) Filed: **Jun. 1, 2005**

(65) **Prior Publication Data**

US 2005/0274798 A1    Dec. 15, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/579,997, filed on Jun. 15, 2004, provisional application No. 60/631,300, filed on Nov. 24, 2004.

(51) **Int. Cl.**
**G06K 5/00** (2006.01)
(52) **U.S. Cl.** ...................... **235/380**; 235/382; 235/492
(58) **Field of Classification Search** ........... 235/472.02; 345/752; 705/14; 711/103
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,331,136 A | 7/1994 | Koenck et al. | |
| 5,696,909 A | 12/1997 | Wallner | |
| 5,844,776 A | 12/1998 | Yamaguchi et al. | |
| 5,979,753 A | 11/1999 | Rosla | |
| 6,003,008 A | 12/1999 | Postrel et al. | |
| 6,062,478 A | 5/2000 | Izaguirre et al. | |
| 6,546,441 B1 | 4/2003 | Lum | |
| 6,553,348 B1 | 4/2003 | Hashimoto | |
| 2002/0082925 A1 | 7/2002 | Herwig | |
| 2002/0193157 A1* | 12/2002 | Yamada et al. | 463/9 |
| 2003/0135148 A1 | 7/2003 | Shekhar et al. | |
| 2003/0174167 A1* | 9/2003 | Poo et al. | 345/752 |
| 2007/0143529 A1* | 6/2007 | Bacastow | 711/103 |
| 2007/0214047 A1* | 9/2007 | Antonello et al. | 705/14 |

* cited by examiner

*Primary Examiner*—Michael G. Lee
*Assistant Examiner*—Allyson N Trail

(57) **ABSTRACT**

An apparatus and method for configuring, altering, controlling, securing, and extending the processing capability and functionality of PCs and POS devices using a non-volatile memory device using software and data carried within the apparatus.

**14 Claims, 2 Drawing Sheets**

## Component List



Host based processor

Used for transaction authorization and clearing and downloading information to the removable flash memory.

Internet, Wireless or dial connection to host

File server

Removable Flash enabled POS terminal.

USB cable (optional)

Removable Flash Memory – Contains programs and data. Interface may be USB or other method.

PC

Used to store information collected on removable flash memory.

Case 2:25-cv-02956-BCL-tmp    Document 13-2    Filed 02/10/26    Page 386 of 404
PageID 766

# Figure 1 – Component List



Used for transaction authorization and clearing and downloading information to the removable flash memory.



Internet, Wireless or dial connection to host



File server

Removable Flash enabled POS terminal.

 USB cable (optional)

Removable Flash Memory -- Contains programs and data. Interface may be USB or other method.



PC

Used to store information collected on removable flash memory.

**U.S. Patent**      Dec. 16, 2008      **Sheet 2 of 2**      US 7,464,862 B2

# Figure 2 – Basic Configuration

Removable Flash enabled POS terminal can process certain transactions in an offline mode, when there is no connection to the host processor.



Removable Flash Memory contains programs and data that interoperate with the enabled POS terminal. Stored data can include Inventory, pricing, negative files, music, games, batched transactions, control totals and other related data which would normally exceed the capacity of the POS terminal.

US 7,464,862 B2

**1**

## APPARATUS & METHOD FOR POS PROCESSING

### RELATED APPLICATION

This application claims the benefit of priority of U.S. provisional application Ser. Nos. 60/579,997 filed Jun. 15, 2004 and 60/631,300, filed Nov. 24, 2004, which are relied on and incorporated herein by reference.

### COPYRIGHT NOTICE

A portion of the disclosure of this patent document may contain material, which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or patent disclosure as it appears in the U.S. Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

### FIELD OF THE INVENTION

The present invention relates to an apparatus and method for enhancing the functionality and security of point-of-sale terminals through the use of a portable non-volatile memory device using software and data carried within the device.

### BACKGROUND OF THE INVENTION

In recent years, point-of-sale (POS) terminals and the software that supports POS business applications have become increasingly complex. New 'modular' applications have been developed to capitalize on the new POS terminal capabilities and serve to increase the utility value of the point-of-sale terminal. Concurrently, the internet has provided an opportunity to increase the communication bandwidth to the POS terminals, again increasing the type of functionality and transactions that can be supported. However, the POS terminals themselves lack the capacity to store large amounts of data and the business applications available to POS terminals are therefore limited.

The number of merchants, terminals and transactions is increasing annually. Along with these increases, there has been an increase in fraud at the point-of-sale. Current methods fail to adequately prevent consumer and merchant fraud from occurring at the point-of-sale. Authenticating transactions originating from POS devices using secure tokens, digital certificates and other unique merchant identifiers used to control or limit individual user access and functionality are not easily supported by conventional methods.

Also, the process of configuring the POS terminal to function in accordance with the merchant's needs and approved transactions is becoming increasingly complex and time consuming. One drawback to conventional methods for configuring POS devices is related to the current method of downloading the POS business application programs (eg. restaurant, retail, lodging, mail order, petroleum) and the merchant-specific configuration attributes (eg. Bar-tabs, tips, merchant-id, terminal-id, American Express SE number). Current methods rely on transferring (i.e. downloading) this information over dial or high-speed connections with a host-based system. The process is very time consuming, error prone and therefore expensive.

