## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| **FIRST HORIZON BANK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. Civil Action No. 2:25-cv-02956** |
| ) | |
| **INTELLECTUAL VENTURES** ) | **JURY DEMAND** |
| **MANAGEMENT, LLC, INTELLECTUAL** ) | |
| **VENTURES I LLC, INTELLECTUAL** ) | |
| **VENTURES II LLC, CALLAHAN** ) | |
| **CELLULAR L.L.C., OL SECURITY** ) | |
| **LIMITED LIABILITY COMPANY,** ) | |
| **INVENTION INVESTMENT FUND I,** ) | |
| **L.P., and INVENTION INVESTMENT** ) | |
| **FUND II, LLC** ) | |
| ) | |
| **Defendants.** ) | |

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

COMES NOW Plaintiff First Horizon Bank ("First Horizon" or "Plaintiff") and for its

Amended Complaint against Defendants Intellectual Ventures Management, LLC ("Intellectual

Ventures Management"), Intellectual Ventures I LLC ("Intellectual Ventures I"), Intellectual

Ventures II LLC ("Intellectual Ventures II"), Callahan Cellular L.L.C. ("Callahan Cellular"), OL

Security Limited Liability Company ("OL Security"), Invention Investment Fund I, L.P. ("Fund

I"), and Invention Investment Fund II, LLC ("Fund 2") (collectively, "Defendants") states the

following:

### I. NATURE OF THE ACTION

1.      This is an action for a declaratory judgment that First Horizon does not infringe

United States Patent Number 7,949,785; United States Patent Number 8,332,844; United States

Patent Number 8,407,722; United States Patent Number 10,567,391; United States Patent Number 7,464,862; United States Patent Number 8,352,584; United States Patent Number 9,678,967; and United States Patent Number RE48,894 (collectively, the "Patents-in-Suit") and that at least the asserted claims of the Patents-in-Suit are invalid.

## II. THE PARTIES

2.      First Horizon is a banking corporation organized and existing under the laws of the State of Tennessee and having its principal place of business located at 165 Madison Ave, Memphis, Tennessee 38103. First Horizon provides banking and financial-related products and services to its customers, including products and services concerning secure payment processing and point-of-sale transactions. First Horizon Bank is the successor by conversion to First Tennessee Bank National Association, a national banking association.

3.      Upon information and belief, Defendant Intellectual Ventures Management is a limited liability company formed under the laws of the State of Washington and having its principal place of business located at 14360 SE Eastgate Way, Bellevue, Washington 98007. The registered agent for service of process for Defendant Intellectual Ventures Management is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

4.      Upon information and belief, Defendant Intellectual Ventures I is a limited liability company formed under the laws of the State of Delaware and having its principal place of business located at 14360 SE Eastgate Way, Bellevue, Washington 98007. The registered agent for service of process for Defendant Intellectual Ventures I is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

2

5.      Upon information and belief, Defendant Intellectual Ventures II is a limited liability company formed under the laws of the State of Delaware and having its principal place of business located at 14360 SE Eastgate Way, Bellevue, Washington 98007. The registered agent for service of process for Defendant Intellectual Ventures II is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

6.      Upon information and belief, Defendant Callahan Cellular is a limited liability company formed under the laws of the State of Delaware and having its principal place of business located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. The registered agent for service of process for Defendant Callahan Cellular is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

7.      Upon information and belief, Defendant OL Security is a limited liability company formed under the laws of the State of Delaware and having its principal place of business located at 160 Greentree Drive, Suite 101, Dover, Delaware 19904. The registered agent for service of process for Defendant OL Security is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

8.      Upon information and belief, Defendant Fund I is a limited partnership formed under the law of the State of Delaware and having its principal place of business located at 14360 SE Eastgate Way, Bellevue, Washington 98007. The registered agent for service of process for Defendant Fund I is the Corporation Service Company having an address of 251 Little Falls Drive, Wilmington, Delaware 19808.

9.      Upon information and belief, Defendant Fund II is a limited liability company formed under the law of the State of Delaware and having its principal place of business located at 14360 SE Eastgate Way, Bellevue, Washington 98007. The registered agent for service of

3

process for Defendant Fund II is The Corporation Trust Company having an address of Corporation Trust Center 1209 Orange St, Wilmington, Delaware 19801.

### III. THE PATENTS

#### A. U.S. Patent No. 7,949,785

10. United States Patent Application No. 10/403,818, entitled SECURE VIRTUAL COMMUNITY NETWORK SYSTEM and naming Hasan S. Alkhatib, Fouad A. Tobagi, and Farid F. Elwailly as the inventors, was filed on March 31, 2003, and issued on May 24, 2011, as U.S. Patent No. 7,949,785. A true and correct copy of the '785 Patent is attached hereto as Exhibit 1.

11. Upon information and belief, Defendant Intellectual Ventures I is the assignee of the '785 Patent and has the right to enforce the '785 Patent.

#### B. U.S. Patent No. 8,332,844

12. United States Patent Application No. 11/709,477, entitled ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT and naming Pradip Kulkarni, Mukul Kumar, Adhir Potdar, Richard Au, and Tung Nguyen as inventors, was filed on February 21, 2007, and issued on December 11, 2012, as U.S. Patent No. 8,332,844. A true and correct copy of the '844 Patent is attached hereto as Exhibit 2.

13. Upon information and belief, Defendant Intellectual Ventures II is the assignee of the '844 Patent and has the right to enforce the '844 Patent.

14. On or about April 30, 2025, Unified Patents, LLC submitted a Request for *Ex Parte* Reexamination of claims 1-27 of the '844 Patent, and on or about July 22, 2025, the United States

4

Patent and Trademark Office granted the Request for *Ex Parte* Reexamination.  As of the filing date of this Amended Complaint, that *Ex Parte* Reexamination proceeding is ongoing.

### C.  U.S. Patent No. 8,407,722

15.     United States Patent Application No. 11/396,251, entitled ASYNCHRONOUS MESSAGING USING A NODE SPECIALIZATION ARCHITECTURE IN THE DYNAMIC ROUTING NETWORK and naming Timothy Tuttle and Karl E. Rumelhart as the inventors was filed on March 30, 2006, and issued on March 26, 2013 as U.S. Patent No. 8,407,722.  A true and correct copy of the '722 Patent is attached hereto as Exhibit 3.

16.     Upon information and belief, Defendant Intellectual Ventures I is the assignee of the '722 Patent and has the right to enforce the '722 Patent.

### D.  U.S. Patent No. 10,567,391

17.     The '391 Patent, entitled GRADUATED AUTHENTICATION IN AN IDENTITY MANAGEMENT SYSTEM and naming Dick C. Hardt as the inventor was filed on May 20, 2019, and issued on February 18, 2020 as U.S. Patent No. 10,567,391. A true and correct copy of the '391 Patent is attached hereto as Exhibit 4.

18.     Upon information and belief, Defendant Callahan Cellular is the assignee of the '391 Patent and has the right to enforce the '391 Patent.

### E.  U.S. Patent No. 7,464,862

19.     The '862 Patent, entitled APPARATUS & METHOD FOR POS PROCESSING and naming Steven V. Bacastow as the inventor was filed on June 1, 2005 and issued on December 16, 2008 as U.S. Patent No. 7,464,862. A true and correct copy of the '862 Patent is attached hereto as Exhibit 5.

20.    Upon information and belief, Defendant OL Security is the assignee of the '862 Patent and has the right to enforce the '862 Patent.

### F.    U.S. Patent No. 8,352,584

21.    The '584 Patent, entitled SYSTEM FOR HOSTING CUSTOMIZED COMPUTING CLUSTERS and naming Jeffrey B. Franklin as the inventor was filed on September 30, 2010 and issued on January 8, 2013. A true and correct copy of the '584 Patent is attached hereto as Exhibit 6.

22.    Upon information and belief, Defendant Intellectual Ventures II is the assignee of the '584 Patent and has the right to enforce the '584 Patent.

### G.    U.S. Patent No. 9,678,967

23.    The '967 Patent, entitled INFORMATION SOURCE AGENT SYSTEMS AND METHODS FOR DISTRIBUTED DATA STORAGE AND MANAGEMENT USING CONTENT SIGNATURES and naming Bruce Borden and Russell Brand as the inventors was filed on April 6, 2007 and issued on June 13, 2017. A true and correct copy of the '967 Patent is attached hereto as Exhibit 7.

24.    Upon information and belief, Defendant Callahan Cellular is the assignee of the '967 Patent and has the right to enforce the '967 Patent.

### H.    U.S. Patent No. RE48,894

25.    The '894 Patent, entitled DISAGGREGATED RESOURCES AND ACCESS METHODS and naming Thomas Earl Ludwig and Mark Adams as the inventors was filed on May 24, 2019 and issued on January 11, 2022. A true and correct copy of the '894 Patent is attached hereto as Exhibit 8.

6

26. Upon information and belief, Defendant Intellectual Ventures I is the assignee of the '894 Patent and has the right to enforce the '894 Patent.

27. On or about January 7, 2022, Rateze Remote Mgmt. L.L.C. submitted a Reissue Application of the '894 Patent. As of the filing date of this Amended Complaint, that reissue proceeding is ongoing.

### I. The Patents-In-Suit

28. Upon information and belief, Defendant Intellectual Ventures Management controls, manages, licenses and/or enforces one or more portfolios of patents that have been assigned to others, which includes the Patents-in-Suit, whose ownership and/or rights are assigned and/or licensed to Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and/or Fund II and/or which share a common nucleus (collectively "Intellectual Ventures Management's Patent Portfolio" or "Patent Portfolio").

29. Upon information and belief, Intellectual Ventures Management is the agent and representative of the assignees and/or exclusive licensees of the patents in Intellectual Ventures Management's Patent Portfolio and has the right, by or on behalf of the assignees, to enter into agreements concerning matters relating to the patents in Intellectual Ventures Management's Patent Portfolio and concerning matters relating to the licensing and enforcement of the patents in its Patent Portfolio.

30. Upon information and belief, Intellectual Ventures Management's Patent Portfolio includes patents that have been assigned and/or exclusively licensed to Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, including the Patents-in-Suit. Intellectual Ventures Management has held itself out as having the right and, upon information and belief does have the right, by or on behalf of Intellectual Ventures I, Intellectual

Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, to enter into agreements concerning matters relating to the Patents-in-Suit and to license and/or enforce the Patents-in-Suit.

31.   Upon information and belief, Intellectual Ventures Management has held itself out as, and is, the agent and representative of Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II concerning at least the patents in Intellectual Ventures Management's Patent Portfolio, including the Patents-in-Suit.

32.   Upon information and belief, all rights, including enforcement, in the Patents-in-Suit are possessed by Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and/or Fund II.

33.   Upon information and belief, Intellectual Ventures Management has acted in its capacity as an agent and representative of Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II concerning the patents in Intellectual Ventures Management's Patent Portfolio in the State of Tennessee and the Western District of Tennessee, including by entering into agreements concerning the assignees' and licensees' patents in its Patent Portfolio, seeking to license those patents, and threatening to enforce those patents it alleges are infringed and not licensed, including in its actions as to First Horizon concerning the Patents-in-Suit alleged in this Complaint.

34.   Upon information and belief, Steve Joroff and Jonathan K. Waldrop are employees and/or agents and representatives of Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II and has acted in their capacities as an employee and/or an agent and representative of Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II with at least the right to enter into agreements concerning the Patents-in-Suit and to license and

8

enforce the Patents-in-Suit by or on behalf of Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, and has done so in the State of Tennessee and the Western District of Tennessee, including in his actions as to First Horizon concerning the Patents-in-Suit alleged in this Complaint.

35.     Upon information and belief, Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II have conspired to monetize the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio by licensing those patents and by enforcing those patents through patent infringement litigation or otherwise, and have conspired to monetize the Patents-in-Suit in the State of Tennessee.

36.     Upon information and belief, Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are owned and/or operated by a common entity or are otherwise under common control.

37.     Upon information and belief, Intellectual Ventures Management is the agent and/or legal representative of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, such that Intellectual Ventures Management is authorized to act on behalf of the assignees and licensees of the patents in its Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, including as to licensing and/or enforcement of the Patent-in-Suit.

38.     Upon information and belief, on its own behalf and by and on behalf of the assignees and licensees of the patents in its Patent Portfolio, Intellectual Ventures Management accuses entities of infringing the assignees' and licensees' patents in its Patent Portfolio, offers

9

licenses of those patents to those entities, purports to negotiate licenses of those patents with those entities, and threatens that the patents will be enforced through patent litigation if the entities refuse to pay the license fee demanded by Intellectual Ventures Management.

39.     Upon information and belief, under the direction and/or control of Intellectual Ventures Management, owners of patents within Intellectual Ventures Management's Patent Portfolio have assigned and/or exclusively licensed patents to other owners of patents also within Intellectual Ventures Management's Patent Portfolio.

40.     For example, upon information and belief, Callahan Cellular has assigned hundreds of patents in Intellectual Ventures Management's Patent Portfolio to other entities also within Intellectual Ventures Management's Patent Portfolio and/or to entities related to Intellectual Ventures Management, including Intellectual Ventures I, Intellectual Ventures II, and related entities. Upon information and belief, Callahan Cellular has assigned patents in the Patent Portfolio under the direction and/or control of Intellectual Ventures Management.

41.     Upon information and belief, Intellectual Ventures Management and Callahan Cellular, Intellectual Ventures I, and Intellectual Ventures II are each owned and/or operated by a common entity or are otherwise under common control or Callahan Cellular, Intellectual Ventures I, and Intellectual Ventures II are owned, managed, and/or controlled by Intellectual Ventures Management. Upon information and belief, Intellectual Ventures Management is also the agent and representative of Callahan Cellular, Intellectual Ventures I, and Intellectual Ventures II.

42.     Upon information and belief, many of the patents in Intellectual Ventures Management's Patent Portfolio that were assigned by Callahan Cellular to other assignees of patents in the Patent Portfolio and/or who are related to Intellectual Ventures Management have been subsequently asserted by those assignees, including Intellectual Ventures I, Intellectual

10

Ventures II, and/or related entities, in patent infringement litigation against entities who refused to pay the license fee demanded by Intellectual Ventures Management.

43.    By way of example, upon information and belief, Defendant Callahan Cellular assigned United States Patent Nos. 7,016,963, 9,092,546 and 9,686,378 to Defendant Intellectual Ventures II on September 18, 2018.

44.    Upon information and belief, as part of the assignment, the same individual (Tracy Lemke) signed on behalf of both Defendant Callahan Cellular (as an Authorized Person) and Defendant Intellectual Ventures II (as the Assistant Company Secretary).

45.    Upon information and belief, Defendant Intellectual Ventures II then sued VMware Inc. for infringement of each of those patents in the U.S. District Court for the Western District of Texas. *See Intellectual Ventures II LLC v. VMware Inc.*, No. 6:20-cv-00220-ADA (W.D. Tex. filed Mar. 25, 2020); *Intellectual Ventures II LLC v. VMware Inc.*, No. 1:20-cv-00457-ADA (W.D. Tex. filed Mar. 25, 2020).

46.    By way of another example, upon information and belief, Defendant Callahan Cellular assigned United States Patent No. RE42,153 to Defendant Intellectual Ventures II on May 6, 2016.

47.    Upon information and belief, as part of the assignment, Tracy Lemke signed on behalf of Defendant Callahan Cellular as an Authorized Person.

48.    Upon information and belief, as alleged above, Tracy Lemke was the Assistant Company Secretary of Defendant Intellectual Ventures II at the time of the assignment.

49.    Upon information and belief, Defendant Intellectual Ventures II then separately sued Arista Networks, Inc. and Hewlett Packard Enterprise Company for infringement of United States Patent No. RE 42,153 in the U.S. District Court for the Western District of Texas. *See*

11

*Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Arista Networks, Inc.*, No. 6:20-cv-00749-ADA (W.D. Tex. filed Aug. 18, 2020); *Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Hewlett Packard Enter. Co.*, No. 6:21-cv-00226-ADA (W.D. Tex. filed Mar. 9, 2021).

50. As another example, upon information and belief, Defendant Callahan Cellular assigned United States Patent No. 7,199,715 to Defendant Intellectual Ventures II on August 4, 2016.

51. Upon information and belief, as part of the assignment, the same individual (Tracy Lemke) signed on behalf of both Defendant Callahan Cellular and Defendant Intellectual Ventures II as an Authorized Person of both parties.

52. Upon information and belief, Defendant Intellectual Ventures II then sued FedEx Corporation, *et al.*, for infringement of United States Patent No. 7,199,715 in the U.S. District Court for the Eastern District of Texas. *See Intellectual Ventures II LLC v. FedEx Co., et al*, No. 2:16-cv-00980-JRG (E.D. Tex. filed Aug. 31, 2016).

53. As another example, upon information and belief, Defendant Callahan Cellular assigned United States Patent No. 6,782,370 to Defendant Intellectual Ventures II on Feb. 15, 2016.

54. Upon information and belief, as part of the assignment, Tracy Lemke signed on behalf of Defendant Callahan Cellular as an Authorized Person.

55. Upon information and belief, as alleged above, Tracy Lemke was the Assistant Company Secretary of Defendant Intellectual Ventures II at the time of the assignment.

56. Upon information and belief, Defendant Intellectual Ventures II then separately sued FTD Companies, Inc. and J.Crew Group, Inc. for infringement of United States Patent No.

12

6,782,370 in the U.S. District Court for the Eastern District of Texas. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. FTD Cos., Inc.*, No. 6:16-cv-00195-JRG (E.D. Tex. filed on Mar. 8, 2016); *Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. J.Crew Grp., Inc.*, No. 6:16-cv-00196-JRG (E.D. Tex. filed Mar. 8, 2016).

57. Upon information and belief, Defendant OL Security has also assigned multiple patents in Intellectual Ventures Management's Patent Portfolio to other entities also within Intellectual Ventures Management's Patent Portfolio and/or to entities related to Intellectual Ventures Management, including Intellectual Ventures Assets 132 LLC, Intellectual Ventures Assets 150, LLC, and related entities. Upon information and belief, OL Security has assigned patents in the Patent Portfolio under the direction and/or control of Intellectual Ventures Management.

58. Upon information and belief, Intellectual Ventures Management and OL Security, Intellectual Ventures Management and Intellectual Ventures Assets 132 LLC, and Intellectual Ventures Management and Intellectual Ventures Assets 150, LLC, are each owned and/or operated by a common entity or are otherwise under common control or OL Security, Intellectual Ventures Assets 132 LLC, and Intellectual Ventures Assets 150, LLC are owned, managed, and/or controlled by Intellectual Ventures Management. Upon information and belief, Intellectual Ventures Management is also the agent and representative of OL Security, Intellectual Ventures Assets 132 LLC, and Intellectual Ventures Assets 150, LLC.

59. By way of example, upon information and belief, on October 29, 2019 Defendant OL Security assigned U.S. Patent Nos. 7,853,250, 9,042,914, 9,800,612, 10,320,840, 7,778,606, 7,603,710, 8,078,722, 8,122,506, 8,661,542, and Application No. 16/436,566 to Intellectual Ventures Assets 132 LLC.

60. Upon information and belief, as part of the assignment of these patents within the patent portfolio, the same individual (Lawrence Froeber) signed on behalf of both OL Security (as the CFO) and Intellectual Ventures Assets 132 LLC (as the CFO).

61. Upon information and belief, Lawrence Froeber was also the CFO of Defendant Intellectual Ventures Management at the time of the assignment. *See* https://www.intellectualventures.com/who-we-are/leadership/larry-froeber (last accessed Oct. 31, 2024).

62. Upon information and belief, as part of the assignment, the correspondence data identified Defendant Intellectual Venture Management as the "Correspondent Name" and identified Intellectual Ventures Management's former principal place of business, 3150 139th Ave SE, BLDG 4, Bellevue, Washington 98005, as the "Address."

63. By way of another example, upon information and belief, Intellectual Ventures Assets 150 LLC assigned United States Patent No. 6,970,843, among other patents, to Kioba Processing, LLC on November 15, 2019. Upon information and belief, as part of the assignment of these patents within the patent portfolio, Lawrence Froeber signed on behalf of Intellectual Ventures Assets 150 LLC as the CFO. Upon information and belief, Lawrence Froeber was also the CFO of Defendant Intellectual Ventures Management at the time of the assignment. *See* https://www.intellectualventures.com/who-we-are/leadership/larry-froeber (last accessed Oct. 31, 2024).

64. Upon information and belief, one or more patents in Intellectual Ventures Management's Patent Portfolio that were assigned by OL Security to other assignees of patents in the Patent Portfolio and/or who are related to Intellectual Ventures Management have been

14

subsequently asserted by those assignees in patent infringement litigation against entities who refused to pay the license fee demanded by Intellectual Ventures Management.

65. By way of another example, upon information and belief, Defendant OL Security assigned United States Patent No. 6,894,639 to Defendant Intellectual Ventures II on March 28, 2024.

66. Upon information and belief, as part of the assignment, the same individual (Michelle Macartney) signed on behalf of both Defendant OL Security (as an Authorized Person) and Defendant Intellectual Ventures II (as the Assistant Company Secretary).

67. Upon information and belief, as part of the assignment, the correspondence data identified Intellectual Ventures Management as the "Correspondent Name" and identified Intellectual Ventures Management's former principal place of business, 3150 139th Ave SE, BLDG 4, Bellevue, Washington 98005, as the "Address."

68. Upon information and belief, Intellectual Ventures II then sued Tesla, Inc. for infringement of United States Patent No. 6,894,639 in the United States District Court for the Western District of Texas. *See Intellectual Ventures II LLC v. Tesla, Inc.*, No. 6:24-cv-00188-ADA (W.D. Tex. filed Apr. 12, 2024).

69. Upon information and belief, Intellectual Ventures Management and Fund I and Fund II are each owned and/or operated by a common entity or are otherwise under common control and Fund I and Fund II are owned, managed, and/or controlled by Intellectual Ventures Management. Upon information and belief, Intellectual Ventures Management is also the agent and representative of Fund I and Fund II.

70. For example, on September 23, 2024, Intellectual Ventures Management's Vice President of Licensing Steve Joroff, by and on behalf of Intellectual Ventures Management and

the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent a letter to First Horizon in relation to the licensing and enforcement of patents in Intellectual Ventures Management's Patent Portfolio. A copy of the letter is attached as Exhibit 9 (hereinafter "Plaintiff's Sept. 23, 2024 Letter"). In Plaintiff's Sept. 23, 2024 Letter, Mr. Joroff admits that Intellectual Ventures Management manages Fund I and Fund II.

71.     On or about October 16, 2025, Jonathan K. Waldrop of Kasowitz LLP, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent a letter by Federal Express to Plaintiff First Horizon's physical address located at 165 Madison Avenue, Memphis, TN 38103, further conducting business in relation to the licensing and enforcement of the in patents in Intellectual Ventures Management's Patent Portfolio. A copy of the letter is attached as Exhibit 10 (hereinafter "Plaintiff's Oct. 16, 2025 Letter"). In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop admits that Intellectual Ventures Management manages Fund I and Fund II.

72.     Further, on Intellectual Ventures' website at www.intellectualventures.com, Intellectual Ventures identifies "Invention Investment Fund", which is the name that Intellectual Ventures uses to refer to Fund I and Fund II (*see, e.g.,* Exhibit 10) as "What We Do" and "Our Work"[1]. A true and correct copy of the Intellectual Ventures website is attached hereto as Exhibit 11.

---

[1] *Invention Investment Fund*, INTELLECTUAL VENTURES, https://www.intellectualventures.com/what-we-do/invention-investment-fund (last visited Dec. 29, 2025).

73.    Accordingly, upon information and belief, and as shown above, Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are owned and/or operated by a common entity or are otherwise under common control or Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are owned, managed, and/or controlled by Intellectual Ventures Management, and Intellectual Ventures Management is the agent and representative of Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II.

## IV. JURISDICTION AND VENUE

74.    This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

75.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1338(a), as it is a civil action arising under an Act of Congress relating to a patent; under 28 U.S.C. § 1331 as it involves a federal question; and under 28 U.S.C. § 2201 and § 2202, as the action seeks a declaratory judgment and further relief.

76.    This Court has personal jurisdiction over Intellectual Ventures Management because, among other things, Intellectual Ventures Management has conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

77.    This Court has personal jurisdiction over Intellectual Ventures I because, among other things, Intellectual Ventures I has conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

78.    This Court has personal jurisdiction over Intellectual Ventures II because, among other things, Intellectual Ventures II has conducted business relating to the licensing and

17

enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

79. This Court has personal jurisdiction over Callahan Cellular because, among other things, Callahan Cellular has conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

80. This Court has personal jurisdiction over OL Security because, among other things, OL Security conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

81. This Court has personal jurisdiction over Fund I because, among other things, Fund I has conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

82. This Court has personal jurisdiction over Fund II because, among other things, Fund II has conducted business relating to the licensing and enforcement of patents in the State of Tennessee, as discussed herein, thus establishing the requisite minimum contact with the State of Tennessee.

83. Venue is proper in this District under 28 U.S.C. § 1391 because Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are subject to personal jurisdiction in this judicial district, and have directed their business, licensing, and enforcement activities at this judicial district, and a

18

substantial part of the events giving rise to the claims occurred in this judicial district, as discussed below.

84.    Intellectual Ventures Management, by and through its representatives, on its own behalf and as the agent and representative of the assignees of the patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II has conducted business relating to the licensing and enforcement of patents in its Patent Portfolio in the State of Tennessee, including by offering specific terms for First Horizon in the State of Tennessee to license the assignees' and licensees' patents in its Patent Portfolio and by sending threatening emails and letters into Tennessee asserting that First Horizon is required to license the assignees' and licensees' patents in its Patent Portfolio, that First Horizon infringes the assignees' and licensees' patents in its Patent Portfolio, and that litigation will be pursued against companies alleged to infringe who do not pay to license the assignees' and licensees' patents in its Patent Portfolio, including the Patents-in-Suit, all with full knowledge that First Horizon is an entity having its principal place of business located in the State of Tennessee.

1. **At Least As Early As 2014, Defendants Were Conducting Their Business Of Licensing and Enforcement of the Assignees' and Licensees' Patents in Intellectual Ventures Management's Patent Portfolio in Tennessee.**

85.    In early 2014, Intellectual Ventures Management, on its own behalf and by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including upon information and belief one or more Defendants, actively met, communicated and negotiated with First Horizon located in the State of Tennessee and in the Western District of Tennessee, in relation to licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

19

86.     In March of 2014, Intellectual Ventures Management's Senior Manager of Market Development, Luke Ekhoff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, met telephonically with counsel for First Horizon located within the State of Tennessee to discuss licensing all of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

87.     In March of 2014, Mr. Ekhoff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, sent an email to counsel for First Horizon, which is located within the State of Tennessee, to arrange a subsequent in-person meeting to discuss licensing all of the assignees' and licensees' patents in the Patent Portfolio.

88.     On April 24, 2014, representatives of Intellectual Ventures Management, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, communicated with counsel for First Horizon to discuss licensing the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

89.     Between the April 24, 2014 meeting and November of 2014, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in its Patent Portfolio, engaged in extensive negotiations with First Horizon in the State of Tennessee regarding licensing the assignees' and licensees' patents in the Patent Portfolio.

90.     Ultimately, on November 12, 2014, the negotiations in 2014 ended without a license of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

91.    Accordingly, upon information and belief, Intellectual Ventures Management, on its own behalf and by and on behalf of the assignees and licensees of the patents in its Patent Portfolio, including upon information and belief one or more Defendants, actively conducted business in the State of Tennessee from at least February to November of 2014 that included offers to and negotiations with First Horizon, which resides in the State of Tennessee and in the Western District of Tennessee, regarding the licensing of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio by First Horizon in the State of Tennessee.

**2.    <u>Multiple Contracts Have Been Negotiated And Executed As Part of Defendants' Business in Tennessee Of Licensing and Enforcement of the Assignees' and Licensees' Patents in Intellectual Ventures Management's Patent Portfolio.</u>**

92.    Beginning in as early as 2013, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, targeted First Horizon, residing in the State of Tennessee and the Western District of Tennessee, and sent threatening correspondence asserting, *inter alia*, that the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio are infringed and are required to be licensed by First Horizon.

93.    Upon information and belief, at least as early as February of 2014, Intellectual Ventures Management, by and through its representatives, on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, also conducted extensive business activities in the State of Tennessee related to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio within the State of Tennessee, including by engaging in extensive negotiations with First Horizon located in the State of Tennessee and in this judicial district in relation to licensing and enforcement of those patents.

21

94.     Upon information and belief, starting as early as February 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, entered into multiple confidentiality agreements and extensions with First Horizon, located in the State of Tennessee and in the Western District of Tennessee, in relation to Intellectual Ventures Management's efforts to license and enforce the assignees' and licensees' patents in its Patent Portfolio in Tennessee.

**a.  The Parties Executed a February 2014 Contract Whose Terms Survive Termination Or Expiration.**

95.     Upon information and belief, as early as February 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, negotiated with First Horizon, located in the State of Tennessee, in relation to licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

96.     Upon information and belief, on February 28, 2014, Defendant Intellectual Ventures Management on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, and First Horizon's predecessors-in-interest, First Horizon National Corporation and First Tennessee Bank National Association, located in the State of Tennessee, entered into and executed a contract entitled "Mutual Confidentiality Agreement" regarding the disclosure, use, and maintaining confidentiality of certain information and materials (1) of Defendant Intellectual Ventures Management, (2) of First Horizon located in the State of Tennessee, and (3) of "any 'individual, corporation, trust, partnership, joint venture, limited liability company, association,

22

unincorporated organization or other legal entity'" that either Defendant Intellectual Ventures Management or First Horizon, "directly or indirectly Controls, is Controlled by, or is under common Control with" (hereinafter "February 2014 Contract"). The February 2014 Contract further defined "Control" as follows:

"Control" (and its derivatives) means (a) ownership or control, directly or indirectly, of more than fifty percent (50%) of the voting stock or other ownership interest of an Entity, or (b) both (i) ownership or control, directly or indirectly, of fifty percent (50%) or less of the voting stock or other ownership interest of an Entity representing the maximum percentage of such voting stock or other ownership interest permitted by local law, and (ii) the power to direct or cause, directly or indirectly, the direction of the management and policies of such Entity.

97.    Although the February 2014 Contract states that its initial term was for a period of ninety (90) days, it specifically provides that the obligations "will survive the expiration or termination of the Term."

98.    Upon information and belief, the obligation to perform and/or not perform specific actions under the February 2014 Contract survived the termination or expiration of the February 2014 Contract and continues today.

99.    Upon information and belief, the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are each an "individual, corporation, trust, partnership, joint venture, limited liability company, association, unincorporated organization or other legal entity" that Defendant Intellectual Ventures Management "directly or indirectly Controls, is Controlled by, or is under common Control with" in accordance with the terms of the February 2014 Contract, including those terms that survive expiration or termination.

100.    Upon information and belief, the February 2014 Contract, including those terms that survive expiration or termination, is a legally binding agreement that created obligations, whether then existing or subsequently arising, to perform and/or not perform specific actions.

101.    Upon information and belief, the February 2014 Contract with First Horizon, located in the State of Tennessee, created obligations, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in its Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II to perform and/or not perform specific actions.

102.    Upon information and belief, the obligations created by the February 2014 Contract, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, survived the termination or expiration of the February 2014 Contract and continue in force today.

103.    Upon information and belief, since February 28, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of patents in the Intellectual Ventures Management Patent Portfolio, including, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and/or not perform the specific actions according to the terms which were negotiated, agreed to, and memorialized in the February 2014 Contract and which the parties agreed would survive its termination or expiration.

104.    Upon information and belief, since February 28, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of the patents in

24

the Intellectual Ventures Management Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and satisfy their obligations, whether then existing or subsequently arising, under the February 2014 Contract to First Horizon and its successor-in-interest First Horizon, located in the State of Tennessee.

**b. The Parties Also Executed a May 2014 Contract Whose Terms Survive Termination Or Expiration.**

105.    In May 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, negotiated a second contract with First Horizon, located in the State of Tennessee, in relation to licensing and enforcement of all of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

106.    Upon information and belief, on May 25, 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, and First Horizon's predecessors-in-interest, First Horizon National Corporation and First Tennessee Bank National Association, located in the State of Tennessee, entered into and executed a contract entitled "Amendment to the Mutual Confidentiality Agreement" which changed the term of the February 2014 Contract to a period of one hundred eighty (180) days and replaced certain wording, but otherwise continued the February 2014 Contract (hereinafter the "May 2014 Contract").

107.    Upon information and belief, as agreed to in the February 2014 Contract and continued by the May 2014 Contract, the obligations owed to First Horizon and its successor-in-interest First Horizon, located in the State of Tennessee, survived the expiration or termination of the May 2014 Contract and continue today.

25

108. Upon information and belief, the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are each an "individual, corporation, trust, partnership, joint venture, limited liability company, association, unincorporated organization or other legal entity" that Defendant Intellectual Ventures Management "directly or indirectly Controls, is Controlled by, or is under common Control with" in accordance with the terms of the February 2014 Contract and continued by the May 2014 Contract, including those terms that survive expiration or termination.

109. Upon information and belief, the May 2014 Contract, including those terms that survive expiration or termination, is a legally binding agreement that created obligations, whether then existing or subsequently arising, to perform and/or not perform specific actions.

110. Upon information and belief, the May 2014 Contract with First Horizon, located in the State of Tennessee, created obligations, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in its Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II to perform and/or not perform specific actions.

111. Upon information and belief, the obligations created by the May 2014 Contract, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, survived the termination or expiration of the May 2014 Contract and continue in force today.

112. Upon information and belief, since May 25, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of patents in the Intellectual Ventures Management Patent Portfolio, including, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and/or not perform the specific actions according to the terms which were negotiated, agreed to, and memorialized in the May 2014 Contract and which the parties agreed would survive its termination or expiration.

113. Upon information and belief, since May 25, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of the patents in the Intellectual Ventures Management Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and satisfy their obligations, whether then existing or subsequently arising, under the May 2014 Contract to First Horizon and its successor-in-interest First Horizon, located in the State of Tennessee.

    **c.**  **The Parties Also Executed an August 2014 Contract Whose Terms Survive Termination Or Expiration.**

114. In August 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees of the patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, negotiated a third contract with First Horizon, located in the State of Tennessee, in relation to licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio.

115. Upon information and belief, on August 24, 2014, Intellectual Ventures Management, on its own behalf and on behalf of all assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio including one or more Defendants, and First

Horizon's predecessors-in-interest, First Horizon National Corporation and First Tennessee Bank National Association, located in the State of Tennessee, entered into and executed a contract entitled "Second Amendment to the Mutual Confidentiality Agreement" which changed the term of the February 2014 Contract to a period of two hundred twenty-five (225) days, but otherwise continued the February 2014 Contract (hereinafter "August 2014 Contract").

116.    Upon information and belief, as agreed to in the February 2014 Contract and continued by the August 2014 Contract, the obligations owed to First Horizon and its successor-in-interest First Horizon, located in the State of Tennessee, survived the expiration or termination of the August 2014 Contract and continue today.

