US RE48,894 E

## 25

performance. In addition, packets are checked for access faults and the faults are reported back to the driver. The driver interprets the access fault as instructions to break requests up so individual logical disk partitions process the requests naturally without requiring logical disk partitions to communicate with each. Other interpretations of access faults are also contemplated in order to properly handle or report error conditions.

It is specifically contemplated that the data storage array uses modules attached to disk where the modules provide the logical disk partition functionality. Modules include rack mount enclosures that house 12 or 16 disks, desktop enclosures housing one to eight disks, single adapters that plug onto disks, or embedded modules integrated with other products.

Example—Disaggregated Video Display

Yet another example of a disaggregated resource includes a video display comprising a plurality of monitors. The video display is virtualized by two or more resource nodes represented by logical video frames where each logical video frame has an address and an extent of pixels, mostly likely in an (x,y) coordinate system. A logical video frame comprises a map that translates a virtual pixel address into a physical pixel address on one of the monitors. The collection of logical video frames appears as a locally connected video display from the perspective of an electrical device. Contemplated electrical devices include computers, TVs, video games, ATM machines, or other devices requiring a display.

The groups employed by the video display including composites groups where multiple logical video frames combine to form an aggregate display or mirror groups where the same video information is displayed more than once. It is contemplated a mirror includes a video recorder. The logical video frames also have names associated with their group types and the name of the video display. Coherency checks for the video display are useful to determine if a monitor has failed.

Just as in the storage example, a resource consumer for the video display can take the form of a driver. Furthermore, it is contemplated that a module comprising hardware, software, or firmware plugs into a video out of an electrical device and communicates with the video display transparently to the electrical device. For video streams, it is contemplated that image decoding can occur within the resource consumer, a third system, or within the logical video frame. Image decoding is required to determine which pixels of the image display should be mapped to which logical video frame and to provide for proper scaling for pixels.

Alternative Embodiments

In addition to the preceding examples alternative embodiments are also contemplated. Alternative embodiments include other computing related resources including processors where the processor bandwidth is treated as a resource, memory where memory is segmented into partitions similar to a storage array, networking interfaces where QoS or bandwidth is treated as a resource, power supplies, audio I/O, input devices, or others. Alternative embodiments also include non-computing resources including products supplied through a distribution system where a number of warehouses represent resource nodes.

It is also contemplated that more than one disaggregated resource can combine to form a larger heterogeneous resource. For example, several disaggregated resources

## 26

including a storage array, video display, or processing array combine to form a disaggregated computer.

Hardware

In yet another aspect, it is contemplated that one could create hardware designed to adapt devices to allow the devices to function as an independent resource node, or in a more preferred embodiment, to function as multiple independent resource nodes where each resource node is responsible for a logical partition of the device. Therefore, the inventive subject matter includes hardware or firmware of such adapters as well as licensing, selling, advertising, managing, distributing, or operating the adapters.

Software

In still another aspect, it is contemplated that one could write software that would configure, simulate, or manage disaggregated resources and their associated infrastructure. From that perspective the inventive subject matter includes methods of writing such software, recording the software on a machine readable form, licensing, selling, distributing, installing, or operating such software on suitable hardware. Moreover, the software per se is deemed to fall within the scope of the inventive subject matter.

Advantages

Disaggregated resources provide a number of advantages. Individual resource nodes composing the disaggregated resource function independently of all other resource nodes which increases responsiveness or performance from the perspective of a resource consumer without requiring out-of-band communication. Each resource node provides partial information regarding the over map of the disaggregated resource allowing each resource consumer that requires access to the disaggregated resource to build its own effective map. This allows two resource consumers to share the same physical resources, or even the same logical resource, but access the disaggregated resources differently as required by their individual needs. For example, a first resource consumer could access one mirror group preferentially over another mirror group to reduce conflicts with the second resource consumer. Resource consumers are able to discover and access the disaggregated resource without working through an extraneous system that would incur cost overhead to a consumer. Finally disaggregated resources place resource map information with required granularity where it is necessary to ensure efficient access. Furthermore, the disaggregated resource can comprise resource maps with very fine levels of granularity offering a high degree of control over physical resources.

Thus, specific compositions and methods of disaggregated resources have been disclosed. It should be apparent, however, to those skilled in the art that many more modifications besides those already described are possible without departing from the inventive concepts herein. The inventive subject matter, therefore, is not to be restricted except in the spirit of the disclosure. Moreover, in interpreting the disclosure all terms should be interpreted in the broadest possible manner consistent with the context. In particular the terms "comprises" and "comprising" should be interpreted as referring to the elements, components, or steps in a non-exclusive manner, indicating that the referenced elements, components, or steps can be present, or utilized, or combined with other elements, components, or steps that are not expressly referenced.

What is claimed is:

[1. A method comprising:

transmitting a discovery request to each of a plurality of resource nodes that each have a unique Internet proto-

US RE48,894 E

27

col address and, collectively, present a logical representation of a plurality of physical resources;

receiving, from one or more resource nodes of the plurality of resource nodes, node information that includes a name for each of the one or more resource nodes; and

determining, from the names of each of the one or more resource nodes, an organizational structure of the plurality of resource nodes, the organizational structure being a parallel structure that will provide a resource consumer with access to a first data block of a data set stored on the plurality of physical resources through at least two resource nodes, or a serial structure that will provide the resource consumer with access to the first data block through a first resource node and access to a second data block, which is consecutive with the first data block, of the data set through a second resource node.]

[2. The method of claim 1, wherein the one or more resource nodes is less than the plurality of resource nodes.]

[3. The method of claim 1, further comprising:

determining a coherency of a disaggregated resource that includes the plurality of resource nodes based at least in part on the node information received from the one or more resource nodes.]

[4. The method of claim 3, wherein the node information includes a name for each of the one or more resource nodes, and said determining a coherency of the disaggregated resource is based at least in part on the names of each of the one or more resource nodes.]

[5. The method of claim 4, wherein the node information further includes a coherency attribute and said determining the coherency of the disaggregated resource is further based at least in part on the coherency attribute.]

[6. The method of claim 5, wherein the organizational structure of the plurality of resource nodes includes a sequence of the plurality of resource nodes and the coherency attribute of a resource node of the one or more resource nodes is indicative of an additional resource node of the plurality of resource nodes that is later in the sequence.]

[7. The method of claim 1, further comprising:

generating a resource map to correspond one or more logical resource element identifiers to each of the plurality of resource nodes.]

8. A method, comprising:

receiving, at a resource consumer device, node names corresponding to each of a plurality of resource nodes;

determining, using the resource consumer device, an organizational structure of the plurality of resource nodes based on the received node names, the organizational structure being a parallel structure that enables access to a data set through at least two of the plurality of resource nodes or a serial structure that enables access to a first data block of the data set through a first resource node and to a second data block consecutive to the first data block of the data set through a second resource node; and

generating, using the resource consumer device, a resource map based at least in part on the organizational structure; and

messaging, by the resource consumer device, one or more resource nodes of the plurality of resource nodes about the data set based at least in part on the resource map.

9. The method of claim 8, wherein the resource consumer device comprises a resource manager device.

10. The method of claim 8, further comprising:

determining, using the resource consumer device, a coherency of a disaggregated resource that includes a

28

portion of the plurality of resource nodes based at least in part on the received node names corresponding to each of the plurality of resource nodes.

11. The method of claim 10, further comprising:

receiving, at the resource consumer device, a coherency attribute associated with the plurality of resource nodes; and

wherein said determining, using the resource consumer device, the coherency of the disaggregated resource based at least in part on the received node names is further based at least in part on the coherency attribute.

12. The method of claim 11,

wherein the organizational structure of the plurality of resource nodes includes a sequence of the plurality of resource nodes; and

wherein the coherency attribute associated with the plurality of resource nodes is indicative of an additional resource node that is later in the sequence.

13. The method of claim 8, wherein the resource map correlates one or more logical resource element identifiers to each of the plurality of resource nodes.

14. The method of claim 13, wherein each of the logical resource element identifiers corresponds to a physical resource.

15. The method of claim 8, wherein the received node names are configured to indicate a group type associated with the plurality of resource nodes.

16. A non-transitory computer-readable medium having instructions stored thereon that, when executed by a resource consumer device, cause the resource consumer device to:

discover a plurality of resource nodes each being associated with a corresponding unique protocol address;

receive node names corresponding to each of the plurality of resource nodes;

determine an organizational structure of the plurality of resource nodes based at least in part on the received node names, the organizational structure being a parallel structure that enables access to a data set through at least two of the plurality of resource nodes or a serial structure that enables access to a first data block of the data set through a first resource node and to a second data block consecutive to the first data block of the data set through a second resource node;

generate a resource map that maps a correspondence between a plurality of logical resource element identifiers and the plurality of resource nodes based at least in part on the organizational structure; and

message one or more resource nodes of the plurality of resource nodes about the data set based at least in part on the resource map.

17. The non-transitory computer-readable medium of claim 16, wherein the resource consumer device comprises a resource manager device.

18. The non-transitory computer-readable medium of claim 16, wherein execution of the instructions cause the resource consumer device further to:

determine a coherency of a disaggregated resource that includes a portion of the plurality of resource nodes based at least in part on the received node names corresponding to each of the plurality of resource nodes.

19. The non-transitory computer-readable medium of claim 18, wherein execution of the instructions cause the resource consumer device further to:

US RE48,894 E

29

receive a coherency attribute associated with the plurality of resource nodes; and

wherein said determine the coherency of the disaggregated resource based at least in part on the received node names is further based at least in part on the coherency attribute.

20. The non-transitory computer-readable medium of claim 19,

wherein the organizational structure of the plurality of resource nodes includes a sequence of the plurality of resource nodes; and

wherein the coherency attribute associated with the plurality of resource nodes is indicative of an additional resource node that is later in the sequence.

21. The non-transitory computer-readable medium of claim 16, wherein each of the logical resource element identifiers corresponds to a physical resource.

22. The non-transitory computer-readable medium of claim 16, wherein the received node names are configured to indicate a group type associated with the plurality of resource nodes.

23. A system, comprising:

a memory device to store instructions; and

one or more resource consumer devices to execute the instructions stored in the memory device to:

receive node names corresponding to each of a plurality of resource nodes, each of the plurality of resource nodes being associated with a corresponding unique protocol address;

determine an organizational structure of the plurality of resource nodes based at least in part on the received node names, the organizational structure being a parallel structure that enables access to a data set through at least two of the plurality of resource nodes or a serial structure that enables access to a first data block of the data set through a first resource node and to a second data block consecutive to the first data block of the data set through a second resource node; and

30

generate a resource map that maps a correspondence between a plurality of logical resource element identifiers and the plurality of resource nodes based at least in part on the organizational structure; and

message one or more resource nodes of the plurality of resource nodes about the data set based at least in part on the resource map.

24. The system of claim 23, wherein the resource consumer device comprises a resource manager device.

25. The system of claim 23, wherein the one or more resource consumer devices is configured to execute the instructions stored in the memory device further to:

determine a coherency of a disaggregated resource associated with the plurality of resource nodes based at least in part on the received node names corresponding to each of the plurality of resource nodes.

26. The system of claim 25, wherein the one or more resource consumer devices is configured to execute the instructions stored in the memory device further to:

receive a coherency attribute associated with the plurality of resource nodes; and

wherein said determine the coherency of the disaggregated resource based at least in part on the received node names is further based at least in part on the coherency attribute.

27. The system of claim 26,

wherein the organizational structure of the plurality of resource nodes includes a sequence of the plurality of resource nodes; and

wherein the coherency attribute associated with the plurality of resource nodes is indicative of an additional resource node that is later in the sequence.

28. The system of claim 23, wherein each of the plurality of logical resource element identifiers corresponds to a physical resource.

29. The system of claim 23, wherein the node names are configured to indicate a group type associated with the plurality of resource nodes.

*     *     *     *     *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.       : RE48,894 E                                          Page 1 of 1
APPLICATION NO.  : 16/422873
DATED            : January 11, 2022
INVENTOR(S)      : Ludwig et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

At Column 1, under the heading "CROSS REFERENCE TO RELATED APPLICATION," please replace Lines 15-20 (approx.), with the following:

--*NOTICE: More than one reissue application has been filed for the reissue of U.S. Patent No. 8,819,092 B2. The reissue applications are U.S. Reissue Patent Application Serial No. 17/571,311, filed on January 7, 2022, which is a continuation reissue application of U.S. Reissue Patent Application Serial No. 16/422,873 (the present application), filed on May 24, 2019, now U.S. Reissue Patent No. RE48,894 E, issued January 11, 2022, which is a continuation reissue application of U.S. Reissue Patent Application Serial No. 15/247,779, filed on August 25, 2016, now U.S. Reissue Patent No. RE47,411 E, issued May 28, 2019, which is a reissue application of U.S. Patent Application Serial No. 11/205,895, filed on August 16, 2005, now U.S. Patent No. 8,819,092 B2, issued August 26, 2014.*--

Signed and Sealed this
Ninth Day of August, 2022

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

# EXHIBIT 9

**INTELLECTUAL VENTURES**

September 23, 2024

Desi Franklin
Senior Vice President, Assistant General Counsel
First Horizon Bank ("First Horizon")
165 Madison Avenue
Memphis, TN  38103
dfranklin@firsthorizon.com

Dear Desi Franklin:

I write on behalf of Intellectual Ventures Management, LLC ("IVM"). IVM provides management services to Invention Investment Fund I, L.P. ("IIF1") and Invention Investment Fund II, LLC ("IIF2", and together with IIF1, "IIF") as well as Intellectual Ventures I LLC ("IV I") and Intellectual Ventures II LLC ("IV II").  IIF, IV I, and/or IV II (collectively "IV") own or have the exclusive right to license a large portfolio of patents and pending patent applications (>5,700 worldwide patents and applications), which relate to a broad range of technologies. Many of these patented technologies should be of interest to First Horizon.

Initially, I would like to call your attention to the following patents in particular, which cover technologies used in at least the example products, platforms, features, and/or services listed in the table below that First Horizon makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import:

| US Patent No. | Title | Assignee | Example Claim | Example Product/Feature |
|---|---|---|---|---|
| US7949785 | Secure virtual community network system | Intellectual Ventures I LLC | 30 | Open-Source Software: First Horizon' use of Kubernetes<br>https://recruiting.ultipro.com/FIR1007FTN/JobBoard/c005ef3e-175a-49c4-ba29-9f431f673944/OpportunityDetail?opportunityId=8c800876-90b0-4dfe-a198-722daa9494d9 |
| US8332844 | Root image caching and indexing for block-level distributed application management | Intellectual Ventures II LLC | 7 | Open-Source Software: First Horizon's use of Docker<br>https://recruiting.ultipro.com/FIR1007FTN/JobBoard/c005ef3e-175a-49c4-ba29-9f431f673944/OpportunityDetail?opportunityId=8c800876-90b0-4dfe-a198-722daa9494d9 |
| US8407722 | Asynchronous messaging using a node specialization architecture in the dynamic routing network | Intellectual Ventures I LLC | 14 | Open-Source Software: First Horizon's use of Kafka<br>https://recruiting.ultipro.com/FIR1007FTN/JobBoard/c005ef3e-175a-49c4-ba29-9f431f673944/OpportunityDetail?opportunityId=8c800876-90b0-4dfe-a198-722daa9494d9 |
| US10567391 | Graduated authentication in an identity management system | Callahan Cellular L.L.C. | 18 | First Horizon's use of Secure Payment Processing<br>https://www.firsthorizon.com/Landing/Business/Merchant-Services<br>https://docs.clover.com/docs/use-3ds |
| US7464862 | Apparatus & method for POS processing | OL Security LLC | 1 | First Horizon's use of Point-of-Sale Systems<br>https://www.firsthorizon.com/Landing/Business/Merchant-Services<br>https://www.clover.com/pos-systems |

Please note that these patents are offered as an initial list of example patents and example infringing products and that IV's investigation of First Horizon products and services is ongoing. Enclosed are copies of each patent listed above.

IV does not authorize First Horizon or First Horizon's customers or partners to practice any of the above patents and/or other IV patent rights without a license. IV is willing to offer a patent license and remains open to business discussions with First Horizon to negotiate such a license, either to the specifically referenced patents or to all or a subset of the IV patent rights.

I look forward to hearing from you at your earliest convenience.

Sincerely,



Steve Joroff
Licensing Executive
On behalf of: Intellectual Ventures Management
3150 139th Ave SE, Building #4
Bellevue, WA 98005
sjoroff@intven.com

Enclosures:
Patent No:  US 7,949,785
Patent No:  US 8,332,844
Patent No:  US 8,407,722
Patent No:  US 10,567,391
Patent No:  US 7,464,862

CC:    Michelle Macartney
       Chief IP Counsel, Patents and IIF Prosecution
       Intellectual Ventures Management, LLC
       mmacartney@intven.com

       Howard Burnston
       Senior Corporate Counsel
       First Horizon Bank
       howard.burnston@firsthorizon.com

# EXHIBIT 10

# TO BE FILED

# UNDER SEAL

# EXHIBIT 11

Case 2:25-cv-02956-BCL tmp   Document 16-4   Filed 02/12/26   Page 10 of 143
PageID 3332

- What We Do
  - Invention Investment Fund
  - Enterprise Science Fund
  - Deep Science Fund
  - IV Lab
- Who We Are
  - Leadership
  - Meet IV
  - In The Community
- Spinouts
- Careers
- Buzz



**INTELLECTUAL VENTURES®**

 

- What We Do
  - Invention Investment Fund
  - Enterprise Science Fund
  - Deep Science Fund
  - IV Lab
- Who We Are
  - Leadership
  - Meet IV
  - In The Community
- Spinouts
- Careers
- Buzz

1. What We Do
2. Invention Investment Fund

# Invention Investment Fund

Founded in 2000, the Invention Investment Fund manages one of the world's largest patent portfolios and has reshaped how patent licensing is done.

Explore Our Fund

## Our Work

### A Pioneer in the Business

The Invention Investment Fund (IIF) is a pioneer in patent licensing, having invested over 3 billion dollars in patents acquired across more than one thousand distinct transactions to develop a comprehensive and finely tuned portfolio. Over the past 20 years, IIF's patents have generated billions of dollars in licensing revenue. With deep licensing expertise, IIF operates at a scale few companies can match.

We offer licenses which grant companies rights to patents in diverse technical categories acquired from a variety of sources; from independent inventors, universities, startups, small-and-medium-sized businesses, to Fortune 500 firms—all while generating a return for our investors. Our team of experts in patent licensing, portfolio strategy and technology manage this large and robust portfolio and continue to unearth new applicability and derive additional value from the patents as businesses and technologies advance.

Many companies, including top global technology firms, have recognized the value of the IIF portfolio by licensing the IIF patents.

### Explore Our Technology Blocks

Spanning 16 technology areas, the IIF patent portfolio was sourced from top inventors around the globe and is relevant to core technologies across a diverse set of industries.

12/29/25, 2:00 PM
Case 2:25-cv-02956-BCL tmp    Document 16-4    Filed 02/12/26    Page 11 of 143
Invention Investment Fund has reshaped patent licensing | Intellectual Ventures
PageID 3333



**Wireless Communications Technologies**



**Wire Based Communications**



**Hybrid Cloud Infrastructure**



**Server, Storage, and Memory Components**



**Media Creation and Delivery**



**Content Discovery and Recommendation**



**Networking and Network Virtualization**



**Security and Authentication**



**Data & Image Acquisition**



**Location Based Services**



**UI/UX, Digital Displays**



**Autonomous Vehicle Engineering**



**Digital Payments Infrastructure**



**Compute and Advanced Processing**



**Semiconductors, Process and Fabrication**



**Record & Document Management**

Learn More

# INTELLECTUAL VENTURES®

IV®

- Careers
- Contact







[14360 SE Eastgate Way](#)
[Bellevue, WA 98007 •](#)
[(425) 467-2300](#)

Copyright © 2025 Intellectual Ventures Management, LLC All rights reserved.

[Terms & Conditions](#) [Privacy Policy](#)

Site Feedback



Search

Submit

Case 2:25-cv-02956-BCL-tmp    Document 16-4    Filed 02/12/26    Page 13 of 143    PageID 3335

Invention Investment Fund has reshaped patent licensing | Intellectual Ventures

**have site feedback?**

Contact the webmaster using the form below.

Name*

Email*

Message

Phone Number*    Submit

# EXHIBIT 12

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Friday, November 17, 2023 11:34 AM
**To:** dfranklin@firsthorizon.com <dfranklin@firsthorizon.com>
**Cc:** howard.burnston@firsthorizon.com <howard.burnston@firsthorizon.com>
**Subject:** Exploring Intellectual Property Opportunities - Collaboration between Intellectual Ventures and First Horizon

Dear Mr. Franklin,

Allow me to introduce myself; I am Steve Joroff, the Vice President of Licensing at Intellectual Ventures (IV). At IV, I lead a dedicated team responsible for negotiating patent license agreements, particularly within the realm of banking, insurance, and financial services.

I am reaching out to initiate a dialogue concerning intellectual property and licensing matters with First Horizon. Exploring the potential synergy between IV's extensive worldwide patent portfolio and First Horizon's endeavors could prove mutually advantageous. I propose that our initial discussion encompass an overview of IV's expansive patent portfolio and its relevance to First Horizon's operations. Subsequently, both parties can collaboratively determine the direction for further exploration, fostering a meaningful and fruitful business relationship.

For context, Intellectual Ventures stands as a pioneer in patent aggregation, licensing, and sales. Over the past two decades, we've invested billions in acquiring, maintaining, and licensing patents. Presently, our portfolio boasts over 7,000 active patents procured from esteemed companies, research institutions, and inventors. Notably, these patents align closely with the technologies integral to First Horizon's daily operations, including cloud computing, networking, security, storage, digital payments, and utilization of open-source software, among others.

I eagerly await your response and the proposal of suitable dates and times for our inaugural discussion. I believe our collaboration holds the potential for substantial mutual benefit and innovation.

Thank you for your attention, and I look forward to our imminent interaction.