Another drawback to conventional methods for introducing new products to the market is related to the fact that the POS business applications must first be certified by the credit card processors (such as Vital Processing, Nova Information

**2**

Systems, Global Payments, RBS Lynk, First Data) in advance of commercial use. Certification must be completed separately by each processor for each type of POS terminal and business application prior to the device being approved for sale and support (as a 'Class-A' product). This certification process is generally manual in nature, time consuming and expensive and often requires 6 to 12 months per each business application. Any single change such as a line of source code (or for example an additional module added) to a business application requires that the certification process start over again. POS terminal manufacturers (i.e. Verifone, Hypercom, Ingenico, others) are therefore constrained in their ability to sell and distribute new POS terminal models until the business applications are certified (and therefore supported) by the major processors. This scenario creates friction in the distribution channel as the manufacturers seek to gain market share with new innovative equipment because it requires them to wait for each of the major processors (i.e. First Data, Vital Processing, Global Payments, Nova Information Systems, RBS Lynk, others) to first certify the business applications.

Finally, because of the high cost of the device and the security requirements, the POS terminal industry is generally constrained to sell terminals and software only for use by approved merchants and they do not typically sell terminals directly to consumers for use at the home or office.

The price of non-volatile (flash) memory is rapidly decreasing while the capacity and available is increasing. The next generation of POS devices will support non-volatile, detachable flash memory from serial, USB, and other methods. In fact, POS manufacturers are in the very beginning stages of supporting USB devices on POS terminals and there are no commercial uses of this technology today on POS devices. Computer programs (i.e. Business Applications) can and should be developed to enhance the utility value, functionality and security of these next generation POS devices. It will be difficult for the industry to embrace this new technology using current methods.

Therefore, a need exists for an apparatus and method that addresses these shortcomings in the prior art by utilizing the new capabilities provided through non-volatile, removable flash memory.

### SUMMARY OF THE INVENTION

The present invention answers these needs by providing an apparatus and method for configuring, altering, controlling, securing, and extending the processing capability and functionality of POS devices using a non-volatile memory device using software and data carried within the device.

According to the present invention design, a portable housing is provided with non-volatile memory inside. An interface is provided on the housing for communication between the non-volatile memory and the Removable Flash Enabled POS Device. Business software applications and configuration data are loaded into the non-volatile memory. The software applications can be loaded into the non-volatile memory by the POS terminal manufacturer, the Independent Sales Organization (ISO), by a payment processing company, or by the Merchant via a CD-ROM, the Internet, or other suitable means.

Because the software 'business applications' and configuration data 'merchant specific attributes' reside (either fully or partially) on the removable storage device (non-volatile memory) and not on fully on the POS terminal (current industry standard), the present invention may be used to configure and inter-operate with multiple POS devices.

US 7,464,862 B2

**3**

It is thus an advantage of the present invention to provide an apparatus and method for quickly configuring, enhancing, controlling, securing, or extending the functionality of a Removable Flash Enabled POS Device without time-consuming and expensive software modifications or host-based download processes. To this end, the present invention is highly portable, operates independently of any particular POS terminal, and is compatible with a wide variety of POS terminal devices.

Embodiments of the present invention are described below by way of illustration. Other approaches to implementing the present invention and variations of the described embodiments may be constructed by a skilled practitioner and are considered within the scope of the present invention.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an overview of the primary components which would be required to support all of the invention embodiments. Components include: (1) Removable-Flash Enabled POS Device; (2) Removable Flash Memory; (3) Dial-up, Wireless, or High-speed internet connection to Host Processor; (4) Host Processor; (5) Cable; (6) File Server; (7) Personal Computer.

FIG. 2 is an overview of the basic required components which would be required to support a limited set of the invention embodiments. Components include: (1) Removable Flash Enabled POS Device; (2) Removable Flash Memory.

DETAILED DESCRIPTION OF THE INVENTION

An embodiment of the invention allows for the secure storage of any persistent data (data of a permanent nature until changed or deleted) onto [FIG. 1: Removable Flash Memory]. This persistent data may be related to POS terminal configuration and, or transaction data. This data volume currently exceeds the storage capacity of the POS device [FIG. 1: Removable Flash Enabled POS Device] and therefore limits the utility value and overall functionality of the device to the merchant.

An embodiment of the invention allows for the tracking of cardholder and related customer transaction activity on the [FIG. 2: Removable Flash Memory] for the purpose of gift and loyalty program tracking without the need for an online, host-based connection.

An embodiment of the invention allows for the storage of known lost, stolen or fraudulent credit card and debit card numbers on the [FIG. 2: Removable Flash Memory], to prevent the use of these cards for POS transactions without the need for a host-based online connection (or in an offline mode). In connection with this embodiment, merchant-specific, employee-specific or location-specific fraud rules and limits may be defined and enforced without the need for an online connection to a host.

An embodiment of the invention allows for the immediate configuration of a new or re-configuration of a POS terminal device shown in [FIG. 2—Removable Flash Enabled POS Device] using data and programs stored on the [FIG. 2: Removable Flash Memory] without the need to dial, download or connect the POS terminal with a central, host-based configuration process.

An embodiment of the invention allows for the storage of daily transaction totals on the [FIG. 1: Removable Flash Memory] for internal control, balancing, and reconcilement purposes using the [FIG. 1: PC or FIG. 1: File Server].

An embodiment of the invention allows for the secure storage of daily transactions (or batches of transactions) on

**4**

the [FIG. 1: Removable Flash Memory] for the subsequent submission or 'uploading' to a host-based authorization system [FIG. 1: Host] and, or a local PC-based reporting process as shown in [FIG. 1: Personal Computer] or [FIG. 1: File Server].

An embodiment of the invention allows for the creation of authorized users and passwords for the merchant-specific POS device and would therefore require the [FIG. 1: Removable Flash Memory] to be connected to the POS device [FIG. 1: Removable Flash Enabled POS Device] prior to use and during use. This embodiment will also serve to control the functionality of the device [FIG. 1: Removable Flash Enabled POS Device] for specific users and therefore act as a 'key' to this POS device.