117.    Upon information and belief, the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II are each an "individual, corporation, trust, partnership, joint venture, limited liability company, association, unincorporated organization or other legal entity" that Defendant Intellectual Ventures Management "directly or indirectly Controls, is Controlled by, or is under common Control with" in accordance with the terms of the February 2014 Contract and continued by the August 2014 Contract, including those terms that survive expiration or termination.

118.    Upon information and belief, the August 2014 Contract, including those terms that survive expiration or termination, is a legally binding agreement that created obligations, whether then existing or subsequently arising, to perform and/or not perform specific actions.

119.    Upon information and belief, the August 2014 Contract with First Horizon, located in the State of Tennessee, created obligations, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in its Patent Portfolio,

28

including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II to perform and/or not perform specific actions.

120. Upon information and belief, the obligations created by the August 2014 Contract, whether then existing or subsequently arising, for Intellectual Ventures Management and the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, survived the termination or expiration of the August 2014 Contract and continue in force today.

121. Upon information and belief, since August 24, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of patents in the Intellectual Ventures Management Patent Portfolio, including, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and/or not perform the specific actions according to the terms which were negotiated, agreed to, and memorialized in the August 2014 Contract and which the parties agreed would survive its termination or expiration.

122. Upon information and belief, since August 24, 2014 and continuing through the present day, Intellectual Ventures Management and the assignees and licensees of the patents in the Intellectual Ventures Management Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have been obligated to continue to perform and satisfy their obligations, whether then existing or subsequently arising, under the August 2014 Contract to First Horizon and its successor-in-interest First Horizon, located in the State of Tennessee.

**3.  In 2023, Defendants Increased Their Licensing and Enforcement in Tennessee of the Assignees' and Licensees' Patents in Intellectual Ventures Management's Patent Portfolio.**

123.     Nine (9) years later, Intellectual Ventures Management, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, has targeted First Horizon in the State of Tennessee, sending threatening emails and letters asserting, *inter alia*, that the assignees' and licensees' Patents-in-Suit are infringed and are required to be licensed by First Horizon, which resides in the State of Tennessee and the Western District of Tennessee.

124.     On November 17, 2023, Intellectual Ventures Management's Vice President of Licensing Steve Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to First Horizon's Senior Vice President and Assistant General Counsel Desiree Franklin, who resides and is located in the State of Tennessee, in relation to licensing and enforcement of all of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit. A copy of the email is attached as Exhibit 12.

125.     Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, indicated an intent to "initiate a dialogue concerning intellectual property and licensing matters with First Horizon" residing in the State of Tennessee and to discuss "an overview of IV's expansive patent portfolio and its relevance to First Horizon's operations." Upon information and

30

belief, in this communication, Intellectual Ventures Management conducted business, by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including on behalf of Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, relating to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio with First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee.

126.    Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, indicated that the assignees' and licensees' patents in Intellectual Ventures Management Patent Portfolio "align closely with the technologies integral to First Horizon's daily operations, including cloud computing, networking, security, storage, digital payments, and utilization of open-source software, among others."

127.    On December 20, 2023, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business relating to the licensing and enforcement of all of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio and emphasizing "the criticality of discussing the potential licensing agreement between" Defendants and First Horizon. A copy of this email is attached as Exhibit 13.

128.    Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including

31

Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that it was "imperative to underscore the significance of obtaining a license" and warned of "inadvertent risks."

129.   Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, further stated that "[w]ithout a formalized agreement in place, there might be inadvertent risks associated with utilizing technologies covered by IV's patents," and that it is "essential to protect both First Horizon's operations and IV's intellectual property rights through a comprehensive licensing arrangement." Upon information and belief, through this communication, Intellectual Ventures Management conducted business, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, relating to the licensing and enforcement of all of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio with First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee.

130.   On January 7, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of all of the assignees' and licensees' patents in Intellectual Ventures Management Patent Portfolio, and further to "stress the urgency of acquiring a license" to the

32

assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio under "fixed fee, non-negotiable financial terms." A copy of this email is attached as Exhibit 14.

131. Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, "raised concerns about potential inadvertent risks related to utilizing technologies encompassed by IV's patents" and that it was "critical to mitigate these risks and protect both First Horizon's operations and IV's intellectual property rights through a formalized licensing arrangement."

132. Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, further stated that First Horizon's "prompt acknowledgment or response" to the email sent on January 7, 2024, was "crucial." Upon information and belief, in this communication, Intellectual Ventures Management by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to all of the assignees' and licensee's patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent

33

infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

133. On January 18, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management Patent Portfolio and stating that it was "crucial" to receive a response "to avoid any misunderstandings." A copy of this email is attached as Exhibit 15.

134. Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio (which includes Defendants' Patents-in-Suit) "aligns strategically with technologies crucial to First Horizon's operations." Upon information and belief, in this communication, Intellectual Ventures Management, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse

34

entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

135. On February 6, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio and further stating that it was "crucial that we at least schedule a 30-minute conversation to address this matter." A copy of this email is attached as Exhibit 16.

136. Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that "[e]fficient infringement is not a viable strategy in this circumstance," and that "engaging in discussions is critical to avoiding misunderstandings or unnecessary escalation." Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license. Upon information and belief, in this communication, Intellectual Ventures Management, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the

State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

137.    On February 23, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio. A copy of this email is attached as Exhibit 17.

138.    Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio, including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I and Fund II, stated that the goal of the communication was to "engage in good-faith negotiations to explore a mutually beneficial license arrangement." Upon information and belief, in this communication, Intellectual Ventures Management conducted business, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, relating to the licensing and enforcement of the assignees' and licensees' patents in Intellectual

Ventures Management's Patent Portfolio with First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee.

139. On March 15, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio and stating that they are "committed to ensuring that all organizations, including First Horizon, operate within the bounds of intellectual property law." A copy of this email is attached as Exhibit 18. Upon information and belief, in this communication, Intellectual Ventures Management, by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

140. On August 26, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's

37

Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio and stating that "26 financial services companies have secured licenses" and his "role is to ensure that one way or another, First Horizon is also properly licensed." A copy of this email is attached as Exhibit 19. Upon information and belief, in this communication, Intellectual Ventures Management, by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

141. On September 23, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent a letter to First Horizon, addressed to Plaintiff First Horizon's physical address of 165 Madison Avenue, Memphis, TN 38103, and to Ms. Franklin in particular,

who resides and is located in the State of Tennessee, further conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio. A copy of the Plaintiff's Sept. 23, 2024 Letter is attached as Exhibit 9.

142.    In Plaintiff's Sept. 23, 2024 Letter, Mr. Joroff, by and on behalf of Intellectual Ventures Management, as well as Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, who are each assignees and/or licensees of patents in Intellectual Ventures Management's Patent Portfolio, alleged that the '785 Patent, the '844 Patent, the '722 Patent, the '391 Patent, and the '862 Patent "cover technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import:

| US Patent No. | Title | Assignee | Example Claim | Example Product/Feature |
|---|---|---|---|---|
| US7949785 | Secure virtual community network system | Intellectual Ventures I LLC | 30 | Open-Source Software: First Horizon' use of Kubernetes<br>https://recruiting.ultipro.com/FIR1007FTN/JobBoard/c005ef3e-175a-49c4-ba29-9f431f673944/OpportunityDetail?opportunityId=8c800876-90b0-4dfe-a198-722daa9494d9 |
| US8332844 | Root image caching and indexing for block-level distributed application management | Intellectual Ventures II LLC | 7 | Open-Source Software: First Horizon's use of Docker<br>https://recruiting.ultipro.com/FIR1007FTN/JobBoard/c005ef3e-175a-49c4-ba29-9f431f673944/OpportunityDetail?opportunityId=8c800876-90b0-4dfe-a198-722daa9494d9 |
| US8407722 | Asynchronous messaging using a node specialization architecture in the dynamic routing network | Intellectual Ventures I LLC | 14 | Open-Source Software: First Horizon's use of Kafka<br>https://recruiting.ultipro.com/FIR1007FTN/JobBoard/c005ef3e-175a-49c4-ba29-9f431f673944/OpportunityDetail?opportunityId=8c800876-90b0-4dfe-a198-722daa9494d9 |
| US10567391 | Graduated authentication in an identity management system | Callahan Cellular L.L.C. | 18 | First Horizon's use of Secure Payment Processing<br>https://www.firsthorizon.com/Landing/Business/Merchant-Services<br>https://docs.clover.com/docs/use-3ds |
| US7464862 | Apparatus & method for POS processing | OL Security LLC | 1 | First Horizon's use of Point-of-Sale Systems<br>https://www.firsthorizon.com/Landing/Business/Merchant-Services<br>https://www.clover.com/pos-systems |

143.    In Plaintiff's Sept. 23, 2024 Letter, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures

39

Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, alleged that Plaintiff infringes at least claim 30 of the '785 Patent with "Kubernetes", Plaintiff infringes at least claim 7 of the '844 Patent with "Docker", Plaintiff infringes at least claim 14 of the '722 Patent with "Kafka", Plaintiff infringes at least claim 18 of the '391 Patent with "Secure Payment Processing", and Plaintiff infringes at least claim 1 of the '862 Patent with "Point-of-Sale Systems". Plaintiff's Sept. 23, 2024 Letter alleged that "First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the "example infringing products" and thereby asserted both direct and indirect infringement of those patents by First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee.

144. In Plaintiff's Sept. 23, 2024 Letter, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, further stated that "these patents are offered as an initial list of example patents and example infringing products and that IV's investigation of First Horizon products and services is ongoing."

145. In Plaintiff's Sept. 23, 2024 Letter, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, further stated that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license."

40

146.    In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, repeated the following statement also in Plaintiff's September 23, 2024 Letter:

> IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license. IV is willing to offer a patent license and remains open to business discussions with First Horizon to negotiate such a license, either to the specifically referenced patents or to all or a subset of the IV patent rights.

147.    Upon information and belief, First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, has been offered a license by or on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, to patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in Intellectual Ventures Management's Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

148.    On October 8, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, conducting business in relation to the licensing

41

and enforcement of the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio and stating that First Horizon "is required to obtain a license for its operations." A copy of this email is attached as Exhibit 20.

149. In this threatening correspondence, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered specific terms for First Horizon to license the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio including Defendants' Patents-in-Suit, namely a "one-time license fee for a worldwide license to the IV patent portfolio is $3.25 million."

150. Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, also attached to his October 8, 2024 correspondence a document titled "Invention Investment Fund (IIF) Commercial Bank Licensing," which states the intent is "to enforce its patent rights, with patent litigations pending against JPMC, Liberty Mutual, and Comerica, with further actions planned." A copy of this document is included in Exhibit 21.

151. The "Invention Investment Fund (IIF) Commercial Bank Licensing" of Exhibit 21 further states that Intellectual Ventures Management, upon information and belief on its own behalf and by and on behalf of the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, "is offering licenses to all financial services and insurance companies with business operations in the United States" and that they "will also

42

consider offers to license (or purchase) selected patents from its portfolio." Upon information and belief, in this communication, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit, under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

152. On December 11, 2024, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, further conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio, claiming to be "following up regarding the notice sent to First Horizon Corp. on September 23, 2024, and the pricing expectations shared on October 8, 2024." A copy of this email is attached as Exhibit 22.

153.     In this correspondence, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that the communication served "to document Intellectual Ventures' ongoing efforts to fulfill its legal obligations" and to "avoid claims of unreasonable delay (laches) or misleading conduct (equitable estoppel), which could limit available remedies." Upon information and belief, in this communication, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit, under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

154.     On February 6, 2025, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, further conducting business in relation to the

44

licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio. A copy of this email is attached as Exhibit 23.

155. In this correspondence, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that "IV has recently settled its financial services litigations with Liberty Mutual and Comerica, further demonstrating the strength and enforceability of our patents." Further, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated a substantive response was required "[t]o avoid unnecessary escalation." Upon information and belief, in this communication, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit, under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

45

156.    On April 3, 2025, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, further conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio. A copy of this email is attached as Exhibit 24.

157.    In this correspondence, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that "IV filed two new patent litigations–against Nationwide Mutual Insurance and The Bank of New York Mellon–following their decision not to engage in licensing discussions," and further that they "anticipate additional enforcement actions in the coming months with institutions that continue to decline meaningful negotiations." Upon information and belief, in this communication, Intellectual Ventures Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit, under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and

46

licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

158.    On April 25, 2025, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent an email to First Horizon, addressed to Ms. Franklin, who resides and is located in the State of Tennessee, further conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio in an attempt to "underscore[] the strength and enforceability of the Intellectual Ventures (IV) patent portfolio." A copy of this email is attached as Exhibit 25.

159.    In this correspondence, Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that "the Patent Trial and Appeal Board (PTAB) officially terminated three inter partes review (IPR) proceedings" for the '722 Patent, the '785 Patent, and the '844 Patent. Mr. Joroff, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, stated that "these outcomes send a clear message: the IV portfolio not only survives challenge but continues to demonstrate its legal and commercial strength in both licensing and litigation contexts." Upon information and belief, in this communication, Intellectual Ventures

Management, on its own behalf and by and on behalf of all assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, offered to First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, a license to the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, including Defendants' Patents-in-Suit, under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in its Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

160.    On or about October 16, 2025, Jonathan K. Waldrop of Kasowitz LLP, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, sent a letter by Federal Express to Plaintiff First Horizon's physical address located at 165 Madison Avenue, Memphis, TN 38103, and to Ms. Franklin in particular, who resides and is located in the State of Tennessee, further conducting business in relation to the licensing and enforcement of the assignees' and licensees' patents in patents in Intellectual Ventures Management's Patent Portfolio. A copy of Plaintiff's Oct. 16, 2025 Letter is attached as Exhibit 10.

161.    On October 16, 2025, Mr. Waldrop of Kasowitz LLP, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures

48

II, Callahan Cellular, OL Security, Fund I, and Fund II, also emailed Plaintiff's Oct. 16, 2025 Letter to Plaintiff First Horizon addressed to Ms. Franklin, who resides and is located in the State of Tennessee.

162. In Plaintiff's Oct. 16, 2005 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, continued to allege that Plaintiff's "products, platforms, features, and/or services" infringe the patents in Intellectual Ventures Management's Patent Portfolio.

163. Plaintiff's Oct. 16, 2025 Letter states that it is "a follow up to the notice letter from Steve Joroff, sent to First Horizon in September 2024. . . . ".  Upon information and belief, "the notice letter from Steve Joroff, sent to First Horizon in September 2024" refers to Plaintiff's Sept. 23, 2024 Letter.

164. Plaintiff's Oct. 16, 2025 Letter is an example of the broad and continuing infringement allegations spanning across Intellectual Ventures Management's Patent Portfolio that Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II have continued to assert against Plaintiff over the course of the parties' communications.

165. In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management, Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, who are each assignees and/or licensees of patents in Intellectual Ventures Management's Patent Portfolio, alleged that the '584 Patent, the '967 Patent, and the

49

'894 Patent are an additional set of sample patents, which cover technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import:

| US Patent No. | Title | Assignee | Example Claim | Example Product/Feature |
|---|---|---|---|---|
| 8,352,584 | SYSTEM FOR HOSTING CUSTOMIZED COMPUTING CLUSTERS | INTELLECTUAL VENTURES II LLC | 1 | Open Source Software: First Horizon's use of Kubernetes *See Enclosures* |
| 9,678,967 | INFORMATION SOURCE AGENT SYSTEMS AND METHODS FOR DISTRIBUTED DATA STORAGE AND MANAGEMENT USING CONTENT SIGNATURES | CALLAHAN CELLULAR L.L.C. a wholly owned subsidiary of IIF2 | 1 | Open Source Software: First Horizon's use of Hadoop *See Enclosures* |
| RE48,894 | DISAGGREGATED RESOURCES AND ACCESS METHODS | INTELLECTUAL VENTURES I LLC | 15 | Open Source Software: First Horizon's use of Kafka *See Enclosures* |

166.    In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, alleged that Plaintiff infringes at least claim 1 of the '584 Patent with "Kubernetes", Plaintiff infringes at least claim 15 of the '894 Patent with "Kafka", and Plaintiff infringes at least claim 1 of the '967 Patent with "Hadoop".

167.    Plaintiff's Oct. 16, 2025 Letter alleged that "First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the "example infringing products" and thereby asserted both direct and indirect infringement of those patents by First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee.

168.    In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures

Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, further stated that "these patents are offered as a list of example patents and example infringing products and that IV's investigation of First Horizon products and services is ongoing."

169.    In Plaintiff's Oct. 16, 2025 Letter, Mr. Waldrop, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, repeated the following statement also in Plaintiff's September 23, 2024 Letter:

> IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license. IV is willing to offer a patent license and remains open to business discussions with First Horizon to negotiate such a license, either to the specifically referenced patents or to all or a subset of the IV patent rights.

170.    Upon information and belief, First Horizon, a company residing in the State of Tennessee and the Western District of Tennessee, has been offered a license by or on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, to patents in Intellectual Ventures Management's Patent Portfolio under the veiled threat of enforcement through litigation with the understanding that Intellectual Ventures Management is a non-practicing entity whose business model is to accuse entities of infringing the patents in Intellectual Ventures Management's Patent Portfolio by and on behalf of the assignees and licensees of those patents, and then for the assignees and licensees of those patents subsequently to file suit for patent infringement for their collective benefit if an accused entity refuses to pay the license fee demanded.

171.    According to its website at www.intellectualventures.com[2], Intellectual Ventures "manages one of the world's largest patent portfolios," "is a pioneer in patent licensing," and has "generated billions of dollars in licensing revenue." As previously mentioned, a true and correct copy of the Intellectual Ventures website is attached hereto as Exhibit 11.

172.    Upon information and belief, the business model of Intellectual Ventures is to license its patents to others.

### V. **THE CONTROVERSY**

173.    There is an actual controversy within the jurisdiction of this Court under 28 U.S.C. § 2201 and § 2202.

174.    Intellectual Ventures Management, by and on behalf of Intellectual Ventures Management and the assignees and licensees of the patents in Intellectual Ventures Management's Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have accused First Horizon of infringing the Patents-in-Suit and indicated the intention to take the steps necessary to protect their intellectual property rights, as set forth in the paragraphs above, including by stating on their behalf that it "seeks to enforce its patents" and identified three ongoing patent infringement lawsuits filed against JP Morgan Chase & Co. ("JP Morgan"), Comerica Inc. ("Comerica"), and Liberty Mutual Holding Company Inc., *et al.*, ("Liberty Mutual *et al.*") filed in the name of one or more Defendants for their collective benefit as examples and evidence of how Defendants protect and enforce the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio, while threatening First Horizon that there are additional "Industry-Related Litigations" planned against accused infringers

---

[2] *Invention Investment Fund*, INTELLECTUAL VENTURES, https://www.intellectualventures.com/what-we-do/invention-investment-fund (last visited Dec. 29, 2025).

who do not pay to license the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio. *See* Exhibit 21.

175. As discussed below, First Horizon does not infringe and has not infringed the Patents-in-Suit.

176. Defendants' actions have created an actual, justiciable, substantial, and immediate controversy between First Horizon and Defendants as to whether First Horizon infringes the Patents-in-Suit.

177. Defendants' actions include the transmission of threatening emails and letters by representatives of Intellectual Ventures Management, by and on behalf of all Defendants, stating First Horizon is purportedly required to license the Patents-in-Suit, alleging that First Horizon infringes each of the Patents-in-Suit, and representing that litigation will be used to attack accused infringers who do not pay to license the patents in Intellectual Ventures Management's Patent Portfolio. *See* Exhibit 21.

178. The assignees of the patents in Intellectual Ventures Management's Patent Portfolio have a history of aggressive litigation against other parties similarly situated to First Horizon when those other parties have refused to pay to license the patents in Intellectual Ventures Management's Patent Portfolio.

179. For example, after Intellectual Ventures Management accused JP Morgan of practicing the patents in Intellectual Ventures Management's Patent Portfolio and JP Morgan refused to pay to license those patents, Defendants Intellectual Ventures I and Intellectual Ventures II filed suit against JP Morgan in the U.S. District Court for the Eastern District of Texas Marshall Division on November 15, 2023, and alleged that JP Morgan's use of Docker, Kafka, Trino and/or Presto, Apache Spark, a mobile banking application with the Zelle payment features, and

53

Kubernetes infringed six patents, including the '844 Patent, the '722 Patent, and the '785 Patent which Defendants also now accuse First Horizon of infringing. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, No. 2:23-cv-00523-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1.

180.    As another example, after Intellectual Ventures Management accused Comerica of practicing the patents in Intellectual Ventures Management's Patent Portfolio and Comerica refused to pay to license those patents, Defendants Intellectual Ventures I and Intellectual Ventures II filed suit in the U.S. District Court for the Eastern District of Texas Marshall Division on November 15, 2023, and alleged that Comerica's use of Docker, Kafka, Apache Spark, and Kubernetes infringed four patents, including the '844 Patent, the '722 Patent, and the '785 Patent which Defendants also now accuse First Horizon of infringing. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Comerica Inc.*, No. 2:23-cv-00524-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1.

181.    As another example, after Intellectual Ventures Management accused Liberty Mutual *et al.* of practicing the patents in Intellectual Ventures Management's Patent Portfolio and Liberty Mutual *et al.* refused to pay to license those patents, Defendants Intellectual Ventures I and Intellectual Ventures II filed suit in the U.S. District Court for the Eastern District of Texas Marshall Division on November 15, 2023, and alleged that Liberty Mutual *et al.*'s use of Docker, Kafka, Spark, and Kubernetes infringed four patents, including the '844 Patent, the '722 Patent, and the '785 Patent which Defendants also now accuse First Horizon of infringing. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Liberty Mut. Holding Co. Inc., et al.*, No. 2:23-cv-00525-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1.

182.    Defendants have established a pattern of practice wherein Intellectual Ventures Management, on its own behalf and by and on behalf of entities it manages and/or who are under common ownership and/or control and/or for which it is the agent and/or legal representative, including the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio such as Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, accuses an entity of practicing the assignees' and licensees' patents in its portfolio, Intellectual Ventures Management offers to license the assignees' and licensees' patents to the allegedly infringing party, and, if the allegedly infringing party does not pay the license fee demanded, then the assignees of those patents file suit for patent infringement against that party in the U.S. District Court in Texas for their collective benefit.

183.    For example, Intellectual Ventures Management, on its own behalf and by and on behalf of entities it manages and/or who are under common ownership and/or control and/or for which it is the agent and/or legal representative, including the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, sent the letter that is Exhibit 5 to their complaint the day before Intellectual Ventures I and Intellectual Ventures II filed suit for patent infringement against Comerica for their collective benefit. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Comerica Inc.*, No. 2:23-cv-00524-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1, Ex. 5. That letter, signed by their attorney, emphasized that the entities do "not authorize Comerica or Comerica's customers or partners to practice any of these patents without a license." *Id.* Further, the letter stated that the entities were "willing to offer a patent license to Comerica and remain[ed] open to business discussions with Comerica to negotiate such a license, either to the specifically referenced patents, or to all or a subset of the IV patent rights." *Id.*

55

184. Substantively identical letters signed by the same attorney were sent to JP Morgan and to Liberty Mutual *et al.* before Intellectual Ventures I and Intellectual Ventures II also filed complaints for patent infringement against each of them, and those letters were then also included as exhibits to their respective complaints. *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, No. 2:23-cv-00523-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1, Ex. 7; *See Intellectual Ventures I LLC, and Intellectual Ventures II LLC v. Liberty Mut. Holding Co. Inc., et al.*, No. 2:23-cv-00525-JRG (E.D. Tex. filed Nov. 15, 2023), ECF No. 1, Ex. 5.

185. Upon information and belief, before each of those letters were received, JP Morgan, Comerica, and Liberty Mutual *et al.* each received similar correspondence from Intellectual Ventures Management, on its own behalf and by and on behalf of entities it manages and/or who are under common ownership and/or control and/or for which it is the agent and/or legal representative, including the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, attempting to license the patents in its Patent Portfolio under threat of litigation as First Horizon has also received.

186. Taken together, a pattern has been demonstrated wherein entities that Intellectual Ventures Management manages and/or who are under common ownership and/or control and/or for which it is the agent and/or legal representative, including the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, file suit for patent infringement against companies who refuse to pay to license the assignees' and licensees' patents in Intellectual Ventures Management's Patent Portfolio and a *modus operandi* in which Intellectual Ventures Management, by and on behalf of itself and those entities, sends substantially identical and successive correspondence preceding the filing of a complaint for patent infringement against

accused infringers who refuse to pay. Intellectual Ventures Management, on its own behalf and by and on behalf of entities it manages and/or who are under common ownership and/or control and/or for which it is the agent and/or legal representative, including the assignees and licensees of patents in Intellectual Ventures Management's Patent Portfolio, has sent First Horizon substantially identical and successive correspondence that it sent to other defendants before a complaint for patent infringement was filed against those defendants.

187. Therefore, there is an actual, justiciable, substantial, and immediate controversy as between First Horizon and Defendants regarding whether First Horizon infringes the Patents-in-Suit. This conclusion is further supported by Intellectual Ventures Management's actions, on behalf of Defendants, that include (1) alleging that there were certain risks related to utilizing technologies encompassed by the patents in the Intellectual Ventures Management Patent Portfolio and it was "critical to mitigate these risks and protect both First Horizon's operations and IV's intellectual property rights through a formalized licensing arrangement"; (2) identifying technology attributed to First Horizon that allegedly infringes patents assigned to Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, in the letter sent on September 23, 2024, by Mr. Joroff, on behalf of Defendants, to First Horizon; and (3) a historically aggressive litigation strategy, viewed in conjunction with the statements from Mr. Joroff where Intellectual Ventures Management, by and on behalf of the assignees and licensees of the patents in its Patent Portfolio including Intellectual Ventures I, Intellectual Ventures II, Callahan Cellular, OL Security, Fund I, and Fund II, have targeted First Horizon just as Liberty Mutual *et al*., Comerica, and JP Morgan were first targeted and then sued.

188.    The facts show a substantial controversy between parties with adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaratory judgment. Accordingly, this Court has declaratory judgment jurisdiction to hear this case.

## VI. CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '785 PATENT

189.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

190.    Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon. Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 18.

191.    Intellectual Ventures Management, by and on behalf all of Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license" of at least the Patents-In-Suit, including the '785 Patent. *See* Exhibit 20.

192.    Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See* Exhibit 9; Exhibit 10.

193.    Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license.

58

194.    Intellectual Ventures Management, on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio, including the '785 Patent, and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

195.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged that the '785 Patent "cover[s] technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" and identifies "Kubernetes," a third party branded software, as the "Example Product/Feature." *See* Exhibit 9.

196.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged infringement of at least claim 30 of the '785 Patent by "First Horizon' [sic] use of Kubernetes" (the "'785 Accused System"). *See* Exhibit 9.

197.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '785 Accused System), or import into the United States any product and/or system (including but not limited to the '785 Accused System) in a manner which infringes the '785 Patent.

198.    By way of an example, each independent claim of the '785 Patent requires, *inter alia*, that a device is registered in a virtual network. *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at Claim 1 ("the virtual network manager configured to register devices in a virtual network"); Claim 30 ("a memory and a processor to implement a register module configured to register

devices in a virtual network"); Claim 38 ("a first device that is registered as a member in the virtual network"); Claim 48 ("distributing a virtual network address to a device to register the device as a member of the virtual network"); Claim 62 ("distribute a virtual network address to a device to register the device as a member in the virtual network"); Claim 75 ("a user set of one or more devices that are registered in the virtual network").

199.    First Horizon does not infringe the '785 Patent (including, for example, the independent claims identified in the preceding paragraph) at least because the '785 Accused System does not register devices in a virtual network.

200.    The "kubernetes.io" website includes the following "overview" of the '785 Accused System. *See* https://kubernetes.io/docs/concepts/overview/#why-you-need-kubernetes-and-what-can-it-do (last accessed Oct. 4, 2024).

> # Overview
>
> Kubernetes is a portable, extensible, open source platform for managing containerized workloads and services, that facilitates both declarative configuration and automation. It has a large, rapidly growing ecosystem. Kubernetes services, support, and tools are widely available.

Let's take a look at why Kubernetes is so useful by going back in time.

**Traditional Deployment**    **Virtualized Deployment**    **Container Deployment**

## Traditional deployment era:

Early on, organizations ran applications on physical servers. There was no way to define resource boundaries for applications in a physical server, and this caused resource allocation issues. For example, if multiple applications run on a physical server, there can be instances where one application would take up most of the resources, and as a result, the other applications would underperform. A solution for this would be to run each application on a different physical server. But this did not scale as resources were underutilized, and it was expensive for organizations to maintain many physical servers.

## Virtualized deployment era:

As a solution, virtualization was introduced. It allows you to run multiple Virtual Machines (VMs) on a single physical server's CPU. Virtualization allows applications to be isolated between VMs and provides a level of security as the information of one application cannot be freely accessed by another application.

Virtualization allows better utilization of resources in a physical server and allows better scalability because an application can be added or updated easily, reduces hardware costs, and much more. With virtualization you can present a set of physical resources as a cluster of disposable virtual machines.

Each VM is a full machine running all the components, including its own operating system, on top of the virtualized hardware.

## Container deployment era:

Containers are similar to VMs, but they have relaxed isolation properties to share the Operating System (OS) among the applications. Therefore, containers are considered lightweight. Similar to a VM, a container has its own filesystem, share of CPU, memory, process space, and more. As they are decoupled from the underlying infrastructure, they are portable across clouds and OS distributions.

61

201.    The "kubernetes.io" website provides that the '785 Accused System is an "open source platform for managing containerized workloads and services" wherein the containers are "decoupled from the underlying infrastructure" and "are portable across clouds and OS distributions." *See* https://kubernetes.io/docs/concepts/overview/#why-you-need-kubernetes-and-what-can-it-do (last accessed Oct. 4, 2024).

202.    The "kubernetes.io" website provides the following description of Kubernetes "Cluster Architecture" which make up the '785 Accused System. *See* https://kubernetes.io/docs/concepts/architecture/ (last accessed Oct. 4, 2024).

The architectural concepts behind Kubernetes.

A Kubernetes cluster consists of a control plane plus a set of worker machines, called nodes, that run containerized applications. Every cluster needs at least one worker node in order to run Pods.

The worker node(s) host the Pods that are the components of the application workload. The control plane manages the worker nodes and the Pods in the cluster. In production environments, the control plane usually runs across multiple computers and a cluster usually runs multiple nodes, providing fault-tolerance and high availability.

203.    The "kubernetes.io" website provides the following description of "Pods" which, as provided above, make up the '785 Accused System. *See* https://kubernetes.io/docs/concepts/workloads/pods/ (last accessed Oct. 4, 2024).

## Pods

*Pods* are the smallest deployable units of computing that you can create and manage in Kubernetes.

A *Pod* (as in a pod of whales or pea pod) is a group of one or more containers, with shared storage and network resources, and a specification for how to run the containers. A Pod's contents are always co-located and co-scheduled, and run in a shared context. A Pod models an application-specific "logical host": it contains one or more application containers which are relatively tightly coupled. In non-cloud contexts, applications executed on the same physical or virtual machine are analogous to cloud applications executed on the same logical host.

As well as application containers, a Pod can contain init containers that run during Pod startup. You can also inject ephemeral containers for debugging a running Pod.

204.    The "kubernetes.io" website provides the following description of "DNS for Services and Pods" which, as provided above, make up the '785 Accused System. *See* https://kubernetes.io/docs/concepts/services-networking/dns-pod-service/ (last accessed Oct. 4, 2024).

## DNS for Services and Pods

Your workload can discover Services within your cluster using DNS; this page explains how that works.

Kubernetes creates DNS records for Services and Pods. You can contact Services with consistent DNS names instead of IP addresses.

Kubernetes publishes information about Pods and Services which is used to program DNS. Kubelet configures Pods' DNS so that running containers can lookup Services by name rather than IP.

Services defined in the cluster are assigned DNS names. By default, a client Pod's DNS search list includes the Pod's own namespace and the cluster's default domain.

63

205.    The "kubernetes.io" website provides that, to the extent that the '785 Accused System is configured to register anything in a virtual network, it is configured to register Pods in a virtual network.

206.    Based at least in part on this representation, a Pod is not a "device" as claimed in each independent claim of the '785 Patent.

207.    Accordingly, First Horizon does not infringe the '785 Patent at least because the '785 Accused System does not register devices in a virtual network.

208.    Accordingly, First Horizon does not directly infringe the '785 Patent, either literally or under the doctrine of equivalents.

209.    Furthermore, at least because there is no direct infringement by Kubernetes, there is also no indirect infringement, and First Horizon does not induce infringement of the '785 Patent or otherwise contribute to infringement of the '785 Patent.

210.    Therefore, an actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '785 Patent.

211.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '785 Accused System) has not infringed and does not infringe the '785 Patent.

## COUNT II
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '785 PATENT

212.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

64

213.    Each claim of the '785 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. § 1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

214.    Upon information and belief, and subject to further discovery, claim 30 of the '785 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

215.    Upon information and belief, and subject to further discovery, claim 30 of the '785 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

1. **Claim 30 of the '785 Patent is Invalid Under 35 U.S.C. § 101.**

216.    Claim 30 of the '785 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 30 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

217.    In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012) (citations omitted)). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

218.    If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two.  Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted).  To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72.  Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

### i.    Claim 30 of the '785 Patent Fails *Alice* Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101

219.    Claim 30 as a whole is directed to an abstract idea. Claim 30 as a whole is directed to: (1) registering devices in a virtual network; (2) receiving a request from a first device on the virtual network for information related to a second device on the same virtual network; and (3) distributing identifying information associated with the second device to the first device to facilitate communication between the first and second devices, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

220.    Claim 30 as a whole is directed to steps for a purely internal process, relying upon generic computer equipment to route communications within a network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

221.    Furthermore, the specification confirms that Claim 30 as a whole is not a claimed advance over the prior art, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over

the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 30 as a whole, including the use of a conventional computing device to register devices on a virtual network and distribute information about said registered devices upon request, were well understood at the time of the invention, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at col. 9, ll. 42–44 ("A hardware architecture for the machines, server or other devices used to implement the present invention should be well understood to one of average skill in the art."). Claim 30 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

222.    Claim 30 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 30 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  For example, Claim 30's functional recitation of "register[ing] devices in a virtual network," "receiv[ing] a DNS request" and "return[ing] a network address[,] … a private network address[,] … and a virtual network address" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 30 as a whole is directed to a generic network architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements, and so

67

is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

223.    Claim 30 as a whole describes using standard hardware to execute basic communication routing tasks over a network without any improvement to the functionality of the network components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 30 is not directed to specific asserted improvements in computer capabilities.

224.    Claim 30 as a whole is directed to basic peer-to-peer communication protocols, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 30 is directed to assigning a virtual network address to a device registered on a virtual network and, in response to a request, providing said virtual network address among other identifying information to a requesting device such that communication may be made, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

225.    Claim 30 as a whole is directed to communication over a network, and specifically to communicating requests to a remote server and receiving communications from that server, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 892 (Fed. Cir. 2019) (quoting *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019)); *see also buySAFE, Inc. v. Google, Inc.*,

765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network … is not even arguably inventive.").