Warm Regards,

**Steve Joroff**

Vice President, Licensing

Intellectual Ventures

E - sjoroff@intven.com

M - 732.995.0230

O - 425.247.2280

*This message may contain confidential information which may also be legally privileged information. If you are not an intended recipient of the message, please delete it and notify the sender via reply email.  Any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden.*

Award-winning service

Confidentiality notice:
This e-mail message, including any attachments, may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution, or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

# EXHIBIT 13

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Wednesday, December 20, 2023 2:21 PM
**To:** dfranklin@firsthorizon.com <dfranklin@firsthorizon.com>
**Cc:** howard.burnston@firsthorizon.com <howard.burnston@firsthorizon.com>
**Subject:** Re: Exploring Intellectual Property Opportunities - Collaboration between Intellectual Ventures and First Horizon

Dear Mr. Franklin,

I am writing to emphasize the criticality of discussing the potential licensing agreement between Intellectual Ventures (IV) and First Horizon. As the Vice President of Licensing at IV, it's imperative to underscore the significance of obtaining a license to our extensive patent portfolio.

Our previous attempts to engage in dialogue regarding intellectual property and licensing matters have unfortunately not yielded a response. However, I want to reiterate that our intent is to collaborate and ensure that First Horizon benefits from accessing our patented technologies while also respecting our mutual business interests.

Without a formalized agreement in place, there might be inadvertent risks associated with utilizing technologies covered by IV's patents. It's essential to protect both First Horizon's operations and IV's intellectual property rights through a comprehensive licensing arrangement.

I am keenly interested in facilitating a meeting to discuss the terms of a patent license agreement that aligns with First Horizon's business goals and ensures compliance with IV's intellectual property rights. This discussion would allow us to address any queries or concerns you may have, ensuring a transparent and mutually beneficial agreement.

Your acknowledgment or response to this communication would be highly appreciated. I sincerely hope to arrange a meeting at your earliest convenience to explore the terms of the licensing agreement further.

Thank you for your attention to this matter. I eagerly await your response and the opportunity to discuss this significant collaboration between our organizations.

Best,

**Steve Joroff**

Vice President, Licensing

Intellectual Ventures

E - sjoroff@intven.com

M - 732.995.0230

O - 425.247.2280

Schedule a meeting:  https://calendly.com/intellectualventures/30min

*This message may contain confidential information which may also be legally privileged information. If you are not an intended recipient of the message, please delete it and notify the sender via reply email.  Any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden.*

# EXHIBIT 14

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Sunday, January 7, 2024 1:51 PM
**To:** dfranklin@firsthorizon.com <dfranklin@firsthorizon.com>
**Cc:** howard.burnston@firsthorizon.com <howard.burnston@firsthorizon.com>
**Subject:** Urgent: Immediate Discussion Needed on Intellectual Property Licensing for First Horizon

Dear Mr. Franklin,

I trust this message finds you well.

I am writing to address the pressing need for a discussion concerning a licensing agreement between Intellectual Ventures (IV) and First Horizon. As the Vice President of Licensing at IV, I am compelled to stress the urgency of acquiring a license to our extensive patent portfolio for the mutual benefit of our organizations.

Regrettably, our previous attempts to engage in discussions on intellectual property and licensing matters have not garnered a response. This lack of engagement has raised concerns about potential inadvertent risks related to utilizing technologies encompassed by IV's patents. It is critical to mitigate these risks and protect both First Horizon's operations and IV's intellectual property rights through a formalized licensing arrangement.

I reiterate our sincere intent to collaborate with First Horizon and ensure that your organization

gains rights to our patented technologies while preserving our mutual business interests. However, the absence of an established agreement poses potential challenges and risks that require immediate attention.

I am urgently requesting a meeting to discuss the fixed fee, non-negotiable financial terms of a patent license agreement correlated with First Horizon's annual U.S. revenue. This conversation is paramount to establishing a transparent and mutually beneficial agreement, and addressing any questions or concerns you may have.

Your prompt acknowledgment or response to this communication is crucial. I am prepared to arrange a meeting before the end of January to delve further into the terms of the licensing agreement.

Thank you for your immediate attention to this matter. I eagerly anticipate your response and the opportunity to discuss this vital collaboration between our esteemed organizations.

Best,

**Steve Joroff**

Vice President, Licensing

Intellectual Ventures

E - sjoroff@intven.com

M - 732.995.0230

O - 425.247.2280

Schedule a meeting:  https://calendly.com/intellectualventures/30min

*This message may contain confidential information which may also be legally privileged information. If you are not an intended recipient of the message, please delete it and notify the sender via reply email.  Any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden.*

# EXHIBIT 15

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Thursday, January 18, 2024 1:46 PM
**To:** dfranklin@firsthorizon.com <dfranklin@firsthorizon.com>
**Cc:** howard.burnston@firsthorizon.com <howard.burnston@firsthorizon.com>
**Subject:** Re: Urgent: Immediate Discussion Needed on Intellectual Property Licensing for First Horizon

Dear Mr. Franklin,

I trust this message finds you well.

I am following up on my previous outreach regarding the Intellectual Ventures (IV) Financial Services Licensing Program and our desire to engage in discussions with First Horizon. If you are not the appropriate contact person for this matter, kindly forward this email to the relevant party within First Horizon to ensure an accurate and timely response.

It is crucial for us to receive a response to avoid any misunderstandings. I want to emphasize that initiating a conversation or engaging in a dialogue with me does not imply First Horizon's immediate willingness to enter into a patent license agreement with IV.

As the head of the IV financial services licensing, I am here to provide information and answer any questions you or your management may have about the IV financial services licensing program. Sharing this material will help address any concerns and provide a clear understanding of the benefits and transparent framework we offer.

To recap the key points from my previous email:

1. Our patent portfolio, with over 6,300 active patents, aligns strategically with technologies crucial to First Horizon's operations.

2. IV's fixed price, non-negotiable pricing table ensures a transparent and equitable framework for financial services companies.

3. An introductory meeting would provide an opportunity to delve into the specifics of our

patent portfolio, showcase its relevance to First Horizon, and explore potential collaboration.

I am committed to accommodating your schedule for a meeting before the end of January. Your prompt response is appreciated, and I look forward to the prospect of a productive and meaningful discussion with you and the First Horizon team.

Thank you for considering this opportunity.

Best,


**Steve Joroff**

Intellectual Ventures
E - sjoroff@intven.com
M - 732.995.0230
O - 425.247.2280
Schedule a meeting:  Use this link to schedule a meeting with Steve

This message may contain confidential information which may also be legally privileged information. If you are not an intended recipient of the message, please delete it and notify the sender via reply email.  Any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden.

# EXHIBIT 16

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Tuesday, February 6, 2024 2:01 PM
**To:** dfranklin@firsthorizon.com <dfranklin@firsthorizon.com>
**Cc:** howard.burnston@firsthorizon.com <howard.burnston@firsthorizon.com>
**Subject:** Re: Urgent: Immediate Discussion Needed on Intellectual Property Licensing for First Horizon

Mr. Franklin,

I have found that direct communication is imperative, especially given the complexities of the IV financial services patent licensing program. It's crucial that we at least schedule a 30-minute conversation to address this matter.

Here are several options for you to choose from:

- Monday, February 12 from 2-5pm ET
- Tuesday, February 13 from 12:30-5pm ET
- Wednesday, February 14 from 9-2pm ET
- Thursday, February 15 from 10-11:30am ET or 12-4pm ET

Efficient infringement is not a viable strategy in this circumstance. Therefore, engaging in discussions is critical to avoiding misunderstandings or unnecessary escalation.

Please let me know your preferred day and time, and I'll promptly send a meeting invitation.

Looking forward to our discussion.


Best,

## Steve Joroff

Intellectual Ventures
E - sjoroff@intven.com
M - 732.995.0230
O - 425.247.2280
Schedule a meeting:  Use this link to schedule a meeting with Steve

This message may contain confidential information which may also be legally privileged information. If you are not an intended recipient of the message, please delete it and notify the sender via reply email.  Any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden.

# EXHIBIT 17

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Friday, February 23, 2024 9:30 AM
**To:** Franklin, Desiree <DFranklin@firsthorizon.com>
**Cc:** BURNSTON, HOWARD S. <Howard.Burnston@firsthorizon.com>
**Subject:** Urgent: Immediate Discussion Needed on Intellectual Property Licensing for First Horizon

**[External Email. Exercise caution when clicking links or opening attachments.]**

Mr. Franklin,

I hope this email finds you well.

I am reaching out once again to follow up on our previous attempts to connect regarding a licensing agreement between our organizations. Despite several previous outreach attempts, we have yet to receive a response or acknowledgment from your end.

As mentioned before, our goal is to engage in good-faith negotiations to explore a mutually beneficial license arrangement. However, the lack of engagement from your side has left us in a challenging position, as we are unable to determine whether you are the appropriate contact person or if there is another individual within your organization we should be communicating with.

We have made it clear in our previous communications that if you are not the right person to respond, we kindly request that you forward our email string to the appropriate individual. Since we have not received any indication to the contrary, we can only assume that you are the designated contact for licensing discussions.

We understand that navigating licensing negotiations can be complex, but we remain committed to transparency and fairness in our approach. We are ready and willing to share non-confidential information about the Intellectual Ventures (IV) patent portfolio with you ahead of a scheduled meeting.

To facilitate this process, I have included some available time slots for an introductory meeting below:

- Tuesday, March 12, 9-11am, 11:30-1pm or 1:30-4pmET
- Wednesday, March 13, 9am-4 pm ET
- Thursday, March 14, 9-10:30amET, or from 12:30-2 pm ET
- Friday, March 15, from 9:30-11amET or 12-1:30pm ET

Please let me know which of these options works best for you, and I will make the necessary arrangements. We believe that a direct conversation will be beneficial in clarifying any questions or concerns you may have.

Thank you for your attention to this matter, and I look forward to your prompt response.

Best,


## Steve Joroff

Intellectual Ventures
E - sjoroff@intven.com
M - 732.995.0230
O - 425.247.2280
Schedule a meeting:  Use this link to schedule a meeting with Steve

This message may contain confidential information which may also be legally privileged information. If you are not an intended recipient of the message, please delete it and notify the sender via reply email.  Any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden.

# EXHIBIT 18

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Friday, March 15, 2024 1:58 PM
**To:** dfranklin@firsthorizon.com <dfranklin@firsthorizon.com>
**Cc:** howard.burnston@firsthorizon.com <howard.burnston@firsthorizon.com>
**Subject:** Urgent: Immediate Discussion Needed on Intellectual Property Licensing for First Horizon

Mr. Franklin,

Following up on our previous attempts to connect regarding a patent license agreement between our organizations. Despite our numerous outreach attempts, we have yet to receive any response or acknowledgment from your end.

Efficient infringement is not going to be an effective strategy in this situation. Intellectual Ventures (IV) holds numerous patents covering various technologies that First Horizon is using, and therefore, they need to be licensed to IV's patent portfolio.

As part of our industry-wide patent licensing program, 19 financial services companies have already taken licenses. We are committed to ensuring that all organizations, including First Horizon, operate within the bounds of intellectual property law.

I strongly encourage you to schedule a meeting with me at your earliest convenience. Once a meeting is scheduled, I will share non-confidential material that will describe the IV patent portfolio, explain the licensing program, and provide sufficient details about the technologies First Horizon is using and the relevant IV patents.

Please let me know which of the following options works best for you:

- Tuesday, April 9: Any time
- Wednesday, April 10: Any time
- Thursday, April 11: 10-11:30 am ET or 12:30-5 pm ET
- Friday, April 12: 9-11 am ET

Your prompt response is greatly appreciated.

Best,

**Steve Joroff**

Intellectual Ventures
E - sjoroff@intven.com
M - 732.995.0230
O - 425.247.2280
Schedule a meeting:  Use this link to schedule a meeting with Steve

This message may contain confidential information which may also be legally privileged information. If you are not an intended recipient of the message, please delete it and notify the sender via reply email.  Any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden.

# EXHIBIT 19

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Monday, August 26, 2024 1:33 PM
**To:** Franklin, Desiree <DFranklin@firsthorizon.com>
**Cc:** BURNSTON, HOWARD S. <Howard.Burnston@firsthorizon.com>
**Subject:** Re: Urgent: Immediate Discussion Needed on Intellectual Property Licensing for First Horizon

**[External Email. Exercise caution when clicking links or opening attachments.]**

Mr. Franklin,

I hope this message finds you well. I'm writing to follow up on my previous correspondence from March 15, 2024. To date, I have not received any response or acknowledgment from you, which is concerning given the importance of this matter.

As of now, 26 financial services companies have secured licenses with Intellectual Ventures (IV) for our patent portfolio. My role is to ensure that one way or another, First Horizon is also properly licensed.

I strongly urge you to connect with me as soon as possible to discuss next steps. We are ready to provide the required information to assist with this process, but maintaining silence is not an option.

Please offer your availability for a meeting at your earliest convenience so we can move forward in a mutually beneficial manner.

Thank you for your prompt attention to this matter.

Best,


**Steve Joroff**

Intellectual Ventures
E - sjoroff@intven.com
M - 732.995.0230
O - 425.247.2280

This message may contain confidential information which may also be legally privileged information. If you are not an intended recipient of the message, please delete it and notify the sender via reply email.  Any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden.

# EXHIBIT 20

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Tuesday, October 8, 2024 12:19 PM
**To:** Franklin, Desiree <DFranklin@firsthorizon.com>
**Cc:** BURNSTON, HOWARD S. <Howard.Burnston@firsthorizon.com>; Michelle Macartney <mmacartney@intven.com>; Rocky Adornato <roadornato@intven.com>
**Subject:** Re: Intellectual Ventures Patent Notice: First Horizon Corp.

## [External Email. Exercise caution when clicking links or opening attachments.]

Dear Mr. Franklin,

I hope this message finds you well.

I am writing to follow up on the notice letter sent to First Horizon Corp. on September 23, 2024, regarding the need for a license to the Intellectual Ventures (IV) patent portfolio. I wanted to ensure that you have received the letter and offer additional information to assist with your review of the matter.

As outlined in the notice, First Horizon Corp. is required to obtain a license for its operations. Based on your reported U.S. revenue of $3.24 billion, the proposed one-time license fee for a worldwide license to the IV patent portfolio is $3.25 million. Our pricing is standard across the financial services industry and is calculated based on U.S. revenue. Please see the attached file for more information.

To move this process forward efficiently, I would like to offer several next steps:

- We can arrange an introductory meeting to discuss the IV financial services licensing program in more detail.

- We can provide claim charts to demonstrate the relevance of our patents to First Horizon Corp's operations.

- We can send over a draft license agreement for your review.

Please let me know how you would like to proceed. Your prompt attention to this matter is appreciated, and I look forward to hearing from you soon.

Best,

**Steve Joroff**

Intellectual Ventures
E - sjoroff@intven.com
O - 425.247.2280

**INTELLECTUAL** VENTURES'

This message may contain confidential information which may also be legally privileged information. If you are not an intended recipient of the message, please delete it and notify the sender via reply email.  Any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden.

# EXHIBIT 21

# Invention Investment Fund (IIF) Commercial Bank Licensing

1. **Commercial Bank Licensing:** IIF offers to license its portfolio using a systematic approach across the financial services and insurance sectors, encompassing the entire scope of those businesses.

2. **Pricing Framework:** The pricing structure for a portfolio-wide license applies consistent metrics to industry parameters to ensure fairness and reliability.

   - **Pricing:** Pricing tiers are based on the most recently disclosed U.S. revenue for each IIF licensing customer, grouped by FinTech industry segments.
   - **Segment Designations:** Industry segment designations align with published customary Primary Industry Group classifications for each IIF licensing customer to facilitate understanding of pricing relevance.

3. **Outreach:** IIF is offering licenses to all financial services and insurance companies with business operations in the United States.

4. **License Scope:** IIF is offering a portfolio-wide perpetual nonexclusive, worldwide license to all patents IIF has the right to license as of the effective date of a definitive license agreement with IIF. Upon request, IIF will also consider offers to license (or purchase) selected patents from its portfolio.

5. **Industry-Related Litigations:** IIF seeks to enforce its patent rights, with patent litigations pending against JPMC, Liberty Mutual, and Comerica, with further actions planned.

| Licensee U.S. Revenue | Commercial Bank License Fee |
| --- | --- |
| Greater than $50B | $7.00M |
| $25B to $50B | $6.00M |
| $10B to $25B | $5.00M |
| $5B to $10B | $4.25M |
| $2.5B to $5B | $3.25M |
| $1B to $2.5B | $2.50M |
| $0.5B to $1B | $1.75M |
| $0.1B to $0.5B | $1.00M |

CONFIDENTIAL – For Discussion Purposes
Copyright © 2024 Intellectual Ventures Management, LLC (IV).
All rights reserved.

# EXHIBIT 22

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Wednesday, December 11, 2024 1:44 PM
**To:** Franklin, Desiree <DFranklin@firsthorizon.com>
**Cc:** BURNSTON, HOWARD S. <Howard.Burnston@firsthorizon.com>; Michelle Macartney <mmacartney@intven.com>; Rocky Adornato <roadornato@intven.com>
**Subject:** Re: Intellectual Ventures Patent Notice: First Horizon Corp.

## [External Email. Exercise caution when clicking links or opening attachments.]

Dear Mr. Franklin,

I hope this message finds you well.

I am following up regarding the notice sent to First Horizon Corp. on September 23, 2024, and the pricing expectations shared on October 8, 2024. Despite our attempts to engage, we have yet to receive a response.

This communication serves to document Intellectual Ventures' ongoing efforts to fulfill its legal obligations as the licensor and ensure transparency in this matter. Regular communication is important to avoid claims of unreasonable delay (laches) or misleading conduct (equitable estoppel), which could limit available remedies.

If there has been any change in First Horizon's position or if you would like to revisit the terms at any point, please let me know.

Best,

**Steve Joroff**

Intellectual Ventures

E - sjoroff@intven.com

O - 425.247.2280

**INTELLECTUAL** VENTURES®

This message may contain confidential information which may also be legally privileged information. If you are not an intended recipient of the message, please delete it and notify the sender via reply email.  Any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden.

# EXHIBIT 23

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Thursday, February 6, 2025 10:16 AM
**To:** Franklin, Desiree <DFranklin@firsthorizon.com>
**Cc:** BURNSTON, HOWARD S. <Howard.Burnston@firsthorizon.com>; Michelle Macartney <mmacartney@intven.com>
**Subject:** Re: Intellectual Ventures Patent Notice: First Horizon Corp.

## [External Email. Exercise caution when clicking links or opening attachments.]

Dear Mr. Franklin,

I am following up regarding First Horizon Corp.'s need for a license to the IV patent portfolio. Since First Horizon was put on notice on September 23, 2024, we have made multiple attempts to engage, yet we have not received any response.

To date, 35 financial services companies have recognized the value of securing a license to the IV portfolio. Additionally, **IV has recently settled its financial services litigations with Liberty Mutual and Comerica**, further demonstrating the strength and enforceability of our patents. I have attached the relevant settlement documents for your reference.

To avoid unnecessary escalation, I ask that you acknowledge this email or provide a substantive response **before February 21**. If First Horizon has any questions or would like to discuss next steps, I am available to schedule a call at your convenience.

Please let me know how you would like to proceed.

Best,

**Steve Joroff**

Intellectual Ventures
E - sjoroff@intven.com
O - 425.247.2280

INTELLECTUAL VENTURES

This message may contain confidential information which may also be legally privileged information. If you are not an intended recipient of the message, please delete it and notify the sender via reply email.  Any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden.

# EXHIBIT 24

**From:** Steve Joroff <sjoroff@intven.com>
**Sent:** Thursday, April 3, 2025 11:21 AM
**To:** Franklin, Desiree <DFranklin@firsthorizon.com>
**Cc:** BURNSTON, HOWARD S. <Howard.Burnston@firsthorizon.com>; Michelle Macartney <mmacartney@intven.com>
**Subject:** Re: Intellectual Ventures Patent Notice: First Horizon Corp.

**[External Email. Exercise caution when clicking links or opening attachments.]**

Dear Mr. Franklin,

I wanted to share a brief update regarding recent developments involving the Intellectual Ventures (IV) patent portfolio and our ongoing licensing efforts in the financial services sector.

Recently, IV filed two new patent litigations—against Nationwide Mutual Insurance and The Bank of New York Mellon—following their decision not to engage in licensing discussions. We anticipate additional enforcement actions in the coming months with institutions that continue to decline meaningful negotiations.

Additionally, two key patents from the IV portfolio have successfully completed ex parte reexamination proceedings before the U.S. Patent and Trademark Office:

- U.S. Patent No. 7,949,785

- U.S. Patent No. 8,407,722

The USPTO has issued Notices of Intent to Issue a Reexamination Certificate (NIRC) for both, reaffirming the validity of the claims and further strengthening the enforceability of these

patents.  See attached.

That said, for the time being, we remain open and willing to engage directly with First Horizon to reach a constructive and amicable resolution. Please let me know when you're available to continue those discussions.

I look forward to your response.

Best,
**Steve Joroff**
Intellectual Ventures

# EXHIBIT 25

**From:** Steve Joroff <sjoroff@intven.com>

**Sent:** Friday, April 25, 2025 10:14 AM

**To:** Franklin, Desiree <DFranklin@firsthorizon.com>

**Cc:** BURNSTON, HOWARD S. <Howard.Burnston@firsthorizon.com>; Michelle Macartney

<mmacartney@intven.com>

**Subject:** Re: Intellectual Ventures Patent Notice: First Horizon Corp.

## [External Email. Exercise caution when clicking links or opening attachments.]

Mr. Franklin,

I'm writing again to provide an important update that further underscores the strength and enforceability of the Intellectual Ventures (IV) patent portfolio.

On April 23, 2025, the Patent Trial and Appeal Board (PTAB) officially terminated three inter partes review (IPR) proceedings filed against IV patents prior to institution. These IPRs were brought by Liberty Mutual and Comerica, and challenged the following patents:

- U.S. Patent No. 8,407,722
- U.S. Patent No. 7,949,785
- U.S. Patent No. 8,332,844

The Board dismissed all three IPRs following settlement between the parties and confirmed that the underlying agreements resolving the disputes would be treated as business confidential information under 35 U.S.C. § 317(b) and 37 C.F.R. § 42.74(c).