An embodiment of the invention allows for protection of files and data stored on the POS device [FIG. 1: Removable Flash Enabled POS Device] or the removable storage device [FIG. 1: Removable Flash Memory] through the use of an encryption method which is compliant with current payment industry security standards set by Visa (i.e. CISP), MasterCard, and American Express.

An embodiment of the invention allows for the merchant-specific configuration of a POS device [FIG. 1: Removable Flash Enabled POS Device] to be backed up onto [FIG. 1: Removable Flash Memory] and restored onto another identical POS device.

An embodiment of the invention allows for an independent audit or sampling of POS transactions from [FIG. 1: Removable Flash Enabled POS Device] onto [FIG. 1: Removable Flash Memory] for use by internal or external auditors as part of Sarbanes Oxley or related internal control requirements.

An embodiment of the invention provides a mechanism for capturing signatures and receipts from the POS device [FIG. 1: Removable Flash Enabled POS Device] onto [FIG. 1: Removable Flash Memory] which can be later transferred to [FIG. 1: Personal Computer] or [FIG. 1: File Server] and used for customer service, charge-back research and other related value-add purposes.

An embodiment of the invention provides a mechanism for capturing check images and check data from [FIG. 1: Removable Flash Enabled POS Device] and storing this information onto [FIG. 1: Removable Flash Memory] formatted in compliance with Check21 and, or NACHA's ARC requirements. This data can subsequently be transferred to [FIG. 1: Personal Computer] or [FIG. 1: File Server] or [FIG. 1: Host] and used for financial transaction fulfillment, clearing other related purposes.

An embodiment of the invention provides a mechanism for storing and retrieving HTML and similar presentation content on the [FIG. 1: Removable Flash Memory] as required to format screens on [FIG. 1: Removable Flash Enabled POS Device].

An embodiment of the invention provides a means to store onto the [FIG. 1: Removable Flash Memory] and display marketing presentations such as flash or video presentations on the screen of the POS device [FIG. 1: Removable Flash Enabled POS Device].

An embodiment of the invention provides a means to conduct customer surveys on [FIG. 1: Removable Flash Enabled POS Device] and collect and store survey results on [FIG. 1: Removable Flash Memory]. This data can subsequently be transferred to [FIG. 1: Personal Computer] or [FIG. 1: File Server] or [FIG. 1: Host] and used for customer service other related purposes.

An embodiment of the invention provides a means of storing product catalogs, inventory levels and pricing on [FIG. 1: Removable Flash Memory] or [FIG. 2: Removable Flash

US 7,464,862 B2

5

Memory] to allow customers to shop at the POS terminal [FIG. 2: Removable Flash Enabled POS Device] while in an offline mode. This inventory data can subsequently be transferred to [FIG. 1: Personal Computer] or [FIG. 1: File Server] or [FIG. 1: Host] and used for updating central inventory, re-order and other related purposes.

An embodiment of the invention allows for local "stand-in" processing using data, logic and rules contained within the [FIG. 2: Removable Flash Memory] to authorize transactions when the host is down in lieu of (or in addition to) traditional voice authorizations. In connection with this embodiment, the locally authorized transactions would be uploaded to the host [FIG. 1: Host Processor] automatically whenever the online connection is restored.

An embodiment of the present invention provides a means of storing onto [FIG. 1: Removable Flash Memory] and dispensing coupons from [FIG. 1: Removable Flash Enabled POS Device] to customers in order to encourage repeat sales and to calculate discounts on sale items for qualifying customers.

An embodiment of the invention allows for music and games to be stored on to [FIG. 1: Removable Flash Memory] and played through the POS device [FIG. 1: Removable Flash Enabled POS Device].

An embodiment of the invention allows for the configuration of a virtual private network (VPN) or similar secure network over the [FIG. 1: Dial-up, Wireless or High-speed Internet connection to Host] to facilitate authentication to the network's processor [FIG. 1: Host Processor]. This embodiment also supports other advanced security mechanisms which otherwise would not be supportable by the POS device. In connection with this embodiment, a secure token, digital certificate, encryption key or other unique identifier is permanently stored on the non-volatile memory device [FIG. 1: Removable Flash Memory] and released to the payment network to authenticate each session and, or transaction.

An embodiment of the invention facilitates the transfer (such as downloading from the internet or a wireless network) of large files (such as but not limited to: inventory levels, pricing, negative card files, bin tables, music, games, marketing presentations, etc.) through the connection POS device [FIG. 1: Removable Flash Enabled POS Device] over high-speed connections [FIG. 1: Dial-up, Wireless, or High-speed internet connection to Host Processor] and stored directly onto [FIG. 1: Removable Flash Memory].

An embodiment of the current invention would allow the POS device to route payment or non-payment transactions based on bin tables (and related rules) that are stored on the removable device. In connection with this embodiment, these bin tables would be updated periodically thought a connection such as [FIG. 1: Dial-up, Wireless, or High-speed internet connection to Host Processor] or via CD ROM.

An embodiment of the invention integrates a Personal Computer with a POS device for merchant or home users. Connectivity would be provided to the non-volatile flash memory [FIG. 1: Removable Flash Memory] to create an interoperable application that fully leverages the capabilities of the PC [FIG. 1: PC]. In connection with this embodiment, a merchant or consumer will be able to initiate a card-centric (swipe and signature/or pin-based) financial transaction from their home or business using the [FIG. 1: Removable Flash Memory] and without the need for a separate POS device. This embodiment also creates a potentially huge new market for accepting secure payment transactions from millions of existing and future PCs.

An embodiment of the invention would allow consumer credit card, pre-paid card, gift card, and other related personal

6

account information to be securely stored on a consumer's personal non-volatile memory device (such as a USB flash memory device) [FIG. 1: Removable USB Flash Memory] and accessed by the POS terminal [FIG. 1: Removable Flash Enabled POS Device] when inserted into the POS terminal or via RFID. This embodiment would therefore replace the need for the consumer to provide a magnetic-stripe, smart-card or other card-centric payment device.