226. Claim 30 as a whole is directed merely to facilitating communication by devices registered on a common virtual network and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

227. For at least the foregoing reasons, Claim 30 fails *Alice* step one.

**ii.    Claim 30 of the '785 Patent Also Fails *Alice* Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

228. Claim 30 merely recites a generic computer with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 30 simply uses a generic computer to perform generic computer functions, including "register[ing] devices in a virtual network," "distribut[ing] a virtual network address" to the registered devices, and, upon "receiv[ing] a DNS request from a first device in the virtual network," "return a network address associated with a route director [and] a private network address [and public network address] associated with a second device in the virtual network", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir. 2015) ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

229. Claim 30 recites architecture of a generic computing system, including a "virtual network," a "virtual network manager," a "network interface," a "memory," a "processor," a

plurality of "devices," and a "DNS server", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Implementation of an abstract idea by the '785 Patent's routine hardware fails to move the mere routing of communications within a network beyond an abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

230. The specification of the '785 Patent further confirms the conventional nature of the architecture in claim 30, explaining that the "hardware architecture for the machines, server or other devices used to implement the present invention should be well understood to one of average skill in the art." *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at col. 9, ll. 42–44.

231. Claim 30 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '785 Patent discloses that a "virtual network" is merely a "private dynamic network which acts as a private LAN for computing devices." *See* Alkhatib *et al.* at col. 9, ll. 1–2. The "choice of processor is not critical," the "memory can be any conventional computer memory," and the "network interface can include a network card for connecting to an Ethernet or other type of LAN." *See* Alkhatib *et al.* at col. 9, ll. 48–58. The "DNS server" is also well-known in the prior art and is included in the prior art system shown in Figure 3 of the '785 Patent. Claim 30 does not improve functionality of these devices; instead, it employs well-understood hardware to simply route communications within a network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network

components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

232. The elements of claim 30, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter.

233. For at least the foregoing reasons, Claim 30 fails *Alice* step two.

234. Accordingly, claim 30 of the '785 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

**2. Claim 30 of the '785 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.**

235. Upon information and belief, and subject to further discovery, claim 30 of the '785 Patent is invalid under 35 U.S.C. §§ 102 and 103.

236. The '785 Patent originated as U.S. Application No. 10/403,818, was filed on March 31, 2003, and does not claim priority to an earlier filing date.

237. Claim 30 of the '785 Patent reads as follows:

30. A virtual network manager, comprising:
 a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public network address;
 a memory and a processor to implement a register module configured to register devices in a virtual network, the register module further configured to:
 receive a registration request from an agent associated with a device;
 distribute a virtual network address to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by the virtual network address; and
 a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return a network

71

address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device.

238. Claim 30 of the '785 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent Publication No. US2003/0028671 (hereinafter "Mehta") and, separately, is also rendered invalid under 35 U.S.C. § 103 by Mehta in combination with "Request for Comment 1383: An Experiment in DNS-Based IP Routing" by Christian Huitema (hereinafter "Comment 1383").

239. Mehta was filed on June 10, 2002 and published on February 6, 2003. It is entitled "Method and System for Two-way Initiated Data Communication with Wireless Devices," and lists Samir Narendra Mehta, Mazin Ramadan, Geoffrey S. Heller, Vineet R. Sharma, Markus L. Janse, Edward L. Gow, and Ngochan T. Nguyen as inventors. A true and correct copy of Mehta is attached hereto as Exhibit 26.

240. Mehta is prior art to the '785 Patent.

241. Comment 1383[3] was publicly available prior to March 31, 2003. A true and correct copy of Comment 1383 is attached hereto as Exhibit 27.

242. Comment 1383 is prior art to the '785 Patent.

243. As shown on the '785 Patent under the heading "References Cited," neither Mehta nor Comment 1383 were considered by the Examiner during examination of the application that issued as the '785 Patent.

---

[3] Huitema, C., Network Working Group Request for Comment (RFC): 1383, entitled An Experiment in DNS Based IP Routing ("RFC-1383").

244. The '785 Patent issued without the United States Patent and Trademark Office considering that Mehta and/or Comment 1383 render the invention claimed in the '785 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

245. On November 20, 2024, a Petition for *Inter Partes* Review of the '785 Patent was filed by Liberty Mutual Insurance Company, Liberty Mutual Technology Group, Inc., Liberty Mutual Holding Company Inc., Liberty Mutual Group Inc., Liberty Mutual Plano LLC, Camparion Insurance Agency, LLC, Ironshore Holdings (U.S.) Inc., and Comerica Incorporated and assigned AIA Review No. IPR2025-00201 (the "Liberty Mutual '785 Petition"). A true and correct copy of the Liberty Mutual '785 Petition and its exhibits are attached hereto as Exhibit 28 and incorporated into this Amended Complaint by reference.

246. The Liberty Mutual '785 Petition explains that Mehta and Comment 1383 render claim 30 of the '785 Patent invalid. The Liberty Mutual '785 Petition explains that when the application that issued as the '785 Patent was filed, the invention claimed in claim 30 of the '785 Patent would have been obvious to a person of skill in the art ("POSITA") in light of Mehta and RFC-1383. *See* Exhibit 28.

247. Before the Patent Trial and Appeal Board ("PTAB") could consider that Mehta and Comment 1383 render claim 30 of the '785 Patent invalid, the parties to IPR2025-00201 reached a settlement and jointly requested that IPR2025-00201 be terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC*, IPR2025-00201, Paper 9 (P.T.A.B. Apr. 23, 2025). In response to the parties' joint request for termination based on the parties' settlement, IPR2025-00201 was terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC*, IPR2025-00201, Paper 10 (P.T.A.B. Apr. 23, 2025).

248.   IPR2025-00201 was terminated before any substantive review or decision by the PTAB as to the invalidity of claim 30 in light of Mehta and Comment 1383.

249.   For at least the reasons stated in the Liberty Mutual '785 Petition, which is adopted herein and set forth below, Mehta and Comment 1383 render claim 30 of the '785 Patent invalid.

250.   Claim 30 claims "[a] virtual network manager, comprising" specific limitations that are recited in claim 30. *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at Claim 30.

251.   Mehta discloses a virtual network manager comprising the limitations recited in claim 30 of the '785 Patent. *See* U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.*

252.   Comment 1383 discloses a virtual network manager comprising certain limitations recited in claim 30 of the '785 Patent. *See* Exhibit 27.

253.   Claim 30 of the '785 Patent claims its virtual network manager comprises "a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public network address" (hereinafter "the Network Interface Limitation"). *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at Claim 30.

254.   Mehta discloses the Network Interface Limitation. For example, Mehta discloses: an "Address Management Proxy System" (AMPS) that is configured to manage communications between "a device on a private network [initiated] from a device on a public network to achieve virtual end-to-end connectivity." *See* U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0002]; Exhibit 28 at 35–36. The AMPS is shown in Figure 2 of Mehta, provided below:



Fig. 2

255.   The AMPS "enables devices and systems connected to a public internet, such as the Internet, to initiate communication with and to send data to wireless devices connected to a private wireless network. . . ." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0024].

256.   As stated in the Liberty Mutual '785 Petition, "Mehta also discloses the AMPS virtual network community is defined by 'public network address[es]' … that have an associated public domain name, [for example,] because Mehta has a DNS or domain name server for the public domain name that returns public IP addresses for associated private devices." Exhibit 28 at 37 (quoting U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0012] ("the AMPS comprises one or more modified DNS'/API servers ... [that] receives a request from a device on a public network for a particular [private network] device, and returns an appropriate temporary public address, which is internally mapped to the private address of the [private network] device"); ¶ [0057] (request for the private network device corresponding to "'uniqueID.hostname.domain.tld,'

which specifies a typical hierarchy of person/service on a machine named 'hostname' on a domain such as a company's network on a top level domain such as 'org.' 'com,' 'edu,' etc.")).

257. Claim 30 claims its virtual network manager also comprises "a memory and a processor to implement a register module configured to register devices in a virtual network, the register module further configured to: receive a registration request from an agent associated with a device; distribute a virtual network address to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by the virtual network address" (hereinafter "the Memory and Processor Limitation"). *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at Claim 30.

258. Mehta discloses the Memory and Processor Limitation. For example, Mehta discloses: "A computer-readable memory medium containing instructions for controlling a processor in a computer system to establish a bi-directional communication channel … between a first device connected to a computer network environment using a public network address and a second device connected to a wireless communications network and having a private address." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at Claim 67. "[A] general purpose computer system for practicing embodiments of the [AMPS] … comprises a computer memory…, a display 402, [and] a Central Processing Unit. . . ." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0036].

259. The AMPS "dynamically allocates, using methods similar to a DHCP protocol, a private wireless network address when the wireless device registers itself with the carrier infrastructure upon being powered on." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0053]. "Thus, the unique ID table 610 may be sparsely filled or entries created dynamically and then deleted dynamically as devices register and unregister with the carrier infrastructure system."

U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0053]. "The AMPS DNS'/API server receives a request from a device on a public network for a particular wireless device…" U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0012].

260.    Figure 3 of Mehta, provided below, depicts an "Address Management Data Server 303" and an "Address Management Data Repository 304" where registration information may be stored:



261.    Mehta discloses that "a pool of public addresses, for example, public IP addresses, is maintained and allocated dynamically to wireless network devices as required." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0039]. The AMPS includes "one or more Address Proxy/Routers 305" that use "the Address Management Data Server 303 or equivalent to create and update a series of routing tables that are used to assign public addresses to wireless devices as needed and to update the various mappings between public addresses and the non-mutable (private) addresses of the wireless devices." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶

[0032]. Further, "[i]f a public network address has not already been assigned or is not valid, then the routine causes a new public network address to be allocated and that new public address is associated with the private wireless network address." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0057].

262.    Claim 30 claims its virtual network manager also comprises "a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device" (hereinafter "the DNS Server Limitation"). *See* U.S. Pat. No. 7,949,785 to Alkhatib *et al.* at Claim 30.

263.    Mehta discloses the DNS Server Limitation.  For example, Mehta discloses: "The [AMPS] achieves two way initiated bi-directional communication by implementing a **modified DNS server** and serving as a proxy/router for devices on the private wireless network as they interface to the public wired internetworking world." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030] (emphasis added). "In summary, a pool of public addresses is maintained and dynamically distributed among active wireless devices as needed by the AMPS…." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030]. "The term "bi-directional" as used herein means that data paths and communication can flow in either direction between two endpoint systems." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030]. "FIG. 2 shows wired devices 201, 202, and 203 connected to public network 210." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030]. "One skilled in the art will recognize that these devices could be connected to another private or public network, which is then connected by one or more wired devices to the public network 210, yet still achieve the functionality discussed here." U.S. Pat. Pub. No. 2003/0028671

78

to Mehta *et al.* at ¶ [0030]. "Any such variation provides equivalent functionality and is explicitly contemplated and presumed to be part of the present invention." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030]. "On the wireless side, the AMPS 220, acting in its capacity as a proxy (and router) for wireless devices, is shown both connected via wire to the public network 210 and via standard carrier infrastructure elements (not shown) to the wireless network 230." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0030].

264.    "[T]he AMPS comprises one or more modified DNS/API servers, one or more Address Proxy/Routers, an Address Management Data Server, one or more Address Management Data Repositories, and optionally a load balancer." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0012]. "The AMPS DNS'/API server receives a request from a device on a public network for a particular wireless device, and returns an appropriate temporary public address, which is internally mapped to the private address of the wireless device." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0012]. "The router (or routing server/service) typically contains a routing table, which determines to which machine (and optionally to which port) to send a datagram, given a destination IP address." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0008] (emphasis added). The AMPS can "be used by one device on a first wireless network to communicate with another wireless device on a second network–each device ends up communicating with the Address Proxy/Router of the other network." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0033].

265.    As stated in the Liberty Mutual '785 Petition, "[i]n Mehta, each (wireless) device has a private IP address and a Unique ID assigned by a (e.g., network) carrier." Exhibit 28 at 48 (citing U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0053]). "Additionally, Mehta has a set of Address Proxy/Router 305 machines, each of which can have multiple public addresses

(facing the Internet) as well as multiple private address (facing the wireless network)." Exhibit 28 at 48 (citing U.S. Pat. Pub. No. US2003/0028671 to Mehta *et al.* at ¶ [0055]). "Mehta organizes this information into three tables … [that] list at least four pieces of information that can be associated with each host: a Unique ID 601, Private Network Address 602, Public Network Address 631, and Proxy/Router machine 621." Exhibit 28 at 48 (citing U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at Figure 6).

266.  "Once all of the tables have been updated in both the proxy/router and in the data repository, the DNS'/API server returns the determined public network address of the associated Address Proxy /Router machine." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0057].

267.  As stated in the Liberty Mutual '785 Petition, "the AMPS stores and assigns to destination devices in the network 'a private non-routable address by means of DHCP (or DHCP-like) server.'" Exhibit 28 at 49–50 (citing U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0026]). "This is the Private Network Address 602 in Tables 610 and 630 of Fig. 6." Exhibit 28 at 50. "As part of the steps of Fig. 7, the DNS'/API server has to query the Address Management Data Server 303 and it returns this private address from the Data Repository 304." Exhibit 28 at 50. "This address is then further returned (upstream) by AMDS 303 to DNS'/API Server 302." Exhibit 28 at 50.

268.  "FIG. 7 is an example flow diagram of an example routine provided by a DNS'/API server of the Address Management Proxy System to return a public address that corresponds to a designated unique identifier." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0057]. The "public address is, for example, an address associated with one of the Address Proxy/Routers, which are connected to the external public network and have access to the private addresses on the private wireless network." U.S. Pat. Pub. No. 2003/0028671 to Mehta *et al.* at ¶ [0012].

269.    Comment 1383 also discloses the DNS Server Limitation.  For example, RFC-1383 discloses: "The 'MX records' are currently used by the mail routing application to introduce a level of decoupling between the 'domain names' used for user registration and the mailbox addresses." Exhibit 27 at 2. "They are particularly useful for sending mail to 'non connected' domains: in that case, the MX record points to one or several Internet hosts that accept to relay mail towards the target domain." Exhibit 27 at 2. "We propose to generalize this scheme for packet routing." Exhibit 27 at 2. "Suppose a routing domain D, containing several networks, subnetwork and hosts, and connected to the Internet through a couple of IP gateways." Exhibit 27 at 2. "These gateways are dual homed: they each have an address within the domain D -- say D1 and D2 -- and an address within the Internet -- say I1 and I2 --." Exhibit 27 at 2–3. "These gateways also have a particularity: they retain information, and don't try to announce to the Internet any reachibility [sic] information on the networks contained within 'D'." Exhibit 27 at 3. "These networks however have been properly registered; a name server accessible from the Internet contains the 'in-addr.arpa' records that enable reverse 'address to name' lookup, and also contains the network level equivalent of 'MX records', say 'RX records'." Exhibit 27 at 3. "Given any host address Dx within D, one can get 'RX records' pointing to the Internet addresses of the gateways, I1 and I2." Exhibit 27 at 3. "A standard Internet router Ix cannot in principle send a packet to the address Dx: it does not have any corresponding routing information." Exhibit 27 at 3. "However, if the said Internet router has been modified to exploit our scheme, it will query the DNS with the name build up from 'Dx' in the 'in-addr.arpa' domain, obtain the RX records, and forward the packet towards I1 (or I2), using some form of 'source routing'." Exhibit 27 at 3. "The gateway I1 (or I2) will receive the packet; its routing tables contain information on the domain D and it can relay the packet to the host Dx." Exhibit 27 at 3.

81

270.    The DNS record type "is designed for easy general purpose extensions in the DNS, and its content is a text string." Exhibit 27 at 11. "The RX record will contain three fields: A record identifier composed of the two characters 'RX' … to disambiguate from other experimental uses of the 'TXT' record[; a] cost indicator, encoded on up to 3 numerical digits … [; and a]n IP address, encoded as a text string following the 'dot' notation." Exhibit 27 at 11.

271.    "Upon reception of the ICMP message, the query manager updates the local routing table, so that any new packet bound to the requested destination becomes routed through the real time forwarder." Exhibit 27 at 12. "At the same time, the query manager will send a DNS request, in order to read the RX records corresponding to the destination." Exhibit 27 at 12. "After reception of the response, it will select a gateway, and pass the information to the real time forwarder." Exhibit 27 at 12.

272.    Mehta discloses the virtual network manager claimed in claim 30 of the '785 Patent. Mehta renders claim 30 of the '785 Patent invalid pursuant to 35 U.S.C. § 102.

273.    In light of the disclosure in Mehta, a POSITA would also consider claim 30 of the '785 Patent obvious pursuant to 35 U.S.C. § 103.

274.    In light of the combined disclosure in Mehta and RFC-1383, a POSITA would also consider claim 30 of the '785 Patent obvious pursuant to 35 U.S.C. § 103.

**COUNT III**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '844 PATENT**

275.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

276.    Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon.  Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that

82

"Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 16. Intellectual Ventures Management, by and on behalf of all Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license" of at least the Patents-In-Suit, including the '844 Patent. *See* Exhibit 20. Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See* Exhibit 9; Exhibit 10. Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license. Intellectual Ventures Management, by and on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio, including the '844 Patent, and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

277.   In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged that the '844 Patent "cover[s] technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" and identifies "Docker," a third party branded software, as the "Example Product/Feature." *See* Exhibit 9.

278.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged infringement of at least claim 7 of the '844 Patent by "First Horizon's use of Docker" (the "'844 Accused System"). *See* Exhibit 9.

279.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '844 Accused System), or import into the United States any product and/or system (including but not limited to the '844 Accused System) in a manner which infringes the '844 Patent.

280.    By way of an example, each independent claim of the '844 Patent requires, *inter alia*, that the claimed "leaf image" contain "only additional data blocks not previously contained in said root image and changes made … to the blocks of said root image." *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 1 ("a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image"); Claim 7 ("said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image"); Claim 14 ("a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image"); Claim 19 ("said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image"); Claim 23 ("said leaf image portion comprising only additional data blocks not previously contained in said root image portion and, changes made by said first compute

84

node to the blocks of said room image, wherein said leaf image portion does not include blocks of said root image that are unchanged by said first compute node").

281.    First Horizon does not infringe the '844 Patent at least because the '844 Accused System does not include leaf images as claimed.

282.    The "Docker" website provides that the '844 Accused System includes an architecture with (1) "images" which are "read-only template[s] with instructions for creating a Docker container" and (2) "containers" which are "runnable instance[s] of an image" where each container "is defined by its image." *See* https://docs.docker.com/get-started/docker-overview/ (last accessed Oct. 4, 2024).

### Images

An image is a read-only template with instructions for creating a Docker container. Often, an image is based on another image, with some additional customization. For example, you may build an image which is based on the `ubuntu` image, but installs the Apache web server and your application, as well as the configuration details needed to make your application run.

You might create your own images or you might only use those created by others and published in a registry. To build your own image, you create a Dockerfile with a simple syntax for defining the steps needed to create the image and run it. Each instruction in a Dockerfile creates a layer in the image. When you change the Dockerfile and rebuild the image, only those layers which have changed are rebuilt. This is part of what makes images so lightweight, small, and fast, when compared to other virtualization technologies.

### Containers

A container is a runnable instance of an image. You can create, start, stop, move, or delete a container using the Docker API or CLI. You can connect a container to one or more networks, attach storage to it, or even create a new image based on its current state.

By default, a container is relatively well isolated from other containers and its host machine. You can control how isolated a container's network, storage, or other underlying subsystems are from other containers or from the host machine.

A container is defined by its image as well as any configuration options you provide to it when you create or start it. When a container is removed, any changes to its state that aren't stored in persistent storage disappear.

283.    The "Docker" website provides that "[t]he major difference between a container and an image is the top writable layer." *See* https://docs.docker.com/engine/storage/drivers/ (last accessed Oct. 4, 2024).

## Container and layers

The major difference between a container and an image is the top writable layer. All writes to the container that add new or modify existing data are stored in this writable layer. When the container is deleted, the writable layer is also deleted. The underlying image remains unchanged.

284.    Upon information and belief, a "container" of the '844 Accused System includes both (1) image layers and (2) a container layer, as depicted below. *See* https://docs.docker.com/engine/storage/drivers/ (last accessed Oct. 4, 2024).



285.    In light of this representation, and on information and belief, a container of the '844 Accused System does not include "only additional data blocks not previously contained in said root image and changes made … to the blocks of said root image" as recited by each independent claim of the '844 Patent.

286.    The '844 Accused System does not include a "leaf image[s]" as claimed by the independent claims of the '844 Patent.

287.    Accordingly, First Horizon does not directly infringe the '844 Patent, either literally or under the doctrine of equivalents.

288.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '844 Patent or otherwise contribute to infringement of the '844 Patent.

289.    Therefore, an actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed, or is infringing, the '844 Patent.

290.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '844 Accused System) has not infringed and does not infringe any claim of the '844 Patent.

## COUNT IV
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '844 PATENT

291.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

292.    Claim 7 of the '844 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

293.    Upon information and belief, and subject to further discovery, claim 7 of the '844 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

294.    Upon information and belief, and subject to further discovery, claim 7 of the '844 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

**1.   Claim 7 of the '844 Patent is Invalid Under 35 U.S.C. §101.**

295.    Claim 7 of the '844 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 7 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

296.    In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

297.    If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two. Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented

methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

### i. Claim 7 of the '844 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.

298.    Claim 7 as a whole is directed to an abstract idea. Claim 7 as a whole is directed to: (1) storing root images on a first storage unit; (2) storing leaf images on a second storage unit; (3) caching blocks of the root images that have been accessed; and (4) indexing the root images, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

299.    Claim 7 as a whole is directed to steps for a purely internal process, relying upon generic computer equipment data storage and management, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

300.    Furthermore, the specification confirms that Claim 7 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 7 as a whole, including the use of a conventional computing device to store root images, store root images, cache blocks of the root images that have been accessed, and index the root images, were well understood at the time of the invention. *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at col. 4, ll. 27–34 (The system including "a general purpose computing system environment, such as compute node 100 [which] includes at least one processing unit 102 and memory 104."); col. 4, ll. 48–56 ("Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other

89

medium which can be used to store the desired information and which can be accessed by compute node 100. Any Such computer storage media may be part of compute node 100."); col. 5, ll. 19–22 (The compute nodes 220*a-n* coupled to first storage unit 240 and a corresponding second storage unit 250*a-n. . . .*"). Claim 7 as a whole claims nothing more than the abstract idea underlying the claims described in the specification. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

301.    Claim 7 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 7 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. For example, Claim 7's functional recitation of "storing blocks of a root image of … compute nodes," "storing leaf images for respective compute nodes," and "caching blocks of said root image" merely describes abstract outcomes without concrete technological solutions.  Claim 7 as a whole is directed to a generic computing system architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

302.    Claim 7 as a whole describes using standard hardware to execute basic data storage and management without any improvement to the functionality of the system components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 7 is not directed to specific asserted improvements in computer capabilities.

90

303.   Claim 7 as a whole is directed to basic data storage and management techniques, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 7 is directed to "storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units," and "caching blocks of the root image that have been accessed by at least one compute node." *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at col. 4, ll. 15–22.

304.   The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc.*, 778 F. App'x at 892 (quoting *ChargePoint, Inc.*, 920 F.3d at 767); *see also buySAFE, Inc.*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network … is not even arguably inventive."). Further, the Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017) (organizing and accessing data held abstract); *Content Extraction and Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of data collection, recognition, and storage is undisputedly well-known.").

305.   Claim 7 as a whole is directed merely to data storage and management within a computing system and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

306.   For at least the foregoing reasons, Claim 7 fails *Alice* step one.

ii.   **Claim 7 of the '844 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

307.   Claim 7 merely recites a generic computer with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 7 simply uses a generic computer to perform generic computer functions, including "storing blocks of a root

91

image of … compute nodes," "storing leaf images for respective compute nodes," and "caching blocks of said root image", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101 *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

308.　Claim 7 recites architecture of a generic computing system, including a "plurality of compute nodes," a "first storage unit," "second storage units," and a "cache memory", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 7. Implementation of an abstract idea by the '844 Patent's routine hardware fails to move the mere storage of data beyond an abstract idea.

309.　Claim 7 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '844 Patent discloses that a "compute node" merely includes "at least one processing unit 102 and memory 104." U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at col. 4, ll. 29–31. The "memory 104 may be volatile (such as RAM), non-volatile (such as ROM, flash memory, etc.) or some combination of the two." U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at col. 4, ll. 32–34. Further, the "[c]omputer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can be accessed by compute node 100." U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at col. 4, ll. 48–56. Notably, the specification fails to note any unique

features of the "first storage unit" and "second storage units," thus confirming they are conventional. Claim 7 does not improve functionality of these devices; instead, it employs well-understood hardware to simply route communications within a network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

310. The elements of claim 7, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter.

311. For at least the foregoing reasons, Claim 7 fails *Alice* step two.

312. Accordingly, claim 7 of the '844 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

**2. Claim 7 of the '844 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.**

313. Upon information and belief, and subject to further discovery, claim 7 of the '844 Patent is invalid under 35 U.S.C. §§ 102 and 103.

314.    The '844 Patent originated as U.S. Application No. 11/709,477 and was filed on February 21, 2007.

315.    The '844 Patent, and specifically U.S. Application No. 11/709,477, claims to be a continuation-in-part of U.S. Application No. 11/395,816, which claims to be a continuation-in-part of U.S. Application No. 11/026,622. U.S. Application No. 11/395,816 was filed on March 30, 2006, and U.S. Application No. 11/026,622 was filed on December 20, 2004.

316.    Claim 7 of the '844 Patent reads as follows:

7. A method for providing data to a plurality of compute nodes, comprising:
   storing blocks of a root image of said compute nodes on a first storage unit;
   storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and
   caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

317.    Claim 7 of the '844 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by "Optimizing the Migration of Virtual Computers" by Sapuntzakis, *et al.* (hereinafter "Sapuntzakis") and is rendered invalid under 35 U.S.C. § 103 by Sapuntzakis in combination with U.S. Patent Publication No. 2005/0283597 (hereinafter "Holzmann").

318.    Sapuntzakis's publication information is Sapuntzakis, *et al.* "Optimizing the Migration of Virtual Computers," Association for Computing Machinery, Special Interest Group on Operating Systems, Operating Systems Review, Proceedings of the 5th Symposium on Operating Systems Design and Implementation, Volume 36, Issue S1, published 12/31/2002. Sapuntzakis was publicly available prior to December 20, 2004. A true and correct copy of Sapuntzakis is attached hereto as Exhibit 29.

319.    Sapuntzakis is prior art to the '844 Patent.

320.    Holzmann was filed on June 22, 2004 and published on December 22, 2005. It is entitled "System and Method for Booting Multiple Servers Form a Single Operating System Image," and lists Richard Holzmann as the inventor. A true and correct copy of Holzmann is attached hereto as Exhibit 30.

321.    Holzmann is prior art to the '844 Patent.

322.    As shown on the '844 Patent under the heading "References Cited," neither Sapuntzakis nor Holzmann were considered by the Examiner during examination of the application that issued as the '844 Patent.

323.    The '844 Patent issued without the United States Patent and Trademark Office considering that Sapuntzakis and/or Holzmann render the invention claimed in the '844 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

324.    On November 20, 2024, a Petition for *Inter Partes* Review of the '844 Patent was filed by Liberty Mutual Insurance Company, Liberty Mutual Technology Group, Inc., Liberty Mutual Holding Company Inc., Liberty Mutual Group Inc., Liberty Mutual Plano LLC, Camparion Insurance Agency, LLC, Ironshore Holdings (U.S.) Inc., and Comerica Incorporated and assigned AIA Review No. IPR2025-00202 (the "Liberty Mutual '844 Petition"). A true and correct copy of the Liberty Mutual '844 Petition and its exhibits are attached hereto as Exhibit 31 and incorporated into this Amended Complaint by reference.

325.    The Liberty Mutual '844 Petition explains that Sapuntzakis and Holzmann render claim 7 of the '844 Patent invalid.  The Liberty Mutual '844 Petition explains that when the application that issued as the '844 Patent was filed, the invention claimed in claim 7 of the '844 Patent would have been obvious to a POSITA in light of Sapuntzakis and Holzmann. *See* Exhibit 31.

326.    Before the PTAB could consider that Sapuntzakis and Holzmann render claim 7 of the '844 Patent invalid, the parties to IPR2025-00202 reached a settlement and jointly requested that IPR2025-00202 be terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC*, IPR2025-00202, Paper 8 (P.T.A.B. Apr. 23, 2025). In response to the parties' joint request for termination based on the parties' settlement, IPR2025-00202 was terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC*, IPR2025-00202, Paper 9 (P.T.A.B. Apr. 23, 2025).

327.    IPR2025-00202 was terminated before any substantive review or decision by the PTAB as to the invalidity of claim 7 in light of Sapuntzakis and Holzmann.

328.    For at least the reasons stated in the Liberty Mutual '844 Petition, which is adopted herein and set forth below, Sapuntzakis and Holzmann render claim 7 of the '844 Patent invalid.

329.    Claim 7 claims "[a] method for providing data to a plurality of compute nodes, comprising" specific limitations that are recited in claim 7. *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 7.

330.    Sapuntzakis discloses a method for providing data to a plurality of compute nodes comprising the limitations recited in claim 7 of the '844 Patent. *See* Exhibit 29.

331.    Holzmann discloses a method for providing data to a plurality of compute nodes comprising certain limitations recited in claim 7 of the '844 Patent. *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann.

332.    Claim 7 of the '785 Patent claims its method for providing data to a plurality of compute nodes comprises "storing blocks of a root image of said compute nodes on a first storage unit" (hereinafter "the First Storage Limitation"). *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 7.

96

333.    Sapuntzakis discloses the First Storage Limitation. For example, Sapuntzakis discloses: "Computers and storage in the Collective system act as caches of capsules." Exhibit 29 at 2. "As users travel, the Collective can move their capsules to computers close to them, giving users a consistent environment." Exhibit 29 at 2. "Capsules could be moved with users as they commute between home and work." Exhibit 29 at 2. "Capsules can be duplicated, distributed to many different machines, and updated like any other data; this can form the basis for administering a group of computers." Exhibit 29 at 2.

334.    "At the root of the hierarchy is a root disk, which is a complete capsule disk." Exhibit 29 at 5. "Figure 1 shows an example of a capsule hierarchy illustrating how it may be used in a university." Exhibit 29 at 5. "The root capsule contains all the software available to all students." Exhibit 29 at 5. Figure 3 shows an "[i]mplementation of capsule disks and demand paging." Figure 1 and 3 of Sapuntzakis are provided below:



Figure 1: An example capsule hierarchy.

97



Figure 3: Implementation of capsule disks and demand paging.

335.    Claim 7 of the '785 Patent claims its method for providing data to a plurality of compute nodes comprises "storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes" (hereinafter "the Second Storage Limitation"). *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 7.

336.    Sapuntzakis discloses the Second Storage Limitation. For example, Sapuntzakis discloses: "We can store the disks in these capsules efficiently by creating a hierarchy, where each child capsule could be viewed as inheriting from the parent capsule with the differences in disk state between parent and child captured in a separate copy-on-write (COW) virtual disk." Exhibit 29 at 5.

337. Sapuntzakis further discloses: "Writes to a capsule disk are performed by writing the data to the latest COW disk and updating its bitmap file." Exhibit 29 at 5. "Reads involve searching the latest COW disk and its ancestor disks in turn until the required block is found." Exhibit 29 at 5. "Since the root COW disk contains a copy of all the blocks, the search is guaranteed to terminate." Exhibit 29 at 5–6. "Since the latest COW disk is always local, all writes are local." Exhibit 29 at 6.

338. Claim 7 of the '785 Patent claims its method for providing data to a plurality of compute nodes comprises "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory" (hereinafter "the Caching Limitation"). *See* U.S. Pat. No. 8,332,844 to Kulkarni *et al.* at Claim 7.

339. Sapuntzakis discloses the Caching Limitation. For example, Sapuntzakis discloses: "Each COW disk can either be local or remote. Each remote COW disk has a corresponding local shadow COW disk which contains all the locally cached blocks of the remote COW disk." Exhibit 29 at 6. "Reads, on the other hand, could either be local or remote." Exhibit 29 at 6. "In the case of a remote read, the disk server requests the block from the shadow COW disk." Exhibit 29 at 6. "If the block is not cached locally, it is fetched remotely and added to the shadow COW." Exhibit 29 at 6. "First, the memory in most systems caches disk blocks." Exhibit 29 at 7.

340. Holzmann discloses the Caching Limitation. For example, Holzmann discloses: "The invention is directed to a system and method for booting multiple servers or other network resources from a single operating system image." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at Abstract. "The operating system image is stored on a solid state disk." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at Abstract. "When a server is booted, cache space is allocated in the volatile memory portion of the solid state disk." *See* U.S. Pat. Pub. No.

2005/0283597 to Holzmann at Abstract. "This cache is used to store data necessary for booting

and operation of the operating system." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at

Abstract. "As additional servers or other network resources are booted, the cache is used to access

the necessary operating system data." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at

Abstract. "FIG. 1 is a block diagram illustrating the component parts of the invented system and

the functions of each component part." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶

[0017]. "The invented system comprises a solid state disk system 101 having a storage means 102,

a control module 103, a memory module 104, an interface module 105 that communicates with

external devices 106, and an internal power source 107." *See* U.S. Pat. Pub. No. 2005/0283597 to

Holzmann at ¶ [0017]. Figure 1 of Holzmann is provided below:



Fig. 1

100

341.    "The memory module 104 comprises at least one direct-access memory module for holding data currently or recently used by external devices 106." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0020]. "The memory module 104 is more quickly accessible, and performs read and write processing functions more quickly, than non-volatile or disk memory, such as storage means 102." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0020]. "The memory module 104 preferably comprises at least one random-access memory (RAM) module." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0020].

342.    "Upon receiving a boot request, the control module 103 loads the required portion of the operating system image (the portion loaded typically depends on the operating system and its boot process) into memory module 104. . . ." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0021]. "Portions of the cache may be assigned statically for each server or other external devices 106. Alternatively, and preferably, the portions of the cache attributed to each server may be assigned dynamically. . . ." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0021].

343.    "The external device 106 requests operating system data through the interface module 105. . . ." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0024]. "[T]he control module 103 monitors the request for operating system data, and determines whether the particular operating system data block requested by the external devices 106 has previously been loaded into the operating system cache." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0024]. "If the data block has been loaded into the cache, and that data block has not been overwritten … the requested data block is provided from the cache. . . ." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0024].

344.    "If a second server or other external device sends a boot request to control module 103, the module allocates additional space in the cache for a second cache 402. . . ." *See* U.S. Pat.

101

Pub. No. 2005/0283597 to Holzmann at ¶ [0033]. "If additional servers require boot operations, additional cache space 403 can [be] allocated for those servers." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0033]. "By allocating separate cache space for each server or other network resource, the inventive system prevents corruption of data, overwriting of data, and other harmful actions that would lead to resource malfunction." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0033].

345.    "If the requested data has not been loaded into the cache 501, the control module 103 copies the data from the operating system data stored in memory portion 400 to the cache 501." *See* U.S. Pat. Pub. No. 2005/0283597 to Holzmann at ¶ [0035].