These terminations follow the USPTO's recent Notices of Intent to Issue Reexamination Certificates (NIRC) for the '722 and '785 patents, reaffirming the validity of their asserted claims. Together, these outcomes send a clear message: the IV portfolio not only survives challenge but continues to demonstrate its legal and commercial strength in both licensing and litigation contexts.

We continue to prioritize resolution through direct licensing discussions and remain open to constructive engagement. Please let me know if you are willing to schedule a call to further discuss how these developments may impact your assessment of the IV portfolio.

Best,

**Steve Joroff**
Intellectual Ventures

# EXHIBIT 26

Case 2:25-cv-02956-BCL-tmp    Document 16-4    Filed 02/12/26    Page 57 of 143 PageID 3379

US 20030028671A1

## (19) United States
## (12) Patent Application Publication
Mehta et al.

(10) Pub. No.: US 2003/0028671 A1
(43) Pub. Date: Feb. 6, 2003

(54) **METHOD AND SYSTEM FOR TWO-WAY INITIATED DATA COMMUNICATION WITH WIRELESS DEVICES**

(75) Inventors: **Samir Narendra Mehta**, Renton, WA (US); **Mazin Ramadan**, Seattle, WA (US); **Geoffrey S. Heller**, Seattle, WA (US); **Vineet R. Sharma**, Renton, WA (US); **Markus L. Jansen**, Renton, WA (US); **Edward L. Gow**, Seattle, WA (US); **Ngochan T. Nguyen**, Seattle, WA (US)

Correspondence Address:
SEED INTELLECTUAL PROPERTY LAW
GROUP PLLC
701 FIFTH AVE
SUITE 6300
SEATTLE, WA 98104-7092 (US)

(73) Assignee: **4th pass Inc.**, Seattle, WA

(21) Appl. No.: 10/167,240

(22) Filed: Jun. 10, 2002

### Related U.S. Application Data

(60) Provisional application No. 60/296,902, filed on Jun. 8, 2001.

### Publication Classification

(51) Int. Cl.[7] ................................................... G06F 15/16

(52) U.S. Cl. .................................................. 709/245; 709/230

(57) **ABSTRACT**

Methods and systems for providing two-way initiated, bi-directional communication with wireless devices using connection-based or connection-less protocols, such as, for example, TCP/IP and UDP/IP, are provided. Example embodiments provide an Address Management Proxy System ("AMPS"), which enables devices and systems connected to a public internet, such as the Internet, to initiate communication with and to send data to wireless devices connected to a private wireless network, without exposing the non-routable private addresses of these wireless devices. The AMPS allocates a public (routable) network address for temporarily use by a requesting device on a public network to communicate with a wireless device on a wireless network. In one embodiment, a pool of public addresses, for example, public IP addresses, is maintained by the AMPS and allocated dynamically to wireless network devices as required. In one embodiment, the AMPS comprises one or more modified DNS/API servers, one or more Address Proxy/Routers, an Address Management Data Server, one or more data repositories, and optionally a load balancer. The AMPS DNS'/API server receives a request from a device on a public network for a particular wireless device, and returns an appropriate temporary public address, which is internally mapped to the private address of the wireless device. The public address is then usable by the device on the public network to send data to the wireless device.



Patent Application Publication     Feb. 6, 2003   Sheet 1 of 8     US 2003/0028671 A1



Fig. 1

Patent Application Publication    Feb. 6, 2003   Sheet 2 of 8    US 2003/0028671 A1



Fig. 2

Patent Application Publication     Feb. 6, 2003   Sheet 3 of 8     US 2003/0028671 A1



*Fig. 3*

Patent Application Publication    Feb. 6, 2003   Sheet 4 of 8    US 2003/0028671 A1



Fig. 4

Patent Application Publication     Feb. 6, 2003   Sheet 5 of 8     US 2003/0028671 A1



Fig. 5



Fig. 6

Patent Application Publication    Feb. 6, 2003  Sheet 7 of 8    US 2003/0028671 A1



Fig. 7

Patent Application Publication    Feb. 6, 2003  Sheet 8 of 8    US 2003/0028671 A1



Fig. 8

US 2003/0028671 A1                                          Feb. 6, 2003

1

# METHOD AND SYSTEM FOR TWO-WAY INITIATED DATA COMMUNICATION WITH WIRELESS DEVICES

## BACKGROUND OF THE INVENTION

[0001]    1. Field of the Invention

[0002]    The present invention relates to methods and systems for initiating communication with wireless devices and, in particular, to methods and systems for initiating communication with a device on a private network from a device on a public network to achieve virtual end-to-end connectivity.

[0003]    2. Background Information

[0004]    The need to connect networked computers together with other networks of computers has become increasingly important as our global society strives to communicate for business and personal reasons on an international level. This need has driven the technical community to devise ways to interconnect devices on different physical networks so that devices on heterogeneous and homogeneous networks can communicate with one another as in a uniform (or standard) manner. Such interconnection technology is often referred to as "internetworking," "internetworks," or simply "internets." One such global internetworking implementation is the Internet (first letter capitalized to distinguish from "internets" generally), as originally developed by the ARPA, NSF, etc. for educational and government purposes. The Internet, in its now expanded version, exists as a complex infrastructure of network backbones that connect to networks around the world. Other (local, regional, private, or public) networks connect to the Internet backbone by means of gateways or routers (also known as gateway servers, gateway systems, router servers, and router systems). For purposes of this document, the term "router" or "gateway," used alone or to modify another noun, are used interchangeably and will refer generically to any hardware or software, subsystem, system, or code that is able to transfer a data packet (at any level of the network or physical data transfer) between two or more homogeneous or heterogeneous machines, systems, or subsystems, without regard to a particular gateway/router machine or service. In the Internet environment, the presence of a router or gateway typically indicates an ability to route an Internet datagram to another router or machine. Machines intended to run applications are generally referred to using networking terminology as "hosts" or "host machines;" for purposes herein, a router/gateway may be a function of a host machine or may be a separate device.

[0005]    In the Internet environment, the various networks and devices communicate using standard network protocols and models, such as TCP/IP (or UDP/IP). Although for the purpose of this document, the reader is presumed to be familiar with networking concepts, protocols, and standards, a brief summary is provided herein for ease. Extensive background information of internetworking, internets, the Internet, and related terms and background technology can be found in Tanenbaum, A., *Computer Networks*, Prentice-Hall, N.J., 3d ed. 1996, and in Comer, D., *Internetworking with TCP/IP, Principles, Protocols, and Architectures*, Prentice Hall, N.J., 4th ed. 2000, which are herein incorporated by reference in their entirety.

[0006]    TCP/IP and UDP/IP (or often referred to as "UDP") refer to a popular transport layer and network layer protocol combinations, which are commonly found in internetworking environments (other protocols are available at each of these layers as well). The "IP" in TCP/IP, refers to "Internet Protocol," and is a network layer protocol that defines how data is organized and represented (the format and meaning of datagrams) and the communications transactions used to route them. TCP ("Transmission Control Protocol") and UDP ("User Datagram Protocol"), which are both transport layer protocols that can be implemented on top of an IP protocol, support connection-based and connectionless data transfer, respectively. Connection-based data transfer implies that a source and destination device request a connection and then send data to each other over the "virtual" connection in a manner that is sequenced (and typically involves handshaking mechanisms). The term "virtual" here implies that, although the connection is not necessarily hard-wired, the connection appears to provide a direct conduit between a source (requestor) and destination (receiver). The data actually flows through lower protocol layers to be eventually transmitted over a physical transmission medium. Connection-less data transfer implies that the source sends a datagram to the destination, but doesn't insure delivery or that data will arrive in a particular order.

[0007]    The IP protocol also defines a uniform network addressing mechanism, so that machines that implement protocols that use IP, such as TCP or UDP, are able to specify sources and destinations for their data transfers. The network addressing mechanism specifies an abstract address and a binding protocol for mapping the abstract address to a physical hardware address. For purposes of this description, the uniform network addressing mechanism will be referred to generically as an "IP address." IP addresses are often written in "dotted decimal" notation, which specifies an address as "w.x.y.z" (e.g., in a 32-bit address, each letter designates a byte of information). For example, an IP address such as "192.251.0.1" may specify a host machine at network "192," subnet "251," and domain "0." Using IP, typically a range of addresses are reserved for private network use and the remaining IP addresses are either reserved for other uses or for public (routable) addresses, which are assigned by an authority organization. Multiple private networks may assign the same (non-routable) IP addresses internally (currently the Internet Corporation for Assigned Names and Numbers, ICANN), but use unique public IP addresses to connect to the Internet. For example, in Class B networks (which, using class-based addressing conventions, allow up to 254 host machines each), private addresses may range from 192.168.0.0 to 192.168.255.0. Addressing conventions are well known to one skilled in the art and are presumed known to the reader. For purposes of this application, an IP address is understood to be whatever address makes sense (and is defined) in a particular internetworking environment, although examples which use Internet IP addressing may be referred to.

[0008]    A network that supports IP can be connected to another TCP/IP-based or UDP/IP-based internet or the Internet, by providing a router which forwards data to another router or host machine based upon an IP address. The router (or routing server/service) typically contains a routing table, which determines to which machine (and optionally to which port) to send a datagram, given a destination IP address. The IP address uniquely identifies a router/host machine, and, in a typical TCP/IP network, can be mapped to a string name that identifies, for example, a particular

US 2003/0028671 A1

Feb. 6, 2003

2

machine as part of a larger domain. (Although referred to herein often as a TCP/IP-based network, one skilled in the art will recognize that the network may also be UDP-based (connectionless), and may support another session management system.)

[0009] In a typical TCP/IP (inter)network, machines are organized according to a naming hierarchy. One such hierarchy is the Domain Name System ("DNS"), which specifies how a particular machine is connected to others. (The term DNS is sometimes used also to identify a server or service that implements the DNS protocol.) For example, the string "initials_machine.4thpass.service_provider.com," may be used to specify a machine belonging to you and connected to the 4thpass company LAN, which is in turn connected to a service_provider's WAN (wide area network). TCP/IP and UDP/IP define tools/libraries for client systems to use to determine an IP address (a logical address on an internet) given a string name of a particular router/machine. One such tool is referred to as a DNS query and includes, for example, an API called "GetHostByName." GetHostByName returns an IP address given a string. A server machine that implement the DNS standard for a particular organization, network, or subnetwork is referred to herein simply as a DNS, although DNS services may be provided in conjunction with other networking services on a single physical machine.

[0010] FIG. 1 is an example block diagram of basic Internet or internet communication to send a data packet using TCP/IP or UDP/IP. In FIG. 1, a host machine 101 is shown connected to the Internet 110 via wire 102. Other wired devices, such as host machines 140 and 141, are shown connected to a private (or public) network 130, which could be, for example, a local area network (LAN). The devices on network 130 communicate over the Internet 110 by means of an additional machine, a router 121, which is shown connected via a wire (e.g., a phone line). A DNS server 120 is shown, also connected via a wire, to Internet 110. In basic typical operation source device (host machine) 101, intending to send a data packet to device 140 (via TCP or UDP), first performs a DNS query to obtain an IP address that corresponds to a string name that represents the device 140. For example, to send data to "initials_machine.4thpass.service_provider.com," DNS 120, may correspond to a DNS server for "4thpass.com." This server knows how to locate machines in its "domain," for example, the "initials_machine", and can retrieve their corresponding public IP addresses. Upon determining the correct (public) IP address, the DNS 120 returns this address to the source device 101. The source device 101 then can either open up a TCP connection to communicate with the destination device 140 or simply send packets via UDP or other connection-less protocol using the returned public IP address.

BRIEF SUMMARY OF THE INVENTION

[0011] Embodiments of the present invention provide computer- and network-based methods and systems for two-way initiated, bi-directional communication with wireless devices using connection-based or connection-less protocols, such as, for example, TCP/IP and UDP/IP. Example embodiments provide an Address Management Proxy System ("AMPS"), which enables devices and systems connected to a public internetwork, such as the Internet, to initiate communication with and send data to wireless devices connected to a private wireless network, without exposing the non-routable private addresses of these wireless devices. The AMPS allocates a public (routable) network address for temporary use by a requesting device on an external public network to communicate with a wireless device on a private wireless network. In one embodiment, a pool of public addresses, for example, public IP addresses, is maintained by the AMPS and allocated dynamically to wireless network devices as required. The mapping of a temporary public address to the private address of a wireless device is maintained and updated transparently by the AMPS using routing tables and other mapping data structures.

[0012] In one embodiment, the AMPS comprises one or more modified DNS/API servers, one or more Address Proxy/Routers, an Address Management Data Server, one or more Address Management Data Repositories, and optionally a load balancer. The AMPS DNS'/API server receives a request from a device on a public network for a particular wireless device, and returns an appropriate temporary public address, which is internally mapped to the private address of the wireless device. The public address is then usable by the device on the external public network to send data to the wireless device. The temporary public address is, for example, an address associated with one of the Address Proxy/Routers, which are connected to the external public network and have access to the private addresses on the private wireless network. In some cases, the device on the public network that desires to send data to the wireless device uses a connection-based protocol, such as TCP/IP to send data. In other cases the device uses a connection-less protocol, such as UDP (UDP/IP) to send the data.

[0013] According to one approach, the AMPS provides a modified DNS server that changes what is returned as a result of a call to a standard DNS query function, such as GetHostByName. In another approach, the AMPS implements a specialized API for a device on a public network to use to query for a public address of a designated wireless device. Using a specialized API implementation in conjunction with Internet Protocol, the AMPS can map private address to addresses that comprise only IP addresses, or can map to an (IP address, port) pair. This latter implementation can extend the usefulness of a particular public address space.

[0014] The AMPS techniques can be used by a wired device on a private or public network and by a wireless device on such a network acting in a capacity of a source device, as long as the device is connected to a public network that can address and be addressed by the AMPS. Thus, the AMPS mechanisms can be used by devices on different private wireless networks to communicate with one another. In addition, the AMPS mechanisms can be used with other internetworks, such as ATM networks and with data transfer protocols other than TCIP/IP or UDP.

[0015] To insure a greater degree of security, according to one embodiment, the AMPS maintains a Time to Live (TTL) parameter with each address mapping. In this way, once the TTL value indicates that the mapping has expired, the AMPS can destroy the mapping, and also any connection. Further, in some embodiments, the AMPS also puts a timestamp in its own mapping tables. After some timeout

US 2003/0028671 A1

Feb. 6, 2003

3

period based upon the timestamp, the AMPS can destroy the mapping, thereby forcing a new mapping to be initiated on a periodic basis.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0016] FIG. 1 is an example block diagram of basic Internet or internet communication to send a data packet using TCP/IP or UDP/IP.

[0017] FIG. 2 is a block diagram of an example Address Management Proxy System used in bi-directional communication with a wireless device.

[0018] FIG. 3 is an example block diagram of components of an example Address Management Proxy System.

[0019] FIG. 4 is an example block diagram of a general purpose computer system for practicing embodiments of the Address Management Proxy System.

[0020] FIG. 5 is an example flow diagram of the process performed by a device on a public network to send data to a wireless device located on a private wireless network using the Address Management Proxy System.

[0021] FIG. 6 is an example block diagram of some of the Address Management Proxy System data repository tables used to support routines of the DNS'/API servers and the Address Proxy/Routers.

[0022] FIG. 7 is an example flow diagram of an example routine provided by a DNS'/API server of the Address Management Proxy System to return a public address that corresponds to a designated unique identifier.

[0023] FIG. 8 is an example flow diagram of an example routine within an Address Proxy/Router of an example Address Management Proxy System that receives data.

## DETAILED DESCRIPTION OF THE INVENTION

[0024] Embodiments of the present invention provide computer- and network-based methods and systems for two-way initiated, bi-directional communication with wireless devices using connection-based or connection-less protocols, such as, for example, TCP/IP and UDP/IP. Example embodiments provide an Address Management Proxy System ("AMPS"), which enables devices and systems connected to a public internet, such as the Internet, to initiate communication with and to send data to wireless devices connected to a private wireless network, without exposing the non-routable private addresses of these wireless devices.

[0025] In existing systems, data communication (communication on a data channel) between a wireless device that is connected to a private wireless network and a wired device connected to a public wired network (e.g., the Internet) can only be initiated by the wireless device. Some carriers have assigned fixed public IP addresses to wireless devices; however, the wireless devices need to then have client programs (e.g., a UDP stack) capability of receiving and handling the incoming communication packets. Moreover, these wireless devices are then part of a public wireless network and not a private wireless network. Since public IP addresses are becoming a scarcer commodity and currently expensive to service a network of multi-million devices, carriers cannot in a practical sense count on having a fixed

public IP address for each device on its network. (Although movement to IPv6 will allow more addresses, the current IPv4 definitions are limited and the potential number of wireless users subscribing to larger carriers is very high. In some regions of the world, the current public address scheme is even more limited.) Further, such addressing capability would expose each device to further security risks, because each such device is part of a publicly accessible network and it becomes more difficult to implement and enforce security measures. Thus, assigning private IP addresses to devices is preferred in existing wireless networks over assigning fixed public IP addresses to devices. When wireless networks are private, the locations (addresses) of the wireless devices are intentionally hidden from public view by a carrier system's (or, as referred to in some countries, operator's) infrastructure.

[0026] Wireless systems on private networks use techniques similar to Network Address Translation (NAT) technology to send data from a wireless device to the public networking world. In a typical carrier infrastructure that uses a private network, a wireless device "registers" itself with the carrier infrastructure when it powers on (or in other circumstances, when the device attempts to initiate data services). The carrier dynamically assigns the wireless device a private non-routable address by means of DHCP (or DHCP-like) server. The information on the mapping of the transient private IP address to the device public IP address is stored in an internal carrier database and managed by carrier services such as a RADIUS server.

[0027] The actual path taken by data when sent from a wireless device on a private network to the internet (or vice versa) is very much network infrastructure, carrier technology dependent, and proprietary. Although several standards have emerged, they are very diverse in nature. In a GPRS network, for example, a SGSN (Service GPRS node) manages the communication with wireless devices; whereas the SGSN connects to a GGSN (Gateway GPRS Node) to connect to the Internet network. Regardless of the mobile network used, data communication between a wireless device and internet involves various network elements like GGSN (or similar elements, based on GPRS, GSM, CDMA or any other network), DNS servers, routers and gateways.

[0028] Limited facilities exist for sending short sequence messages from a wired device on a public network to a mobile device on a wireless network (with a private address), again dependent upon carrier and network technology. SMS (Short Message System) protocol defines a format for such messages, but doesn't provide any guidance for underlying structure or data transfer. In addition, such messages are of a fixed (very short) length and use a specialized channel for sending control information (a signaling channel), not a data channel.

[0029] Therefore, there is no existing mechanism for setting up a bi-directional communication channel to communicate with wireless devices that are connected via a private network to the carrier infrastructure using a standard addressing scheme. Nor, is there any mechanism for initiating the communication with such a wireless device from a device connected to a public network. Thus, embodiments of existing systems are not able to support any kind of programmatic "push" of data to wireless devices from wired devices that reside external to a carrier's infrastructure. In

US 2003/0028671 A1

Feb. 6, 2003

4

addition, messages sent from the wireless device to a device on a public (wired) network cannot be directly responded to by the wired device, because the address of the wireless device contained in the message may no longer be valid. Moreover, it is not possible using these systems to provide over-the-air provisioning of applications and to send other code to a wireless device from a device external to the carrier infrastructure. Over-the-air provisioning and related techniques for dynamic provisioning and downloading applications to wireless devices are discussed in detail in U.S. application Ser. No. 09/997,402, entitled "Method and System for Maintaining and Distributing Wireless Applications, filed on Nov. 28, 2001. Thus, a mechanism for allowing an external device with a public IP address to initiate bi-directional communication with a wireless device is highly desirable.

[0030] The Address Management Proxy System achieves two way initiated bi-directional communication by implementing a modified DNS server and serving as a proxy/router for devices on the private wireless network as they interface to the public wired internetworking world. In summary, a pool of public addresses is maintained and dynamically distributed among active wireless devices as needed by the AMPS. FIG. 2 is a block diagram of an example Address Management Proxy System used in bi-directional communication with a wireless device. The term "bi-directional" as used herein means that data paths and communication can flow in either direction between two endpoint systems. FIG. 2 shows wired devices 201, 202, and 203 connected to public network 210. One skilled in the art will recognize that these devices could be connected to another private or public network, which is then connected by one or more wired devices to the public network 210, yet still achieve the functionality discussed here. Any such variation provides equivalent functionality and is explicitly contemplated and presumed to be part of the present invention. On the wireless side, the AMPS 220, acting in its capacity as a proxy (and router) for wireless devices, is shown both connected via wire to the public network 210 and via standard carrier infrastructure elements (not shown) to the wireless network 230. It is presumed that the reader has a working knowledge of the elements of a carrier's infrastructure and the basic mechanisms for routing and mechanisms converting packets from a wired network to a wireless network. These may use analog or digital technology and may require protocol conversions in order to send the physical data and transmit it, for example through a satellite, ultimately to the wireless device. Detailed background information on wireless technology and wireless routing mechanisms is described in Stallings, W., *Wireless Communications and Networks*, Prentice Hall, N.J., 2002, which is herein incorporated by reference in its entirety. In FIG. 2, wireless device 240 is shown connected via various wireless elements (not shown) to the wireless network 230.

[0031] In operation, when a wired device such as wired device 201, desires to send data to wireless device 240, the wired device needs first to determine a routable address location of the wireless device 240 on the public network 210. However, as can be observed from FIG. 2, the wireless device 240 is not directly connected to the public network 210. Thus, the wired device must use the Address Management Proxy System 220 to determine a routable (public) address to which to send the data destined for the wireless device 240. To accomplish this task, the wired device 201

performs a query (for example, a modified DNS query) to locate a routable public address that corresponds to wireless device 240. The Address Management Proxy System 220 receives the query and determines and assigns a public (routable) address from a pool of addresses, which address can be used as a destination address for data packets targeted to wireless device 240. One should note that, although shown here as a DNA query, the Address Management Proxy System, as will be described further, modifies the DNS query implementation to handle wireless device technology, and/or provides an alternative API for determining a suitable routable address. Once the Address Management Proxy System 220 has returned a routable address to wired device 201, the wired device 201 can send data to that address. The Address Management Proxy System 220 receives the data, converts formats and protocols, etc., as needed, and sends the converted data through the wireless network 230 to the wireless device 240.