Having thus described the invention in detail, it should be apparent that various modifications and changes may be made without departing from the spirit and scope of the present invention. Consequently, these and other modifications are contemplated to be within the spirit and scope of the following claims.

I claim:

1. An apparatus for extending the capability of a POS Device including:

   a. a portable housing;

   b. non-volatile memory within the housing;

   c. an interface on the housing for communication between the non-volatile memory and the POS device; and

   d. a software application in the non-volatile memory comprising a series of programs designed to perform specific functions;

   e. a data repository in the non-volatile memory to store required data to support software functions; wherein

   the software application can function as a key which will serve to unlock the POS device when connected and lock the device when unconnected.

2. The apparatus as further defined in claim 1, that can serve as an access control mechanism to authenticate approved users when initially connected based on a combination of information stored and released from the apparatus in combination with secret information that is entered by the user.

3. The apparatus as defined in claim 2, that can serve as an operational control mechanism to limit the functions that can be performed by authenticated users based on each approved user's profile that is stored and retrieved from the apparatus.

4. The apparatus as defined in claim 1, that can store and release security related data that will serve to authenticate the communication session between a POS device and a host payment processor.

5. The apparatus as defined in claim 1, that can store and release data that will serve to authenticate each transaction with a host payment processor.

6. The apparatus as defined in claim 1, that can read a file containing lost, stolen, or fraudulent and cancelled gift card, credit card, and debit card numbers and prevent the use of these cards without being connected to a host-based process.

7. The apparatus as defined in claim 1, that can authorize and store payment transactions without being connected to a host-based process and later upload these transactions to a host upon connection.

8. An apparatus for extending the capability of a PC including:

   a. a portable housing;

   b. non-volatile memory within the housing;

   c. an interface on the housing for communication between the non-volatile memory and the PC; and

   d. a software application in the non-volatile memory comprising a series of programs designed to perform specific functions;

   e. a data repository in the non-volatile memory to store all required data to support software functions; wherein

   the software application can function as a key which will serve to unlock the PC when connected and lock the PC when unconnected.

US 7,464,862 B2

7

9. The apparatus as further defined in claim 8, that can serve as an access control mechanism to authenticate approved users when initially connected based on a combination of information stored and released from the apparatus in combination with secret information that is entered by the user.

10. The apparatus as defined in claim 9, that can serve as an operational control mechanism to limit the functions that can be performed by authenticated users based on each approved user's profile that is stored and retrieved from the apparatus.

11. The apparatus as defined in claim 8, that can store and release security related data that will serve to authenticate the communication session between a PC and a host payment processor.

8

12. The apparatus as defined in claim 8, that can store and release data that will serve to authenticate each transaction with a host payment processor.

13. The apparatus as defined in claim 8, that can read a file containing lost, stolen, or fraudulent and cancelled gift card, credit card, and debit card numbers and prevent the use of these cards without being connected to a host-based process.

14. The apparatus as defined in claim 8, that can authorize and store payment transactions without being connected to a host-based process and later upload these transactions to a host upon connection.

*  *  *  *  *

# EXHIBIT 6

US008352584B2

## (12) United States Patent
### Franklin

(10) **Patent No.:**     **US 8,352,584 B2**

(45) **Date of Patent:**     *Jan. 8, 2013

(54) **SYSTEM FOR HOSTING CUSTOMIZED COMPUTING CLUSTERS**

(75) Inventor: **Jeffrey B. Franklin**, Louisville, CO (US)

(73) Assignee: **Light Refracture Ltd., LLC**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/894,664**

(22) Filed: **Sep. 30, 2010**

(65) **Prior Publication Data**

US 2011/0023104 A1     Jan. 27, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/927,921, filed on Oct. 30, 2007, now Pat. No. 7,822,841.

(51) **Int. Cl.**
**G06F 15/16**     (2006.01)
**G06F 15/173**     (2006.01)
**G06F 15/177**     (2006.01)

(52) **U.S. Cl.** .......... **709/223**; 713/153; 719/311; 726/11; 726/12; 709/224

(58) **Field of Classification Search** .................. 709/223, 709/224; 713/153; 719/311; 726/12, 11
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,731,860 A | 3/1988 | Wahl | |
| 4,837,831 A | 6/1989 | Gillick et al. | |
| 5,079,765 A | 1/1992 | Nakamura | |
| 5,185,860 A | 2/1993 | Wu | |
| 5,224,205 A | 6/1993 | Dinkin et al. | |
| 5,371,852 A | 12/1994 | Attanasio et al. | |
| 5,649,141 A | 7/1997 | Yamazaki | |
| 5,694,615 A | 12/1997 | Thapar et al. | |

(Continued)

#### FOREIGN PATENT DOCUMENTS

WO     2009058642     5/2009

#### OTHER PUBLICATIONS

Lee, Dong Woo, et al., "visPerf: Monitoring Tool for Grid Computing" In Proceedings of the International Conference on Computational Science 2003 (LNCS vol. 2659/2003), Dec. 31, 2003.

(Continued)

*Primary Examiner* — Haresh N Patel

(74) *Attorney, Agent, or Firm* — Stolowitz Ford Cowger LLP

(57)     **ABSTRACT**

A computer system for hosting computing clusters for clients. The system includes clusters each including a set of computing resources and each implemented in custom or differing configurations. Each of the configurations provides a customized computing environment for performing particular client tasks. The configurations may differ due to configuration of the processing nodes, the data storage, or the private cluster network or its connections. The system includes a monitoring system that monitors the clusters for operational problems on a cluster level and also on a per-node basis such as with monitors provided for each node. The system controls client access to the clusters via a public communications by only allowing clients to access their assigned cluster or the cluster configured per their specifications and performing their computing task. Gateway mechanisms isolate each cluster such that communications within a cluster or on a private cluster communications network are maintained separate.