346.    Sapuntzakis discloses the virtual network manager claimed in claim 7 of the '844 Patent. Sapuntzakis renders claim 7 of the '844 Patent invalid pursuant to 35 U.S.C. § 102.

347.    In light of the disclosure in Sapuntzakis, a POSITA would also consider claim 7 of the '844 Patent obvious pursuant to 35 U.S.C. § 103.

348.    In light of the combined disclosure in Sapuntzakis and Holzmann, a POSITA would also consider claim 7 of the '844 Patent obvious pursuant to 35 U.S.C. § 103.

## COUNT V
## <u>DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '722 PATENT</u>

349.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

350.    Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon. Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 16.

Intellectual Ventures Management, by and on behalf of all Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license" of at least the Patents-In-Suit, including the '722 Patent. *See* Exhibit 20. Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See,* Exhibit 9; Exhibit 10. Intellectual Ventures Management, on behalf of Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license. Intellectual Ventures Management, by and on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio, including the '722 Patent, and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

351. In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged that the '722 Patent "cover[s] technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" and identifies "Kafka," a third party branded software, as the "Example Product/Feature." *See* Exhibit 9.

352.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged infringement of at least claim 14 of the '722 Patent by "First Horizon's use of Kafka" (the "'722 Accused System"). *See* Exhibit 9.

353.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '722 Accused System) or import into the United States any product and/or system (including but not limited to the '722 Accused System) in a manner which infringes the '722 Patent.

354.    By way of example, independent claim 14 of the '722 Patent requires, *inter alia*, that the claimed method provide "a data representation to a client device, … wherein the data representation includes at least one live object recognizable by the client device." *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

355.    The '722 Patent states that the "live objects" are "designated to be real-time dynamically-updateable objects." *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at col. 5, ll. 27–31.

356.    First Horizon does not infringe the '722 Patent at least because the '722 Accused System does not include a data representation to a client device that includes at least one live object recognizable by the client device.

357.    Upon information and belief, and based on the representations made on the "Kafka" website, the '722 Accused System sends data in the form of "events" or "records," not "real-time dynamically-updateable    objects"    as    required    by    the    '722    Patent.    *See* https://kafka.apache.org/documentation/#majordesignelements (last accessed Oct. 4, 2024).

358.    Accordingly, First Horizon does not directly infringe the '722 Patent, either literally or under the doctrine of equivalents.

104

359.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '722 Patent or otherwise contribute to infringement of the '722 Patent.

360.    An actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '722 Patent.

361.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '722 Accused System) has not infringed and does not infringe the '722 Patent.

**COUNT VI**
**DECLARATORY JUDGMENT OF INVALIDITY OF THE '722 PATENT**

362.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

363.    Claim 14 of the '722 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

364.    Upon information and belief, and subject to further discovery, claim 14 of the '722 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

365.    Upon information and belief, and subject to further discovery, claim 14 of the '722 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

   1. **Claim 14 of the '722 Patent is Invalid Under 35 U.S.C. § 101.**

105

356. Claim 14 of the '722 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 14 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

357. In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

358. If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two. Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

### i. Claim 14 of the '722 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.

359.    Claim 14 as a whole is directed to an abstract idea. Claim 14 as a whole is directed to: (1) providing a data representation to a device; (2) registering for updates related to the data representation; and (3) sending update messages to the device related to the data representation, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

360.    Claim 14 as a whole is directed to steps for a purely internal process, relying upon generic computer equipment to route content within a network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

361.    Furthermore, the specification confirms that Claim 14 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 14 as a whole, including the use of conventional computing components to route update messages containing updates to properties of live objects, were well understood at the time of the invention, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at col. 4, l. 66 – col. 5, l. 2 ("The server 112, client 114, information provider 108, dynamic content provider 116, and routing network 110 are preferably in communication via conventional communications links 117 such as those comprising the Internet."); col. 9, ll. 51–56 (explaining that the "information provider" and "dynamic content provider" are each merely a "conventional computer system"); col. 10, ll. 15–17 (explaining that the "client" is merely a "conventional personal computer used by a person to access information on the Internet"); col. 6, ll. 14–15 (explaining that the server is "a conventional computer system configured to act as a web server"); col. 5, ll. 34–36 (explaining that the routing network simply "maintains a registry

indicating which clients have registered for which object IDs," a task executable by known computer components.). Claim 14 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

362.    Claim 14 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 14 as a whole relies on functional language to claim high-level results without specific implementation details. For example, Claim 14's functional recitation of "providing … a data representation to a client device," "register[ing] for updates," and "sending … an update message to the routing network" merely describes abstract outcomes without concrete technological solutions.  Claim 14 as a whole is directed to a generic network architecture performing routine tasks and lacks sufficient specificity regarding such things as data routing techniques and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

363.    Claim 14 as a whole describes using standard hardware to execute basic content routing tasks over a network without any improvement to the functionality of the network components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 14 is not directed to specific asserted improvements in computer capabilities.

364.    Claim 14 as a whole is directed to basic content routing protocols, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 14 is directed to providing a data representation which includes at least one live object to a client device, causing the client device to respond by determining an object identifier of the live object and to register for updates of the live object with the routing network, and sending an update message to the routing network which updates a property of the live object, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

365.    Claim 14 as a whole is directed to content routing over a network, and specifically to content routing based on a registry of interested devices, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc.*, 778 F. App'x at 892 (quoting *ChargePoint, Inc.*, 920 F.3d at 767); *see also buySAFE, Inc.*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network … is not even arguably inventive."). Further, the Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Erie Indem. Co.*, 850 F.3d at 1327 (organizing and accessing data held abstract); *Content Extraction and Transmission LLC*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

366.    Claim 14 as a whole is directed merely to content routing based over a network based on a registry of interested devices and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

367.    For at least the foregoing reasons, Claim 14 fails *Alice* step one.

**ii.  Claim 14 of the '722 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

368.    Claim 14 merely recites a generic computer with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 14 simply uses a generic computer to perform generic computer functions, including "providing … a data representation to a client device," "register[ing] for updates," and "sending … an update message to the routing network", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101 *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

369.    Claim 14 recites architecture of a generic computing system, including a server, client, information provider, dynamic content provider, and a routing network wherein each component is "in communication via conventional communication links", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See* U.S. Pat. No. 8,407,722 to Tuttle at col. 4, l. 66 – col. 5, l. 2. Implementation of an abstract idea by the '722 Patent's routine hardware fails to move the mere routing of content within a network beyond an abstract idea.

370.    Claim 14 is directed to a method implemented via conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The specification of the '722 Patent further confirms the conventional nature of these computing elements. The '722 Patent discloses the "information provider" and "dynamic content provider" are each merely a "conventional computer system." U.S. Pat. No. 8,407,722 to Tuttle at col. 9, ll. 51–56. Similarly, the "client" is merely a "conventional personal computer used by a person to access information on the Internet." U.S. Pat. No. 8,407,722 to Tuttle at col. 10, ll. 15–17. The

110

server is "a conventional computer system configured to act as a web server." U.S. Pat. No. 8,407,722 to Tuttle at col. 6, ll. 14–15. The routing network simply "maintains a registry indicating which clients have registered for which object IDs," a task executable by known computer components. U.S. Pat. No. 8,407,722 to Tuttle at col. 5, ll. 34–36. Claim 14 does not improve functionality of these devices; instead, it employs well-understood hardware to simply route content within a network. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

371.    The elements of claim 14, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter.

372.    For at least the foregoing reasons, Claim 14 fails *Alice* step two.

366.    Accordingly, claim 14 of the '722 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

   **2.  Claim 14 of the '722 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.**

367.    Upon information and belief, and subject to further discovery, claim 14 of the '722 Patent is invalid under 35 U.S.C. §§ 102 and 103.

368.    The '722 Patent originated as U.S. Application No. 11/396,251 and was filed on March 30, 2006.

369.    The '722 Patent, and specifically U.S. Application No. 11/396,251, claims to be a continuation of U.S. Application No. 10/105,018, which was filed on March 21, 2002.

370.    U.S. Application No. 10/105,018 claims to be a continuation-in-part of U.S. Application No. 10/017,182, which was filed on December 14, 2001.

371.    U.S. Application No. 10/017,182 claims priority to the following Provisional Patent Applications: 60/278,303 filed on March 21, 2001; 60/280,627 filed on March 29, 2001; 60/279,608 filed on March 28, 2001; 60/276,847 filed on March 16, 2001; and 60/256,613 filed on December 18, 2000.

372.    Claim 14 of the '722 Patent reads as follows:

> 14. A method comprising:
> providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network; and
> sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object,
> wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network,
> wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

112

> wherein the client device processes the update message upon receipt to update the property of the live object at the client device.

373.    Claim 14 of the '722 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent No. 5,721,825 (hereinafter "Lawson") and U.S. Patent No. 6,480,883 (hereinafter "Tsutsumitake"), alone and in combination.

374.    Lawson was filed on October 3, 1996 and issued February 12, 1998. It is entitled "System and Method for Global Event Notification and Delivery in a Distributed Computing Environment," and lists Todd C. Lawson, Warren D. Cave, and Dean L. Schmidt as inventors. A true and correct copy of Lawson is attached hereto as Exhibit 32.

375.    Lawson is prior art to the '722 Patent.

376.    Tsutsumitake was filed June 29, 1999 and issued November 12, 2002. It is entitled "Real-Time Information Transmission System," and lists Hideyuki Tsutsumitake as the inventor. A true and correct copy of Tsutsumitake is attached hereto as Exhibit 33.

377.    Tsutsumitake is prior art to the '722 Patent.

378.    As shown on the '722 Patent under the heading "References Cited," neither Lawson nor Tsutsumitake were considered by the Examiner during examination of the application that issued as the '722 Patent.

379.    The '722 Patent issued without the United States Patent and Trademark Office considering that Lawson and/or Tsutsumitake render the invention claimed in the '722 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

380.    On November 20, 2024, a Petition for *Inter Partes* Review of the '722 Patent was filed by Liberty Mutual Insurance Company, Liberty Mutual Technology Group, Inc., Liberty Mutual Holding Company Inc., Liberty Mutual Group Inc., Liberty Mutual Plano LLC, Camparion Insurance Agency, LLC, Ironshore Holdings (U.S.) Inc., and Comerica Incorporated and assigned

113

AIA Review No. IPR2025-00200 (the "Liberty Mutual '722 Petition"). A true and correct copy of the Liberty Mutual '722 Petition and its exhibits are attached hereto as Exhibit 34 and incorporated into this Amended Complaint by reference.

381. The Liberty Mutual '722 Petition explains that Lawson and Tsutsumitake render claim 14 of the '722 Patent invalid. The Liberty Mutual '722 Petition explains that when the application that issued as the '722 Patent was filed, the invention claimed in claim 14 of the '722 Patent would have been obvious to a person of skill in the art ("POSITA") in light of Lawson and Tsutsumitake. *See* Exhibit 34.

382. Before the PTAB could consider that Lawson and Tsutsumitake render claim 14 of the '722 Patent invalid, the parties to IPR2025-00200 reached a settlement and jointly requested that IPR2025-00200 be terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC*, IPR2025-00200, Paper 8 (P.T.A.B. Apr. 23, 2025). In response to the parties' joint request for termination based on the parties' settlement, IPR2025-00200 was terminated. *See Liberty Mut. Ins. Co. et al. v. Intellectual Ventures I LLC*, IPR2025-00200, Paper 9 (P.T.A.B. Apr. 23, 2025).

383. IPR2025-00200 was terminated before any substantive review or decision by the PTAB as to the invalidity of claim 14 in light of Lawson and Tsutsumitake.

384. For at least the reasons stated in the Liberty Mutual '722 Petition, which is adopted herein and set forth below, Lawson and Tsutsumitake render claim 14 of the '722 Patent invalid.

385. Claim 14 claims "[a] method comprising" specific limitations that are received in claim 14. *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

386. Lawson discloses a method comprising the limitations recited in claim 14 of the '722 Patent. *See* U.S. Pat. No. 8,721,825 to Lawson *et al.*

387.    Tsutsumitake discloses a method comprising the limitations recited in claim 14 of the '722 Patent. *See* U.S. Pat. No. 6,480,883 to Tsutsumitake.

388.    Claim 14 of the '722 Patent claims its method comprises "providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network" (hereinafter "the Providing Limitation"). *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

389.    Lawson discloses the Providing Limitation. For example, Lawson discloses: "A system in method for global event notification in a distributed computer environment is presented." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract. "The system and method of the present invention utilizes a local event registry to identify local event consumers that should be notified when an event occurs." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract. "The system and method also utilizes a global event registry which identifies other servers which need notification when an event occurs." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract. "These other servers will then, in turn, notify their local event consumers of the event." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract. "The system and method of the present invention incorporates multiple levels of filtering to allow event consumers to remove notification of events having little or no interest." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract. "The system

and method of the present invention also ensures that duplicate event notifications are not received for the same event." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at Abstract.

390.   Lawson further discloses: "In FIG. 1, event consumers are illustrated by the triangular regions 20 and are numbered 1-4." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 1–2. "Event producers are identified by rectangular regions 22 and are labeled 5-7." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 2–3. "Event producer and event consumer are meant to be generic terms that are interpreted broadly." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 4–5. "Event producer will be used to refer to a process, user, device, or other item that produces or generates an event." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 5–7. "An event consumer should be broadly interpreted to refer to any process, user, device, or other item that desires notification of an event." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 7–9. "As used throughout this application, event notification will refer to not only notification of an event but also distribution of information associated with that event." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 9–11.

391.   Lawson further discloses: "The presently preferred embodiment of a system for global event notification and distribution comprises a general purpose computer." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 17–19. "The present invention, however, can also be used with any special purpose computer or other hardware system and all should be included within its scope." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 19–21. "The preferred general purpose computer comprises traditional computer elements such as display means for displaying information to a user, a CPU means or other processing means for processing program code means, program storage means for storing program code means executed by the CPU or other processing means, and input means for receiving input from a user." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 22–28. "Additionally, computers having no local program storage means and that receive

116

program code means across a communication link should also be included within the scope of the present invention." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 28–31. "Embodiments within the scope of the present invention also include articles of manufacture comprising program storage means having encoded therein program code means for causing a CPU to perform certain actions." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 32–35. "Such program storage means can be any available media which can be accessed by the processing means of a general purpose or special purpose computer." U.S. Pat. No. 8,721,825 to Lawson at col. 7, ll. 35–39.

392.    Lawson "achieves global event notification by storing a global event registry comprising a list of events and a corresponding list of servers which need notification when the corresponding event occurs." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 45–48. "In addition to the global registry, each server stores a local event registry comprising a list of events and a corresponding list of local event consumers that need notification when an event occurs." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 48–52. "Each server has running thereon a local event globalization process that registers for events desired by local event consumers." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 54–56. "When an event consumer registers for an event, the event globalization process of the event consumer's local server places an entry into the local event registry for the local server." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 56–59. "An entry is also placed into the global event registry for the local server where the event consumer is located." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 59–61. "Thus, the global event registry is updated to contain an entry identifying the server where the event consumer is located and the desired event and the local event registry of that server is updated to identify the event consumer and the desired event." U.S. Pat. No. 8,721,825 to Lawson at col. 4, ll. 61–65. Figure 1 of Lawson is provided below:

117



FIG. 1

393.    In one example, Lawson states that "[i]t would be desirable to update the employee phone book database whenever a new employee was added to the system or whenever information about an existing employee was changed." U.S. Pat. No. 8,721,825 to Lawson at col. 21, ll. 16–19. "In such a situation, the employee phone book database could register for notification of 'a modified object' type event." U.S. Pat. No. 8,721,825 to Lawson at col. 21, ll. 19–21. "The employee database could then submit a filter that filtered out modifications to any objects except employee record type objects." U.S. Pat. No. 8,721,825 to Lawson at col. 21, ll. 21–23. "Then when an employee record was changed in the system, the database would receive notification that an employee record had been changed." U.S. Pat. No. 8,721,825 to Lawson at col. 21, ll. 24–26. In other examples, Lawson states that the "event consumer 4 is a company phone directory that has registered to receive an 'add user' event so that it can extract the phone number of the added user and place it in the company phone book." U.S. Pat. No. 8,721,825 to Lawson at col. 23, ll. 64–67. "Further, assume that event consumer 1 is a payroll database that has also registered for

118

the add user event so that information can be extracted to update the employee payroll database." U.S. Pat. No. 8,721,825 to Lawson at col. 24, ll. 1–4.

394.    Lawson states: "When an event consumer receives notification that a certain event happened on an event producer, the event consumer can take appropriate action." U.S. Pat. No. 8,721,825 to Lawson at col. 1, ll. 61–64. Lawson further states: "Event consumers which desire to receive notification of certain events 'register' with the event producing system." U.S. Pat. No. 8,721,825 to Lawson at col. 2, ll. 6–8. "When an event occurs, notification is sent to all registered event consumers." U.S. Pat. No. 8,721,825 to Lawson at col. 2, ll. 8–9. "When an event consumer needs to register for a new event or create a new event, the event consumer can send a 'register for event' packet or a 'create event packet' to the event globalization process on the local server." U.S. Pat. No. 8,721,825 to Lawson at col. 15, ll. 41–45. "When an event is created, the event globalization process will create an entry in the global event registry, as for example global event registry 68 of FIG. 3." U.S. Pat. No. 8,721,825 to Lawson at col. 15, ll. 45–47. "This entry will include the event identifier of the new event." U.S. Pat. No. 8,721,825 to Lawson at col. 15, ll. 47–48. "When an event consumer registers for an event, the event globalization process will place an entry in the local event registry, as for example local event registry 72 of FIG.3, identifying the event and the event consumer wishing to receive notification of the event." U.S. Pat. No. 8,721,825 to Lawson at col. 15, ll. 48–53. "The event globalization process will also place an entry into the global event registry, as for example global event registry 68 of FIG. 3, identifying the local server needing to receive notification of the event when it occurs." U.S. Pat. No. 8,721,825 to Lawson at col. 15, ll. 53–56.

395.    Tsutsumitake discloses the Providing Limitation. For example, Tsutsumitake discloses: "A real-time information transmission system can immediately transmit information

updated on a server to a client, even if directly communication between the server and the client is not established." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract. "If the server receives a page request from the client, the server returns a requested page to the client." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract. "The same connection ID is added to the request from the client and to an associated response from the server." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract. "The client analyzes the page. If an event request is included in the analyzed page, the client adds another connection ID to the request and sends it to the server." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract. "Using the connection ID, the server sends an event to the client each time the event has occurred." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract. "The client processes the event and reflects the processed result on a screen of a display." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at Abstract.

396.    "A page request receiving unit 102 receives a page request sent from the client 11 via the network interface 101, analyzes it, and informs a page transmission unit 103 of a page to be sent to the client 11." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 39–42. "Suppose that a format called URL (Uniform Resource Locator), which is generally used in the WWW, is applied to the page request." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 42–44. "The page transmission unit 103 transmits an HTML file 100 stored in the server 10 to the network 12 via the network interface 101." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 45–47. "Information to be transmitted is not limited to the HTML file (100), and may be freely chosen one such as image or voice." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 47–49.

397.    "In this structure, the client, which received the requested page information from the server, can automatically issue the event request to the server according to the event request information set in the page information, and can activate the event notification." U.S. Pat. No.

6,480,883 to Tsutsumitake at col. 4, ll. 21–25. "Specifically, by associating the page information with the event, the page information opened on the client side can be dynamically changed according to the event notification sent from the server." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 4, ll. 25–29.

398.    The system of Tsutsumitake is shown in Figure 1, provided below:



399.    "FIG.2 shows an example of the HTML file format. In this example, an event request to the Server is included in the page." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 10, ll. 20–22. "The event request is expressed by an attribute 'URL' in a tag 'EVENT' in a tag 'EMBED'." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 10, ll. 22–23. Figure 2 of Tsutsumitake is provided below:

```
< HTML >
< HEAD >
< TITLE > SAMPLE PAGE < /TITLE >
< /HEAD >
< BODY >
< H1 > SAMPLE  PAGE < /H1 >
THIS PAGE  INCLUDES  EVENT  REQUEST
< EMBED >
   < EVENT  URL=http://abc.def/hij.evt >
< /EMBED >
< /BODY >
< /HTML >
```

## FIG. 2

400.    "The page receiving unit 112 receives a response from the server 10 to the page request, that is, the requested page, via the network interface 109." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 9, ll. 60–62. "The received page is displayed on the display of the input/output unit 110." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 9, ll. 62–63. "There is a case where the page received from the server 10 includes a description for issuing an event request to the server 10." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 9, ll. 63–65. "In such a case, the page receiving unit 112 informs an event request unit 113 of the URL of the event request." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 9, ll. 65–67.

401.    "The page receiving unit 112 analyzes the content of the page sent from the server 10 (step A6) to determine whether an event request is included in the page (step A7)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 10, ll. 56–59. "[I]f the event request is included, the page receiving unit 112 informs the event request unit 113 of the URL of the event and causes the event request unit 113 to send the event request to the server 10 (step A8)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 10, ll. 64–67. "The event request receiving unit 104 asks the connection management unit 105 whether or not an identifier (event ID) of the event requested by the event

request and an identifier (client ID) of the client 11 at the request originating point have already been registered (steps B8, B9)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 45–50. "If they are registered, the connection with the client 11 is cut off (step B10)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 50–51. "If they are not registered, a pair of the identifier (event ID) of the event requested by the event request and the identifier (client ID) of the client 11 at the request originating point are registered in the connection management unit 105 (step B11)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 51–55.

402.    Claim 14 of the '722 Patent claims its method comprises "sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object" (hereinafter "the Sending Limitation"). *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

403.    Lawson discloses the Sending Limitation. For example, Lawson discloses: "By its very nature, event notification is a local phenomenon." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 2, ll. 3–4. "In other words, an event producer notifies event consumers of events which happen locally to the event producer." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 2, ll. 4–6. "Event consumers which desire to receive notification of certain events 'register' with the event producing system." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 2, ll. 6–8. "When an event occurs, notification is sent to all registered event consumers." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 2, ll. 8–9. "As used throughout this application, event notification will refer to not only notification of an event but also distribution of information associated with that event." U.S. Pat. No. 8,721,825 to Lawson at col. 9, ll. 9–12. "[W]hether they be local events or remote events, are preferably packaged into an event packet." U.S. Pat. No. 8,721,825 to Lawson at col.

11, ll. 57–59. An event packet may comprise an Event Producer, Server, Type of Event, Time of Event, Size of Event Data, and Event Data. U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 7–11. "[T]he event producer field is an identifier that identifies the process, device. user, etc. which generated the event." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 12–14. "The server field identifies the server location where the event was produced." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 14–15. "The type of event field is an identifier describing the type of event which occurred." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 15–17. "This identifier preferably identifies an event in the global event registry and/or local event registry so that appropriate servers or event consumers can be identified to receive the event." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 17–20. "The time of event field is a time stamp indicating the time that the event occurred." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 20–21. "This time stamp is preferably a network time that can be referenced by each server in the network, although this is not strictly required." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 21–23. "The size of event data is a field indicating the size of the attached event data field." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 24–25. "The event data is the data associated with the event." U.S. Pat. No. 8,721,825 to Lawson at col. 12, ll. 25–26.

404.   Tsutsumitake discloses the Sending Limitation. For example, Tsutsumitake discloses: "If an event has occurred, the server 10 sends it to the client 11 with use of this connection ID." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 1–3. "Subsequently, as shown in FIG. 6, each time an event has occurred, it is sent repeatedly with use of the ID (Conn2)." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 3–5. "If an event has occurred in the event generation unit 107 or event generation monitoring unit 108, the event transmission unit 106 is instructed to send the event to the client 11 (step B15)." U.S. Pat. No. 6,480,883 to Tsutsumitake

at col. 12, ll. 10–13. "Thus, the event transmission unit 106 sends the generated event to the client 11 at the event request originating point via the network interface 101 (step B16)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 12, ll. 13–15. "The browser (client 11) processes a plurality of events (both the event indicating the present value of current and the event indicating the state of the device being transmitted in real time) sent from the server 10 in response to one event request issued in accordance with the displayed page, and reflects on the screen the event processing results on the current value display section 71 or device state display section 72." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 58–65.

405.   Claim 14 of the '722 Patent claims its method comprises "wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network" (hereinafter "the Gateway Limitation"). *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

406.   Lawson discloses the Gateway Limitation. For example, Lawson discloses: "[R]emote event processing block 66 monitors event queue 64 and when events are placed therein by incoming event processing block 60 that need to be transferred to other servers in the network, remote event processing block 66 will establish a connection to those servers and transfer the events to the other server." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 12–17. "Embodiments within the scope of the present invention may, therefore, comprise means for accessing a global event registry to identify which servers should receive which events." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 18–21. "Such means may be incorporated into remote event processing block 60." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 21–22. "In such a case, remote event processing block 66 identifies the servers that should receive

125

events queued in event queue 64 by checking global registry 68." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 22–24. "[W]hen an event is transferred from one server to another server, a connection must be established between the two servers." U.S. Pat. No. 8,721,825 to Lawson at col. 13, ll. 25–27. "Once the transfer is complete, then the connection is terminated." U.S. Pat. No. 8,721,825 to Lawson at col. 13, ll. 27–28. "Since it takes time to establish and terminate a connection, it is preferable that when a connection is established between two servers, all information that needs to be transferred between the two servers be accomplished while the connection is established." U.S. Pat. No. 8,721,825 to Lawson at col. 13, ll. 28–33. "Thus, there is a possibility of events being transferred both to and from the local server." U.S. Pat. No. 8,721,825 to Lawson at col. 13, ll. 33–34. "Remote event 58 represents a local event that is transferred to another server via network connection 52." U.S. Pat. No. 8,721,825 to Lawson at col. 11, ll. 51–53. "It should be pointed out that in FIG. 3 network connection 52 represents an example of the networking means for interconnect servers in the present invention." U.S. Pat. No. 8,721,825 to Lawson at col. 11, ll. 53–56.

407.    "[E]mbodiments of the present invention may comprise means for filtering events so that an event is only transferred if the event meets designated filtering criteria." U.S. Pat. No. 8,721,825 to Lawson at col. 20, ll. 10–13. "Furthermore, filtering can be performed on any of the information available from a particular event." U.S. Pat. No. 8,721,825 to Lawson at col. 20, ll. 25–27. "The available information for an event includes not only the information available in the event data itself, but also in the event packet, such as the event packet previously described." U.S. Pat. No. 8,721,825 to Lawson at col. 20, ll. 27–30.

408.    Tsutsumitake discloses the Gateway Limitation. For example, Tsutsumitake discloses: "An event request receiving unit 104 receives an event request sent from the client 11

via the network interface 101, analyzes it, and communicates with a connection management unit 105 to determine whether the event request should be processed." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 50–54. "The event request receiving unit 104 instructs an event transmission unit 106, where necessary, to transmit an event to the client 11." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 8, ll. 54–56. "The event request receiving unit 104 asks the connection management unit 105 whether or not an identifier (event ID) of the event requested by the event request and an identifier (client ID) of the client 11 at the request originating point have already been registered (steps B8, B9)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 45–50. "If they are registered, the connection with the client 11 is cut off (step B10)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 50–51. "If they are not registered, a pair of the identifier (event ID) of the event requested by the event request and the identifier (client ID) of the client 11 at the request originating point are registered in the connection management unit 105 (step B11)." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 11, ll. 51–55.

409.    Claim 14 of the '722 Patent claims its method comprises "wherein the node is configured to identify the client device as a registered device and to route the update message to the client device" (hereinafter "the Node Limitation"). *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

410.    Lawson discloses the Node Limitation. For example, Lawson discloses: "[L]ocal event processing block 70 monitors event queue 64 for events that should be transferred to a local event consumer." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 43–45. "Embodiments of the present invention may, therefore, comprise means for accessing a local event registry to identify which local event consumers should receive which events." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 45–48. "Such means may be incorporated into local event processing

127

block 70." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 48–49. "In such a case, local event consumers that should receive events queued in event queue 64 are identified by checking local event registry 72 and any associated filtering criteria." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 49–52. "Embodiments within the scope of the present invention may comprise means for filtering events so that an event is only transferred when the event meets designated filtering criteria." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 53–56. "Such means, discussed in greater detail below, may be part of local event processing block 70." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 56–57. "The filtering criteria is illustrated in FIG.3 by filtering criteria block 74." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 57–58. "Although the details of filtering are presented below, filtering criteria may be stored as part of the local event registry or may be stored in any other manner as long as a local server can access the filtering criteria and identify the local event consumer and the event type that the filtering criteria applies to." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 13, ll. 58–64.

411.    Tsutsumitake discloses the Node Limitation. For example, Lawson discloses: "According to this invention, in the Situation in which each time an event has occurred in the Server the event notification has to be sent to the client at the event request originating point. . . ." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 4, ll. 36–39. "If an event has occurred, the server 10 sends it to the client 11 with use of this connection ID." U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 1–3.

412.    Claim 14 of the '722 Patent claims its method comprises "wherein the client device processes the update message upon receipt to update the property of the live object at the client device" (hereinafter "the Client Device Limitation"). *See* U.S. Pat. No. 8,407,722 to Tuttle *et al.* at Claim 14.

128

413.    Lawson discloses the Client Device Limitation. For example, Lawson discloses: "[A]ssume that event consumer 4 is a company phone directory that has registered to receive an 'add user' event so that it can extract the phone number of the added user and place it in the company phone book." *See* U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 23, ll. 64–67. "As indicated by step 176, the event packet is received by the company phone directory and as indicated by the return arrow to step 174, processing could continue for the event notification process after transfer of the event packet." U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 24, ll. 64 – col. 25, l. 1. "The event packet could be transferred to event consumer 4 using any of the previously identified event transfer methods or with another appropriate event transfer method." U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 25, ll. 1–4. "After the event has been transferred, the company phone directory process creates a new record in the company phone book as indicated by step 178." U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 25, ll. 4–7.

414.    "In step 182, the event globalization process of server A transfers the event packet to the local event consumer which, in this case, is the payroll database process." U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 25, ll. 16–18. "The payroll database process receives the information as indicated by step 184 and proceeds to create a new entry in the employee payroll database as indicated by step 186." U.S. Pat. No. 8,721,825 to Lawson *et al.* at col. 25, ll. 18–21.

415.    Tsutsumitake discloses the Client Device Limitation. For example, Lawson discloses: "The current value in the specific device in the plant system 42 is monitored by the server 10 every second through the controller 40." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 46–48. "Specifically, the event generating unit 107 or event generation monitoring unit 108 generates the event of the present value of electric current at intervals of one second." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 48–51. "In addition, the state

129

(normal/abnormal) of the control device is monitored by the server 10 through the controller 40." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 51–53. "The event generating unit 107 or event generation monitoring unit 108 generates events of the state (normal/abnormal) of the control device non-periodically." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 53–55. "These generated events are transmitted in real time to the client 11." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 56–57. "The browser (client 11) processes a plurality of events (both the event indicating the present value of current and the event indicating the state of the device being transmitted in real time) sent from the server 10 in response to one event request issued in accordance with the displayed page, and reflects on the screen the event processing results on the current value display section 71 or device state display section 72." *See* U.S. Pat. No. 6,480,883 to Tsutsumitake at col. 13, ll. 58–65.

416.    Lawson discloses the method claimed in claim 14 of the '722 Patent. Lawson renders claim 14 of the '722 Patent invalid pursuant to 35 U.S.C. § 102.

417.    Tsutsumitake discloses the method claimed in claim 14 of the '722 Patent. Tsutsumitake renders claim 14 of the '722 Patent invalid pursuant to 35 U.S.C. § 102.

418.    In light of the disclosure of Lawson, a POSITA would also consider claim 14 of the '722 Patent obvious pursuant to 35 U.S.C. § 103.

419.    In light of the disclosure of Tsutsumitake, a POSITA would also consider claim 14 of the '722 Patent obvious pursuant to 35 U.S.C. § 103.

420.    In light of the combined disclosure of Lawson and Tsutsumitake, a POSITA would also consider claim 14 of the '722 Patent obvious pursuant to 35 U.S.C. § 103.

## COUNT VII
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '391 PATENT

421.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

422.    Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon. Intellectual Ventures Management, by and on behalf of Defendants, have alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 16. Intellectual Ventures Management, by and on behalf of all Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license" of at least the Patents-In-Suit, including the '391 Patent. *See* Exhibit 20. Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See* Exhibit 9; Exhibit 10. Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license. Intellectual Ventures Management, by and on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio, including the '391 Patent, and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

131

423.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged that the '391 Patent "cover[s] technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" and identifies "Clover," a third party branded software, as the "Example Product/Feature."

424.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged infringement of at least claim 18 of the '391 Patent by "First Horizon's use of Secure Payment Processing," and specifically the use of third-party "Clover®" branded software allegedly using the 3-D Secure protocol (the "'391 Accused System"). *See* Exhibit 9.

425.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '391 Accused System) or import into the United States any product and/or system (including but not limited to the '391 Accused System) in a manner which infringes the '391 Patent.

426.    By way of example, each independent claim of the '391 Patent requires, *inter alia*, that the accused system or method receive information about "a first type of transaction" and "a second type of transaction" wherein "the second type of transaction is different from the first type of transaction." *See* U.S. Pat. No. 10,567,391 to Hardt at Claim 1, Claim 10, Claim 18.

427.    Upon information and belief, and based on the representations made about the 3-D Secure protocol on the "3dsecure2" website, the '391 Accused System (1) "allows issuers to approve a transaction without the need to interact with the cardholder" and (2) "will only require additional authentication if the risk is high." *See* https://3dsecure2.com/frictionless-flow/ (last accessed Oct. 4, 2024).

132

428.    Upon information and belief, and based on the representations made on the "3dsecure2" website, the '391 Accused System provides for multiple authentication methods related to a single transaction, rather than for authentication of two different transactions. *See* https://3dsecure2.com/frictionless-flow/ (last accessed Oct. 4, 2024).

429.    At least in light of this representation, and on information and belief, the '391 Accused System does not include information about "a first type of transaction" and "a second type of transaction" wherein "the second type of transaction is different from the first type of transaction" as recited by each independent claim of the '391 Patent.

430.    Accordingly, First Horizon does not directly infringe the '391 Patent, either literally or under the doctrine of equivalents.

431.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '391 Patent or otherwise contribute to infringement of the '391 Patent.

432.    An actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '391 Patent.

433.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '391 Accused System) has not infringed and does not infringe the '391 Patent.