[0032] FIG. 3 is an example block diagram of components of an example Address Management Proxy System. In one embodiment, the Address Management Proxy System (AMPS) comprises one or more modified DNS'/API servers 302, one or more Address Proxy/Routers 305, an Address Management Data Server 303 which manages a database or other repositories such as Address Management Data Repository 304, and optionally a load balancer 301. The DNS'/API servers 302 are either individually connected to a public network 310 or are connected to the load balancer 301 which is in turn connected to public network 310. Similarly, each Address Proxy/Router 305 is also connected to the public network 310, via the routable (public) address to which data from the external network 310 is sent that is destined for the wireless devices. The DNS'/API servers 302 are either modified implementations of a DNS server to add functionality necessary to communicate with wireless devices, or are servers that implement one or more specialized APIs, as will be described further below. The DNS'/API servers 302 use the Address Management Data Server 303 to assist in mapping a unique identifier (e.g., string name) for a wireless device to a public address on public network 310. The pool of public addresses is also maintained by the Address Management Data Serve 303 and Data Repository 304. The Address Management Data server 303 and Address Management Data Repository 304 may be implemented using existing database technology, for example, ODBC technology or, may be implemented as a structure such as a simple text file. One skilled in the art will recognize that any embodiment for storing a set of tables, data, lists, or mappings can be used. Each Address Proxy/Router 305 also uses the Address Management Data Server 303 or equivalent to create and update a series of routing tables that are used to assign public addresses to wireless devices as needed and to update the various mappings between public addresses and the non-routable (private) addresses of the wireless devices. The tables and mappings that are maintained on behalf of the DNS'/API servers 302 and the Address Proxy/Routers 305 by the Address Management Data Server 303 are described below with reference to FIG. 6.

[0033] Although the techniques of the AMPS are generally applicable to any a wired device communicating with a wireless device, the phrase "public network" (or "wired network") is used generally to imply any type of internetworked environment including a public network or a backbone that is somewhere down the line connected to one or

US 2003/0028671 A1

Feb. 6, 2003

5

more private or public networks. In addition, although the examples described herein often refer to the Internet, one skilled in the art will recognize that the concepts and inventions described are applicable to other forms and embodiments of internetworking, including, for example ATM type networks. Thus, techniques of the present invention can also be used by one device on a first wireless network to communicate with another wireless device on a second network—each device ends up communicating with the Address Proxy/Router of the other network. This scenario is feasible because each wireless network (or its carrier infrastructure) is connected to a proxy/router that is also connected (via a public address) to a public network. In addition, although a public network is sometimes also referred to herein as a wired network, one skilled in the art will recognize that any network that exposes routable (public) addresses may be implied. Thus, a wireless network with unique public (and routable) address can also employ techniques of the present invention to perform bi-directional communication. Also, one skilled in the art will recognize that terms such as wireless device, phone, handheld, etc., are used interchangeably to indicate any type of wireless device that is capable of operating with the AMPS. In addition, terms may have alternate spellings which may or may not be explicitly mentioned, and one skilled in the art will recognize that all such variations of terms are intended to be included.

[0034] Example embodiments described herein provide applications, tools, data structures and other support to implement private to public address mappings over one or more wired and wireless networks to be used for bi-directional communication. One skilled in the art will recognize that other embodiments of the methods and systems of the present invention may be used for many other purposes, including to push information and/or data or code from a public network such as the Internet to a wireless device. In addition, although this description primarily refers to "data" as being sent via the networks, one skilled in the art will recognize that all types of data can be communicated using the techniques described herein including, but not limited to, text, graphics, audio, and video.

[0035] Also, in the following description, numerous specific details are set forth, such as data formats and code sequences, etc., in order to provide a thorough understanding of the techniques of the methods and systems of the present invention. One skilled in the art will recognize, however, that the present invention also can be practiced without some of the specific details described herein, or with other specific details, such as changes with respect to the ordering of the code flow.

[0036] FIG. 4 is an example block diagram of a general purpose computer system for practicing embodiments of the Address Management Proxy System. The general purpose computer system 400 may comprise one or more server and/or client computing systems and may span distributed locations. In addition, each block may represent one or more such blocks as appropriate to a specific embodiment or may be combined with other blocks. The various blocks of the Address Management Proxy System 410 may physically reside on one or more machines, which use standard interprocess communication mechanisms to communicate with each other. In the embodiment shown, computer system 400 comprises a computer memory ("memory") 01, a display

402, a Central Processing Unit ("CPU") 403, and Input/Output devices 404. The Address Management Proxy System 410 is shown residing in memory 401. The components of the Address Management Proxy System 410 preferably execute on CPU 403 and manage the address mapping of wireless devices on a wireless network, as described in previous figures, to allow other wired systems to communicate with the wireless devices. Other downloaded code 405 and potentially other data repositories also reside in the memory 410, and preferably execute on one or more CPU's 403. In a typical embodiment, the AMPS 410 includes one or more DNS'/API servers 411, one or more Address Proxy/Routers 412, an Address Management Data Server 413, and Address Management Data Repositories 414. As described earlier, the AMPS may include other data repositories and components, such as a load balancer, depending upon the particular implementation.

[0037] In an example embodiment, components of the AMPS 410 are implemented by modifying existing UDP-based technology, such as DNS servers and routers, which are typically implemented on Linux/Unix systems written in the C programming language. Programming interfaces to the DNS'/API servers 411 and Address Proxy/Routers 412 can be available by standard means such as through C, C++, C#, and Java API and through scripting languages such as XML, or through web servers supporting such. The Address Management Data Server 413 and Address Management Data Repositories 414 are preferably implemented for scalability reasons as a database system rather than as a text file and may be implemented using a SQL/ODBC database management system. The DNS'/API servers 411 and Address Proxy/Routers 412 are typically implemented using Linux, UNIX, or other Unix-based or Unix-like machines.

[0038] One skilled in the art will recognize that the AMPS 410 may be implemented in a distributed environment that is comprised of multiple, even heterogeneous, computer systems and networks. For example, in one embodiment, the DNS'/API servers 411, the Address Proxy/Router components 412, and the Address Management Data Servers 413 with their data repositories 414 are all located in physically different computer systems. In another embodiment, various components of the AMPS 410 are hosted each on a separate server machine and may be remotely located from the tables which are stored in the address management data repository 414. In addition, under some scenarios, the entire AMPS system 410 may be hosted within a carrier's infrastructure and be completely subsumed by it. Different configurations and locations of programs and data are contemplated for use with techniques of the present invention. In example embodiments, these components may execute concurrently and asynchronously; thus the components may communicate using well-known message passing techniques. One skilled in the art will recognize that equivalent synchronous embodiments are also supported by an AMPS implementation. Also, other steps could be implemented for each routine, and in different orders, and in different routines, yet still achieve the functions of the AMPS.

[0039] There are several implementation approaches to the components of the Address Management Proxy System, three of which are described herein. One skilled in the art will recognize that various other approaches and combinations are possible. All three approaches allocate a public (routable) network address for temporary use by a wired

US 2003/0028671 A1

Feb. 6, 2003

6

device to communicate with a wireless device. In one embodiment, a pool of public addresses, for example, public IP addresses, is maintained and allocated dynamically to wireless network devices as required. For example, a typical Class B Internet network address block allows for approximately 65,000 simultaneous connections to wireless devices. Although this number may seem large at first blush, when one considers the number of cell phones and handsets, for example, connected to a carrier, this number can be quite limiting.

[0040] The first approach provides a public address mapping for a wireless device and makes it available using a UDP protocol. This is a store and forward type of approach. One advantage of this approach is that it facilitates UDP-based traffic to wireless devices over a wireless connection and allows a device connected to the public side of the connection to initiate the connection. A disadvantage, however, is that either the standard UDP protocol requires modification or an extra API call is added so that the requesting device can identify the destined wireless device. These modifications are necessary because the UDP protocol only supports the designation of an IP address and does not provide for an alternative means of uniquely identifying a device (such as a string similar to the TCP/IP protocol). Since it is desirable to hide this (private) address, the standard UDP call to send data does not suffice.

[0041] The second approach used to implement the AMPS supports full bi-directional communication through point-to-point connections established, for example, using TCP/IP protocol. (Note that these same techniques also support connection-less UDP bi-directional communication). The second approach can be implemented by providing a modified implementation of a standard UDP or TCP/IP function, "GetHostByName." The GetHostByName API allows a string designation to identify the designated device and returns an IP address data structure. Alternatively, to increase the level of security provided, the AMPS can implement a specialized API to return the dynamically allocated public address that (now) corresponds to the requested wireless device. A disadvantage of the specialized API approach is that the device on the public network (or other device that wishes to obtain a connection to the wireless device) needs to include specialized code in the application on the requesting device.

[0042] The third approach is similar to the second approach, but provides for greater potential simultaneous connections using a "port" concept. Using this approach, instead of returning just a host address on the wired network that corresponds to the wireless device (a public address of an Address Proxy/Router), the AMPS also returns a particular port designation on the host machine (the Address Proxy/Router). Ports and their implementation are well known in the art and, in general, correspond to queues implemented by the machine that receives the data to track messages destined for different locations. The machines that receive the data forward messages to the different destinations based upon the port designations in the message and handle, where necessary, sequencing and handshaking on a by-port basis.

[0043] Ports are typically used to open multiple virtual channels on a single physical address and potentially extend a single physical address to another approximately 65,000

connections. This enables an AMPS to use Class C IP addresses, for example, which are typically much cheaper and more readily available than the other types of addresses, to achieve approximately 16 million simultaneous connections to wireless devices (using a UNIX-based system). One skilled in the art will recognize that the number of ports available and their particular implementation is operating system dependent and directly correlates to the number of bits used to specify a port address.

[0044] The UDP (as well as TCP/IP) protocol currently supports a port abstraction; however, the standard DNS query used with UDP and TCP/IP systems (e.g., GetHostByName) does not allow for the returning of a port designation and leaves control of the port designation up to the requesting device instead of the receiving router. Thus, according to the third approach to implementing the AMPS, ports are specified preferably by the Address Proxy/Router using a specialized API and returned to the requesting device with the host machine designation.

[0045] In one embodiment, a scripting language interface, such as XML, can be used instead of a specialized API (code interface) to interface to a specialized address mapping function. When using XML, the DNS'/API server accepts API calls as XML post events and returns XML formatted responses. Similar support for invoking this mapping function using other language models and/or other programming languages is also contemplated and will operate with techniques of the present invention. An XML type interface minimizes the cost to a requesting device of integrating an API into its software.

[0046] In addition, when using a specialized API, the requesting device can push additional data to the private wireless device with no further coding effort required. For example, billing code orienting to billing the wireless device for the type of connection being established with the wired device can be pushed to the wireless device using this technique. An example billing code mechanism is discussed in U.S. patent application Ser. No. 10/085,981, entitled "Method and System for Transmission-Based Billing of Applications," filed on Feb. 26, 2002.

[0047] There are several security related reasons that also may indicate a desire to use a specialized API rather than the standard GetHostByName API of UDP and TCP/IP. These security reasons may indicate a desire to use the port-based mechanism which also requires a specialized API. First, any bi-directional communication that uses the "GetHostByName" API and router protocol is susceptible to denial of service (DOS) attacks associated with that host name. DOS attacks can occur as a result of one or more machines specifying the same GetHostByName with the same input parameter simultaneously so as to close out the possibility of enough public addresses (of proxy/router machine addresses) being available. Second, use of the GetHostByName (or any other standard) API also makes the AMPS susceptible to security attacks as a result of DNS zone transfer. DNS zone transfer occurs, for example, when one DNS transfers a DNS query to one or more other DNS servers in order to find a requested host name. One typical scenario involves multiple DNS hops from country to country. The idea of DNS zone server attacks is to capture information on a particular DNS server by inserting malicious code as a malicious DNS server and impersonate the

US 2003/0028671 A1

Feb. 6, 2003

7

destination address. Third, inattentiveness to the duration of a connection can make data available to unauthorized requesting devices. Specifically, since a mapping is established between the public device and a wireless device, the public device may assume the mapping to exist longer than it really does and potentially end up (maliciously or not) communicating with the wrong device. This could occur because some DNS server implementations ignore Time to Live settings. Having a modified DNS server implementation, whether or not it implements the standard GetHostByName API, or a specialized API, avoids this problem by abiding by the TTL characteristics of the established mapping between the private and the public addresses.

[0048] FIGS. 5-8 describe various example embodiments of the specific routines implemented by the DNS'/API servers and the Address Proxy/Routers to achieve the functionality described with reference to FIGS. 2 and 3. FIG. 5 is an example flow diagram of the process performed by a device on a public network to send data to a wireless device located on a private wireless network using the Address Management Proxy System. In step 501, the source (e.g., wired) device requests a public (routable) address for the designated wireless device from the AMPS. As described above, one mechanism for retrieving such an address is for the AMPS to implement a modified interface for DNS services, such as a modified GetHostByName routine. For example, a GetHostByName routine may be invoked to specify a unique wireless device designation, in a string form. The string "personname.phone.wsp.com" is an example string that indicates a wireless device that corresponds to a person by the name of "person," with a phone number of "phone," located at a wireless service provider's website (DNS) that is abbreviated "wsp.com." (For example, susan.ph2065551212.sprint.com may refer to a person, Susan, with phone number 206 555 1212, on a sprint network.) Another mechanism that may be implemented by the AMPS is to provide a separate (specialized) API, such as "GetProxyIP" which returns an indication of a public (routable) address that corresponds to the designated wireless device. Using a separate API is useful for security reasons; for example, it becomes more difficult for a rogue device to intercept the routable address by spoofing. Another reason is to control the actual format of the address information returned, such as to be able to provide a port designation in addition to a host address of the Address Proxy/Router. The implementation of either GetHostByName, or a specialized API such as GetProxyIP, is discussed further below with respect to FIG. 7.

[0049] In step 502, once the public address for the wireless device has been returned by the AMPS, the source device extracts from the indicated address information an actual address location (IPdata.ip), a Time to Live parameter (IPdata.TTL), and optionally, where applicable, a port designation (IPdata.port) for example, when the standard GetHostByName API is not used. In step 503, when the source device desires to perform connection-based communication with the wireless device, it opens a connection, such as a socket. In step 504, the wired device determines whether the Time to Live parameter specifies that the returned public address of the wireless device has expired, and, if so, returns to step 501 to request a different address, else continues in step 505. The Time to Live parameter is used by the AMPS to ensure that a public address for a wireless device (which may or may not be always connected to the wireless network

and powered on) does not extend past a period of usefulness for that wireless device. In some embodiments, a very short TTL parameter is used, to prevent security breaches in which a wired device is able to monitor activity on a particular public address and then use that address for other purposes. In step 505, the wired device sends a data packet (via the connection or not) to the wireless device. It is presumed, but not shown, that the wired device and the wireless device communicate using the standard calls specified in the transfer protocol being used, for example UDP or TCP/IP. In step 506, if the data transaction is complete, then the wired device is done, else it returns to check the TTL parameter in step 504 in order to send more data.

[0050] Table 1 below contains pseudocode that describes one example implementation of how a public (requester) device can use a modified GetHostByName query as described in FIG. 5 to obtain a public address that corresponds to a user identified by the phone number "2065551212" using the Address Management Proxy System. From the public device's perspective, standard UDP and TCP/IP calls are invoked in a standard manner.

TABLE I

```
InetAddress ip =
InetAddress.GetHostByName("2065551212.fourthDNs.att.com");
byte [] data;
int destPort = 80;
// data buffer filled by some internal routine say
// populateDataBuffer(), which in turn uses setData() Java
API.
int datasize = populateDataBuffer(data);
DatagramSocket socket = new DatagramSocket(destPort, ip);
// Now send some data . . .
DatagramPacket packet = new DatagramPacket (data,
datasize);
socket.send (packet);
```

[0051] Table 2 below contains pseudocode that describes an example implementation of the specialized API mechanism described in FIG. 5 as used by a public (requester) device to obtain a public address of the user identified by the same phone number. In Table 2, the public device calls a specialized API, GetProxyIP, to get a data structure that contains the needed information including the assigned public address of the Address Proxy/Server. Thereafter, the public device can use the same techniques (standard UDP or TCP/IP protocol) to send the data.

TABLE 2

```
public class IPInfo
{
    private String _publicIPAddress;
    private int _publicPort, _TTL;
    public String getPublicIPAddress()  {
        return _publicIPAddress;
    }
    public int getPublicPort()  {
        return _publicPort;
    }
    public int getTTL()
    {
        return _TTL;
    }
}
int destPort = 80;
IPInfo ipi = GetProxyIP("2065551212.fourthDNS.att.com",
```

US 2003/0028671 A1

8

Feb. 6, 2003

TABLE 2-continued

```
destPort);
// Return value of ipi.getPublicIPAddress() in format
x.y.z.q
// For example: 142.432.14.2
InetAddress ip =
InetAddress.getByName (ipi.getPublicIPAddress ());
byte [] data;
// data buffer filled by some internal routine say
// populateDataBuffer(), which in turn uses setData()
Java API.
int datasize = populateDataBuffer(data);
DatagramSocket socket =
    new DatagramSocket (destPort, ipi.getPublicPort ());
// Now send some data. . .
DatagramPacket packet = new DatagramPacket (data,
datasize);
socket.send (packet)
```

[0052]   FIG. 6 is an example block diagram of some of the Address Management Proxy System data repository tables used to support routines of the DNS'/API servers and the Address Proxy/Routers. In one embodiment, the Address Management Data Repository comprises three tables: a unique identifier (unique ID) to private address table 610, a public-to-private address table 630, and a public address to proxy/router machine table 620. Although three tables are shown, one skilled in the art will recognize that these tables could contain other data and may be organized differently, including a different number of tables and with different columns or fields. In addition, any technique for storing a table or list of data may be used. To support embodiments that map a host address plus a port designator to a wireless device, the tables are correspondingly modified.

[0053]   The unique ID table 610 maps unique string names of wireless devices to the private wireless network addresses that have been assigned typically by a carrier's infrastructure. In some embodiments, the carrier infrastructure dynamically allocates, using methods similar to a DHCP protocol, a private wireless network address when the wireless device registers itself with the carrier infrastructure upon being powered on. Thus, the unique ID table 610 may be sparsely filled or entries created dynamically and then deleted dynamically as devices register and unregister with the carrier infrastructure system.

[0054]   The public-to-private address table 630 comprises several fields/columns including a public network address 631, a private (wireless) network address 602, a flag 632 that specifies whether the public address stored in field 631 is free or is already used, a Time to Live (TTL) parameter 633, and other connection data 634. In one embodiment, the DNS'/API servers of the AMPS query table 630 to determine a public network address that corresponds to a designated private wireless network address or to allocate an unused public network address (as indicated in field 632) and map the determined unused public address to a private network address stored in field 602.

[0055]   Public address to proxy/router machine table 620 comprises a public network address field 631 and an indication of a functioning proxy/router machine 621. By maintaining such a mapping, the AMPS is able to substitute proxy/router machines for other proxy/router machines to provide a higher degree of robustness. Each proxy/router

machine has a preconfigured set of public network addresses, such as are typically configured by network cards inserted into the proxy/router machine. These address are allocated in a standard fashion through prior purchase or obtaining from an address authorizing authority, currently the Internet Corporation for Assigned Names and Numbers (ICANN). When a machine is inserted for use into the AMPS, indications of these addresses are stored in field 631.

[0056]   In one embodiment, a timestamp of the mapping between a public network address and a private address is also noted in table 630. After a defined time out, based upon this timestamp, the Address Management Data Server sends a request to the Address Proxy/Router associated with the mapping to unmap the public-to-private address mapping and updates the mapping table 630, thereby returning the associated public address to the pool of unused public network addresses.

[0057]   FIG. 7 is an example flow diagram of an example routine provided by a DNS'/API server of the Address Management Proxy System to return a public address that corresponds to a designated unique identifier. In essence, this routine implements a DNS query or DNS-like query capability for the AMPS using a modified GetHostByName interface or a specialized API, for example GetProxyIP, as described with reference to FIG. 5. In summary, the routine dynamically allocates an appropriate Address Proxy/Router machine to associate with the wireless device and returns the public address of that machine (along with a TTL parameter and potentially other parameters). Specifically, in step 701, the routine determines the private (non-routable) address of the wireless device designated by a string parameter passed as input to the routine. For example, the string parameter may use fields such as "uniqueID.hostname.domain.tld," which specifies a typical hierarchy of person/service on a machine named "hostname" on a domain such as a company's network on a top level domain such as "org.""com, ""edu," etc. One skilled in the art will recognize that many other string parameter designations could be used. One mechanism for implementing this routine is to request information from the Address Management Data Repository. In one embodiment, the data repository stores a table that maps unique IDs to private network addresses (see Table 610 in FIG. 6). Preferably, any mechanism that is used by the AMPS stores this data in a secure manner in order to keep the wireless network addresses private. In step 702, the routine retrieves the public network address that corresponds to the private wireless network address of the designated device if one has already been assigned by the AMPS to that device and is still valid. In one embodiment, the data repository stores this mapping information between private wireless network address and public network address (see for example table 630 in FIG. 6). If a public network address has not already been assigned or is not valid, then the routine causes a new public network address to be allocated and that new public address is associated with the private wireless network address. Appropriate tables in the data repository are then updated. In step 703, the routine determines the Address Proxy/Router machine that is associated with the assigned public network address (for example using table 620 in FIG. 6). In step 704, the routine sends a request to the determined proxy/router machine to update its routing tables to map the determined public network address to the private wireless network address. In step 705, the routine updates information in the data repository to include any other

US 2003/0028671 A1

9

Feb. 6, 2003

connection related information (e.g., field **634** in Table **630** in **FIG. 6**) and indicates a Time to Live (TTL) parameter for the public-private address association (e.g., field **633** in Table **630** in **FIG. 6**). Once all of the tables have been updated in both the proxy/router and in the data repository, the DNS'/API server returns the determined public network address of the associated Address Proxy/Router machine. As described earlier, the public address may be a (hostname, port) pair when a port-based implementation is used.