**13 Claims, 7 Drawing Sheets**



## US 8,352,584 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,774,650 | A | 6/1998 | Chapman et al. |
| 5,822,531 | A | 10/1998 | Gorczyca et al. |
| 5,890,007 | A | 3/1999 | Zinguuzi |
| 5,946,463 | A | 8/1999 | Carr et al. |
| 6,088,727 | A | 7/2000 | Hosokawa et al. |
| 6,363,495 | B1 | 3/2002 | MacKenzie et al. |
| 6,427,209 | B1 | 7/2002 | Brezak, Jr. et al. |
| 6,438,705 | B1 | 8/2002 | Chao et al. |
| 6,748,429 | B1 | 6/2004 | Talluri et al. |
| 6,779,039 | B1 | 8/2004 | Bommareddy et al. |
| 6,823,452 | B1 | 11/2004 | Doyle et al. |
| 6,826,568 | B2 | 11/2004 | Bernstein et al. |
| 6,854,069 | B2 | 2/2005 | Kampe et al. |
| 6,990,602 | B1 | 1/2006 | Skinner et al. |
| 6,996,502 | B2 * | 2/2006 | De La Cruz et al. .......... 702/188 |
| 7,035,858 | B2 | 4/2006 | Dinker et al. |
| 7,185,076 | B1 | 2/2007 | Novacs et al. |
| 7,188,171 | B2 | 3/2007 | Srinivasan et al. |
| 7,203,864 | B2 | 4/2007 | Goin et al. |
| 7,243,368 | B2 | 7/2007 | Ford |
| 7,246,256 | B2 | 7/2007 | De La Cruz |
| 7,269,762 | B2 | 9/2007 | Heckmann et al. |
| 7,634,683 | B2 | 12/2009 | De La Cruz |
| 7,822,841 | B2 * | 10/2010 | Franklin ...................... 709/223 |
| 2005/0039180 | A1 | 2/2005 | Fultheim |
| 2005/0060391 | A1 | 3/2005 | Kaminsky et al. |
| 2005/0108425 | A1 * | 5/2005 | Rabinovitch .................. 709/238 |
| 2005/0108518 | A1 * | 5/2005 | Pandya ........................ 713/151 |
| 2005/0159927 | A1 | 7/2005 | Cruz et al. |
| 2005/0172161 | A1 | 8/2005 | Cruz et al. |
| 2005/0228906 | A1 * | 10/2005 | Kubota ........................... 710/1 |
| 2005/0235055 | A1 * | 10/2005 | Davidson ...................... 709/223 |
| 2005/0251567 | A1 * | 11/2005 | Ballew et al. ................ 709/223 |
| 2006/0080323 | A1 | 4/2006 | Wong et al. |
| 2006/0085785 | A1 | 4/2006 | Garrett |
| 2006/0143350 | A1 * | 6/2006 | Miloushev et al. ........... 710/242 |
| 2006/0190602 | A1 | 8/2006 | Canali et al. |
| 2006/0212332 | A1 | 9/2006 | Jackson |
| 2006/0212334 | A1 | 9/2006 | Jackson |
| 2006/0230149 | A1 | 10/2006 | Jackson |
| 2006/0248371 | A1 | 11/2006 | Chen et al. |
| 2007/0028244 | A1 * | 2/2007 | Landis et al. ................. 718/108 |
| 2007/0061441 | A1 * | 3/2007 | Landis et al. ................. 709/224 |
| 2007/0067435 | A1 * | 3/2007 | Landis et al. ................. 709/224 |
| 2007/0067481 | A1 * | 3/2007 | Sharma et al. ............... 709/231 |
| 2007/0156677 | A1 | 7/2007 | Szabo |
| 2007/0156813 | A1 | 7/2007 | Galvez et al. |
| 2007/0220152 | A1 | 9/2007 | Jackson |
| 2007/0245167 | A1 | 10/2007 | De La Cruz et al. |
| 2008/0043769 | A1 | 2/2008 | Hirai |
| 2008/0070550 | A1 * | 3/2008 | Hose ............................ 455/411 |
| 2008/0086523 | A1 * | 4/2008 | Afergan et al. ............... 709/202 |
| 2008/0086524 | A1 * | 4/2008 | Afergan et al. ............... 709/202 |
| 2008/0092058 | A1 * | 4/2008 | Afergan et al. ............... 715/745 |
| 2008/0120403 | A1 * | 5/2008 | Lowery et al. ............... 709/223 |
| 2008/0177690 | A1 * | 7/2008 | Vescovi et al. ................. 706/48 |
| 2008/0216081 | A1 | 9/2008 | Jackson |
| 2009/0019535 | A1 * | 1/2009 | Mishra et al. ................... 726/12 |
| 2010/0023949 | A1 * | 1/2010 | Jackson ........................ 718/104 |

### OTHER PUBLICATIONS

Peng, Liang, et al., "Performance Evaluation in Computational Grid Environments" Proceedings of the Seventh International Conference on High Performance Computing and Grid in Asia Pacific Region (HPCAsia '04) 2003 (LNCS vol. 2659/2003) Dec. 31.

International Search Report May 25, 2009, PCT/US2008/080876.

G.A. Koenig et al.; "Cluster Security with NVisionCC: Process Monitoring by Levering Emergent Properties"; http://ieeexplore. ieee/org/xpl/freeabs_all.jsp?arnumber=155853; Dec. 19, 2005.