## COUNT VIII
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '391 PATENT

434.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

133

435. Claim 18 of the '391 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

436. Upon information and belief, and subject to further discovery, claim 18 of the '391 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

437. Upon information and belief, and subject to further discovery, claim 18 of the '391 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

1. **Claim 18 of the '391 Patent is Invalid Under 35 U.S.C. § 101.**

438. Claim 18 of the '391 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 18 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

439. In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

440.    If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two.  Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

### iii. Claim 18 of the '391 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.

441.    Claim 18 as a whole is directed to an abstract idea. Claim 18 as a whole is directed to: (1) receiving requests for user authentication as part of usage events; and (2) performing transactions associated with the requests at various transaction security levels by selecting a transaction security level based on the type of transaction, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

442.    Claim 18 as a whole is directed to steps for a purely internal process, relying upon generic computer equipment to offer a series of graduated security levels for transactions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

443.    Furthermore, the specification confirms that Claim 18 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 18 as a whole,

including the use of a conventional computing devices to offer a series of graduated security levels for transactions based on the type of transaction, were well understood at the time of the invention, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See* U.S. Pat. No. 10,567,391 to Hardt at col. 10, ll. 50–54 ("[T]he various systems of the present invention can be implemented using standard computing hardware controlled by software to receive information, analyze it, and provide a response. . . ."). Claim 18 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

444.    Claim 18 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 18 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. For example, Claim 18's functional recitation of "receiv[ing] a first request for user authentication," "receiv[ing] a second request for user authentication," "perform[ing] at least one transaction associated with the first request at a first transaction security level," and "perform[ing] at least one transaction associated with the second request at a second transaction security level" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 18 as a whole is directed to a generic system architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, authentication techniques, and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at

136

1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

445.    Claim 18 as a whole describes using standard hardware to perform a plurality of transactions at varying security levels based on the type of transaction without any improvement to the functionality of the system components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  It is not directed to specific asserted improvements in computer capabilities.

446.    Claim 18 as a whole is directed to basic authentication protocols, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  It is directed to receiving a request for user authentication and performing a transaction associated with the request at a specific transaction security level based on the type of transaction, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

447.    Claim 18 as a whole is simply involves communication over a network, and specifically to communicating requests to an interface and receiving communications from that interface to perform transactions via a processor, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc.*, 778 F. App'x at 892 (quoting *ChargePoint, Inc.*, 920 F.3d at 767); *see also buySAFE, Inc.*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network … is not even arguably inventive.").

448.    Claim 18 as a whole is directed merely to offering a series of graduated security levels in a conventional computing system and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

449.    For at least the foregoing reasons, Claim 18 fails *Alice* step one.

### iv.    Claim 18 of the '391 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101

450.    Claim 18 merely recites a generic computer with a patent-ineligible abstract idea. Claim 18 simply uses a generic computer to perform generic computer functions, including "receiv[ing] a first request for user authentication," "receiv[ing] a second request for user authentication," "perform[ing] at least one transaction associated with the first request at a first transaction security level," and "perform[ing] at least one transaction associated with the second request at a second transaction security level", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

451.    Claim 18 recites architecture of a generic computing system, including a "at least one memory" and "at least one interface." Implementation of an abstract idea by the '391 Patent's routine hardware fails to move the mere offering of graduated security levels beyond an abstract idea.

452.    The specification of the '391 Patent further confirms the conventional nature of the architecture in claim 18, explaining that "the various systems of the present invention can be implemented using standard computing hardware controlled by software to receive information,

138

analyze it, and provide a response. . . ." *See* U.S. Pat. No. 10,567,391 to Hardt at col. 10, ll. 50–54.

453.    Claim 18 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '391 Patent discloses that the "at least one memory" is merely a conventional database. U.S. Pat. No. 10,567,391 to Hardt at col. 13, ll. 23–24; col. 14, ll. 44–47. The "at least one interface" is simply a conventional web browser providing a user access to homesites and membersites. U.S. Pat. No. 10,567,391 to Hardt at col. 5, ll. 10–15; col. 7, ll. 31–33; col. 14, ll. 3–5; col. 14, ll. 8–11. Claim 18 does not improve functionality of these devices; instead, it employs well-understood hardware to simply provide graduated security levels, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc.*, 827 F.3d at 1349 ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

454.    The elements of claim 18, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter.

455.    For at least the foregoing reasons, Claim 18 fails *Alice* step two.

456.   Accordingly, claim 18 of the '391 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

## 2.   Claim 18 of the '391 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.

457.   Upon information and belief, and subject to further discovery, claim 18 of the '391 Patent is invalid under 35 U.S.C. §§ 102 and 103.

458.   The '391 Patent originated as U.S. Application No. 16/417,361 and was filed on May 20, 2019.

459.   The '391 Patent, and specifically U.S. Application No. 16/417,361, claims to be a continuation of U.S. Application No. 15/172,008. U.S. Application No. 15/172,008 was filed on June 2, 2016.

460.   U.S. Application No. 15/172,008 claims to be a continuation of U.S. Application No. 14/622,722. U.S. Application No. 14/622,722 was filed on February 13, 2015.

461.   U.S. Application No. 14/622,722 claims priority to U.S. Application No. 14/015,813. U.S. Application No. 14/015,813 was filed on August 30, 2004.

462.   U.S. Application No. 14/015,813 claims priority to U.S. Application No. 11/039,885. U.S. Application No. 11/039,885 was filed on January 24, 2005.

463.   U.S. Application No. 11/039,885 claims priority to U.S. Application No. 60/605,150. U.S. Application No. 60/605,150 was filed on August 30, 2004.

464.   U.S. Application No. 11/039,885 claims priority to U.S. Application No. 60/579,890. U.S. Application No. 60/579,890 was filed on June 16, 2004.

465.   Claim 18 of the '391 Patent reads as follows:

18. A system for implementing variable transaction security levels, the system
    comprising:
    at least one memory;
    at least one interface configured to:

140

receive a first request for user authentication as part of a first usage event,
wherein the first request for user authentication includes information about a first type of transaction to be performed by a user during the first usage event;
receive a second request for user authentication as part of a second usage event,
wherein the second request for user authentication includes information about a second type of transaction to be performed by the user during the second usage event, and wherein the second type of transaction is different from the first type of transaction; and
one or more processors configured to:
perform at least one transaction associated with the first request at a first transaction security level by selecting a first transaction mechanism having the first transaction security level, wherein the first transaction mechanism is selected based on the first type of transaction to be performed by the user during a first usage event; and
perform at least one transaction associated with the second request at a second transaction security level by selecting a second transaction mechanism having the second transaction security level,
wherein the second transaction mechanism is selected based on the second type of transaction to be performed by the user during the second usage event,
and wherein the first transaction security level is different from the second transaction security level.

466.   Claim 18 of the '391 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent Publication No. 2003/0056111 (hereinafter "Brizek"), JP2003091650 (hereinafter "Masahiro"), and JP2002304522 (hereinafter "Tomoharu"), alone or in combination.

467.   Brizek was filed on September 19, 2001 and published March 20, 2003. It is entitled "Dynamically Variable Security Protocol," and lists John P. Brizek as the inventor. A true and correct copy of Brizek is attached hereto as Exhibit 35.

468.   Brizek is prior art to the '391 Patent.

469.   Masahiro was filed on September 14, 2001 and published March 28, 2003. It is entitled "Online Buying System and Method," and lists Abe Masahiro as the inventor. A true and correct copy of Masahiro is attached hereto as Exhibit 36.

141

470.     A translation of Masahiro from the World Intellectual Property Organization's (hereinafter "WIPO") PATENTSCOPE system is attached hereto as Exhibit 37.

471.     WIPO is an agency of the United Nations that provides a global forum for intellectual property services, policy, information, and cooperation.

472.     WIPO is considered a reliable resource for information and disclosures regarding technology and intellectual property globally.

473.     The translation of Masahiro from WIPO, attached hereto as Exhibit 37, is an accurate translation of Masahiro from Japanese to English.

474.     Masahiro is prior art to the '391 Patent.

475.     Tomoharu was filed on April 5, 2001 and published October 18, 2002. It is entitled "Authentication Method, Transaction-Side System, Computer Program and Recording Medium Recorded with the Program," and lists Tomoharu Ogura as the inventor ("Ogura"). A true and correct copy of Ogura is attached hereto as Exhibit 38.

476.     A translation of Tomoharu from the World Intellectual Property Organization's (hereinafter "WIPO") PATENTSCOPE system is attached hereto as Exhibit 39.

477.     WIPO is an agency of the United Nations that provides a global forum for intellectual property services, policy, information, and cooperation.

478.     WIPO is considered a reliable resource for information and disclosures regarding technology and intellectual property globally.

479.     The translation of Tomoharu from WIPO, attached hereto as Exhibit 39, is an accurate translation of Ogura from Japanese to English.

480.     Tomoharu is prior art to the '391 Patent.

481.    As shown on the '391 Patent under the heading "References Cited," neither Brizek, Masahiro, nor Tomoharu were considered by the Examiner during examination of the application that issued as the '391 Patent.

482.    The '391 Patent issued without the United States Patent and Trademark Office considering that Brizek, Masahiro, and Tomoharu render the invention claimed in the '391 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

483.    Claim 18 claims "[a] system for implementing variable transaction security levels, the system comprising" specific limitations that are recited in claim 18. *See* U.S. Pat. No. 10,567,391 to Hardt *et al.* at Claim 18.

484.    Brizek discloses a system for implementing variable transaction security levels comprising the limitations recited in claim 18 of the '391 Patent. *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek.

485.    Masahiro discloses a system for implementing variable transaction security levels comprising the limitations recited in claim 18 of the '391 Patent. *See* Japanese Pat. Pub. No. 2003091650 to Masahiro.

486.    Tomoharu discloses a system for implementing variable transaction security levels comprising the limitations recited in claim 18 of the '391 Patent. *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu.

487.    Claim 18 of the '391 Patent claims its system for implementing variable transaction security levels comprises "at least one memory" (hereinafter "the Memory Limitation"). *See* U.S. Pat. No. 10,567,391 to Hardt *et al.* at Claim 18.

488.    Brizek discloses the Memory Limitation. For example, Brizek discloses: "The processor 26 may also be coupled to storage 38, which stores software 20 and 50." *See* U.S. Pat.

143

Pub. No. US2003/0056111 to Brizek at ¶ [0015]. "A system comprising: … a storage coupled to said processor, said storage storing instructions that enable the processor to receive information about the type of an electronic transaction and access that information to select a security level for the transaction." U.S. Pat. Pub. No. US2003/0056111 to Brizek at Claim 21.

489.    Masahiro discloses the Memory Limitation. For example, Masahiro discloses: "[A] purchase center (a transmission/reception device including a server." *See* Japanese Pat. Pub. No. 2003091650 to Masahiro. "[T]he reception terminal 13 includes an authentication data management unit 139 that registers and manages authentication data and reads out and outputs the authentication data according to a request." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0018]. "As the authentication data, it is possible to use a parameter indicating an effective period or an effective amount (remaining power, etc.) in addition to a device-specific identifier such as an ID or a telephone number unique to the communication terminal." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0018]. "The registration of such a parameter can be rewritten from the outside or by a user operation as necessary." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0018]. "In addition, it is assumed that a function of registering secret information to be individually given, such as one time pad random number, is provided." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0018]. "The authentication data is previously registered in the purchase center 15 offline." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0018].

490.    Tomoharu discloses the Memory Limitation. For example, Tomoharu discloses: "The customer terminal 20 has a wired or wireless network environment and is a terminal owned by a customer, and for example, a mobile phone, a telephone, a PC, a PDA, or the like can be used." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0017]. "In the present embodiment, since the customer terminal 20 is used as an authentication tool for performing

additional authentication to be described later, it is preferable that the customer terminal 20 has portability so as to be able to cope with a customer, especially when assuming a transaction by a delivery channel of a customer visit type." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0017]. "The bank-side system 30 includes a transaction system 31 and an authentication system 32 capable of transmitting information to each other, and each of the systems 31 and 32 is a general computer mainly composed of a CPU, a ROM, a RAM, a storage device, a communication device, and the like." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "The transaction system 31 is capable of transmitting information to and from the delivery channel 10 via a network, and is connected to, for example, a PC or the like that is a customer-at-home channel via the Internet via a dedicated line with an ATM that is a customer-visiting channel." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "In addition, a transaction ledger database is stored in a storage device 33 such as a magnetic disk device (HDD) accessible by the transaction system 31 in order to unitarily manage transactions with individual customers." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "The transaction ledger database may be implemented in a single database, but maybe implemented in a plurality of (linked) databases associated with each other." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "On the other hand, the authentication system 32 can transmit information to the customer terminal 20 via the network, and performs access processing to the customer terminal 20 when performing additional authentication." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018].

491.    Claim 18 of the '391 Patent claims its system for implementing variable transaction security levels comprises "at least one interface configured to: receive a first request for user authentication as part of a first usage event, wherein the first request for user authentication

145

includes information about a first type of transaction to be performed by a user during the first usage event; receive a second request for user authentication as part of a second usage event, wherein the second request for user authentication includes information about a second type of transaction to be performed by the user during the second usage event, and wherein the second type of transaction is different from the first type of transaction" (hereinafter "the Receive Limitation"). *See* U.S. Pat. No. 10,567,391 to Hardt *et al.* at Claim 18.

492.    Brizek discloses the Receive Limitation. For example, Brizek discloses: "Ideally, the server 32 communicates with the client 42 to undertake a series of transactions." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "These transactions may include financial transactions, data transmissions and provision of services to mention a few examples." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "In each case, it is desirable to complete the transaction with the least amount of security overhead that is appropriate given the type and value of the transaction." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "Thus, a transaction involving a very large amount of money may need a relatively high security overhead while merely downloading a script may involve a relatively low security overhead." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "In accordance with embodiments of the present invention, the level of the security overhead may be adjustably or variably determined in a dynamic fashion." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0017]. "This may be determined based on code information provided by an initiator of the transaction, or it may be deduced dynamically during the course of the transaction." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0017]. "Referring to FIG. 2, the security software 20 stored in the storage 38 in FIG. 1, begins by receiving transaction type information as indicated in block 10 in accordance with one embodiment of the present invention." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018].

146

"The type information may indicate the nature of the transaction and may be provided by the initiator." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018]. "For example, the initiator of the transaction may enter information in a graphical user interface, which allows the type of the transaction to be determined." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018]. "Alternatively, in another embodiment, a variety of information may be obtained from the initiator." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018]. "As still another embodiment, the entity that receives the initiated transaction by the initiator may provide information." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018]. "The nature of the transaction may be indicated to a degree sufficient to enable the security overhead to be dynamically adjusted." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0018]. Figure 2 of Brizek is provided below:



FIG. 2

147

493.    Masahiro discloses the Receive Limitation. For example, Masahiro discloses: "An online purchase system and a method thereof according to the present invention are characterized by: transmitting purchase introduction information for online purchasing a commodity or a service through a network by broadcasting or communication; receiving and presenting the purchase introduction information on the communication terminal side; call-connecting to the purchase center through the network on the basis of connection information to a purchase center included in the purchase introduction information when there is a purchase instruction input of the user; preparing a plurality of purchase means having different security levels for notification and authentication in advance when the purchase procedure is performed by notifying the purchase registration information including the purchase content and the personal information; and selectively executing the purchase means according to the user's request or the purchase content." *See* Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0007]. "Here, when there is online shopping information in the program data and the user makes a purchase application, the operation input unit 135 performs a predetermined operation to download the online shopping information to the download processing unit 136." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0016]. "The information indicates an operation procedure for the purchase application, is reproduced through the decoder unit 134, and the user inputs the purchase registration information while viewing the reproduction screen." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0016].

494.    Tomoharu discloses the Receive Limitation. For example, Tomoharu discloses: "In addition, the 'transaction condition' defines a condition of a transaction that needs to further perform additional authentication following normal authentication, in other words, an execution condition of additional authentication." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "The customer sets and registers a condition type such as a transaction amount and a

148

transaction type and a condition content according to the condition type in advance according to his or her own will." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "For example, if the upper limit of the transaction amount (payment amount) is set as in 'withdrawal of 100 million yen or more', the additional authentication is performed when payment of an amount of 100 million yen or more is applied." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "In addition, the type of the delivery channel 0 can also be set as the 'transaction condition'. *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "For example, a transaction condition of 'disbursement of 100 thousands or more by ATM' may be set." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "In this case, the additional authentication is performed when an account payment of an amount of 100 million yen or more is applied by the ATM, but the additional authentication is not performed in a case where a channel other than the ATM is used." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "Further, the upper limit related to the total amount of transaction (total payment amount) within a predetermined period (for example, one day) may be set as the 'transaction condition'." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "The 'transaction condition' can be set with respect to various transaction forms including account transfer or the like in addition to dispensing." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "What transaction form (offer) is the target of the additional authentication, or what kind of transaction condition is set for each transaction form (offer of the offer) is determined as a design matter on the bank side in consideration of the needs of the customer." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020]. "The customer can arbitrarily set and specify his or her own transaction condition within a range allowed by the bank." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0020].

495.    "In step 3, the transaction system 31 determines whether or not there is a transaction content that requires additional authentication with respect to the transaction that has been applied this time." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0026]. "This determination is performed by comparing the 'transaction condition' described in the target record with the transaction content applied this time." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0026]. "For example, in a case where the transaction condition of 'withdrawal of 100 million yen or more' is preset by the customer, if the current transaction content matches this condition, the process proceeds to step 4 in accordance with the determination of step 3, and additional authentication processing to be described later is performed." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0026]. "On the other hand, if the transaction content of this time does not match the transaction condition, the process proceeds to step 7." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0026]. "The case that proceeds from Step 3 to Step 7 corresponds to Case #1 in FIG. 5, and performs a transaction process that permits a transaction that has been applied this time, that is, a process such as an additional update of a transaction history, an instruction to an ATM, or the like (for example, a payment permission) (arrow B in FIG. 1)." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0026].

496.    "In addition, the security level of authentication (only normal authentication, or a combination of normal authentication and additional authentication) is changed in accordance with the content of the applied transaction." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0038].

497.    Claim 18 of the '391 Patent claims its system for implementing variable transaction security levels comprises "one or more processors configured to: perform at least one transaction associated with the first request at a first transaction security level by selecting a first transaction

mechanism having the first transaction security level, wherein the first transaction mechanism is selected based on the first type of transaction to be performed by the user during a first usage event; and perform at least one transaction associated with the second request at a second transaction security level by selecting a second transaction mechanism having the second transaction security level, wherein the second transaction mechanism is selected based on the second type of transaction to be performed by the user during the second usage event, and wherein the first transaction security level is different from the second transaction security level." (hereinafter "the Processor Limitation"). *See* U.S. Pat. No. 10,567,391 to Hardt *et al.* at Claim 18.

498.    Brizek discloses the Processor Limitation. For example, Brizek discloses: "The server 32 includes a processor 36 coupled to an input/output port 34, which may provide an interface to the link 48." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0015]. "The processor 36 may also be coupled to storage 38, which stores software 20 and 50." *See* U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0015]. "Ideally, the server 32 communicates with the client 42 to undertake a series of transactions." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "These transactions may include financial transactions, data transmissions and provision of services to mention a few examples." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "In each case, it is desirable to complete the transaction with the least amount of security overhead that is appropriate given the type and value of the transaction." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "Thus, a transaction involving a very large amount of money may need a relatively high security overhead while merely downloading a script may involve a relatively low security overhead." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0016]. "In accordance with embodiments of the present invention, the level of the security overhead may be adjustably or variably determined in a dynamic fashion." U.S. Pat. Pub. No.

US2003/0056111 to Brizek at ¶ [0017]. "This may be determined based on code information provided by an initiator of the transaction, or it may be deduced dynamically during the course of the transaction." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0017]. "Once the type information has been received as indicated in block 10, a check at diamond 12 determines whether or not the transaction is a low value transaction in one embodiment of the present invention." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0019]. "If so, a determination at diamond 14 determines whether hardware encryption is required." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0019]. "If not, the low value security assets may be utilized as indicated in block 16." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0019]. "This facilitates the execution of the transaction by reducing the security overhead. In some cases, the low value security assets may be essentially no security whatsoever and in other cases, the low value security assets may be as simple as a password." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0019]. "Still other security assets may be utilized in other cases." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0019]. "If a low value transaction is not involved, a check at diamond 18 determines whether a higher value or midvalue transaction is determinable based on the received type information." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0020]. "If so, a check at diamond 20 determines whether hardware is required." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0020]. "If not, a mid-value security asset may be applied as indicated in block 22." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0020]. "This may involve some authentication or less time consuming encryption as examples." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0020]. "A variety of other security assets may be applied depending on the context." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0020]. "Finally, a check at diamond 24 determines whether the transaction is determined to be a high value transaction." U.S. Pat. Pub. No. US2003/0056111 to

Brizek at ¶ [0022]. "If not, the transaction is not determinable and may not be permitted in one embodiment." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0022]. "If the transaction is determinable to be a high value transaction and high value assets are present as determined in diamond 26, the high value security assets may be applied as indicated in block 28." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0022]. "In such case, the security overhead or burden may be enhanced, but would be appropriate under such circumstances." U.S. Pat. Pub. No. US2003/0056111 to Brizek at ¶ [0022].

499.    Masahiro discloses the Processor Limitation. For example, Masahiro discloses: "[T]hree stages (low, medium, and high) having different security levels are exemplified as the purchase procedure." *See* Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0021]. "FIG. 2 is a flowchart illustrating a purchase procedure with a low level of security level." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0022]. "In FIG. 2, when the low-level security level purchase procedure is selected, identity verification (for example, a password, a fingerprint, or the like) is performed between the reception terminal 13 and the user (step S11)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0022]. "When it can be confirmed that the person is the person himself/herself, a call is made to the purchase center 15 through a network 14 such as a telephone, a cellular phone, and the Internet, and a line is connected, and a purchase application procedure is performed (step S12)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0022]. "Further, user confirmation (for example, name, card number, telephone number, etc.) and purchase content are confirmed from the purchase center 15 (step S13)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0022]. "FIG. 3 is a flowchart illustrating a purchase procedure having an intermediate level security level." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0024]. "In FIG. 3, when the middle level security level purchase procedure is selected, identity verification

(for example, password, fingerprint, etc.) is performed between the reception terminal 13 and the user as in the case of the low level (step S21)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0024]. "When it can be confirmed that the user is the person himself/herself, a call is made to the purchase center 15 through a network 14 such as a telephone, a cellular phone, and the Internet, and a line is connected, and a purchase application procedure is performed (step S22)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0024]. "When the procedure of the purchase application is completed, the line connection is once disconnected on the user side (step S23)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0024]. FIG. 4 is a flowchart illustrating a purchase procedure with a high level of security level. "In FIG. 4, when a high-level security level purchase procedure is selected, identity verification (for example, a password, a fingerprint, or the like) is performed between the reception terminal 13 and the user as in the middle level (step S31)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0026]. "When it can be confirmed that the user is the person himself/herself, a call is made to the purchase center 15 through a network 14 such as a telephone, a cellular phone, and the Internet, and a line is connected to perform a purchase application procedure (step S32)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0026]. "When the procedure of the purchase application is completed, the line connection is once disconnected on the user side (step S33)." Japanese Pat. Pub. No. 2003091650 to Masahiro at ¶ [0026].

500.    Tomoharu discloses the Processor Limitation. For example, Tomoharu discloses: "The customer terminal 20 has a wired or wireless network environment and is a terminal owned by a customer, and for example, a mobile phone, a telephone, a PC, a PDA, or the like can be used." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0017]. "In the present embodiment, since the customer terminal 20 is used as an authentication tool for performing

additional authentication to be described later, it is preferable that the customer terminal 20 has portability so as to be able to cope with a customer, especially when assuming a transaction by a delivery channel of a customer visit type." *See* Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0017]. "The bank-side system 30 includes a transaction system 31 and an authentication system 32 capable of transmitting information to each other, and each of the systems 31 and 32 is a general computer mainly composed of a CPU, a ROM, a RAM, a storage device, a communication device, and the like." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "The transaction system 31 is capable of transmitting information to and from the delivery channel 10 via a network, and is connected to, for example, a PC or the like that is a customer-at-home channel via the Internet via a dedicated line with an ATM that is a customer-visiting channel." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "In addition, a transaction ledger database is stored in a storage device 33 such as a magnetic disk device (HDD) accessible by the transaction system 31 in order to unitarily manage transactions with individual customers." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "The transaction ledger database may be implemented in a single database, but maybe implemented in a plurality of (linked) databases associated with each other." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018]. "On the other hand, the authentication system 32 can transmit information to the customer terminal 20 via the network, and performs access processing to the customer terminal 20 when performing additional authentication." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0018].

501. "First, in the case of 'transaction approval', a transaction process that corresponds to the case # 2 of FIG. 5 and permits the transaction that has been applied this time is performed (Step 7)." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0034]. "In this case, the same

155

processing as the normal transaction processing is performed on the delivery channel 0 side, and the same display as the normal transaction is performed without displaying the fact of the additional authentication." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0034]. "On the side of the customer terminal 20, it is notified that the transaction approval has been accepted." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0034]. "The person who inputs the code from the customer terminal 20 can know that the transaction authentication has been appropriately received through the customer terminal 20." Japanese Pat. Pub. No. 2002304522 to Tomoharu at ¶ [0034].

502. Brizek discloses the system for implementing variable transaction security levels claimed in claim 18 of the '391 Patent. Brizek renders claim 18 of the '391 Patent invalid pursuant to 35 U.S.C. § 102.

503. Masahiro discloses the system for implementing variable transaction security levels claimed in claim 18 of the '391 Patent. Masahiro renders claim 18 of the '391 Patent invalid pursuant to 35 U.S.C. § 102.

504. Tomoharu discloses the system for implementing variable transaction security levels claimed in claim 18 of the '391 Patent. Tomoharu renders claim 18 of the '391 Patent invalid pursuant to 35 U.S.C. § 102.

505. In light of the disclosure in Brizek, a POSITA would also consider claim 18 of the '391 Patent obvious pursuant to 35 U.S.C. § 103.

506. In light of the disclosure in Masahiro, a POSITA would also consider claim 18 of the '391 Patent obvious pursuant to 35 U.S.C. § 103.

507. In light of the disclosure in Tomoharu, a POSITA would also consider claim 18 of the '391 Patent obvious pursuant to 35 U.S.C. § 103.

508.    In light of the disclosures in Brizek, Masahiro, and/or Tomoharu, in various combinations, a POSITA would also consider claim 18 of the '391 Patent obvious pursuant to 35 U.S.C. § 103.

## COUNT IX
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '862 PATENT

509.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

510.    Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon.  Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 16. Intellectual Ventures Management, by and on behalf of all Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license" of at least the Patents-In-Suit, including the '862 Patent.  *See* Exhibit 20.  Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See* Exhibit 9; Exhibit 10.  Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license.  Intellectual Ventures Management, by and on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management patent portfolio, including the '862 Patent, and identified patent litigation cases filed by entities

157

under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

511.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged that the '862 Patent "cover[s] technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" and identifies "Clover," a third party branded software, as the "Example Product/Feature." *See* Exhibit 9.

512.    In Plaintiff's Sept. 23, 2024 Letter, Steve Joroff on behalf of Defendants alleged infringement of at least claim 1 of the '862 Patent by "First Horizon's use of Point-of-Sale Systems," and specifically the use of third-party "Clover®" branded software (the "'862 Accused System"). *See* Exhibit 9.

513.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '862 Accused System), or import into the United States any product and/or system (including but not limited to the '862 Accused System) in a manner which infringes the '862 Patent.

514.    By way of an example, independent claim 1 of the '862 Patent requires, *inter alia*, a portable housing that meets the claim limitations which include having "a software application in the non-volatile memory comprising a series of programs designed to perform specific functions" and "wherein the software application can function as a key which will serve to unlock the POS device [or PC] when connected and lock the device [or PC] when unconnected." *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

158

515.    Upon information and belief, the '862 Accused Device does not include at least a portable housing as claimed in each independent claim in the '862 Patent that has "a software application in the non-volatile memory comprising a series of programs designed to perform specific functions . . . wherein the software application can function as a key which will serve to unlock the POS device [or PC] when connected and lock the device [or PC] when unconnected." *See* https://www.clover.com/pos-systems (last accessed Oct. 4, 2024).

516.    Accordingly, First Horizon does not directly infringe the '862 Patent, either literally or under the doctrine of equivalents.

517.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '862 Patent or otherwise contribute to infringement of the '862 Patent.

518.    Therefore, an actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '862 Patent.

519.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '862 Accused System) has not infringed and does not infringe the '862 Patent.

**COUNT X**
**DECLARATORY JUDGMENT OF INVALIDITY OF THE '862 PATENT**

520.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

521.    Claim 1 of the '862 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the

Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

522.  Upon information and belief, and subject to further discovery, claim 1 of the '862 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

523.  Upon information and belief, and subject to further discovery, claim 1 of the '862 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

### 1.  Claim 1 of the '862 Patent is Invalid Under 35 U.S.C. § 101.

524.  Claim 1 of the '862 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 1 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

525.  In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

526.  If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two. Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept

160

sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

> **i.    Claim 1 of the '862 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.**

527.    Claim 1 as a whole is directed to an abstract idea. Claim 1 as a whole is directed to an apparatus having a portable housing, a non-volatile memory, an interface for communication between the non-volatile memory and a point-of-sale ("POS") device, a data repository in the non-volatile memory, and a software program in the non-volatile memory configured to function as a key to unlock the POS device when the apparatus is connected, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

528.    Claim 1 as a whole is directed to an apparatus configured to perform steps for a purely internal process, relying upon generic computer equipment to lock and unlock a common POS device, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

529.    Furthermore, the specification confirms that Claim 1 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 1 as a whole, including the use of a conventional computing components to lock and unlock a POS device, were well understood at the time of the invention. *See* U.S. Pat. No. 7,464,862 to Bacastow at Figure 1

161

(providing that the system merely includes a conventional processor, the Internet, a conventional file server, a conventional POS terminal, a conventional removable flash memory, and a conventional personal computer). Claim 1 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

530.    Claim 1 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. For example, Claim 1's functional recitation of "the software application [functioning] as a key which will serve to unlock the POS device when connected and lock the device when unconnected" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 as a whole is directed to a generic apparatus performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"— without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

531.    Claim 1 as a whole describes storing data relevant to a computing device on a removable flash memory, rather than on the computing device itself, without any improvement to

the functionality of the network components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 is not directed to specific asserted improvements in computer capabilities. The Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Erie Indem. Co.*, 850 F.3d at 1327 (organizing and accessing data held abstract); *Content Extraction and Transmission LLC*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

532. Claim 1 as a whole is directed merely to storing data on a removable flash memory and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

533. For at least the foregoing reasons, Claim 1 fails *Alice* step one.

**ii.    Claim 1 of the '862 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

534. Claim 1 merely recites generic computing elements with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 simply uses generic computing elements to perform generic computer functions, including functioning as a key to unlock a POS device when an apparatus is connected and lock the POS device when the same apparatus is connected, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

535. Claim 1 recites architecture of a generic computing system, including a "portable housing," a "non-volatile memory," "an interface on the housing," "a software application in the

163

non-volatile memory," and "a data repositor in the non-volatile memory", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Implementation of an abstract idea by the '862 Patent's routine hardware fails to move the mere storage of data on a removable flash memory beyond an abstract idea.

536.    Claim 1 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '862 Patent discloses an "apparatus" including a "portable housing" that is configured to be connected to a computing device via an "interface." *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1. As shown in Figure 1, the portable memory apparatus is merely a "Removable Flash Memory" and the interface is conventional "USB." U.S. Pat. No. 7,464,862 to Bacastow at Figure 1. The "apparatus" includes a "non-volatile memory" having a "data repository" therein; something entirely conventional for portable flash memory devices. U.S. Pat. No. 7,464,862 to Bacastow at Claim 1. Claim 1 does not improve functionality of these devices; instead, it employs well-understood hardware to simply store data remote from the computing device, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc.*, 827 F.3d at 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be

164

significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

537. The elements of claim 1, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

538. For at least the foregoing reasons, Claim 1 fails *Alice* step two.

539. Accordingly, claim 1 of the '862 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

### 2. Claim 1 of the '862 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.

540. Upon information and belief, and subject to further discovery, claim 1 of the '862 Patent is invalid under 35 U.S.C. §§ 102 and 103.

541. The '862 Patent originated as U.S. Application No. 11/141,837 and was filed on June 1, 2005.

542. The '862 Patent, and specifically U.S. Application No. 11/141,837, claims priority to U.S. Application No. 60/579,997. U.S. Application No. 60/579,997 was filed on June 15, 2004.

543. The '862 Patent, and specifically U.S. Application No. 11/141,837, claims priority to U.S. Application No. 60/631,300. U.S. Application No. 60/631,300 was filed on November 24, 2004.

544. Claim 1 of the '862 Patent reads as follows:

1. An apparatus for extending the capability of a POS Device including:
   a. a portable housing;
   b. non-volatile memory withing the housing;
   c. an interface on the housing for communication between the non-volatile memory and the POS device; and
   d. a software application in the non-volatile memory comprising a series of programs designed to perform specific functions;

e. a data repository in the non-volatile memory to store required data to support software functions; wherein the software application can function as a key which will serve to unlock the POS device when connected and lock the device when unconnected.

545. Claim 1 of the '862 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent No. 5,854,891 (hereinafter "Postlewaite"), U.S. Patent No. 6,088,802 (hereinafter "Bialick"), and International Publication No. WO 03/001350 (hereinafter "Behar"), alone or in combination.

546. Postlewaite was filed on August 9, 1996 and issued December 29, 1998. It is entitled "Smart Card Reader Having Multiple Data Enabling Storage Compartments," and lists William M. Postlewaite, Kim J. Vogel, Jason Maynard, and Vincent Poole as inventors. A true and correct copy of Postlewaite is attached hereto as Exhibit 40.

547. Postlewaite is prior art to the '862 Patent.

548. Bialick was filed on June 4, 1997 and issued July 11, 2000. it is entitled "Peripheral Device with Integrated Security Functionality," and lists William P. Bialick, Mark J. Sutherland, Janet L. Dolphin-Peterson, Thomas K. Rowland, Kirk W. Skeba, and Russel D. Housley as inventors. A true and correct copy of Bialick is attached hereto as Exhibit 41.

549. Bialick is prior art to the '862 Patent.

550. Behar was filed on June 20, 2002 and published January 3, 2003. It is entitled "Security System and Software to Prevent Unauthorized Use of a Computing Device," and lists Yaacov Behar as the inventors. A true and correct copy of Behar is attached hereto as Exhibit 42.

551. Behar is prior art to the '862 Patent.

552. As shown in the '862 Patent under the heading "References Cited," neither Postlewaite, Bialick, nor Behar were considered by the Examiner during examination of the application that issued as the '862 Patent.

166

553.    The '862 Patent issued without the United States Patent and Trademark Office considering that Postlewaite, Bialick, and Behar render the invention claimed in the '862 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

554.    Claim 1 claims "[a]n apparatus for extending the capability of a POS Device including" specific limitations that are recited in claim 1. *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

555.    Postlewaite discloses an apparatus for extending the capability of a POS Device including the limitations recited in claim 1 of the '862 Patent. *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.*

556.    Bialick discloses an apparatus for extending the capability of a POS Device including the limitations recited in claim 1 of the '862 Patent. *See* U.S. Pat. No. 6,088,802 to Bialick *et al.*

557.    Behar discloses an apparatus for extending the capability of a POS Device including the limitations recited in claim 1 of the '862 Patent. *See* International Pub. No. WO 03/001350 to Behar.

558.    Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes "a portable housing" (hereinafter "the Housing Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

559.    Postlewaite discloses the Housing Limitation. For example, Postlewaite discloses: "As seen in FIG. 1 of the drawings, the present invention is an intermediate peripheral device for a computer 2 as an interface for utilizing one or more smart cards 4." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 4, ll. 27–30. "The invention comprises hardware components and associated software collectively comprising a security device generally designated 100." *See* U.S.