[0058] **FIG. 8** is an example flow diagram of an example routine within an Address Proxy/Router of an example Address Management Proxy System that receives data. This routine is implemented by an Address Proxy/Router to receive data from wired devices using the relevant protocol (e.g., TCP/IP, UDP/IP, etc.). (Data is sent to a particular Address Proxy/Router because the public (routable) address of that Address Proxy/Router was returned to the requesting/source device in response to a query of the DNS'/API server of the AMPS.) The proxy/router is responsible for any conversions of the data necessary to send data from the wired network to the wireless network (if, for example, the carrier infrastructure desires such conversion to be performed at this level). The proxy/router is also responsible for forwarding the data via the wireless network to the private wireless address of the wireless device that corresponds to the public address used to invoke the proxy/router.

[0059] Specifically, in step **801**, the routine determines (for example, from the Address Management Data Repository) the private wireless address that corresponds to the invoked public address and the TTL parameter associated with this mapping. These values can be obtained, for example, from the public-to-private address table **630** of **FIG. 6**. In step **802**, the routine determines whether the value of the determined TTL parameter indicates that the mapping has expired, and if so, returns an error, else continues in step **803**. In step **803**, the routine determines the format required by the target device (the wireless network format). In step **804**, the routine determines whether any protocol conversion is necessary and, if so, continues in step **805** else continues in step **806**. Note that protocol conversion for a specific wireless network such as converting the data to an "HTTP" packet may be done by the proxy/router or may be done by some other component within the carrier infrastructure. One skilled in the art will recognize that these are example steps and that different formatting or different protocol conversion routines may be added or omitted as specific to the environment. In step **806**, the Address Proxy/Router routine sends the data packet (which has been formatted and whose protocol is converted as necessary) to the determined associated private address of the wireless device, and returns.

[0060] All of the above U.S. patents, U.S. patent application publications, U.S. patent applications, foreign patents, foreign patent applications and non-patent publications referred to in this specification and/or listed in the Application Data Sheet, including but not limited to U.S. Provisional Patent Application No. 60/296,902, entitled "Method and System for Two-Way Initiated Data Communication with Wireless Devices," filed Jun. 8, 2001; U.S. patent application Ser. No. 09/997,402, entitled "Method and System for Maintaining and Distributing Wireless Applications," filed Nov. 28, 2001; and U.S. patent application Ser. No. 10/085, 981, entitled "Method and System for Transmission-Based

Billing of Applications," filed on Feb. 26, 2002 are incorporated herein by reference, in their entirety.

[0061] From the foregoing it will be appreciated that, although specific embodiments of the invention have been described herein for purposes of illustration, various modifications may be made without deviating from the spirit and scope of the invention. For example, one skilled in the art will recognize that the methods and systems for establishing bi-directional communication discussed herein are applicable to other types of public networks and protocols other than the Internet, TCP/IP, and UDP, or even a plurality of such networks. For example, private address to public address mappings can also be provided for ATM networks to connect devices on an ATM network with a wireless device. One skilled in the art will also recognize that the methods and systems discussed herein are applicable to differing protocols, communication media (optical, wireless, cable, etc.) and wireless devices (such as wireless handsets, electronic organizers, personal digital assistants, portable email machines, game machines, pagers, navigation devices such as GPS receivers, etc.) to different wired device (such as kiosks, personal computers, mainframes), and to wireless devices having a wired connection capabilities, e.g., wireless email or PDA devices that can be connected to a docking station for synchronization purposes.

1. A method in a computer network environment that is connected to a wireless communications network through an address management proxy system, the wireless communications network connected to a wireless device using a private network address of the wireless communications network, the wireless device having an associated unique identifier, the address management proxy system having a public network address of the computer network environment, and the computer network environment connected to a wired device using a public network address of the computer network environment, comprising:

under control of the wired device,

using the public network address of the address management proxy system, sending a request to the address management proxy system for an indication of a public network address of the computer network environment to use for communicating with the wireless device, the request indicating the unique identifier associated with the wireless device;

under control of the address management proxy system,

receiving the request for the indication of the public network address;

determining a public network address from a plurality of available public network addresses of computer network environment;

associating the determined public network address with the private network address of the wireless device that corresponds to the indicated unique identifier; and

forwarding an indication of the determined public network address to the wired device; and

under control of the wired device,

receiving the indicated public network address; and

US 2003/0028671 A1                                                Feb. 6, 2003

10

sending data to the wireless device using the indicated public network address, such that the wired device perceives that the wired device is communicating directly with the wireless device.

2. The method of claim 1, further comprising:

under control of the address management proxy system,

receiving the data sent from the wired device;

determining the private network address that is associated with the indicated public network address; and

routing the received data to the private network address over the wireless communication network in a manner that is transparent to the wired device.

3. The method of claim 1 wherein the computer network environment is the Internet and each public network address is specified in accordance with Internet Protocol (IP) addressing conventions.

4. The method of claim 1 wherein the computer network environment is an ATM network.

5. The method of claim 1 wherein the indicated public network address is the public network address of the address management proxy system, wherein data sent from the wired device indicates the unique identifier of the wireless device, and wherein the address management proxy system stores and forwards the data to the wireless device associated with the indicated unique identifier.

6. The method of claim 1 wherein the indicated public network address is received as a result of a call by the wired device to an address mapping function of the computer network environment.

7. The method of claim 6 wherein the address mapping function is a standard function of the computer network environment.

8. The method of claim 6 wherein the address mapping function is a GetHostByName function.

9. The method of claim 1 wherein the indicated public network address is received as a result of a call by the wired device to a function that returns a host system address and a port specification.

10. The method of claim 9 wherein the function is a customized API.

11. The method of claim 9 wherein the function supports an XML interface.

12. The method of claim 1, further comprising:

under control of the wireless device, sending data to the wired device using the public network address of the wired device, thereby performing bi-directional communication.

13. The method of claim 1 wherein a virtual end-to-end connection is established between the wired device and the wireless device.

14. The method of claim 1 wherein a connectionless communications path is established between the wired device and the wireless device.

15. A computer network environment comprising:

a wireless device connected to a wireless communications network using a private network address of the wireless communications network, the wireless device having an associated unique identifier;

a wired device connected to the computer network environment using a public network address of the computer network environment, that is structured to:

request an indication of a public network address of the computer network environment to use for communicating with the wireless device, the request indicating the unique identifier associated with the wireless device;

receive the indicated public network address, and,

send data to the wireless device using the indicated public network address, such that the wired device communicates directly with the wireless device using a virtual end-to-end connection; and

an address management proxy system connected to the computer network environment using a public network address of the computer network environment, that is structured to:

receive the request from the wired device,

determine a public network address from a plurality of available public network addresses of computer network environment,

associate the determined public network address with the private network address of the wireless device that corresponds to the indicated unique identifier, and

forward an indication of the determined public network address to the wired device.

16. The computer network environment of claim 15 wherein the address management proxy system is further structured to:

receive the data sent from the wired device,

determine the private network address that is associated with the indicated public network address, and

route the received data to the private network address over the wireless communication network in a manner that is transparent to the wired device.

17. The computer network environment of claim 15 wherein the computer network environment is the Internet and each public network address is specified in accordance with Internet Protocol (IP) addressing conventions.

18. The computer network environment of claim 15 wherein the computer network environment is an ATM network.

19. The computer network environment of claim 15 wherein the indicated public network address is the public network address of the address management proxy system, wherein data sent from the wired device indicates the unique identifier of the wireless device, and wherein the address management proxy system is structured to store and forward the data to the wireless device associated with the indicated unique identifier.

20. The computer network environment of claim 15 wherein the indicated public network address is received as a result of a call by the wired device to an address mapping function of the computer network environment.

21. The computer network environment of claim 20 wherein the address mapping function is a standard function of the computer network environment.

22. The computer network environment of claim 20 wherein the address mapping function is a GetHostByName function.

US 2003/0028671 A1

Feb. 6, 2003

11

23. The computer network environment of claim 15 wherein the indicated public network address is received as a result of a call by the wired device to a function that returns a host system address and a port specification.

24. The computer network environment of claim 23 wherein the function is a customized API.

25. The computer network environment of claim 23 wherein the function supports an XML interface.

26. The computer network environment of claim 15, wherein the wireless device is further structured to send data to the wired device using the public network address of the wired device, thereby performing bi-directional communication.

27. The computer network environment of claim 15 wherein a virtual end-to-end connection is established between the wired device and the wireless device.

28. The computer network environment of claim 15 wherein a connectionless communications path is established between the wired device and the wireless device.

29. A method in a computer network environment for establishing a bi-directional communication channel virtual communication channel between a first device connected to the computer network environment using a public network address and a second device connected to a wireless communications network and having a private address, comprising:

receiving a request from the first device to communicate with the second device;

dynamically determining a public network address from a pool of public network addresses:

associating the determined public network address with the private address of the second device; and

returning an indication of the determined public network address to the first device so that the first device can thereafter send data to the second device using the determined public network address.

30. The method of claim 29 wherein the request indicates a unique identifier of the second device that is different from the private address of the second device, and the associating the determined public address with the private address of the second device is performed using the unique identifier.

31. The method of claim 29, further comprising:

receiving data from the first device directed to the determined public network address; and

transparently routing the received data to the second device using the private network address associated with the determined public network address.

32. The method of claim 31 wherein the transparent routing is performed by a masquerading system connected to the computer network environment by a public network address of the computer network environment.

33. The method of claim 29 wherein the first device is a wired device.

34. The method of claim 29 wherein the first device is a wireless device.

35. The method of claim 29 wherein the second device is a device capable of a wired connection.

36. The method of claim 29 wherein the second device is a wireless device.

37. The method of claim 29 wherein the determined public network address specifies a host system address and a port specification.

38. The method of claim 29 wherein the determined public network address specifies an Internet Protocol (IP) address.

39. The method of claim 29 wherein the method is performed by a modified DNS server.

40. The method of claim 29 wherein the received request is a standard API of the computer network environment.

41. The method of claim 40 wherein the API is a GetHostByName API.

42. The method of claim 29 wherein the received request is a modified API of the computer network environment that specifies a name of a host machine and an indication of a port.

43. The method of claim 29, further comprising:

associating the determined public network address with an expiration period; and

destroying the association between the determined public network address and the private address of the second device when the expiration period as expired.

44. The method of claim 43 wherein the expiration period is specified as Time to Live (TTL) data.

45. An address proxy management system connected to a computer network environment for establishing a virtual communication channel between a first device connected to the computer network environment using a public network address and a second device connected to a wireless communications network and having a private address comprising:

domain name service (DNS) that is structured to:

receive a request from the first device to communicate with the second device,

dynamically determine a public network address from a pool of public network addresses;

associate the determined public network address with the private address of the second device; and

return an indication of the determined public network address to the first device so that the first device can thereafter send data to the second device using the determined public network address.

46. The system of claim 45 wherein the DNS is a modified DNS that abides by at least one of UDP and TCP/IP standards.

47. The system of claim 45 wherein the computer network environment is the Internet.

48. The system of claim 45 wherein each public network address is specified in accordance with Internet Protocol (IP) addressing conventions.

49. The system of claim 45 wherein the DNS uses a database to associate the determined public network address with the private address of the second device.

50. The system of claim 45 wherein the DNS uses a database to dynamically determine a public network address from a pool of public network addresses.

51. The system of claim 45 wherein the request indicates a unique identifier of the second device that is different from the private address of the second device, and the DNS associates the determined public address with the private address of the second device using the unique identifier.

US 2003/0028671 A1

12

Feb. 6, 2003

52. The system of claim 45, further comprising:

private address management router that is structured to receive data from the first device directed to the determined public network address, and transparently routes the received data to the second device using the private network address associated with the determined public network address.

53. The system of claim 52 wherein the private address management router is connected to the computer network environment by a public network address of the computer network environment, and transparently routes the received data to the public address of the second device by determining the private network address associated with the received data and causes the data to be forwarded over the wireless communications network to the second device at the determined private network address.

54. The system of claim 52 wherein the private address management router causes protocol conversion of the received data to be performed when applicable before transparently routing the received data.

55. The system of claim 45 wherein the first device is a wired device.

56. The system of claim 45 wherein the first device is a wireless device.

57. The system of claim 45 wherein the second device is a device capable of a wired connection.

58. The system of claim 45 wherein the second device is a wireless device.

59. The system of claim 45 wherein the determined public network address specifies a host system address and a port specification.

60. The system of claim 45 wherein the determined public network address specifies an Internet Protocol (IP) address.

61. The system of claim 45 wherein the received request is a standard API of the computer network environment.

62. The system of claim 61 wherein the API is a GetHostByName API.

63. The system of claim 45 wherein the received request is a new API that specifies a name of a host machine and an indication of a port.

64. The system of claim 45, wherein the DNS is further structured to:

associate the determined public network address with an expiration period; and

cause the association between the determined public network address and the private address of the second device to be destroyed when the expiration period as expired.

65. The system of claim 64 wherein the expiration period is specified as Time to Live (TTL) data.

66. An address proxy management system connected to a computer network environment for establishing a virtual communication channel between a first device connected to the computer network environment using a public network address and a second device connected to a wireless communications network and having a private address comprising:

means for receiving a request from the first device to communicate with the second device;

means for dynamically determining a public network address from a pool of public network addresses;

means for associating the determined public network address with the private address of the second device; and

means for returning an indication of the determined public network address to the first device so that the first device can thereafter send data to the second device using the determined public network address.

67. A computer-readable memory medium containing instructions for controlling a processor in a computer system to establish a bi-directional communication channel virtual communication channel between a first device connected to a computer network environment using a public network address and a second device connected to a wireless communications network and having a private address, by:

receiving a request from the first device to communicate with the second device;

dynamically determining a public network address from a pool of public network addresses;

associating the determined public network address with the private address of the second device; and

returning an indication of the determined public network address to the first device so that the first device can thereafter send data to the second device using the determined public network address.

68. The computer-readable memory medium of claim 67 wherein the request indicates a unique identifier of the second device that is different from the private address of the second device, and the associating the determined public address with the private address of the second device is performed using the unique identifier.

69. The computer-readable memory medium of claim 67, the instructions further controlling the computer processor by:

receiving data from the first device directed to the determined public network address; and

transparently routing the received data to the second device using the private network address associated with the determined public network address.

70. The computer-readable memory medium of claim 69 wherein the transparent routing is performed by a masquerading system connected to the computer network environment by a public network address of the computer network environment.

71. The computer-readable memory medium of claim 67 wherein the first device is a wired device.

72. The computer-readable memory medium of claim 67 wherein the first device is a wireless device.

73. The computer-readable memory medium of claim 67 wherein the second device is a device capable of a wired connection.

74. The computer-readable memory medium of claim 67 wherein the second device is a wireless device.

75. The computer-readable memory medium of claim 67 wherein the determined public network address specifies a host system address and a port specification.

76. The computer-readable memory medium of claim 67 wherein the determined public network address specifies an Internet Protocol (IP) address.

77. The computer-readable memory medium of claim 67 wherein the method is performed by a modified DNS server.

US 2003/0028671 A1

Feb. 6, 2003

13

78. The computer-readable memory medium of claim 67 wherein the received request is a standard API of the computer network environment.

79. The computer-readable memory medium of claim 78 wherein the API is a GetHostByName API.

80. The computer-readable memory medium of claim 67 wherein the received request is a modified API of the computer network environment that specifies a name of a host machine and an indication of a port.

81. The computer-readable memory medium of claim 67, the instructions further controlling the computer processor by:

associating the determined public network address with an expiration period; and

destroying the association between the determined public network address and the private address of the second device when the expiration period as expired.

82. The computer-readable memory medium of claim 81 wherein the expiration period is specified as Time to Live (TTL) data.

83. A method in a computer network environment for communicating with a wireless device connected to an address management proxy system using a private network address, the wireless device having an associated unique identifier that is not the private network address, the address management proxy system connected to the computer network environment using a public network address of the network environment, comprising:

requesting from the address management proxy system a public network address that corresponds to the unique identifier associated with the wireless device;

receiving an indication of the public network address of the wireless device; and

sending data to the indicated public network address.

84. The method of claim 83 wherein the computer network environment is the Internet.

85. The method of claim 83 wherein the indicated public network address is specified in accordance with Internet Protocol (IP) addressing standards.

86. The method of claim 83 wherein the unique identifier is at least one of a person's name and telephone number, an MSISDN number, and an ISMI number.

87. The method of claim 83 wherein the request is a standard API, such that communication with the wireless device is performed in the same manner as communication with a wired device connected to the computer network environment.

88. The method of claim 87 wherein the API is a GetHostByName function call.

89. The method of claim 83 wherein the indication of the public network address of the wireless device is a host machine address.

90. The method of claim 83 wherein the indication of the public network address of the wireless device is a host machine address and a port specification.

91. A computer-readable memory medium containing instructions for controlling a computer processor to communicate in a computer network environment with a wireless device connected to an address management proxy system using a private network address, the wireless device having an associated unique identifier that is not the private network address, the address management proxy system connected to the computer network environment using a public network address of the network environment, by:

requesting from the address management proxy system a public network address that corresponds to the unique identifier associated with the wireless device;

receiving an indication of the public network address of the wireless device; and

sending data to the indicated public network address.

92. The computer-readable memory medium of claim 91 wherein the computer network environment is the Internet.

93. The computer-readable memory medium of claim 91 wherein the indicated public network address is specified in accordance with Internet Protocol (IP) addressing standards.

94. The computer-readable memory medium of claim 91 wherein the unique identifier is at least one of a person's name and telephone number, an MSISDN number, and an ISMI number.

95. The computer-readable memory medium of claim 91 wherein the request is a standard API, such that communication with the wireless device is performed in the same manner as communication with a wired device connected to the computer network environment.

96. The computer-readable memory medium of claim 95 wherein the API is a GetHostByName function call.

97. The computer-readable memory medium of claim 91 wherein the indication of the public network address of the wireless device is a host machine address.

98. The computer-readable memory medium of claim 91 wherein the indication of the public network address of the wireless device is a host machine address and a port specification.

99. A wired device that is connected to a computer network environment using a public network address of the computer network environment, the network environment connected to an address management proxy system using a public network address of the network environment, the address management proxy system connected to a wireless device using a private network address, the wireless device having an associated unique identifier that is not the private network address, comprising:

communications code module that is structured to:

request from the address management proxy system a public network address that corresponds to the unique identifier associated with the wireless device,

receive an indication of the public network address of the wireless device; and

send data to the indicated public network address.

100. The device of claim 99 wherein the computer network environment is the Internet.

101. The device of claim 99 wherein the indicated public network address is specified in accordance with Internet Protocol (IP) addressing standards.

102. The device of claim 99 wherein the unique identifier is at least one of a person's name and telephone number, an MSISDN number, and an ISMI number.

103. The device of claim 99 wherein the request is a standard API, such that communication with the wireless device is performed in the same manner as communication with a wired device connected to the computer network environment.

US 2003/0028671 A1

14

Feb. 6, 2003

104. The device of claim 103 wherein the API is a GetHostByName function call.

105. The device of claim 99 wherein the indication of the public network address of the wireless device is a host machine address.

106. The device of claim 99 wherein the indication of the public network address of the wireless device is a host machine address and a port specification.

107. The device of claim 99 wherein the communications code module implements at least one of UDP and TCP/IP communication with the wireless device.

108. The device of claim 99 wherein the communications code module implements UDP communication with the wireless device.

* * * * *

# EXHIBIT 27

Network Working Group                                        C. Huitema
Request for Comments: 1383                                        INRIA
                                                         December 1992


                An Experiment in DNS Based IP Routing

Status of this Memo

   This memo defines an Experimental Protocol for the Internet
   community.  Discussion and suggestions for improvement are requested.
   Please refer to the current edition of the "IAB Official Protocol
   Standards" for the standardization state and status of this protocol.
   Distribution of this memo is unlimited.


Table of Contents

   1. Routing, scaling and hierarchies ......................   1
   2. Routing based on MX records ...........................   2
   3. Evaluation of DNS routing .............................   3
   3.1 Loops and relays ....................................   4
   3.2 Performances and scaling ............................   5
   3.3 Tunneling or source routing .........................   6
   3.4 Choosing a gateway ..................................   6
   3.5 Routing dynamics ....................................   6
   3.6 DNS connectivity ....................................   7
   3.7 On the way back .....................................   8
   3.8 Flirting with policy routing ........................   8
   4. Rationales for deployment ............................   9
   4.1 The good citizens ...................................  10
   4.2 The commercial approach .............................  10
   5. The experimental development .........................  11
   5.1 DNS record ..........................................  11
   5.2 Interface with the standard IP router ...............  12
   5.3 The DNS query manager ...............................  12
   5.4 The real time forwarder .............................  12
   5.5 Interaction with routing protocols ..................  13
   6. Acknowledgments ......................................  13
   7. Conclusion ...........................................  13
   8. References ...........................................  14
   9. Security Considerations ..............................  14
   10. Author's Address ....................................  14

1.  Routing, scaling and hierarchies

   Several recent studies have outlined the risk of "routing explosion"
   in the current Internet: there are already more than 5000 networks
   announced in the NSFNET routing tables, more than 7000 in the EBONE



Huitema                                                        [Page 1]

routing tables.  As these numbers are growing, several problems
occur:

   *     The size of the routing tables grows linearly with the
         number of connected networks; handling this larger tables
         requires more resources in all "intelligent" routers, in
         particular in all "transit" and "external" routers that
         cannot rely on default routes.

   *     The volume of information carried by the route exchange
         protocols such as BGP grows with the number of networks,
         using more network resources and making the reaction to
         routing events slower.

   *     Explicit administrative decisions have to be exercised by
         all transit networks administrators which want to
         implement "routing policies" for each and every
         additional "multi-homed" network.