William Yurcik et al.; "NVisionCC: A Visualization Framework for High Performance Cluster Security"; http://dl.acm.org/citation. cfm?id-1029230; Dec. 31, 2004.

International Bureau of WIPO; International Preliminary Report on Patentability and Written Opinion, PCT/US2008/080876; May 4, 2010 and May 22, 2010; 9 pages.

Stolowitz Ford Cowger LLP; Related Case Listing; Feb. 10, 2012; 1 Page.

* cited by examiner

Case 2:25-cv-02956-BCL-tmp    Document 13-2    Filed 02/10/26    Page 395 of 404
PageID 775



FIG.1

Case 2:25-cv-02956-BCL-tmp    Document 13-2    Filed 02/10/26    Page 396 of 404
PageID 776



FIG.2

Case 2:25-cv-02956-BCL-tmp    Document 13-2    Filed 02/10/26    Page 397 of 404
PageID 777



FIG.3A

Case 2:25-cv-02956-BCL-tmp    Document 13-2    Filed 02/10/26    Page 398 of 404
PageID 778



FIG.3B



FIG.3C

Case 2:25-cv-02956-BCL-tmp    Document 13-2    Filed 02/10/26    Page 400 of 404
PageID 780



FIG.4



FIG.5

US 8,352,584 B2

**1**

# SYSTEM FOR HOSTING CUSTOMIZED COMPUTING CLUSTERS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 11/927,921, now U.S. Pat. No. 7,822,841, filed Oct. 30, 2007, which is incorporated herein by reference in its entirety.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates, in general, to distributed computing and clustered computing environments, and, more particularly, to computer software, hardware, and computer-based methods for hosting a set of computer clusters that are uniquely configured or customized to suit a number of remote customers or clients.

2. Relevant Background.

A growing trend in the field of distributed computing is to use two or more computing resources to perform computing tasks. These grouped resources are often labeled clustered computing environments or computing clusters or simply "clusters." A cluster may include a computer or processors, network or communication links for transferring data among the grouped resources, data storage, and other devices to perform one or more assigned computing processes or tasks. The clusters may be configured for high availability, for higher performance, or to suit other functional parameters. In a typical arrangement, a portion of a company's data center may be arranged and configured to operate as a cluster to perform one task or support the needs of a division or portion of the company. While a company may benefit from use of a cluster periodically on an ongoing basis, there are a number of reasons why it is often undesirable for a company to own and maintain a cluster.

As one example, High Performance Computing (HPC) clusters are difficult to setup, configure, and manage. An HPC cluster also requires numerous resources for ongoing maintenance that increases the cost and manpower associated with cluster ownership. Despite these issues, a company may require or at least demand HPC clusters (or other cluster types) to solve large problems that would take an inordinate amount of time to solve with a single computer. The need for HPC and other cluster types is in part due to the fact that processor speeds have stagnated over the past few years. As a result, many companies and other organizations now turn to HPC clusters because their problems cannot be solved more rapidly by simply purchasing a faster processor. These computer users are placed in the difficult position of weighing the benefits of HPC clusters against the resources consumed by owning such clusters. Decision makers often solve this dilemma by not purchasing clusters, and clusters have remained out of reach of some clients as the resource issues appear insurmountable.

When utilized, HPC systems allow a set of computers to work together to solve a single problem. The large problem is broken down into smaller independent tasks that are assigned to individual computers in the cluster allowing the large problem to be solved faster. Assigning the independent tasks to the computer is often the responsibility of a single node in the cluster designated the master node. The responsibilities of the master node include assigning tasks to nodes, keeping track of which nodes are working on which tasks, and consolidating the results from the individual nodes. The master node is

**2**

also responsible for determining if a node fails and assigning the task of the failed node to another node to ensure that node failures are handled transparently. Communication between nodes is accomplished through a message passing mechanism implemented by every member of the cluster. Message passing allows the individual computers to share information about their status on solving their piece of the problem and return results to the master node. Currently, those who determine a cluster is worth the drain on resources purchase a cluster, host the cluster, and manage it on their premises or on site.

Unfortunately, while the number of tasks and computing situations that would benefit from HPC clusters continues to rapidly grow, HPC clusters are not being widely adopted. In part, this is because HPC clusters require the most computers of any cluster type and, thus, cause the most problems with maintenance and management. Other types of clusters that have been more widely adopted include the "load balancing cluster" and the "high availability cluster," but resources are also an issue with these clusters. A load balancing cluster is a configuration in which a server sends small individual tasks to a cluster of additional servers when it is overloaded. The high availability cluster is a configuration in which a first server watches a second server and if the second server fails, then the first server takes over the function of the second server.

The multi-cluster subsumes all other classes of clusters because it incorporates multiple clusters to perform tasks. The difficulties for managing clusters are amplified when considering multiple clusters because of their complexity. For example, if one HPC cluster consumes a set of resources, then multiple HPC clusters will, of course, consume a much larger set of resources and be even more expensive to maintain. One method proposed for managing multiple high availability clusters is described in U.S. Pat. No. 6,438,705, but this method is specific only to the managing of high availability clusters. Further, the described method requires each cluster to have a uniform design. Because it is limited to high availability clusters, the owner would not have an option to incorporate multiple cluster types, such as HPC or load-balancing clusters, within the managed multi-cluster. Additionally, the suggested method does not solve one of the fundamental difficulties associated with cluster usage because it requires the cluster to be owned and operated by the user and to remain on the client's property or site. Other discussions of cluster management, such as those found in U.S. Pat. Nos. 6,748,429, 5,371,852, and 5,946,463 generally describe a single cluster configuration and do not relate to operating multi-clusters. In all of these cases, the burden of managing, monitoring, and hosting the cluster remains with the user of the cluster who owns the cluster who must maintain the cluster on their premises.