Pat. No. 5,854,891 to Postlewaite *et al.* at col. 4, ll. 30–32. "As an interface, security device 100 greatly expands the ability of a single smart card 4 to be connected to a variety of different type computers." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 4, ll. 50–52. "[A] smart card reader having means for communicating with a smart card having memory." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at Claim 1. "[S]ecurity device 100 comprises a card reader 102 having a receptacle 104 and contacts 106." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col 5, ll. 1–2. "Contacts 106 correspond to contacts 8 located on the face of smart card 4 (see FIG. 2)." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col 5, ll. 2–4. "When fully inserted into receptacle 104, contacts 8 align and establish electrical communication with contacts 106." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col 5, ll. 4–6. "Significantly, a single smart card reader of this invention reads and stores in different segments of its memory the data from a plurality of smart cards so that a customer having multiple smart cards for multiple applications need make but one insertion of each card into the novel smart card reader." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 34–39.

560.    Figures 1 and 2 of Postlewaite are shown below:

168



561.    Bialick discloses the Housing Limitation. For example, Bialick discloses: "The system 300 includes a host computing device 301 and a peripheral device 302 that communicate via a communications interface 303." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 50–52. "Herein, 'peripheral device' can refer to any device that operates outside of a host computing device and that is connected to the host computing device." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 52–55. "In FIG. 3B, the peripheral device 302 is embodied as a card 312 that can be inserted into a corresponding slot 313 formed in a portable computer 311 that, in FIG. 3B, embodies the host computing device 301." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 42–46. "Often a peripheral device according to the invention is a portable device, such as the card 312 shown in FIG. 3B." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 46–47. "Herein, 'portable device' can refer generally to any device that is capable of being easily carried by hand." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 48–49. Figures 3A and 3B are provided below:

169



FIG. 3A

FIG. 3B

562.    Behar discloses the Housing Limitation. For example, Behar discloses: "In order to secure one or more a personal or laptop computers 10, a key device 20 is issued for each device by a system manager or any other person within an organisation [sic] responsible for security of the IT environment." *See* International Pub. No. WO 03/001350 to Behar at 6. "The key device 20 consists of a little token which may readily be attached to other keys of the user, like home and car keys, likely to be carried along." *See* International Pub. No. WO 03/001350 to Behar at 6. Figure 1 of Behar is provided below:



FIG. 1

563.    Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes a "non-volatile memory within the housing" (hereinafter "the Memory Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

564.    Postlewaite discloses the Memory Limitation. For example, Postlewaite discloses: "Significantly, a single smart card reader of this invention reads and stores in different segments of its memory the data from a plurality of smart cards so that a customer having multiple smart cards for multiple applications need make but one insertion of each card into the novel smart card reader." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 34–39. "The present invention provides apparatus for compiling virtual tokens (virtual smart cards) stored in non-volatile memory (NVM) associated with a card reader." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 56–58. "The NVM  device may either be contained within a card reader which is connectable to a computer, or alternatively, may be integral with a computer." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 58–62.

171

565. Bialick discloses the Memory Limitation. For example, Bialick discloses: "Each embodiment of the communications interface 303 includes hardware present in each of the host computing device 301 and peripheral device 302 that operates in accordance with a communications protocol (which can be embodied, for example, by software stored in a memory device and/or firmware that is present in the host computing device 301 and/or peripheral device 302) appropriate for that type of communications interface, as known to those skilled in the art." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 10–18. "The peripheral device 602 includes security functionality 611, a memory device 612, an input/output (I/O) device 613 for enabling communication with the host 40 computing device 601 and target functionality 614." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 37–40. "The security functionality 611, memory device 612, I/O device 613 and target functionality 614 can each be implemented by conventional devices and can communicate with each other via a conventional computer bus 615, as is well known and s understood." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 40–45.

566. Behar discloses the Memory Limitation. For example, Behar discloses: "The key device comprises programmable memory means capable of storing said key information." *See* International Pub. No. WO 03/001350 to Behar at 6. "In this embodiment flash EEPROM is used as storage medium in the key device but also other kinds of non-volatile, one-time or repeatedly programmable memory may be used or even volatile memory provided that the latter is accompanied by a suitable power source, like a battery or the like, in order to avoid data loss." *See* International Pub. No. WO 03/001350 to Behar at 6.

567. Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes "an interface on the housing for communication between the non-volatile

memory and the POS device" (hereinafter "the Interface Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

568.    Postlewaite discloses the Interface Limitation. For example, Postlewaite discloses: "Enabling data is loaded into NVM through smart cards read by the card reader." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 65–66. "The NVM is segmented, each segment being dedicated to one virtual token bearing enabling data received from any one smart card." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, l. 66 – col. 3, l. 1. "Once enabling data is loaded, it is not alterable by the computer with which it is associated, nor by any computer not specifically equipped to modify the NVM." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 1–4. "The NVM is contained within a control module having plural interface apparatuses enabling communicating connection to the computer." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 4–7. "When utilized with computer 2 connected to security device 100, security device 100 enables the connected computer 2 to access protected programs or data directly or to perform other functions in connection with other remote computers (not shown)." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col 4, ll. 35–40. "To accomplish this, security device 100 comprises a card reader 102 having a receptacle 104 and contacts 106." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 1–2. "Contacts 106 correspond to contacts 8 located on the face of smart card 4 (see FIG. 2)." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 3–5. "When fully inserted into receptacle 104, contacts 8 align and establish electrical communication with contacts 106." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 4–6. "Card reader 102 communicates with a control module 108, as represented by communications conductor 110." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 7–8. "Security device 100 includes a plurality

173

of interface apparatuses for connection to computers generally." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col 5, ll. 63–65. Refer also to Figure 1, provided above.

569.    Bialick discloses the Interface Limitation. For example, Bialick discloses: "The system 300 includes a host computing device 301 and a peripheral device 302 that communicate via a communications interface 303." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 50–52. "Herein, 'peripheral device' can refer to any device that operates outside of a host computing device and that is connected to the host computing device." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 52–55. "Generally, the communications interface 303 can be any embodied by any of a variety of communication interfaces, such as a wireless communications interface, a PCMCIA interface, a smart card interface, a serial interface (such as an RS-232 interface), a parallel interface, a SCSI interface or an IDE interface." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 5–10. "Each embodiment of the communications interface 303 includes hardware present in each of the host computing device 301 and peripheral device 302 that operates in accordance with a communications protocol (which can be embodied, for example, by software stored in a memory device and/or firmware that is present in the host computing device 301 and/or peripheral device 302) appropriate for that type of communications interface, as known to those skilled in the art." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 10–18. "Each embodiment of the communications interface 303 also includes mechanisms to enable physical engagement, if any, between the host computing device 301 and peripheral device 302." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, ll. 18–21.

570.    Behar discloses the Interface Limitation. For example, Behar discloses: "The key device 20 comprises a standard infrared interface 21 which operates according to the Ultra Protocol as established by the Infrared Data Association (IrDA) in order to facilitate data communication

between a system manager's work station and the key device." *See* International Pub. No. WO 03/001350 to Behar at 7. Refer also to Figure 1, provided above.

571.    Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes "a software application in the non-volatile memory comprising a series of programs designed to perform specific functions" (hereinafter "the Software Application Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

572.    Postlewaite discloses the Software Application Limitation. For example, Postlewaite discloses: "Control module 108 includes processing means 112 for executing commands and monitoring for authorization, a segmented NVM 114 for providing virtual tokens, and an optional special purpose math coprocessor 116 for accelerating encryption and decryption of data." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 9–13. "Processing means 112 has an automatic recording means 118 to enter enabling data into the segmented NVM 114 from smart card 4 through card reader 102 without aid of computer 2." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 13–16. "Processing means 112 includes all signals, power, and protocol required for a connected computer to access a virtual token." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 17–19. "Processing means 112 enables execution commands to be operably communicated, if detected by recognition means 120, to selected protected programs contained in the memory of computer 2 connected to security device 100, or, of course, contained in a greater network as discussed prior." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 19–24. "Recognition means 120 detects and verifies appropriate enabling data entered into segmented NVM 114." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 24–25. "Processing means 112 includes a disabling inhibitor 122 for preventing execution commands originating at connected computer 2 to be recognized by processing means 112 if recognition

175

means 120 cannot detect and verify appropriate enabling data entered into segmented NVM 114."
*See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 26–30.

573.    Bialick discloses the Software Application Limitation. For example, Bialick discloses: "The peripheral device 302 includes a security mechanism 302a that enables security operations (examples of which are described in more detail below) to be performed on data that is stored within the host computing device 301, data that is transmitted from the host 60 computing device 301 to the peripheral device 302, or data that is transmitted from the peripheral device to the host computing device 301." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 55–62. "As explained in more detail below, the peripheral device 302 also provides additional functionality (referred to herein as 'target functionality') to the system 300, such as, for example, the capability to store data in a solid-state disk storage device, the capability to enable communications from the host computing device 301 to another device, the capability to accept biometric input to enable user authentication to the host computing device 301, and the capability to receive and read a smart card inserted into the peripheral device 302." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, l. 62 – col. 5, l. 4. "Each embodiment of the communications interface 303 includes hardware present in each of the host computing device 301 and peripheral device 302 that operates in accordance with a communications protocol (which can be embodied, for example, by software stored in a memory device and/or firmware that is present in the host computing device 301 and/or peripheral device 302) appropriate for that type of communications interface, as known to those skilled in the art." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, 10–18. "The peripheral device 602 includes security functionality 611, a memory device 612, an input/output (I/O) device 613 for enabling communication with the host computing device 601 and target functionality 614." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 37–40. "The security

functionality 611, memory device 612, I/O device 613 and target functionality 614 can each be implemented by conventional devices and can communicate with each other via a conventional computer bus 615, as is well known and s understood." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 40–45.

574.    Behar discloses the Software Application Limitation. For example, Behar discloses: "Key information 25 is written into the key device by means of appropriate software, available to the system manager only, in order to activate the key device." *See* International Pub. No. WO 03/001350 to Behar at 6. "The key device comprises programmable memory means capable of storing said key information." *See* International Pub. No. WO 03/001350 to Behar at 6.

575.    Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes "a data repository in the non-volatile memory to store required data to support software functions" (hereinafter "the Data Repository Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

576.    Postlewaite discloses the Data Repository Limitation. For example, Postlewaite discloses: "Significantly, a single smart card reader of this invention reads and stores in different segments of its memory the data from a plurality of smart cards so that a customer having multiple smart cards for multiple applications need make but one insertion of each card into the novel smart card reader." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 34–39. "The present invention provides apparatus for compiling virtual tokens (virtual smart cards) stored in non-volatile memory (NVM) associated with a card reader." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, 57–59. "Enabling data is loaded into NVM through smart cards read by the card reader." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 65–66. "The NVM is segmented, each segment being dedicated to one virtual token bearing enabling data received from any one

smart card." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, l. 66 – col. 3, l. 1. "Once enabling data is loaded, it is not alterable by the computer with which it is associated, nor by any computer not specifically equipped to modify the NVM." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 1–4. "The NVM is contained within a control module having plural interface apparatuses enabling communicating connection to the computer." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 4–7. "In use in a computer, execution of protected software is dependent upon presence or detection and verification of encryption data or keys contained in the virtual token or installed smart card." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 8–11. "If a key is not present, the software will not operate." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 11–12. "Processing means 112 has an automatic recording means 118 to enter enabling data into the segmented NVM 114 from smart card 4 through card reader 102 without aid of computer 2." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 5, ll. 13–16.

577.    Bialick discloses the Data Repository Limitation. For example, Bialick discloses: "The peripheral device 302 includes a security mechanism 302a that enables security operations (examples of which are described in more detail below) to be performed on data that is stored within the host computing device 301, data that is transmitted from the host 60 computing device 301 to the peripheral device 302, or data that is transmitted from the peripheral device to the host computing device 301." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, ll. 55–62. "As explained in more detail below, the peripheral device 302 also provides additional functionality (referred to herein as 'target functionality') to the system 300, such as, for example, the capability to store data in a solid-state disk storage device, the capability to enable communications from the host computing device 301 to another device, the capability to accept biometric input to enable user authentication to the host computing device 301, and the capability to receive and read a smart

178

card inserted into the peripheral device 302." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 4, l. 62 – col. 5, l. 4. "Each embodiment of the communications interface 303 includes hardware present in each of the host computing device 301 and peripheral device 302 that operates in accordance with a communications protocol (which can be embodied, for example, by software stored in a memory device and/or firmware that is present in the host computing device 301 and/or peripheral device 302) appropriate for that type of communications interface, as known to those skilled in the art." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 5, 10–18. "The peripheral device 602 includes security functionality 611, a memory device 612, an input/output (I/O) device 613 for enabling communication with the host computing device 601 and target functionality 614." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 37–40. "The security functionality 611, memory device 612, I/O device 613 and target functionality 614 can each be implemented by conventional devices and can communicate with each other via a conventional computer bus 615, as is well known and s understood." U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 6, ll. 40–45.

578. Behar discloses the Data Repository Limitation. For example, Behar discloses: "The key device comprises programmable memory means capable of storing said key information. In this embodiment flash EEPROM is used as storage medium in the key device but also other kinds of non-volatile, one-time or repeatedly programmable memory may be used or even volatile memory provided that the latter is accompanied by a suitable power source, like a battery or the like, in order to avoid data loss." *See* International Pub. No. WO 03/001350 to Behar at 6. "Key information 25 is written into the key device by means of appropriate software, available to the system manager only, in order to activate the key device." International Pub. No. WO 03/001350 to Behar at 6. "The key device comprises programmable memory means capable of storing said key information." International Pub. No. WO 03/001350 to Behar at 6.

579.    Claim 1 of the '862 Patent claims its apparatus for extending the capability of a POS Device includes "the software application can function as a key which will serve to unlock the POS device when connected and lock the device when unconnected" (hereinafter "the Key Limitation"). *See* U.S. Pat. No. 7,464,862 to Bacastow at Claim 1.

580.    Postlewaite discloses the Key Limitation. For example, Postlewaite discloses: "One smart card may, for example, be required to access the computer, another to copy protect valuable software, another to access the Internet, and still another to purchase goods and services over the Internet with a credit card." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 25–29. "Each of these actions once required the user to insert a different smart card into his or her computer." *See* U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 2, ll. 29–30. "In use in a computer, execution of protected software is dependent upon presence or detection and verification of encryption data or keys contained in the virtual token or installed smart card." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 8–11. "If a key is not present, the software will not operate." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 11–12. "[T]he card reader can enable any of many computers, due to having a variety of interface apparatuses." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 16–18. "Control is retained by the possessor of the card reader." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, l. 19. "Firstly, the possessor can load selected data into an NVM segment, thereby creating a virtual token." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 19–20. "Secondly, the card reader can be a hardware key necessary for enabling a host computer to perform selected functions or transactions controlled by the virtual tokens." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 3, ll. 20–23. "The invention is a security device for enabling selected functions to be performed, such as, accessing operating software to run the computer, or to protect programs or data contained in memory in computers."

U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 4, ll. 32–34. "When utilized with computer 2 connected to security device 100, security device 100 enables the connected computer 2 to access protected programs or data directly or to perform other functions in connection with other remote computers (not shown)." U.S. Pat. No. 5,854,891 to Postlewaite *et al.* at col. 4, ll. 32–40.

581.    Bialick discloses the Key Limitation. For example, Bialick discloses: "In particular, the peripheral device can be adapted to enable, in a single integral peripheral device, performance of one or more security operations on data, and a defined interaction with a host computing device that has not previously been integrated with security operations in a single integral device." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 3, ll. 27–33. "The defined interactions can provide a variety of types of functionality (e.g., data storage, data communication, data input and output, user identification), as described further below." *See* U.S. Pat. No. 6,088,802 to Bialick *et al.* at col. 3, ll. 33–36.

582.    Behar discloses the Key Limitation. For example, Behar discloses: "The present invention relates to a security system to prevent unauthorized use of a computing device, said system comprising a key device carrying an key identification; memory means installed in said computing device for storing a validation record; an interface to connect said key device with said computing device and to provide a pathway to exchange said key identification; a program to validate said key identification embedded in said key device using said validation record; and means for inhibiting use of said computing device if said key identification and said validation record do not match." *See* International Pub. No. WO 03/001350 to Behar at 1. "The key device provides a level of security which requires the possession of the device itself." International Pub. No. WO 03/001350 to Behar at 5. "Without a key device no access is possible to a computing device in the system." International Pub. No. WO 03/001350 to Behar at 5.

583.     Postlewaite discloses the apparatus for extending the capability of a POS Device claimed in claim 1 of the '862 Patent. Postlewaite renders claim 1 of the '862 Patent invalid pursuant to 35 U.S.C. § 102.

584.     Bialick discloses the apparatus for extending the capability of a POS Device claimed in claim 1 of the '862 Patent. Bialick renders claim 1 of the '862 Patent invalid pursuant to 35 U.S.C. § 102.

585.     Behar discloses the apparatus for extending the capability of a POS Device claimed in claim 1 of the '862 Patent. Behar renders claim 1 of the '862 Patent invalid pursuant to 35 U.S.C. § 102.

586.     In light of the disclosure in Postlewaite, a POSITA would also consider claim 1 of the '862 Patent obvious pursuant to 35 U.S.C. § 103.

587.     In light of the disclosure in Bialick, a POSITA would also consider claim 1 of the '862 Patent obvious pursuant to 35 U.S.C. § 103.

588.     In light of the disclosure in Behar, a POSITA would also consider claim 1 of the '862 Patent obvious pursuant to 35 U.S.C. § 103.

589.     In light of the disclosures in Postlewaite, Bialick, and/or Behar, in various combinations, a POSITA would also consider claim 1 of the '862 Patent obvious pursuant to 35 U.S.C. § 103.

## COUNT XI
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '584 PATENT

590.     First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

591.     Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First

Horizon. Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 18. Intellectual Ventures Management, by and on behalf all of Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license for its operations" of at least the Patents-In-Suit. *See* Exhibit 20. Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See* Exhibit 9; Exhibit 10. Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18. Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license. Intellectual Ventures Management, on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples. *See* Exhibit 16.

592.    In Plaintiff's October 16, 2025 Letter, Kasowitz LLP, on behalf of Defendants, alleged that First Horizon's use of Kubernetes, a third party branded software, infringes at least claim 1 of the '584 Patent (the "'584 Accused System"). *See* Exhibit 10.

593.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '584 Accused System), or import into the

United States any product and/or system (including but not limited to the '584 Accused System) in a manner which infringes the '584 Patent.

594. By way of an example, each independent claim of the '584 Patent requires, *inter alia*, a first gateway communicatively linked between a first cluster and a private communications network, *and* a second gateway communicatively linked between a second cluster and the private communications network. *See* U.S. Pat. No. 8,352,584 to Franklin at Claim 1 ("a first gateway communicatively linked between the first cluster and the private communications network [and] … a second gateway communicatively linked between the second cluster and the private communications network"); Claim 10 ("a first gateway communicatively linked between the first HPC cluster and the private network [and] … a second gateway communicatively linked between the second HPC cluster and the private network").

595. First Horizon does not infringe the '584 Patent (including, for example, the independent claims identified in the preceding paragraph) at least because the '584 Accused System does not include a first gateway communicatively linked between a first cluster and a private communications network, *and* a second gateway communicatively linked between a second cluster and the private communications network.

596. The "kubernetes.io" website provides the following description of Kubernetes "Cluster Architecture" which make up the '584 Accused System. *See* https://kubernetes.io/docs/concepts/architecture/ (last accessed Oct. 4, 2024).

184

The architectural concepts behind Kubernetes.

A Kubernetes cluster consists of a control plane plus a set of worker machines, called nodes, that run containerized applications. Every cluster needs at least one worker node in order to run Pods.

The worker node(s) host the Pods that are the components of the application workload. The control plane manages the worker nodes and the Pods in the cluster. In production environments, the control plane usually runs across multiple computers and a cluster usually runs multiple nodes, providing fault-tolerance and high availability.

597.    The "kubernetes.io" website provides the following diagram depicting the architecture of the '584 Accused System. *See* https://kubernetes.io/docs/concepts/architecture/ (last accessed Oct. 4, 2024).



598.    The "kubernetes.io" website provides that each "cluster" is connected to a "cloud provider api," and more specifically that each cluster is connected to the cluster via a "cloud control manager" which resides, or forms a portion of, the cluster. *See* https://kubernetes.io/docs/concepts/architecture/ (last accessed Oct. 4, 2024).

599.    Notably, there is no component, whether residing in software or hardware, disposed between the cluster, but more specifically the cloud control manager, and the cloud provider api. *See* https://kubernetes.io/docs/concepts/architecture/ (last accessed Oct. 4, 2024).

600.    The "kubernetes.io" website does provide that a "gateway API" is an optional add-on that may be applied to the '584 Accused System and may route and direct traffic between a plurality of clusters. *See* https://kubernetes.io/docs/concepts/services-networking/gateway/ (last accessed Nov. 11, 2025). One may equate this gateway API to the gateways as claimed in the '584 Patent.

601.    However, the '584 Accused System only employs a single gateway API, if at all, to route and direct traffic between the plurality of clusters. *See* https://kubernetes.io/docs/concepts/services-networking/gateway/ (last accessed Nov. 11, 2025).

602.    The '584 Accused System does not include a plurality of gateway APIs each dedicated to a specific cluster.

603.    Accordingly, First Horizon does not infringe the '584 Patent at least because the '584 Accused System does include a first gateway communicatively linked between a first cluster and a private communications network, *and* a second gateway communicatively linked between a second cluster and the private communications network.

604.    Accordingly, First Horizon does not directly infringe the '584 Patent, either literally or under the doctrine of equivalents.

605.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '584 Patent or otherwise contribute to infringement of the '584 Patent.

606.    Therefore, an actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '584 Patent.

607.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '584 Accused System) has not infringed and does not infringe the '584 Patent.

## COUNT XII
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '584 PATENT

608.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

609.    Claim 1 of the '584 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

610.    Upon information and belief, and subject to further discovery, claim 1 of the '584 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

611.    Upon information and belief, and subject to further discovery, claim 1 of the '584 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

1.  **Claim 1 of the '584 Patent is Invalid Under 35 U.S.C. § 101.**

612.    Claim 1 of the '584 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 1 as a whole is directed to a non-patentable, abstract

187

idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

613.     In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

614.     If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two.  Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

### i.     Claim 1 of the '584 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.

615.     Claim 1 as a whole is directed to an abstract idea. Claim 1 as a whole is directed to: (1) providing a first computing environment via a first cluster of computing resources; (2) establishing communications between the first computing environment and a first gateway; (3)

188

providing a second computing environment via a second cluster of computing resources; (4) establishing communications between the second computing environment and a second gateway; and (5) monitoring operations of the first cluster and the second cluster for communications problems, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

616.    Claim 1 as a whole is directed to a computer system configured to perform steps for a purely *internal* process, relying upon generic computer equipment to route communications within a network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

617.    Furthermore, the specification confirms that Claim 1 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 1 as a whole, including the use of a conventional computing system to offload computing tasks to remote clusters and monitor these communications, were well understood at the time of the invention. *See* U.S. Pat. No. 8,352,584 to Franklin at Figure 2 (providing that the system merely includes a plurality of clusters and associated gateways connected to the Internet via a private company network and firewall). Claim 1 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

618.    Claim 1 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 as a whole relies on functional language

to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. For example, Claim 1's functional recitation of "monitor[ing] operations of the first cluster and the second cluster for communications problems," "provid[ing] a first computing environment," "provid[ing] a second computing environment," and "establish[ing] communications" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 as a whole is directed to a generic computer system architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

619.    Claim 1 as a whole describes using standard hardware to execute basic cluster computing tasks without any improvement to the functionality of the system components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 is not directed to specific asserted improvements in computer capabilities.

620.    Claim 1 as a whole is directed to basic cluster computing wherein communications may be routed over a network, and specifically routed between clusters of computing resources and computing elements, such as servers, connected to the Internet, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc.*, 778 F. App'x at 892

190

(quoting *ChargePoint, Inc.*, 920 F.3d at 767); *see also buySAFE, Inc.*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network … is not even arguably inventive."). Further, the Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Erie Indem. Co.*, 850 F.3d at 1327 (organizing and accessing data held abstract); *Content Extraction and Transmission LLC*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

621.    Claim 1 as a whole is directed merely to a conventional computing system configured to offload computing tasks to remote clusters and monitor these communications, and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

622.    For at least the foregoing reasons, Claim 1 fails *Alice* step one.

### ii.    Claim 1 of the '584 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101

623.    Claim 1 merely recites a generic computer with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 simply uses a generic computer to perform generic computer functions, including "monitor[ing] operations of the first cluster and the second cluster for communications problems," "provid[ing] a first computing environment," "provid[ing] a second computing environment," and "establish[ing] communications", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

624.    Claim 1 recites architecture of a generic computing system, including "a private communications network," "a public communications network," "a first cluster comprising a set of computing resources," "a second cluster comprising a set of computing resources," "a monitoring system," "a first gateway," and "a second gateway", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Implementation of an abstract idea by the '584 Patent's routine hardware fails to move the mere offloading of computing tasks to remote clusters and monitoring these communications beyond an abstract idea.

625.    Claim 1 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '584 Patent discloses that the "private communications network" is merely a company's private network and the "public communications network" is merely the "Internet, a LAN, a WAN, or the like." *See* U.S. Pat. No. 8,352,584 to Franklin at Figure 2; col. 5, ll. 25–29. The "first cluster comprising a set of computing resources" and "second cluster comprising a set of computing resources" simply include two or more nodes each configured to "perform a computing task." U.S. Pat. No. 8,352,584 to Franklin at col. 10, ll. 29–31. Each node is merely "a group of circuitry and electronic components designed to perform one or more computing tasks" and "may include one or more processors (e.g. Intel Xeon™ or AMD Opteron™), memory, and interface circuitry." U.S. Pat. No. 8,352,584 to Franklin at col. 10, ll. 31–36. The "monitoring system" uses common hardware and/or software to "monitor[] the hardware and software components on each cluster node" and to "monitor[] the network connectivity of each node." U.S. Pat. No. 8,352,584 to Franklin at col. 7, ll. 53–62; col. 8, ll. 37–39. The "first gateway" and "second gateway" are merely routers "configured with software and hardware to apply a standard set of rules to only permit traffic destined for its corresponding cluster to pass through." U.S. Pat. No. 8,352,584 to Franklin at col. 5, ll. 32–34; col. 5, ll. 42–46. Claim 1

192

does not improve functionality of these devices; instead, it employs well-understood hardware to simply offload computing tasks to remote clusters, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

626.    The elements of claim 1, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

627.    For at least the foregoing reasons, Claim 1 fails *Alice* step two.

628.    Accordingly, claim 1 of the '584 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

## 2. **Claim 1 of the '584 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.**

629.    Upon information and belief, and subject to further discovery, claim 1 of the '584 Patent is invalid under 35 U.S.C. §§ 102 and 103.

630.    The '584 Patent originated U.S. Application No. 12/894,664 and was filed on September 30, 2010.

193

631.    The '584 Patent, and specifically U.S. Application No. 12/894,664, claims to be a

continuation of U.S. Application No. 11/927,921. U.S. Application No. 11/927,921 was filed on

October 30, 2007.

632.    Claim 1 of the '584 Patent reads as follows:

1.  A computer system, comprising:
    a private communications network linked to a public communications network;
    a first cluster comprising a set of computing resources, including at least one
       hardware processor, in a first configuration, wherein the first cluster is
       communicatively linked to the private communications network;
    a second cluster comprising a set of computing resources, including at least one
       hardware processor, in a second configuration, wherein the second cluster
       is communicatively linked to the private communications network; and
    a monitoring system to monitor operations of the first cluster and the second
       cluster for communications problems;
    wherein the first configuration differs from the second configuration;
    wherein the first configuration provides a first computing environment to
       perform a first client task and the second configuration provides a second
       computing environment to perform a second client task; and
    wherein the computing resources comprise processing nodes, data storage
       shared by the processing nodes, and at least one communications network
       to link the processing nodes to each other and to the data storage;
    wherein the first cluster establishes communications between the set of
       computing resources of the first cluster and a first gateway
       communicatively linked between the first cluster and the private
       communications network;
    wherein the second cluster establishes communications among the set of
       computing resources of the second cluster and a second gateway
       communicatively linked between the second cluster and the private
       communications network;
    wherein communications between the first cluster and the second cluster are
       isolated;
    wherein the first cluster is a high performance cluster; and
    wherein the second cluster is a high performance cluster.

633.    Claim 1 of the '584 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by

U.S. Patent No. 6,952,737 (hereinafter "Coates") and U.S. Patent Publication No. 2006/0075199

(hereinafter "Kallahalla"), alone or in combination.

634.    Coates was filed on December 29, 2000 and issued October 4, 2005. It is entitled "Method and Apparatus for Accessing Remote Storage in a Distributed Storage Cluster Architecture," and lists Joshua L. Coates, Patrick E. Bozeman, and David A. Patterson as inventors. A true and correct copy of Coates is attached hereto as Exhibit 43.

635.    Coates is prior art to the '584 Patent.

636.    Kallahalla was filed on October 6, 2004 and published April 6, 2006. It is entitled "Method of Providing Storage to Virtual Computer Cluster Within Shared Computing Environment," and lists Mahesh Kallahalla, Mustafa Uysal, and Ram Swaminathan as inventors. A true and correct copy of Kallahalla is attached hereto as Exhibit 44.

637.    Kallahalla is prior art to the '584 Patent.

638.    As shown on the '584 Patent under the heading "References Cited," neither Coates nor Kallahalla were considered by the Examiner during examination of the application that issued as the '584 Patent.

639.    The '584 Patent issued without the United States Patent and Trademark Office considering that Coates and Kallahalla render the invention claimed in the '584 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

640.    Claim 1 claims "[a] computer system, comprising" specific limitations that are recited in claim 1. *See* U.S. Pat. No. 8,352,584 to Franklin *et al.* at Claim 1.

641.    Coates discloses a computer system comprising the limitations recited in claim 1 of the '584 Patent. *See* U.S. Pat. No. 6,952,737 to Coates *et al.*

642.    Kallahalla discloses a computer system comprising the limitations recited in claim 1 of the '584 Patent. *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.*

195

643.    Claim 1 of the '584 Patent claims its computer system comprises "a private communications network linked to a public communications network" (hereinafter "the Private Communications Network Limitation"). *See* U.S. Pat. No. 8,352,584 to Franklin *et al.* at Claim 1.

644.    Coates discloses the Private Communications Network Limitation. For example, Coates discloses: "A storage system, accessed over a network by a client, includes one or more storage centers." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 2, ll. 66–67. "The client, such as an end-user computer or a content server, issues requests over a network (e.g., Internet) to retrieve object files." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 4–6. "From any location on the Internet, clients see the exact same view of their private file system." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 19, ll. 2–4. "FIG. 27 is a block diagram illustrating one embodiment to interface a storage center to a client's private file directory system." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 4, ll. 54–56. Figure 27 of Coates is provided below:



**Figure 27**

645.    "FIG. 29 is a block diagram illustrating one embodiment for a storage port fail over configuration." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 14–15. "For purposes of explanation, FIG. 29 illustrates a fail over configuration with two storage ports." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 16–17. "However, the storage port fail over configuration may be extended to any '2N' fail over configuration." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 17–19. "For this embodiment, the fail over configuration includes an active storage port 3010 and a passive storage port 3020." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 19–

21. "Each storage port includes a plurality of network interface cards." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 21–22. "Both the active storage port 3010 and passive storage port 3020 communicate to storage center(s) over wide area network 3065, through network interface cards 3045 and 3025, respectively." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 22–25. "The active storage port 3010 and passive storage port 3020 also communicate to the client site network via network interface cards 3050 and 3035, respectively." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 25–27. "As shown in FIG. 29, the client accesses the active storage port 3010 over client site network 3060 using IP Addr." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 29, ll. 27–30. Figure 29 of Coates is provided below:



**Figure 29**

198

646.    Kallahalla discloses the Private Communications Network Limitation. For example, Kallahalla discloses: "The shared computing environment 200 comprises host computers 202, disk arrays 204, a SAN (storage area network) 206, and a LAN (local area network) 208." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The SAN 206 couples the host computers 202 to the disk arrays 204." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The LAN 208 couples the host computers 202 together. In an embodiment, the LAN 208 couples to a wide area network 210 (e.g., the Internet)." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The alternative shared computing environment 800 comprises a plurality of host computers 802 (e.g., desktop computers) coupled together by a LAN 808." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0047]. "Each host computer 802 comprises a processor 812, memory 814, a network interface 818, and storage 820." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0047]. "In an embodiment, the alternative shared computing environment 800 couples to a WAN 810." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0047]. Figure 8 of Kallahalla is provided below:



FIG. 8

647.    Claim 1 of the '584 Patent claims its computer system comprises "a first cluster comprising a set of computing resources, including at least one hardware processor, in a first configuration, wherein the first cluster is communicatively linked to the private communications network; a second cluster comprising a set of computing resources, including at least one hardware processor, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; … wherein the first configuration differs from the second configuration; wherein the first configuration provides a first computing environment to perform a first client task and the second configuration provides a second computing environment to perform a second client task; and wherein the computing resources comprise processing nodes, data storage shared by the processing nodes, and at least one communications network to link the processing nodes to each other and to the data storage; … wherein the first cluster is a high

performance cluster; and wherein the second cluster is a high performance cluster." (hereinafter "the Cluster Limitation"). *See* U.S. Pat. No. 8,352,584 to Franklin *et al.* at Claim 1.

648. Coates discloses the Cluster Limitation. For example, Coates discloses: "A storage system, accessed over a network by a client, includes one or more storage centers." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 2, l. 66–67. "A storage center contains a control nodes (e.g., distributed object storage managers) and a plurality of intelligent storage nodes." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 2, l. 67 – col. 3 l. 2. "The intelligent storage nodes store the object files in one or more disk drives." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 2–4. "The client, such as an end-user computer or a content server, issues requests over a network (e.g., Internet) to retrieve object files." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 4–6. "In response to a client request, a control node is selected to manage the file retrieval process." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 6–7. "In one embodiment, a load balancing fabric, such as an L4 switch, receives the request from the network, and selects one of the control nodes in manner so as to load balance client requests in the storage system." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 8–11. "The control node determines the location of the object file in one of the intelligent storage nodes ('destination storage node')." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 11–13. "The control node receives the object file from the destination storage node, and transfers the object file to the client." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 13–15. "In one embodiment, the control nodes include a data cache to store object files previously retrieved from an intelligent storage node." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 15–18. "For the embodiment of FIG. 1, the storage system consists of a control path and a data path." U.S. Pat. No. 6,952,737 to Coates *et al* at col. 5, ll. 35–37. "The control path consists of a virtual file system ("VFS") 50 and the data path consists of a

distributed storage cluster 70….” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 5, ll. 37–39. “The distributed storage cluster 70 is used to store the object files for the system (i.e., all client data).” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 5, ll. 45–46. “As shown in FIG. 1, the VFS and the storage cluster 70 are coupled to communicate information so as to coordinate file system information with the physical storage of the object files.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 5, ll. 46–49. “The storage service 130 includes processing and networking facilities, such as a server 140, and data store 150.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 21–22. “The storage service 130 and content origin server 120 communicate to conduct file directory operations and object file operations.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 22–25. “The data store 150, part of the storage service 130, stores large data files, such as rich media data files, illustrated as multimedia files 160, 170 and 180 in FIG. 2.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 25–27. “In one embodiment, the data store 150 consists of a cluster of intelligent storage nodes.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 27–29.