The current "textbook" solution to the routing explosion problem is
to use "hierarchical routing" based on hierarchical addresses. This
is largely documented in routing protocols such as IDRP, and is one
of the rationales for deploying the CIDR [3] addressing structure in
the Internet. This textbook solution, while often perfectly adequate,
as a number of inconveniences, particularly in the presence of
"multihomed stubs", e.g., customer networks that are connected to
more than one service providers.

The current proposal presents a scheme that allows for simple
routing. It is complementary with the classic "hierarchical routing"
approach, but provides an easy to implement and low cost solution for
"multi-homed" domains. The solution is a generalization of the "MX
record" scheme currently used for mail routing.

2.  Routing based on MX records

The "MX records" are currently used by the mail routing application
to introduce a level of decoupling between the "domain names" used
for user registration and the mailbox addresses. They are
particularly useful for sending mail to "non connected" domains: in
that case, the MX record points to one or several Internet hosts that
accept to relay mail towards the target domain.

We propose to generalize this scheme for packet routing.  Suppose a
routing domain D, containing several networks, subnetwork and hosts,
and connected to the Internet through a couple of IP gateways. These
gateways are dual homed: they each have an address within the domain
D -- say D1 and D2 -- and an address within the Internet -- say I1

and I2 --. These gateways also have a particularity: they retain
information, and don't try to announce to the Internet any
reachibility information on the networks contained within "D". These
networks however have been properly registered; a name server
accessible from the Internet contains the "in-addr.arpa" records that
enable reverse "address to name" lookup, and also contains the
network level equivalent of "MX records", say "RX records". Given any
host address Dx within D, one can get "RX records" pointing to the
Internet addresses of the gateways, I1 and I2.

A standard Internet router Ix cannot in principle send a packet to
the address Dx: it does not have any corresponding routing
information. However, if the said Internet router has been modified
to exploit our scheme, it will query the DNS with the name build up
from "Dx" in the "in-addr.arpa" domain, obtain the RX records, and
forward the packet towards I1 (or I2), using some form of "source
routing". The gateway I1 (or I2) will receive the packet; its routing
tables contain information on the domain D and it can relay the
packet to the host Dx.

At this stage, the readers should be convinced that we have presented
a scheme that:

    *       avoid changes in host IP addresses as topology changes,
            without requiring extra overhead on routing (provided
            that the routing employs some form of hierarchical
            information aggregation/abstraction),

    *       allow to support multihomed domains without requiring
            additional overhead on routing and without requiring
            hosts to have explicit knowledge of multiple addresses.

They should also forcingly scratch their head, and mumble that things
can't be so simple, and that one should perhaps carefully look at the
details before assuming that the solution really works.

3.  Evaluation of DNS routing

    Several questions come to mind immediately when confronted to such
    schemes:

        -       Should all relays access the DNS? What about possible
                loops?

        -       Will the performances be adequate?

        -       How does one choose the best gateway when several are
                announced? What happens if the gateway is overloaded, or

unreachable?

-       What if the directory cannot be accessed?

-       How does it work in the reverse direction?

-       Should we use tunnelling or loose source routing?

-       Can we be more general?

There may indeed be more questions, but these ones, at least, have
been taken into account in the setting of our experiment.

3.1.  Loops and relays

In the introduction to DNS-IP routing, we mentioned that the packets
would be directed towards the access gateway I1 or I2 by means of
"source routing" or "tunnelling". This is not, stricto sensu,
necessary. One could imagine that the packet would simply be routed
"as if it was directed towards I1 or I2". The next relay would, in
turn, also access the DNS to get routing information and forward the
packet.

Such a strategy would have the advantage of leaving the header
untouched and of letting the transit nodes choose the best routing
towards the destination, based on their knowledge of the reachability
status. It would however have two important disadvantages:

-       It would oblige all intermediate relays to access the
        DNS,

-       It would oblige all these relays to exploit consistently
        the DNS information.

Obliging all intermediate gateways to access the DNS is impractical
in the short term: it would mean that we would have to update each
and every transit relay before deploying the scheme. It could also
have an important performance impact: the "working set" of transit
relays is typical much wider than that of stub gateways, and the
argument presented previously on the efficiency of caches may not
apply. This would perhaps remain impractical even in the long term,
as it the volume of DNS traffic could well become excessive.

The second argument would apply even if the performance problem had
been solved. Suppose that several RX records are registered for a
given destination, such as I1 and I2 for Dx in our example, and that
a "hop by hop routing" strategy is used. There would be a fair risk
that some relays would choose to route the packet towards I1 and some

Huitema                                                      [Page 4]

others towards I2, resulting in inefficient routing and the
possibility of loops.

In order to ensure coherency, we propose that all routing decisions
be made at the source, or by one of the first relays near the source.

3.2.  Performances and scaling

The performance impact of using the DNS for acquiring routing
information is twofold:

   *      The initial DNS exchanges required for loading the
          information may induce a response time penalty for the
          users,

   *      The extra DNS traffic may contribute to overloading the
          network.

We already have some experience of DNS routing in the Internet for
the "mail" application. After the introduction of the "MX record",
the mail routing slowly evolved from a hardwired hierarchy, e.g.,
send all mail to the addresses in the ".FR" domain to the french
gateway, towards a decoupling between a name hierarchy used for
registration and the physical hierarchy used for delivery.

If we consider that the mail application represent about 1/4th of the
Internet traffic, and that a mail message seldom include more than
half a dozen packets, we come to the point that DNS access is already
needed at least once for every 24 packets. The performances are not
apocalyptic -- or someone would have complained! In fact, if we
generalize this, we may suppose that a given host has a "working set"
of IP destinations, and that some caching strategy should be
sufficient to alleviate the performance effect.

In the scheme that we propose, the DNS is only accessed once, either
by the source host or by an intelligent router located near the
source host. The routing decision is only made once, and consistent
routing is pursued in the Internet until reaching an access router to
the remote domain.

The volume of DNS traffic through the NSFNET, as collected by MERIT,
is currently about 9%. When a host wants to establish communication
with a remote host it usually need to obtain the name - IP address
mapping. Getting extra information (I1 or I2 in our example) should
incur in most cases one more DNS lookup at the source. That lookup
would at most double the volume of DNS traffic.

3.3.   Tunneling or source routing

   Source directed routing, as described above, can be implemented
   through one of two techniques: source routing, or a form of
   encapsulation protocol. For the sake of simplicity, we will use
   source routing, as defined in [1]: we don't have to define a
   particular tunnelling protocol, and we don't have to require hosts to
   implement a particular encapsulation protocol.

3.4.   Choosing a gateway

   A simplification to the previous problem would be to allow only one
   RX record per destination, thus guaranteeing consistent decisions in
   the network. This would however have a number of draw-backs. A single
   access point would be a single point of failure, and would be
   connected to only one transit network thus keeping the "customer
   locking" effect of hierarchical routing.

   We propose that the RX records have a structure parallel to that of
   MX records, i.e., that they carry associated with each gateway
   address a preference identifier. The source host, when making the
   routing decision based on RX records, should do the following:

           -      List all possible gateways,

           -      Prune all gateways in the list which are known as
                  "unreachable" from the local site,

           -      If the local host is present in the list with a
                  preference index "x", prune all gateways whose preference
                  index are larger than "x" or equal to "x".

           -      Choose one of the gateway in the list. If the list is
                  empty, consider the destination as unreachable.

   Indeed, these evaluations should not be repeated for each and every
   packet. The routers should maintain a cache of the most frequently
   used destinations, in order to speed up the processing.

3.5.   Routing dynamics

   In theory, one could hope to extract "distance" information from the
   local routing table and combine it with the preference index for
   choosing the "best" gateway. In practice, as shown in the mail
   context, it is extremely difficult to perform this kind of test, and
   one has to rely on more heuristical approaches. The easiest one is to
   always choose a "preferred gateway", i.e., the gateway which has the
   minimal preference index. One could also, alternatively, choose one

Huitema                                                          [Page 6]

RFC 1383                    DNS based IP routing               December 1992

gateway at random within the list: this would spread the traffic on
several routes, which is known to introduce better load sharing and
more redundancy in the network.

As this decision is done only once, the particular algorithm to use
can be left as a purely local matter. One domain may make this
decision based purely on the RX record, another based purely on the
routing information to the gateways listed in the RX record, and yet
the third one may employ some weighted combinations of both.

Perhaps the most important feature is the ability to cope rapidly
with network errors, i.e., to detect that one of the route has become
"unreachable". This is clearly an area where we lack experience, and
where the experiment will help. One can think of several possible
solutions, e.g.,:

    *    Let intermediate gateways rewrite the loose source route
         in order to replace an unreachable access point by a
         better alternative,

    *    Monitor the LSR options in the incoming packets, and use
         the reverse LSR,

    *    Monitor the "ICMP Unreachable" messages received from
         intermediate gateways, and react accordingly,

    *    Regularly probe the LSR, in order to check that it is
         still useful.

A particularly interesting line would be to combine these
connectivity checks with the transport control protocol
acknowledgments; this would however require an important modification
of the TCP codes, and is not practical in the short term. We will not
try any such interaction in the early experiments.

The management of these reachability informations should be taken
into account when caching the results of the DNS queries.

3.6.  DNS connectivity

It should be obvious that a scheme relying on RX records is only
valid if these records can be accessed. By definition, this is not
the case of the target domain itself, which is located at the outer
fringes of the Internet.

A domain that want to obtain connectivity using the RX scheme will
have to replicate its domain name service info, and in particular the
RX records, so has to provide them through servers accessible from

Huitema                                                         [Page 7]

the core of the Internet. A very obvious way to do so is to locate
replicated name servers for the target domain in the access gateways
"I1" and "I2".

3.7.  On the way back

A source located in the fringe domain, when accessing a core Internet
host, will have to choose an access relay, I1 or I2 in our example.

A first approach to the problem is to let the access gateway relay
the general routing information provided by the routing domains
through the fringe network. The fringe hosts would thus have the same
connectivity as the core hosts, and would not have to use source
directed routing.  This approach has the advantage of leaving the
packets untouched, but may pose problems should the transit network
need to send back a ICMP packet: it will have to specify a source
route through the access gateway for the ICMP packet. This would be
guaranteed if the IP packets are source routed, as the reverse source
route would be automatically used for the ICMP packet. We are thus
led to recommend that all IP packets leaving a fringe domain be
explicitly source routed.

The source route could be inserted by the access gateway when the
packet exits the fringe domain, if the gateway has been made aware of
our scheme. It can also be set by the source host, which would then
have to explicitly choose the transit gateway, or by the first router
in the path, usually the default router of the host sending the
packets. As we expect that hosts will be easier to modify than
routers, we will develop here suitable algorithms.

The fringe hosts will have to know the set of available gateways, of
which all temporarily unreachable gateways shall indeed be pruned. In
the absence of more information, the gateway will be chosen according
to some preference order, or possibly at random.

It is very clear that if a "fringe" host wants to communicate with
another "fringe" host, it will have to insert two relays in the LSR,
one for the domain that sources the packet, and one for the domain
where the destination resides.

3.8.  Flirting with policy routing

The current memo assumes that all gateways to a fringe domain are
equivalent: the objective of the experiment is to test and evaluate a
simple form of directory base routing, not to provide a particular
"policy routing" solution. It should be pointed out, however, that
some form of policy routing could be implemented as a simple
extension to our RX scheme.

In the proposed scheme, RX records are only qualified by an "order of preference".  It would not be very difficult to also qualify them with a "supported policy" indication, e.g., the numeric identifier of a particular "policy". The impact on the choice of gateways will be obvious:

   -    When going towards a fringe network, one should prune
        from the usable list all the gateways that do not support
        at least one of the local policies,

   -    When exiting a fringe network, one should try to assess
        the policies supported by the target, and pick a
        corresponding exit gateway,

   -    When going from a fringe network towards another fringe
        network, one should pick a pair of exit and access
        gateway that have matching policies.

In fact, a similar but more general approach has been proposed by Dave Clark under the title of "route fragments". The only problem here are that we don't know how to identify policies, that we don't know whether a simple numeric identifier is good enough and that we probably need to provide a way for end users to assess the policy on a packet per packet or flow per flow basis. In short, we should try to keep the initial experiment simple. If it is shown to be successful, we will have to let it evolve towards some standard service; it will be reasonable to provide policy hooks at this stage.

4.  Rationales for deployment

Readers should be convinced, after the previous section, that the DNS-IP routing scheme is sleek and safe. However, they also are probably convinced that a network which is only connected through our scheme will probably enjoy somewhat less services than if they add have full traditional connectivity.  We can see two major reasons for inducing users into this kind of scheme:

   -    Because they are good network citizen and want to suffer
        their share in order to ease the general burden of the
        Internet,

   -    Because they are financially induced to do so.

We will examine these two rationales separately.

Huitema                                                         [Page 9]

RFC 1383                     DNS based IP routing              December 1992

4.1.  The good citizens

   A strong tradition of the Internet is the display of cooperative
   spirit: individual users are ready to suffer a bit and "do the right
   thing" if this conduct can be demonstrated to improve the global
   state of the network -- and also is not overly painful.

   Restraining to record your internal networks in the international
   connectivity tables is mainly an advantage for your Internet
   partners, and in particular for the backbone managers. The normal way
   to relieve this burden is to follow a hierarchical addressing plan,
   as suggested by CIDR. However, when for some reason the plan cannot
   be followed, e.g., when the topology just changed while the target
   hosts have not yet been renumbered, our scheme provides an
   alternative to "just announcing one more network number in the
   tables". Thus, it can help reducing the routing explosion problem.

4.2.  The commercial approach

   Announcing network numbers in connectivity tables does have a
   significant cost for network operators:

      -      larger routing tables means more memory hence more
             expensive routres,

      -      more networks means larger and more frequent routing
             messages, hence consume more network resources,

      -      more remote networks means more frequent administrative
             decisions if policies have to be implemented.

   These costs are very significant not only for regionals, but also for
   backbone networks. It would thus be very reasonable, from an
   economical point of view, for a backbone to charge regionals
   according to the number of networks that they announce. A similar
   line of reasoning can be applied by the regionals, which could thus
   give the choice to their customers between:

      -      being charged for announcing an address of their choice,

      -      or being allocated at a lower cost a set of addresses in
             an addressing space belonging to the regional.

   Our scheme may prove an interesting tool if the charge for individual
   addresses, which are necessary for "multi homed" clients, becomes too
   high.

Huitema                                                        [Page 10]

5.  The experimental development

   The experimental software, implemented under BSD Unix in a "socket"
   environment, contains two tasks:

            -    a real time forwarder, which is implemented inside the
                 kernel and handles the source demanded routes,

            -    a DNS query manager, which transmit to the real time
                 forwarder the source routing information.

   In this section, we will describe the real time forwarder, the query
   manager, the format of the DNS record, and the interface with the
   standard IP routers.

5.1.  DNS record

   In a definitive scheme, it would be necessary to define a DNS record
   type and the corresponding "RX" format. In order to deploy this
   scheme, we would then have to teach this new format to the domain
   name service software. While not very difficult to do, this would
   probably take a couple of month, and will not be used in the early
   experimentations, which will use the general purpose "TXT" record.

   This record is designed for easy general purpose extensions in the
   DNS, and its content is a text string. The RX record will contain
   three fields:

            -    A record identifier composed of the two characters "RX".
                 This is used to disambiguate from other experimental uses
                 of the "TXT" record.

            -    A cost indicator, encoded on up to 3 numerical digits.
                 The corresponding positive integer value should be less
                 that 256, in order to preserve future evolutions.

            -    An IP address, encoded as a text string following the
                 "dot" notation.

   The three strings will be separated by a single comma. An example of
   record would thus be:

| domain | type | record | value |
|---|---|---|---|
| *.27.32.192.in-addr.arpa | IP | TXT | RX, 10, 10.0.0.7 |

which means that for all hosts whose IP address starts by the three
octets "192.32.27" the IP host "10.0.0.7" can be used as a gateway,
and that the preference value is 10.

5.2.  Interface with the standard IP router

We have implemented our real time forwarder "on the side" of a
standard IP router, as if it were a particular subnetwork connection:
we simply indicate to the IP router that some destinations should be
forwarded to a particular "interface", i.e., through our real time
forwarder.

Of particular importance is indeed to know efficiently which
destinations should be routed through our services. As the service
would be useless for destinations which are directly reachable, we
have to monitor the "unreachable" destinations.  We do so by
monitoring the "ICMP" messages which signal the unreachable
destination networks, and copying them to the DNS query manager.

There are indeed situations, e.g., for fringe networks, where the
router knows that destinations outside the local domain will have to
be routed through the real time forwarder. In this case, it makes
sense to declare the real time forwarder as the "default route" for
the host.

5.3.  The DNS query manager

Upon reception of the ICMP message, the query manager updates the
local routing table, so that any new packet bound to the requested
destination becomes routed through the real time forwarder.

At the same time, the query manager will send a DNS request, in order
to read the RX records corresponding to the destination. After
reception of the response, it will select a gateway, and pass the
information to the real time forwarder.

5.4.  The real time forwarder

When the real time forwarder receives a packet, it will check whether
a gateway is known for the corresponding destination.  If that is the
case, it will look at the packet, and insert the necessary source
routing information; it will then forward the packet, either by
resending it through the general IP routing program, or by forwarding
it directly to the network interface associated to the intermediate
gateway.

If the gateway is not yet known, the packet will be placed in a
waiting queue. Each time the query manager will transmit to the real

time forwarder new gateway information, the queue will be processed,
and packets for which the information has become available will be
forwarded. Packets in this waiting queue will "age"; their time to
live counts will be decremented at regular intervals. If it become
null, the packets will be destroyed; an ICMP message may be
forwarded.

The DNS query manager may be in some cases unable to find RX
information for a particular destination. It will in that case signal
to the real time forwarder that the destination is unreachable. The
information will be kept in the destination table; queued packet for
this destination will be destroyed, and new packets will not be
forwarded.

The information in the destination table will not be permanent. A
time to live will be associated to each line of the table, and the
aging lines will be periodically removed.

5.5.   Interaction with routing protocols

The monitoring of the "destination unreachable" packets described
above is mostly justified by a desire to leave standard IP routing,
and the corresponding kernel code, untouched.

   If the IP routing code can be modified, and if the local host has
   full routing tables, it can take the decision to transmit the
   packets to the real time forwarder more efficiently, e.g., as a
   default action for the networks that are not announced in the
   local tables. This procedure is better practice, as it avoids the
   risk of loosing the first packet that would otherwise have
   triggered the ICMP message.

6.   Acknowledgments

We would like to thank Yakov Rekhter, which contributed a number of
very helpful comments.

7.   Conclusion

This memo suggests an experiment in directory based routing.  The
author believes that this technique can be deployed in the current
Internet infrastructure, and may help us to "buy time" before the
probably painful migration towards IPv7.

The corresponding code is under development at INRIA. It will be
placed in the public domain. Interested parties are kindly asked to
contact us for more details.

RFC 1383                    DNS based IP routing              December 1992


8.  References

    [1] Postel, J., "Internet Protocol - DARPA Internet Program Protocol
        Specification", STD 5, RFC 791, DARPA, September 1981.

    [2] Clark, D., "Building routers for the routing of tomorrow",
        Message to the "big-internet" mailing list, reference
        <9207141905.AA06992@ginger.lcs.mit.edu>, Tue, 14 Jul 92.

    [3] Fuller, V., Li, T., Yu, J., and K. Varadhan, "Supernetting:  an
        Address Assignment and Aggregation Strategy", RFC 1338, BARRNet,
        cisco, Merit, OARnet, June 1992.

9.  Security Considerations

    Security issues are not discussed in this memo.

10.  Author's Address

    Christian Huitema
    INRIA, Sophia-Antipolis
    2004 Route des Lucioles
    BP 109
    F-06561 Valbonne Cedex
    France

    Phone: +33 93 65 77 15
    EMail: Christian.Huitema@MIRSA.INRIA.FR


Huitema                                                        [Page 14]

# EXHIBIT 28

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

Liberty Mutual Insurance Company, Liberty Mutual Technology Group, Inc., Liberty Mutual Holding Company Inc., Liberty Mutual Group Inc., Liberty Mutual Plano LLC, Comparion Insurance Agency, LLC, Ironshore Holdings (U.S.) Inc.,

and

Comerica Incorporated

Petitioners

v.