Hence, there remains a need for systems and methods for providing clusters to users or "clients" such as companies and other organizations that provide the computational assets or power that the clients demand while not presenting an unacceptable burden on the clients' resources. Preferably, these systems and methods would be effective in providing a cluster that is adapted to suit a particular need or computing task rather than forcing a one-size-fits-all solution upon a cluster user.

## SUMMARY OF THE INVENTION

To address the above and other problems, the present invention provides methods and systems for hosting a plurality of clusters that are each configured for a particular task or computing application presented by a user or client. In par-

US 8,352,584 B2

| 3 | 4 |

ticular, the present invention provides for configuration, access control, and monitoring of multiple customized clusters that are hosted for one or more remote clients. For example, system or cluster configuration data may be generated for a cluster based on input from a client or user regarding their computing needs and planned tasks, and this configuration data may be used to configure a cluster particularly for that client. The customized cluster is then hosted at a central hosting facility and is made accessible to that client, such as via a public network such as the Internet.

More particularly, a computer system or network is provided for hosting computing clusters for clients or customers (such as businesses and organizations that desire a cluster but do not want to own, operate, and maintain one on their premises). The system includes a first cluster including a set of computing resources such as processing nodes, data storage, and a private communications network that is arranged or implemented in a first configuration. The system also includes a second cluster having a set of computing resources in a second configuration, which differs from the first configuration (e.g., both may be HPC clusters but be configured to handle a different client-assigned or defined task). The first configuration provides a first computing environment for performing a first client task while the second configuration provides a second computing environment for performing a second client task (which typically will differ from the first client task). The first and second configurations may differ due to configuration of the processing nodes in the clusters, based on configuration of the data storage, based on the private communications network or its connections, or based on software modules provided on the nodes, or based on other hardware or software components and/or configurations.

The system may further include a monitoring system that monitors the clusters for connectivity and availability or other operational problems on a cluster level and, typically, on a per-node basis (such as with monitors provided for each node) and issues alerts to operations and/or maintenance personnel based on identified issues. The system also provides clients or client systems access to the clusters via a public communications network that is linked, such as via a firewall, to a private company network to which the clusters are linked, such as via a gateway mechanism. The system is adapted to control access of the clients to the clusters such that a client can only access particular ones of the clusters (e.g., the cluster that has been configured according to their specifications or computing parameters or to perform their computing tasks). For example, the firewall mechanism may act to determine which cluster a client is attempting to access and then to determine whether the requesting client has permission or authorization to access that cluster. The gateway mechanisms operate, in part, to isolate each cluster such that communications within a cluster such as on the private cluster communications network are separated (e.g., do not have to share bandwidth of a single system network).

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates a multi-cluster system available prior to the invention;

FIG. 2 is a functional block diagram illustrating a hosted cluster system of one embodiment of the invention;

FIGS. 3A-3C illustrate three representative embodiments of clusters that are configured to provide customization to suit a particular task or computing application (e.g., to meet the particular needs of a requesting customer);

FIG. 4 illustrates another embodiment of a hosted cluster system of the invention in which dedicated firewall and authentication mechanisms or systems are provided for each cluster; and

FIG. 5 is a flow diagram representing a monitoring process implemented in a hosted cluster system in one embodiment of the invention for monitoring operation of multiple, customized clusters.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention is directed to methods and systems for hosting multiple clusters or clustered computing environments such that each of the clusters is configured to match or address a particular client or user computing task or problem (e.g., in response to a request for a hosted cluster from a client that identifies their computing and associated requirements). The cluster systems of the invention differ from prior clusters in part because they are physically provided at one or more locations that are remote from the processing user or client's facilities (i.e., the computing resources are not owned and operated by the user). The client may establish processing parameters that are used to configure a cluster in the system in a manner that suits their needs and, then, access their hosted cluster from a remote location via a communications network such as the Internet or other network.

The hosted cluster systems and hosting methods of the invention are described herein in relation to three issues associated with hosting multiple customized clusters that were identified by the inventor. Particularly, the systems and methods of the invention address issues associated with arranging the clusters in a consistent and useful manner and of controlling client access to the clusters. Additionally, the systems and methods address issues involved with monitoring the individual cluster components. Examples of solutions to each of these problems are described in the embodiments shown in FIGS. 2-5.

It will be clear from the following description that the managed and hosted clusters of the various embodiments can be used to give a client control over the design and configuration of a cluster while removing the impediments required by traditional clusters consuming the client's real-estate and requiring nearly constant maintenance. Additionally, the hosting options presented with the hosting methods and hosted cluster systems relieve the client of many burdens and opens up future potential avenues for cluster usage. Furthermore, the hosted multi-clusters have the following additional advantages. Providing a hosted cluster to a client does not lock the client into using any one vendor for cluster computing parts because the cluster components can be from any vendor and can be modified and replaced as appropriate to support client needs. Hosted clusters allow for easily expandable clusters since each cluster is isolated or is maintained as a standalone unit in communication with a network for communications with a corresponding client and monitoring equipment and/or software modules. It provides for constant monitoring of the cluster because each cluster is hosted and managed.