649.    “In one embodiment, the storage cluster utilizes distributed systems technology that harnesses the throughput of hundreds of CPUs and the storage of thousands of disk drives.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 58–60. “FIG. 3 is a block diagram illustrating one embodiment for the storage cluster.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 61–62. “As shown in FIG. 3, the storage cluster consists of distributed object storage managers (‘DOSMs’) 320 and intelligent storage nodes 340.” U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 6, ll. 65–67.



*Figure 3*

650.    "The DOSMs 320 communicate with the intelligent storage nodes 340 via an interconnect fabric 330." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 30–31. "The interconnect fabric 330 consists of a high-speed, high bandwidth fabric to ensure that all the DOSMs 320 communicate with every intelligent storage node at all times." U.S. Pat. No.

6,952,737 to Coates *et al.* at col. 7, ll. 31–34. "In one embodiment, the DOSMs 320 communicate with the intelligent storage node over the interconnect fabric via a protocol, entitled the distributed object storage protocol ('DOSP')." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 34–37. "Effectively, the DOSP links hundreds of intelligent storage nodes into one large storage cluster." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 38–39. "As described more fully below, the DOSP consist of a multi-cast protocol as well as a point-to-point protocol." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 39–41. "In general, the intelligent storage nodes 340 provide the persistent store for the objects or files." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 42–43. "The intelligent storage nodes contain thousands of high-density disk drives." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 43–44.

651. Kallahalla discloses the Cluster Limitation. For example, Kallahalla discloses: "The present invention comprises a method of providing storage to a virtual computer cluster within a shared computing environment." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "According to an embodiment, the method begins with a first step of combining storage resources within the shared computing environment into a virtual storage pool." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "The virtual storage pool comprises at least portions of storage devices in which at least one of the storage devices is not directly accessible by all computers which directly access any of the storage devices." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "The method continues with a second step of partitioning a virtual storage volume from the virtual storage pool." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "In a third step, the method assigns the virtual storage volume to the virtual computer cluster." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "The method concludes with a fourth step of making the virtual storage volume

accessible to computing platforms of the virtual computer cluster using software." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007].

652.    "An embodiment of a shared computing environment (e.g., a utility data center) upon which the method 100 forms the virtual computer cluster is illustrated schematically in FIG. 2." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The shared computing environment 200 comprises host computers 202, disk arrays 204, a SAN (storage area network) 206, and a LAN (local area network) 208." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The SAN 206 couples the host computers 202 to the disk arrays 204." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The LAN 208 couples the host computers 202 together." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "In an embodiment, the LAN 208 couples to a wide area network 210 (e.g., the Internet)." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "Each host computer 202 comprises a processor 212, memory 214, an HBA (host bus adapter) 216, and a NIC (network interface card) 218." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The HBAs 216 couple the host computers 202 to the SAN 206." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The NICs 218 couple the host computers 202 to the LAN 208." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "A disk array 220 couples to a first host computer 202A." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The disk array 220 comprises direct attached storage for the first host computer 202A." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The direct attached storage comprises local storage for the first host computer 202A." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "The host computers 202 may be clients which access the disk arrays 204." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. "Or, the host computers 202 may be servers which access the disk arrays 204 for

clients (not shown)." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0023]. Figure 2 of

Kallahalla is provided below:



FIG. 2

653.    "The third step 106 uses gatekeeper software located on host computers of the

virtual computer cluster including the first and second host computers, 202A and 202B, to perform

the isolation." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "The gatekeeper

software allows communication between the computing platforms of the virtual computer cluster

while precluding communication with other computing platforms within the shared computing

environment." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "The gatekeeper

software also controls input and output operations for the computer cluster." U.S. Pat. Pub. No.

2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "In an embodiment, the gatekeeper isolates the

virtual computer cluster from the remainder of the shared computing environment by keeping a

table of resources of the virtual computer cluster (e.g., computing platforms and virtual storage)

206

and allowing network and input/output traffic only within the resources identified in the table."
U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0030]. "The table may identify resource as network addresses, hardware identifiers, internally generated numbers unique identifiers (e.g., virtual server IDs), vendor specific unique identifiers (e.g., world-wide names), or other identifiers." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0030]. "Users of the virtual computer cluster may only access the resources in the table." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0030]. "Preferably, the users of the virtual computer cluster are also prevented from detecting resources in the shared computing environment which are not listed in the table." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0030].

654.    Claim 1 of the '584 Patent claims its computer system comprises "a monitoring system to monitor operations of the first cluster and the second cluster for communications problems" (hereinafter "the Monitoring System Limitation"). *See* U.S. Pat. No. 8,352,584 to Franklin *et al.* at Claim 1.

655.    Coates discloses the Monitoring System Limitation. For example, Coates discloses: "[I]f a failure occurs in an intelligent storage node, then the DOSM searches for the object file in a different storage center." See U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 55–57. "All components within the network storage system are replicated and redundant to provide complete recoverability in the event of a failure." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 19, ll. 51–53. "In one embodiment, each storage center attaches to multiple network back bone providers to ensure continuous network access." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 19, ll. 53–55. "All files and the control path directory structure are geographically replicated at the time of upload to prevent any possible loss of data." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 19, ll. 55–57. "As is described more fully below, the system maintains coherency among disparate storage

207

centers through use of the distributed object storage protocol ('DOSP')." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 19, ll. 57–60. "Thus, if a failure occurs in a distributed directory of storage center 1510, then the distributed directory manager in storage center 1510, using an IP address mapping, accesses the replicated distributed directory in storage center 1520." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 21, ll. 10–13. "Each operation has an associated operation code and a pair of structures: one for issuance of the request, and a second separate structure for return values." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 31, ll. 21–23. "Once the receiver has received and processed the request (sent data, deleted file, etc) it then sends a response consisting of the appropriate 'Out Structure' indicating the status of the request (SUCCESS, FAILURE, etc) and any required return values." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 31, ll. 23–28. "Currently, there are six service operations supported by the DOSP: null, store file, retrieve file, retrieve file range, delete file, and get contents." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 31, ll. 28–30.

656.    "The DOSM also maintains a state table 630." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 11, l. 36. "In general, the state table 630 provides the state of the system by storing information on the overall capacity and health of the intelligent storage nodes 340." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 11, ll. 36–39. "In one embodiment, the state tables are built using the multicast protocol to obtain, from the intelligent storage nodes, information about the corresponding intelligent storage node." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 11, ll. 39–42. "The state information indicates whether disks on the intelligent storage nodes are healthy, how much space is on the disks, etc." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 11, ll. 42–44. "In one embodiment, as shown in FIG. 6, state table 630 stores: read-write state of the storage nodes; health of the storage nodes (including an identification of failed nodes); and the current

load of the storage nodes, including available storage capacity and the number of input/output

("I/O") operations per second." U.S. Pat. No. 6,952,737 to Coates *et al.* at col 11, ll. 44–49. Figure

6 of Coates is provided below:



**Figure 6**

657. Kallahalla discloses the Monitoring System Limitation. For example, Kallahalla discloses: "In another gatekeeper enhancement embodiment, the module 1012 performs traffic monitoring for the computing platform 1006." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "In yet another gatekeeper enhancement embodiment, the module 1012 performs traffic control for the computing platform 1006." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "For example, the module 1012 may perform traffic admission control to the computing platform 1006." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "Or, the module 1012 may perform traffic throttling." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "The management station for the gatekeeper software may provide traffic control parameters to the module 1012." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "The management station may periodically update the traffic control parameters." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0056]. "In another gatekeeper enhancement embodiment, the module 1012 monitors an operating system in operation within the computing platform 1006." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0057]. "In yet another gatekeeper enhancement embodiment, the module 1012 monitors the computer hardware 1002." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0057].

658. Claim 1 of the '584 Patent claims its computer system comprises "wherein the first cluster establishes communications between the set of computing resources of the first cluster and a first gateway communicatively linked between the first cluster and the private communications network; wherein the second cluster establishes communications among the set of computing resources of the second cluster and a second gateway communicatively linked between the second cluster and the private communications network; wherein communications between the first cluster

and the second cluster are isolated" (hereinafter "the Monitoring System Limitation"). *See* U.S. Pat. No. 8,352,584 to Franklin *et al.* at Claim 1.

659.    Coates discloses the Communications Limitation. For example, Coates discloses: "In one embodiment, a load balancing fabric, such as an L4 switch, receives the request from the network, and selects one of the control nodes in manner so as to load balance client requests in the storage system." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 8–11. "The control node determines the location of the object file in one of the intelligent storage nodes ('destination storage node')." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 11–13. "The control node receives the object file from the destination storage node, and transfers the object file to the client." *See* U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 13–15. "In one embodiment, the control node stores a reference (e.g., look-up table) that cross references object files to intelligent storage node locations." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 32–34. "In response to a client request, the control node determines whether the object file is identified on the reference." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 34–36. "If so, the control node, through an interconnect fabric, retrieves the object file from the identified intelligent storage node." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 3, ll. 36–38. "The DOSMs 320 communicate with the intelligent storage nodes 340 via an interconnect fabric 330." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 30–31. "The interconnect fabric 330 consists of a high-speed, high bandwidth fabric to ensure that all the DOSMs 320 communicate with every intelligent storage node at all times." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 31–34. "In one embodiment, the DOSMs 320 communicate with the intelligent storage node over the interconnect fabric via a protocol, entitled the distributed object storage protocol ("DOSP")." U.S. Pat. No. 6,952,737 to Coates *et al.* at col.

211

7, ll. 34–37. Effectively, the DOSP links hundreds of intelligent storage nodes into one large storage cluster." U.S. Pat. No. 6,952,737 to Coates *et al.* at col. 7, ll. 38–39.

660.    Kallahalla discloses the Communications Limitation. For example, Kallahalla discloses: "The method concludes with a fourth step of making the virtual storage volume accessible to computing platforms of the virtual computer cluster using software." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "The software allows access to the virtual storage volume by the computing platforms while precluding access to remaining storage within the shared computing environment by the computing platforms." *See* U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0007]. "The third step 106 uses gatekeeper software located on host computers of the virtual computer cluster including the first and second host computers, 202A and 202B, to perform the isolation." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "The gatekeeper software allows communication between the computing platforms of the virtual computer cluster while precluding communication with other computing platforms within the shared computing environment." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "The gatekeeper software also controls input and output operations for the computer cluster." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at ¶ [0029]. "[I]solating the virtual computer cluster from a remainder of the shared computing environment using the gatekeeper software such that the gatekeeper software allows communication between the computing platforms while precluding communication with other computing platforms of the shared computing environment and such that the gatekeeper software controls input and output operations for the virtual computer cluster." U.S. Pat. Pub. No. 2006/0075199 to Kallahalla *et al.* at Claim 29.

661. Coates discloses the computer system claimed in claim 1 of the '584 Patent. Coates renders claim 1 of the '584 Patent invalid pursuant to 35 U.S.C. § 102.

662. Kallahalla discloses the computer system claimed in claim 1 of the '584 Patent. Kallahalla renders claim 1 of the '584 Patent invalid pursuant to 35 U.S.C. § 102.

663. In light of the disclosure in Coates, a POSITA would also consider claim 1 of the '584 Patent obvious pursuant to 35 U.S.C. § 103.

664. In light of the disclosure in Kallahalla, a POSITA would also consider claim 1 of the '584 Patent obvious pursuant to 35 U.S.C. § 103.

665. In light of the combined disclosure in Coates and Kallahalla, a POSITA would also consider claim 1 of the '584 Patent obvious pursuant to 35 U.S.C. § 103.

### COUNT XIII
### <u>DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '967 PATENT</u>

666. First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

667. Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon. Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 18. Intellectual Ventures Management, by and on behalf all of Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license for its operations" of at least the Patents-In-Suit. *See* Exhibit 20. Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See*

Exhibit 9; Exhibit 10.  Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18.  Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license.  Intellectual Ventures Management, on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples.  *See* Exhibit 16.

668.    In Plaintiff's October 16, 2025 Letter, Kasowitz LLP, on behalf of Defendants, alleged that First Horizon's use of Hadoop, a third party branded software, infringes at least claim 1 of the '967 Patent (the "'967 Accused System").  *See* Exhibit 10.

669.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '967 Accused System), or import into the United States any product and/or system (including but not limited to the '967 Accused System) in a manner which infringes the '967 Patent.

670.    First Horizon does not make, use, offer for sell, or sell the Hadoop product, and further does not deploy Hadoop's framework in any First Horizon product or system.

671.    Defendants do not accuse any other technology used by First Horizon of infringing any claim of the '967 Patent.

672.    Accordingly, First Horizon does not infringe the '967 Patent.

673.    Accordingly, First Horizon does not directly infringe the '967 Patent, either literally or under the doctrine of equivalents.

674.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '967 Patent or otherwise contribute to infringement of the '967 Patent.

675.    Therefore, an actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '967 Patent.

676.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '967 Accused System) has not infringed and does not infringe the '967 Patent.

## COUNT XIV
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '967 PATENT

677.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

678.    Claim 1 of the '967 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. §1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

679.    Upon information and belief, and subject to further discovery, claim 1 of the '967 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

680.    Upon information and belief, and subject to further discovery, claim 1 of the '967 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

1.    **Claim 1 of the '967 Patent is Invalid Under 35 U.S.C. § 101.**

215

681.    Claim 1 of the '967 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 1 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

682.    In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

683.    If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two. Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

i.    **Claim 1 of the '967 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.**

684. Claim 1 as a whole is directed to an abstract idea. Claim 1 as a whole is directed to: (1) receiving a request for a file to be deleted; (2) generating a content signature for the requested file; (3) identifying a stored content signature that is identical to the content signature of the file to be deleted and locations of devices that contain files with that content signature; (4) transmitting a delete instruction; and (5) generating a deletion report, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

685. Claim 1 as a whole is directed to steps for a purely *internal* process, relying upon generic computer equipment to delete common files across an organizational network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

686. Furthermore, the specification confirms that Claim 1 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 1 as a whole, including the use of a conventional computing system to delete common files across an organizational network, were well understood at the time of the invention. *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 32, ll. 57–59. (explaining that the method is merely "implemented using well known computers"). Claim 1 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

217

687.    Claim 1 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. For example, Claim 1's functional recitation of "receiving a request for a file," "generating a content signature for the requested file," "identifying … a stored content signature that is identical to the content signature of the file to be deleted and locations of information source client computing devices … that contain files whose content signatures are identical to the stored content signature," "transmitting a delete instruction," and "generating a deletion report" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 as a whole is directed to a generic computer system architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

688.    Claim 1 as a whole describes using standard hardware to execute basic data storage and management tasks without any improvement to the functionality of the system components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 1 is not directed to specific asserted improvements in computer capabilities.

689.    Claim 1 as a whole is directed to basic data storage and management, and specifically to deleting common files across an organizational network, and so is directed to patent-

218

ineligible subject matter under 35 U.S.C. § 101.  The Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Erie Indem. Co.*, 850 F.3d at 1327 (organizing and accessing data held abstract); *Content Extraction and Transmission LLC*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

690.    Claim 1 as a whole is directed merely to a conventional computing system configured to delete common files and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

691.    For at least the foregoing reasons, Claim 1 fails *Alice* step one.

ii.    **Claim 1 of the '967 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

692.    Claim 1 merely recites a generic computer system with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 1 simply uses a generic computer system to perform generic computer functions, including "receiving a request for a file," "generating a content signature for the requested file," "identifying … a stored content signature that is identical to the content signature of the file to be deleted and locations of information source client computing devices … that contain files whose content signatures are identical to the stored content signature," "transmitting a delete instruction," and "generating a deletion report", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

693. Claim 1 recites architecture of a generic computing system, including only an "organization," "a server," and "information source client computing devices", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Implementation of an abstract idea by the '967 Patent's routine hardware fails to move the mere deletion of common files across an organizational network beyond an abstract idea.

694. Claim 1 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '967 Patent discloses that the "organization" is merely a "local area network with twenty desktop computers." *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 1, ll. 35–39. The specification does not recite any novel aspects of the "server" and thus it is merely a conventional server. The "information source client computing devices" "can be any type of device capable of storing files[, including] desktop computers, laptop computers, server computers, personal digital assistants, CDROMs, and printer ROMs." U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 5, ll. 48–52. The "files" of claim 1 "include any named or namable collection of data located on an electronic device[, including] data files, application files, system files, and programmable ROM files." U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 6, ll. 16–20. The "content signature" of claim 1 is simply a "unique identifier for the file content," and more specifically a "hash function signature." U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 15, ll. 20–25. In fact, the specification concedes that the claimed methods are merely "implemented using well known computers." U.S. Pat. No. 9,678,967 to Borden *et al.* at col. 32, ll. 57–59. Claim 1 does not improve functionality of these devices; instead, it employs well-understood hardware to simply delete common files across an organizational network, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic

computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc.*, 827 F.3d at 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

695.    The elements of claim 1, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

696.    For at least the foregoing reasons, Claim 1 fails *Alice* step two.

697.    Accordingly, claim 1 of the '967 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

## 2. Claim 1 of the '967 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.

698.    Upon information and belief, and subject to further discovery, claim 1 of the '967 Patent is invalid under 35 U.S.C. §§ 102 and 103.

699.    The '967 Patent originated as U.S. Application No. 11/783,271 and was filed on April 6, 2007.

700.    The '967 Patent, and specifically U.S. Application No. 11/783,271, claims to be a continuation-in-part of U.S. Application No. 10/443,006. U.S. Application No. 10/443,006 was filed on May 22, 2003.

701.    The '967 Patent, and specifically U.S. Application No. 11/783,271, claims priority from U.S. Application No. 60/857,188. U.S. Application No. 60/857,188 was filed on November 7, 2006.

702.    Claim 1 of the '967 Patent reads as follows:

1.  A method for deleting files on one or more identified information source client computing devices across an organization, comprising:
    receiving a request for a file located internal to the organization to be deleted;
    generating a content signature for the requested file to be deleted, wherein the content signature uniquely identifies content of the requested file to be deleted;
    identifying, at a server within the organization, a stored content signature that is identical to the content signature of the file to be deleted and locations of information source client computing devices within the organization that contain files whose content signatures are identical to the stored content signature, wherein the locations are identified based on stored metadata associated with the stored content signature, and wherein the stored content signature and the stored metadata are each stored on a server within the organization;
    transmitting a delete instruction to the identified locations of the information source client computing devices within the organization, wherein the delete instruction automatically deletes the matching files residing on each of the information source client computing devices; and
    generating a deletion report comprising the information source client computing devices on which the file to be deleted was found and deletion status of the file to be deleted on the information source client computing devices.

703.    Claim 1 of the '967 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent Publication No. 2006/0095479 (hereinafter "Cochran") and U.S. Patent Publication No. 2003/0037022 (hereinafter "Adya"), alone or in combination.

704.    Cochran was filed on November 4, 2004 and published May 4, 2006. It is entitled "Managing a File in a Network Environment," and lists Robert A. Cochran and John Wilkes as inventors. A true and correct copy of Cochran is attached hereto as Exhibit 45.

705.    Cochran is prior art to the '967 Patent.

222

706. Adya was filed on June 6, 2001 and published February 20, 2003. It is entitled "Locating Potentially Identical Objects Across Multiple Computers," and lists Atul Adya, William J. Bolosky, John R. Douceur, and Marvin M. Theimer as inventors. A true and correct copy of Adya is attached hereto as Exhibit 46.

707. Adya is prior art to the '967 Patent.

708. As shown on the '967 Patent under the heading "References Cited," neither Cochran nor Adya were considered by the Examiner during examination of the application that issued as the '967 Patent.

709. The '967 Patent issued without the United States Patent and Trademark Office considering that Cochran and Adya render the invention claimed in the '967 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

710. Claim 1 claims "[a] method for deleting files on one or more identified information source client computing devices across an organization, comprising" specific limitations that are cited in claim 1. *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

711. Cochran discloses a method for deleting files on one or more identified information source client computing devices across an organization comprising the limitations recited in claim 1 of the '967 Patent. *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.*

712. Adya discloses a method for deleting files on one or more identified information source client computing devices across an organization comprising the limitations recited in claim 1 of the '967 Patent. *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.*

713. Claim 1 of the '967 Patent claims its method for deleting files on one or more identified information source client computing devices across an organization comprises

223

"receiving a request for a file located internal to the organization to be deleted" (hereinafter "the Receiving Limitation"). *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

714.    Cochran discloses the Receiving Limitation. For example, Cochran discloses: "In response to requests from the monitoring service server 126, the monitoring agent 134 performs monitoring and other file management tasks with respect to files stored in the corresponding storage server system 104." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0022]. "The monitoring agent 134 is a software module that is executable on a CPU 136 in each storage server system 104." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0022]. "As an example, the monitoring service server 126 in the central server system 106 can send requests to the monitoring agent 134 to monitor the copy of file X 132 in the storage 130, to update a signature of the copy of file X 132, to retrieve other tracking information of the copy of file X 132, or to perform other management tasks." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0022]. "Based on the notification of the number of duplicate copies of the monitored file, the user can issue requests to delete one or more of the duplicate copies of the monitored file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0034]. "Upon receiving (at 218) the request to delete one or more duplicate copies of the monitored file, the monitoring service server 126 performs the requested deletion by sending requests to the appropriate storage server systems 104." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0034]. "[R]eceiving one or more requests from the client system, in response to the information pertaining to the plural copies of the file, to delete one or more of the copies of the file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at Claim 1. "[R]eceiving a request to delete the master copy of the file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at Claim 3.

715.    Adya discloses the Receiving Limitation. For example, Adya discloses: "Additionally, it is not uncommon for files to be deleted from computing device 200." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "For example, the user may decide he or she no longer desires to run any programs that use a particular file (and uninstalls the program from the computing device), or the user no longer desires to keep a document file he or she created, etc." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "In these situations, a component of computing device 200 (e.g., distributed system file interface 210) forwards an indication to one or more other computing devices 200 that the file has been deleted from computing device 200." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "The other computing devices 200 that this indication is communicated to include the same computing devices that file information generation module 220 previously determined the file identifier should be sent to, thereby allowing those devices to remove the file information entry from their respective databases." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060].

716.    Claim 1 of the '967 Patent claims its method for deleting files on one or more identified information source client computing devices across an organization comprises "generating a content signature for the requested file to be deleted, wherein the content signature uniquely identifies content of the requested file to be deleted" (hereinafter "the Content Signature Limitation"). *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

717.    Cochran discloses the Content Signature Limitation. For example, Cochran discloses: "The central repository 108 includes plural sets of tracking information 112 for respective files stored in storage servers 104 of the network environment." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "In one example, the tracking information 112 includes a signature (e.g., a hash signature) of the file, a size of the file, a name of the file, an

identifier of the registered owner of the file, and a location of the file." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "A hash signature of a file is created by applying an input associated with the file (such as the entire content of the file) through a hashing algorithm." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "Various hashing algorithms may be used, such as the MD5 (Message-Digest) algorithm." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "The MD5 algorithm creates a 128-bit message digest from a predefined data input, where the message digest is unique to the specific data input." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "As the content of the file changes, the hash signature of the file can be recomputed to different values." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "In other embodiments, instead of using a hash signature, another type of unique signature based on the content of the file can be used." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "Each file system 140 of a storage server system 104 includes one or more i-nodes 142." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0024]. "An i-node is a data structure that contains information about a particular file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0024]. "Each file typically is associated with an i-node and is identified by an i-node number (i-number) in the file system 140." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0024]. "[I]n accordance with some embodiments of the invention, an i-node 142 can be maintained in the file system 140 of a storage server system 104 for a file that is not present in the storage server system 104." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0025]. "The i-node 142 according to some embodiments of the invention can contain a locator identifier, such as a uniform resource locator (URL) or other similar locator identifier, that identifies a location of the file associated with the i-node 142." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0025]. "The location identifier in the i-node 142 can point,

226

for example, to the golden copy of the corresponding file in the central repository 108, or to another copy of a file on another storage server system 104." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0025].

718. Adya discloses the Content Signature Limitation. For example, Adya discloses: "File information generation module 220 generates file information for one or more encrypted files 240." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "The file information for each file is a semi-unique value based on the data in the file itself (the data may be program instructions, program data, etc.) and/or other characteristics of the file." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "The value is a semi-unique value because it is based on the data in the file but is not completely representative of the file." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "For example, the file information may be a hash value that is based on the data in the file, but it is possible for two different files having different data to have the same hash value." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "Different characteristics of the file can also be incorporated into the file information, such as the file size, the file type, the file name, and so forth." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "The file information can be generated in any of a wide variety of manners, so long as each of the computing devices generates its file information in the same manner." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0048]. "In one implementation, the file information is a hash value generated based on the file." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at [0049]. "The hash value may be generated using a one-way hashing function (e.g., SHA, MD5, etc.), or any of a variety of other public or proprietary hashing functions." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at [0049]. "The hash value may be based on the entire file, or alternatively only a portion of the file (e.g., the beginning of the file, the end of the file, the middle

227

of the file, and so forth)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at [0049]. "In another implementation, the file information is referred to as a file signature, which is a combination of a hash value based on the file (the hash value represents 64 bits of the file signature) and the file size (which represents another 64 bits of the file signature)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at [0049]. "The file size is used because two files with differing file sizes cannot be identical." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at [0049].

719. Claim 1 of the '967 Patent claims its method for deleting files on one or more identified information source client computing devices across an organization comprises "identifying, at a server within the organization, a stored content signature that is identical to the content signature of the file to be deleted and locations of information source client computing devices within the organization that contain files whose content signatures are identical to the stored content signature, wherein the locations are identified based on stored metadata associated with the stored content signature, and wherein the stored content signature and the stored metadata are each stored on a server within the organization" (hereinafter "the Identifying Limitation"). *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

720. Cochran discloses the Identifying Limitation. For example, Cochran discloses: "The central repository 108 includes plural sets of tracking information 112 for respective files stored in storage servers 104 of the network environment." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "In one example, the tracking information 112 includes a signature (e.g., a hash signature) of the file, a size of the file, a name of the file, an identifier of the registered owner of the file, and a location of the file." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "A hash signature of a file is created by applying an input associated with the file (such as the entire content of the file) through a hashing algorithm." *See* U.S. Pat. Pub. No.

228

2006/0095470 to Cochran *et al.* at ¶ [0011]. "Various hashing algorithms may be used, such as the MD5 (Message-Digest) algorithm." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "The MD5 algorithm creates a 128-bit message digest from a predefined data input, where the message digest is unique to the specific data input." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "As the content of the file changes, the hash signature of the file can be recomputed to different values. In other embodiments, instead of using a hash signature, another type of unique signature based on the content of the file can be used." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0011]. "In accordance with some embodiments of the invention, the signature of the file is used to detect duplicate copies of a file, as well as to detect for unauthorized modification of a file by a hacker." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0012]. "The monitoring service server 126 may monitor the unique signatures of monitored files in the network environment to determine how many duplicate copies of each monitored file exist in the network environment." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0020]. "A duplicate copy of a file is one where the signatures of the files match identically." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0020]. "Each file system 140 of a storage server system 104 includes one or more i-nodes 142." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0024]. "An i-node is a data structure that contains information about a particular file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0024]. "Each file typically is associated with an i-node and is identified by an i-node number (i-number) in the file system 140." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0024]. "[I]n accordance with some embodiments of the invention, an i-node 142 can be maintained in the file system 140 of a storage server system 104 for a file that is not present in the storage server system 104." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0025]. "The i-node 142 according to some

229

embodiments of the invention can contain a locator identifier, such as a uniform resource locator (URL) or other similar locator identifier, that identifies a location of the file associated with the i-node 142." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0025]. "The location identifier in the i-node 142 can point, for example, to the golden copy of the corresponding file in the central repository 108, or to another copy of a file on another storage server system 104." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0025].

721.    Adya discloses the Identifying Limitation. For example, Adya discloses: "In these situations, a component of computing device 200 (e.g., distributed system file interface 210) forwards an indication to one or more other computing devices 200 that the file has been deleted from computing device 200." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "The other computing devices 200 that this indication is communicated to include the same computing devices that file information generation module 220 previously determined the file identifier should be sent to, thereby allowing those devices to remove the file information entry from their respective databases." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "The file information generated by a computing device is communicated to one or more computing devices referred to herein as database servers." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "Each database server maintains a database of file information that it receives and compares the received file information to identify any file information for two files that is the same (and thus indicative of potentially identical files)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "The database servers may be dedicated database servers (e.g., storing only file information), or alternatively may be other computing devices 200 in the network, storing both received file information as well as other files 240 in the distributed system portion(s) of their storage devices 208." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "In a database

server, file identification comparison module 242 receives file information and a corresponding file identifier (e.g., filename) from one or more other computing devices 200." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Module 242 manages a database 244 (e.g., stored on device 208) of the file information it receives." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Database 244 maintains a mapping of the file information to the file identifier." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062].

722.    Claim 1 of the '967 Patent claims its method for deleting files on one or more identified information source client computing devices across an organization comprises "transmitting a delete instruction to the identified locations of the information source client computing devices within the organization, wherein the delete instruction automatically deletes the matching files residing on each of the information source client computing devices" (hereinafter "the Transmitting Limitation"). *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

723.    Cochran discloses the Transmitting Limitation. For example, Cochran discloses: "Upon receiving (at 218) the request to delete one or more duplicate copies of the monitored file, the monitoring service server 126 performs the requested deletion by sending requests to the appropriate storage server systems 104." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0034].

724.    Adya discloses the Transmitting Limitation. For example, Adya discloses: "In these situations, a component of computing device 200 (e.g., distributed system file interface 210) forwards an indication to one or more other computing devices 200 that the file has been deleted from computing device 200." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "The other computing devices 200 that this indication is communicated to include the same

231

computing devices that file information generation module 220 previously determined the file identifier should be sent to, thereby allowing those devices to remove the file information entry from their respective databases." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "The file information generated by a computing device is communicated to one or more computing devices referred to herein as database servers." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "Each database server maintains a database of file information that it receives and compares the received file information to identify any file information for two files that is the same (and thus indicative of potentially identical files)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "The database servers may be dedicated database servers (e.g., storing only file information), or alternatively may be other computing devices 200 in the network, storing both received file information as well as other files 240 in the distributed system portion(s) of their storage devices 208." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0061]. "In a database server, file identification comparison module 242 receives file information and a corresponding file identifier (e.g., filename) from one or more other computing devices 200." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Module 242 manages a database 244 (e.g., stored on device 208) of the file information it receives." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Database 244 maintains a mapping of the file information to the file identifier." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062].

725.    Claim 1 of the '967 Patent claims its method for deleting files on one or more identified information source client computing devices across an organization comprises "generating a deletion report comprising the information source client computing devices on which the file to be deleted was found and deletion status of the file to be deleted on the information

232

source client computing devices" (hereinafter "the Generating Limitation"). *See* U.S. Pat. No. 9,678,967 to Borden *et al.* at Claim 1.

726.    Cochran discloses the Generating Limitation. For example, Cochran discloses: "The central repository service (and associated monitoring service) can be subscribed to by a user (or users)." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0015]. "Each subscriber can then register files that the user wishes to track and monitor." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0015]. "Additionally, system operators or other administrators, such as system managers, user-group representatives, owners, and so forth, can register files on behalf of users, or apply default or mandated policies that set the files to be monitored or not monitored." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0015]. "These sets can have rules applied to allow them to be composed." *See* U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0015]. "The user interface 116 can display information regarding files to be monitored (referred to as 'monitored files') in the network environment." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0016]. "For example, the user interface 116 can display notifications regarding how many duplicate copies of a monitored file are present in the network environment." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0016]. "Also, the user interface 116 can display alarms associated with monitored files of the network environment." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0017]. "These alarms can indicate that a particular file has been corrupted or modified without authorization, or that multiple copies of the particular file exist, or that a new copy has been created." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0017]. "Through the user interface 116, a user can select which duplicate copies of the file are to be deleted." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0017]. "If alteration or deletion of such a static monitored file is detected, then the

233

monitoring service server 126 may initiate an automatic restoration of the altered or deleted monitored file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0030]. "Alternatively, the monitoring service server 126 can communicate with the monitoring service client 120 in the user terminal 102 to provide a user with the option of restoring the altered or deleted static monitored file." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0030]. "As yet another alternative, the monitoring service server 126 may simply notify the user, or just log the event for later analysis." U.S. Pat. Pub. No. 2006/0095470 to Cochran *et al.* at ¶ [0030].

727.    Adya discloses the Generating Limitation. For example, Adya discloses: "For example, in the distributed file system environment illustrated in FIG. 1, a computing device may create or update a file for storage in distributed file system 150, and then communicate the file to another device(s) in distributed file system 150 acting as a directory server." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0047]. "The directory server then stores the file on an appropriate computing device (based on the rules followed by distributed file system 150) and maintains a record of where the file is stored." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0047]. "In this example, the computing device creating or updating the file generates the file information (via its file information generation module 220), while the computing device acting as the directory server (and thus which knows what other computing device the file is stored at) determines the location where the generated file information is to be communicated (via its forwarding location determination module 222)." *See* U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0047]. "In these situations, a component of computing device 200 (e.g., distributed system file interface 210) forwards an indication to one or more other computing devices 200 that the file has been deleted from computing device 200." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0060]. "Module 242 manages a database 244 (e.g., stored on device 208) of the file

234

information it receives." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Database 244 maintains a mapping of the file information to the file identifier." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Database 244 may also maintain an indication of the computing device on which the file corresponding to the received file information is stored (or alternatively this may be inherent in the file identifier, which may include a filename as well as directory path to locate the file)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062]. "Alternatively, the file identifier may not be stored (so long as the computer at which the file corresponding to the file information is stored is maintained in the database or otherwise known, the file information can be returned to that computer as an identification of the file)." U.S. Pat. Pub. No. 2003/0037022 to Adya *et al.* at ¶ [0062].

728.    Cochran discloses the computer system claimed in claim 1 of the '967 Patent. Cochran renders claim 1 of the '967 Patent invalid pursuant to 35 U.S.C. § 102.

729.    Adya discloses the computer system claimed in claim 1 of the '967 Patent. Adya renders claim 1 of the '967 Patent invalid pursuant to 35 U.S.C. § 102.

730.    In light of the disclosure in Cochran, a POSITA would also consider claim 1 of the '967 Patent obvious pursuant to 35 U.S.C. § 103.

731.    In light of the disclosure in Adya, a POSITA would also consider claim 1 of the '967 Patent obvious pursuant to 35 U.S.C. § 103.

732.    In light of the combined disclosure in Cochran and Adya, a POSITA would also consider claim 1 of the '967 Patent obvious pursuant to 35 U.S.C. § 103.