Intellectual Ventures I LLC

Patent Owner

---

IPR2025-00201
U.S. Patent No. 7,949,785

---

# PETITION FOR *INTER PARTES* REVIEW
# OF U.S. PATENT NO. 7,949,785

Mail Stop Patent Board
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

## TABLE OF CONTENTS

I.      INTRODUCTION ...............................................................................1

II.     GROUNDS FOR STANDING...............................................................2

III.    IDENTIFICATION OF CHALLENGE ....................................................3

IV.     THE 785 PATENT ............................................................................3

      A.   Overview ...............................................................................3

      B.   Prosecution History .............................................................12

      C.   Person of Ordinary Skill in the Art ......................................14

V.      CLAIM CONSTRUCTION ................................................................15

      A.   All Claims: "virtual network address" ..................................15

      B.   Claim 30, 34, 76: "register module" ...................................16

      C.   Claims 35-37, 77-78: "join module"....................................18

      D.   Other Claims.......................................................................21

VI.     PRIOR ART....................................................................................21

      A.   Mehta21

      B.   RFC-1383 ...........................................................................23

      C.   Motivation to Combine Mehta and RFC-1383 ....................26

VII.    GROUND 1: Claims 1-2, 6-12, 22, 25-26, 28-49, 51-55, 60-63, 65-66,
      72-80, 82-86, and 82-90  are obvious in view of Mehta alone or with
      RFC-1383 ......................................................................................34

      A.   The Independent Claims.....................................................34

         1.   Preamble: Virtual network system or manager..........................34

         2.   "A virtual network defined by a domain name" ..........................36

         3.   Registration/distribution of virtual network address to each
            device which uniquely identifies the device ...............................38

         4.   Route director/routing ................................................................44

         5.   DNS server, request, and responses .............................................46

         6.   A memory and a processor generally...........................................54

      B.   The Dependent Claims .......................................................55

i

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

1.    Dependent Claims 2, 6-12, 22, 25-26, and 28-29 .........................55

2.    Dependent Claims 31-37 ................................................................59

3.    Claims 49, 52, 54, 61, 63,  and 65-66 ..........................................61

4.    Claims 51, 53, 55, 60, 72 and 73 ..................................................64

5.    Claims 76-80, 82-90 ......................................................................65

6.    Claims 87-88: NAT device limitations .........................................66

VIII.  DISCRETIONARY DENIAL IS NOT APPROPRIATE ...........................67

A.  35 U.S.C. § 325(d) ................................................................................67

B.  35 U.S.C § 314(a) .................................................................................68

IX.   MANDATORY NOTICES ...........................................................................70

A.  Real Party-in-Interest ...........................................................................70

B.  Related Matters .....................................................................................71

C.  Lead and Backup Counsel and Service Information .............................72

X.    CONCLUSION .............................................................................................72

ii

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

**EXHIBIT LIST**

| Exhibit | Description |
|---|---|
| 1001 | U.S. Patent 7,949, 785 (filed 2003-31-03, granted 2011-24-05) ("785 patent") |
| 1002 | File History for U.S. Patent No. 7,949,785 (Appl. No. 10/403,818 ) ("785 FH") |
| 1003 | Reserved |
| 1004 | Declaration of Dr. Erez Zadok ("Zadok Decl.") |
| 1005 | Curriculum Vitae of Dr. Erez Zadok |
| 1006 | U.S. Patent Application Publication No. US2003/0028671 to Mehta et al. ("Mehta") |
| 1007 | Huitema, C., Network Working Group Request for Comment (RFC): 1383, entitled An Experiment in DNS Based IP Routing ("RFC-1383") |
| 1008 | Reserved |
| 1009 | Reserved |
| 1010 | Reserved |
| 1011 | Reserved |
| 1012 | Reserved |
| 1013 | Microsoft Computer Dictionary, 3rd ed., 1997, excerpts ("Microsoft Computer Dictionary") |
| 1014 | Andrew S. Tanenbaum, *Computer Networks*, 2nd ed., 1988, excerpts ("Tanenbaum") |
| 1015 | W. Richard Stevens, *TCP/IP Illustrated Volume 1, The Protocols*, 1994, excerpts ("Stevens") |
| 1016 | William R. Cheswick & Steven M. Bellovin, *Firewalls and Internet Security, Repelling the Wily Hacker*, 1994, excerpts ("Cheswick") |
| 1017 | Domain Names - Concepts and Facilities, RFC 1034, IETF, 1987, https://www.rfc-editor.org/rfc/pdfrfc/rfc1034.txt.pdf |
| 1018 | Domain Names - Implementation and Specification, RFC 1035, IETF, 1987, https://www.rfc-editor.org/rfc/pdfrfc/rfc1035.txt.pdf |
| 1019 | IP Encapsulating Security Payload (ESP), RFC 2406, IETF, 1998, https://www.rfc-editor.org/rfc/pdfrfc/rfc2406.txt.pdf |
| 1020 | Dynamic Host Configuration Protocol, RFC 2131, IETF, 1997, https://www.rfc-editor.org/rfc/pdfrfc/rfc2131.txt.pdf |

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

| Exhibit | Description |
|---|---|
| 1021 | Linux DNS Server Administration, Craig Hunt, 2000, excerpts ("Hunt") |
| 1022 | *Intellectual Ventures v. Liberty Mutual*, No. 23-cv-525 (E.D. Tex.) – Infringement Contentions |
| 1023 | *Intellectual Ventures v. Comerica*, No. 23-cv-524 (E.D. Tex.) – Infringement Contentions |

iv

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

## I.    INTRODUCTION

Liberty Mutual Insurance Company, Liberty Mutual Technology Group, Inc., Liberty Mutual Holding Company Inc., Liberty Mutual Group Inc., Liberty Mutual Plano LLC, Comparion Insurance Agency, LLC, Ironshore Holdings (U.S.) Inc., (together, "Liberty Mutual"), and Comerica Incorporated ("Comerica") (collectively, "Petitioners'") petition for *inter partes* review ("IPR") of claims 1-2, 6-12, 22, 25-26, 28-49, 51-55, 60-63, 65-66, 72-80, 82-90 (the "challenged claims") of U.S. Patent No. 7,949,785 titled "Secure Virtual Community Network System") ("the 785 patent," EX1001).[1][2]

The 785 patent is generally directed to "[a] private virtual dynamic network ... provided for computing devices coupled to public networks or private networks." Ex. 1001, Abstract. The 785 patent describes a virtual network manager or system that "allows local and remote entities [users] to communicate and collaborate from various locations,"— allowing "two or more users to communicate securely via at least one public network, whether the users are both coupled directly to the public

---

[1] The Office is authorized to charge fees to Deposit Account 50-3725.

[2] All emphasis in quotations and annotations/highlights in figures herein has been added, unless otherwise noted.

1

network, both coupled directly to separate private networks or whether one is in a public network and one is in a private network." EX1001, 5:48-56.

The 785 patent's claimed "virtual network manager [/system]," including (1) "a network interface ... for data communication," (2) "a register module," (3) a "route director," and (4) a "DNS server," does not recite a patentable invention. *E.g.,* EX1001, 36:37-56 (claim 30). The claim elements of the 785 patent, their intended functions, and their arrangements were well-established in the prior art before the 785 patent's priority date. Additionally, the dependent claims merely reflect incidental details also found in the prior art. Therefore, there is at least a reasonable likelihood that at least one claim of the 785 patent is unpatentable.

Petitioners, supported by the declaration of Dr. Erez Zadok who has over 30 years of experience, demonstrate that the challenged claims are unpatentable. Petitioners respectfully request that the Board institute trial on the grounds presented herein and determine that the challenged claims of the 785 patent are unpatentable.

## II.    GROUNDS FOR STANDING

Petitioners certify the 785 patent is available for IPR, and they are not barred or estopped from requesting IPR of the challenged claims on the ground identified below.

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

## III.  IDENTIFICATION OF CHALLENGE

Petitioners request IPR and cancellation of the challenged claims of the 785

patent on the following ground:

| Ground | Challenged Claims | Basis for Rejection |
|--------|-------------------|---------------------|
| 1 | 1-2, 6-12, 22, 25-26, 28-49, 51-55, 60-63, 65-66, 72-80, and 82--90 | § 103:  Mehta (US 2003/0028671A1) and RFC-1383 |

The 785 patent application (Appl. No. 10/403,818) was filed on and only

claims priority to March 31, 2003 (i.e., no earlier applications). EX1001 at 1. Every

prior art reference in below ground precedes the 785 patent's claimed priority date.

| Reference | Prior Art Date | Status |
|-----------|----------------|--------|
| Mehta (EX1006) | Priority 6/8/2001 Filed 6/10/2002 Published 2/6/2003 | § 102(a), (e) |
| RFC 1383 (EX1007) | Published 12/1992 | § 102(b) |

## IV.  THE 785 PATENT

### A.  Overview

The 785 patent claims a "virtual network manager [or system]" that includes

several components: (1) a computing device or "network interface configured for

data communication," (2) a "register module configured to register devices in a

virtual network," (3) a router or route director, and (4) a "DNS server configured to

3

receive a DNS request" from a first (source) device and return three addresses to the source, including "[(i)] a network address associated with a network route director, [(ii)] a private network address associated with a second [destination] device in the virtual network, and [(iii)] a virtual network address associated with the second [destination] device." EX1001, 36:37-56 (claim 30).

Representative claim 30 is below:

[30.0] A virtual network manager, comprising:

[30.1] a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public network address;

[30.2] a memory and a processor to implement a register module configured to register devices in a virtual network, the register module further configured to:

[30.3] receive a registration request from an agent associated with a device;

[30.4] distribute a virtual network address to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by the virtual network address; and

[30.5] a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return a network address associated with a network route director, a private network address associated with a second device in

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

the virtual network, and a virtual network address associated with the second device.[3]

The 785 patent identifies the so-called IP address depletion problem as a challenge it was trying to solve to "enable the rapid creation of secure means that allows local and remote specified entities [computer devices] to communicate and collaborate from any location via a standard Internet connection." EX1001, 1:32-37. The 785 patent indicates that, due to its own popularity, the Internet is "running out of [IP] addresses" that can be assigned to each device, thereby limiting the ability for devices in private networks, for example, to communicate or be accessible via the Internet. EX1001, 1:50-55. The 785 patent also purports to address the "mobility problem," involving devices being assigned constantly changing/dynamic IP addresses, which other devices on the Internet wishing to communicate with them might find difficult to track. EX1001, 5:10-45. The 785 patent thus describes "a need for a system that provides for local and remote entities to communicate and collaborate using the Internet, [a system that] can work with existing NAT [(Network Address Translation)] devices and firewalls, and allows for devices to move to different physical networks." EX1001, 2:45-48.

---

[3] Appendix A contains a listing of all challenged claims of the 785 patent.

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

In the "Description of the Related Art" section, the 785 patent admits that NAT solutions where well known the art, and used to transparently translated between private and public IP address:

> One popular solution to the depleting address problem is [NAT]. This concept includes predefining a number of network addresses to be private addresses and public addresses. Public addresses are unique addresses that should only be used by one entity having access to the Internet. That is, no two entities on the Internet should have the same public address. Private addresses are not unique and are typically used for entities not having direct access to the Internet. Private addresses are used in private networks. Private addresses can be used by more than one organization or network. NAT assumes that all of the machines on a network will not need to access the Internet at all times. Therefore, there is no need for each machine to have a public address. A local network can function with a small number of one or more public addresses assigned to a NAT device. The remainder of the machines on the network will be assigned private addresses. Since entities on the network have private addresses, the network is considered to be a private network.

EX1001, 1:56-2:7.

One embodiment discloses a "secure Virtual Community Network or ('VCN')," described as "a private dynamic network which acts a private LAN for

6

computing devices coupled to public networks or private networks." EX1001, 8:66-9:5.



Figure 4 shows an exemplary VCN, which comprises a "computer or device B (host name—b.Cob.com) in a first private domain and computer or device A (host name—a.Coa.com) in a second private domain, both of which are coupled to the Internet by firewall devices 402, 404." EX1001, 9:9-13. The firewall devices are NAT devices. EX1001, 9:13-15. Moreover, "[c]omputer or device X is coupled directly to the Internet and has a public IP address." EX1001,. 9:16-17. "Devices A, B, and X can join the VCN, leave the VCN, or allows other devices in the VCN to communicate with them." EX1001, 9:18-23. "All members of the VCN are accessible as if they were part of a physical local network" (e.g. all in the same

7

private network)—allowing direct communication between devices within the virtual domain. .EX1001, 9:22-27.

The 785 patent states that "hardware architecture for the machines, servers, or other devices used to implement the present invention should be well understood to one of ordinary skill in the art," and outlines standard, readily available hardware/software components, including "one or more processors, a memory, a mass storage device, a portable storage device, a first network interface, a second network interface, and I/O devices, in communication with each other." EX1001, 9:42-48; *see id.* 9:48-54. The patent also states the network interface can include or be connected to a firewall. EX1001, 9:57-60. The network interfaces are inside a computer, and when the computer also functions as a "router," it "includes two or more network interfaces;" *h*owever, "in other embodiments, the computer may include only one network interface." EX1001, 9:54-56.

Another example of the system is illustrated in Figure 5A. The VCN includes a VCN Manager 510, a Network Route Director 520 and/or Private Route Director 530, and a number of user devices (e.g., $M_C$, $M_X$, $M_A$ etc.). .EX 1001, 10:24-27. "The VCN Manager 510 is a central server or server cluster



Fig. 5a

providing management, connection, and security services for the VCN." EX 1001, 10:66-11:1. The "various user machines, Mn, are coupled to the Internet 506, as well as other devices." EX1001,10:17-20. "In order to establish or participate in communication within the VCN, a device must register with and join the VCN, thereby becoming a member." To join, "[t]he Agent will send a message to the VCN Manager 510 and receive a virtual IP address in return." EX1001, 14:10-15. This is shown in step 650 of Figure 7. *Id.*

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201



Fig. 7

The 785 patent describes the virtual IP or network address as preferably another private network address that is chosen in a well-defined set of addresses (virtual address realm) such that each virtual network address occurs only once across the virtual network and thus is a unique identifier of the device within the network address. EX1001, 12:50-54 ("each member is assigned a virtual IP address unique in the context of the virtual community and that will not conflict with any local addresses on its LAN or any public addresses on the Internet."); EX1001, 12:48-50 ("In general, when choosing virtual addresses it is best to choose addresses

10

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

that will not be routable to the member."). To that end, the 785 patent describes this virtual network address in broad terms, adding that it can be a string, or an address compliant with either IPV4 or IPV6 standards. EX1001, 12:40-44 ("Assigning a virtual address to each peer designated by a DNS string solves the problem of ambiguous endpoints ...These virtual addresses may be any legal IPv4 addresses.")

As shown in Figure 7, a new member device wanting to send a message to another device in the VCN "will initiate a DNS request," which is then sent to the VCN Manager 510, as shown in step 654. EX1001, 14:32-34. In response, the "VCN Manager 510 returns the public address of the Route Director for the destination, the private address for the destination device, and a virtual IP address for the destination device," as shown in Step 656. EX1001, 14:34-38.[4] This information is then stored in a table, or any other data structure" for creating a virtual IP packet to be forwarded to the destination address. EX1001, 14:48-15:15. When the destination wishes to respond to the source, or the sources wishes to send additional information, the

---

[4] The 785 specification notes that the three addresses are not always returned, for instance, in the case where "the destination machine has a public address (and, thus does not use a routing director) then step 656 will only include returning the public IP address for the destination." EX1001, 14:40-44.

11

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

process of Figure 7 can be repeated, although the steps of performing the DNS request do not need to be performed again, since the information between the two devices has already been stored by the devices. EX1001, 15:58-67.

### B.     Prosecution History

The application for the 785 patent was filed on March 31, 2003 with a total of 109 claims. During prosecution, the examiner rejected the pending claims numerous times on § 101, 102 and 103 grounds, including based on a number of prior art references. EX1002, 143 (non-final rejection); 203 (final office action); 392 (non-final rejection); 614 (final office action); 687 (rejection).

Of particular relevance to allowance, in an office action dated November 22, 2006, the examiner rejected all claims as anticipated by U.S. Patent Publication No. 2003/0041136 (Cheline). EX1002, 143-162. In response, applicants amended the claims by adding specifically that the network traffic router "uses router data to route traffic between members of the virtual community," and that "a first member of the virtual community communicates with another member in the virtual community by querying the DNS server to determine a virtual network address and a private network address for the other member, and to determine a public address of the network traffic router." EX1002, 172-187.

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

Applicants argued "the client 102(1) of Cheline does not communicate with the DNS server 120 to obtain a virtual network address and private network address of another client, such as client 102(2), or to obtain a public network address of the service provider system 146, which is asserted by the Examiner to be a network traffic router as claimed." EX1002, 190-191.

On September 1, 2010, the examiner issued another office action, stating that then-pending claims 1-15, 17-24, 26-36, 41-43, and 93-109 were allowed, while then-pending claims 53-66 and 68-92 were rejected as anticipated by U.S. Patent No. 6,631,416 (Bendinelli). EX1002, 613-618. The examiner's reasons for allowance stated that "the prior art was not found to teach or suggest returning a public network address of a route director, a private network address for a destination device, and a virtual network address that corresponds to the destination device in response to a DNS request in the context of claims 1, 32, and 93," and that "[s]pecifically, no examples were found in the prior art of record in which both a private address and a virtual address of a destination device would be returned." EX1002, 616-617.

Applicants subsequently filed an amendment on October 21, 2010, revising some of the rejected claims (claims 53-55, 64, and 80) to include a similar DNS request and corresponding response with a triplet of addresses. EX1002, 658-683.

13

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

Following another rejection by the examiner, this time rejecting claims 1-15, 17-24, 26-36, 41-43, and 80-92 as invalid under § 101 while finding that the remaining claims contained allowable subject matter, applicants filed another amendment clarifying that the recited virtual network manager and/or route director are implemented using a memory and a processor of a computing device to traverse the § 101 rejection. EX1002, 687-691. In response, applicants filed an amendment on December 2, 2010, to specify the recited virtual network manager and/or route director are implemented using a memory and processor of a computing device. EX1002, 723-750. A notice of allowance was then issued on January 14, 2011. EX1002, 760-766.

### C.    Person of Ordinary Skill in the Art

The 785 Patent relates to virtual networking. EX1001, Abstract. A person of skill in the art ("POSA") at the time of the claimed invention would have had a bachelor's degree in computer science, computer engineering, or an equivalent degree. A POSA would also have had approximately two years of experience working in the fields of networking including network virtualization, security, and management. Additional experience might substitute for less education and vice versa. EX1004, ¶ 34.

14

Petitioners' independent expert, Dr. Zadok, qualified as POSA as of the earliest priority date, and remains qualified to testify regarding the understanding of a POSA at the time of the claimed invention. EX1004, ¶ 35.

## V.    CLAIM CONSTRUCTION

Claim terms are construed according to the *Phillips* standard in an IPR. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005); 37 C.F.R. § 42.100. However, claim construction is only required where necessary to resolve a dispute. *See, e.g.*, *Toyota Motor Corp. v. Cellport Sys., Inc.*, IPR2015-00633, Paper 11 at 16 (Aug. 14, 2015) (citing *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011)). Petitioners propose the following claim constructions.

### A.    All Claims: "virtual network address"

All of the claims of the 785 patent recite a "virtual network address" that is assigned to a device once it is registered in the virtual network. The 785 patent explains a "virtual network address" is a name or address that can be used to identify and send communications to other devices in the virtual network. *See* EX1001, 6:1-7, 31:24-43.

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

### B. Claim 30, 34, 76: "register module"

Claims 30, 34, 76 recite a "register module"[5] for performing certain functions.

"Module" is a nonce word that substitutes for "means" for purposes of § 112, ¶6.

*See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015) (en

banc).

| | |
|---|---|
| [30.2-30.4] a memory and a processor to implement] a register module configured to register devices in a virtual network, the register module further configured to: receive a registration request from an agent associated with a device; distribute a virtual network address to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by the virtual network | Nonce word for "means" function without recitation of structure to perform it |
| [34] The virtual network manager of claim 30 wherein the register module is further configured to receive the registration request from the agent that is installed on the device for data communication via the virtual network. | |

---

[5] In the litigation, Patent Owner asserts claim 30 and 34 and reads the "registration module" very broadly against commonly and widely used open-source software known as Kubernetes. *See* EX1022 and EX1023 at Claims 30 and 34. Patent Owner contends this term is not a means-plus-function limitation.

16

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

Means-plus-function claims are construed by identifying the claimed function and the corresponding structure in the specification for performing it. *See Williamson*, 792 F.3d at 1351. The chart below provides these constructions.

| Claims | Function | Structure in 785 Specification |
|---|---|---|
| 30 | "receiving registration request from device's agent and distributing a virtual network address to the device when it registers with the virtual network." | "The Registration exchange between the member agent and the VCN Manager is shown in FIG. 12A. When a Member Agent 565 attempts to register at step 1200, Member Agent 565 will send a registration request packet 1202 to the VCN Manager 510 to start registration. The packet is included in an HTTP wrapper as illustrated at 1204. The registration packet will carry the client Fully Qualified Domain Name (FQDN) and a Diffe-Hellman Key Exchange request to the VCN Manager. The packet further includes packet version information, type and length information, a user authenticator, the length of FQDN in octets, a VCN name offset, the member's FQDN in DNS format, the length of Diffe-Hellman value in octets, and the members initial Diffe-Hellman value." EX1001, 18:18-29. |
| 34 | "receiving registration request from the agent installed on device for data communication via the virtual network." | *Id.* |

17

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

### C.    Claims 35-37, 77-78: "join module"

Claims 35-37, 77, and 78 recite a "join module"[6] performing the below described functions. *See Williamson,* 792 F.3d at 1350 ("Module" is a nonce word that substitutes for "means" for purposes of § 112, ¶6.). Claim set 25-37, discussed below, is illustrative.

| | |
|---|---|
| [35] The virtual network manager of claim 30 further comprising a join module configured to receive a join request from the agent associated with the device to indicate that the device is connected for data communication within the virtual network, the join module further configured to receive a leave request from the agent associated with the device to indicate that the device will be disconnected from data communication within the virtual network. | Nonce word for "means" <br><br> function without recitation of structure to perform it |
| [36] The virtual network manager of claim 35 wherein the join module is further configured to provide virtual network addresses to the devices that are registered in the virtual network. | |
| [37] The virtual network manager of claim 35 wherein the join module is further configured to maintain data to associate a virtual network address with a device in the virtual network. | |
| [77] The system of claim 75 wherein the virtual network manager includes a member join module. | |

---

[6] *See* EX1022 and EX1023 at Claims 35-37 for Patent Owner's broad constructions.

18

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

| | |
|---|---|
| [78] The system of claim 77 wherein the member join module provides a virtual network address to a device that is registered as a member of the network. | |

Means-plus-function claims are construed by identifying the claimed function and the corresponding structure in the specification for performing it. *See Williamson*, 792 F.3d at 1351. The chart below provides these constructions.

| Claims | Function | Structure in 785 Specification |
|---|---|---|
| 35 | "receiving join and leave requests from the device or its agent indicating that the device is connected or will be disconnected from data communication, respectively" | The Member Join process is illustrated in FIG. 13 and the leave process in FIG. 14.  Fig. 13 |

19

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

Fig. 14

*See also* EX1001, 20-21 (for description of figures).

| | | |
|---|---|---|
| 36, 78 | "providing virtual network addresses to the devices that are registered in the virtual network" | *Id.* |
| 37 | "maintaining data to associate a virtual network address with a device in the virtual network." | *Id.* |
| 77 | *N/A* | |

20

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

## D.  Other Claims

No express construction of the other challenged claims is necessary in this IPR because the prior art renders these claims obvious under any reasonable construction.[7]

## VI.  PRIOR ART

### A.  Mehta

Mehta, entitled "Method and System for Two-way Initiated Data Communication with Wireless Devices," describes a system designed to enable secure, bi-directional communication between public network devices and wireless devices on private networks. EX1006, Abstract. Mehta discloses an Address Management Proxy System (AMPS) that allocates temporary public IP addresses to wireless devices to facilitate communication across public and private networks without exposing private IP addresses. EX1006, Abstract. Mehta's system,

---

[7] Petitioners do not concede no construction of the claims may ever be necessary or any other claim construction argument. Should any subsequent discussion of claim interpretation arise here or in the parallel district court proceeding, Petitioners reserve the right to propose constructions and respond to any construction advanced by Patent Owner, the Board, and/or the District Court.