Before the invention, the use of multiple cluster systems was known, but these multi-cluster systems were typically limited in ways that hindered their use and adoption. For example, prior multi-cluster computing systems were limited to systems owned and operated by a single user (e.g., to being located upon the owner's facilities), limited to a single configuration such as all clusters being a particular configuration to support a similar processing task, limited to a particular

US 8,352,584 B2

5

type such as all being high availability, or otherwise limited in their function and/or configuration. For example, one prior multi-cluster system having high availability clusters is described in U.S. Pat. No. 6,438,705 and is illustrated in FIG. 1. In this diagram, several clusters are shown that each consist of a primary node 100 and a secondary cluster node 101 connected to a primary storage system 110 and secondary storage system 111. As discussed above, this cluster system design requires each cluster to have a uniform design with like hardware and software. The described cluster system limits or even prevents the ability to have multiple cluster types (such as a HPC cluster and a load balancing or high availability cluster) within a single managed multi-cluster. In the patent description, the cluster system is also restricted to high availability clusters and not applicable to other cluster types such as HPC or load balancing. Significantly, this system also does not solve the fundamental difficulties associated with prior cluster systems, i.e., the clients are required to host and manage the clusters that are located on their site or in their facilities.

In FIG. 2, one preferred embodiment of a hosted cluster system 200 is illustrated such as it may be provided at a hosting facility typically remote from users or clients (i.e., from their accessing nodes or systems 208). The system 200 has, or is connected to, a public network 204 (e.g., a wired and/or wireless digital communications network including the Internet, a LAN, a WAN, or the like), which in turn is connected to a firewall and authentication system 210. The authentication system 210 connects to the company network 230, which has a monitoring system 220 for all the customized clusters 250, 251, 252. The company network 230 also has gateways 240, 241, 242, such as routers, to each unique cluster 250, 251, 252. On the other side of each gateway 240, 241, 242 is a private network 300, 301, 302 for the individual clusters 250, 251, 252.

The embodiment shown with system 200 provides efficient separation of the individual cluster network traffic to prevent one cluster from interfering with other clusters. The traffic separation is achieved through the gateway 240, 241, and/or 242 located between each cluster 250, 251, and 252 and the company network 230. Each gateway 240, 241, 242 is configured with software and hardware to apply a standard set of rules to only permit traffic destined for its corresponding cluster to pass through from the company network 230 while keeping all cluster traffic internal to the cluster. With this cluster separation, the internal cluster configuration is abstracted from the primary company network 230 allowing the configuration of each cluster to be selected and maintained independently from the other clusters on the network 230. By keeping all clusters 250, 251, 252 connected to a common network 230 through the gateways 240, 241, 242, it is significantly easier to administer the many individual clusters and it also gives the clusters 240, 241, 242 a common destination for any monitoring information (e.g., to monitoring system 220 via common network 230).

Access control to the individual clusters 250, 251, 252 is governed by the firewall and authentication mechanism 210. This mechanism 210 may be implemented with several configurations to achieve the goal of ensuring that clients have access to their cluster, and only to their cluster. Each of these configurations performs two primary steps: (1) ensuring that an incoming connection goes to the correct Cluster and (2) ensuring that the incoming user has access to that cluster (e.g., that a client or customer operating a client node or system 208 attempting a communication or connection with their cluster is directed to the proper one of the clusters 250, 251, or 252

6

and that the system 208 or, more typically, the user of the system 208 has access to that particular cluster 250, 251, or 252).

One useful configuration of the system 200 and mechanism 210 is to give each cluster 250, 251, 252 its own public address. This enables the firewall portion of mechanism 210 to know that all incoming connections to that specific public address are sent to a node (not shown in FIG. 2) on a particular cluster 250, 251, 252. Once the client system 208 is connected to a node on a cluster 250, 251, or 252, that node is then responsible for user authentication to grant access (e.g., a node is provided within each cluster 250, 251, 252 that has the proper software and/or hardware to authenticate accessing users). Another configuration of the system 200 and mechanism 210 is to have each client 210 connect to a different service on the firewall 210, such as a TCP/IP port. The firewall 210 will then know which services are for which clusters out of the many clusters 250, 251, 252 on the network 230. It is then able to route the connection to a node on the desired cluster 250, 251, or 252 to perform user authentication. Another configuration for system 200 and mechanism 210 is for client system 208 to connect to a common service on the firewall 210 and have the firewall 210 authenticate the user. This configuration requires the firewall 210 to setup a special user environment on the firewall 210 that will only allow the user of the system 208 to communicate with their cluster 250, 251, or 252 and no other clusters. This is accomplished through common virtual machine technology. All of these possible configurations can co-exist together and are not mutually exclusive. Many other configurations exist that provide per-cluster and per-user authentication, and the above-described configurations for the system 200 and mechanism 210 are merely provided as examples.

Significantly, each individual cluster 250, 251, 252 can have any configuration requested by the client of that cluster. For example, companies or organizations may face differing computing challenges and have different needs for a cluster, and the system 200 is intended to represent generally a hosted cluster system 200 in which a plurality of clusters 250, 251, 252 are provided for access by client systems 208 via public network 204 (or another network). Hence, the clusters 250, 251, 252 are located remotely from the customer or user's facilities or sites (e.g., the system 200 excluding the client remote systems 208 and all or portions of the network 204 may be located at a hosting facility or facilities) and are not typically owned by the customer or user but instead are provided on an as-needed basis from an operator of the system 200 (such as by leasing use of a cluster 250, 251, or 252). As a result the customer or user is not required to operate and maintain a data center filled with clusters. Further, in contrast to prior practice, each of the clusters 250, 251, 252 is independent and can be configured to suit the needs of the user or customer. For example, each of the cluster users or clients may need a cluster to perform a particular and differing task. Previously, a data center would be provided with clusters of a particular configuration, and the task would be performed by that configured cluster.

In contrast, the system 200 is adapted such that each of the clusters 250, 251, 252 may have a differing configuration with such configuration being dynamically established in response to a user or customer's request so as to be better suited to perform their task. For example, the task may be handled better with a cluster configuration designed to provide enhanced processing or enhanced data storage. In other cases, the task may best be served with a cluster configured for very low latency or a cluster with increased bandwidth for communications between nodes and/or accessing storage.