## COUNT XV
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '894 PATENT

733.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

734.    Intellectual Ventures Management, by and on behalf of all Defendants, has indicated that, absent a license, they intend to enforce their intellectual property rights against First Horizon. Intellectual Ventures Management, by and on behalf of all Defendants, has alleged that "Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio." *See* Exhibit 18. Intellectual Ventures Management, by and on behalf all of Defendants, has stated unequivocally that "First Horizon Corp. is required to obtain a license for its operations" of at least the Patents-In-Suit. *See* Exhibit 20.  Intellectual Ventures Management, by and on behalf of all Defendants, has also confirmed that "IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license." *See* Exhibit 9; Exhibit 10.  Intellectual Ventures Management, by and on behalf of all Defendants, has accused First Horizon of "Efficient infringement." *See* Exhibit 16; Exhibit 18.  Upon information and belief, "efficient infringement" refers to a business practice where a company intentionally infringes on another company's patent because it's cheaper than paying for a license.  Intellectual Ventures Management, on behalf of all Defendants, has threatened "escalation" if First Horizon does not license the patents in the Intellectual Ventures Management Patent Portfolio and identified patent litigation cases filed by entities under common ownership or control as Intellectual Ventures Management and/or entities to which Intellectual Ventures Management is the agent and/or legal representative as threatening examples.  *See* Exhibit 16.

735.    In Plaintiff's October 16, 2025 Letter, Kasowitz LLP, on behalf of Defendants, alleged that First Horizon's use of Kafka, a third party branded software, infringes at least claim 15 of the '894 Patent (the "'894 Accused System").  *See* Exhibit 10.

236

736.    First Horizon does not make, use, offer to sell, or sell any product and/or system within the United States (including but not limited to the '894 Accused System) or import into the United States any product and/or system (including but not limited to the '894 Accused System) in a manner which infringes the '894 Patent.

737.    By way of example, claim 15 of the '894 Patent, which depends from independent claim 8, requires, *inter alia*, that the claimed method determine "an organizational structure of the plurality of resource nodes based on the received node names." *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 15.

738.    The '894 Patent provides that "[t]hrough structured naming, resource consumers determine the overall structure of a disaggregated resource…." U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 14, ll. 62–64.

739.    First Horizon does not infringe the '894 Patent at least because the '894 Accused System does not determine an organizational structure of a plurality of resource nodes based on re.

740.    Accordingly, First Horizon does not directly infringe the '894 Patent, either literally or under the doctrine of equivalents.

741.    Furthermore, at least because there is no direct infringement, there is also no indirect infringement, and First Horizon does not induce infringement of the '894 Patent or otherwise contribute to infringement of the '894 Patent.

742.    An actual, justiciable, substantial, and immediate controversy exists between First Horizon and Defendants as to whether First Horizon has infringed and/or is infringing the '894 Patent.

743.    The controversy between the parties is sufficient to entitle First Horizon to a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that First Horizon (including but not limited to through its use of the '894 Accused System) has not infringed and does not infringe the '894 Patent.

**COUNT XVI**
**DECLARATORY JUDGMENT OF INVALIDITY OF THE '894 PATENT**

744.    First Horizon incorporates and realleges the foregoing paragraphs as if fully set forth herein.

745.    Claim 15 of the '894 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. § 1, *et seq.*, including, but not limited to, 35 U.S.C. §§ 101, 102, and 103.

746.    Upon information and belief, and subject to further discovery, claim 15 of the '894 Patent is invalid under 35 U.S.C. § 101 as being directed to patent ineligible subject matter.

747.    Upon information and belief, and subject to further discovery, claim 15 of the '894 Patent is invalid under 35 U.S.C. § 102 as being anticipated by the prior art identified herein and/or under 35 U.S.C. § 103 as being obvious in light of the prior art identified herein.

**1.    Claim 15 of the '894 Patent is Invalid Under 35 U.S.C. § 101.**

748.    Claim 15 of the '894 Patent is invalid as being directed to patent ineligible subject matter pursuant to 35 U.S.C. § 101. Claim 15 as a whole is directed to a non-patentable, abstract idea and does not recite an inventive concept. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

749.    In *Alice Corp. v. CLS Bank Int'l*, the Supreme Court articulated a two-step approach for resolving whether a claim is directed to patent-ineligible subject matter and is thus outside the

scope of Section 101. *See id.* Under the first step, the Court must determine whether the claims are directed to ineligible subject matter under Section 101, such as laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217–218 (citing *Mayo Collaborative Servs.*, 566 U.S. at 70). Where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," they are directed toward an abstract idea because computers are merely invoked as a tool. *Elec. Power Grp.*, 830 F.3d at 1354.

750.    If from step one of *Alice* the claim as a whole is determined to be directed to ineligible subject matter, then analysis proceeds to *Alice* step two.   Under the second step, the Court examines "the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotations omitted). To transform an abstract idea into a patent-eligible application, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 566 U.S. at 72. Courts have regularly held that claims of computer-implemented methods fail the second step when they are drawn to "merely selecting information, by content or source, for collection, analysis, and display…." *Elec. Power Grp.*, 830 F.3d at 1355.

i.    **Claim 15 of the '894 Patent Fails Alice Step One and is Ineligible Subject Matter Under 35 U.S.C. § 101.**

751.    Claim 15 as a whole is directed to an abstract idea. Claim 15 as a whole is directed to: (1) receiving node names corresponding to a plurality of resource nodes; (2) determining an organizational structure of the plurality of resource nodes; (3) generating a resource map based on the organizational structure; and (4) messaging resource nodes based on the resource map, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

752.    Claim 15 as a whole is directed to steps for a purely *internal* process, relying upon generic computer equipment to route data requests based on a determined organizational structure, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

753.    Furthermore, the specification confirms that Claim 15 as a whole is not a claimed advance over the prior art. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter"). For example, the components and techniques of Claim 15 as a whole, including the use of a conventional computing system to route data requests based on a determined organizational structure, were well understood at the time of the invention. *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 8, ll. 46–47 (explaining that the resource nodes are merely conventional computing devices, such as "modules comprising a combination of hardware, software, or firmware" that include a "processing unit 210 and memory 220); col. 8, ll. 11–26 (explaining that the resource consumers are simply "electrical device[s] running a driver on a processing unit," for example "computers, operating systems, file systems, [and] management software"). Claim 15 as a whole claims nothing more than the abstract idea underlying the claims described in the specification, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See ChargePoint, Inc.*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

754.    Claim 15 claims a result and not a way of achieving it, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 15 as a whole relies on functional language to claim high-level results without specific implementation details, and so is directed to patent-

240

ineligible subject matter under 35 U.S.C. § 101. For example, Claim 15's functional recitation of "receiving … node names corresponding to each of a plurality of resource nodes," "determining … an organizational structure of the plurality of resource nodes based on the received node names," "generating … a resource map based at least in part on the organizational structure," and "messaging … one or more resource nodes … based at least in part on the resource map" merely describes abstract outcomes without concrete technological solutions, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 15 as a whole is directed to a generic computer system architecture performing routine tasks and lacks sufficient specificity regarding such things as storage structures/hardware, data routing techniques, and other technical improvements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Two-Way Media Ltd.*, 874 F.3d at 1337–38 (Fed. Cir. 2017) (invalidating claim reciting functional results—"converting," "routing," and "monitoring"—without any technological implementation and that simply relied on a generic network architecture performing routine tasks).

755.    Claim 15 as a whole describes using standard hardware to execute basic data storage and retrieval tasks without any improvement to the functionality of the system components themselves, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 15 is not directed to specific asserted improvements in computer capabilities.

756.    Claim 15 as a whole is directed to the storage and retrieval of data, and specifically to routing data request based on a determined organizational structure, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc.*, 778 F. App'x at 892 (quoting *ChargePoint, Inc.*, 920 F.3d at 767); *see also buySAFE, Inc.*, 765 F.3d at 1355 ("That a

241

computer receives and sends the information over a network … is not even arguably inventive."). Further, the Federal Circuit has consistently held that organizing and routing data on a computer system is an abstract practice in nature. *See Erie Indem. Co.*, 850 F.3d at 1327 (organizing and accessing data held abstract); *Content Extraction and Transmission LLC*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

757.    Claim 15 as a whole is directed merely to a conventional computing system configured to route data requests based on a determined organizational structure and not to an improvement to computer functionality or troubleshooting, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

758.    For at least the foregoing reasons, Claim 15 fails *Alice* step one.

**ii.    Claim 15 of the '894 Patent Also Fails Alice Step Two and is Ineligible Subject Matter Under 35 U.S.C. § 101**

759.    Claim 15 merely recites a generic computer system with a patent-ineligible abstract idea, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Claim 15 simply uses a generic computer system to perform generic computer functions, including "receiving … node names corresponding to each of a plurality of resource nodes," "determining … an organizational structure of the plurality of resource nodes based on the received node names," "generating … a resource map based at least in part on the organizational structure," and "messaging … one or more resource nodes … based at least in part on the resource map", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. *See Alice*, 573 U.S. at 223 (instructing "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent eligible invention"); *see also Symantec Corp.*, 838 F.3d at 1315; *see also Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no

more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

760.    Claim 15 recites architecture of a generic computing system, including only "a resource consumer device" and "a plurality of resource nodes", and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Implementation of an abstract idea by the '894 Patent's routine hardware fails to move the mere routing of data requests based on a determined organizational structure beyond an abstract idea.

761.    Claim 15 is directed to conventional computing elements, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The '894 Patent refers to the computing devices as "resource nodes," but they are merely conventional computing devices, such as "modules comprising a combination of hardware, software, or firmware," that include a "processing unit 210 and memory 220." *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 8, ll. 46–47. Each computing device is assigned a "resource node name" which merely provides "one or more pieces of information to remote consumers including identification or group membership information, logical position information within a disaggregated resource, partial role information, or other information that a resource consumer might need to access a disaggregated resource. U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 13, ll. 18–23. The resource nodes may "combine together to form groups of different types" wherein "[e]ach type of group represents a desired functionality, capability, or service." U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 12, ll. 9–11. The "group type" of claim 15 "provides resource consumers partial information regarding the role a group plays in the disaggregated resource." U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 12, ll. 11–13. The "resource map" of claim 15 merely provides information related to the physical address of the "resource nodes." U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 18, ll. 1–10.

Finally, the "resource consumers" that interact with the "resource nodes" are simply "electrical device[s] running a driver on a processing unit," for example "computers, operating systems, file systems, [and] management software…." U.S. Pat. No. RE48,894 to Ludwig *et al.* at col. 8, ll. 11–26. Claim 15 does not improve functionality of these devices; instead, it employs well-understood hardware to simply route data requests, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  *See Capital One Bank (USA)*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible"); *see also Elec. Power Grp.*, 830 F.3d at 1355 (instructing that "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility); *Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."); *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer.").

762.    The elements of claim 15, both individually and as an ordered combination, do not recite an inventive concept and fail to transform the claimed invention into patent-eligible subject matter, and so is directed to patent-ineligible subject matter under 35 U.S.C. § 101.

763.    For at least the foregoing reasons, Claim 15 fails *Alice* step two.

764.    Accordingly, claim 15 of the '894 Patent is directed to patent ineligible subject matter and, thus, invalid pursuant to 35 U.S.C. § 101.

**2.  <u>Claim 15 of the '894 Patent is Invalid Under 35 U.S.C. §§ 102 and 103.</u>**

765. Upon information and belief, and subject to further discovery, claim 15 of the '894 Patent is invalid under 35 U.S.C. §§ 102 and 103.

766. The '894 Patent originated as U.S. Application No. 16/422,873 and was filed on May 24, 2019.

767. The '894 Patent claims to be a reissue of U.S. 8,819,092 bearing U.S. Application No. 11/205,895. U.S. Application No. 11/205,895 was filed on August 16, 2005.

768. The '894 Patent, and specifically U.S. Application No. 16/422,873, claims to be a continuation of U.S. RE47,411 bearing U.S. Application No. 15/247,779. U.S. Application No. 15/247,779 was filed on August 25, 2016.

769. U.S. RE47,411 also claims to be a reissue of U.S. 8,819,092 bearing U.S. Application No. 11/205,895.

770. Claim 15 of the '894 Patent is a dependent claim that depends from independent claim 8.

771. Claim 8 of the '894 Patent reads as follows:

8. A method, comprising:
   receiving, at a resource consumer device, node names corresponding to each of a plurality of resource nodes;
   determining, using the resource consumer device, an organizational structure of the plurality of resource nodes based on the received node names, the organizational structure being a parallel structure that enables access to a data set through at least two of the plurality of resource nodes or a serial structure that enables access to a first data block of the data set through a first resource node and to a second data block consecutive to the first data block of the data set through a second resource node; and
   generating, using the resource consumer device, a resource map based at least in part on the organizational structure; and
   messaging, by the resource consumer device, one or more resource nodes of the plurality of resource nodes about the data set based at least in part on the resource map.

772. Claim 15 of the '894 Patent reads as follows:

245

15. The method of claim 8, wherein the received node names are configured to indicate a group type associated with the plurality of resource nodes.

773.    Claim 15 of the '894 Patent is rendered invalid under 35 U.S.C. §§ 102 and 103 by U.S. Patent 8,886,705 (hereinafter "Tewari"), U.S. Patent No. 7,644,136 (hereinafter "Rose"), and U.S. Patent No. 5,701,462 (hereinafter "Whitney"), alone or in combination.

774.    Tewari is entitled "Goal-Oriented Storage Management for a Distributed Data Storage Network," and lists Ruchir Tewari, Xiaohui Dawn Chen, Gregory L. Slaughter, and Thomas E. Saulpaugh as inventors. A true and correct copy of Tewari is attached hereto as Exhibit 47.

775.    Tewari is prior art to the '894 Patent.

776.    Rose is entitled "Virtual File System," and lists Steven W. Rose, Neil A. Rhoads, and Corinna G. Abdul as inventors. A true and correct copy of Rose is attached hereto as Exhibit 48.

777.    Rose is prior art to the '894 Patent.

778.    Whitney is entitled "Distributed File System Providing a Unified Name Space with Efficient Name Resolution," and lists Alan Whitney, Yuval Neeman, Sudheer Koneru, Milan Shah, Peter J. Cook, and Arnold S. Miller as inventors. A true and correct copy of Whitney is attached hereto as Exhibit 49.

779.    Whitney is prior art to the '894 Patent.

780.    As shown on the '894 Patent under the heading "References Cited," neither Tewari, Rose, nor Whitney were considered by the Examiner during examination of the application that issued as the '894 Patent.

246

781.    The '894 Patent issued without the United States Patent and Trademark Office considering that Tewari, Rose, and Whitney render the invention claimed in the '894 Patent unpatentable under 35 U.S.C. §§ 102 and/or 103.

782.    Claim 15 claims "[t]he method of claim 8" comprising specific limitations that are cited in claim 8 and claim 15. *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 15.

783.    Tewari discloses a method comprising the limitations recited in claim 8 and claim 15 of the '894 Patent. *See* U.S. Pat. No. 8,886,705 to Tewari *et al.*

784.    Rose discloses a method comprising the limitations recited in claim 8 and claim 15 of the '894 Patent. *See* U.S. Pat. No. 7,644,136 to Rose *et al.*

785.    Whitney discloses a method comprising the limitations recited in claim 8 and claim 15 of the '894 Patent. *See* U.S. Pat. No. 5,701,462 to Whitney *et al.*

786.    Claim 8 of the '894 Patent claims its method comprises "receiving, at a resource consumer device, node names corresponding to each of a plurality of resource nodes" (hereinafter "the Receiving Limitation"), and Claim 15, which depends from Claim 8, incorporates this limitation from Claim 8. *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 8, Claim 15.

787.    Tewari discloses the Receiving Limitation. For example, Tewari discloses: "The distributed data storage network 100 includes computing nodes (e.g., computer systems) 110A-110E … [which] may be coupled through a network 102." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 23–32. "Most communication protocols require some addressing scheme to name a destination endpoint (such as a node) as the target of a message." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 5, ll. 61–63. "[M]essage addressing in the distributed data storage network 100 may be based on the concept of a 'role.'" U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 5, ll. 65–67. "As used herein, a role may refer to a location-independent address for a computer network."

247

U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 5, l. 61 – col. 6, l. 1. "Each tree may have one or more nodes that may be addressed by a 'role.'" U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 1–2. "Each message may be addressed to a particular role on a particular tree." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 2–3. "[E]ach role may be identified using a string, e.g., the name of the role." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 8–9. "The message address may include information identifying a tree and a role of the tree." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 10–12. "The node may also maintain routing information that allows messages to be routed from node to remote roles, i.e., roles instances associated with other nodes." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 45–48. Each node may receive "information indicative of states of other nodes [comprising] receiving information regarding the plurality of groups." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 8, ll. 16–18. "In one embodiment, the information may also identify which nodes are members of each group." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 8, ll. 18–21. "Resource Roles may reflect the state of availability or utilization of node resources such as storage, computing power, network bandwidth, etc." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 8, ll. 42–44. "Thus, membership in a resource role may be based on any of various attributes of a node, such as storage or operating characteristics." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 8, ll. 44–47.

788.    Rose discloses the Receiving Limitation. For example, Rose discloses: "The [Interactive Content Engine] (ICE) 100 includes an appropriate multiple-port … switch 101 … coupled to a number of Storage Processor Nodes (SPNs) 103." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 3, ll. 22–25. "Each title map or 'directory entry' contains a list indicating where the chunks of its title are stored, and more specifically, where each subchunk of each chunk is located." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 29–31. "[E]ach item in the list

representing a subchunk contains an SPNID identifying a specific user SPN 103, a disk drive number (DD#) identifying a specific disk drive 111 of the identified user SPN 103, and a subchunk pointer." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 32–36. "When a [user process] executing on an SPN requests a directory entry, the entire entry is sent and stored locally for the corresponding user." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 40–42. "In the [virtual file system] 209, each SPN 103 is assigned a logical ID that ... corresponds to the SPN's physical location." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 10, l. 66 – col. 11, l. 1.

789.    Whitney discloses the Receiving Limitation. For example, Whitney discloses: "A distributed file system uses objects to model the behavior of components of the distributed file system." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at Abstract. "Each object has an associated logical path name and physical address." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at Abstract. "An aggregation of all the logical path names comprises a distributed name space which can be logically partitioned into domains." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at Abstract. "Each domain includes a domain folder object which maps logical path names of objects in the domain containing the domain folder object, into addresses in the distributed system where the objects are stored." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at Abstract. "The addresses of the objects are used to access the objects in order to retrieve information from the distributed system." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at Abstract. "A preferred embodiment of the present invention provides a distributed file system." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 3, ll. 36–37. "The distributed file system of the preferred embodiment of the present invention is implemented by components distributed across a distributed system." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 3, ll. 37–40. "Initially a request to access an object is received (step 402)." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 63–64. "For purposes of

249

illustration, suppose that the request originates from workstation 500 shown in FIG. 5." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 63–66. "The workstation 500 includes an input/output (1/0) unit 502, a central processing unit (CPU) 504, and a memory 506." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, l. 66 – col. 7, l. 1. "In addition, the workstation 500 is connected to a keyboard 508 and a mouse 510." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 1–2. "The workstation memory 506 holds a copy of a workstation operating system 512, and at least one application program 514." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 2–5. "The operating system 512 includes the access object routine 516; and a local file system driver 526 that is responsible for managing the local file system." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 5–7. "The memory 500 also holds four other routines 518, 522, 524 and 526 which will be described in more detail below." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 7–9. "The request to access the object is forwarded to the CPU 504 of workstation 500." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 10–11. "The CPU 504 executes the access object routine 516 and begins processing to fulfill the request." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 11–13. "The request may originate from the application program 514 or from the operating system 512." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 13–14. "For example, suppose that a query request is entered on keyboard 508 or on mouse 510." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 14–16. "The query request to query an object is received by the input/output unit 302, which transfers the query request to the CPU 504." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 7, ll. 16–18.

790.    Claim 8 of the '894 Patent claims its method comprises "determining, using the resource consumer device, an organizational structure of the plurality of resource nodes based on the received node names, the organizational structure being a parallel structure that enables access

250

to a data set through at least two of the plurality of resource nodes or a serial structure that enables access to a first data block of the data set through a first resource node and to a second data block consecutive to the first data block of the data set through a second resource node" (hereinafter "the Determining Limitation"). *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 8.  Claim 15, which depends from Claim 8, incorporates this limitation from Claim 8.

791.    Tewari discloses the Determining Limitation. For example, Tewari discloses: "[E]ach role may be identified using a string, e.g., the name of the role." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 8–9. "The message address may include information identifying a tree and a role of the tree." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 10–12. "[T]he network software 132 may also include software operable to create and manage topology and routing information for the data storage network 100 and software operable to utilize the topology and routing information to route messages to other nodes 110." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 4, ll. 45–49. "Each node may maintain a list of role instances which are associated with that node for each tree." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 44–45. "The node may also maintain routing information that allows messages to be routed from the node to remote nodes, i.e., role instances associated with other nodes." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 45–48. "The resources may be identified and accessed using the respective resource node names." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 9, ll. 40–41.

792.    Rose discloses the Determining Limitation. For example, Rose discloses: "Each title map or 'directory entry' contains a list indicating where the chunks of its title are stored, and more specifically, where each subchunk of each chunk is located." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 29–31. "[E]ach item in the list representing a subchunk contains an SPNID identifying a specific user SPN 103, a disk drive number (DD#) identifying a specific disk drive

251

111 of the identified user SPN 103, and a subchunk pointer." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 32–36. "When a [user process] executing on an SPN requests a directory entry, the entire entry is sent and stored locally for the corresponding user." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 40–42. "[T]he disk drives 111 on the user SPNs 103 primarily store the subchunks of the titles." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 8, ll. 40–42. "The VFS 209 includes identifiers for the location of each subchunk via SPNID, DD#, and the LBA." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 8, ll. 42–43. "In the [virtual file system] 209, each SPN 103 is assigned a logical ID that ... corresponds to the SPN's physical location." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 10, l. 66 – col. 11, l. 1.

793.    Whitney discloses the Determining Limitation. For example, Whitney discloses: "A distributed file system (DFS) manager 208 is provided in the domain to manage knowledge about the distributed file system and the volumes (described in more detail below) contained within the domain." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 56–60. "The logical path name identifies an object, volume or other component within the distributed name space 300." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 5–6. "The distributed system of the preferred embodiment of the present invention provides a vehicle for resolving the logical path name to a physical address." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 6–9. "The functional components within each domain controller 200 include directory service (DS) entries 202, which provide directory service information." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 43–46. "Each domain controller also includes a directory service (DS) server 204." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 46–47. "The DS server 204 is responsible for mediating access to the DS entries 202." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 47–48. "The names of objects in the distributed system are organized into a distributed name space." U.S. Pat.

No. 5,701,462 to Whitney *et al.* at col. 5, ll. 29–30. "FIG. 3 shows a simplified example of such a distributed name space 300 for a distributed system." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 5, ll. 30–32. "The distributed file system makes the distributed name space visible." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 5, ll. 32–33. "The distributed name space 300 is a single logical tree structure that graphically represents the named objects of the distributed system." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 5, ll. 33–35. "The single tree structure provides a place for centralizing knowledge about the system and facilitates access to the entire name space." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 5, ll. 35–38.

794.    Claim 8 of the '894 Patent claims its method comprises "generating, using the resource consumer device, a resource map based at least in part on the organizational structure" (hereinafter "the Generating Limitation"). *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 8.  Claim 15, which depends from Claim 8, incorporates this limitation from Claim 8.

795.    Tewari discloses the Generating Limitation. For example, Tewari discloses: "[T]he network software 132 may also include software operable to create and manage topology and routing information for the data storage network 100 and software operable to utilize the topology and routing information to route messages to other nodes 110." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 4, ll. 45–49. "Each node may maintain a list of role instances which are associated with that node for each tree." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 44–45. "The node may also maintain routing information that allows messages to be routed from the node to remote nodes, i.e., role instances associated with other nodes." U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 45–48.

796.    Rose discloses the Generating Limitation. For example, Rose discloses: "The ICE 100 maintains a database of all titles available to a user." *See* U.S. Pat. No. 7,644,136 to Rose *et*

*al.* at col. 5, ll. 45–46. "The list includes the local optical disk library, real time network programming, and titles at remote locations where license and transport arrangements have been made." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 46–48. "The database contains all the metadata for each title..." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 5, ll. 48–49. "The VFS 209 returns a directory entry (DE) to the UP 207, which locally stores the DE." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 6, ll. 55–57. "The DE 211 includes a list locating each subchunk of the title..., each entry including the SPNID identifying a specific user SPN 103, the disk drive number (DD#) identifying a specific disk drive 111 of the identified SPN 103, and an address or LBA providing the specific location of the subchunk on the identified disk drive." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 6, ll. 57–63. "The VFS 209 on the MGMT SPN 205 manages the list of titles and their locations in the ICE 100." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 8, ll. 33–34.

797. Whitney discloses the Generating Limitation. For example, Whitney discloses: "The distributed file system performs the distributed name resolution required by step 406." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 7, ll. 31–32. "FIG. 6 is a flow chart of a retrieve storage location routine 518 which performs the mapping of the logical path name of an object to a physical address for the object in the distributed system 100 (i.e., step 406 of FIG. 4)." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 7, ll. 32–36. "Copies of the retrieve storage location routine 518 are preferably stored in all of the workstations 101 (FIG. 1) and domain controllers 106 of the distributed system 100." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 7, ll. 36–39.

798. Claim 8 of the '894 Patent claims its method comprises "messaging, by the resource consumer device, one or more resource nodes of the plurality of resource nodes about the data set based at least in part on the resource map" (hereinafter "the Messaging Limitation"). *See* U.S. Pat.

No. RE48,894 to Ludwig *et al.* at Claim 8. Claim 15, which depends from Claim 8, incorporates this limitation from Claim 8.

799.    Tewari discloses the Messaging Limitation. For example, Tewari discloses: "In one embodiment, the distributed data storage network 100 may be implemented as a peer-to-peer network." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 53–54. "The peer-to-peer network may comprise a decentralized network of nodes 110 where each node has similar capabilities and/or responsibilities." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 54–57. "Each node 110 may communicate directly with at least a subset of the other nodes 110." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 57–58. "Messages may be propagated through the distributed data storage network 100 in a decentralized manner." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 58–60. "For example, in one embodiment each node 110 in the network 100 may effectively act as a message router." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 3, ll. 60–62.

800.    Rose discloses the Messaging Limitation. For example, Rose discloses: "When a user requests a title, a full set of directory information (ID's/addresses) is made available to the UP executing on the user SPN 103 that accepted the user's request." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 8, ll. 46–49. "From there, the task is to transfer subchunks off of disk drives to memory (buffers), moving them via the switch 101 to the requesting user SPN 103, which assembles a full chunk in a buffer, delivers it to the user, and repeats until done." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 8, ll. 49–52.

801.    Whitney discloses the Messaging Limitation. For example, Whitney discloses: "If all the logical path names of the distributed name space 300 for the distributed system 100 were stored in the workstation prefix table 520, then the mapping of the logical path name for the object

255

would only entail a simple lookup of the logical path name and a retrieval of the corresponding address." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 24–29. "However, as the distributed system 100 expands into a system with thousands or even tens of thousands of hardware and software components modeled as corresponding named objects, the distributed name space 300 expands correspondingly." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 29–33. "Management of a single prefix table for such an extensive distributed system becomes impractical due to the sheer size of such a prefix table." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 33–35. "In step 606, the retrieve storage location routine 518 searches the workstation prefix table 520 for the longest logical path name which is a prefix of the logical path name from the request." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 36–39. "In other words, the workstation 500 first wants to discover whether it already possesses the requisite knowledge to complete name resolution for the logical name." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 39–42. "The notion of a prefix for a logical path name is perhaps best explained by example." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 42–43. "For example, '\a\b' is a prefix of logical path name '\a\b\c'." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 43–44. "The longest matching prefix found in step 606 may be equivalent to the entire logical path name or may match only a leading portion of the logical path name." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 44–47. "In step 608, the retrieve storage location routine 520 determines if there was a match between the logical path name from the request and a logical path name in the workstation prefix table 520 (i.e., was there a prefix that matched a leading portion of the logical name)." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 47–51. "If there was a match, it is determined whether the matched entry in the workstation prefix table 520 has its local volume flag set in column 812 (step 610)." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll.

51–54. "In other words, it is determined whether the object having the logical path name is within a local volume for the workstation." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 54–56. "If the local volume flag is set, the local address is retrieved from column 810 of the prefix table and the logical path name from the request is translated by substituting the retrieved local address for the matched portion of the logical path name (step 612)." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 56–60. "Control is then returned to the access object routine 516 (see FIG. 4)." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 8, ll. 60–61.

802. Claim 15 of the '894 Patent claims the method of claim 8 "wherein the received node names are configured to indicate a group type associated with the plurality of resource nodes" (hereinafter "the Node Name Limitation"). *See* U.S. Pat. No. RE48,894 to Ludwig *et al.* at Claim 15.

803. Tewari discloses the Node Name Limitation. For example, Tewari discloses: "[E]ach role may be identified using a string, e.g., the name of the role." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 8–9. "The message address may include information identifying a tree and a role of the tree." *See* U.S. Pat. No. 8,886,705 to Tewari *et al.* at col. 6, ll. 9–12.

804. Rose discloses the Node Name Limitation. For example, Rose discloses: "Accesses to subchunks on each disk is managed in groups. Each group is sorted in physical order according to 'elevator seek' operation…." *See* U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 7, ll. 47–50. "[E]ach chunk of title content is stored on a different group, and content is spread across all groups in round-robin fashion." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 11, ll. 13–15. "[E]ach directory entry (DE) of the VFS 209 consists of various metadata about the title, and an array of chunk locators." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 12, ll. 4–6. "The chunk locator data

structure consists of 8 bytes: two bytes for identifying the group, two bytes for identifying the disk, and four bytes for identifying the disk allocation block...." U.S. Pat. No. 7,644,136 to Rose *et al.* at col. 12, ll. 6–9.

805. Whitney discloses the Node Name Limitation. For example, Whitney discloses: "The distributed file system partitions the distributed system into administrative domains (which will be described in more detail below) which may each implement separate administrative." *See* U.S. Pat. No. 5,701,462 to Whitney *et al.* col. 3, ll. 46–50. "The components included in the distributed system 100 are logically partitioned into domains 108A, 108B and 108C, wherein each domain includes a subset of the hardware and software components of the distributed system 100." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 10–14. "Each domain may include one or more networks running network operating systems." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 14–15. "A domain ... is a self-contained and self-sufficient unit for purposes of administration and security." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 4, ll. 15–19. "'Logical roots' are programming invariants that refer to a point in the distributed name space 300." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 34–35. "Logical roots are used to gain access to files and objects through the distributed name space 300." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 35–37. "Logical roots are context-sensitive in that a same logical root may resolve to different addresses on different machines." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 37–39. "Logical roots typically identify the root of a domain, the root of a machine's name space, or the root of all domains." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 39–41. "Logical roots are shortcuts for directly accessing an object in the tree that forms the distributed name space 300 without having to traverse the direct lineal ancestor objects." U.S. Pat. No. 5,701,462 to Whitney *et al.* at col. 6, ll. 41–44.

806.    Tewari discloses the method claimed in claim 15 of the '894 Patent. Tewari renders claim 15 of the '894 Patent invalid pursuant to 35 U.S.C. § 102.

807.    Rose discloses the method claimed in claim 15 of the '894 Patent. Rose renders claim 15 of the '894 Patent invalid pursuant to 35 U.S.C. § 102.

808.    Whitney discloses the method claimed in claim 15 of the '894 Patent. Whitney renders claim 15 of the '894 Patent invalid pursuant to 35 U.S.C. § 102.

809.    In light of the disclosure in Tewari, a POSITA would also consider claim 15 of the '894 Patent obvious pursuant to 35 U.S.C. § 103.

810.    In light of the disclosure in Rose, a POSITA would also consider claim 15 of the '894 Patent obvious pursuant to 35 U.S.C. § 103.

811.    In light of the disclosure in Whitney, a POSITA would also consider claim 15 of the '894 Patent obvious pursuant to 35 U.S.C. § 103.

812.    In light of the disclosures in Tewari, Rose, and/or Whitney, in various combinations, a POSITA would also consider claim 15 of the '894 Patent obvious pursuant to 35 U.S.C. § 103.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff requests that this Court grant the following relief:

1.    A declaratory judgment that First Horizon has not infringed the '785 Patent;

2.    A declaratory judgment that claim 30 of the '785 Patent is invalid;

3.    A declaratory judgment that First Horizon has not infringed the '844 Patent;

4.    A declaratory judgment that claim 7 of the '844 Patent is invalid;

5.    A declaratory judgment that First Horizon has not infringed the '722 Patent;

6.    A declaratory judgment that claim 14 of the '722 Patent is invalid;

7.    A declaratory judgment that First Horizon has not infringed the '391 Patent;

259

8.    A declaratory judgment that claim 18 of the '391 Patent is invalid;

9.    A declaratory judgment that First Horizon has not infringed the '862 Patent;

10.    A declaratory judgment that claim 1 of the '862 Patent is invalid;

11.    A declaratory judgment that First Horizon has not infringed the '584 Patent;

12.    A declaratory judgment that claim 1 of the '584 Patent is invalid;

13.    A declaratory judgment that First Horizon has not infringed the '967 Patent;

14.    A declaratory judgment that claim 1 of the '697 Patent is invalid;

15.    A declaratory judgment that First Horizon has not infringed the '894 Patent;

16.    A declaratory judgment that claim 15 of the '894 Patent is invalid;

17.    A declaration that Intellectual Ventures Management, LLC, is the agent and representative of Intellectual Ventures I LLC, Intellectual Ventures II LLC, Callahan Cellular L.L.C., OL Security Limited Liability Company, Invention Investment Fund I, L.P., and Invention Investment Fund II, LLC, and has acted in that capacity regarding the Patents-in-Suit;

18.    A declaration that this case is exceptional within the meaning of 35 U.S.C. § 285, thereby entitling First Horizon to recovery of its costs including reasonable attorneys' fees under 35 U.S.C. § 285 and all other applicable statutes, rules, and common law, including this Court's inherent authority;

19.    Declaring that judgment be entered in favor of First Horizon, and against Defendants on First Horizon's claims;

20.    An order enjoining Defendants and those in privity with Defendants from asserting the '785, '844, '722, '391, '862, '584, '967, and '894 Patents against First Horizon and First Horizon's representatives, agents, affiliates, subsidiaries, vendors and customers; and

260

21.     Such other equitable and/or legal relief as this Court may deem proper and just under the circumstances.

## VII. <u>DEMAND FOR JURY TRIAL</u>

In accordance with Local Rule 7.1(c), First Horizon hereby demands a trial by jury of no less than twelve (12) members.

Dated:  February 12, 2026

Respectfully submitted,

*/s/ Edward D. Lanquist, Jr.*
Adam S. Baldridge (BPR No. 23488)
Lea Speed (BPR No. 19410)
abaldridge@bakerdonelson.com
lspeed@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Tele: (901) 577-2102 / Fax:  (901) 577-2303

Edward D. Lanquist, Jr. (TN Bar No. 13303)
Dominic A. Rota (TN Bar No. 37622)
elanquist@bakerdonelson.com
drota@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Tele: (615) 726-5581 / Fax:  (615) 726-0464

*Attorneys for First Horizon Bank*