21

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

illustrated in Figure 3, includes modified DNS/API servers, Address Proxy/Routers, and an Address Management Data Server to dynamically assign public IP addresses to private network devices as needed. EX1006, [0011].



Fig. 3

Metha's AMPS uses techniques like Time to Live (TTL) for each IP mapping, ensuring temporary mappings that enhance security by automatically expiring connections. EX1006, [0015]. The system manages a pool of public addresses to allocate dynamically, using protocols like TCP/IP and UDP for seamless data exchange. EX1006, [0011], [0024]. AMPS can support various types of networks

22

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

and devices beyond traditional IP networks, including ATM networks and other wireless technologies. Metha addresses the challenge of secure and efficient communication between disparate network types, enhancing connectivity options without compromising network security. EX1006, [0041].

### B.    RFC-1383

*Request For Comment 1383: An Experiment in DNS-Based IP Routing* by Christian Huitema outlines a proposal for utilizing DNS records for IP routing. RFC-1383 seeks to solve the issue of "routing explosion" on the Internet caused by the increasing number of networks, resulting in larger routing tables, more data in route exchanges, and slower responses to routing events. EX1007, 1-2.

RFC-1383 discloses "a scheme that allows for simple routing" that is "complementary with the classic hierarchical routing approach," while providing "an easy to implement and low cost solution for 'multi-homed' domains." EX1007, 2. Specifically, the RFC-1383 solution is described as "a generalization of the 'MX record' scheme used for mail routing." EX1007, 2,

Similar to the aforementioned mail routing model that uses MX records, RFC-1383 introduces "RX records" for routing IP packets by associating domain names with preferred gateways by means of "source routing" or "tunneling," or another form of encapsulation protocol. EX1007, 4. To implement this RX routing, a

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

modified DNS lookup is suggested: the source or an early relay makes the routing decision by querying the DNS for RX records, which list gateways with preference levels. EX1007, 6, 9. This approach avoids hop-by-hop routing updates across the network and is scalable. EX1007, 4.

RFC-1383 describes a network interface integrated with a standard IP router, working alongside a DNS query manager. EX1007, 12-13. When an Internet Control Message Protocol (ICMP) message is received, the query manager updates the local routing table to ensure that any new packets bound for the specified destination are routed through the real-time forwarder. *Id.* Simultaneously, the query manager sends a DNS request to read the RX records for the destination. *Id.* Upon receiving the response, the query manager selects a gateway and provides this information to the real-time forwarder. EX1007, 11-12.

When the real-time forwarder receives a packet, it checks if a gateway for the destination is available. EX1007, 12-13. If so, it inserts the necessary source routing information and forwards the packet—either through the general IP routing program or directly to the network interface linked to the intermediate gateway.  EX1007 12. Notably, RFC-1383 discloses (a) a way to store and return multiple IP addresses in response to a single query, and (b) identify an address of the destination in the

24

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

domain part of the DNS request and response. RFC-1383 proposes using "TXT"

DNS records to store that information:

> This [TXT] record is designed for easy general purpose extensions in
> the DNS, and its content is a text string. Each RX record will contain
> three fields:
>
> - A record identifier, "RX," to distinguish it from other
>   experimental uses of the "TXT" record.
> - A cost indicator, encoded on up to 3 numerical digits.
> - An IP address, encoded as a text string following the 'dot'
>   notation.

EX1007, 11. RFC-1383 shows an example record:

```
|            domain            | type |  record |   value         |
|              -               |  |   |  |   |  |   |           |
|*.27.32.192.in-addr.arpa |  IP  |   TXT   |  RX, 10, 10.0.0.7|
|_____|_____|_____|_____|
```

RFC-1383 explains the table shows: "that [] for all hosts whose IP address

starts by the three octets '192.32.27' the IP host '10.0.0.7' can be used as a gateway,

and that the preference value is 10." EX1007, 12. The TXT records described in

RFC-1383 are simply a domain field containing a destination address, and a string

value comprising comma-delimited fields, including an IP address.

25

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

### C.    Motivation to Combine Mehta and RFC-1383

A POSA would have been motivated to combine Mehta and RFC-1383 for at least the following reasons. As an initial matter, DNS is a foundational Internet technology, so much so that it was one of the very first IETF standards. Work on standardizing domain names began in 1981, with the publication of RFC-799, titled "Internet Name Domains". *See* https://datatracker.ietf.org/doc/html/rfc799; EX1004, ¶233. Several more RFCs ensued and provided extensive detail on DNS. Even the 785 patent recognized the importance and ubiquity of DNS; indeed, it states "[m]ore information about Dynamic DNS can be found in RFC 2136 incorporated herein by reference." EX1001, 5:12-14. Without being able to name computer hosts and address them uniquely, the Internet would not even exist. *See id.*

Similarly, Mehta briefly describes DNS. "In a typical TCP/IP (inter)network, machines are organized according to a naming hierarchy. One such hierarchy is [DNS], which specifies how a particular machine is connected to others. (The term DNS is sometimes used also to identify a server or service that implements the DNS protocol.)" EX1006, [0009]. A POSA would recognize that DNS has been in use and well known for decades prior to the 785 patent's 2003 priority date, and POSA would have sought out additional DNS details on known methods in the various RFCs and textbooks written on the subject. *See* EX1004, ¶235.

26

Mehta also discloses a modified DNS server that serves as a proxy/router for devices on a private network by maintaining a pool of addresses that are dynamically distributed among active devices. "The Address Management Proxy System achieves two way initiated bi-directional communication by implementing a modified DNS server and serving as a proxy/ router for devices on the private wireless network as they interface to the public wired internetworking world. In summary, a pool of public addresses is maintained and dynamically distributed among active wireless devices as needed by the AMPS." EX1006, ¶ [0030]

Mehta also discloses a DNS query that returns (a) the device's unique identifier as the domain part of the DNS query response and (b) a public address associated with the active device. "The DNS' /API servers 302 use the Address Management Data Server 303 to assist in mapping a unique identifier (e.g., string name) for a wireless device to a public address on public network 310." EX1006, ¶[0032] "FIG. 7 is an example flow diagram of an example routine provided by a DNS' /API server of the Address Management Proxy System to return a public address that corresponds to a designated unique identifier." "Specifically, in step 701, the routine determines the private (non-routable) address of the wireless device designated by a string parameter passed as input to the routine. For example, the string parameter may use fields such as "uniqueID.hostname.domain.tld," ... One

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

skilled in the art will recognize that many other string parameter designations could be used." EX1006, ¶[0057].

Mehta also describes details of some of the well-known APIs used to programmatically access DNS systems. For example, "TCP/IP and UDP/IP define tools/libraries for client systems to use to determine an IP address (a logical address on an internet) given a string name of a particular router/machine. One such tool is referred to as a DNS query and includes, for example, an API called 'GetHostByName.' GetHostByName returns an IP address given a string." EX1006, [0009]. Petitioners' expert, Dr. Zadok, also describes personally using these programmable APIs and tools many times. *See* EX1004, ¶238.

A POSA would have also known that DNS queries can return multiple types of resource records and multiple entries per query. One example is returning multiple IP addresses for a single name. *See* EX1004, ¶239. As an example, Mehta discloses a modified DNS server that can change what and how much is returned as a result of a DNS query. "According to one approach, the AMPS provides a modified DNS server that changes what is returned as a result of a call to a standard DNS query function, such as GetHostByName." EX1006, [0013].

Mehta also discloses being able to query information using alternative APIs, not necessarily the standard DNS ones. "In another approach, the AMPS implements

28

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

a specialized API for a device on a public network to use to query for a public address
of a designated wireless device. Using a specialized API implementation in
conjunction with Internet Protocol, the AMPS can map private address to addresses
that comprise only IP addresses, or can map to an (IP address, port) pair. This latter
implementation can extend the usefulness of a particular public address space." *Id.*

A POSA would have appreciated the power that comes with modifying or
extending APIs: new, more versatile functionality can be enabled easily. *See*
EX1004, ¶242.

Mehta further discloses returning the information using eXtended Markup
Language (XML). "In one embodiment, a scripting language interface, such as
XML, can be used instead of a specialized API (code interface) to interface to a
specialized address mapping function. When using XML, the DNS'/API server
accepts API calls as XML post events and returns XML formatted responses. Similar
support for invoking this mapping function using other language models and/or other
programming languages is also contemplated and will operate with techniques of the
present invention. An XML type interface minimizes the cost to a requesting device
of integrating an API into its software." EX1006, [0045]. A POSA would have
known that data formatted as XML can be easily processed and parsed, and can be
used to return an arbitrary number of items of any type. *See* EX1004, ¶243.

29

Mehta organizes all the information it needs into three tables, seen in Figure

6 (reproduced below). These tables list at least four pieces of information that can

be associated with each host: a Unique ID 601, Private Network Address 602, Public

Network Address 631, and Proxy/Router machine 621. *See* EX1006, [0052]-[0056].

Mehta also discloses auxiliary information such as F/U (flag) 632, TTL 633, and

"Other 'connection' data" 634. EX1006, [0054].



Fig. 6

Taking all these into account, a POSA would have recognized that Mehta

(a) discloses a modified DNS server that serves as a proxy/router by maintaining a

pool of addresses that are assigned to active devices, (b) discloses a DNS query

response that contains a device's unique identifier and a public address associated

with the device, and (c) discloses returning multiple pieces of data and (b) offers

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

several methods for returning said data. EX1004, ¶246. In other words, Mehta describes a system that routes IP packets based on information stored in DNS. *Id.*

A POSA implementing Mehta's system would have been motivated to seek out additional forms of returning Mehta's DNS information. EX1004, ¶247. Mehta discloses changing the DNS server implementation to enable new functionality. EX1006, [0030]. Changing DNS code requires access to the DNS source code (which is generally opens source) as well as the ability to modify the code, test it, and deploy it. EX1004, ¶247. A POSA would have looked for ways to implement Mehta's solution with less effort, including by utilizing DNS's existing mechanisms. Therefore, a POSA would have found RFC-1383, titled "An Experiment in DNS Based IP Routing." Just from this RFC's title alone, a POSA would have recognized its similarity and applicability to Mehta, because Mehta effectively routes IP packets based on information stored in DNS. EX1004, ¶248.

POSA would have recognized that RFC-1383 goes into more detail about the modified DNS server by disclosing a way to identify an address of the destination in the domain part of the DNS request and response, and to store and return multiple IP addresses in response to a single query, namely "TXT" DNS records having "three fields: [(1)] A record identifier composed of the two characters 'RX' ... used to disambiguate from other experimental uses of the 'TXT' record [(2) a] cost

31

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

indicator, encoded on up to 3 numerical digits.... [, and (3) a]n IP address, encoded as a text string following the 'dot' notation," as shown below:

| domain | type | record | value |
|---|---|---|---|
| *.27.32.192.in-addr.arpa | IP | TXT | RX, 10, 10.0.0.7 |

EX1007, 11. The table "means for all hosts whose IP address starts by the three octets '192.32.27' the IP host '10.0.0.7' can be used as a gateway, and that the preference value is 10." EX1007, 12.

POSA would have appreciated that the TXT records are just a domain field containing a destination address, and a string value comprising comma-delimited fields, including an IP address. EX1004, ¶253. POSA would have found it trivial to use such TXT records to return any number of comma-delimited IP addresses or values, including any of the DNS information disclosed in Mehta. *Id.* Moreover, POSA would have recognized RFC-1383 suggests using TXT records in very similar ways as claimed by the 785 patent: as a resource record with auxiliary information stored in the TXT records. *See* EX1001, 22:53-57 ("The target member's virtual IP address will be presented using an A-type resource record in the answer section of the normal DNS response packet. All the remaining information will be transferred using a TXT-type resource record in an additional section of the DNS Response."). Parsing data strings in such TXT records using delimiters such as commas is a well-

32

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

known technique often taught to first year computer science students. EX1004, ¶255.

Indeed, as any user who has used a spreadsheet file knows, a "comma-delimited file" is "[a] data file consisting of fields and records, stored as text, in which the fields are separated from each other by commas. Use of comma-delimited files allows communication between database systems that use different formats. If the data in a field contains a comma, the field is further surrounded with quotation marks." EX1004, ¶255.

In sum, given how well-known DNS is, a POSA would have found it easy and desirable to modify Mehta with RFC-1383's TXT record disclosures for routing IP packets using DNS because (a) RFC-1383 provides additional detail about modifications to the DNS server of Mehta that enable multiple addresses to be returned as part of the DNS request and response utilizing standard "TXT" DNS records, and (b) RFC-1383 enhances the unique identifier of Mehta with destination address information by including a destination address in the domain field of the DNS query response. EX1004, ¶256. This obvious change would have been simple and would not have required extensive experimentation or impose undue burden, because DNS is well known, standardized, and widely used. EX1004, ¶257. For the same reasons, the combination would have yielded predictable results. EX1004, ¶257. Lastly, a POSA would have had a high expectation of success because RFC-

33

1383 merely provides details of one form of returning addresses out of several that

Mehta describes. *Id.*

**VII.**  **GROUND 1**: Claims 1-2, 6-12, 22, 25-26, 28-49, 51-55, 60-63, 65-66, 72-80, 82-86, and 82-90 are obvious in view of Mehta alone or with RFC-1383

**A.**  **The Independent Claims**

The six independent claims of the 785 patent (claims 1, 30, 38, 48, 62 and 75)

recite substantially overlapping subject matter. For ease of discussion, Petitioners

address the independent claims together.

These claims generally disclose a virtual network system or manager,

comprising a virtual network with a public domain name, a registration feature or

module to register devices on the network, a route director to route data traffic

between the devices on the network and a DNS server to exchange network

addresses of the devices on the network upon request. These limitations, as shown

further below, would have been obvious to a POSA before the time of filing of the

785 patent, in light of Mehta alone or combined with RFC-1383.

**1.**  **Preamble: Virtual network system or manager**

| Claim | Limitations |
|---|---|
| [1.0, 1.1] | **A virtual network system**, comprising **a virtual network manager** |
| [30.0] | **A virtual network manager**, comprising: |
| [38.0] | **A virtual network system**, comprising: |
| [48.0] | A computer-implemented method, comprising: |

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

| Claim | Limitations |
|---|---|
| [62.0, 62.1] | One or more processor readable storage media devices comprising processor readable code that, if executed by a computer device, implements **a virtual network manager** |
| [75.0] | **A virtual network system**, comprising: |

To the extent the preambles are limiting,[8] Mehta discloses an Address Management Proxy System ("AMPS") illustrated in Figure 2, which is a virtual network system designed to manage communications between "a device on a private network [initiated] from a device on a public network to achieve virtual end-to-end connectivity." EX1006, [002], claim 67. *See also* EX1004, ¶178-180.

---

[8] The 785 patent explains that "[t]he VCN Manager 510 is a central server or server cluster providing management, connection, and security services for the VCN." EX1001, 10:66-11:1. *See also* EX1004, ¶179.

35

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201



Fig. 2

### 2.   "A virtual network defined by a domain name"

| Claim | Limitations |
|---|---|
| [1.2] | **the virtual network manager configured to register** devices[9] **in a virtual network that is defined by a domain name** |
| [30.1] | a network interface[10] configured for data communication via **a virtual network that is defined by a domain name having an associated public network address** |

---

[9] POSA would know any system that purports to connect to a computer network includes devices. EX1006, [0033], [0055]; EX1004, ¶181.

[10] Mehta discloses "[e]ach proxy/router machine has a preconfigured set of public network addresses, such as are typically configured by *network cards*

36

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

| Claim | Limitations |
|-------|-------------|
| [38.1] | **a network manager of a virtual network that is defined by a public domain name** |
| [48.2] | **a virtual network that is defined by a domain name having an associated public network address in a public network** |
| [62.2] | **a virtual network that is defined by a domain name having an associated public network address in a public network** |
| [75.1] | a network interface coupled to a virtual network, **the virtual network manager including at least one virtual community definition that is defined by a domain name having an associated public network address** |

Mehta discloses the AMPS (virtual network system/manager) enables "devices and systems connected to a public internet ... to initiate communication with and to send data to [] devices connected to a private [] network." EX1006, [0024]. Mehta also discloses the AMPS virtual network community is defined by "public network address[es]" (*see, e.g.,* EX1006, claims 1, 5) that have an associated public domain name, including because Mehta has a DNS or domain name server for the public domain name that returns public IP addresses for associated private devices. *Id.* [0012] ("the AMPS comprises one or more modified DNS'/API servers ... [that] receives a request from a device on a public network for a particular [private network] device, and returns an appropriate temporary public address, which is

---

[network interface] inserted into the proxy/router machine." EX1006, [0055], Figs. 1-2; EX1004, ¶181.

37

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

internally mapped to the private address of the [private network] device"), [0057] (request for the private network device corresponding to "'uniqueID.hostname.domain.tld,' which specifies a typical hierarchy of person/service on a machine named 'hostname' on a domain such as a company's network on a top level domain such as 'org.' 'com,' 'edu,' etc."); *see also* [0048], Fig. 7. *See also* EX1004, ¶181-182.

### 3. Registration/distribution of virtual network address to each device which uniquely identifies the device

| Claim | Limitations |
|---|---|
| [1.2] | **the virtual network manager configured to register devices** in a virtual network that is defined by a domain name, **each device in the virtual network being identified to the other devices by a virtual network address that is unique for each device** and not directly routable via a public network,[11] the virtual network manager further |

---

[11] The '785 patent describes the virtual network address in broad terms, adding that it can be any address compliant with the IPv4 standard, provided that it "will not be routable to the member." EX1001, 12:40-44 ("These virtual addresses may be any legal IPv4 addresses."); *Id.* 12:48-50 ("In general, when choosing virtual addresses it is best to choose addresses that will not be routable to the member."). Any POSA would understand "not directly routable via a public network" to mean not directly routable via a public network **to the member**, because an address that

38

| Claim | Limitations |
|---|---|
| | configured to distribute a virtual network address to a device when the device is registered in the virtual network; |
| [30.2-30.4] | [a memory and a processor to implement] a register module configured **to register devices in a virtual network**, the register module further configured to: receive a registration request from an agent[12] associated with a device; distribute a **virtual network** |

is routable in the abstract is not necessarily directly routable with respect to a specific device. The temporary public addresses that Mehta discloses are from a pre-assigned pool of public addresses that are dynamically allocated to devices as required, and unusable when not allocated. EX1006, Abstract, ("[A] pool of public addresses, for example, public IP addresses, is maintained by the AMPS and allocated dynamically to [] network devices as required."); EX1006, [0056] ("...returning the associated public address to the pool of unused public network addresses."); *Id.* [0015] ("To insure a greater degree of security, according to one embodiment, the AMPS maintains a Time to Live (TTL) parameter with each address mapping. In this way, once the TTL value indicates that the mapping has expired, the AMPS can destroy the mapping, and also any connection."). Any POSA would understand that unused public network addresses are not directly routable to any destination device.

[12] Mehta discloses a proxy or agent of the device (client programs or specialized API) that communicate with the AMPS on behalf of the device when the

39

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

| Claim | Limitations |
|-------|-------------|
|  | **address** to the device when the device is registered in the virtual network, **the device being identified to other devices in the virtual network by the virtual network address**; |
| [38.2-38.3] | the network manager configured to distribute virtual network addresses to devices that register as members in the virtual network, **each device in the virtual network being identified to the other devices by a virtual network address** associated with the device; |
| [48.1-48.2] | **receiving registration requests from devices that request to be registered as members of a virtual network** that is defined by a domain name having an associated public network address in a public network, each of the devices having an associated private network address; distributing a virtual network address to a device to register the device as a member in the virtual network, **each device in the virtual network being identified to the other devices by the virtual network address** that is associated with the device; |
| [62.1-62.2] | **receive registration requests from devices that request to be registered** as members of a virtual network that is defined by a domain name having an associated public network address in a public network, each of the devices having an associated private network address; distribute a virtual network address to a device to register the device as a member in the virtual network, **each device in the virtual network being identified to the other devices by the virtual network address** that is associated with the device; |
| [75.3] | a user set of one or more devices that are **registered** in the virtual network, **each device in the virtual network being identified to the other devices by a virtual network address** that is associated with the device. |

device needs to register with the virtual network. EX1006, [0025]. *See also* EX1006,

[0034].

40

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

Mehta discloses that AMPS "dynamically allocates, using methods similar to a DHCP protocol, a private [] network address when the [private network] device registers itself with the [network] infrastructure upon being powered on" that uniquely identifies the device. EX1006, [0053]. "Thus, the unique ID table 610 may be sparsely filled or entries created dynamically and then deleted dynamically as devices register and unregister with the [network] infrastructure system." *Id.*; *see also* Fig. 3 (showing the Address Management Data Server 303 and Address Management Data Repository 304 where registration information for each device is stored).



Fig. 3

Mehta also discloses "a pool of public addresses, for example, public IP addresses, is maintained and allocated dynamically to [] network devices as required." EX1006, [0039]. For example, AMPS "comprises...one or more Address Proxy/Routers" that "uses the Address Management Data Server 303 or equivalent to create and update a series of routing tables that are used to assign public addresses [virtual network addresses] to [] devices as needed and to update the various mappings between public addresses and the non-routable (private) addresses of the wireless devices." EX1006, [0032].

42

Petition for IPR of U.S. Patent No. 7,949,785
IPR2025-00201

Mehta does not disclose the public network address being distributed when the device is registered. However Mehta does disclose that the public network address may already have been assigned at the time the DNS/API server of the AMPS returns a public address in response to a DNS query. "If a public network address has not already been assigned or is not valid, then the routine causes a new public network address to be allocated and that new public address is associated with the private wireless network address." EX1006, [0057]. It would be obvious to a POSA that the public network address could be allocated at the time the device is registered. *See also* EX1004, ¶183-184.

43